**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

|  |  |  |
|---|---|---|
| **JERICHO GROUP, LTD.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **No. 07-CV-1792 (RCC) (DCF)** |
| **- against -** | : | |
| | : | **ECF CASE** |
| | : | |
| **MIDTOWN DEVELOPMENT, L.P., EDWARD** | : | |
| **IMPERATORE and MAURICE STONE,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

----------------------------------------------------------------X

<u>**ANSWER AND AFFIRMATIVE DEFENSES**</u>

Defendants, Midtown Development, L.P. ("Midtown"), Edward Imperatore and

Maurice Stone, for their answer to Plaintiff's Verified Complaint, state as follows:

1.       Admit the allegations of paragraph 1.

2.       Admit that Midtown is partnership organized under the laws of New York

and deny the remaining allegations of paragraph 2.

3.       Deny the allegations of paragraph 3.

4.       Admit the allegations of paragraph 4, but deny any inference that Midtown

is obligated to sell to plaintiff, Jericho Group, Ltd. ("Jericho"), the two referenced parcels

of real estate.

5.       Admit the allegations of paragraph 5, but deny any inference that Midtown

is obligated to sell to Jericho the two referenced parcels of real estate.

6.      Deny the allegations of paragraph 6.

7.      Admit the allegations of paragraph 7.

8.      Admit that the Contract is dated June 18, 2002 and otherwise refer to the

Contract for a fair, accurate, and complete statement of its contents.[1]

9.      Deny the allegations of paragraph 9 to the extent they imply that Midtown

made any unspecified representations or warranties regarding the Property and refer to

the Contract for a fair, accurate, and complete statement of its contents.

10.     Admit that the parties structured the transaction as an "as is" sale and

purchase transaction; admit that the Contract provided Jericho with a 75-day "Study

Period"; admit that Plaintiff paid a deposit of $250,000; otherwise deny the allegations of

paragraph 10; and refer to the Contract for a fair, accurate, and complete statement of its

contents.

11.     Deny any inference that may arise from the phrase "in this regard" in

paragraph 11; admit that the allegations of paragraph 11 appear to selectively quote from

Paragraphs 29(a) and (c) of the Contract and refer to the Contract for a fair, accurate, and

complete statement of its contents.

12.     Admit that the allegations of paragraph 12 appear to selectively quote

from Paragraph 30(b)(iii) of the Contract; refer to the Contract for a fair, accurate, and

complete statement of its contents; and deny that paragraph 30(b)(iii) was the only

exception to Paragraph 30(b) of the Contract.

---

[1] Jericho's Complaint selectively quotes from and makes allegations about the Contract, and thereby
incorporates the Complaint by reference, but does not actually attach a copy of the Contract.  A true and
correct copy of the June 18, 2002 Contract between Midtown Development, L.P. and Jericho Group, Ltd. is
attached hereto as Exhibit A.

13.    Admit that a copy of an Amtrak Agreement was attached to the Contract; admit that the copy of the Amtrak Agreement attached to the Contract made reference to "preparation of exhibits"; admit that no Exhibits were attached to that copy of the Amtrak Agreement; and otherwise deny the allegations of paragraph 13.

14.    Admit that the allegations of paragraph 14 appear to selectively quote from Paragraph 33 of the Contract and refer to the Contract for a fair, accurate, and complete statement of its contents.

15.    Admit that Mr. Imperatore and Mr. Stone represented Midtown in the negotiation of the Contract and otherwise deny the allegations of paragraph 15.

16.    Admit that the allegations of paragraph 16 appear to selectively quote from a letter written by Mr. Stone, dated June 19, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 16.

17.    Deny the allegations of paragraph 17 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

18.    Deny the allegations of paragraph 18 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

19.    Deny the allegations of paragraph 19 for lack of knowledge or information sufficient to form a belief as to the truth thereof .

20.    Admit that the allegations of paragraph 20 purport to describe the contents of a letter written by Jericho, dated July 17, 2002; refer to that letter itself for a fair,

accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 20.

21.    Admit that the allegations of paragraph 21 purport to describe the contents of a letter written by Jericho, dated July 17, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 21.

22.    Admit that the allegations of paragraph 22 purport to describe the contents of a letter written by Jericho, dated August 1, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 22.

23.    Admit that the allegations of paragraph 23 appear to selectively quote the contents of a letter written by Mr. Imperatore, dated August 2, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 23.

24.    Admit that the allegations of paragraph 24 purport to describe the contents of a letter written by Mr. Imperatore, dated August 2, 2002, and refer to that letter itself for a fair, accurate, and complete statement of its contents.

25.    Deny that Jericho was "delayed" in starting a "meaningful due diligence analysis" and otherwise deny the allegations of paragraph 25 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

26.     Admit that the allegations of paragraph 26 appear to selectively quote the contents of a letter written by Jericho, dated August 13, 2002, and refer to that letter itself for a fair, accurate, and complete statement of its contents.

27.     Admit that the allegations of paragraph 27 appear to selectively quote the contents of a letter written by Mr. Stone, dated August 14, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 27.

28.     Deny the allegations of paragraph 28.

29.     Deny the allegations of paragraph 29.

30.     Deny the allegations of paragraph 30 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

31.     Deny the allegations of paragraph 31 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

32.     Admit that the allegations of paragraph 32 appear to selectively quote the contents of an e-mail written by Mr. Imperatore, dated August 22, 2002, and refer to that e-mail itself for a fair, accurate, and complete statement of its contents.

33.     Admit that the referenced message was transmitted from Elaine Emmet to Benjamin Shafran on or about August 23, 2002; deny that Benjamin Shafran is a "Midtown broker"; and otherwise deny the allegations of paragraph 33 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

34.     Deny the allegations of paragraph 34.

35.     Admit that the allegations of paragraph 35 appear to selectively quote the contents of a letter written by Jericho, dated August 30, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 35.

36.     Admit that the allegations of paragraph 36 appear to selectively quote the contents of a letter written by Jericho, dated August 30, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 36.

37.     Deny the allegations of paragraph 37.

38.     Deny that Benjamin Shafran is a "Midtown broker" and otherwise deny the allegations of paragraph 38 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

39.     Deny the allegations of paragraph 39 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

40.     Admit that the allegations of paragraph 40 purport to describe the contents of a letter written by Jericho, dated September 2, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 40.

41.     Admit that the allegations of paragraph 41 appear to selectively quote the contents of a letter written by Imperatore, dated September 3, 2002, and refer to that letter itself for a fair, accurate, and complete statement of its contents.

42.     Admit that the allegations of paragraph 42 appear to selectively quote the contents of letter written by Jericho, dated September 2, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 42.

43.     Admit that the allegations of paragraph 43 appear to selectively quote the contents of a letter written by Imperatore, dated September 3, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 43.

44.     Deny the allegations of paragraph 44.

45.     Deny the allegations of paragraph 45.

46.     Admit that paragraph 46 purports to describe the contents of a letter by Mr. Imperatore, dated September 3, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 46.

47.     Admit that the allegations of paragraph 47 appear to selectively quote and purport to describe the contents of a letter written by Imperatore, dated September 3, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 47.

48.     Admit that the allegations of paragraph 48 appear to selectively quote the contents of a letter written by Jericho, dated September 2, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 48 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

49.     Admit that the allegations of paragraph 49 appear to selectively quote the contents of a letter written by Jericho, dated September 3, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 49.

50.     Deny the allegations of paragraph 50.

51.     Admit that the allegations of paragraph 51 appear to selectively quote the contents of a letter written by Midtown, dated September 4, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 51.

52.     Admit that the allegations of paragraph 52 purport to describe the contents of a letter written by Midtown, dated September 4, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 52.

53.     Admit that the allegations of paragraph 53 purport to describe the contents of a letter written by Jericho, dated September 4, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 53.

54.     Admit that the allegations of paragraph 54 appear to selectively quote the contents of a letter written by Jericho, dated September 4, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 54.

55.    Admit that the allegations of paragraph 55 purport to describe the contents of letters written by Mr. Stone, dated September 5, 2002 and September 10, 2002; refer to those letters for a fair, accurate, and complete statement of their contents; and otherwise deny the allegations of paragraph 55.

56.    Admit that the allegations of paragraph 56 appear to selectively quote the contents of a letter written by Jericho, dated September 12, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 56.

57.    Deny the allegations of paragraph 57.

58.    Deny the allegations of paragraph 58.

59.    Deny the allegations of paragraph 59.

60.    Admit that the allegations of paragraph 60 appear to selectively quote from Paragraph 42 of the Contract; refer to the Contract itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 60.

61.    Admit that the allegations of paragraph 61 appear to selectively quote from Paragraph 44 of the Contract; refer to the Contract itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 60.

62.    Deny the allegations of paragraph 62.

63.    Admit that the allegations of paragraph 63 appear to selectively quote and purport to describe the contents of a letter written by Shulem Pfeiffer, dated September 18, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 63.

64.    Admit that, on or around September 24, 2002, Jericho was permitted by the New York Department of Environmental Protection to review materials regarding the oil spill and otherwise deny the allegations of paragraph 64 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

65.    Admit that the allegations of paragraph 65 purport to describe the contents of a letter written by Shulem Pfeiffer, dated October 18, 2002; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 65.

66.    Admit that the allegations of paragraph 66 appear to selectively describe the contents of letters written by Shulem Pfeiffer, dated January 5, 2004, January 23, 2004, and February 16, 2004; refer to those letters themselves for a fair, accurate, and complete statement of their contents; and otherwise deny the allegations of paragraph 66.

67.    Admit that the Contract provided for a closing 15 days after the end of the Study Period; refer to the Contract itself for a fair, accurate, and complete statement of its contents; and deny any inference from paragraph 47 that Midtown was obligated to give notice to close on a cancelled contract.

68.    Admit that Jericho commenced an action in the Supreme Court of the State of New York, New York County, under Index No. 113274/04, and otherwise deny the allegations of paragraph 68.

69.    Admit that Midtown moved to dismiss Jericho's complaint under CPLR 3211(a)(1) and (a)(7) and admit that the Supreme Court of the State of New York, New York County, denied Midtown's motion.

70.    Admit that Midtown appealed the decision to the Supreme Court of the State of New York, Appellate Division, First Department; admit that the First Department unanimously reversed the lower court's order, with costs to Midtown; admit that the allegations of paragraph 70 appear to selectively quote from the First Department's decision; hereby incorporate that decision by reference; and refer to First Department's decision itself for a fair, accurate, and complete statement of its contents.

71.    Admit that discovery proceeded during the pendency of Midtown's appeal to the Appellate Division, First Department, and otherwise deny the allegations of paragraph 71.

72.    Deny the allegations of paragraph 72.

73.    Admit that the Office of the Clerk for the Supreme Court, State of New York, entered a judgment of dismissal at the express direction of the Appellate Division, First Department; admit that Jericho moved in the Supreme Court to vacate the judgment; and otherwise deny the allegations of paragraph 73.

74.    Admit that the Supreme Court granted Jericho's motion to vacate the judgment; admit that the Supreme Court's decision was dated February 2, 2007 and filed February 20, 2007; and refer to that decision itself for a fair, accurate, and complete statement of its contents.

75.    Admit that the Supreme Court stated that Jericho is "welcome" to "file a new Complaint in a new action"; deny any inference that such an unsolicited invitation to re-file an already dismissed case is lawful, proper, or in any way permitted by the Appellate Division's final order dismissing Jericho's complaint; and otherwise deny the

allegations of paragraph 75 for lack of knowledge or information as to how or why this new action came to be filed.

