**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
  **JERICHO GROUP, LTD.,**                          :
                                                  :
                    **Plaintiff,**                :
                                                  :
               **- against -**                :    **No. 07-CV-1792 (RCC) (DCF)**
                                                  :    **ECF CASE**
  **MIDTOWN DEVELOPMENT, L.P., EDWARD**    :
  **IMPERATORE and MAURICE STONE,**          :
                                                  :
                  **Defendants.**               :
--------------------------------------------------------------X

## AMENDED NOTICE OF REMOVAL

       Defendants Midtown Development, L.P. ("Midtown"), Edward Imperatore, and Maurice Stone hereby file this Amended Notice of Removal of the above-captioned action and state the grounds for removal as follows:

       1.     On February 22, 2007, plaintiff, Jericho Group, Ltd., filed a Summons and Verified Complaint against Defendants in the Supreme Court of the State of New York, New York County (the "State Court Action"). A copy of the Summons and Verified Complaint filed in the State Court Action is attached hereto as Exhibit A.

       2.     On February 26, 2007, Plaintiff served each Defendant with a copy of the Summons and Verified Complaint. Defendants filed a Notice of Removal on March 1, 2007. This Amended Notice of Removal is being filed on March 8, 2007, within thirty days after the receipt by the Defendants of a copy of the initial pleading in the State Court Action. *See In re CBS Inc. v. Snyder*, 762 F. Supp. 71, 73 (S.D.N.Y. 1991) ("A petition for removal may be amended freely within the statutory 30-day period calculated from the date of service of the

initial state court pleading.").  No other process, pleadings, or other orders have been served upon Defendants in connection with the State Court Action.

3.      The State Court Action is removable to this Court because the Court has original jurisdiction over the State Court Action.  The State Court Action is between citizens of different states and the matter in controversy in it exceeds the sum of $75,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(a).

4.      At the time of the commencement of the State Court Action and at the time of removal, plaintiff, Jericho Group, Ltd., was and is incorporated in the State of New York, with its principal place of business at 519 Flushing Avenue, Brooklyn, New York.  *See* Verified Complaint in the State Court Action ¶ 1.

5.      At the time of the commencement of the State Court Action and at the time of removal, defendant Midtown Development, L.P. was and is a limited partnership organized under the laws of the State of New York.  The citizenship of a partnership is determined by the citizenship of all of its partners, not by the state under whose laws it is organized or the location of its place of business or property.  *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990).

6.      At the time of the commencement of the State Court Action and at the time of removal, Midtown's only general partners were and are Arthur E. Imperatore and Edward W. Ross.  At the time of the commencement of the State Court Action and at the time of removal, Midtown's only limited partner was and is Consolidated Rail Corporation, as successor in interest to CRC Properties, Inc.

7.      At the time of the commencement of the State Court Action and at the time of removal, Arthur E. Imperatore was and is a citizen and resident of the State of New Jersey.  The address of Arthur E. Imperatore is 38 King Avenue, Weehawken, New Jersey.

8.      At the time of the commencement of the State Court Action and at the time of removal, Edward W. Ross was and is a citizen and resident of the State of Illinois.  The address of Edward W. Ross is 1240 North Lakeshore Drive, 29 A/B, Chicago, Illinois.

9.      At the time of the commencement of the State Court Action and at the time of removal, Consolidated Rail Corporation was and is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

10.      At the time of the commencement of the State Court Action and at the time of removal, Defendant Edward Imperatore was and is a citizen and resident of the State of New Jersey.  The address of Edward Imperatore is 105 Serpentine Road, Tenafly, New Jersey.

11.      At the time of the commencement of the State Court Action and at the time of removal, Defendant Maurice Stone was and is a citizen and resident of the State of New Jersey. The address of Maurice Stone is 114 Avondale Road, Ridgewood, New Jersey.

12.      The amount in controversy in the above-captioned action exceeds the sum of $75,000, exclusive of interests and costs.  Plaintiff seeks damages of "not less than $100,000,000."  *See* Verified Complaint in the State Court Action ¶ 162.  Plaintiff also seeks specific performance of a contract for the sale of real property that is valued at more than $75,000, exclusive of interest and costs.  *See id.* ¶¶ 4-5, 8, 162.

13.      All Defendants join in this Amended Notice of Removal.

14.      The United States District Court for the Southern District of New York embraces the place where the State Court Action is pending.

15.      On March 1, 2007, Defendants filed a notice of filing of the Notice of Removal with the Clerk of the Court of the Supreme Court of the State of New York, as required by 28 U.S.C. § 1446(d).

Dated: New York, New York
        March 8, 2007

Respectfully submitted,

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939

By:    / s / Todd R. Geremia
    Fredrick E. Sherman (FS 5442)
    Todd R. Geremia (TG 4454)

—and—

PHILLIPS NIZER LLP
Alfred D. Lerner (AL 5927)
George Berger (GB 8924)
666 Fifth Avenue
New York, New York  10103-0084
Telephone:  (212) 977-9700

Attorneys for Defendants,
Midtown Development, L.P., Edward
Imperatore, and Maurice Stone

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 8, 2007, I caused the foregoing AMENDED NOTICE OF

REMOVAL to be served by First Class U.S. mail to the following counsel for plaintiff:

Herbert Rubin
HERZFELD & RUBIN, P.C.
40 Wall Street
New York, New York  10005

*Attorneys for Plaintiff,*
*Jericho Group, Ltd.*

Dated: New York, New York
        March 8, 2007

_____ / s / Todd R. Geremia _____
Todd R. Geremia

A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------x

JERICHO GROUP, LTD.,

                Plaintiff,

        - against -

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE,

                Defendants.

------------------------------------------------------------x

Index No.

Filing Date: _07600566_

**SUMMONS**

Plaintiff designates New York
County as the Place of Trial.
Venue is based upon County
in which real estate which is
subject of action is located.

TO THE ABOVE NAMED DEFENDANTS:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons, to
serve a notice of appearance on the plaintiff's attorneys within twenty (20) days after the
service of this summons, exclusive of the day of service (or within thirty (30) days after
service is complete if this summons is not personally delivered to you within the State of
New York); and in case of your failure to appear or answer, judgment will be taken
against you by default for the relief demanded in the complaint.

Dated: New York, New York
       February 22, 2007

                        HERZFELD & RUBIN, P.C.
                        Attorneys for Plaintiffs

                        By: _____
                              Herbert Rubin
                        40 Wall Street
                        New York, NY 10005
                        Tel: (212) 471-8500

**FILED**
FEB 22 2007
NEW YORK
COUNTY CLERKS

Defendants' Addresses:

Midtown Development, L.P.
c/o 40 Arcorp Properties
Pershing Road
Weehawken, New Jersey 07086

Edward Imperatore
c/o Phillips Nizer LLP
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601

Maurice Stone
c/o Harwood Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
JERICHO GROUP, LTD.,

               Plaintiff,

        - against -

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE,

               Defendants.
-------------------------------------------------------------------x

Index No.