76.    Deny the allegations of paragraph 76.

77.    Admit that the allegations of paragraph 77 appear to selectively quote from and purport to describe the contents of a letter written by Mr. Stone, dated April 9, 2001; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 77.

78.    Admit that the allegations of paragraph 78 purport to describe the contents of a letter written by Mr. Stone, dated April 11, 2001; refer to that letter itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 78.

79.    Admit that Midtown produced documents during the prior action in a timely fashion in response to Jericho's request for production of documents; admit that Midtown produced documents to Jericho in the prior action that Midtown had obtained from the DEC; aver that the complaint does not make clear what "approximately 100 pages of documentation" it is referring to in paragraph 79; and otherwise deny the allegations of paragraph 79 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

80.    Deny the allegations of paragraph 80 for lack of knowledge or information sufficient to form a belief as to the truth thereof.

81.    Deny the allegations of paragraph 81.

82.    Admit that paragraph 82 purports to describe the contents of a letter from Mr. Stone, dated April 9, 2001, and an e-mail message from Mr. Imperatore, dated August 22, 2002; refer to the contents of those writings for a fair, accurate, and complete statement of their contents; and otherwise deny the allegations of paragraph 82.

83.    Deny the allegations of paragraph 83.

84.    Deny the allegations of paragraph 84.

85.    Deny the allegations of paragraph 85.

86.    Deny the allegations of paragraph 86.

87.    Deny the allegations of paragraph 87.

88.    Deny the allegations of paragraph 88.

89.    Admit that Midtown produced documents during the prior action in a timely fashion in response to Jericho's request for production of documents; admit that Midtown produced, among other documents, copies of photographs; aver that the complaint does not make clear what "34 pages of copies of photographs" it is referring to in paragraph 89; and otherwise deny the allegations of paragraph 89.

90.    Deny the allegations of paragraph 90.

91.    Refer to the referenced documents for a fair, accurate, and complete statement of their contents and otherwise deny the allegations of paragraph 91.

92.    Admit that the June 2006 Affirmation of Mr. Imperatore was submitted in support of a motion for summary judgment by Midtown, which was denied as moot in light of the Appellate Division's Final Order dismissing Jericho's complaint; admit that

Midtown asserted, truthfully, in its memorandum of law in support of that motion that there is no evidence that the Exhibits to the Amtrak Agreement have ever existed; refer to Mr. Imperatore's affirmation and Midtown's memorandum of law for a fair, accurate, and complete statement of their contents.

93.     Deny the allegations of paragraph 93.

94.     Deny the allegations of paragraph 94.

95.     Deny the allegations of paragraph 95.

96.     Deny the allegations of paragraph 96.

97.     Deny the allegations of paragraph 97.

98.     Deny the allegations of paragraph 98.

99.     Deny the allegations of paragraph 99.

100.    Deny the allegations of paragraph 100.

101.    Deny the allegations of paragraph 101.

102.    Admit that the allegations of paragraph 102 appear to selectively quote Paragraph 24 of Mr. Imperatore's Affirmation, dated January 6, 2005, and refer to that affirmation itself for a fair, accurate, and complete statement of its contents.

103.    Deny the allegations of paragraph 103.

104.    Admit that the allegations of paragraph 104 appear to selectively quote Paragraph 27 of Mr. Imperatore's Affirmation, dated January 6, 2005; refer to that affirmation itself for a fair, accurate, and complete statement of its contents; and otherwise deny the allegations of paragraph 104.

105.    Admit that the allegations of paragraph 105 appear to selectively quote from the transcript of the oral argument on Midtown's motion to dismiss the prior action and refer to that transcript itself for a fair, accurate, and complete statement of the contents of the transcript.

106.    Deny the allegations of paragraph 106 and refer to the Appellate Decision's Final Order for a fair, accurate, and complete statement of its contents.

107.    Deny the allegations of paragraph 107.

108.    Deny the allegations of paragraph 108 and refer to the Appellate Decision's Final Order for a fair, accurate, and complete statement of its contents.

109.    Deny the allegations of paragraph 109.

110.    Deny the allegations of paragraph 110.

111.    Deny the allegations of paragraph 111.

112.    Deny the allegations of paragraph 112.

113.    Deny the allegations of paragraph 113.

114.    Deny the allegations of paragraph 114.

115.    In response to the allegations set forth in paragraph 115, Midtown repeats and realleges its responses contained in Paragraphs 1 through 114 as if fully set forth herein.

116.    Deny the allegations of paragraph 116.

117.    Deny the allegations of paragraph 117.

118.    Deny the allegations of paragraph 118.

119.    Deny the allegations of paragraph 119.

120.    Deny the allegations of paragraph 120.

121.    Deny the allegations of paragraph 121.

122.    Deny the allegations of paragraph 122.

123.    Deny the allegations of paragraph 123.

124.    Deny the allegations of paragraph 124.

125.    Deny the allegations of paragraph 125.

126.    Deny the allegations of paragraph 126.

127.    Deny the allegations of paragraph 127.

128.    In response to the allegations set forth in paragraph 128, Midtown repeats and realleges its responses contained in Paragraphs 1 through 127 as if fully set forth herein.

129.    Deny the allegations of paragraph 129.

130.    Deny the allegations of paragraph 130.

131.    Deny the allegations of paragraph 131.

132.    In response to the allegations set forth in paragraph 132, Midtown repeats and realleges its responses contained in Paragraphs 1 through 131 as if fully set forth herein.

133.    Deny the allegations of paragraph 133.

134.    Deny the allegations of paragraph 134.

135.    Deny the allegations of paragraph 135 and refer to the Appellate Division's Final Order for a fair, accurate, and complete statement of its contents.

136.    Deny the allegations of paragraph 136.

137.    Deny the allegations of paragraph 137.

138.    Deny the allegations of paragraph 138.

139.    Deny the allegations of paragraph 139.

140.    In response to the allegations set forth in paragraph 140, Midtown repeats and realleges its responses contained in Paragraphs 1 through 139 as if fully set forth herein.

141.    Deny the allegations of paragraph 141.

142.    Deny the allegations of paragraph 142.

143.    Admit that Midtown did not agree with Jericho to extend the Study Period and refer to the Appellate Division's final order for a description of the parties' correspondence on this issue and the Appellate Division's grounds for dismissing Jericho's causes of action based on assertions that it was entitled to an extension of the Study Period.

144.    Deny the allegations of paragraph 144.

145.    Deny the allegations of paragraph 145.

146.    Deny the allegations of paragraph 146.

147.    Deny the allegations of paragraph 147.

148.    In response to the allegations set forth in paragraph 148, Midtown repeats and realleges its responses contained in Paragraphs 1 through 147 as if fully set forth herein.

149.    Deny the allegations of paragraph 149.

150.    Deny the allegations of paragraph 150.

151.    Deny the allegations of paragraph 151.

152.    Deny the allegations of paragraph 152.

153.    Deny the allegations of paragraph 153.

154.    In response to the allegations set forth in paragraph 154, Midtown repeats and realleges its responses contained in Paragraphs 1 through 153 as if fully set forth herein.

155.    Deny the allegations and inferences Jericho seeks to draw in paragraph 155 and refer to the Contract for a fair, accurate, and complete description of its contents.

156.    Deny the allegations of paragraph 156.

157.    Deny the allegations of paragraph 157.

158.    Deny the allegations of paragraph 158.

159.    Deny the allegations of paragraph 159.

160.    Deny the allegations of paragraph 160.

161.    In response to the allegations set forth in paragraph 161, Midtown repeats and realleges its responses contained in Paragraphs 1 through 160 as if fully set forth herein.

162.    Deny the allegations of paragraph 162.

163.    Deny each and every allegation of the complaint that is not expressly admitted in this answer.

164.    Deny that plaintiff is entitled to any of the relief requested in the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

165.    Plaintiff's claims are barred by the doctrines of res judicata, collateral estoppel, and related preclusion doctrines, by the final order of the Supreme Court of the State of New York, Appellate Division, First Department, in *Jericho Group, Ltd. v. Midtown Development, L.P.*, 32 A.D.3d 294, 820 N.Y.S.2d 241 (1st Dep't 2006).

### SECOND DEFENSE

166.    The complaint fails to state a claim on which relief may be granted.

### THIRD DEFENSE

167.    Plaintiff's claims are barred by the doctrine of abandonment.

### FOURTH DEFENSE

168.    Plaintiff's claims are barred by the doctrine of election of remedies, Plaintiff having elected to cancel the Contract and accept the return of its down payment.

### FIFTH DEFENSE

169.    Plaintiff's claims are barred by the doctrine of accord and satisfaction.

### SIXTH DEFENSE

170.    Plaintiff has waived any rights that it had under the Contract.

## SEVENTH DEFENSE

171.     Plaintiff is estopped from asserting claims for breach, specific

performance, or fraud in connection with the performance of the Contract.

## EIGHTH DEFENSE

172.     Plaintiff is judicially estopped from denying that it cancelled the Contract.

## NINTH DEFENSE

173.     Specific performance is not available on a cancelled contract for the sale

of real estate.

## TENTH DEFENSE

174.     Plaintiff's claims for specific performance are barred by the doctrine of

laches.

## ELEVENTH DEFENSE

175.     Plaintiff's claims for specific performance are barred by the doctrine of

unclean hands.

## TWELFTH DEFENSE

176.     Plaintiff's claims for fraud are barred by the Contract and express

disclaimers of reliance in the Contract.

**WHEREFORE**, defendants Midtown Development, L.P., Edward Imperatore, and Maurice Stone pray for a final judgment as follows:

(1)    that plaintiff take nothing by virtue of its Complaint herein and that this action be dismissed in its entirety with prejudice; and

(2)    for an order awarding attorney's fees and costs to Midtown; and

(3)    for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       March 1, 2007

                                        JONES DAY
                                        222 East 41st Street
                                        New York, New York  10017
                                        Telephone:  (212) 326-3939

                                        By:    / s /  Todd R. Geremia
                                             Fredrick E. Sherman (FS 5442)
                                             Todd R. Geremia  (TG 4454)

                                                     —and—

                                        PHILLIPS NIZER LLP
                                        Alfred D. Lerner (AL 5927)
                                        George Berger (GB 8924)
                                        666 Fifth Avenue
                                        New York, New York  10103-0084
                                        Telephone:  (212) 977-9700

                                        Attorneys for Defendants,
                                        Midtown Development, L.P., Edward
                                        Imperatore, and Maurice Stone

## **CERTIFICATE OF SERVICE**

I certify that on March 1, 2007, I caused the foregoing ANSWER AND

AFFIRMATIVE DEFENSES to be served by First Class U.S. mail to the following

counsel for plaintiff:

> Herbert Rubin
> HERZFELD & RUBIN, P.C.
> 40 Wall Street
> New York, New York  10005
>
> *Attorneys for Plaintiff,*
> *Jericho Group, Ltd.*

Dated: New York, New York
      March 1, 2007

                                                 ____/ s / Todd R. Geremia_____
                                                        Todd R. Geremia

.2002   3:54PM   NEW YORK                                    NO.918   P.1

'ntract of Sale 6-20-75 (NYBTU 8041)

.LT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT-THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

**NOTE: FIRE LOSSES.** This form of contract contains no express provisions as to risk of loss by fire or other casualty before delivery of the deed. Unless express provision is made, the provisions of Section 5-1311 of the General Obligations Law will apply. This section also placed risk of loss upon purchaser if title or possession is transferred prior to closing.