**VERIFIED COMPLAINT**

07600566

Plaintiff Jericho Group, Ltd. ("Jericho"), by its attorneys Herzfeld & Rubin, P.C.,

as and for its Complaint, respectfully alleges as follows:

### The Parties To The Action

    1.    Plaintiff Jericho Group, Ltd. ("Jericho") is a New York corporation,

having an office at 519 Flushing Avenue, Brooklyn, New York 11205.

    2.    Upon information and belief, Defendant Midtown Development, L.P.

("Midtown") is a New York limited partnership, having an office at c/o 40 Arcorp Properties,

Pershing Road, Weehawken, New Jersey 07086.

    3.    Defendants Maurice Stone ("Stone") and Edward Imperatore

("Imperatore") were at relevant times officers of Midtown and were lawyers for Midtown who

participated in the tortious acts described in the transactions in issue. Imperatore had, at relevant

times, an economic interest in Midtown.

### The Property In Issue

    4.    The subject litigation pertains to a contract whereby Midtown was to sell

to Jericho two parcels of real estate located in the Borough of Manhattan, County, City and State

of New York.

5.      Specifically, these two parcels are identified on the Tax Map of the City of New York as Block 708, Lot 1 and Block 709, Lot 17, being located between 36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York (hereinafter said lots are collectively referred to as the "Property").

6.      The Property and its location are unique, one of a kind, and special.

7.      The Property consists of development sites which are encumbered by railroad easements and rights of way in favor of "Amtrak".

### The Contract And Its Relevant Provisions

8.      Pursuant to the aforesaid Contract, dated June 18, 2002, between Midtown as the "Seller" and Jericho as the "Purchaser," Midtown agreed to sell the Property to Jericho for $28,000,000.

9.      The Contract, by its terms, limited Midtown's representations and warranties regarding the Property.

10.      To balance the limited representations and warranties, the parties structured the transaction as an "as is" sale and purchase transaction which provided Jericho with a 75-day "Study Period" to allow Jericho to obtain the additional information it required to permit it to decide whether to proceed to a closing.  Plaintiff paid a deposit of $250,000 on signing the Contract.

11.      The Contract provided in this regard, in pertinent part as follows:

> 29. a)      Purchaser shall have seventy-five (75) days from the date this Contract has been executed by both parties (the "Study Period"), to cause to be performed, at Purchaser's cost and expense, such environmental and/or architectural/engineering and or other tests and/or inspections as Purchaser, in its sole discretion, shall elect to

2

perform. In accordance with the terms of Paragraph 29(b) below, Seller shall allow Purchaser and its representatives access to Property at all reasonable times, shall cooperate with Purchaser and its representatives and shall make available to Purchaser and its representatives such material pertinent to such tests and/or inspections as Seller may have in its possession. If prior to the conclusion of the Study Period, Purchaser shall determine, in its sole and absolute discretion that the Property is not suitable for its needs, the Purchaser shall have the right to cancel this Contract upon written notice to Seller .... Purchaser need not specify any reason for such cancellation. Upon the timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser the monies paid upon execution hereof.

\* \* \* \* \*

c) Immediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which Purchaser reasonably requests....

12.     In addition, the Contract provided in pertinent part in paragraph 30(b)(iii) that Midtown would convey title to the Property to Jericho free and clear of liens and encumbrances except for "(iii) Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller [i.e., Midtown], Terrart Venture and Amtrak which is attached hereto as Exhibit B (the 'Amtrak Agreement')."

13.     The copy of the Amtrak Agreement attached to the Contract made reference to Exhibits to the Amtrak Agreement concerning easements on the Property and restrictions on its use, but no Exhibits were attached to that copy of the Amtrak Agreement.

14.     The Contract further provided in pertinent part, in paragraph 33;

At closing, Seller should assign to Purchaser, without recourse, any such permits and/or approvals which Seller may have obtained with respect to the development of the premises. Within two (2) business days from the date hereof, Seller shall make available to the Purchaser copies of all documentation pertaining to such permits and/or

3

approvals. Seller makes no representation that any of such permits and/or approvals are in force and effect or that any of same are transferable.

15.    In the negotiation of the Contract and subsequent communications with Jericho concerning the subject matter of the Contract, Midtown was represented by Imperatore and Stone.

## Events During The Study Period

16.    On June 19, 2002, the first day of the Study Period, Midtown sent certain documents to Jericho in purported compliance with the Contract, under cover of a letter from Stone. Stone's letter stated: "In accordance with the Contract of Sale I am enclosing the following due diligence items ...." The items listed in the letter and provided to Jericho included an "Environmental Impact Statement dated December 15, 1989."

17.    In July, 2002, Jericho asked Midtown to contact Amtrak to set up a meeting with Jericho so that Jericho could obtain relevant information about the property from Amtrak.

18.    Midtown refused this request, and advised Jericho to contact Amtrak directly.

19.    Jericho did so, but Amtrak refused to deal with Jericho, with which it had no relation.

20.    On July 17, 2002, Jericho wrote to Stone to advise that Jericho had obtained information showing that more than 20 documents filed by Midtown's architect with the City which should have been in Midtown's "due diligence" package had not been provided by Midtown.

21.    In the July 17, 2002 letter, Jericho advised that without the documents filed by Midtown's architect, Jericho's architect and zoning attorneys could not begin a

4

meaningful analysis of the Property, and asked that these documents be provided as soon as possible.

22.    By its August 1, 2002 letter, Jericho advised Stone that it had not received the documents requested in the July 17 letter. Jericho attached a letter from its architect explaining the need for the documents in order to proceed with the architect's development analysis.

23.    By Imperatore's August 2, 2002 letter, Midtown disclaimed responsibility for providing the documents filed by its architect, stating:

> You should know that pursuant to Paragraph 29 (a) of the Contract of Sale, Midtown's obligation is merely to provide Jericho with such "due diligence" materials that Midtown had <u>in its own possession</u>. <u>Midtown has long since produced those materials.</u>

(emphasis added).

24.    Midtown nonetheless advised in the August 2, 2002 letter that it had directed the architect to provide further documents to Jericho.

25.    Jericho received these documents on or about August 7, 2002. It was thus delayed by 49 days from June 19 in starting a meaningful due diligence analysis.

26.    By letter to Stone of August 13, 2002, Jericho's counsel made the following request:

> Our client has also noted that, while an environmental impact statement pertaining to the area in which the property is located was included in the due diligence package, there was <u>no report of any environmental study pertaining specifically to this property</u>. Our client finds this somewhat unusual since filings with NYC generally require at least a Phase I environmental report. <u>Please ascertain whether an environmental study of this property was done and whether any such report was prepared (whether for your client or any of the professionals retained by your client) and, if so, furnish our client a copy.</u> If no

written report was prepared, <u>kindly advise whether your client received any oral reports concerning the existence of hazardous materials at the property.</u>

(emphasis added)

27.    By Stone's August 14 letter, Midtown answered the August 13 letter, stating only that "[n]o Phase I Environmental Study was performed on the Property."