**THIS AGREEMENT,** made the _18_ day of June          , in the year two thousand two
BETWEEN

> MIDTOWN DEVELOPMENT, L.P., a New York limited partnership
> with an office at 40 Arcorp Properties, Pershing Road,
> Weehawken, New Jersey

hereinafter described as the seller, and Jericho Group, Ltd., a New York corporation as nominee for a limited liability company to be hereafter formed, with offices c/o
S~z~e~g~d~a~x~6~x~G~a~r~b~i~n~g~x~a~t~x~3~9~0~x~E~a~s~t~x~4~2~n~d~x~S~t~r~e~e~t~x~x~N~e~w~x~Y~o~r~k~x~x~N~e~w~x~Y~o~r~k~x~x~1~0~0~1~7~
Wasserman Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, New York 11211

hereinafter described as the purchaser,

**WITNESSETH,** that the seller agrees to sell and covey, and the purchaser agrees to purchase,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being
in the     See schedule A annexed hereto, being Lot 1 in Block 708 and Lot 17 in
 Block 709.

> The Property is located between 36th and 37th Streets and
> 11th Avenue, New York, New York and between 37th and 38th
> Streets and 11th Avenue, New York, New York and is more
> particularly described by the legal descriptions set forth
> in Exhibit A hereto.

> The development of the Property is and will be subject to
> and in conformance with any requirements and restrictions
> imposed by any governmental entity (the "Zoning Requirements")
> and the Property is subject to certain easements and rights
> in favor of the National Railroad Passenger Corporation
> ("Amtrak").

MID 00053

1. .·'    This sale includes all right, title and interest, if any, of the seller in and to any land lying in the bed of any street, road or avenue opened or proposed, in front of or adjoining said premises, to the center line thereof, and all right, title and interest of the seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to said premises by reason of change of grade of any street; and the seller will execute and deliver to the purchaser, on closing of title, or thereafter, on demand, all proper instruments for the conveyance of such title and the assignment and collection of any such reward.

2.        The price is twenty-eight million ($28,000,000)                              Dollars,
payable as follows:

· See Rider paragraph 28.

                                                                                      Dollars,

~on the signing of this contract, by check subject to collection, the receipt of which is hereby acknowledged:~

                                                                                      Dollars,

in cash or good certified check to the order of the seller on the delivery of the deed as hereinafter provided:

                                                                                      Dollars,

by taking title subject to a               mortgage now a lien on said premises in that amount, bearing interest
at the rate of               per cent per annum, the principal being due and payable

                                                                                      Dollars,

by the purchaser or assigns executing, acknowledging and delivering to the seller a bond or, at the option of the seller, a note
secured by a purchase money               mortgage on the above premises, in that amount, payable

                               together with interest at the rate of _____ per cent per annum

~payable~

APR.24.2002   3:54PM   NEW YORK                                    NO.918   P.2

~~3.      Any bond or note and mortgage to be given hereunder shall be drawn on the standard forms of New York Board~~
of Title Underwriters for mortgages of like lien; and shall be drawn by the attorney for the seller at the expense of the
purchaser, who shall also pay the mortgage recording tax and recording fees.

4.      If such purchase money mortgage is to be a subordinate mortgage on the premises it shall provide that it shall be
subject and subordinate to the lien  of the existing                    mortgage   of $
any extensions thereof said to any mortgage   or consolidated mortgage   which may be placed on the premises in lieu
thereof, and to any extensions thereof provided (a) that the interest rate thereof shall not be greater than      per cent per
annum and (b) that, if the principal amount thereof shall exceed the amount of principal owing and unpaid on said existing
mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such
purchase money mortgage in reduction of the principal thereof. Such purchase money mortgage shall also provide that such
payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and
shall further provide that the holder thereof will, on demand and without charge therefor, execute, acknowledge and deliver
~~any agreement or agreements further to effectuate such subordination.~~

5.      If there be a mortgage on the premises the seller agrees to deliver to the purchaser at the time of delivery of the deed
a proper certificate executed and acknowledged by the holder of such mortgage and in form for recording, certifying as to
the amount of the unpaid principal and interest thereon, date of maturity thereof and rate of interest thereon, and the seller
shall pay the fees for recording such certificate. Should the mortgagee be a bank or other institution as defined n Section
274-a, Real Property Law, the mortgagee may, in lieu of the said certificate, furnish a letter signed by a duly authorized
officer, or employee, or agent, containing the information required to be set forth in said certificate. Seller represents that
such mortgage will not be in default at or as a result of the delivery of the deed hereunder and that neither said mortgage,
nor any modification thereof contains any provision to accelerate payment, or to change any of the other terms or provisions
thereof by reason of the delivery of the deed hereunder.

6.      Said premises are sold and are to be conveyed subject to:

    a.      Zoning regulations and ordinances of the city, town or village in which the premises lie which are not
            violated by existing structures.

    b.      Consents by the seller or any former owner of premises for the erection of any structure or structures on,
            under or above any street or streets on which said premises may abut.

    c.      Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway.

    d.      Certain rights and easements in favor of Amtrak.
            See also Paragrph 30 of the Rider.

                                                        MID 00054

~~7.      All notes or notices of violations of law or municipal ordinances orders or requirements noted in or issued by the~~
Departments of Housing and Buildings, Fire, Labor, Health, or other State or Municipal ~~Department~~ having jurisdiction,
against or affecting the premises at the date hereof, ~~shall be complied with~~ by the seller and the premises shall be conveyed
free of the same, and ~~this provision of this contract shall survive delivery of the deed hereunder. The seller shall furnish the~~
~~purchaser with an authorization to make the necessary searches therefor.~~

8.      All obligations affecting the premises incurred under the Emergency Repairs provisions of the Administrative Code
of the City of New York (Sections 564-18.0, etc.) prior to the delivery of the deed shall be paid and discharged by the seller
upon the delivery of the deed. This provision shall survive the delivery of the deed.

*Omit clause 8 if*
*the property is*
*not located in*
*the City of New*
*York.*

*Clause 9 is*
*usually omitted*
*if the property*
*is not in the*
*City of New*
*York*

9.      If, at the time of the delivery of the deed, the premises or any part thereof shall be or shall have been affected by
an assessment or assessments which are or may become payable in annual installments, of which the first installment is then
a charge or lien, or has been paid, then for the purposes of this contract all the unpaid installments of any such assessment,
including those which are to become due and payable after the delivery of the deed, shall be deemed to be due and payable
and to be liens upon the premises affected thereby and shall be paid and discharged by the seller, upon the delivery of the
deed.

10.     The following are to be apportioned:  ~~(a) Rents as and when collected.  (b) Interest on mortgages.  (c) Premiums~~
~~on existing transferable insurance policies or renewals of those expiring prior to the closing.~~ (d) Taxes and sewer rents, if
any, on the basis of the fiscal year for which assessed ~~(e) Water charges on the basis of the calendar year.  (f) Fuel, if any.~~

11.     If the closing of the title shall occur before the tax rate is fixed, the apportionment of taxes shall be upon the basis
of the tax rate for the next preceding year applied to the latest assessed valuation.

12.     ~~If there be a water meter on the premises, the seller shall furnish a reading to a date not more than thirty days prior~~
to the time herein set for closing title, and the unfixed meter charge and the unfixed sewer rent, if any, based thereon for the
~~intervening time shall be apportioned on the basis of such last reading.~~

13.     The deed shall be the usual bargain and sale,with covenants,      deed in proper statutory short form
for record and shall be duly executed and acknowledged so as to convey to the purchaser the fee simple of the said premises,
free of all encumbrances, except as herein stated, and shall contain the covenant required by subdivision 5 of Section 13 of
the Lien Law.

        If the seller is a corporation, it will deliver to the purchaser at the time of the delivery of the deed hereunder a
resolution of its Board of Directors authorizing the sale and delivery of the deed, and a certificate by the Secretary or
Assistant Secretary of the corporation certifying such resolution and setting forth facts showing the conveyance is in
conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a
recital sufficient to establish compliance with said section.

14.     At the closing of the title the seller shall deliver to the purchaser a certified check to the order of the recording
officer of the county in which the deed is to be recorded for the amount of the documentary stamps to be affixed thereto in
accordance with Article 31 of the Tax Law and a certified check to the order of the appropriate country officer for any other
tax payable by reason of the delivery of the deed; and a return, if any is required, duly signed and sworn to by the seller;
and the purchaser also agrees to sign and swear to the return and to cause the check and the return to be delivered to the

APR.24.2002  3:55PM   NEW YORK                      NO.918   P.3

appropriate county officer promptly after the closing of title.

15.     In addition, the seller shall at the same time deliver to the purchaser a certified check to the order of the Finance Administrator for the amount of the Real Property Transfer Tax imposed by Title II of Chapter 46 of the Administrative Code of the City of New York and will also deliver to the purchaser the return required by the said statute and the regulations issued pursuant to the authority thereof, duly signed and sworn to by the seller; the purchaser agrees to sign and swear to the return and to cause the check and the return to be delivered to the City Register promptly after the closing of the title.

16.     The seller shall give and the purchaser shall accept a title such as **any reputable title insurance company.** a Member of the Title Insurance Rate Service Association, Inc., will be willing to approve and insure.

17. ~~All sums paid on account of this contract, and the reasonable expenses of the examination of the title to said premises and of the survey, if any, made in connection therewith are hereby made liens on said premises, but such liens shall not continue after default by the purchaser under this contract.~~

18.     ~~All fixtures and articles of personal property attached or appurtenant to or used in connection with said premises are represented to be owned by the seller, free from all liens and encumbrances except as herein stated,~~ and are included in this sale; without limiting the generality of the foregoing, such ~~fixtures and articles of personal property~~ including plumbing, heating, lighting and cooking fixtures, ~~air conditioning fixtures and units, ranges, refrigerators, radio and television aerials, bathroom and kitchen cabinets, mantels, door mirrors, venetian blinds, shades, screens, awnings, storm windows, window boxes, storm doors, mail boxes, weather vanes, flagpoles, pumps, shrubbery and outdoor statuary.~~

19.     The amount of any unpaid taxes, assessments, water charges and sewer rents which the seller is obligated to pay and discharge, with the interest and penalties thereon to a date not less than two business days after the date of closing title, may at the option of the seller be allowed to the purchaser out of the balance of the purchase price, provided official bills therefor with interest and penalties thereon figured to said date are furnished by the seller at the closing.

20.     If at the date of closing there may be any other liens or encumbrances which the seller is obligated to pay and discharge, the seller may use any portion of the balance of the purchase price to satisfy the same, provided the seller shall simultaneously either deliver to the purchaser at the closing of title instruments in recordable form and sufficient to satisfy such liens and encumbrances of record together with the cost of recording or filing said instruments; or, provided that the seller has made arrangements with the title company employed by the purchaser in advance of closing, seller will deposit with said company sufficient monies, acceptable to and required by it to insure obtaining and the recording of such satisfactions and the issuance of title insurance to the purchaser either free of any such liens and encumbrances, or with insurance against enforcement of same out of the insured premises. The purchaser, if request is made within a reasonable time prior to the date of closing of title, agrees to provide at the closing separate certified checks as requested, aggregating the amount of the balance of the purchase price, to facilitate the satisfaction of any such liens or encumbrances. The existence of any such taxes or other liens and encumbrances shall not be deemed objections to title if the seller shall comply with the foregoing requirements.