28.    In early August, 2002, Jericho had orally requested from Midtown copies of Exhibits referenced in the Amtrak Agreement but not attached to the copy of that Agreement in Jericho's possession.

29.    Midtown advised Jericho that it had misplaced the Exhibits, and told Jericho that it should obtain the Exhibits from Amtrak.

30.    Amtrak responded to Jericho's requests for Exhibits by stating that Amtrak had no relationship with Jericho, and that Jericho should get the Exhibits from Midtown, or have Midtown contact Amtrak.

31.    On or about August 20, 2002, Jericho orally advised Midtown that Jericho had heard something about an oil spill on the Property and asked if Midtown knew anything about such an event.

32.    On August 22, 2002, Midtown sent an e-mail message to its broker stating the following:

> <u>We have no papers confirming the successful cleanup of the oil spill from properties neighboring the Sites, in fact, we have not had contact with NYDEC in years.</u>  However, NYDEC should have the necessary papers filed under:
>
> Parts Center Project
> Project ID Number SP00334
> Spill Number 9709152
>
> NYDEC investigatory had been Chris Tomosello but he is long departed.  Our last contact Louise Munster at (718) 482-4912.

6

(emphasis added)

33.    On August 23, 2002 the above message was allegedly transmitted from the Midtown broker who received it, Elaine Emmett, to another Midtown broker, Benjamin Shafren, who asserts that he never received it.

34.    There was no suggestion in either the August 22 message or the August 23 transmittal that the August 22 message be passed on to Jericho.

35.    Failing to hear from Midtown regarding any oil spill, Jericho's counsel wrote on August 30, 2002 to Imperatore in pertinent part:

> In a letter to your colleague, Maurice Stone, dated August 13, 2002, we requested whether any environmental studies had been performed specifically with respect to these properties and, if any written reports existed, to have copies thereof. We also asked "if no written report was prepared, kindly advise whether your client received any oral reports concerning the existence of hazardous materials at the property." Mr. Stone's response on August 14, 2002, was that "[n]o Phase I Environmental Report or Study was performed on the Property" and did not specifically address our request.
>
> We raise this issue only because our client's principals have very recently heard scuttlebutt that there may have been an oil spill on the properties which may or may not have been cleaned up. Please advise, immediately, if there is any truth to this information and also whether Midtown, or any of its representatives, ever received any notice, written or oral, from the City of New York or any agency thereto, or from any third party, of the existence or possible existence of an oil spill or any other hazardous material on either of the properties, and, if so, the disposition thereof. Notwithstanding all that has preceded, our client is disposed to proceed with the contract, but needs this information in order to make an informed decision whether or not to do so.

(emphasis added)

7

36.     Jericho, by its counsel's August 30 letter, also responded to Midtown's argument that it was not required by paragraph 29 (a) of the Contract to provide documents which had been filed by Midtown's architect. It stated:

> Our client's principals have pointed out to us that it is Paragraph 29(c) and Paragraph 33 of the Contract of Sale, and not Paragraph 29(a) which address this issue. Paragraph 29(c) provides, in pertinent part, "[i]mmediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current <u>custody or control</u> relating to the Property, which Purchaser reasonably requests" (emphasis added). Paragraph 33 provides, in pertinent part, "[w]ithin two (2) business days from the date hereof, Seller shall make available to the Purchaser copies of all documentation pertaining to such permits and/or approvals" (i.e., the permits and/or approvals which Midtown may have obtained with respect to the development of the premises).
>
> Our client's principals believe that documents and/or drawings in the possession of the firm of architects engaged by Midtown to develop the property are documents and/or drawings under Midtown's custody or control and that such documents and/or drawings were documentation pertaining to the permits and/or approvals which Midtown had obtained (albeit expired) with respect to the development of the premises. For this reason, our client's principals believe that the seventy-five (75) day study period should not have begun to run until the date the 1990 documents and drawings were delivered by Midtown's architects. Please advise whether Midtown will concur in such interpretation.

37.     Despite Jericho's oral inquiry and the two communications of August 22 and August 23, Midtown did not respond to Jericho's inquiry about the oil spill until September 3, when, instead of producing the documents in its possession or control, it falsely stated that Jericho had relevant information through the e-mail message set forth in paragraph 32 above, allegedly sent on August 23 to "Jericho's broker", which, in fact, was not Jericho's broker but Midtown's broker.

8

38.     The August 22 e-mail message was never passed on to Jericho by Mr. Shafren, the Midtown broker to whom it was allegedly forwarded. Jericho did not receive that message until September 2, 2002, when it was faxed at 4:56 P.M. to Jericho by Ms. Emmett, the Midtown broker to whom Midtown had sent the August 22 message.

39.     During August, Jericho made strenuous efforts with at least three Amtrak offices to obtain the Amtrak exhibits referred to in paragraph 39 above, which Midtown had allegedly misplaced. These efforts were frustrated when Amtrak responded that it had no relationship with Jericho and Jericho should get the Exhibits from Midtown.

40.     Following further oral inquiries to Midtown concerning these Exhibits, Jericho's counsel wrote to Imperatore on September 2, 2002, referring to the missing Exhibits to the Amtrak Agreement and asking that copies be sent directly to Jericho by facsimile.

41.     In a letter of September 3, 2002, Midtown, through Imperatore, responded to Jericho's request for copies of the Exhibits to the Amtrak Agreement, stating:

> Midtown does not now (and did not at the commencement of the Contractual "Study Period") have the Exhibits referred in your letter, so it could not provide those Exhibits to Jericho. More to the point, Jericho has had 75 days under the Contract to obtain such Exhibits from the National Rail Corporation, more commonly known as "Amtrak", and, indeed, to meet with Amtrak concerning all issues relating to Amtrak's easement across the Sites and Jericho's right to build over that easement. It never did so.

42.     Jericho's counsel immediately sent by fax the following response:

> The referenced contract does not provide that Jericho is required to obtain documents from Amtrack [sic]. Rather, section 31 of the referenced contract recites that Exhibit B is a true copy of the agreement permitting development over Amtrack's railroad tracks. The exhibits referred to in my earlier letter could radically alter that agreement, for example, by reciting that the rights granted thereunder were personal to the named parties, or in any other fashion.

9

> Moreover, Jericho's representatives have spoken
> with John Youngdahl, Mark Brendar and Sheila Mac
> Sopper of Amtrack, each of whom advised our client that it
> should obtain the documents from Midtown ....

(emphasis added)

43.    In a separate September 3, 2002 letter, Imperatore, addressing Jericho's oil

spill inquiry, made the false statement that the August 22 e-mail message to Midtown's broker

had been sent by that broker on August 23 to Jericho's broker, when in fact the person to whom it

was allegedly sent was another of Midtown's brokers and not a Jericho broker. Midtown,

through Imperatore, deceitfully stated in this September 3 letter:

> Jericho has known at least since my letter dated
> August 14, 2002, a copy of which is attached, that Midtown
> performed no environmental studies with respect to the Sites.
>
> Finally, Jericho has known since Midtown's broker's
> e-mail to Jericho's broker dated August 23, 2002, a copy of
> which is also attached, that Midtown has no information with
> respect to whether or not an oil spill from adjacent properties
> onto the Sites was cleaned up. Nevertheless, Midtown
> provided Jericho in that e-mail with all information
> necessary to make that determination.