21.     If a search of the title discloses judgments, bankruptcies or other returns against other persons having names the same as or similar to that of the seller, the seller will on request deliver to the purchaser an affidavit showing that such judgments, bankruptcies or other returns are not against the seller.

22.     In the event that the seller is unable to convey title in accordance with the terms of this contract, the sole liability of the seller will be to refund to the purchaser the amount paid on account of the purchase price ~~and to pay the net cost of examining the title, which cost is not to exceed the charges fixed by the New York Board of Title Underwriters, and the net cost of any survey made in connection therewith incurred by the purchaser,~~ and upon such refund any payment being made this contact shall be considered canceled.

23.     The deed shall be delivered upon the receipt of said payments at the office of **Purchaser's lender's counsel.** at                    o'clock on                        , in the year

24.     The parties agree that **Brown Harris Stevens and Benjamin A. Shadrin P.A.** is the broker who brought about this sale and the seller agrees to pay any commission earned thereby.

25.     It is understood and agreed that all understandings and agreements heretofore had between the parties hereto are merged in this contract, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation, neither party relying upon any statement or representation, not embodied in this contract, made by the other. The purchaser has inspected the buildings standing on said premises and is thoroughly acquainted with their condition and agrees to take title "as is" and in their present condition and subject to reasonable use, wear, tear, and natural deterioration between the date thereof and the closing of title.

26.     This agreement may not be changed or terminated orally. The stipulations aforesaid are to apply to and bind the heirs, executors, administrators, successors and assigns of the respective parties.

27.     If two or more persons constitute either the seller or the purchaser, the word "seller" or the word "purchaser" shall be construed as if it read "sellers" or purchasers" whenever the sense of this agreement so requires.

**This Agreement is modified by the Rider to Contract of Sale dated of\* IN WITNESS WHEREOF,** this agreement has been duly executed by the parties hereto.

In presence of:                                MIDTOWN DEVELOPMENT, LP Seller

                                               By _[signature]_

\*even date herewith and attached
hereto and made a part hereof.

                                               Jericho Group Ltd., Purchaser

                                               By _George Klein_

MID 00055

APR.24.2002  3:56PM  NEW YORK                                              NO.918   P.4

SE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

lat   New York, County of                    } ss.:

n the   day of                    in the year
before me, the undersigned, personally appeared

ersonally known to me or proved to me on the basis of satisfactory
vidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the
ame in his/her/their capacity(ies), and that by his/her/their signature(s) on
he instrument, the individual(s), or the person upon behalf of which the
ndividual(s) acted, executed the instrument.

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                    } ss.

On the   day of                    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on
the instrument, the individual(s), or the person upon behalf of which the
individual(s) acted, executed the instrument.

ACKNOWLEDGMENT FORM FOR USE WITHIN NEW YORK STATE ONLY:
(New York Subscribing Witness Acknowledgment Certificate)
State of New York, County of                    } ss.:

On the   day of                    in the year
before me, the undersigned, personally appeared

the subscribing witness to the foregoing instrument, with whom I am
personally acquainted, who, being by me duly sworn, did depose and
say that he/she/they reside(s) in

(If the place of residence is in a city, include the street and street number, if any,
th   ); that he/she/they know(s)

to be the individual described in and who executed the foregoing
instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed
his/her/their name(s) as a witness thereto.

ACKNOWLEDGMENT FORM FOR USE OUTSIDE NEW YORK STATE ONLY:
(Out of State or Foreign General Acknowledgment Certificate)
                                                        } ss.:
(Complete Venue with State, Country, Province or Municipality)

On the   day of                    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to
the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their capacity(ies), that by his/her/ their
signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument, and
that such individual made such appearance before the undersigned
in the

(Insert the city or other political subdivision and the state or country or
other place the acknowledgment was taken).

Closing of title under the within contract is hereby adjourned to
o'clock at                                      ; title to be closed and all adjustments to be made
as of
Dated,
For value received, the within contract and all the right, title and interest of the purchaser thereunder are hereby assigned,
transferred and set over unto
and said assignee hereby assumes all obligations of the purchaser thereunder.
Dated,

_____
                                    Purchaser

_____
                          Assignee of Purchaser

**CONTRACT OF SALE**
(AMENDED 1975)

TITLE NO. _____

                TO


FIDELITY NATIONAL TITLE INSURANCE
COMPANY OF NEW YORK
INCORPORATED 1928
"Appreciate the Fidelity Difference"
Member New York State Land Title Association

DISTRICT
SECTION
BLOCK
LOT
COUNTY OR TOWN

RECORDED AT REQUEST OF
Fidelity National Title Insurance Company of New York
RETURN BY MAIL TO

MID 00056

# RIDER TO CONTRACT OF SALE

Dated: June *18*, 2002

between

## MIDTOWN DEVELOPMENT, L.P., Seller

and

## JERICHO GROUP, LTD., as nominee, Purchaser

28. The total purchase price twenty eight million ($28,000,000) dollars (the "Purchase Price") shall be paid as follows:

a) two hundred fifty ($250,000) dollars has been paid to the Escrowee upon execution hereof, by check subject to collection, the receipt of which is acknowledged by the Escrowee (the "Downpayment") (The term "Downpayment" as used in this Contract, both in the printed form and in this Rider, shall mean so much of the funds referred to in this paragraph 28 which have been received by the Escrowee hereunder);

b) the balance shall be paid to Seller or as Seller shall direct, at closing, by good certified or official bank teller's check or checks drawn on a bank or banks which is/are (a) member(s) of the New York City Banker's Clearinghouse, or , if Seller shall so request, by wire transfer or transfers; and

c) The Downpayment shall not be refundable to Purchaser except as provided in Paragraph 29 hereof.

29. a) Purchaser shall have seventy-five (75) days from the date this Contract has been executed by both parties (the "Study Period"), to cause to be performed, at Purchaser's cost and

1044235
(S7)SlabakisJerichoRider

1

expense, such environmental and/or architectural/engineering and or other tests and/or inspections as Purchaser, in its sole discretion, shall elect to perform. In accordance with the terms of Paragraph 29(b) below, Seller shall allow Purchaser and its representatives access to Property at all reasonable times, shall cooperate with Purchaser and its representatives and shall make available to Purchaser and its representatives such material pertinent to such tests and/or inspections as Seller may have in it possession. If prior to the conclusion of the Study Period, Purchaser shall determine, in its sole and absolute discretion that the Property is not suitable for its needs, the Purchaser shall have the right to cancel this Contract upon written notice to Seller and the Escrowee. Purchaser need not specify any reason for such cancellation. Upon the timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser the monies paid upon execution hereof.

b)      During the Study Period, Purchaser, personally or through its authorized agents or representatives, shall be entitled to enter upon the Property, at all reasonable times upon reasonable advance notice to Seller to make preliminary above surface architectural studies for Purchaser's intended improvements. Notwithstanding Purchaser's entitlement to conduct such studies, Purchaser has agreed to accept the Property in "AS IS" condition subject to its inspection rights during the Study Period and Purchaser shall have no right to terminate this Agreement other than as provided in 29(a) above. Purchaser's entry onto the Property and all of the foregoing activities shall be subject to the following conditions:

(1)      Purchaser shall not unreasonably interfere with the Amtrak's service operation, shall minimize disruption to such operation, shall not enter or interfere with Amtrak's right of way absent Amtrak's express written consent and shall be subject in all events to Amtrak's rights under the Amtrak Agreement (as defined hereunder).

1044235
(S7)SlabakisJerichoRider

2

(2)    Purchaser shall not disturb the surface or subsurface of the Property.

(3)    Purchaser shall indemnify and hold harmless Seller and Amtrak and their respective partners, directors, officers, employees and agents from and against all liability, claims, losses, damages, injuries to persons or to property and expense (including, without limitation, reasonable legal fees and disbursements) suffered by Seller or Amtrak or their respective partners, directors, officers, employees or agents by reason of or resulting from such entry or any activities conducted or undertaken on or in connection with the Property by or on behalf of Purchaser.

(4)    Such entry and all activities conducted by or on behalf of Purchaser shall be in compliance with all applicable federal, state and local laws, rules, regulations, ordinances, orders and permits and with any requirements of Amtrak.

(5)    Purchaser and its contractors and representatives shall procure the following insurance coverage to cover the risks associated with such activities, in the minimum amounts set forth below:

(A)    Workers' Compensation Insurance in accordance with statutory requirements and Employer's Liability Insurance with a minimum limit of $500,000 each accident;

(B)    Commercial General Liability Insurance (occurrence form), including premises, contractual liability, products/completed operations, independent contractors and broad form property damage coverage with the following limits of liability: Bodily Injury - $1,000,000 each occurrence; Property Damage - $1,000,000 each occurrence, or $2,000,000 combined single limit;

(C)    Comprehensive Automobile Liability Insurance, including coverage for all owned, non-owned and hired automobiles used in the performance of the work with the

1044235
(S7)SlabakisJerichoRider

3

MID 00059

following minimum limits of liability: Bodily Injury - $1,000,000 each occurrence; Property Damage - $1,000,000 each occurrence, or $2,000,000 combined single limit;

(D)     Environmental/Pollution Liability, including bodily injury and property damage liability associated with the removal and/or disposal of hazardous wastes and/or materials with the following minimum limits of liability: Bodily Injury - $2,000,000 each occurrence; Property Damage - $2,000,000 each occurrence or $4,000,000 combined single limit; and

(E)     Such railroad liability and other insurances as required by Amtrak. All insurance shall provide for thirty (30) days' written notice prior to cancellation, shall name Seller and Amtrak as additional insureds, and shall provide that all liability coverage is primary and without the right of contribution from insurance carried by Seller. Notwithstanding the foregoing, nothing contained herein shall impose any obligation on Seller or limit any obligation imposed upon Purchaser hereunder.

(6)     Prior to entry of the Property, Purchaser shall: (i) provide Seller three days' written notice of its intent to enter the Property, (ii) submit binders of insurance to Seller with said notice and (iii) submit a copy of Amtrak's consent to any studies to be performed on or adjacent to Amtrak's right of way.

(7)     Seller shall provide notice to, and provide reasonable assistance to Purchaser to request permission from, Amtrak in respect of Purchaser's request, if any, to enter upon the area of easements in favor of Amtrak, it being understood, however, that Seller makes no representation with respect to Amtrak's permitting such entry or the terms upon which it may permit such entry.

(8)     Seller shall at all reasonable times during such entry and after the secession thereof have the right to inspect all activities of Purchaser and its architects on the Property. Seller

1044235
(S7)SlabakisJerichoRider

4

shall also have the right (but not the obligation) to inspect and copy all data and reports collected by or for Purchaser in the course of these activities.

(9)     Unless required by law or court order, Purchaser shall not disclose the substance of any activities performed hereunder and Purchaser shall treat as confidential all maps, data, reports, and other written proprietary information received from Seller. Purchaser and its personnel will not publish, in any technical articles or otherwise, information obtained from these activities.  The obligations of confidentiality set forth above shall not apply to any information which: (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its partners, directors, officers, employees, agents, representatives or subcontractors; (ii) was generally available to the public on the date of this Agreement; (iii) was known to Purchaser prior to its dealings with Seller; or (iv) was lawfully received by Purchaser from a third party without restriction on disclosure and provided such third party is not under an obligation of non-disclosure with Seller.  In the event that Purchaser does not acquire the Property, Purchaser shall deliver to Seller any and all information about the Property received directly from Seller, including materials disclosed within ten (10) days after request by Seller.