(emphases added)

44.    This bald faced lie is accentuated by the information learned by Jericho in

November 2006 when, in a letter to Justice Ramos, the Midtown lawyers disclosed an e-mail

dated April 22, 2002 by Ms. Emmet, the Midtown broker, to defendant Imperatore in which she

reports that she had stated to her co-broker that the oil spill "had been cleaned up," thus further

giving the lie to the aforesaid letters of August 14, August 22 and September 3.

45.    Midtown knew, because of its own inquiries to the DEC in 1998 and 2001,

as set forth below, that documents in the DEC's file identified in the referenced e-mail could

only be obtained through a Freedom of Information Law request, and that it would take many weeks to obtain a response to such a request.

46.    Midtown, through Imperatore, responded in the same September 3, 2002 letter to Jericho's August 30 comments about the belated delivery of the documents filed by Midtown's architect.

47.    Midtown falsely stated that it had "complied with all of its obligations under the Contract" and that it had made "available to Jericho copies of all architectural documents and drawings that it had in its possession." (emphasis added)  Midtown rejected Jericho's position that the Study Period commenced as of the date Jericho received the documents from Midtown's architect.

48.    Following receipt from Midtown's broker, at 4:56 P.M. on September 2, of the faxed e-mail message about the oil spill, Jericho immediately contacted the New York State Department of Environmental Conservation by telephone.  As Jericho's counsel advised Imperatore by letter the following day:

> One of our client's principals telephoned the regional office of NYDEC today in attempt to learn the extent of the spill and whether it was cleaned up, but was able to glean only that the file, apparently, is still open.  He was also told that, in order to inspect the file, he would have to make a formal request under the Freedom of Information Act.  Proceeding under this regimen would take 4-8 weeks and the study period expires this afternoon.

49.    Jericho responded separately to Midtown's September 3 comments regarding the oil spill by letter of September 3, 2002, stating:

> Be advised that, unless you advise us in writing that Midtown is willing (i) to make an affirmative representation that the oil spill referred to in my earlier letter of today's date has been cleaned up and paid for or (ii) to undertake whatever cleanup may be necessary at its cost and expense or (iii) to extend the study period for a sufficient period to

11

allow Jericho to investigate this matter, and, in any case provide Jericho with the requested due diligence documentation, Jericho requests that the monies paid upon execution of the Contract be returned to it in accordance with the Contract's terms.

50.  Jericho's request for the return of its deposit was based on concerns that a) the oil spill belatedly identified by Midtown but about which it provided no information would require an expensive cleanup by Jericho, (b) the unseen Exhibits to the Amtrak Agreement not produced by Amtrak might contain facts restricting Jericho's use of the Property to an unknown extent, (c) Midtown for 49 days had failed to produce documents filed by its architect, and (d) Midtown's evasions and delayed compliance with its obligations to provide documents to Jericho, created a need to protect the deposit by seeking a return of same at that stage of the transaction.

51.  Midtown's response, in a September 4, 2002 letter from Imperatore, was as follows:

> Midtown has made clear in the Contract and as you well know, Midtown has never made and is not now willing to make any representation with respect to environmental matters. Secondly, Midtown has never offered to "undertake whatever cleanup may be necessary" at its cost and expense. Finally, as you well know, Midtown will not extend the Study Period afforded by the Contract <u>even one day</u>. Indeed, that Study Period expired last evening.

(emphasis added)

52.  Midtown advised in this letter that it would return Jericho's down payment only if Jericho provided Midtown with a general release.

53.  By responding letter of September 4, 2003, Jericho advised Midtown that there was no basis for Jericho's request for a general release, and demanded the return of its down payment.

54.    Jericho repeated in that letter its concern about "the possibility of the property being contaminated by an oil spill ...." Jericho made it clear that the reason for seeking the return of its deposit was Midtown's refusal to alleviate that concern by making a "representation concerning the oil spill" or by undertaking "to clean it up at [Midtown's] cost and expense."

55.    By letters from defendant Stone of September 5 and September 10, 2002, Midtown advised Jericho that it would not return Jericho's down payment unless Jericho gave notice that Jericho was canceling the Contract.

### The Ineffectual Contract Cancellation

56.    Jericho's counsel responded by letter of September 12, 2002, stating:

> Although Jericho's principals felt, and still feel, that under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period and the request for production of documents was warranted, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of Jericho's down payment was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof.

57.    Counsel's September 12 letter was sent without the knowledge of Jericho and without Jericho's authorization, and was not "cc'd" to Jericho.

58.    Jericho had advised Midtown on several occasions, that Mr. Szegda, the attorney who authored and sent the September 12 letter, did not have authority to cancel the Contract.

59.    In addition to the absence of authorization, the September 12 letter did not comply with the requirements of the Contract for cancellation of the Contract. The Contract provided in paragraph 29 that if the "Purchaser" (i.e., Jericho) determined at its sole and absolute

13

discretion that the Property was not suitable for its needs, "the Purchaser shall have the right to cancel this Contract upon written notice to the Seller [Midtown] and the Escrowee [Midtown's law firm]".

60.     The Contract further provided, in paragraph 42:

This Contract constitutes the entire agreement between the parties hereto.  No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the party against whom the change, modification or discharge is claimed or sought to been [sic] enforced;  nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

61.     In addition, paragraph 44 of the Contract provided:

All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party s hall have specified most recently by like Notice.  At the same time any Notice is given to either party, a copy shall be sent to its attorney.  For the purposes of this paragraph 44 the attorneys for the parties are as follows:

Attorneys for Seller:

Edward Imperatore, Esq.
Harwood Lloyd, LLC
130 Main Street
Hackensack, NJ  07601

Attorney for Purchaser:

Szegda & Gerbing
300 East 42nd Street
New York, New York  10017
Attn:  Michael A. Szegda, Esq.

14

62. The September 12 letter was not signed by the party (Jericho) against which the cancellation was to be enforced, and was not sent to "the party to be notified" (Midtown, as distinguished from its attorney).

63. By letter dated September 18, 2002, Jericho's Vice President advised Midtown that the Contract had not been properly cancelled, and asked Midtown to "inform Jericho in writing ... when and how you [Midtown] want to proceed with the Contract."

64. On or about September 24, 2002, plaintiff was permitted by the New York State Department of Environmental Protection to see some materials regarding the oil spill at the Property and the cleanup.