(10)     Purchaser shall not generate any waste on the Property.

(11)     Upon completion of such entry, Purchaser shall promptly restore the Property, at Purchaser's sole cost and expense, to the state and condition thereof prior thereto and shall promptly repair all damage caused by or resulting from such entry.

c)     Immediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which Purchaser reasonably requests. Seller shall

1044235
(S7)SlabakisJerichoRider

5

also make its representatives available to meet with representatives of Purchaser, at Purchaser's cost and expense, concerning such matters at a time and place that shall be mutually convenient to Purchaser and Seller.

30.  a)  The Seller represents that it is the fee owner of the premises and not a contract vendee therefor.

b)  At the Closing, Seller shall convey to Purchaser, by Bargain and Sale Deed with Covenants against Grantor's Acts (the "Deed"), fee simple title to the Property free and clear of any and all liens and/or encumbrances except for the following (the "Permitted Exceptions"):

(i)  The lien for general real estate taxes for the calendar year or other applicable tax period during which the Closing shall occur and subsequent years (and/or periods);

(ii) The exceptions to title enumerated on Exhibit C attached hereto and such other exceptions as may be approved in writing by Purchaser; and

(iii) Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller, Jerrart Venture and Amtrak which is attached hereto as Exhibit B (the "Amtrak Agreement").

c)  Purchaser shall promptly after execution of this Agreement cause title to be examined and a title report and a commitment for an owner's title insurance policy for the Property to be prepared by Purchaser's Title Company (the "Title Company"). Within three (3) days of its receipt of such title report, Purchaser shall deliver copies thereof to Seller's attorneys, Harwood Lloyd, LLC, together with a notice setting forth any matters contained in the title report which materially would interfere with the development of the Property that are not Permitted Exceptions, to which Purchaser objects. Within thirty (30) days after delivery to Seller's attorneys of any such notice of objections to

1044235
(S7)SlabakisJerichoRider

6

title, Seller shall advise Purchaser whether Seller shall undertake to remove such matters and endeavor to clear title.

d)    If, as of the date of the Closing, Seller is unable to convey title to the Property to Purchaser in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser at or prior to the Closing, to adjourn the Closing, from time to time, to enable Seller to endeavor to clear such title. If Seller does not so elect to adjourn the Closing, or if at the adjourned Closing Date, Seller remains unable to clear title in accordance with the provisions of this Agreement, Purchaser may either: (i) waive such title defects and close title in accordance with this Agreement, with no reduction of or any credit or allowance against the Purchase Price, and with no claims against Seller; or (ii) terminate this Agreement by written notice delivered at or before the Closing, in which event Seller and Purchaser shall jointly instruct the Escrow Agent to promptly return the Deposit to Purchaser, and this Agreement shall thereupon become void and of no further effect and neither party shall have any rights against or obligations of any nature to the other under this Agreement or by reason hereof. If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment in accordance with its terms. Nothing contained in this Article or elsewhere in this Agreement shall be deemed to require Seller to take or bring any action or proceeding to remove any defect in or objection to title or expend any sums to cure such title defects and exceptions. Purchaser shall not have any claim, cause or right of action against Seller, at law or in equity, whether for damages, or specific performance or otherwise, by reason of Seller's failure to clear any such title defects or exceptions.

1044235
(S7)SlabakisJerichoRider

7

c)      The occurrence of the Closing and delivery to and acceptance of the Deed by Purchaser shall be deemed to be full performance, discharge and satisfaction of every agreement and obligation on Seller's part required to be performed under this Agreement.

31.      Seller represents that annexed hereto, as Exhibit B, is a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks.

32.      Closing shall take place on the fifteenth (15th) day after the conclusion of the Study Period, at the offices of Purchaser's lending institution or such lending institution's attorneys. If Purchaser does not close by such date, Seller shall be entitled to set a date for closing by giving fourteen (14) days written notice to Purchaser which date shall be TIME OF THE ESSENCE. In the event Purchaser desires to extend the closing date for an additional thirty (30) days past the time of the essence closing date set by Seller, Purchaser may do so provided that Purchaser pays a non-refundable payment of $100,000.00 to Seller along with a writing specifying an adjourned closing date within thirty (30) days of the Seller's time of the essence closing date, which shall be TIME OF THE ESSENCE. The parties agree that fourteen (14) days shall be a reasonable notice period and failure by Seller to send such notice to Purchase shall not be deemed to be a waiver of Seller's rights to get a time of the essence closing date. Failure by Purchaser to close on such date shall entitle the Seller to direct the Escrow Agent to pay the Downpayment to Purchaser and for the Purchaser to retain the Downpayment as liquidated damages and Purchaser shall thereupon have no rights to purchase the Property.

33.      At closing, Seller should assign to Purchaser, without recourse, any such permits and/or approvals which Seller may have obtained with respect to the development of the premises. Within two (2) business days from the date hereof, Seller shall make available to the Purchaser

1044235
($7)SlabakisJerichoRider

8

MID 00064

copies of all documentation pertaining to such permits and/or approvals. Seller makes no representation that any of such permits and/or approvals are in force and effect or that any of same are transferable.

34. Except as may be herein otherwise provided to the contrary, all apportionments shall be as of 11:59 p.m. on the day immediately proceeding the date of closing of title on the basis of a 365 day year and the actual number of days in any month.

35. The existence of liens or encumbrances upon the premises, to which the Purchaser is not obligated under the terms hereof to take subject, shall not be objections to title provided that properly executed instruments in recordable form necessary to satisfy the same are delivered to the Purchaser at the Closing, together with recording and/or filing fees. Such liens or encumbrances may be paid out of the cash consideration paid by the Purchaser. Unpaid liens for taxes, water charges and assessments shall not be objections to title, but the amount thereof plus interest and penalties thereon shall be deducted from the cash consideration to be paid hereunder and allowed to the Purchaser, subject to the provisions for apportionment of taxes and water charges contained herein.

36. Franchise, transfer, inheritance, estate, license or similar taxes, charges, or liens of any nature not hereinbefore excepted shall not be an objection to title provided that Purchaser's title company agrees to insure the Purchaser against collection of said liens out of the premises.

37. If a proceeding is pending to correct or reduce the assessed valuation of the premises for a period extending after the Purchaser's acquisition of title, such proceeding shall be continued by the Seller (or Seller's predecessor, as the case may be) and the Purchaser agrees to pay its proportionate share of the fees and disbursements in the event that such a reduction is obtained. This provision shall survive the delivery of the deed.

1044235
(S7)Slabakis JerichoRider

9

MID 00065

38.     Except as provided in paragraph 29 hereof, the Purchaser represents that it has inspected the premises to its satisfaction and is purchasing the Premises in "as is" condition as of the date hereof, ordinary wear and tear excepted.  This Contract, as written, contains all of the terms and conditions of the agreement entered into between the parties.  The Purchaser acknowledges that the Seller, except as specifically set forth elsewhere in this Contract, has made no representations, is unwilling to make any representations, and has held out no inducements to the Purchaser, other than those herein expressed.  The Purchaser further acknowledges and warrants that Seller is not liable or bound in any manner by (i) expressed or implied warranties, guarantees, promises, statements, representations or information pertaining to the premises as to the physical condition, income, expense, operation, or to what use the premises can be applied, including but not limited to any matter or thing affecting or relating to the said premises, except as herein specifically set forth; and (ii) any verbal or written statements, representations, real estate broker's "set ups" or information pertaining to the above premises furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth herein.

39.     If the payment made on account of the purchase price at the time of the execution of this Contract is by check, subject to collection, and if said check fails due collection, and Purchaser does not replace said check with an official teller's check or good certified check within five (5) business days after written notice thereof, the Seller at its option, may declare this Contract null and void and of no force and effect.  Seller may thereupon pursue its remedies against Purchaser upon said check or in any manner permitted by law, such remedies being cumulative.

40.     (a)     If the Purchaser shall default in the performance of this Contract, then the Seller shall as its sole remedy, retain the Downpayment as liquidated damages.  This Contract shall

1044235
(S7)SlabakisJerichoRider

10

thereupon become null and void subject to any rights of Seller pursuant to Paragraph 29(b) of this Rider, and neither party shall have further rights as against the other.

(b)  If the Seller shall default in the performance of this Contract, the Purchaser's rights are as set forth in Paragraph 22 of the Contract.

41.  (a)  The Escrowee acknowledges receipt from Purchaser, subject to collection, of the money paid upon execution hereof and agrees to hold and pay over the proceeds thereof and the balance of the Downpayment in accordance with the terms of this Contract, but only upon notice to the adverse party. Said money shall be deposited by the Escrowee in a non-interest bearing attorney trust account.

(b)  The Escrowee shall not be responsible for the genuiness of any certificate or signature and may rely conclusively upon and shall be protected when acting upon any notice, affidavit, request, consent, instruction, check, or other instrument believed by it in good faith to be genuine or to be signed or presented by the proper person, or duly authorized, or property made. The Escrowee shall have no responsibility except for the performance of its express duties provided for hereunder and no additional duties shall be inferred herefrom or implied hereby.

(c)  The Escrowee shall not be responsible or liable for any act or omission on its part in the performance or its duties as Escrowee under this contract unless act or omission constitutes bad faith, fraud or negligence.

(d)  The parties acknowledge that the Escrowee is the firm of attorneys representing the Seller in connection with this contract and the transaction contemplated thereby. The parties agree that, in the event any dispute arises regarding this contract, the Escrowee may continue to represent the Seller as the Seller's legal counsel in connection therewith, irrespective of

1044235
(S7)SlobukisJerichoRider

11

whether the Escrowee continues to hold in escrow the money paid upon execution hereof.

(e)     The Escrowee shall not be required to institute or defend any action involving any matter referred to herein or which affects his duties or liabilities hereunder unless or until requested to do so by any party to this contract and then only upon receiving full indemnity, in character satisfactory to the Escrow Agent, against any and all claims, liabilities, and expenses in relation thereto. In the event of any dispute among the parties hereto with relation to the Escrowee or its duties, (i) the Escrow Agent may act or refrain from acting in respect of any matter referred to herein in full reliance upon and by and with the advice of counsel selected by it and shall be fully protected in so acting or in refraining from acting upon the advice of such counsel, or (ii) the Escrowee may refrain from acting until required to do so by an order of a court of competent jurisdiction.

(f)     The parties further agree that the Escrowee may also discharge its liability hereunder by commencing an interpleader action against Seller and the Purchaser, and/or their respective successors or assigns, in any court of competent jurisdiction, and depositing the money paid upon execution hereof, together with accrued interest, with the Clerk of such court (or such other officer of such court who shall be authorized to accept such property).

42.     This Contract constitutes the entire agreement between the parties hereto. No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the party against whom the change, modification or discharge is claimed or sought to been enforced; nor shall any waiver of the

1044235
(S7)SlabakisJerichoRider

12

conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

43.    No provision, covenant or representation contained in this contract shall survive the delivery of the deed except as expressly provided.  Acceptance of the deed shall be deemed a conclusive acknowledge by Purchaser that Seller has performed all of the obligations of the Seller hereunder except such as may expressly be stated to survive the delivery of the deed.

44.    All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party shall have specified most recently by like Notice.  At the same time any Notice is given to either party, a copy shall be sent to its attorney.  For the purposes of this paragraph 44, the attorneys for the parties are as follows:

Attorneys for Seller:

Edward Imperatore, Esq.
Harwood Lloyd, LLC
130 Main Street
Hackensack, NJ  07601

Attorney for Purchaser:

Szegda & Gerbing
300 East 42nd Street
New York, New York 10017

Attn:  Michael A. Szegda, Esq.