65. Jericho requested a response to its September 18 letter in a letter of October 18, 2002.

66. In 2003, Jericho reasserted its position that the Contract had not been properly cancelled in conversations, and in letters to Midtown's counsel dated January 5, January 23, and February 16, 2004. Jericho again asked in these letters that Midtown advise Jericho how and when Midtown wanted to proceed with the Contract.

67. The Contract had provided for a closing 15 days after the end of the Study Period, and further provided that if Jericho did not close by such date, Midtown could set a "time of the essence" closing date on 14 days' notice. Midtown never gave such notice.

68. On Midtown's failure to respond to plaintiff's request to schedule a closing of the Contract, Jericho commenced an action against Midtown in this Court under Index No. 113274/04 to enforce the Contract and for related relief.

69. Midtown moved before this Court pursuant to CPLR 3211 for dismissal of the complaint. That motion was denied.

15

70.    Upon denial of the dismissal motion, Midtown appealed the decision to the Appellate Division which reversed the decision below reciting, among other things,

"Had Midtown willfully and deliberately breached its obligations under paragraph 29(a) of the Contract, Jericho's two causes of action (for specific performance or alternatively, for damages for breach of contract) would not have been barred by its termination of the contract and recovery of its downpayment."

71.    In fact, pending the appeal to the Appellate Division and, therefore, not part of the appellate record, discovery proceedings had been proceeding which disclosed that, indeed, Midtown and the other defendants in this action had willfully and deliberately breached their obligations referred to in the Appellate Division decision.

72.    More than that, said discovery proceedings disclosed that the defendants herein had engaged in willful and deliberate fraud upon this Court and upon plaintiff in that they had deliberately made omissions and misrepresentations to the Court, including the Appellate Division, which violated express mandates of the proceeding.

73.    Upon the Court's entry of judgment dismissing this action on the basis of the Appellate Division decision, plaintiff moved in this Court to vacate the judgment of dismissal, submitting documentary evidence unavailable to the Appellate Division because it developed after the appeal was pending and could not be included in the appellate record.

74.    This Court, by decision dated February 2, 2007, filed February 20, 2007, granted the motion to vacate the judgment of dismissal, stating, among other things,

"However, Jericho has presented sufficient evidence of fraud with regard to the NYDEC documents to satisfy CPLR 5015(a)(3). Midtown repeatedly said to this Court that it had complied with its disclosure obligation in 2002 when it clearly had not. Indeed, the Appellate Division relied on this misrepresentation. In its August 17, 2006 decision, the Appellate Division states "[b]y e-mail dated August 23, 2002, Midtown let Jericho know that it had no information

concerning the cleanup of an oil spill on properties neighboring the lands Jericho sought to purchase." at p. 38. The Appellate Division concluded that Midown had provided Jericho all of the information in Midtown's possession regarding the oil spill, which we now know to be false. The e-mail was sent to Elaine Osborn Emmet, undisputedly Midtown's broker who immediately sent it to Benjamin Shafren. However, Mr. Shafren never sent it to Jericho.

\* \* \*

"Accordingly, this Court vacates its judgment as this Court will not be a party to defendant's fraud on the court."

75.    This action is brought on the decision of the Court which recites that "Plaintiff is welcome to file a new Complaint in a new action ...."

### Disclosures To Jericho Of The Facts
### Misrepresented And Concealed By Midtown

76.    In the discovery conducted by Jericho pending Midtown's appeal of the denial of its CPLR 3211(a) motion, referred to above, Midtown had produced documents showing that the representation in the August 22 e-mail to Midtown's broker that Midtown had "not had contact with NYDEC in years" was false, in that among the documents produced in the discovery proceedings were letters to the DEC from Stone dated April 9 and April 11, 2001, seeking information concerning the oil spill at the Property. Imperatore was copied on the letter of April 9, 2001.

77.    Among other things, Defendant Stone wrote a letter to the DEC on April 9, 2001, referring to a meeting he had with DEC staff members in the Summer of 1998 concerning the DEC's progress in "investigating and remediating" the oil spill (emphasis added), and seeking updated information "with respect to the investigation and remediation of the Spill ...."

17

78.     Mr. Stone then wrote to the Dec on April 11, 2001 to ask, pursuant to the Freedom of Information Act, for all of the DEC's records regarding the oil spill.

79.     Midtown produced in the discovery proceedings in the prior action approximately 100 pages of documentation from DEC concerning the oil spill, obviously, obtained by Mr. Stone in 2001 pursuant to his request.

80.     These documents showed, most significantly, that the DEC had conducted a study of the oil spill and reported thereon, and that <u>substantial remediation work with respect to the oil spill had been performed at the end of 1997 and through May, 1998</u> at the expense of the DEC.

81.     Yet Mr. Stone (a) did not include those documents among the "due diligence items" he provided with his June 19, 2002 letter to Jericho; (b) misleadingly stated in his August 14, 2002 letter, in response to Jericho's August 13, 2002 letter asking about environmental studies or reports concerning the Property, that no "Phase I Environmental Report or Study was performed on the Property;" and (c) remained silent after he received a copy of Jericho's August 30, 2002 letter to Mr. Imperatore requesting information about an oil spill, leaving it to Mr. Imperatore to respond by denying that <u>Midtown</u> had performed any environmental studies, and that Midtown had no information regarding any cleanup of an oil spill.

82.     Defendant Imperatore, for his part, among other things, was copied on Mr. Stone's April 9, 2001 letter to the DEC. Yet Mr. Imperatore sent the August 22, 2002 e-mail to Midtown's broker stating: "We have not had contact with the DEC in years."

83.     More egregious was the disclosure, in defendants' November 8, 2006 letter to this Court, of the previously unproduced e-mail of April 22, 2002 to defendant

18

Imperatore confirming Imperatore's knowledge at that date that the oil spill has been "cleaned up."

84.    Notwithstanding this knowledge, Mr. Imperatore was the author of the September 3, 2003 letter to Jericho disclaiming, in response to Jericho's specific request, any knowledge about the clean up of the oil spill.

85.    In addition, Mr. Imperatore was the person who responded to Jericho's September 2, 2002 letter asking for the Amtrak Exhibits by stating that Midtown did not have those documents, and telling Jericho to get them from Amtrak, notwithstanding Mr. Imperatore's knowledge, revealed in his sworn deposition testimony, that the Exhibits never existed.

86.    Defendants' communications with the DEC in 1998 and 2001, their possession of the documents from the DEC concerning the oil spill, and the April 22, 2002 e-mail to Imperatore, demonstrate, among other things, that

        (a)    Midtown, defendant Stone and defendant Imperatore had lied in submitting Imperatore's September 3, 2002 letter, stating that Midtown "has no information with respect to whether or not [the] oil spill … was cleaned up."

        (b)    Midtown's statements, in Stone's August 14, 2002 letter, in response to Jericho's August 13, 2002 inquiry as to whether an environmental study had been done and "any [environmental] report" prepared, that "[no] Phase I Environmental Study" had been performed, was grossly misleading and false, in that no mention was made of the study performed by the DEC, of which Midtown and defendants were well aware at the time.