1044235
(S7)SlabakisJerichoRider

13

MID 00069

45. This Rider is intended to modify the printed portion of this Contract. In the event of conflict between any provision contained in the printed portion and any provision contained in this Rider, the provision in this Rider shall be controlling and this Contract interpreted accordingly.

46. This Contract may be signed in counterparts, both of which together shall constitute as single instrument. Signatures transmitted by telephone facsimile shall be binding and valid as if manually affixed to any counterpart.

MIDTOWN DEVELOPMENT, L.P, Seller

By: _____

JERICHO GROUP, LTD., as nominee, Purchaser

By: _George Klein_____

1044235
(37)BlahakdalerichoRider

14

**EXHIBIT A**

LEGAL DESCRIPTION OF PROJECT BEING LOT 1 IN BLOCK 708
AND LOT 17, BLOCK 709, ON THE TAX MAP OF THE
CITY OF NEW YORK, NEW YORK
(annexed hereto)

# CHICAGO TITLE INSURANCE COMPANY

## SCHEDULE A DESCRIPTION

Title No.: 9801-00612

Parcel 1 (Block 708 Lot 1)

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the easterly line of Eleventh Avenue with the northerly line of West 36th Street:

RUNNING THENCE northerly, along the easterly line of Eleventh Avenue, 98 feet 9 inches;

THENCE easterly, parallel with the northerly lineof West 36th Street, 175 feet 0 inches;

THENCE northerly parallel with the easterly line of Eleventh Avenue, 98 feet 9 inches to a point in the southerly line of West 37th Street;

THENCE easterly along the southerly line of West 37th Street, 275 feet 0 inches;

THENCE southerly parallel with the easterly line of Eleventh Avenue, 98 feet 9 inches to the center line of the block;

THENCE westerly, parallel with the northerly line of West 36th Street and along the center line of block, 75 feet 0 inches;

THENCE southerly parallel with the easterly line of Eleventh Avenue, 98 feet 9 inches to a point in the northerly line of West 36th Street;

THENCE westerly along the northerly line of West 36th Street, 375 feet 0 inches to the point or place of BEGINNING.

--CONTINUED--

LEGAL

CHICAGO TITLE INSURANCE COMPANY

Title No.: 9801-00612

LEGAL DESCRIPTION -- CONTINUED

EXCEPTING and reserving therefrom an exclusive permanent assignable easement or easements, on, over and across the following described property (reserved premises)

ALL that portion of the below described parcel lying below an upper inclined plane having an elevation of 27.86 feet at the northerly lien of West 36th Street and an elevation of 26.14 feet at the southerly line of West 37th Street, bounded and described as follows:

BEGINNING at a point in the northerly line of West 36th Street, distant 198 feet 5-3/4 inches easterly of the corner formed by the intersection of the northerly line of West 36th Street with the easterly line of Eleventh Avenue;

RUNNING THENCE northerly on the arc of a circle curving to the left, having a radius of 1100 feet 0 inches and an included angle of 11 degrees 21 minutes 41 seconds, whose radial line forms an angle of 30 degrees 35 minutes 43 seconds on its southerly side with the northerly line of West 36th Street, 218 feet 1-1/2 inches to a point in the southerly line of West 37th Street, distant 290 feet 2-5/8 inches easterly of the corner formed by the intersection of the southerly line of West 37th Street with the easterly line of Eleventh Avenue;

THENCE easterly along the southerly line of West 37th Street, 59 feet 1-5/8 inches;

THENCE southerly on the arc of a circle curving to the right, having a radius of 1156 feet 0 inches and an included angle of 10 degrees 41 minutes 57 seconds, whose radial line forms an angle of 18 degrees 16 minutes 06 seconds on its southerly side with the southerly line of West 37th Street, 215 feet 10-3/8 inches to a point in the northerly line of West 36th Street, distant 263 feet 2 inches easterly of the corner formed by the intersection of the northerly line of West 36th Street with the easterly line of Eleventh Avenue;

THENCE westerly along the northerly line of West 36th Street, 64 feet 6-1/4 inches to the point or place of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

LEGALCON                    -LEGAL DESCRIPTION, CONTINUED-

# CHICAGO TITLE INSURANCE COMPANY

Title No.: 9801-00612

## LEGAL DESCRIPTION -- CONTINUED

Parcel 2 (Block 709 Lot 17)

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point in the southerly line of West 38th Street distant 350 feet 0 inches west of the corner formed by the intersection of the westerly line of Tenth Avenue with the southerly line of West 38th Street;

RUNNING THENCE southerly, parallel with the westerly line of Tenth Avenue, 197 feet 6 inches to a point in the northerly line of West 37th Street;

THENCE westerly, along the northerly line of West 37th Street, 150 feet 0 inches;

THENCE northerly parallel with the westerly line of Tenth Avenue, 197 feet 6 inches to a point in the southerly line of West 38th Street;

THENCE easterly along the southerly line of West 38th Street, 150 feet 0 inches to the point or place of BEGINNING.

EXCEPTING and reserving therefrom an exclusive permanent and assignable easement or easements, on, over and across the following described premises (reserved premises):

ALL that portion of the below described parcel lying below an upper inclined plane having an elevation of 23.99 feet at the southerly line of West 38th Street and an elevation of 25.66 feet at the northerly line of West 37th Street; bounded and described as follow:

BEGINNING at a point in the northerly line of West 37th Street, distant 432 feet 7-1/2 inches westerly from the corner formed by the intersection of the northerly line of West 37th Street with the westerly line of Tenth Avenue;

RUNNING THENCE westerly along the northerly line of West 37th Street, 58 feet 1-1/2 inches;

THENCE northerly on the arc of a circle curving to the left, having a radius of 1100 feet 0 inches and an included angle of 5 degrees 14 minutes 34 seconds, whose radial line forms an angle of 15 degrees 57 minutes 17 seconds on its southerly side with the northerly line of West 37th Street, 100 feet 7-3/4 inches to a point of tangency;

THENCE still northerly 101 feet 4-1/4 inches to a point in the southerly line of West 38th Street, distant 448 feet 8-1/2 inches westerly from the corner formed by the intersection of the southerly line of West 38th Street with the westerly line of Tenth Avenue;

THENCE easterly along the southerly line of West 38th Street, 56 feet 11-7/8 inches;

THENCE southerly along a line forming an angle of 79 degrees 17 minutes 17 seconds on its westerly side with the preceding course, 111 feet 11-3/8 inches to a point of curvature;

LEGALCON                    -LEGAL DESCRIPTION, CONTINUED-        MID 00074

3

## CHIGAGO TITLE INSURANCE COMPANY

Title No.: 9801-00612

## LEGAL DESCRIPTION -- CONTINUED

THENCE still southerly on the arc of a circle curving to the right, having a radius of 1156 feet 0 inches and an included angle of 4 degrees 27 minutes 03 seconds, 89 feet 9-5/8 inches to the point or place of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

MID 00075

LEGALCON                         -LEGAL DESCRIPTION, CONTINUED-                                      4

**EXHIBIT B**

<u>MIDTOWN - JERRART- AMTRAK</u>

Access and Construction Agreement regarding Amtrak's Rail Line, dated as of April 23, 1990.

MID-TOWN – JERRART – AMTRAK
ACCESS AND CONSTRUCTION AGREEMENT
REGARDING AMTRAK'S WEST SIDE RAIL LINE

Agreement made as of April 23 , 1990, by and among Mid-Town Development Limited Partnership, a New York limited partnership ("Mid-Town"), Jerrart Venture, an Illinois general partnership ("Jerrart"), and National Railroad Passenger Corporation, a corporation of the District of Columbia ("Amtrak").

WHEREAS, by Deed dated January 10, 1986, recorded in the Office of the City Register, New York County, in Reel 1080, Page 974 ("CRCP Deed"), Consolidated Rail Corporation, a Pennsylvania corporation ("Conrail"), conveyed to CRC Properties, Inc., a Delaware corporation ("CRCP") all of Conrail's right, title and interest in and to a line of railroad, easements for railroad operations across and through five parcels of land in the Borough of Manhattan, County of New York, State of New York, and certain additional rights (reserving to Conrail certain other rights), all as described in the CRCP Deed; and

WHEREAS, by Deed dated June 27, 1986, recorded in the Office of the City Register, New York County, in Reel 1059, Page 1108 ("Amtrak Deed"), CRCP conveyed to Amtrak the railroad line, easements, and rights conveyed to CRCP by Conrail in the CRCP Deed; and

MID 00077

WHEREAS, by Deed dated March 25, 1987, recorded in the Office of the City Register, New York County, in Reel 1226, Page 170 ("Mid-Town Deed"), Conrail conveyed to Mid-Town two parcels of land ("Parcels 1 and 2") in the Borough of Manhattan, County of New York, State of New York (being two of the five parcels of land referred to in the first WHEREAS clause of this Agreement which are the same two parcels that are referred to as Parcels 1 and 2, respectively, on Page 2 of the Amtrak Deed), and with respect to said Parcels 1 and 2 conveyed to Mid-Town all of the rights reserved by Conrail in the CRCP Deed (except as expressly reserved and excepted by Conrail in the Mid-Town Deed), and all the rights of Developer as set forth in the CRCP Deed and in Exhibit A thereof, all as described in the Mid-Town Deed; and

WHEREAS, by Deed dated March 25, 1987, recorded in the Office of the City Register, New York County, in Reel 1226, Page 185 ("Jerrart Deed"), Conrail conveyed to Jerrart three parcels of land ("Parcels 3, 4 and 5") in the Borough of Manhattan, County of New York, State of New York (being three of the five parcels of land referred to in the first WHEREAS clause of this Agreement, which are the same three parcels that are referred to as Parcels 3, 4, and 5, respectively, on Page 2 of the Amtrak Deed), and with respect to said Parcels 3, 4, and 5 conveyed to Jerrart all of the rights reserved by Conrail in the CRCP Deed (except as expressly reserved and excepted by Conrail in the Jerrart Deed), and all the

rights of Developer set forth in the CRCP Deed and in Exhibit A thereof, all as described in the Jerrart Deed; and

WHEREAS, Mid-Town, Jerrart and Amtrak desire to clarify the identity of the "Developer" and "Owner" as said terms are used in the Amtrak Deed, to relocate certain of the easements described in the Amtrak Deed, and to set forth certain agreements between Mid-Town and Amtrak with respect to the location and construction of a temporary and permanent vehicular access ramp in connection with Parcels 1 and 2; and

WHEREAS, except as modified by or in conflict with the terms of this Agreement, the parties hereto intend that the terms and conditions of the Amtrak Deed shall remain in full force and effect.

NOW, THEREFORE, it is agreed:

1.    With respect to Parcels 1 and 2, the term "Developer" as is used in the Amtrak Deed and Exhibit A thereof shall mean Mid-Town, its successors and assigns, and the term "Owner" as used in the Amtrak Deed and Exhibit A thereof shall mean Amtrak, its successors and assigns.

2.    With respect to Parcels 3, 4 and 5, the term "Developer" as it is used in the Amtrak Deed and Exhibit A thereof shall mean Jerrart, its successors and assigns, and

MID 00079

the term "Owner" as used in the Amtrak Deed and Exhibit A thereof shall mean Amtrak, its successors and assigns.