19

(c)     in responding to Jericho's August 30, 2002 request as to whether Midtown had notice from any source of an oil spill and the disposition thereof, by stating that "Midtown has performed no environmental studies" (emphasis added), defendants were being willfully evasive and deliberately concealing the fact that extremely relevant documents were in its possession.

87.     The DEC documents in Midtown's possession also demonstrate that the September 4, 2002 assertions by defendants that Midtown had no obligation to, and would not, make any representation regarding environmental matters, and had never offered to undertake a clean-up, were only a smoke screen.  In light of the fact that Midtown had the DEC documents and could readily have given them to Jericho, Midtown's assertions were evidently a pretext for not producing the DEC documents Midtown wanted to conceal, in an attempt to induce Jericho to cancel the Contract by creating the impression of heavy risks of oil spill remediation if there was ownership of the property.

88.     At his deposition in this action in December 2005, during the pending Appellate Division appeal, Imperatore, the author of several of the written communications to Jericho's counsel identified above, further demonstrated defendants' fraud by stating that in 2002 he was not concerned about the spill at all, because "[i]t must be remediated by the State of New York."

89.     Midtown also produced, during discovery, 34 pages of copies of photographs taken in June, 1998, depicting the area in which the oil spill occurred and the effects of the oil spill together with a copy of an invoice for developing the photographs showing that they had been taken by or at the behest of Midtown's counsel.  These photographs reflect an

environmental study or report providing information regarding the clean up, and further demonstrate the fraudulent-nature of Midtown's responses to the inquiries cited in paragraphs 81(a) and (b) above.

90.    The photographs also demonstrate that Midtown's representation that Midtown had performed no environmental studies at the site was not only grossly misleading, but a flagrant falsehood.

91.    Jericho further learned, while Midtown's appeal from the dismissal order was pending, that in conducting its search for the Exhibits attached to the Amtrak Agreement, Jericho had been misdirected to a time consuming wild goose chase which had been doomed to failure from the start. Mr. Imperatore, who (a) advised in early August, 2002 that Midtown had "misplaced" those Exhibits and told Jericho to get them from Amtrak, and (b) told Jericho's counsel in writing on September 3, 2002 that Midtown did not "now" have the Exhibits and that Jericho should have gotten the Exhibits from Amtrak, stated under penalty of perjury in a June 29, 2006 affirmation submitted to this Court: "to my knowledge the exhibits referred to in the 1990 agreement between Amtrak and Midtown do not exist." (emphasis added).

92.    Mr. Imperatore's June, 2006 affirmation was submitted in support of a summary judgment motion by Midtown. Midtown asserted, in its memorandum of law in support of that motion, that it had no evidence that the documents had "ever" existed. (emphasis in original).

93.    Nonetheless, Mr. Imperatore himself wrote the September 3, 2002 letter advising Jericho that Midtown did not "now" have the Exhibits, and telling Jericho that it had had 75 days in which to obtain the Exhibits from Amtrak. The making of such statements with the knowledge that there were no such exhibits constituted a deliberate and material

misrepresentation and concealment of facts by both Mr. Imperatore and Midtown, with the intent

of creating doubt and uncertainty so as to cause Jericho to withdraw from its transaction.

94.     The materiality of the existence or non-existence of the Exhibits to the

Amtrak Agreement was confirmed by documents produced by Amtrak in the course of discovery

in response to a Freedom of Information Law inquiry.  Among those documents were letters

from Mr. Imperatore, dated September 23 and October 13, 1998, asking for the "missing"

exhibits in connection with a potential sale by Midtown of the affected property to third parties.

Upon information and belief, Mr. Imperatore and Midtown learned that the Exhibits did not exist

as a result of these inquires.

95.     Beyond the issue of misrepresentations as to the non-existent Exhibits,

discovery showed that Midtown possessed but did not produce during the Study Period certain

modifications to and clarifications of the Amtrak Agreement, and architectural plans prepared in

2000 relating to a proposed parking garage development on the Property which rendered the

document production incomplete.

96.     The documents referred to in paragraph 89 above were among those

required by paragraph 33 of the Contract to be produced within two business days of the

execution of the contract.

97.     In addition, these documents should have been produced pursuant to

paragraph 29(c) of the Contract, after Jericho requested the missing Exhibits to the Amtrak

Agreement, since they contained information which would have resolved Jericho's concerns

about what the missing Exhibits might show.

98.     Defendants knowingly concealed the existence of the documents

referenced in paragraph 89 above from Jericho.

99.     Based on the foregoing facts regarding all of the documents Midtown

failed to disclose and provide to Jericho, the representation in Midtown's August 2, 2002 letter

that Midtown had "long since" produced the due diligence materials it was required to produce

pursuant to the Contract was knowingly false.

100.     Based on the foregoing facts regarding all of the documents Midtown

failed to disclose and provide to Jericho, Midtown's September 3, 2002 representation that it

"complied with all of the obligations under the Contract" was knowingly false and fraudulent.

### Defendants Commission Of
### A Fraud Upon The Court

101.     With his affirmation of January 6, 2005 in support of Midtown's motion to

dismiss Jericho's complaint in the prior action, defendants submitted as Exhibits several of the

false or misleading letters from Imperatore and Stone identified in paragraphs 28 through 49

above:  the June 19, 2002 letter covering documents supposedly submitted in complete

compliance with Midtown's due diligence obligations; the incomplete August 14, 2002 response

to Jericho's inquiry regarding environmental matters; the September 3, 2002 letter disclaiming

knowledge regarding the oil spill cleanup or lack thereof, and accompanying e-mail message;

and the September 3, 2002 letter advising that Midtown did not "now" have copies of the

Exhibits to the Amtrak Agreement and advising that Midtown should have gotten the Exhibits

from Amtrak.  As discovery and the subsequent court proceedings demonstrated, each of those

documents were false and/or so evasive as to constitute fraud.

102.     Mr. Imperatore asserted in paragraph 24 of his January 6, 2005

affirmation:  "The parties' contemporaneous correspondence shows that Midtown did not

conceal any documents from Jericho."

23

103.  The subsequent disclosure of Midtown's failure to produce the extensive files as to the oil spill expose Mr. Imperatore's statement as blatant lying. The denial of possession of the Amtrak Exhibits, after putting Jericho to a wild goose chase, with full knowledge that such Exhibits never existed, is the most brazen fraud.

104.  Mr. Imperatore stated in paragraph 27 of his January 6, 2005 affirmation that the August 23, 2002 e-mail message regarding the oil spill, which referred to a file at the DEC, was sent from Midtown's broker "to Jericho's broker." This statement likewise was willfully false. Mr. Imperatore acknowledged at his deposition that Benjamin Shafran, the addressee of the e-mail, was Midtown's broker, and not Jericho's broker.