3.    The easement across and through Parcel 3 granted and described in the Amtrak Deed and on Exhibit B thereof is hereby modified so that said easement will be located as shown on Exhibit A-1 attached hereto and made a part hereof.

4.    The easement across and through Parcel 4 granted and described in the Amtrak Deed and on Exhibit B thereof is hereby modified so that said easement will be located as shown on Exhibit A-2 attached hereto and made a part hereof.

5.    The easement across and through Parcel 5 granted and described in the Amtrak Deed and on Exhibit B thereof is hereby modified so that said easement will be located as shown on Exhibit A-3 attached hereto and made a part hereof.

6.    Amtrak shall reimburse Mid-Town, in an amount not to exceed $1,000, for all costs and expenses incurred in connection with preparation of the exhibits to Paragraph 3, 4, and 5, above, and surveys for Parcels 3, 4 and 5 so as to relocate the easements pursuant to the provisions of Paragraphs 3, 4 and 5, above. Amtrak shall be responsible for moving or laying track, moving or installing signal, catenary and other equipment needed for the operation of a railroad, and for filling and restoring Jerrart's land beyond the

borders of Amtrak's easements to the same general condition as existed before commencement of such work. Amtrak shall keep Jerrart's land within the borders of Amtrak's easements in comparable condition, as compared to Jerrart's adjacent land; provided however, that this sentence is not intended, and shall not be interpreted, to restrict or interfere with Amtrak's rehabilitation of the railroad line or its maintenance and operation of a railroad thereon.

7. Except as may be otherwise required by such law or laws as may be effective prior to the date that Developer commences the improvement of the parcels, the height clearance required and to be required by Amtrak in connection with the easements granted to it on Parcels 1, 2, 3, 4 and 5 in the Amtrak Deed and the provisions of Exhibit A thereof, as modified by Paragraphs 3, 4 and 5 of this Agreement, shall not exceed 18.5 feet above the top of the rail at any point, except that Amtrak may exceed this height at the following locations (including one foot on both the north and south sides of each such location), as indicated on Exhibit B-1 hereto:

| STATION | | TOP OF RAIL TO TOP OF AMTRAK STRUCTURE, AS INSTALLED |
|---|---|---|
| Parcel 1 | 32+00 | 21.52 feet |
| | 32+64 | 21.00 feet |
| | 33+30 | 21.53 feet |
| | 33+97 | 21.00 feet |
| Parcel 2 | 34+82 | 21.53 feet |
| | 35+64 | 20.86 feet |
| | 36+61 | 20.33 feet |
| Parcel 3 | 37+64 | 21.86 feet |
| | 38+94 | 21.86 feet |
| Parcel 4 | 50+95 | 21.66 feet |
| | 52+35 | 21.66 feet |
| Parcel 5 | 61+40 | 22.02 feet |
| | 62+26 | 21.66 feet |
| | 63+12 | 22.03 feet |

MID 00081

provided, that each such increase in height at such locations shall be limited to a maximum of 23 feet above top of rail. Due to the respective construction schedules of Amtrak and Developer, Amtrak will design and construct its signal and/or catenary systems based on the assumption that neither system will be attached to any building or other structure to be constructed by Developer. Amtrak agrees to consult with Developer as its design progresses in an effort to avoid any designs that would preclude such attachment(s) at a later date.

(a)   In the event that Developer's plans call for a change in any provision of this Paragraph 7 with respect to height clearance (or location of signal or catenary supports), Amtrak agrees, upon the request of Developer, to approve such change(s) in the locations indicated on Exhibit B-1 as requested and/or to attach its catenary and/or signal structures to buildings or other structures to be built by Developer subject, however, to the following terms and conditions:

(i)   the prior written approval of Amtrak's Deputy Chief Engineer must be obtained, which approval shall not be unreasonably withheld;

MID 00082

(ii)    all of Amtrak's costs in connection with effecting such change(s) and/or attachment(s) (including design, labor, materials, and overhead) shall be paid by Developer; and

(iii)    Amtrak shall be granted a permanent right to attach or relocate its catenary and/or signal system to the buildings or other structures to be built by Developer, provided the location and manner of any such relocation(s) or attachment(s) shall be subject to Amtrak's consultations with Developer and Developer's prior approval, such approval being not unreasonably withheld.

(b)    In the event that Amtrak's plans call for a change in any provision of this Paragraph 7 with respect to height clearance (or location of signal or catenary supports), Developer agrees, upon the request of Amtrak: (1) to approve such change(s) in the locations indicated on Exhibit B-1 as requested, and/or (2) to permit Amtrak to attach to catenary and/or signal structures to the buildings or other structures to be built by Developer subject, however, to the following terms and conditions:

(i)    the prior written approval of Developer must be obtained which approval shall not be unreasonably withheld;

MID 00083

(ii)  all of Developer's costs in connection with effecting such change(s) and/or permitting such attachment(s) (including design, labor, materials and overhead) shall be paid by Amtrak; and

(iii)  the location and manner of such attachments, if any, shall be subject to Amtrak's consultation with Developer and Developer's prior approval, such approval being not unreasonably withheld.  Concurrent with such approval, Amtrak shall be granted a permanent right to attach or relocate its catenary and/or signal systems to the buildings or other structures.

8.    (a) Amtrak at its sole cost and expense may construct a temporary vehicular access ramp ("Temporary Ramp"), with an approximate width of 13 feet, extending southward from West 38th Street to the easement across and through Parcel 2 granted and described in the Amtrak Deed and Exhibit B thereof.  Such ramp shall be located across the western portion of said Parcel 2 and shall be located and constructed in accordance with the plans and specifications prepared by Amtrak and attached hereto as Exhibit C-1.  Amtrak shall repair and maintain the Temporary Ramp at its sole cost and expense and in conformity to all applicable governmental laws and regulations, and may use the Temporary Ramp at no charge for such use, until such time as the Temporary Ramp is replaced by Mid-Town with the Permanent Ramp described below.

MID 00084

During such time as Mid-Town may be engaged in construction on Parcel 1 and/or 2, Amtrak acknowledges and agrees that access to and use of the Temporary Ramp by Amtrak may be interrupted by Mid-Town and its contractors, but Mid-Town agrees that, except in an emergency, any such interruption shall be subject to the following:

(i)    Any interruption extending longer than one (1) hour but less than two (2) hours will be preceded by not less than twenty-four (24) hours notice to Amtrak's West Side Line Project Manager, or of such other representative as may be indicted by Amtrak from time to time;

(ii)  With respect to any interruption of two (2) hours or longer, the prior approval of Amtrak's West Side Line Project Manager, or of such other representative as may be indicated by Amtrak from time to time, must be obtained, which approval shall not be unreasonably withheld or delayed;and

(iii)  In all events, Mid-Town agrees to use its best efforts to keep any periods of interruption to a minimum.

MID 00085

(b)    At such time as Mid-Town is ready to commence construction of a permanent ramp that would extend from West 38th Street to Amtrak's easement across and through Parcel 2 ("Permanent Ramp"), then on thirty (30) days prior written notice from Mid-Town to Amtrak, but not before May 1, 1990, Mid-Town at its sole cost and expense shall construct the Permanent Ramp with minimum unobstructed dimensions of eleven (11) feet in height and thirteen (13) feet in width and a maximum grade of ten percent (10%), using the Temporary Ramp to the extent reasonably feasible for that purpose. Mid-Town agrees to consult with Amtrak as its plans and specifications for the Permanent Ramp progress in an effort to assure that such ramp will meet Amtrak's needs and to minimize the disruption to Amtrak's access during construction. Amtrak agrees that its access to and use of the Temporary Ramp shall be halted to the extent necessary during construction of the Permanent Ramp.    Mid-Town agrees to complete construction of the Permanent Ramp with due diligence after commencement of its construction.    Upon completion of construction of the Permanent Ramp, Amtrak shall have the permanent right to use the Permanent Ramp at no cost for the purpose of pedestrian and vehicular access by Amtrak's employees, agents, contractors and suppliers to and from its easements, track and other properties.    At its sole cost and expense, Mid-Town shall keep, repair and maintain the Permanent Ramp in good working order (except with respect to damage caused by Amtrak's negligence) and in conformity to all

MID 00086

applicable governmental laws and regulations. The Permanent Ramp shall be artificially lighted In a manner similar to that set forth in Paragraph 11 of CRCP Deed. Mid-Town shall also allow police, fire, sewer and emergency vehicles to use the Permanent Ramp.

9.   Before beginning construction of the Temporary Ramp and continuing during the period when the Temporary Ramp is in existence and from and after completion of the Permanent Ramp, Amtrak shall procure and maintain policies of insurance insuring Mid-Town and Amtrak for injury or death to any person in an amount of not less than $5 million, for injury to or death of more than one person in any one occurrence in an amount of not less than $20 million, and for damage to property in an amount not less than $1 million made by or on behalf of any person or persons, firm or corporation arising from, related to or connected with Amtrak's construction, repair, maintenance or use of the Temporary Ramp and its use of the Permanent Ramp. The insurance policies shall comprehend coverage of the indemnity set forth in Paragraph 12(a) below. In lieu of procuring and maintaining the insurance policies described in this Paragraph 9, Amtrak shall have the right to self-insure.

MID 00087

10.    Mid-Town and its contractors, supplier, lessees, licensees and invitees shall have the the right to use both the Temporary Ramp and the Permanent Ramp and any service roadway or similar facility constructed by Amtrak on its easements located on Parcels 1 and 2, provided that such use shall not unreasonably interfere with the use of said ramps, roadway and facilities by Amtrak, its contractors and suppliers, and by police, fire, sewer and emergency vehicles.

Mid-Town and Amtrak hereby agree that each shall endeavor to ensure that said ramps, roadway and facilities are not used by persons and entities other than Amtrak, Mid-Town, and those persons and entities expressly permitted to use them under this Agreement, or as otherwise permitted by mutual agreement of Amtrak and Mid-Town.

11.    Amtrak hereby waives and releases any rights of and to a vehicular access ramp to Parcel 1 that it has or may have by reason of the provisions of the Amtrak Deed or otherwise. Mid-Town and Jerrart hereby confirm that Amtrak has permanent easements for rail operations (including the right to use, operate, maintain, repair, renew, replace and remove the existing track or tracks) across and through Parcels 1, 2, 3, 4 and 5.

MID 00088

12.    (a)  Amtrak will protect, indemnify and save harmless Mid-Town  from  and  against  all  liabilities,  obligations, claims,    damages,   penalties,   causes  of  action,  costs  and expenses  (including  without limitation, reasonable attorneys' fees  and  expenses)  imposed  upon  or incurred by or asserted against  Mid-Town by reason of any accident, injury to or death of  persons  or  loss  for  damage  to  property  arising  from Amtrak's  construction, maintenance and repair of the Temporary Ramp   or   any  part  thereof,  or  its  use  by  Amtrak,  its contractors  and  suppliers,  or  arising  from  the use of the Permanent  Ramp  or any part thereof by Amtrak, its contractors and suppliers.

In   case  any action, suit or proceeding is brought against Mid-Town  by reason of such occurrence, Amtrak will at Amtrak's expense  resist  and defend such action, suit, or proceeding or cause  the same to be resisted and defended by counsel approved by  Mid-Town,  which  approval  shall  not  be  unreasonably withheld.