105.  When this Court asked, at the May 2005 hearing on Midtown's dismissal motion, whether Jericho had sent "specific request[s] [for documents] in writing to the Seller [Midtown]," Midtown's counsel responded: "They sent some requests, and the requests were fulfilled." (emphasis added)

106.  Midtown's false and misleading submissions were included in the Record on Appeal, and formed the basis for arguments in Midtown's briefs. Manifestly, they misled the Appellate Division. For example, the Appellate Division, accepting Midtown's recitals, stated in its August 17, 2006 Decision: "By e-mail dated August 23, 2002 Midtown let Jericho know that it had no information concerning the cleanup of [the] oil spill." The Appellate Division also was led by Midtown's false statements to state: "the record is plain that Midtown provided Jericho with information in its possession."

107.  The materiality of these false statements is established by the recital by the Appellate Division in its decision dismissing the complaint which is quoted in paragraph 10 above.

24

108.    The Appellate Division found that to the extent Jericho was alleging willful and deliberate conduct, such allegations were "contradicted by the documentary evidence." Such evidence consisted of the false, deceitful and fraudulent documents that Midtown and its counsel placed in the record. In fact, the additional documentary evidence ultimately produced from Midtown's own records, which could not be included in the Record on Appeal, constitutes evidence that Midtown's conduct was willful, deliberate and fraudulent.

109.    The false and fraudulent statements and conduct manifestly were made to mislead and defraud this court as well.

110.    Defendants' failure to disavow the statements on the motion before this court referred to in paragraph 73 above continued and perpetuated the attempt to perpetuate the fraud.

111.    The fraudulent documents were calculated to cause, and did cause, Jericho to have uncertainty and doubt as to whether to proceed with the Contract and closing and to seek a return of its deposit.

112.    As set forth above, the misconduct of defendants includes the following:

a.    <u>Oil Spill</u>. Willful and deliberate failure to produce documents in Midtown's possession or control regarding the oil spill, including photographs commissioned and obtained by defendants, Freedom of Information requests to the Department of Environmental Control ("DEC"), responses by the DEC and correspondence and documents relating to the oil spill; false representations that Midtown had produced such due diligence materials as were in its possession and had complied with all contractual requirements; false representations that Midtown had not had contact with the DEC in years, and had no information with respect to an oil spill clean up; that the e-mail message about the oil spill had

25

been sent to Jericho's broker; and false and misleading responses to Jericho's specific requests for environmental reports and studies and for information about the cleanup of the oil spill.

b. <u>Exhibits to the Amtrak Agreement</u>. Advising Jericho, despite defendants' knowledge that the Exhibits to the Amtrak Agreement did not exist, that Midtown had misplaced the Exhibits; that Jericho should get the Exhibits from Amtrak; and that Midtown did not "now," in September 2002, have the Exhibits.

c. <u>Modifications and Clarifications to the Amtrak Agreement and Relevant Architectural Drawings</u>. Knowingly, deliberately and willfully failing to produce documents which would have alleviated Jericho's concerns about the "missing" Amtrak Exhibits.

d. <u>Documents Submitted by Midtown's Architects to the City of New York</u>. Failing to produce documents as required by the Contract, and refusing to grant an extension of the Study Period because of the long delay in their production.

e. <u>Improper Termination of the Contract by Midtown</u>. Asserting that the Contract was terminated and refusing to proceed with the sale of the Property, knowing that Jericho's attorney had no power to take such action and that proper procedures for cancellation had not been followed.

113. As set forth above, the knowingly false and misleading nature of defendants' misrepresentations, and their willful and deliberate concealment of material facts, was demonstrated by the documents produced by Midtown and Amtrak during the course of discovery, and by defendants' sworn statements to the Court with respect thereto.

114. As set forth above, defendants' knowing misrepresentations and concealments caused Jericho to refrain from proceeding with the transaction and to ask for the

return of its deposit. But for defendants' knowing misrepresentations and concealments, Jericho would have proceeded to close the purchase transaction.

## FIRST CAUSE OF ACTION
### (For Fraud, Against All Defendants)

115.    Repeats the allegations of paragraphs 1 through 114 above as if set forth at length herein.

116.    Defendants willfully and deliberately lied to Jericho in making false representations that Midtown had produced the materials in its possession concerning environmental matters referenced in the Contract, and knowingly concealed from Jericho, in response to Jericho's inquiries and otherwise, the documents and knowledge in Midtown's possession concerning the oil spill and remediation thereof.

117.    The facts known to defendants in this regard were clearly material, as they related directly to Jericho's concern that the oil spill had not been cleaned up and that Jericho might have responsibility for such clean-up and its costs.

118.    Defendants, during the 75-day Study Period, knowingly gave misleading and incomplete responses to Jericho's requests for the Exhibits to the Amtrak Agreement which indicated that there were unproduced materials which were part of the Amtrak Agreement, creating doubt as to the contents of the Exhibits and their impact on the decision to be taken at the end of the Study Period, while knowing at all times that such Exhibits did not exist.

119.    Defendants' assertions as to unproduced or incompletely produced Exhibits were clearly material, in that such facts were relevant to the issue of whether the Amtrak Agreement placed restrictions on the owner's right to develop the Property beyond those specified in the produced text of the Agreement.

27

120.    Defendants knowingly, deceitfully and fraudulently created doubt and confusion as to the existence of the Exhibits and contents thereof, so as to preclude a meaningful decision by Jericho regarding the Amtrak Agreement. Midtown's conduct in this regard was willful and deliberate.

121.    Defendants knowingly, deceitfully and fraudulently concealed from Jericho the documents identified in paragraph 89 above, which had they been disclosed would have alleviated Jericho's concerns as to what was contained in the missing Exhibits to the Amtrak Agreement. Midtown's conduct in this regard was willful and deliberate.

122.    The existence or non-existence of liability of the oil spill, the clean-up and its costs, and liability therefore, and the precise terms of the Amtrak Agreement regarding the development of the Property, were essential considerations for Jericho in any decision as to go forward with the purchase of the Property under the Contract.

123.    Defendants had a duty to disclose all of the documents and information which they knowingly concealed.

124.    Defendant's representations, misleading responses and concealments were intended to induce Jericho not to proceed with the purchase of the Property. Jericho reasonably relied on defendants' representations, misleading responses and concealments in its decision to request a return of its deposit. Had it obtained the documents and information in Midtown's possession regarding the oil spill, and had it known there were no Exhibits to the Amtrak Agreement, Jericho would have gone to closing and purchased the Property.

125.    Jericho has been injured as a result of Midtown's conduct in various ways, including by virtue of the fact that it lost the opportunity to purchase the Property at the price specified in the Contract.

28

126.    Jericho has no adequate remedy at law.

127.    By virtue of Midtown's fraudulent conduct, Jericho is entitled to restore the Contract to its September 3, 2002 status.

### SECOND CAUSE OF ACTION
**(For Fraud and Specific Performance, Against All Defendants)**

128.    Repeats the allegations of paragraphs 1 through 127 above as if set forth at length herein.

129.    Jericho was ready and able to purchase the Property in accordance with the contract at the end of the Study Period, and would have been willing to do so but for Midtown's misrepresentations and concealments.