(b)   Mid-Town  will  protect, indemnify and save harmless Amtrak  from  and against all liabilities, obligations, claims, damages,  penalties,  causes  of  action,  costs  and  expenses (including  without  limitation,  reasonable attorneys' fees and expenses)  imposed  upon  or  incurred  by  or asserted against Amtrak  by  reason  of  any  accident,  injury  to  or death of persons  or loss for damage to property arising from Mid-Town's

construction, maintenance and repair of the Permanent Ramp or any part thereof, or its use by Mid-Town, its contractors, suppliers, lessees, licensees and invitees, or arising from the use by Mid-Town, its contractors, suppliers, lessees, licensees and invitees of the Temporary Ramp, any part thereof, or of any facility or structure constructed by Amtrak on its easements located on Parcels 1 and 2. In case any action, suit or proceeding is brought against Amtrak by reason of such occurrence, Mid-Town will at Mid-Town's expense resist and defend such action, suit, or proceeding or cause the same to be resisted and defended by counsel approved by Amtrak, which approval shall not be unreasonably withheld.

(c)    Nothing herein is intended to limit in any way the parties' respective rights of indemnification under the appropriate Deeds.

13.    This Agreement shall be binding upon and inure to the benefit of Amtrak, its successors and assigns, provided that the provisions in this Agreement with respect to the construction and use of the Temporary Ramp and the use of the Permanent Ramp shall be personal to Amtrak and to any successor operator of intercity rail passenger service, and not inure to the benefit of any other of Amtrak's successors and assigns. This Agreement shall be binding upon and inure to the benefit of Mid-Town, its successors and assigns, and Jerrart, its successors and assigns.

MID 00090

14.     Except as otherwise specified, any notice required or permitted to be given hereunder shall be in writing and shall be deemed to be delivered on the earlier of (i) the date received if by personal or commercial messenger delivery, (ii) the date of delivery, refusal, or non-delivery indicated on the return receipt if deposited in a United States Postal Service Depository, postage prepaid, sent registered or certified mail, return receipt requested, addressed in every case to the party to receive the same at the addresses set forth below:

        TO:  National Railroad Passenger Corporation
             2000 Market Street
             Philadelphia, Pennsylvania 19103
             Attention:  Deputy Chief Engineer

        TO:  Mid-Town Development Limited Partnership
             c/o Jerrart Venture
             ARCORP Properties
             Pershing Road
             Weehawken, New Jersey  07087

        With a copy to:

             Jerrart Venture
             ARCORP Properties
             Pershing Road
             Weehawken, New Jersey  07087

        With a copy to:

             Ira Kipnis
             Suite 1500
             919 North Michigan Avenue
             Chicago, Illinois  60611

        TO:  Consolidated Rail Corporation
             c/o Conrail Real Estate
             Room 1500
             6 Penn Center Plaza
             Philadelphia, Pennsylvania  19103
             Attention:  Mr. John Jaeger

MID 00091

or at such other addresses as may be designated by five (5) days' prior notice delivered or mailed as herein provided.

15. This Agreement shall be governed by the laws of the District of Columbia.

16. The parties intend that this Agreement be recorded with the recorder of land records for the Borough of Manhattan, and each further agrees to execute such additional documents as may be necessary to effect such recording. All cost of such recording shall be shared equally by the three parties herein.


IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the day and year first written above.

                    National Railroad Passenger Corporation

                    By: _____

                                                                    FORM APPROVED
                                                                    Date 21 Aug 90
                                                                    Sig.
                                                                    LAW
                                                                    DEPART

ATTEST:

_____
Asst.    Secretary


                    Mid-Town Development Limited Partnership

                    By: Jerrart Venture (Its General Partner)

                    By: Hadrian Properties, Ltd.

                         By: Fafner Enterprises, Inc.

                         By: _____
                         President

                         By: _____
                         Arthur E. Imperatore
                         Its General Partner

-16-                          MID 00092

By:   WR West Side Associates

By: _____
     Jerrold Wexler

By: _____
     Edward W. Ross
     Its General Partners


Jerrart Venture

By:  Hadrian Properties, Ltd.

By:  Fafner Enterprises, Inc.

By: _____
     President

By: _____
     Arthur E. Imperatore
     Its General Partner



By:   WR West Side Associates

By: _____
     Jerrold Wexler

By: _____
     Edward W. Ross
     Its General Partners

-17-                MID 00093

<u>CONSENT</u>

Consolidated Rail Corporation, a Pennsylvania corporation, hereby consents to the relocation of the easements as provided in Paragraphs 3, 4, and 5 of the foregoing Agreement by and among Mid-Town Development Limited Partnership, a New York limited partnership, Jerrart Venture, an Illinois general partnership, and National Railroad Passenger Corporation, a corporation of the District of Columbia, approves the provisions with respect to the Temporary Ramp as set forth in said Agreement, and hereby approves the height clearance provision of Paragraph 7 of said Agreement.

In witness whereof Consolidated Rail corporation has caused this Consent to be executed this____ day of _____, 1989.

Consolidated Rail Corporation

By:_____

_____President

ATTEST:

_____

_____Secretary

DISTRICT OF COLUMBIA

I, _Beverly J. Vinston_, a Notary Public in and for said District of Columbia, do hereby certify that _Tony DeAngelo_ personally known to me to be the _Vice President - Real Estate and Operations Development_ of National Railroad Corporation and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as _Vice President - Real Estate and Operations Development_ of said corporation, pursuant to authority given by the Board of Directors of said corporation, as his free and voluntary act and as the free and voluntary act and deed of said corporation for the uses and purposed therein set forth.

Given under my hand and notarial seal this _23rd_ day of _April_, 19~~89~~ _90_.

Commission Expires: _June 30, 1992_

_Beverly J. Vinston_
Notary Public

MID 00095

STATE OF New Jersey )

)  SS.

COUNTY OF Hudson )

I, Benita Rodman, a Notary Public in and for said County in the State aforesaid, do hereby certify that Armand Pohn, personally known to me to be the President of Fafner Enterprises, Inc. and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as President of said corporation, pursuant to authority given by the Board of Directors of said corporation, as his free and voluntary act and as the free and voluntary act and deed of said corporation, as a general partner of Hadrian Properties, Ltd., for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of Feb, 1989.

Commission Expires:

BENITA A. RODMAN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAY 11, 1993

Notary Public

MID 00096

STATE OF New Jersey )

                      ) SS.

COUNTY OF Hudson )

    I, the undersigned, a Notary Public in and for said County, in the State aforesaid, do hereby certify that Arthur E. Imperatore, a General Partner of Hadrian Properties Ltd., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he as a general partner as aforesaid signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

    Given under my hand and notarial seal this 22 day of Feb , 1989.

Commission Expires:
                    BENITA A. RODMAN
                    NOTARY PUBLIC OF NEW JERSEY
                    MY COMMISSION EXPIRES MAY 12, 1993

                            Benita A. Rodman
                            Notary Public

STATE OF ILLINOIS⟋ )

                              ) SS.

COUNTY OF ~~COOK~~ Hudson )

 

 

I, Benita Rodman, a Notary Public in and for said County in the State aforesaid, do hereby certify that Jerrold Wexler and Edward W. Ross, General Partners of WR West Side Associates, are personally known to me to be the same persons whose names are subscribed to the foregoing instrument, and they did appear before me this day in person and acknowledged that they as General Partners as aforesaid, signed and delivered the said instrument as their own free and voluntary acts for the use and purposes therein set forth.

 

Given under my hand and notarial seal this ___15___ day of February, ~~1989~~ 90.

 

Commission Expires: May 12 1993

 

BENITA A. RODMAN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAY 12, 1993

_Benita A. Rodman_

Notary Public

 

THIS INSTRUMENT PREPARED BY:

Ira A. Kipnis
Suite 1500
919 North Michigan Avenue
Chicago, Illinois  60611

# EXHIBIT C

## Permitted Exceptions as to the Property

Title to the Property is to be conveyed to and accepted subject only to the following:

1.      Standard "printed form" exceptions in the Title Company's title policy, provided that the "gap", tenancy and mechanic's lien exceptions shall be omitted, the survey exception shall be modified to read in a current survey and the real estate taxes exception shall be modified to read "but not yet due and payable".

2.      Party Wall Agreement recorded 9/29/30 in Liber 3771 Cp. 369 (Affects southeasterly line of Parcel 1).

3.      Railroad Easements and Reservations made by New York State Realty and Terminal Company to The New York Central Railroad Company dated December 17, 1936 recorded January 14, 1937 in Liber 3947 page 163.  Affects Block 708 Lot 1.

4.      Reservations, Restrictive Covenants and Charges contained in deed made by Consolidated Rail Corporation to Mid-Town Development Limited Partnership dated March 25, 1987 recorded May 5, 1987 in Reel 1226 page 170.

5.      Terms, covenants and conditions contained in deed made by Robert W. Blanchette et al as trustees of the property of Penn Central Transportation Company to Consolidated Rail Corporation dated March 30, 1976 recorded December 15, 1978 in Reel 463 page 1563A.

6.      Terms, covenants and conditions contained in Real Property Identification Document made by and between Despatch Shops, Inc. and Consolidated Rail Corporation undated recorded December 15, 1978 in Reel 463 page 1624A.

    (a)    Release of Easements made by Despatch Shops, Inc. to Consolidated Rail Corporation dated May 21, 1985 recorded May 5, 1986 in Reel 1226 page 210.

MID 00099

    (b)    Release of Easements made by Despatch Shops, Inc. to Consolidated Rail Corporation dated May 21, 1985

## EXHIBIT C

### Permitted Exceptions as to the Property

7.     Easement Agreement made by and between New York State Realty and Terminal Company and The New York Central Railroad Company dated June 8, 1932 recorded June 10, 1932 in Liber 3842 page 11. Affects both parcels.

(a)    Correction Agreement made by and between New York State Realty and Terminal Company and The New York Central Railroad Company dated December 11, 1937 recorded January 4, 1938 in Liber 3968 cp 375. Affects block 709 lot 1.

FOR INFORMATION ONLY

8.     Easement made by Consolidated Rail Corporation to National Railroad Passenger Corporation dated January 10, 1986 recorded May 6, 1986 in Reel 1059 page 1108. Affects Eleventh Avenue.

9.     Terms, Covenants, Conditions and Easements contained in deed made by Consolidated Rail Corporation to CBC Properties, Inc. dated January 10, 1986 recorded June 25, 1986 in Reel 1080 page 974.

10     Terms, Covenants, Conditions and Easements contained in deed made by CBC Properties, Inc. to National Railroad Passenger Corporation dated June 27, 1986 recorded March 16, 1987 in Reel 1203 page 1015.

## EXHIBIT C

### Permitted Exceptions as to the Property

11.        <u>Notices of Sidewalk Violations:</u>

Filed:        **August 14, 1968**        No. 9260
Filed:        **July 10, 1986**         No. 39137
Affect Block 709 Lot 17

Filed:        **April 29, 1982**        No. 24556
Filed:        **July 10, 1986**         No. 39120
Affect Block 708 Lot 1

(a)   Action:            Article 15, nuisance, breach of
                         contract, determination of claims to
                         real property
     Action:            25678-92
     Filed:             September 17, 1992
     Court:             Supreme Court, New York County
     Plaintiff:         Consolidated Rail Corporation
     Defendant:         Mid-Town Development Limited
                        Partnership et al

Note: Latest entries in clerks minutes are dated February
11, 1999 and February 16, 1999 and refer to a notice of
appeal.

(b)   Action:            Unsafe building
     Action:            40061-74
     Index No.:         1974
     Court:             Supreme Court, New York County
     Plaintiff:         The City of New York
     Defendant:         New York State Realty and Terminal