130.    Now that it has knowledge of the true facts, Jericho is ready, willing and able to purchase the Property in accordance with the Contract.

131.    By virtue of Midtown's fraudulent conduct, Jericho is entitled to specific performance of the Contract by Midtown.

### THIRD CAUSE OF ACTION
**(For Breach of Contract and Specific Performance, Against Midtown)**

132.    Repeats the allegations of paragraphs 1 through 114 above as if set forth at length herein.

133.    In failing to provide Jericho with documents and information within its possession relating to the oil spill and giving misleading answers to Jericho's inquiries on this subject, Midtown breached its express obligations under paragraph 29 of the Contract and breached its duty of good faith and fair dealing in connection with the requirements of said paragraph.

29

134.    In failing to produce to Jericho the documents specified in paragraph 89 above, Midtown breached its express obligations under paragraphs 29 and 33 of the Contract, and breached its duty of good faith and fair dealing in connection with the requirements of said paragraph.

135.    Midtown's breach of its obligations under the Contract was willful and deliberate, and thus supportive of Jericho's claims for specific performance, or alternatively for damages for breach of contract. The Appellate Division, as set forth above, stated in its August 17, 2006 decision that if "Midtown willfully or deliberately breached its obligations under paragraph 29(a) of the contract, Jericho's first two causes of action would not have been barred by its termination of the contract and recovery of its down payment ...."

136.    But for Midtown's breaches of its obligations under the Contract, Jericho would have gone to closing and purchased the Property.

137.    Jericho has been injured by Midtown's conduct in various ways, including by virtue of the fact that it lost the opportunity to purchase the Property at the price specified in the Contract.

138.    Jericho has no adequate remedy at law. Jericho was ready, willing and able to purchase the Property in accordance with the contract at the end of the Study Period, and would have been willing to do so but for Midtown's willful and deliberate breaches.

139.    Now that it has knowledge of the true facts, Jericho is ready, willing and able to purchase the Property in accordance with the terms of the Contract.

### FOURTH CAUSE OF ACTION
**(For Breach of Contract and Specific Performance, Against Midtown)**

140.    Repeats the allegations of paragraphs 1 through 114 above, as if set forth at length herein.

141.    By failing to timely provide Jericho a) with information as to the oil spill as set forth in paragraphs 26, 27, 31, 35, 37 and 38, and 43-54, and b) with the documents submitted by its architect to the City, as set forth in paragraphs 20 through 25 above, Midtown willfully and deliberately breached the contract.

142.    By virtue of Midtown's breach, Jericho was entitled to an extension of the Study Period.

143.    Jericho requested an extension of time which Midtown denied in its letter of September 3, 2002.

144.    As a consequence of Midtown's willful and deliberate breach and its failure to extend the Study Period, Jericho lost the opportunity to obtain additional facts to which it was entitled for the purpose of exercising its option provided for at the close of the Study Period.

145.    Had Jericho obtained such facts, it would have gone to closing and purchased the Property at the end of the extended Study Period.

146.    Now that it has knowledge of the true facts, Jericho is ready, willing and able to purchase the Property in accordance with the terms of the contract.

147.    Jericho has no adequate remedy at law.

### FIFTH CAUSE OF ACTION
**(For Declaratory Judgment, Against Midtown)**

148.    Repeats the allegations of paragraphs 1 through 114 above, as if set forth at length herein.

149.    As alleged in paragraph 67, Midtown knew, at the time it alleges the Contract was cancelled by Mr. Szegda, that Mr. Szegda had no authority to speak for Jericho on this subject.

150.    As is alleged in paragraphs 59 to 66 above, the communications which Midtown claims resulted in the cancellation of the Contract did not comply in material respects with the contract provisions governing cancellation of the Contract.

151.    Jericho is entitled to a declaratory judgment that the Contract was never cancelled, and that Jericho's right to purchase the Property thereunder remains in full force and effect.

152.    . Jericho is ready, willing and able to purchase the Property in accordance with the terms of the Contract.

153.    Jericho has no adequate remedy at law

## SIXTH CAUSE OF ACTION
### (For A Declaratory Judgment, Against Midtown)

154.    Repeats the allegations of paragraphs 1 through 114 above, as if set forth at length herein.

155.    The Contract did not provide that time was of the essence with respect to its provisions requiring Jericho to elect to proceed or cancel at the end of the 75 day Study Period.

156.    Given the facts as set forth herein, Midtown had a duty to comply with Jericho's requests for an extension of the Study Period.

157.    Jericho is entitled to a declaration that the Study Period should have been continued, and that Jericho's right to purchase the Property remains in full force and effect.

158.    Jericho is ready, willing and able to purchase the Property in accordance with the terms of the contract.

159.    Jericho has no adequate remedy at law.

32

160.    Jericho would have been ready, willing and able to purchase the Property in accordance with the contract at the end of an extended Study Period.

## SEVENTH CAUSE OF ACTION
### (Against All Defendants, For Fraud On The Court)

161.    Repeat the allegations of paragraphs 1 through 114 above as if set forth at length herein.

162.    The conduct of defendants specified in paragraphs 96 through 103 constituted a fraud upon the courts, by which Jericho was tortiously injured.

WHEREFORE, Jericho demands judgment (a) on its First Cause of Action, declaring that the Contract has been reinstated; (b) on its Second, Third and Fourth Causes of Action, (i) compelling Midtown to sell the Property to Jericho in accordance with the Contract, or (ii) in the alternative, awarding damages to Jericho in an amount to be determined, but not less than $100,000,000; (c) on its Fifth Cause of Action, declaring that Jericho's right to purchase the Property in accordance with the Contract is in full force and effect, and compelling Midtown to sell the Property to Jericho in accordance with the Contract; (d) on its Sixth Cause of Action, declaring that the Study Period should have been extended and that Jericho's right to purchase the Property in accordance with the Contract is in full force and effect, and compelling Midtown to sell the Property to Jericho in accordance with the Contract; (e) on its Seventh Cause of Action for damages, including expenses incurred by Jericho for attorneys fees, in excess of

33

$100,000,000; (f) for punitive damages in an amount not less than $100,000,000., and (g) for

such other and further relief as the Court may deem just and proper, together with costs and

disbursements.

Dated: New York, New York
       February 22, 2007

HERZFELD & RUBIN, P.C.


By: _____
       Herbert Rubin
Attorneys for Plaintiff
40 Wall Street
New York, New York  10005
(212) 471-8500

34

V E R I F I C A T I O N

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )

Samuel Pfeiffer, being duly affirmed, deposes and says;

That deponent is the Vice-President of Jericho Group, Ltd., the plaintiff in the within action; that he has read the foregoing Complaint and knows the contents thereof; that the same is true to his own knowledge except those matters therein stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

Samuel Pfeiffer

Affirmed before me this
22d day of February, 2007

BERNARD J. WALD
Notary Public, State of New York
No. 02WA41237450
Qualified in New York County
Commission Expires September 30, 2008