UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JERICHO GROUP, LTD.,

No. 07-CV-1792 (RCC) (DCF)

              Plaintiff,

ECF CASE

   -against-

**NOTICE OF MOTION**

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE,

            Defendants.
-------------------------------------------------------------X

      **PLEASE TAKE NOTICE,** that upon annexed Affidavit of Herbert Rubin,

sworn to the 29th day of March, 2007, the exhibits annexed thereto, the accompanying

Memorandum of Law, and upon all the pleadings and prior proceedings had herein, the

undersigned attorneys for plaintiff will move this Court, before the Hon. Harold Baer, Jr.,

at the Courthouse located at 500 Pearl Street, New York, New York 10007, for an

Order, pursuant to 28 U.S.C. §1447, remanding this case to the Supreme Court of the

State of New York, New York County, together with such other and further relief as this

Court deems just and proper.

      **PLEASE TAKE FURTHER NOTICE,** that answering papers, if any, must

be served upon the undersigned on or before April 13, 2007, pursuant to the Federal

Rules of Civil Procedure and the Local Rules of the Southern District of New York.

Dated:  New York, New York
       March 30, 2007

                        HERZFELD & RUBIN, P.C.

To:    Jones Day
       Attorneys for Defendants
       222 East 41st Street             By:  /s/ Herbert  Rubin
       New York, New York 10017         Herbert Rubin (HR8484)
                                 Attorney for Plaintiff
                                 40 Wall Street
                                 New York, New York 10005
                                 (212) 471-8500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
JERICHO GROUP, LTD.,

               Plaintiff,

    -against-

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE,

             Defendants.
--------------------------------------------------------------X

No. 07-CV-1792 (RCC) (DCF)

ECF CASE

**AFFIDAVIT IN SUPPORT
OF MOTION TO REMAND**

STATE OF NEW YORK  )
                 : ss.:
COUNTY OF NEW YORK )

      HERBERT RUBIN, being duly sworn, deposes and says:

      1.    I am the Senior Member of the firm of Herzfeld & Rubin, P.C.,
attorneys for plaintiff Jericho Group, Ltd. ("Jericho"). This case was removed to this
Court from the Supreme Court of the State of New York, New York County, by Notice of
Removal filed on March 1, 2007. I make this affidavit in support of Jericho's motion,
pursuant to 28 U.S.C. §1447, to remand this case to the Supreme Court, New York
County. This motion is based on (a) the fact that serious questions exist with regard to
defendants' representations in their Notice of Removal concerning the facts upon which
the Court's diversity jurisdiction is invoked, and (b) the doctrine of abstention as
established in Colorado Water Conservation Dist. v. United States, 424 U.S. 800
(1976).

## BACKGROUND

2.     This is an action for specific performance of a contract for the sale of real estate on the west side of Manhattan and for related relief.  A copy of the Complaint is annexed as Exhibit A hereto.  In essence, Jericho claims that it was dissuaded from proceeding to purchase the land pursuant to a contract between the parties by defendants' willful and fraudulent conduct.  The misconduct involved the failure of defendant Midtown Development, L.P. ("Midtown"), during a contractually specified "Study Period," to provide Jericho with documents which it was obliged to provide, and defendants' false responses to Jericho's inquiries about relevant facts regarding the property.  A previous action for the same relief was commenced by Jericho against defendant Midtown Development, L.P. ("Midtown") in the Supreme Court, New York County, in November, 2004.  A copy of the Amended Complaint in that action (referred to hereafter as the "Original Action") is annexed as Exhibit B hereto.  Jericho filed a Notice of Pendency at the time it commenced the original action.

3.     The Original action was assigned to Justice Charles Ramos.  A motion by Midtown to dismiss the Original Action was denied by Justice Ramos in May, 2005.  A copy of his decision is annexed as Exhibit C hereto.  Thereafter, the parties engaged in substantial discovery.  A total of 12 depositions of parties and non-parties were taken.  Voluminous documents were produced by the parties, and by non-parties pursuant to subpoena.  Interrogatories were asked and answered.  All of these proceedings were conducted under the supervision of Justice Ramos.

4.     The discovery was conducted while Midtown's appeal from the denial of its dismissal motion was pending.  On August 17, 2006, the Appellate Division, First Department, reversed Justice Ramos' decision and directed dismissal of the

2

Original Action.  A copy of the Appellate Division's decision is annexed as Exhibit D hereto.  Judgment dismissing the Original Action was entered by the Supreme Court on September 19, 2006.

5. In November, 2006, Jericho moved to vacate the judgment against it on the ground that it had been procured by fraud, and for leave to serve an amended complaint.  By decision dated February 2, 2007, and entered on February 20, 2007, Justice Ramos granted Jericho's motion, finding, inter alia, that

> "Midtown repeatedly said to this Court that it had complied with its disclosure obligation when it clearly had not," and that Midtown committed fraud in responding to Jericho's requests for certain documents by stating that the documents were lost, when in fact Midtown knew that there were no such documents, because "[i]t is fraud or misrepresentation to say something exists when it does not."  Justice Ramos stated: "this Court vacates the judgment as this court will not be a party to defendant's fraud on the Court."

A copy of the decision and order vacating the judgment is annexed as Exhibit E.

6. Justice Ramos found that the Appellate Division's decision precluded him from permitting Jericho to serve an amended complaint, but stated that Jericho was free to serve a new complaint in a new action.  On February 22, 2007, Jericho commenced its new action.  In that action, it sought essentially the same relief as in the Original Action, based on the same transaction.  Jericho named two defendants in addition to Midtown: Edward Imperatore and Maurice Stone, who had served as attorneys for Midtown in connection with the transaction giving rise to the fraud found by Justice Ramos.  Also, on February 22 and 23, 2007, Jericho filed Notices of Pendency of the new action (see Ex. F hereto), the earlier Notice of Pendency having been vacated following the Appellate Division's August, 2006 decision.

7.    Midtown served a Notice of Appeal from Justice Ramos' February 2, 2007 ruling on February 22, 2007.  The Record, on Appeal including many exhibits reflecting proceedings in the original action before Justice Ramos prior to the Appellate Division's decision, constitutes 1340 pages.  Midtown served its brief and the Record on Appeal on March 19, 2007.  The appeal is scheduled to be heard during the June, 2007 Term of the Appellate Division, First Department.

8.    On March 9, 2007, Jericho moved in the original action to clarify certain portions of Justice Ramos' February 2, 2007 decision.  Midtown serve opposing papers; Jericho served reply papers; and the motion was submitted on March 22, 2007.

9.    Jericho served its complaint in the new action (i.e., this action) on all defendants on February 26, 2007.  Defendants filed a Notice of Removal on March 1, 2007, and filed an Amended Notice of Removal on or about March 8, 2007.

## DEFENDANTS' NOTICE OF REMOVAL

10.    In their Amended Notice of Removal, a copy of which is annexed as Exhibit G hereto, defendants assert that this Court has jurisdiction over the present action pursuant to 28 U.S.C. §1333(a) because it is between citizens of different states and the amount in controversy exceeds $75,000.

11.    In support of their claim that the Court has diversity jurisdiction, defendants state that Jericho is a New York corporation with its principal place of business in Brooklyn, and that defendants Edward Imperatore and Maurice Stone are citizens and residents of New Jersey.  In addition, defendants state, in paragraphs 5 through 9 of the Notice of Removal:

> At the time of the commencement of the State Court Action
> and at the time of removal, defendant Midtown

4

Development, L.P. was and is a limited partnership organized under the laws of the State of New York. The citizenship of a partnership is determined by the citizenship of all of its partners, not by the state under whose laws it is organized or the location of its place of business or property. *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990).

At the time of the commencement of the State Court Action and at the time of removal, Midtown's only general partners were and are Arthur E. Imperatore and Edward W. Ross. At the time of the commencement of the State Court Action and at the time of removal, Midtown's only limited partner was and is Consolidated Rail Corporation, as successor in interest to CRC Properties, Inc.

At the time of the commencement of the State Court Action and at the time of removal, Arthur E. Imperatore was and is a citizen and resident of the State of New Jersey. The address of Arthur E. Imperatore is 38 King Avenue, Weehawken, New Jersey.

At the time of the commencement of the State court Action and at the time of removal, Edward W. Ross was and is a citizen and resident of the State of Illinois. The address of Edward W. Ross is 1240 North Lakeshore Drive, 29 A/B, Chicago, Illinois.

At the time of the commencement of the State court Action and at the time of removal, Consolidated Rail Corporation was and is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

## **EVIDENCE AS TO THE IDENTITY OF MIDTOWN'S PARTNERS**

12.    The testimony of defendant Edward Imperatore at his deposition in the Original Action as to the identity of Midtown's owners was inconsistent with the representation in the Notice of Removal that Midtown's only partners are Arthur E. Imperatore, Edward W. Ross and Consolidated Rail Corporation. The deposition began on November 8, 2005, and continued on June 15, 2006. Copies of the pages of the transcripts reflecting the relevant testimony are annexed as Exhibit H hereto. On

5

November 8, 2005, Edward Imperatore testified that Arthur Imperatore and Edward Ross were the general partners of an entity whose name the reporter transcribed as "Gerart," and that "Gerart owns 47.5 percent of Midtown." (emphasis added). See p. 21 of the November 8, 2005 deposition transcript.[1] He further testified that Conrail owned 5% of Midtown (Id., p. 21), and that the remaining 47.5 percent was "owned by W.R. West Side, another partnership," the general partner of which was Edward Ross. Id., p. 22. (emphasis added).

13.    According to Mr. Imperatore's testimony a partnership named Hadrian was "an owner of Gerart;" Arthur Imperatore was "the general partner of Hadrian," and the other partners of Hadrian were members of Arthur Imperatore's immediate family. Id. at pp. 20-21. Mr. Imperatore further stated that W.R. West Side was a limited partnership, 99 percent of which was owned by "members of [Mr. Ross's] family or their trust;" "members of the late Jerry Wexler's family or their trust;" and a "small equity interest held by Irv Markin, Ira Kipmus and myself." Id. at p.22. Mr. Imperatore said that Mr. Kipmus and Mr. Markin were deceased, so that "their estates … have equity interest in West Side." Id. at p. 24.

14.    At the second session of his deposition on June 15, 2006, Mr. Imperatore again testified to W.R. West Side's role in Midtown, as follows: "Mr. Ross is one of the principals of Midtown through W.R. West Side. He's the general manager of W.R.; he is general partner of W.R. West Side, which is one of the parties that comprises Midtown." June 15, 2006 transcript, p. 33.

15.    Other evidence also raises questions about the accuracy of the representations in Midtown's Notice of Removal as to the identity of its general partners.

---

[1] Transcript page references refers to the numbers at the bottom of the pages annexed as Exhibit H.

6

A Certificate of Limited Partnership of Mid-Town Development Limited Partnership dated June 11, 1985 (Exhibit I hereto) is signed by Arthur E. Imperatore, Jerrold Wexler and Edward W. Ross as Midtown's General Partners, and, indicates that CRC Properties, Inc. is a Limited Partner. A "Second Amendment" to Midtown's Certificate of Limited Partnership, however, dated May 28, 1987 (Exhibit J hereto) is signed by Arthur Imperatore, Jerrold Wexler and Edward Ross as "<u>withdrawing</u> General Partners" and states that the new general partner of Midtown is Jerrart Venture, with an address at 630 Fifth Avenue, New York, New York. (emphasis added). This document is signed by Arthur E. Imperatore or behalf of Jerrart Venture.

16.    A document entitled "Joint Venture Agreement of Jerrart Venture" dated February 3, 1987, made between W.R. West Side Associates, an Illinois limited partnership, and Hadrian Properties Ltd., a New Jersey Limited Partnership, indicates that Jerrart Venture is a joint venture between the W.R. West Side and Hadrian limited partnerships. See Exhibit K hereto. This document is signed Jerrold Wexler and Edward Ross as General Partners of W.R. West Side Associates, and by an entity called Fafner Enterprises, Inc. (the signature is illegible) and Arthur Imperatore as general partners of Hadrian Properties Ltd.

17.    As shown in the accompanying memorandum of law, in determining the citizenship of a limited partnership such as Midtown for purposes of establishing diversity jurisdiction, it is necessary to take into account the citizenship of each of its general and limited partners. In addition, a Notice of Removal filed by a defendant limited partnership based on diversity must specify the citizenship of each general and limited partner. Further, if a partner in a limited partnership is itself a limited partnership

7

the diversity analysis must extend to the citizenship of each of the general and limited partners of the constituent limited partnership.

18.    As previously stated, the foregoing evidence creates, at a minimum, doubt as to whether Midtown has made full disclosure to this Court and whether the Court has diversity jurisdiction over this action.  The authorities set forth in the accompanying memorandum of law show that it is incumbent upon Midtown to identify with specificity each of the general and limited partners of any partnership or joint venture which is a partner of Midtown.  Based on Edward Imperatore's testimony as to the identity of Midtown's partners as recently as ten months ago, Midtown has failed to do so.  The documentation as to Midtown's members when it was formed and shortly thereafter add to the doubt in this regard.  Unless Midtown can show conclusively that the Court had diversity jurisdiction at the time this action was commenced and at the time of removal to this Court, Jericho's motion to remand this action to the State Court must be granted.

## ABSTENTION

19.    Assuming, *arguendo*, that the facts establish this Court's diversity jurisdiction, Jericho nonetheless asks that this action be remanded to State court based on the Colorado River abstention doctrine.  The applicable authorities concerning abstention are set forth in the accompanying memorandum of law.  The facts establishing predicate for such abstention – the pendency of concurrent litigation in the State court – are set forth at the outset of this affirmation.  In order to more fully explain why abstention would be appropriate here, however, some further detail as to the issues in the two cases must be presented to the Court.

20.     As is alleged in the complaint, in both actions, under the Contract between both parties, defendant Midtown had agreed to sell certain property on the West Side of Manhattan (the "Property") to Jericho. The Contract, dated June 18, 2002, provided for a 75 day "Study Period," during which time Jericho was to engage in a due diligence investigation into the condition and other relevant facts regarding the Property. The Contract required Midtown to produce documents and information in its possession, custody or control which were relevant to Jericho's conduct of its due diligence investigation.

21.     During the Study Period and at the conclusion thereof, Midtown represented that it had complied with all of its obligations to provide Jericho with documents and information. As the Supreme Court ruled, it falsely denied that it had documents which the Contract required Midtown to produce. Such documents, in fact, were in Midtown's possession or under its control. Midtown also misrepresented other facts regarding material documents. Midtown refused Jericho's request to extend the Study Period to permit Jericho to obtain material documents. Because it did not have the concealed documents and information, Jericho was induced to seek the return of the $250,000 Jericho had deposited under the Contract, and the closing of the purchase of the property did not take place.

22.     Jericho then brought the Original Action, asserting claims for breach of contract based on Midtown's failure to comply with its contractual obligations to provide information, and for fraud. The Supreme Court, in its May 16, 2005 decision denying Midtown's motion to dismiss, stated, among other things, that there were fact issues as to whether there was "misleading information given," and as to whether there

9

was "an attempt by the seller [i.e., Midtown] to back out of the deal by feeding misleading information …."

23.    Midtown's appeal to the Appellate Division followed.  Pending the appeal period Jericho conducted depositions and other discovery.  That discovery uncovered documentary evidence and other facts which demonstrated, among other things, willful and deliberate breaches of the obligations of Midtown to produce documents as well as fraud on both Jericho and the Court.  Jericho learned that Midtown had knowingly and falsely advised Jericho, in response to Jericho's inquiries as to an oil spill on the Property which would have affected Jericho's plans to develop the Property, that Midtown had no documents or information relating to this matter.  In fact Midtown had voluminous documentation, in excess of 100 pages, regarding the clean-up of the oil spill.  The documents indicated that Midtown knew that the State of New York was obliged to incur the expenses of such clean-up and the property owner had no responsibility therefore.

24.    A second key fact that Jericho learned during the pendency of the appeal concerned references, in an attachment to the Contract, to Exhibits to an earlier agreement between Midtown and Amtrak which potentially dealt with easements and other rights in the Property by Amtrak which could prevent its development by a purchaser.

25.    Information contained in these documents, like information about the oil spill, could have a decisive impact on the option given to Jericho under the Contract to decide after the Study Period to proceed to closing or to refrain from purchasing the property.  In response to Jericho's request to Midtown during the Study

Period that the Amtrak documents be produced, Midtown stated that it had "misplaced" the documents and that it did not "now" have the documents, and told Jericho that it should get the documents from Amtrak, which Jericho unsuccessfully tried to do.

26.    In reality, as revealed by an affirmation and a memorandum of law submitted to the Supreme Court by Midtown's counsel, in July, 2006 the Amtrak documents did not and never existed. Despite this knowledge, Midtown told Jericho that it had misplaced the documents and should obtain them from Amtrak.

27.    Midtown's motive in falsely denying possession of documents, failing to produce the oil spill documents, and giving misleading responses regarding the Amtrak Exhibits and other documents was to trick Jericho into refraining from proceeding with the closing and acquisition of the Property.

28.    But for the fraud of defendants in denying possession of documents regarding the oil spill and the "missing" Amtrak documents, Jericho would not have been concerned about the risks to the development of the property and would have proceeded to close title to the Property.

29.    No mechanism was available to place before the Appellate Decision, as part of the Record on Appeal, disclosures wrung from Midtown during the discovery period, while the appeal was pending, of the willful and deliberate breaches as well as fraud on Jericho and the Court. Accordingly they could not be considered by the Appellate Division in its decision.

30.    The foregoing facts are significant here because the fraud found by Justice Ramos which led him to vacate the Supreme Court judgment against Jericho specifies related to the issue of disclosure of information about the oil spill, and the facts

11

concerning the Amtrak Exhibits, discussed above.  See pp. 6-10 and 12-14 of the

February 2, 2007 decision, Ex. E hereto.  The question of fraud regarding these matters

is one with which the Appellate Division will have to deal in determining Midtown's

appeal from Justice Ramos' decision.  As previously noted, Jericho's claims in the

present action are based in part on the same assertions of fraud.  See paragraphs 76-

94 and 116-125 of the complaint, Exhibit A hereto.  Thus if this case were to remain in

this Court, it would have to determine the same issues as will be determined by the

Appellate Division.

        31.    As shown in the accompanying memorandum of law, the potential

for inconsistent rulings in circumstances such as this is an important consideration

which militates in favor of abstention under the *Colorado River* abstention doctrine.  As

is also explained in the accompanying memorandum, the application of other tests

under that doctrine to the facts set forth above also militates in favor of abstention and

remand of this case to the New York Supreme Court.


                /s/   Herbert Rubin
                Herbert Rubin (HR8484)

Sworn to before me this
  29th day of March, 2007


   /s/ Bruce Cathey
Notary Public

12

## CERTIFICATE OF SERVICE

I certify that on March 30, 2007, I caused the foregoing Notice of Motion

and Affidavit in Support of Motion to Remand to be served by hand delivery to the office

of counsel for defendants, addressed to:

Todd R. Geremia, Esq.
Jones Day
222 East 41st Street
New York, New York 10017

Attorneys for Defendants

Dated:   New York, New York
March 30, 2007

/s/ Charles A. Crum
Charles A. Crum (CC9919)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

JERICHO GROUP, LTD.,

                  Plaintiff,

      - against -

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE,

                  Defendants.

------------------------------------------------------------------x

Index No. 600566/07

**VERIFIED COMPLAINT**

Plaintiff Jericho Group, Ltd. ("Jericho"), by its attorneys Herzfeld & Rubin, P.C.,

as and for its Complaint, respectfully alleges as follows:

### The Parties To The Action

1.     Plaintiff Jericho Group, Ltd. ("Jericho") is a New York corporation,

having an office at 519 Flushing Avenue, Brooklyn, New York 11205.

2.     Upon information and belief, Defendant Midtown Development, L.P.

("Midtown") is a New York limited partnership, having an office at c/o 40 Arcorp Properties,

Pershing Road, Weehawken, New Jersey 07086.

3.     Defendants Maurice Stone ("Stone") and Edward Imperatore

("Imperatore") were at relevant times officers of Midtown and were lawyers for Midtown who

participated in the tortious acts described in the transactions in issue.  Imperatore had, at relevant

times, an economic interest in Midtown.

### The Property In Issue

4.     The subject litigation pertains to a contract whereby Midtown was to sell

to Jericho two parcels of real estate located in the Borough of Manhattan, County, City and State

of New York.

5.    Specifically, these two parcels are identified on the Tax Map of the City of New York as Block 708, Lot 1 and Block 709, Lot 17, being located between 36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York (hereinafter said lots are collectively referred to as the "Property").

6.    The Property and its location are unique, one of a kind, and special.

7.    The Property consists of development sites which are encumbered by railroad easements and rights of way in favor of "Amtrak".

## The Contract And Its Relevant Provisions

8.    Pursuant to the aforesaid Contract, dated June 18, 2002, between Midtown as the "Seller" and Jericho as the "Purchaser," Midtown agreed to sell the Property to Jericho for $28,000,000.

9.    The Contract, by its terms, limited Midtown's representations and warranties regarding the Property.

10.    To balance the limited representations and warranties, the parties structured the transaction as an "as is" sale and purchase transaction which provided Jericho with a 75-day "Study Period" to allow Jericho to obtain the additional information it required to permit it to decide whether to proceed to a closing.  Plaintiff paid a deposit of $250,000 on signing the Contract.

11.    The Contract provided in this regard, in pertinent part as follows:

> 29. a)    Purchaser shall have seventy-five (75) days from the date this Contract has been executed by both parties (the "Study Period"), to cause to be performed, at Purchaser's cost and expense, such environmental and/or architectural/engineering and or other tests and/or inspections as Purchaser, in its sole discretion, shall elect to

perform. In accordance with the terms of Paragraph 29(b) below, Seller shall allow Purchaser and its representatives access to Property at all reasonable times, <u>shall cooperate with Purchaser and its representatives and shall make available to Purchaser and its representatives such material pertinent to such tests and/or inspections as Seller may have in its possession.</u> If prior to the conclusion of the Study Period, Purchaser shall determine, in its sole and absolute discretion that the Property is not suitable for its needs, the Purchaser shall have the right to cancel this Contract upon written notice to Seller …. Purchaser need not specify any reason for such cancellation. Upon the timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser the monies paid upon execution hereof.

\* \* \* \* \*

c)  <u>Immediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which Purchaser reasonably requests….</u>

12.    In addition, the Contract provided in pertinent part in paragraph 30(b)(iii) that Midtown would convey title to the Property to Jericho free and clear of liens and encumbrances except for "(iii) Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller [i.e., Midtown], Terrart Venture and Amtrak which is attached hereto as Exhibit B (the 'Amtrak Agreement')."

13.    The copy of the Amtrak Agreement attached to the Contract made reference to Exhibits to the Amtrak Agreement concerning easements on the Property and restrictions on its use, but no Exhibits were attached to that copy of the Amtrak Agreement.

14.    The Contract further provided in pertinent part, in paragraph 33;

At closing, Seller should assign to Purchaser, without recourse, any such permits and/or approvals which Seller may have obtained with respect to the development of the premises. <u>Within two (2) business days from the date hereof, Seller shall make available to the Purchaser copies of all documentation pertaining to such permits and/or</u>

3

approvals. Seller makes no representation that any of such permits and/or approvals are in force and effect or that any of same are transferable.

15.    In the negotiation of the Contract and subsequent communications with Jericho concerning the subject matter of the Contract, Midtown was represented by Imperatore and Stone.

## Events During The Study Period

16.    On June 19, 2002, the first day of the Study Period, Midtown sent certain documents to Jericho in purported compliance with the Contract, under cover of a letter from Stone. Stone's letter stated: "In accordance with the Contract of Sale I am enclosing the following due diligence items ...." The items listed in the letter and provided to Jericho included an "Environmental Impact Statement dated December 15, 1989."

17.    In July, 2002, Jericho asked Midtown to contact Amtrak to set up a meeting with Jericho so that Jericho could obtain relevant information about the property from Amtrak.

18.    Midtown refused this request, and advised Jericho to contact Amtrak directly.

19.    Jericho did so, but Amtrak refused to deal with Jericho, with which it had no relation.

20.    On July 17, 2002, Jericho wrote to Stone to advise that Jericho had obtained information showing that more than 20 documents filed by Midtown's architect with the City which should have been in Midtown's "due diligence" package had not been provided by Midtown.

21.    In the July 17, 2002 letter, Jericho advised that without the documents filed by Midtown's architect, Jericho's architect and zoning attorneys could not begin a

4

meaningful analysis of the Property, and asked that these documents be provided as soon as possible.

22.    By its August 1, 2002 letter, Jericho advised Stone that it had not received the documents requested in the July 17 letter. Jericho attached a letter from its architect explaining the need for the documents in order to proceed with the architect's development analysis.

23.    By Imperatore's August 2, 2002 letter, Midtown disclaimed responsibility for providing the documents filed by its architect, stating:

> You should know that pursuant to Paragraph 29 (a) of the Contract of Sale, Midtown's obligation is merely to provide Jericho with such "due diligence" materials that Midtown had <u>in its own possession</u>. <u>Midtown has long since produced those materials.</u>

(emphasis added).

24.    Midtown nonetheless advised in the August 2, 2002 letter that it had directed the architect to provide further documents to Jericho.

25.    Jericho received these documents on or about August 7, 2002. It was thus delayed by 49 days from June 19 in starting a meaningful due diligence analysis.

26.    By letter to Stone of August 13, 2002, Jericho's counsel made the following request:

> Our client has also noted that, while an environmental impact statement pertaining to the area in which the property is located was included in the due diligence package, there was <u>no report of any environmental study pertaining specifically to this property</u>. Our client finds this somewhat unusual since filings with NYC generally require at least a Phase I environmental report. <u>Please ascertain whether an environmental study of this property was done and whether any such report was prepared (whether for your client or any of the professionals retained by your client) and, if so, furnish our client a copy. If no</u>

written report was prepared, <u>kindly advise whether your
client received any oral reports concerning the existence of
hazardous materials at the property</u>.

(emphasis added)

27.    By Stone's August 14 letter, Midtown answered the August 13 letter,
stating only that "[n]o Phase I Environmental Study was performed on the Property."

28.    In early August, 2002, Jericho had orally requested from Midtown copies
of Exhibits referenced in the Amtrak Agreement but not attached to the copy of that Agreement
in Jericho's possession.

29.    Midtown advised Jericho that it had misplaced the Exhibits, and told
Jericho that it should obtain the Exhibits from Amtrak.

30.    Amtrak responded to Jericho's requests for Exhibits by stating that
Amtrak had no relationship with Jericho, and that Jericho should get the Exhibits from Midtown,
or have Midtown contact Amtrak.

31.    On or about August 20, 2002, Jericho orally advised Midtown that Jericho
had heard something about an oil spill on the Property and asked if Midtown knew anything
about such an event.

32.    On August 22, 2002, Midtown sent an e-mail message to its broker stating
the following:

> <u>We have no papers confirming the successful cleanup of the oil
> spill from properties neighboring the Sites, in fact, we have not had
> contact with NYDEC in years</u>.  However, NYDEC should have the
> necessary papers filed under:
>
> Parts Center Project
> Project 1D Number SP00334
> Spill Number 9709152
>
> NYDEC investigatory had been Chris Tomosello but he is
> long departed.  Our last contact Louise Munster at (718) 482-4912.

(emphasis added)

33.    On August 23, 2002 the above message was allegedly transmitted from the Midtown broker who received it, Elaine Emmett, to another Midtown broker, Benjamin Shafren, who asserts that he never received it.

34.    There was no suggestion in either the August 22 message or the August 23 transmittal that the August 22 message be passed on to Jericho.

35.    Failing to hear from Midtown regarding any oil spill, Jericho's counsel wrote on August 30, 2002 to Imperatore in pertinent part:

> In a letter to your colleague, Maurice Stone, dated August 13, 2002, we requested whether any environmental studies had been performed specifically with respect to these properties and, if any written reports existed, to have copies thereof. We also asked "if no written report was prepared, kindly advise whether your client received any oral reports concerning the existence of hazardous materials at the property." Mr. Stone's response on August 14, 2002, was that "[n]o Phase I Environmental Report or Study was performed on the Property" and did not specifically address our request.
>
> We raise this issue only because our client's principals have very recently heard scuttlebutt that there may have been an oil spill on the properties which may or may not have been cleaned up. Please advise, immediately, if there is any truth to this information and also whether Midtown, or any of its representatives, ever received any notice, written or oral, from the City of New York or any agency thereto, or from any third party, of the existence or possible existence of an oil spill or any other hazardous material on either of the properties, and, if so, the disposition thereof. Notwithstanding all that has preceded, our client is disposed to proceed with the contract, but needs this information in order to make an informed decision whether or not to do so.

(emphasis added)

36.    Jericho, by its counsel's August 30 letter, also responded to Midtown's

argument that it was not required by paragraph 29 (a) of the Contract to provide documents

which had been filed by Midtown's architect.  It stated:

> Our client's principals have pointed out to us that it is
> Paragraph 29(c) and Paragraph 33 of the Contract of Sale,
> and not Paragraph 29(a) which address this issue.  Paragraph
> 29(c) provides, in pertinent part, "[i]mmediately upon
> execution of this Agreement, Seller shall make available to
> Purchaser or its representatives, such documents within
> Seller's current <u>custody or control</u> relating to the Property,
> which Purchaser reasonably requests" (emphasis added).
> Paragraph 33 provides, in pertinent part, "[w]ithin two (2)
> business days from the date hereof, Seller shall make
> available to the Purchaser copies of all documentation
> pertaining to such permits and/or approvals" (i.e., the permits
> and/or approvals which Midtown may have obtained with
> respect to the development of the premises).

> Our client's principals believe that documents and/or
> drawings in the possession of the firm of architects engaged
> by Midtown to develop the property are documents and/or
> drawings under Midtown's custody or control and that such
> documents and/or drawings were documentation pertaining
> to the permits and/or approvals which Midtown had obtained
> (albeit expired) with respect to the development of the
> premises.  For this reason, our client's principals believe that
> the seventy-five (75) day study period should not have begun
> to run until the date the 1990 documents and drawings were
> delivered by Midtown's architects.  Please advise whether
> Midtown will concur in such interpretation.

37.    Despite Jericho's oral inquiry and the two communications of August 22

and August 23, Midtown did not respond to Jericho's inquiry about the oil spill until September

3, when, instead of producing the documents in its possession or control, it falsely stated that

Jericho had relevant information through the e-mail message set forth in paragraph 32 above,

allegedly sent on August 23 to "Jericho's broker", which, in fact, was not Jericho's broker but

Midtown's broker.

38.    The August 22 e-mail message was never passed on to Jericho by Mr. Shafren, the Midtown broker to whom it was allegedly forwarded. Jericho did not receive that message until September 2, 2002, when it was faxed at 4:56 P.M. to Jericho by Ms. Emmett, the Midtown broker to whom Midtown had sent the August 22 message.

39.    During August, Jericho made strenuous efforts with at least three Amtrak offices to obtain the Amtrak exhibits referred to in paragraph 39 above, which Midtown had allegedly misplaced. These efforts were frustrated when Amtrak responded that it had no relationship with Jericho and Jericho should get the Exhibits from Midtown.

40.    Following further oral inquiries to Midtown concerning these Exhibits, Jericho's counsel wrote to Imperatore on September 2, 2002, referring to the missing Exhibits to the Amtrak Agreement and asking that copies be sent directly to Jericho by facsimile.

41.    In a letter of September 3, 2002, Midtown, through Imperatore, responded to Jericho's request for copies of the Exhibits to the Amtrak Agreement, stating:

> Midtown does not now (and did not at the commencement of the Contractual "Study Period") have the Exhibits referred in your letter, so it could not provide those Exhibits to Jericho. More to the point, Jericho has had 75 days under the Contract to obtain such Exhibits from the National Rail Corporation, more commonly known as "Amtrak", and, indeed, to meet with Amtrak concerning all issues relating to Amtrak's easement across the Sites and Jericho's right to build over that easement. It never did so.

42.    Jericho's counsel immediately sent by fax the following response:

> The referenced contract does not provide that Jericho is required to obtain documents from Amtrack [sic]. Rather, section 31 of the referenced contract recites that Exhibit B is a true copy of the agreement permitting development over Amtrack's railroad tracks. The exhibits referred to in my earlier letter could radically alter that agreement, for example, by reciting that the rights granted thereunder were personal to the named parties, or in any other fashion.

9

> Moreover, Jericho's representatives have spoken
> with John Youngdahl, Mark Brendar and Sheila Mac
> Sopper of Amtrack, each of whom advised our client that it
> should obtain the documents from Midtown ....

(emphasis added)

43.     In a separate September 3, 2002 letter, Imperatore, addressing Jericho's oil

spill inquiry, made the false statement that the August 22 e-mail message to Midtown's broker

had been sent by that broker on August 23 to Jericho's broker, when in fact the person to whom it

was allegedly sent was another of Midtown's brokers and not a Jericho broker.  Midtown,

through Imperatore, deceitfully stated in this September 3 letter:

> Jericho has known at least since my letter dated
> August 14, 2002, a copy of which is attached, that Midtown
> performed no environmental studies with respect to the Sites.
>
> Finally, Jericho has known since Midtown's broker's
> e-mail to Jericho's broker dated August 23, 2002, a copy of
> which is also attached, that Midtown has no information with
> respect to whether or not an oil spill from adjacent properties
> onto the Sites was cleaned up.  Nevertheless, Midtown
> provided Jericho in that e-mail with all information
> necessary to make that determination.

(emphases added)

44.     This bald faced lie is accentuated by the information learned by Jericho in

November 2006 when, in a letter to Justice Ramos, the Midtown lawyers disclosed an e-mail

dated April 22, 2002 by Ms. Emmet, the Midtown broker, to defendant Imperatore in which she

reports that she had stated to her co-broker that the oil spill "had been cleaned up," thus further

giving the lie to the aforesaid letters of August 14, August 22 and September 3.

45.     Midtown knew, because of its own inquiries to the DEC in 1998 and 2001,

as set forth below, that documents in the DEC's file identified in the referenced e-mail could

only be obtained through a Freedom of Information Law request, and that it would take many weeks to obtain a response to such a request.

46.    Midtown, through Imperatore, responded in the same September 3, 2002 letter to Jericho's August 30 comments about the belated delivery of the documents filed by Midtown's architect.

47.    Midtown falsely stated that it had "complied with all of its obligations under the Contract" and that it had made "available to Jericho copies of all architectural documents and drawings that it had in its possession." (emphasis added)  Midtown rejected Jericho's position that the Study Period commenced as of the date Jericho received the documents from Midtown's architect.

48.    Following receipt from Midtown's broker, at 4:56 P.M. on September 2, of the faxed e-mail message about the oil spill, Jericho immediately contacted the New York State Department of Environmental Conservation by telephone.  As Jericho's counsel advised Imperatore by letter the following day:

> One of our client's principals telephoned the regional office of NYDEC today in attempt to learn the extent of the spill and whether it was cleaned up, but was able to glean only that the file, apparently, is still open.  He was also told that, in order to inspect the file, he would have to make a formal request under the Freedom of Information Act. Proceeding under this regimen would take 4-8 weeks and the study period expires this afternoon.

49.    Jericho responded separately to Midtown's September 3 comments regarding the oil spill by letter of September 3, 2002, stating:

> Be advised that, unless you advise us in writing that Midtown is willing (i) to make an affirmative representation that the oil spill referred to in my earlier letter of today's date has been cleaned up and paid for or (ii) to undertake whatever cleanup may be necessary at its cost and expense or (iii) to extend the study period for a sufficient period to

allow Jericho to investigate this matter, and, in any case provide Jericho with the requested due diligence documentation, Jericho requests that the monies paid upon execution of the Contract be returned to it in accordance with the Contract's terms.

50.    Jericho's request for the return of its deposit was based on concerns that a) the oil spill belatedly identified by Midtown but about which it provided no information would require an expensive cleanup by Jericho, (b) the unseen Exhibits to the Amtrak Agreement not produced by Amtrak might contain facts restricting Jericho's use of the Property to an unknown extent, (c) Midtown for 49 days had failed to produce documents filed by its architect, and (d) Midtown's evasions and delayed compliance with its obligations to provide documents to Jericho, created a need to protect the deposit by seeking a return of same at that stage of the transaction.

51.    Midtown's response, in a September 4, 2002 letter from Imperatore, was as follows:

> Midtown has made clear in the Contract and as you well know, Midtown has never made and is not now willing to make any representation with respect to environmental matters. Secondly, Midtown has never offered to "undertake whatever cleanup may be necessary" at its cost and expense. Finally, as you well know, Midtown will not extend the Study Period afforded by the Contract even one day. Indeed, that Study Period expired last evening.

(emphasis added)

52.    Midtown advised in this letter that it would return Jericho's down payment only if Jericho provided Midtown with a general release.

53.    By responding letter of September 4, 2003, Jericho advised Midtown that there was no basis for Jericho's request for a general release, and demanded the return of its down payment.

54.    Jericho repeated in that letter its concern about "the possibility of the property being contaminated by an oil spill …." Jericho made it clear that the reason for seeking the return of its deposit was Midtown's refusal to alleviate that concern by making a "representation concerning the oil spill" or by undertaking "to clean it up at [Midtown's] cost and expense."

55.    By letters from defendant Stone of September 5 and September 10, 2002, Midtown advised Jericho that it would not return Jericho's down payment unless Jericho gave notice that Jericho was canceling the Contract.

### The Ineffectual Contract Cancellation

56.    Jericho's counsel responded by letter of September 12, 2002, stating:

> Although Jericho's principals felt, and still feel, that under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period and the request for production of documents was warranted, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of Jericho's down payment was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof.

57.    Counsel's September 12 letter was sent without the knowledge of Jericho and without Jericho's authorization, and was not "cc'd" to Jericho.

58.    Jericho had advised Midtown on several occasions, that Mr. Szegda, the attorney who authored and sent the September 12 letter, did not have authority to cancel the Contract.

59.    In addition to the absence of authorization, the September 12 letter did not comply with the requirements of the Contract for cancellation of the Contract. The Contract provided in paragraph 29 that if the "Purchaser" (i.e., Jericho) determined at its sole and absolute

13

discretion that the Property was not suitable for its needs, "the Purchaser shall have the right to cancel this Contract upon written notice to the Seller [Midtown] and the Escrowee [Midtown's law firm]".

> 60.    The Contract further provided, in paragraph 42:

> This Contract constitutes the entire agreement between the parties hereto. No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the party against whom the change, modification or discharge is claimed or sought to been [sic] enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

> 61.    In addition, paragraph 44 of the Contract provided:

> All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party s hall have specified most recently by like Notice. At the same time any Notice is given to either party, a copy shall be sent to its attorney. For the purposes of this paragraph 44 the attorneys for the parties are as follows:

> Attorneys for Seller:

> Edward Imperatore, Esq.
> Harwood Lloyd, LLC
> 130 Main Street
> Hackensack, NJ 07601

> Attorney for Purchaser:

> Szegda & Gerbing
> 300 East 42nd Street
> New York, New York 10017
> Attn: Michael A. Szegda, Esq.

62.    The September 12 letter was not signed by the party (Jericho) against which the cancellation was to be enforced, and was not sent to "the party to be notified" (Midtown, as distinguished from its attorney).

63.    By letter dated September 18, 2002, Jericho's Vice President advised Midtown that the Contract had not been properly cancelled, and asked Midtown to "inform Jericho in writing ... when and how you [Midtown] want to proceed with the Contract."

64.    On or about September 24, 2002, plaintiff was permitted by the New York State Department of Environmental Protection to see some materials regarding the oil spill at the Property and the cleanup.

65.    Jericho requested a response to its September 18 letter in a letter of October 18, 2002.

66.    In 2003, Jericho reasserted its position that the Contract had not been properly cancelled in conversations, and in letters to Midtown's counsel dated January 5, January 23, and February 16, 2004. Jericho again asked in these letters that Midtown advise Jericho how and when Midtown wanted to proceed with the Contract.

67.    The Contract had provided for a closing 15 days after the end of the Study Period, and further provided that if Jericho did not close by such date, Midtown could set a "time of the essence" closing date on 14 days' notice. Midtown never gave such notice.

68.    On Midtown's failure to respond to plaintiff's request to schedule a closing of the Contract, Jericho commenced an action against Midtown in this Court under Index No. 113274/04 to enforce the Contract and for related relief.

69.    Midtown moved before this Court pursuant to CPLR 3211 for dismissal of the complaint. That motion was denied.

70.    Upon denial of the dismissal motion, Midtown appealed the decision to the Appellate Division which reversed the decision below reciting, among other things,

> "Had Midtown willfully and deliberately breached its obligations under paragraph 29(a) of the Contract, Jericho's two causes of action (for specific performance or alternatively, for damages for breach of contract) would not have been barred by its termination of the contract and recovery of its downpayment."

71.    In fact, pending the appeal to the Appellate Division and, therefore, not part of the appellate record, discovery proceedings had been proceeding which disclosed that, indeed, Midtown and the other defendants in this action had willfully and deliberately breached their obligations referred to in the Appellate Division decision.

72.    More than that, said discovery proceedings disclosed that the defendants herein had engaged in willful and deliberate fraud upon this Court and upon plaintiff in that they had deliberately made omissions and misrepresentations to the Court, including the Appellate Division, which violated express mandates of the proceeding.

73.    Upon the Court's entry of judgment dismissing this action on the basis of the Appellate Division decision, plaintiff moved in this Court to vacate the judgment of dismissal, submitting documentary evidence unavailable to the Appellate Division because it developed after the appeal was pending and could not be included in the appellate record.

74.    This Court, by decision dated February 2, 2007, filed February 20, 2007, granted the motion to vacate the judgment of dismissal, stating, among other things,

> "However, Jericho has presented sufficient evidence of fraud with regard to the NYDEC documents to satisfy CPLR 5015(a)(3). Midtown repeatedly said to this Court that it had complied with its disclosure obligation in 2002 when it clearly had not. Indeed, the Appellate Division relied on this misrepresentation.  In its August 17, 2006 decision, the Appellate Division states "[b]y e-mail dated August 23, 2002, Midtown let Jericho know that it had no information

16

concerning the cleanup of an oil spill on properties neighboring the lands Jericho sought to purchase." at p. 38. The Appellate Division concluded that Midown had provided Jericho all of the information in Midtown's possession regarding the oil spill, which we now know to be false. The e-mail was sent to Elaine Osborn Emmet, undisputedly Midtown's broker who immediately sent it to Benjamin Shafren. However, Mr. Shafren never sent it to Jericho.

\* \* \*

"Accordingly, this Court vacates its judgment as this Court will not be a party to defendant's fraud on the court."

75.    This action is brought on the decision of the Court which recites that

"Plaintiff is welcome to file a new Complaint in a new action ...."

### Disclosures To Jericho Of The Facts
### Misrepresented And Concealed By Midtown

76.    In the discovery conducted by Jericho pending Midtown's appeal of the

denial of its CPLR 3211(a) motion, referred to above, Midtown had produced documents

showing that the representation in the August 22 e-mail to Midtown's broker that Midtown had

"not had contact with NYDEC in years" was false, in that among the documents produced in the

discovery proceedings were letters to the DEC from Stone dated April 9 and April 11, 2001,

seeking information concerning the oil spill at the Property. Imperatore was copied on the letter

of April 9, 2001.

77.    Among other things, Defendant Stone wrote a letter to the DEC on

April 9, 2001, referring to a meeting he had with DEC staff members in the Summer of 1998

concerning the DEC's progress in "investigating and remediating" the oil spill (emphasis added),

and seeking updated information "with respect to the investigation and remediation of the Spill

...."

17

78.    Mr. Stone then wrote to the Dec on April 11, 2001 to ask, pursuant to the Freedom of Information Act, for all of the DEC's records regarding the oil spill.

79.    Midtown produced in the discovery proceedings in the prior action approximately 100 pages of documentation from DEC concerning the oil spill, obviously, obtained by Mr. Stone in 2001 pursuant to his request.

80.    These documents showed, most significantly, that the DEC had conducted a study of the oil spill and reported thereon, and that <u>substantial remediation work with respect to the oil spill had been performed at the end of 1997 and through May, 1998 at the expense of the DEC</u>.

81.    Yet Mr. Stone (a) did not include those documents among the "due diligence items" he provided with his June 19, 2002 letter to Jericho; (b) misleadingly stated in his August 14, 2002 letter, in response to Jericho's August 13, 2002 letter asking about environmental studies or reports concerning the Property, that no "Phase I Environmental Report or Study was performed on the Property;" and (c) remained silent after he received a copy of Jericho's August 30, 2002 letter to Mr. Imperatore requesting information about an oil spill, leaving it to Mr. Imperatore to respond by denying that <u>Midtown</u> had performed any environmental studies, and that Midtown had no information regarding any cleanup of an oil spill.

82.    Defendant Imperatore, for his part, among other things, was copied on Mr. Stone's April 9, 2001 letter to the DEC. Yet Mr. Imperatore sent the August 22, 2002 e-mail to Midtown's broker stating: "We have not had contact with the DEC in years."

83.    More egregious was the disclosure, in defendants' November 8, 2006 letter to this Court, of the previously unproduced e-mail of April 22, 2002 to defendant

Imperatore confirming Imperatore's knowledge at that date that the oil spill has been "cleaned up."

84.    Notwithstanding this knowledge, Mr. Imperatore was the author of the September 3, 2003 letter to Jericho disclaiming, in response to Jericho's specific request, any knowledge about the clean up of the oil spill.

85.    In addition, Mr. Imperatore was the person who responded to Jericho's September 2, 2002 letter asking for the Amtrak Exhibits by stating that Midtown did not have those documents, and telling Jericho to get them from Amtrak, notwithstanding Mr. Imperatore's knowledge, revealed in his sworn deposition testimony, that the Exhibits never existed.

86.    Defendants' communications with the DEC in 1998 and 2001, their possession of the documents from the DEC concerning the oil spill, and the April 22, 2002 e-mail to Imperatore, demonstrate, among other things, that

(a)    Midtown, defendant Stone and defendant Imperatore had lied in submitting Imperatore's September 3, 2002 letter, stating that Midtown "has no information with respect to whether or not [the] oil spill ... was cleaned up."

(b)    Midtown's statements, in Stone's August 14, 2002 letter, in response to Jericho's August 13, 2002 inquiry as to whether an environmental study had been done and "any [environmental] report" prepared, that "[no] Phase I Environmental Study" had been performed, was grossly misleading and false, in that no mention was made of the study performed by the DEC, of which Midtown and defendants were well aware at the time.

19

(c)    in responding to Jericho's August 30, 2002 request as to whether Midtown had notice from any source of an oil spill and the disposition thereof, by stating that "<u>Midtown</u> has performed no environmental studies" (emphasis added), defendants were being willfully evasive and deliberately concealing the fact that extremely relevant documents were in its possession.

87.    The DEC documents in Midtown's possession also demonstrate that the September 4, 2002 assertions by defendants that Midtown had no obligation to, and would not, make any representation regarding environmental matters, and had never offered to undertake a clean-up, were only a smoke screen. In light of the fact that Midtown had the DEC documents and could readily have given them to Jericho, Midtown's assertions were evidently a pretext for not producing the DEC documents Midtown wanted to conceal, in an attempt to induce Jericho to cancel the Contract by creating the impression of heavy risks of oil spill remediation if there was ownership of the property.

88.    At his deposition in this action in December 2005, during the pending Appellate Division appeal, Imperatore, the author of several of the written communications to Jericho's counsel identified above, further demonstrated defendants' fraud by stating that in 2002 he was not concerned about the spill at all, because "[i]t must be remediated by the State of New York."

89.    Midtown also produced, during discovery, 34 pages of copies of photographs taken in June, 1998, depicting the area in which the oil spill occurred and the effects of the oil spill together with a copy of an invoice for developing the photographs showing that they had been taken by or at the behest of Midtown's counsel. These photographs reflect an

environmental study or report providing information regarding the clean up, and further demonstrate the fraudulent-nature of Midtown's responses to the inquiries cited in paragraphs 81(a) and (b) above.

90.    The photographs also demonstrate that Midtown's representation that Midtown had performed no environmental studies at the site was not only grossly misleading, but a flagrant falsehood.

91.    Jericho further learned, while Midtown's appeal from the dismissal order was pending, that in conducting its search for the Exhibits attached to the Amtrak Agreement, Jericho had been misdirected to a time consuming wild goose chase which had been doomed to failure from the start. Mr. Imperatore, who (a) advised in early August, 2002 that Midtown had "misplaced" those Exhibits and told Jericho to get them from Amtrak, and (b) told Jericho's counsel in writing on September 3, 2002 that Midtown did not "now" have the Exhibits and that Jericho should have gotten the Exhibits from Amtrak, stated under penalty of perjury in a June 29, 2006 affirmation submitted to this Court: "to my knowledge the exhibits referred to in the 1990 agreement between Amtrak and Midtown do not exist." (emphasis added).

92.    Mr. Imperatore's June, 2006 affirmation was submitted in support of a summary judgment motion by Midtown. Midtown asserted, in its memorandum of law in support of that motion, that it had no evidence that the documents had "ever" existed. (emphasis in original).

93.    Nonetheless, Mr. Imperatore himself wrote the September 3, 2002 letter advising Jericho that Midtown did not "now" have the Exhibits, and telling Jericho that it had had 75 days in which to obtain the Exhibits from Amtrak. The making of such statements with the knowledge that there were no such exhibits constituted a deliberate and material

misrepresentation and concealment of facts by both Mr. Imperatore and Midtown, with the intent of creating doubt and uncertainty so as to cause Jericho to withdraw from its transaction.

94.     The materiality of the existence or non-existence of the Exhibits to the Amtrak Agreement was confirmed by documents produced by Amtrak in the course of discovery in response to a Freedom of Information Law inquiry. Among those documents were letters from Mr. Imperatore, dated September 23 and October 13, 1998, asking for the "missing" exhibits in connection with a potential sale by Midtown of the affected property to third parties. Upon information and belief, Mr. Imperatore and Midtown learned that the Exhibits did not exist as a result of these inquires.

95.     Beyond the issue of misrepresentations as to the non-existent Exhibits, discovery showed that Midtown possessed but did not produce during the Study Period certain modifications to and clarifications of the Amtrak Agreement, and architectural plans prepared in 2000 relating to a proposed parking garage development on the Property which rendered the document production incomplete.

96.     The documents referred to in paragraph 89 above were among those required by paragraph 33 of the Contract to be produced within two business days of the execution of the contract.

97.     In addition, these documents should have been produced pursuant to paragraph 29(c) of the Contract, after Jericho requested the missing Exhibits to the Amtrak Agreement, since they contained information which would have resolved Jericho's concerns about what the missing Exhibits might show.

98.     Defendants knowingly concealed the existence of the documents referenced in paragraph 89 above from Jericho.

99.    Based on the foregoing facts regarding all of the documents Midtown failed to disclose and provide to Jericho, the representation in Midtown's August 2, 2002 letter that Midtown had "long since" produced the due diligence materials it was required to produce pursuant to the Contract was knowingly false.

100.    Based on the foregoing facts regarding all of the documents Midtown failed to disclose and provide to Jericho, Midtown's September 3, 2002 representation that it "complied with all of the obligations under the Contract" was knowingly false and fraudulent.

### Defendants Commission Of
### A Fraud Upon The Court

101.    With his affirmation of January 6, 2005 in support of Midtown's motion to dismiss Jericho's complaint in the prior action, defendants submitted as Exhibits several of the false or misleading letters from Imperatore and Stone identified in paragraphs 28 through 49 above:  the June 19, 2002 letter covering documents supposedly submitted in complete compliance with Midtown's due diligence obligations; the incomplete August 14, 2002 response to Jericho's inquiry regarding environmental matters; the September 3, 2002 letter disclaiming knowledge regarding the oil spill cleanup or lack thereof, and accompanying e-mail message; and the September 3, 2002 letter advising that Midtown did not "now" have copies of the Exhibits to the Amtrak Agreement and advising that Midtown should have gotten the Exhibits from Amtrak.  As discovery and the subsequent court proceedings demonstrated, each of those documents were false and/or so evasive as to constitute fraud.

102.    Mr. Imperatore asserted in paragraph 24 of his January 6, 2005 affirmation:  "The parties' contemporaneous correspondence shows that Midtown did not conceal any documents from Jericho."

23

103.    The subsequent disclosure of Midtown's failure to produce the extensive files as to the oil spill expose Mr. Imperatore's statement as blatant lying. The denial of possession of the Amtrak Exhibits, after putting Jericho to a wild goose chase, with full knowledge that such Exhibits never existed, is the most brazen fraud.

104.    Mr. Imperatore stated in paragraph 27 of his January 6, 2005 affirmation that the August 23, 2002 e-mail message regarding the oil spill, which referred to a file at the DEC, was sent from Midtown's broker "to Jericho's broker." This statement likewise was willfully false. Mr. Imperatore acknowledged at his deposition that Benjamin Shafran, the addressee of the e-mail, was Midtown's broker, and not Jericho's broker.

105.    When this Court asked, at the May 2005 hearing on Midtown's dismissal motion, whether Jericho had sent "specific request[s] [for documents] in writing to the Seller [Midtown]," Midtown's counsel responded: "They sent some requests, and the requests were fulfilled." (emphasis added)

106.    Midtown's false and misleading submissions were included in the Record on Appeal, and formed the basis for arguments in Midtown's briefs. Manifestly, they misled the Appellate Division. For example, the Appellate Division, accepting Midtown's recitals, stated in its August 17, 2006 Decision: "By e-mail dated August 23, 2002 Midtown let Jericho know that it had no information concerning the cleanup of [the] oil spill." The Appellate Division also was led by Midtown's false statements to state: "the record is plain that Midtown provided Jericho with information in its possession."

107.    The materiality of these false statements is established by the recital by the Appellate Division in its decision dismissing the complaint which is quoted in paragraph 10 above.

24

108.    The Appellate Division found that to the extent Jericho was alleging willful and deliberate conduct, such allegations were "contradicted by the documentary evidence." Such evidence consisted of the false, deceitful and fraudulent documents that Midtown and its counsel placed in the record. In fact, the additional documentary evidence ultimately produced from Midtown's own records, which could not be included in the Record on Appeal, constitutes evidence that Midtown's conduct <u>was</u> willful, deliberate and fraudulent.

109.    The false and fraudulent statements and conduct manifestly were made to mislead and defraud this court as well.

110.    Defendants' failure to disavow the statements on the motion before this court referred to in paragraph 73 above continued and perpetuated the attempt to perpetuate the fraud.

111.    The fraudulent documents were calculated to cause, and did cause, Jericho to have uncertainty and doubt as to whether to proceed with the Contract and closing and to seek a return of its deposit.

112.    As set forth above, the misconduct of defendants includes the following:

a.    <u>Oil Spill</u>. Willful and deliberate failure to produce documents in Midtown's possession or control regarding the oil spill, including photographs commissioned and obtained by defendants, Freedom of Information requests to the Department of Environmental Control ("DEC"), responses by the DEC and correspondence and documents relating to the oil spill; false representations that Midtown had produced such due diligence materials as were in its possession and had complied with all contractual requirements; false representations that Midtown had not had contact with the DEC in years, and had no information with respect to an oil spill clean up; that the e-mail message about the oil spill had

been sent to Jericho's broker; and false and misleading responses to Jericho's specific requests for environmental reports and studies and for information about the cleanup of the oil spill.

        b.    Exhibits to the Amtrak Agreement. Advising Jericho, despite defendants' knowledge that the Exhibits to the Amtrak Agreement did not exist, that Midtown had misplaced the Exhibits; that Jericho should get the Exhibits from Amtrak; and that Midtown did not "now," in September 2002, have the Exhibits.

        c.    Modifications and Clarifications to the Amtrak Agreement and Relevant Architectural Drawings. Knowingly, deliberately and willfully failing to produce documents which would have alleviated Jericho's concerns about the "missing" Amtrak Exhibits.

        d.    Documents Submitted by Midtown's Architects to the City of New York. Failing to produce documents as required by the Contract, and refusing to grant an extension of the Study Period because of the long delay in their production.

        e.    Improper Termination of the Contract by Midtown. Asserting that the Contract was terminated and refusing to proceed with the sale of the Property, knowing that Jericho's attorney had no power to take such action and that proper procedures for cancellation had not been followed.

        113.    As set forth above, the knowingly false and misleading nature of defendants' misrepresentations, and their willful and deliberate concealment of material facts, was demonstrated by the documents produced by Midtown and Amtrak during the course of discovery, and by defendants' sworn statements to the Court with respect thereto.

        114.    As set forth above, defendants' knowing misrepresentations and concealments caused Jericho to refrain from proceeding with the transaction and to ask for the

return of its deposit. But for defendants' knowing misrepresentations and concealments, Jericho would have proceeded to close the purchase transaction.

### FIRST CAUSE OF ACTION
#### (For Fraud, Against All Defendants)

115. Repeats the allegations of paragraphs 1 through 114 above as if set forth at length herein.

116. Defendants willfully and deliberately lied to Jericho in making false representations that Midtown had produced the materials in its possession concerning environmental matters referenced in the Contract, and knowingly concealed from Jericho, in response to Jericho's inquiries and otherwise, the documents and knowledge in Midtown's possession concerning the oil spill and remediation thereof.

117. The facts known to defendants in this regard were clearly material, as they related directly to Jericho's concern that the oil spill had not been cleaned up and that Jericho might have responsibility for such clean-up and its costs.

118. Defendants, during the 75-day Study Period, knowingly gave misleading and incomplete responses to Jericho's requests for the Exhibits to the Amtrak Agreement which indicated that there were unproduced materials which were part of the Amtrak Agreement, creating doubt as to the contents of the Exhibits and their impact on the decision to be taken at the end of the Study Period, while knowing at all times that such Exhibits did not exist.

119. Defendants' assertions as to unproduced or incompletely produced Exhibits were clearly material, in that such facts were relevant to the issue of whether the Amtrak Agreement placed restrictions on the owner's right to develop the Property beyond those specified in the produced text of the Agreement.

27

120.    Defendants knowingly, deceitfully and fraudulently created doubt and confusion as to the existence of the Exhibits and contents thereof, so as to preclude a meaningful decision by Jericho regarding the Amtrak Agreement. Midtown's conduct in this regard was willful and deliberate.

121.    Defendants knowingly, deceitfully and fraudulently concealed from Jericho the documents identified in paragraph 89 above, which had they been disclosed would have alleviated Jericho's concerns as to what was contained in the missing Exhibits to the Amtrak Agreement. Midtown's conduct in this regard was willful and deliberate.

122.    The existence or non-existence of liability of the oil spill, the clean-up and its costs, and liability therefore, and the precise terms of the Amtrak Agreement regarding the development of the Property, were essential considerations for Jericho in any decision as to go forward with the purchase of the Property under the Contract.

123.    Defendants had a duty to disclose all of the documents and information which they knowingly concealed.

124.    Defendant's representations, misleading responses and concealments were intended to induce Jericho not to proceed with the purchase of the Property. Jericho reasonably relied on defendants' representations, misleading responses and concealments in its decision to request a return of its deposit. Had it obtained the documents and information in Midtown's possession regarding the oil spill, and had it known there were no Exhibits to the Amtrak Agreement, Jericho would have gone to closing and purchased the Property.

125.    Jericho has been injured as a result of Midtown's conduct in various ways, including by virtue of the fact that it lost the opportunity to purchase the Property at the price specified in the Contract.

126.    Jericho has no adequate remedy at law.

127.    By virtue of Midtown's fraudulent conduct, Jericho is entitled to restore the Contract to its September 3, 2002 status.

## SECOND CAUSE OF ACTION
### (For Fraud and Specific Performance, Against All Defendants)

128.    Repeats the allegations of paragraphs 1 through 127 above as if set forth at length herein.

129.    Jericho was ready and able to purchase the Property in accordance with the contract at the end of the Study Period, and would have been willing to do so but for Midtown's misrepresentations and concealments.

130.    Now that it has knowledge of the true facts, Jericho is ready, willing and able to purchase the Property in accordance with the Contract.

131.    By virtue of Midtown's fraudulent conduct, Jericho is entitled to specific performance of the Contract by Midtown.

## THIRD CAUSE OF ACTION
### (For Breach of Contract and Specific Performance, Against Midtown)

132.    Repeats the allegations of paragraphs 1 through 114 above as if set forth at length herein.

133.    In failing to provide Jericho with documents and information within its possession relating to the oil spill and giving misleading answers to Jericho's inquiries on this subject, Midtown breached its express obligations under paragraph 29 of the Contract and breached its duty of good faith and fair dealing in connection with the requirements of said paragraph.

134.    In failing to produce to Jericho the documents specified in paragraph 89 above, Midtown breached its express obligations under paragraphs 29 and 33 of the Contract, and breached its duty of good faith and fair dealing in connection with the requirements of said paragraph.

135.    Midtown's breach of its obligations under the Contract was willful and deliberate, and thus supportive of Jericho's claims for specific performance, or alternatively for damages for breach of contract. The Appellate Division, as set forth above, stated in its August 17, 2006 decision that if "Midtown willfully or deliberately breached its obligations under paragraph 29(a) of the contract, Jericho's first two causes of action would not have been barred by its termination of the contract and recovery of its down payment ...."

136.    But for Midtown's breaches of its obligations under the Contract, Jericho would have gone to closing and purchased the Property.

137.    Jericho has been injured by Midtown's conduct in various ways, including by virtue of the fact that it lost the opportunity to purchase the Property at the price specified in the Contract.

138.    Jericho has no adequate remedy at law. Jericho was ready, willing and able to purchase the Property in accordance with the contract at the end of the Study Period, and would have been willing to do so but for Midtown's willful and deliberate breaches.

139.    Now that it has knowledge of the true facts, Jericho is ready, willing and able to purchase the Property in accordance with the terms of the Contract.

## FOURTH CAUSE OF ACTION
### (For Breach of Contract and Specific Performance, Against Midtown)

140.    Repeats the allegations of paragraphs 1 through 114 above, as if set forth at length herein.

141.    By failing to timely provide Jericho a) with information as to the oil spill as set forth in paragraphs 26, 27, 31, 35, 37 and 38, and 43-54, and b) with the documents submitted by its architect to the City, as set forth in paragraphs 20 through 25 above, Midtown willfully and deliberately breached the contract.

142.    By virtue of Midtown's breach, Jericho was entitled to an extension of the Study Period.

143.    Jericho requested an extension of time which Midtown denied in its letter of September 3, 2002.

144.    As a consequence of Midtown's willful and deliberate breach and its failure to extend the Study Period, Jericho lost the opportunity to obtain additional facts to which it was entitled for the purpose of exercising its option provided for at the close of the Study Period.

145.    Had Jericho obtained such facts, it would have gone to closing and purchased the Property at the end of the extended Study Period.

146.    Now that it has knowledge of the true facts, Jericho is ready, willing and able to purchase the Property in accordance with the terms of the contract.

147.    Jericho has no adequate remedy at law.

### FIFTH CAUSE OF ACTION
**(For Declaratory Judgment, Against Midtown)**

148.    Repeats the allegations of paragraphs 1 through 114 above, as if set forth at length herein.

149.    As alleged in paragraph 67, Midtown knew, at the time it alleges the Contract was cancelled by Mr. Szegda, that Mr. Szegda had no authority to speak for Jericho on this subject.

150.    As is alleged in paragraphs 59 to 66 above, the communications which Midtown claims resulted in the cancellation of the Contract did not comply in material respects with the contract provisions governing cancellation of the Contract.

151.    Jericho is entitled to a declaratory judgment that the Contract was never cancelled, and that Jericho's right to purchase the Property thereunder remains in full force and effect.

152.    . Jericho is ready, willing and able to purchase the Property in accordance with the terms of the Contract.

153.    Jericho has no adequate remedy at law

## SIXTH CAUSE OF ACTION
### (For A Declaratory Judgment, Against Midtown)

154.    Repeats the allegations of paragraphs 1 through 114 above, as if set forth at length herein.

155.    The Contract did not provide that time was of the essence with respect to its provisions requiring Jericho to elect to proceed or cancel at the end of the 75 day Study Period.

156.    Given the facts as set forth herein, Midtown had a duty to comply with Jericho's requests for an extension of the Study Period.

157.    Jericho is entitled to a declaration that the Study Period should have been continued, and that Jericho's right to purchase the Property remains in full force and effect.

158.    Jericho is ready, willing and able to purchase the Property in accordance with the terms of the contract.

159.    Jericho has no adequate remedy at law.

160.    Jericho would have been ready, willing and able to purchase the Property

in accordance with the contract at the end of an extended Study Period.

## SEVENTH CAUSE OF ACTION
### (Against All Defendants, For Fraud On The Court)

161.    Repeat the allegations of paragraphs 1 through 114 above as if set forth at

length herein.

162.    The conduct of defendants specified in paragraphs 96 through 103

constituted a fraud upon the courts, by which Jericho was tortiously injured.

WHEREFORE, Jericho demands judgment (a) on its First Cause of Action,

declaring that the Contract has been reinstated; (b) on its Second, Third and Fourth Causes of

Action, (i) compelling Midtown to sell the Property to Jericho in accordance with the Contract,

or (ii) in the alternative, awarding damages to Jericho in an amount to be determined, but not less

than $100,000,000; (c) on its Fifth Cause of Action, declaring that Jericho's right to purchase the

Property in accordance with the Contract is in full force and effect, and compelling Midtown to

sell the Property to Jericho in accordance with the Contract; (d) on its Sixth Cause of Action,

declaring that the Study Period should have been extended and that Jericho's right to purchase

the Property in accordance with the Contract is in full force and effect, and compelling Midtown

to sell the Property to Jericho in accordance with the Contract; (e) on its Seventh Cause of

Action for damages, including expenses incurred by Jericho for attorneys fees, in excess of

$100,000,000; (f) for punitive damages in an amount not less than $100,000,000., and (g) for such other and further relief as the Court may deem just and proper, together with costs and disbursements.

Dated: New York, New York
       February 22, 2007

                             HERZFELD & RUBIN, P.C.

                             By: _____
                                    Herbert Rubin
                             Attorneys for Plaintiff
                             40 Wall Street
                             New York, New York  10005
                             (212) 471-8500

# V E R I F I C A T I O N

STATE OF NEW YORK     )
                              ) ss.:
COUNTY OF NEW YORK   )

         Samuel Pfeiffer, being duly affirmed, deposes and says;

         That deponent is the Vice-President of Jericho Group, Ltd., the plaintiff in the within action; that he has read the foregoing Complaint and knows the contents thereof; that the same is true to his own knowledge except those matters therein stated to be alleged upon information and belief, and that as to those matters, he believes them to be true.

                                        Samuel Pfeiffer

Affirmed before me this
_____ day of February, 2007

BERNARD J. WALD
Notary Public, State of New York
No. 02WA41237450
Qualified in New York County
Commission Expires September 30, 2001

Annexed to Motion –
First Amended Verified Complaint, dated November 29, 2004
[pp. 36-63]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JERICHO GROUP, LTD.,                          Index No.  113274/04

                              Plaintiff,       **FIRST AMENDED**
                                               **VERIFIED**
        -against-                              **COMPLAINT**

MIDTOWN DEVELOPMENT, L.P.,


                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff, Jericho Group, Ltd., by its attorney, Robert B. Goebel, Esq. as and for its

First Amended Complaint, respectfully alleges as follows:

## GENERAL BACKGROUND APPLIABLE TO ALL CAUSES OF ACTION

**A.**    **The Parties**

        1.      Plaintiff is a New York corporation, having an office at c/o Wasserman

Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, New York 11211, Attention:  Shulem

Pfeiffer (hereinafter sometimes referred to as "Plaintiff" or "Jericho").

        2.      Upon information and belief, Defendant Midtown Development, L.P. is a

New York limited partnership, having an office at c/o 40 Arcorp Properties, Pershing

Road, Weehawken, New Jersey 07086 (hereinafter sometimes referred to as "Defendant"

or "Midtown").

**B.    The Property**

3.    The subject litigation pertains to the purchase by Jericho and sale by Midtown of two (2) parcels of real estate located in the Borough of Manhattan, County, City and State of New York.  Specifically, these two parcels are identified on the Tax Map of the City of New York as Block 708, Lot 1 and Block 709, Lot 17, being located between 36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York. (hereinafter such two lots are collectively sometimes referred to as the "Property").

4.    The Property and its location are unique, one of a kind, and special.

5.    The Property consists of development sites, which are encumbered by railroad easements and rights of way in favor of "Amtrak".  The scope, location and the extent of these easements and the economic terms upon which the holder of these easements would permit development above these easement areas encompassed by the easements were absolutely crucial to Jericho's determination of the use, development and value of the Property.  Also, the existence, if any, of hazardous materials and/or non-compliance with environmental laws is also materially relevant.

**C.    The Original Contract of Sale**

6.    With respect to the sale and purchase of the Property, Midtown as the "Seller" and Jericho as the "Purchaser" entered into a Contract of Sale dated June 18, 2002 (the "Original Contract of Sale").

7.    In connection with entering into the Original Contract of Sale Midtown wanted to limit the representations or warranties regarding the subject Property.

- 2 -

8.    To justify the purchase price and to satisfy prospective lenders, Jericho needed to know, in part, the following information:

- To what extent, would "Amtrak" allow the owner of the Property to develop the Property above the railroad easements held by Amtrak?
- What type of development would be permitted on the Property and how large could it be?
- What kind of structural foundation support would the development have if constructed above the easement areas?
- What was the then current zoning for the Property and what was currently permitted as of right?
- Were there any prior submissions to governmental authorities or agencies with respect to prior proposed development of the Property and were there any permits and approvals issued? And if so what happened and how will this effect future proposed development?
- Were there any existing environmental or hazardous materials issues?

9.    In order to bridge the gap, the parties structured the transaction as a so called "as is" sale and purchase transaction with limited representations regarding the aforesaid concerns that Jericho had[1] and in lieu thereof the parties negotiated and agreed to a 75 day "Study Period" to allow Jericho to perform the due diligence.

10.    This structure provided Midtown with an "as is" deal and at the same time provided Jericho with the right to investigate by performing due diligence.

11.    In that regard, as discussed below, Midtown agreed to cooperate with Jericho and its representatives including Midtown's covenant to timely make available to Jericho and its representatives all pertinent material.

---

[1] Midtown did represent, however in Paragraph 31 of the Original Contract of Sale that: "a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks", was annexed to the Original Contract of Sale. As discussed below, this representation was materially false.

- 3 -

12.    Jericho, in material reliance upon these due diligence provisions, executed and delivered the Original Contract of Sale and the "Downpayment" to Harwood Lloyd LLC, as Escrowee ("Harwood").

13.    As discussed below, Midtown by withholding crucial materials and information during the "Study Period", materially breached its covenants and obligations under the Original Contract of Sale and, as amended, with respect to the due diligence and entitlements granted to Jericho.

14.    Jericho reasonably and foreseeably relied upon Midtown's expected performance of these obligations to Jericho's material detriment.

15.    Had Jericho not reasonably relied upon Midtown's expected performance of its obligations, Jericho may have been able to timely obtain from third parties materials and information, which should have properly been delivered to Jericho by Midtown; and which was in the custody and/or control of Midtown.

16.    As a result of these breaches by Midtown, Midtown willfully caused Jericho to wrongfully lose the benefits of the due diligence period provisions and consequently the opportunity to purchase the Property.

**D.    Amendment to the Original Contract of Sale**

17.    As discussed below, the Original Contract of Sale was amended by Midtown and Jericho by Midtown's offer dated July 15, 2002 (as remade and/or reconfirmed from time to time) to amend the Original Contract of Sale, and by Jericho's acceptance of Midtown's offer by letter dated August 28, 2002, as discussed. Also, as discussed below, Midtown did not have the right to reject Jericho's acceptance of

Midtown's offer because: (x) the offer became irrevocable at least through the end of the originally scheduled due diligence period based upon Midtown's conduct and because Jericho reasonably and forseeably relied thereon; (y) Midtown is estopped from rejecting Jericho's acceptance of the because Jericho reasonably and foreseeably relied to its material detriment upon Midtown's acts and omissions including but not limited to Midtown manifesting that the offer was still on the table immediately prior to Jericho acceptance of the offer; and/or (z) Midtown acted in bad faith.

E.    **Midtown's Wrongful Conduct; Reasonable and Foreseeable Reliance by Jericho**

18.    In sum:

- Midtown breached its obligations with respect to the "Original Contract of Sale"; Midtown misrepresented that a copy of the Amtrak Agreement was annexed to the Original Contract of Sale; and to make matters even more damaging to Jericho, it was not until the last day of the originally scheduled expiration of the Study Period that Midtown disclosed for the very first time that Midtown did not have the Exhibits to the Amtrak Agreement; Midtown failed to make required submissions and deliveries to Jericho of due diligence materials; Midtown failed to disclose the oil spill as discussed below and Midtown failed to disclose that there was no environmental report for the Property; Midtown failed to disclose that the Property was not currently approved for 729,164 buildable square feet as represented in writing by Midtown's exclusive broker, Brown Harris Stevens; Midtown failed to disclose the various conflicts of interest among Midtown, its principals and Midtown's counsel and the escrow agent; and Midtown breached its implied duty to Jericho to act in good faith.
- Midtown wrongfully rejected the contract amendment and therefore wrongfully repudiated the Original Contract of Sale, as amended.

F.    **Certain Provisions of the Original Contract of Sale**

19.    Paragraph 29(a) of the Original Contract of Sale grants Purchaser a 75-day period from the execution by both parties of the Original Contract of Sale (referred to

therein as the "Study Period") to perform such tests or inspections as Purchaser shall elect to perform with respect to the Property, which absent an extension of such period as described hereinbelow, would have expired on or about September 3, 2002.

20.  The Original Contract of Sale also set forth various provisions expressly agreed to by Midtown which required Midtown to make submissions to Jericho, and allow Jericho to conduct its due diligence.  Thus, paragraph 29(a) of the Original Contract of Sale further states that: "Seller shall allow Purchaser and its representatives access to Property at all reasonable times, shall cooperate with Purchaser and its representatives and shall make available to Purchaser and its representatives such material pertinent to such tests and/or inspections as Seller may have in it possession."  Paragraph 29(b) of the Original Contract of Sale states that: "Purchaser has agreed to accept the Property in "AS IS" condition subject to its inspection rights. . . ." *[emphasis added]*.  Paragraph 29(c) of the Original Contract of Sale states that: "Immediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control *[emphasis added]* relating to the condition of the Property, which Purchaser reasonably requests."[2]

## JERICHO'S ACCEPTANCE OF MIDTOWN'S OFFER TO AMEND THE ORIGINAL CONTRACT OF SALE

21.  After execution and delivery of the Original Contract of Sale there were substantial problems with Midtown's performance of its obligations to submit to Jericho

---

[2] The inspection rights were particularly important to Plaintiff because this is a so called "as is" transaction; and because of the location of the Property with respect to "Amtrak's" railroad tracks and also because there might exist significant environmental and hazardous material issues.  Since this is an "as is" transaction, Plaintiff was contractually entitled to have the opportunity to learn all it could about the Property in accordance with the terms and conditions negotiated and agreed to in the Original Contract of Sale.

all of the required due diligence material to allow Jericho to commence and complete its due diligence during the Study Period.

22.    Jericho considered three ways this situation could be handled, <u>to wit</u>: (i) The Study Period could be extended pursuant to mutually agreeable terms to allow Jericho the opportunity to seek to obtain missing information and missing material from sources other than from Midtown including but not limited to obtaining missing documentation from "Amtrak" and missing documentation from applicable governmental authorities regarding an oil spill hereinafter described with respect to its effect on the Property, (ii) Jericho could continually seek to obtain required and anticipated performance from Midtown, and/or (iii) Jericho could seek to obtain the missing materials and information from other sources even without the extension of the Study Period to the extent possible.

23.    Jericho elected to pursue in varying degrees all of such courses of action so that it could be in a position to purchase the Property.

24.    With respect to an extension of the Study Period, Edward G. Imperatore ("Imperatore"), counsel to Midtown and a member attorney of Harwood, sent a letter dated July 15, 2002 to Michael Szegda, Esq. ("Szegda"), counsel to Jericho. In this letter, Midtown made the following offer/proposal to amend the Original Contract of Sale to extend the Study Period from on or about September 3, 2002 through December 31, 2002 (the "Extension Period"):

> "1.    Jericho must pay Midtown $250,000.00 to cover its expenses of "carrying" the Sites, and such payment would not constitute a portion of the Deposit under the Contract, would not constitute an offset against the Purchase Price set forth in the Contract and would be completely non-refundable;

    2.     Jericho must place an additional $500,000.00 in
Deposit under the Contract, making the total Deposit
$750,000.00; and

    3.     Jericho must concede that $250,000.00 of such Deposit
would be non-refundable in the event Jericho fails to close
under the Contract and would not constitute an offset against
the Purchase Price in the event Jericho does close."

25.     This offer commenced a series of letters back and forth between Midtown
and Jericho regarding an extension of the Study Period.[3]

26.     As can be seen (see *Footnote 4* and discussion herein) there was almost
certainty and no controversy with respect to an extension of the Study Period by the
parties to December 31, 2002; the applicable issue was an extension beyond December
31, 2002 to July 1, 2003.

27.     It was very foreseeable to Midtown and it's counsel that Jericho would
rely on an extension of the Study Period to December 31, 2002.

---

[3] Jericho promptly responded on July 17, 2002 and proposed an extension until July 1, 2003 and offered to deposit an additional $500,000.00 into escrow to be used to fund certain real estate tax obligations with respect to the Property which Midtown wanted reimbursement for. On July 25, 2002, eight days later, Imperatore responded to Szegda's letter of July 17, 2002 regarding an extension of the Study Period. Imperatore stated that: "Midtown is still willing to permit Jericho to extend the "Study Period" through December 31, 2002 in accordance with the terms of my July 15, 2002 letter." Also in his July 25, 2002 letter, Imperatore offered Jericho the right to terminate the contract prior to expiration of the Study Period. This was not acceptable to Jericho because Jericho wanted to purchase the Property and Jericho expected Midtown to perform its obligations under the Original Contract of Sale. Szegda promptly responded to Imperatore on July 29, 2002 proposing to extend the Study Period to December 31, 2002 with Jericho having the right to further extend the Study Period until July 1, 2003 by payment of $1,000,000.00 to Midtown as an increase to the purchase price payable to Midtown outside of escrow and non-refundable in all events. On July 30, 2002, in Imperatore's response to Szegda, Imperatore repeated Midtown's prior offer to extend the term of the Study Period through December 31, 2002 while also stating that Midtown would not extend the Study Period beyond December 31, 2002 as had been requested by Jericho. Also, Imperatore's July 30, 2002 letter, repeated Midtown's amenability to resolve the situation by giving Jericho the right to terminate the contract prior to the end of the Study Period. Again Jericho did not want to do this because Jericho wanted to purchase the Property. With the Study Period getting very tight, Szegda wrote to Stone on August 19, 2002 and proposed that Jericho would pay Midtown $750,000.00 out of escrow and non-refundable as an increase to the purchase price for an extension of the Study Period to July 1, 2003.

28.    Thus, upon information and belief, as of the delivery of Imperatore's July 30, 2002 reply letter (see *Footnote 4* herein), all of the parties and their counsel understood the offer to amend the Original Contract of Sale to extend the Study Period through December 31, 2002 to still be "on the table" and the parties proceeded on that basis, including with respect to Jericho's continual requests for various due diligence materials and Midtown's responses thereto.

29.    On August 21, 2002, Imperatore wrote, in part, that Midtown did not agree to Jericho's August 19, 2002 letter (see *Footnote 4* herein) to extend the Study Period to July 1, 2003 in exchange for a $750,000.00 non-refundable payment.  Again, he stated that Midtown was unwilling to consider extending the Study Period to July 1, 2003.  He said nothing about the status of Midtown's July 15, 2002 offer to extend the Study Period to December 31, 2002 and again only stated that Midtown was unwilling to extend to July 1, 2003.[4]

30.    Under tremendous pressure, by letter dated August 28, 2002, Szegda informed Maurice Stone, Esq. ("Stone"), an attorney at Harwood assisting Imperatore, that Jericho accepted Midtown's offer regarding the extension through December 31, 2002 of the Study Period.[5]

---

[4] He went on to state that:  "Should Jericho desire to exercise its right to extend the Study Period to October 4, 2002 by making the additional payment, which is provided for in the Contract, please provide Midtown with the notice required in the Contract".  As it turned out, as far as Jericho can determine, the contract right referred to by Imperatore to extend the Study Period to October 4, 2002 by making an additional payment simply did not exist under the Original Contract of Sale.

[5] According to Midtown's July 15, 2002 offer, it would cost Jericho $250,000.00 of nonrefundable monies plus an increase to the Downpayment of another $250,000.00.

31.     In Szegda's letter he expressly stated on behalf of Jericho that the acceptance was made without prejudice to Jericho's current rights under the Original Contract of Sale.

32.     Then, for the very first time, and one day after Jericho's acceptance of Midtown's offer, Imperatore announced:

> "Because Jericho several times rejected proposals set forth in my July 15 and July 27, 2002 letters by counterproposals demanding extensions of the Study Period under the Contract through, at least, July 1, 2003, Midtown deems those proposals as rejected, to be null and void."[6]

33.     Jericho and its counsel were astounded by Imperatore's response on behalf of Midtown. Up to that point, the parties had sent numerous letters to each other and Midtown continually referred Jericho to Midtown's July 15, 2002 offer. Jericho and Midtown had been in constant communications up to August 27. It would have been an easy and simple matter for the offeror, Midtown, to expressly inform the offeree, Jericho, of its position that the offer was no longer on the table in any form but this was not done.

34.     Instead, Midtown consistently referred Jericho to its July 15, 2002 letter and/or Midtown would state that it would not extend the Study Period to July 1, 2003 or beyond December 31, 2002.

35.     Based on the conduct of the parties Midtown's July 15, 2002 offer was still on the table when Jericho sent its acceptance letter dated August 28, 2002. Also, Midtown could foresee that Jericho would rely on having an extension of the Study Period at least through December 31, 2002; again the only issue was a longer extension.

---

[6] Reference by Imperatore to a July 27, 2002 letter is probably incorrect because Jericho does not have a copy of said letter and has no record of receiving same.

36.     From July 15, 2002 to August 29, 2002, Midtown allowed and/or caused Jericho to believe the offer to extend the Study Period to still be on the table.

37.     Furthermore, based upon the doctrine of promissory estoppel, Midtown's July 15, 2002 offer was irrevocable at least until the expiration of the Study Period and therefore could not be terminated by revocation and/or rejection.

38.     Alternatively, the time period for the Study Period should have been tolled until such time as Midtown complied with its obligations under the Original Contract of Sale pertaining to the Study Period.

## NO "TIME OF THE ESSENCE"

39.     On September 4, 2002 Imperatore wrote that: "Midtown will not extend the Study Period afforded by the Contract even one day."

40.     Midtown can not change the Original Contract of Sale by making the expiration date of the Study Period time of the essence.

41.     At a minimum, Jericho was entitled to a reasonable extension of the Study Period consistent with reasonable extensions of closing dates in transactions where there is no time of the essence provided for.  In fact, the Original Contract of Sale expressly provides for approximately a minimum of 44 days of extended time allowed for the purchaser to close before the closing date becomes subject to time of the essence.

42.     Midtown would not be harmed by a reasonable extension of the Study Period especially if it did not affect the Closing Date.

## RETURN OF THE DOWNPAYMENT

- 11 -

43.    Thereafter, because Midtown was in breach of its obligations under the Original Contract of Sale (and as amended) and to safeguard the return of the Downpayment, and with no opportunity to conduct further due diligence and move forward with the transaction and under tremendous pressure from Midtown, Szegda wrote that unless the oil spill could be dealt with by Midtown and Midtown provided Jericho with the requested due diligence documents, Jericho was requesting a return of its Downpayment. Imperatore responded that Midtown was not willing to return Jericho's Downpayment unless Midtown received a general release of Midtown from Jericho by September 6, 2002 and that Midtown expected that its refund of the Downpayment to Jericho would constitute a termination of the contract in all respects.

44.    Jericho was unwilling to agree to release Midtown and was unwilling to agree to an "accord and satisfaction" of any kind. After protesting this issue, Midtown ultimately conceded this point, and withdrew its requirement for a general release and refunded the Downpayment.

45.    Midtown then demanded confirmation from Jericho that Jericho's letter requesting return of the Downpayment was intended as the exercise of Jericho's right under Paragraph 29(a) of the Original Contract of Sale to cancel said contract. On September 12, 2002, solely in order to protect and expedite the return of Jericho's Downpayment, Szegda sent such confirmation. Nevertheless, Jericho terminated the Original Contract of Sale due to Midtown's material breach of its obligations to Jericho.

## DUE DILIGENCE

46.    As stated above, there were certain areas of concern that Jericho had with respect to the Property (i.e. development potential, zoning, environmental and Amtrak).

- 12 -

Accordingly, the parties agreed that Jericho would have the Study Period provisions including Midtown's obligations to cooperate and provide the due diligence materials it agreed to provide.

47.    Paragraph 30(b) of the Original Contract of Sale states that Purchaser is required to accept fee simple title to the Property subject to, in part: "(iii) Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller, Jerrart Venture and Amtrak which is attached hereto as Exhibit B (the "Amtrak Agreement")." Paragraph 31 of the Original Contract of Sale states: "Seller represents that annexed hereto, as Exhibit B, is a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks."

48.    As stated above, the exhibits were not attached to the back of the Amtrak Agreement annexed to the Original Contract of Sale and were not included in any submissions to Plaintiff by Midtown or its counsel. Subsequently, it was not until on or about the expiration of the original Study Period, that Midtown inexplicably informed Jericho for the very first time that it did not have them. By then, Jericho did not have the information that it required to make the decision to go forward with the transaction. This was solely the result of Midtown's misrepresentation.

49.    It was only a few days earlier, on August 29, 2002 that Midtown wrongfully rejected Jericho's acceptance of the offer to extend the Study Period to December 31, 2002.

50.    If Jericho had not reasonably and foreseeably relied upon the aforesaid representation Jericho would have stepped up its efforts much earlier in the Study Period to seek to obtain a copy of such agreement directly from Amtrak.

51.    Nevertheless, Jericho spoke with at least three individuals at Amtrak and was told that Jericho had to obtain the Amtrak documents from Midtown.

52.    Not only was Midtown in breach its representation in Paragraph 31 of the Original Contract of Sale but also Midtown caused Jericho substantial delay in intensifying its efforts in the pursuit of a complete copy of the Amtrak Agreement. The Amtrak Agreement involved the very essence of the subject transaction.

53.    Prior to the execution and delivery of the Original Contract of Sale, and during the Study Period, Brown Harris Stevens, the exclusive broker for Midtown, represented in writing that the Property could be developed for 729,164 buildable square feet. Apparently as of the Study Period this also was erroneous; and had this been disclosed Jericho would have negotiated a longer Study Period at least with respect to this zoning issue.

54.    Upon information and belief, Midtown's submissions to Jericho did not include numerous due diligence items that Midtown was required to timely deliver to Jericho under the terms of the Original Contract of Sale as herein discussed, including but not limited to documents and/or drawings regarding presumably proposed development and use of the Property, the oil spill and environmental matters related to the Property.

55.    Had Jericho not reasonably relied upon the expected complete performance of Midtown it would not have lost so much time during the Study Period in gathering information from third parties.

56.    By an additional letter dated July 17, 2002, Szegda informed Stone that he had learned that more than twenty of the documents and/or drawings previously filed by Midtown's professionals, Cooper, Robinson & Partners ("Cooper Robinson") on behalf of Midtown regarding the possibilities for development and use of the Property, were inexplicably not previously delivered by Midtown.

57.    Cooper Robinson indicated that they would have to locate and retrieve these items from archives.

58.    By letter dated August 1, 2002, Szegda reminded Stone that Jericho was still waiting to receive the items requested in his July 17, 2002 letter and that Jericho's architects stated that they could not proceed with "due diligence" without these items.

59.    In a further letter dated August 13, 2002, Szegda called to Midtown's attention that:

(i.)    The National Railroad Passenger Corporation Temporary Permit to enter upon the Property previously delivered by Midtown to Jericho was undated and unsigned;

(ii.)    The survey of the Property located between 36th Street and 37th Street had not been delivered to Jericho;

(iii.)    An environmental impact statement had been delivered, but there was no environmental report delivered;

(iv.)    Jericho was unable to timely ascertain the scope of the Amtrak easement because Jericho had reasonably relied upon Midtown's representation in the Original Contract of Sale that a true copy of the Amtrak Agreement was annexed as Exhibit B.

60.    On August 30, 2002, Szegda wrote to Imperatore that Jericho disagrees with Midtown's contention that its obligation to provide Jericho with "due diligence" materials is limited to materials that Midtown has in its own possession.[7]

61.    Szegda asked for the Study Period to begin to run from the day that the documents and drawings filed with the City of New York in 1990 were actually delivered to Jericho.

62.    On September 2, 2002, Szegda wrote Imperatore, again requesting a copy of Exhibits A-1, A-2, A-3, B-1 and C-1 to the "Amtrak Agreement".

63.    By letter dated on or about September 3, 2002, Szegda wrote to Imperatore and stated that Jericho was informed by Seller's exclusive broker, Brown Harris Stevens, only the day before that the New York State Department of Environmental Conservation ("NYDEC") had a file regarding the previously referred to oil spill and was advised over the telephone by the regional office of NYDEC that Jericho should make a formal request under the Freedom of Information Act.

64.    Jericho was to learn sometime after the Study Period that Midtown had actual knowledge and writings in its possession pertaining to the oil spill.

65.    Had Jericho known earlier of this environmental situation it would have had time prior to the expiration of the Study Period to make such formal request. Without the extension of the Study Period this would be a waste of time and effort.

---

[7] Szegda pointed out that Paragraph 29(c) of the Original Contract of Sale requires Seller to make available to Purchaser or its representatives such documents which are within Seller's custody or control which Purchaser reasonably requests and that Paragraph 33 of the Original Contract of Sale provides that Seller shall make available to Purchaser copies of all documentation with respect to permits and/or approvals which Midtown may have obtained with respect to development of the Property. Upon information and belief, Midtown breached this obligation.

relied upon the expected complete performance by Midtown, to Jericho's material

detriment.

## AS AND FOR A FIRST CAUSE OF ACTION
## (Midtown's Material Breach of Original Contract of Sale—Specific Performance)

71.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1

through 70 above as if fully set forth herein.

72.   Midtown purposely and willfully materially breached the Original

Contract of Sale as follows:

> (i.)   Midtown wrongfully failed to timely provide applicable materials, which it had in its custody and/or control and, upon information and belief, wrongfully limited its production of materials to Plaintiff solely to those that were in Midtown's possession at the time of the execution and delivery of the Original Contract of Sale.

> (ii.)   Prior to the execution and delivery of the Original Contract of Sale and during nearly the entire Study Period, Midtown and its exclusive broker wrongfully failed to disclose the occurrence of a prior oil spill which, upon information and belief, affected the Property.

> (iii.)   Prior to the execution and delivery of the Original Contract of Sale and during nearly the entire Study Period, Midtown and its exclusive broker wrongfully failed to disclose the existence of an "open file" with the NYDEC regarding the oil spill. Midtown only informed Jericho of the existence of an open file at the offices of NYDEC on or about September 2, 2002 (just one day prior to the expiration of the Study Period).

> (iv.)   Prior to the execution and delivery of the Original Contract of Sale, Midtown wrongfully failed to disclose the non-existence of a Phase I environmental report with respect to the Property, which was unusual and not customary under the circumstances because there was an environmental impact statement. Midtown only informed Jericho in the middle of August 2002 of the non-existence of a Phase I environmental report.

(v.)    Prior to the execution and delivery of the Original Contract of Sale and during the due diligence period, Midtown and its exclusive broker wrongfully failed to disclose that the applicable development permits pertaining to the Property that had been obtained by Midtown could no longer be routinely renewed.

(vi.)    Upon information and belief, Midtown knowingly failed to attach the exhibits to the Amtrak Agreement to the Original Contract of Sale and Midtown misrepresented that a true copy of the Amtrak Agreement was attached as Exhibit B. Midtown only informed Jericho on or about the last day of the Study Period that it did not have copies of the Exhibits to the Amtrak agreement.

(vii.)    With respect to all of the foregoing, Midtown also breached its implied duty to act in good faith under the terms of the Original Contract of Sale; and in addition, Midtown wrongfully coerced Jericho into terminating the Original Contract of Sale so as to protect the return of the Downpayment; and as discussed below Midtown wrongfully failed to disclose and concealed the fact that Imperatore, an attorney member of Harwood, upon information and belief, individually and/or with family and affiliates owned and/or controlled Midtown.

Upon information and belief, Midtown had in its possession and/or control the Exhibits to the Amtrak agreement; and the environmental materials and files regarding the oil spill and willfully failed to deliver the same to Jericho in order to coerce Jericho into canceling the Original Contract of Sale.

73.    Consistent with Midtown's refusal to perform its obligations under the Original Contract of Sale, on several occasions Midtown offered Jericho the right to an early termination of the contract with an early return of the Downpayment. However, this was not what Jericho had bargained for and not what Midtown had agreed to.

74.    As a direct result of Midtown's material breach of the Original Contract of Sale, Plaintiff lost a substantial and valuable contractual right and benefit with respect to the Study Period to determine the situation regarding certain areas of concern with respect to the Property and therefore lost the right, opportunity and entitlement to acquire the Property.

75.    Defendant placed Plaintiff in an unfair, unreasonable and unbargained-for position where its only prudent action was to terminate the Original Contract Sale in order to protect and obtain the uncontested return of the Downpayment; and Jericho was entitled to a reasonable extension of the Study Period especially under the circumstances and there was no time of the essences.

76.    Because Midtown insisted upon an "as is" deal, the Study Period was intended to provide Plaintiff with a fair and reasonable opportunity to determine, in part, what the Property was worth and what it could be used for and developed.

77.    Had Plaintiff been allowed to have this opportunity that it had bargained for, it would likely have purchased the Property. The opportunity was wrongfully limited by Midtown's misconduct.

78.    There are no contractual limitations under the Original Contract of Sale on the kinds of rights and remedies available to the Purchaser as a result of a breach by Midtown with respect to the Study Period.

79.    Despite, Midtown's demand for a general release Jericho properly refused to release Midtown in exchange for the return of the Downpayment and the parties understood that the return of the Downpayment to Jericho and the cancellation of the

contract did not constitute a release or an accord and satisfaction with respect to Jericho's claims under the Original Contract of Sale.

80.    The Property and its location are unique, special and one of a kind; and Jericho has no adequate remedy at law. Plaintiff was and continues to be ready, willing and able to perform the obligations of the Purchaser under the Original Contract of Sale.

81.    As a result of the foregoing, the Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the Original Contract of Sale including a reasonable extension to the Study Period subject to such terms and conditions, which the Court determines to be equitable and fair.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Midtown's Material Breach of Original Contract of Sale)

### (In the Alternative)

82.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 81 above as if fully set forth herein.

83.    Midtown wrongfully materially breached the Original Contract of Sale.

84.    As a result of all of the foregoing, Plaintiff has been wrongfully deprived of its opportunity to purchase the Property in accordance with the Original Contract of Sale, and has been damaged.

85.    As a result of the foregoing, in the alternative, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Midtown's Material Breach and Wrongful Repudiation and/or Rejection of Amendment to Original Contract of Sale—Specific Performance)

86.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 85 above as if fully set forth herein.

87.    Midtown wrongfully rejected and/or repudiated acceptance by Jericho of Midtown's July 15, 2002 proposal for the amendment to the Original Contract of Sale which amendment was validly entered into when Jericho notified Midtown on August 28, 2002 that it accepted Midtown's July 15, 2002 offer as remade, ratified and/or reconfirmed, as aforesaid, to extend the Study Period through December 31, 2002.

88.    Based upon the course of dealings, the letters back and forth and the conduct between and among the parties and their attorneys, and Midtown's continued manifestations that its July 15, 2002 offer was what Midtown was prepared to proceed with, both parties understood that Midtown's July 15, 2002 offer was still on the table on August 28, 2002 when Jericho sent its acceptance letter.

89.    Furthermore, Midtown's July 15, 2002 offer was irrevocable at least through the expiration of the Study Period based upon Defendant's misconduct which deprived Plaintiff of the benefits of the Study Period, equitable considerations and equitable/promissory estoppel and therefore could not be terminated by revocation by Midtown and/or rejection by Jericho.

90.    Furthermore, Midtown's breach of the Original Contract of Sale and its failure to timely deliver to Jericho all applicable due diligence materials in its custody and control and its failure to make various material disclosures to Jericho which were

known to Midtown, necessitated either a reasonable extension of the Study Period upon reasonable terms and/or a reasonable tolling of the expiration of the Study Period.

91.    Midtown should not be permitted to unfairly preclude and diminish the exercise of Jericho's rights with respect to the Study Period.

92.    Had it not been for Jericho's reasonable reliance upon Midtown's covenants and obligations under the Original Contract of Sale to Jericho's material detriment Jericho might have been able to timely obtain necessary materials and information prior to the end of the Study Period (e.g. making applications pursuant to the Freedom of Information Act).

93.    As a result of the foregoing, Plaintiff has been deprived of its opportunity to purchase the Property in accordance with the amendment to the Original Contract of Sale.

94.    Plaintiff was and continues to be ready, willing and able to perform the obligations of the Purchaser under the amended Original Contract of Sale.

95.    The Property and its location are unique, special and one of a kind; and Jericho has no adequate remedy at law.

96.    As a result of the foregoing, the amended Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the amended Original Contract of Sale including a reasonable extension of the Study Period subject to such terms and conditions, which the Court determines to be equitable and fair.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Midtown's Material Breach And Wrongful Repudiation And/Or Rejection Of Amendment To Original Contract Of Sale)

### (In The Alternative)

97.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 96 above as if fully set forth herein.

98.    As a result of the foregoing, Plaintiff has been deprived of its opportunity to purchase the Property in accordance with the amendment to the Original Contract of Sale.

99.    As a result of the foregoing, in the alternative, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Midtown's Deceit)

### (In The Alternative)

100.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 99 above as if fully set forth herein.

101.    Plaintiff's counsel received a letter dated November 4, 2004 from Zurich North America, an insurance company, addressed to Janice Berrios at Port Imperial Ferry Corporation regarding the subject litigation, with respect to which, Midtown is an additional insured party.  Thus, upon information and belief Midtown is affiliated with Port Imperial Ferry Corporation and upon information and belief Imperatore and/or family and/or affiliates own or control Midtown and upon information and belief

Imperatore is a principal/member of Harwood, the escrow agent under the Original
Contract of Sale.

102.     These relationships create various conflicts of interest which Jericho was
never given the opportunity to consent to.

103.     Midtown had a duty to Jericho to act in good faith; and Harwood, as
escrow agent, had fiduciary duties with respect to the parties to the contract documents.

104.     Upon information and belief Midtown, its counsel and Harwood
intentionally, willfully and knowingly deceived and concealed these relationships and
conflicts of interest to the material detriment of Jericho.  For example, Harwood, as
escrow agent, was more aggressive towards Jericho than it would have been had these
relationships and conflicts not existed.

105.     Midtown knowingly failed to timely disclose and concealed the
unavailability of the Exhibits to the Amtrak agreement.

106.     Midtown knowingly failed to timely disclose and concealed the
occurrence and ramifications of the oil spill.

107.     Midtown knowingly failed to timely disclose the expiration of the Amtrak
permits.

108.     Midtown's conduct was intentional and willful and Midtown knew that
Jericho would reasonably rely upon such deceit and concealment to its material
detriment.

109.    As a result of the foregoing, in the alternative, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court.

**WHEREFORE,** Plaintiff requests judgment as follows:

1.    On the First Cause of Action, judgment that: as a result of the foregoing, the Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the Original Contract of Sale including a reasonable extension of the Study Period, subject to such terms and conditions, which the Court determines to be equitable and fair;

2.    On the Second Cause of Action, in the alternative, judgment that: As a result of the foregoing, Midtown is liable to Plaintiff for damages in an amount of not less than Fifty Million Dollars ($50,000,000.00), as determined by the Court;

3.    On the Third Cause of Action, judgment that: As a result of the foregoing, the amended Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the amended Original Contract of Sale including a reasonable extension of the Study Period subject to such terms and conditions, which the Court determines to be equitable and fair;

4.    On the Fourth Cause of Action, in the alternative, judgment that: As a result of the foregoing, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court; and

        5.      On the Fifth Cause of Action, in the alterative, judgment that: As a result of the foregoing, Midtown is liable to Plaintiff for damages in an amount not less than Fifty Million Dollars ($50,000,000.00) to be determined by the Court;

63

awarding Plaintiff such other and further relief as the Court may deem just and proper, together with the costs and disbursements of this action.

Dated:    November 29, 2004

ROBERT B. GOEBEL
*Attorney for Plaintiff*
14 Walworth Avenue
Scarsdale, New York 10583
(914) 725-5243

- 28 -

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ **Charles Edward Ramos** _____    PART **53**

*Justice*

0113274/2004

JERICHO GROUP, LTD                          INDEX NO. _____
vs
MIDTOWN DEVELOPMENT, LP                      MOTION DATE _____

SEQ 1                                         MOTION SEQ. NO. _____

DISMISS                                       MOTION CAL. NO. _____

The following papers, numbered 1 to _____ ... this motion to/for _____

| | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits | _____ |
| Replying Affidavits | _____ |

**Cross-Motion:** ☐ Yes    ☐ No

Upon the foregoing papers, it is ordered that this motion

the Court's transcript.    Motion denied as reflected in

FILED

MAY 18 2005

NEW YORK
COUNTY CLERK'S OFFICE

Dated: _5/16/05_ _____    _____ J.S.C.

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

**Check one:** ☐ FINAL DISPOSITION    ☑ NON-FINAL DISPOSITION

**Check if appropriate:** ☐ DO NOT POST    ☐ REFERENCE

05/19/2005 THU 16:46 FAX                                    @002/028

1                                                          1

2

3    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK: CIVIL PART  53
4    - - - - - - - - - - - - - - - - - - - - - - - - - - -X

5    JERICHO GROUP, LTD.

6                                      Plaintiff,

                  -against-

7    MIDTOWN DEVELOPMENT, LP,

8                                      Defendant.
     - - - - - - - - - - - - - - - - - - - - - - - - - - -X

9    INDEX 113274/04

10                                60 Centre Street
                                  New York, NY 10007,
11                                May 12, 2005

12   B E F O R E:

13        HONORABLE CHARLES E. RAMOS, JUSTICE.

14   A P P E A R A N C E S:

15

         ROBERT B. GOEBEL, ESQ.
16       Attorney for Plaintiff
         14 Walworth Avenue
17       Scarsdale, NY 10583
     BY:   RICHARD L. MARASSE, ESQ.
18

19       JONES DAY, ESQ.
         Attorneys for Defendant
20       221 East 41st Street
         New York, NY   10017
21   BY:   FREDERICK E. SHERMAN, ESQ.
         TODD R. GEREMIA, ESQ.
22

23                     oOo

24                     MILLICENT J. ANGIULLI
                       Official Court Reporter
25

26

         MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

8

⊠003/028

2

1                                 Proceedings

2

3            THE COURT:    Okay, motion sequence number

4    one, which means we have not committed any error yet.

5            Who has the plaintiff?

6            MR. MARASSE:    I am the plaintiff, but I

7    am not the movant.

8            THE COURT:    I just want to know who is the

9    plaintiff.

10           MR. MARASSE:    This is a case involving a

11   breach of a complex contract or real estate involving

12   real estate over the Javitz Center in Manhattan, and

13   we filed a motion for damages -- refiled a complaint

14   for damages and for specific performance and for

15   contract, and--

16           THE COURT:    Is it one of those warehouses

17   in the area.

18           MR. MARASSE:    There was nothing on the

19   property.

20           THE COURT:    It's empty land over there?

21

22           MR. MARASSE:    It was knocked down.   I

23   think it is still empty land.   This was couple years

24   ago, in 2002, and Jericho contracted, and after the

25   amendment now we feel we are entitled to damages

26   because of failures under the contract by the

09/19/2005 THU 16:47 FAX                                    @004/028

```
 1                          Proceedings                       3
 2      defendants to perform under the terms of the contract.
 3              THE COURT:    What did the contract call
 4      for?
 5              MR. MARASSE:    Specifically we believe
 6      there were several acts of bad fate in terms of the
 7      contract.  There was a period when disclosure--
 8              THE COURT:    What was the contract for?
 9              What did the party of the first part not do
10      to the party of the second part?
11              MR. MARASSE:    Eventually go to
12      Development or sell it to some one with Development,
13      and during the contracting process the contract
14      specifically set up a period called the study period.
15      Certain documents were going to be produced, and it is
16      our contention that there was wilful withholding of
17      key documents during that period, bad fate
18      withholding.
19              THE COURT: The contract provided for-- it
20      was an executed contract?
21              MR. MARASSE:    Yes.
22              THE COURT:    Purchased by or contract
23      amount?
24              MR. MARASSE:    28 million dollars.
25              THE COURT:    And as a consequence of that
26      contract the defendants were conveyed title?
```

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

05/18/2005 THU 16:47 FAX                                                    ☒003/026

|   |                                                                      |
|---|----------------------------------------------------------------------|
| | Proceedings                          4 |

1  

2      MR. MARASSE:     To convey title.

3      THE COURT:     And during this period of

4   time, after the contract was executed there was some

5   sort of disclosure that went forward.

6      MR. MARASSE:     There was an obligation to

7   provide documentation to the right of purchase.

8      THE COURT:     So I take it it was somewhat

9   executory in terms of the contract.   There was a

10   second step.

11      MR. MARASSE:     There was  a period  called

12   a study period with a definite time limit.   We allege

13   that the documentation that should have been provided

14   during that period was not, and we allege it was done

15   in bad fate.

16      THE COURT:     As a consequence of not

17   providing the information, what happened, you withdrew

18   from the deal or you went through with the deal?

19      MR. MARASSE:     At the end of the day, the

20   contract was terminated.

21      THE COURT:     Because the information given

22   to your client made your client back off?

23      MR. MARASSE:     Our client felt, the client

24   felt at that time he did not have sufficient

25   information to feel comfortable going ahead, so he

26   ultimately exercised his right to terminate.

.05/18/2005 THU 16:47. FAX                                                    ☒005/025 ....    ..

5

Proceedings

1

2        THE COURT:    Was there any cost to your

3 client to exercise, is there a forfeiture of any

4 deposit?

5        MR. MARASSE:    No.

6        THE COURT:    So now I have a feel for what

7. the case is about, why don't I hear from the

8 defendants, since it is there motion.

9        THE COURT:    Defendant or defendants.    One

10 defendant?

11        MR. SHERMAN:    Just one defendant, Midtown

12 Development.

13        Your Honor, my name is Fred Sherman.    I am

14 with Jones Day.  We represent Midtown Development, and

15 it is our motion.

16        THE COURT:    Step over by the lectern.

17 Take your papers, and the court reporter can hear you

18 more clearly, and I can hear you.

19        This is a motion to dismiss under CPLR 3212

20 summary judgment?

21        MR. SHERMAN:    It is a motion to dismiss,

22 although it does refer to some documents referred to

23 in the complaint.

24        THE COURT:    All right.

25        MR. SHERMAN:    The short story of this

26 case is as follows, there was a contract executed

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

**12**

03/13/2003 THU 10:41  FAX                                    @007/028

6

1                           Proceedings
2      between the two parties who were the parties to this
3      action on June 12, 2002.
4              The contract was for purchase and sale of
5      two lots.
6              THE COURT:    Wasn't it June 18, 2002.
7              MR. SHERMAN:    My mistake, June 18, 2002.
8      The contract was for purchase and sale of two lots of
9      real estate on the West Side of Midtown Manhattan,
10     11th Avenue.
11             The purchase price was 28 million dollars.
12     There was, pursuant to contract, a down payment paid
13     upon execution, of $250,000.  The contract called for
14     the seller to convey the property as is.
15             The contract contained no representations at
16     all of any kind with respect to the condition of the
17     property, environmental circumstances, permits and so
18     on.  The buyer had a 70-day, 75-day period from the
19     execution of the contract, which was called a study
20     period, in which it could inspect the premises,
21     examine it, satisfy itself or not satisfy itself as to
22     the suitability of the real estate for whatever its
23     purposes were, and during that 70 day --
24             THE COURT:    The first part of this
25     contract sounds like a letter of intent.  It's a small
26     deposit.  $250,000 downpayment is -- usually it would

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

**13**

03/18/2005 THU 16:47  FAX                                          ☒008/028

1                            Proceedings                    7

2  be couple million dollars down payment on a contract

3  of this type.  For $250,000, it's like you gave them

4  an option and they studied it for 75 days.

5              MR. SHERMAN:    Yes, and they'd decide in

6  their own complete discretion whether they want it or

7  not.

8              THE COURT:    They do their own due

9  diligence?

10             MR. SHERMAN:    Yes.

11             THE COURT:    Any obligation on the part

12 of defendant to supply them with information?

13             MR. SHERMAN:    There is an obligation on

14 defendant's part to provide them with information

15 within the seller's control.

16             THE COURT:    The rider, I take it, is what

17 is important here.

18             What paragraph of the rider?

19             MR. SHERMAN:    Let me finish the short

20 story, and I want to talk about the contract terms to

21 you.

22             THE COURT:    It's my courtroom, so I get to

23 ask you questions.

24             MR. SHERMAN:    Of course, you can ask me

25 questions.

26             THE COURT:    What paragraph is it, 29?

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

**14**

05/19/2005 THU 16:45  FAX                                        009/028

8

```
 1                        Proceedings
 2           MR. MARASSE:     Paragraph 29A.
 3           THE COURT:     Let me read it to myself and
 4    when you are speaking I will have an idea of what you
 5    are talking about.
 6           These are the rail yards?
 7           This is the same property that is now
 8    subject of the New York Jets Stadium?
 9           MR. SHERMAN:    No, but it's.in the
10    neighborhood.
11           MR. SHERMAN:    The property that the Jets
12    are considering is owned by the Port Authority.
13           THE COURT:    I thought it was the Transit
14    Authority.
15           MR. SHERMAN:    The Transit Authority.
16           THE COURT:    Amtrak has an easement below
17    grade for rail lines.
18           MR. SHERMAN:    Yes.
19           THE COURT:    I see paragraph 11C, that the
20    seller will make available to the purchaser such
21    documents within the seller's current custody and
22    control related to the condition of the property which
23    the purchaser reasonably request.
24           Is there any other obligation on the part of
25    the seller to supply information to the purchaser?
26           MR. SHERMAN:    I think there is an earlier
```

. 05/19/2005 THU 16:48 FAX                                              ☒010/028 · ·   · · · .

|   |   |
|---|---|
| 1 | Proceedings                    9 |
| 2 | section which says virtually the same thing, but that |
| 3 | is-- |
| 4 | THE COURT:    So did they send specific |
| 5 | request in writing to the seller? |
| 6 | MR. SHERMAN:    They sent some requests, |
| 7 | and the requests were fulfilled. |
| 8 | THE COURT:    Are they taking the position |
| 9 | now that the response was inadequate or somehow |
| 10 | misleading? |
| 11 | MR. SHERMAN:    They certainly are taking |
| 12 | that position. |
| 13 | THE COURT:    How do I decide that on a |
| 14 | motion to dismiss? |
| 15 | MR. SHERMAN:    ' I don't know that you can |
| 16 | decide if that issue were critical to deciding the . |
| 17 | case. |
| 18 | The short story of the case was, as you just |
| 19 | read, they had a 75-day period to satisfy themselves |
| 20 | or not.  They had an absolute right within the 75-day |
| 21 | period to decide to terminate, to cancel the contract |
| 22 | without giving any reason. |
| 23 | As you said this contract in many  ways is |
| 24 | like an option.  On the last day of the study period, |
| 25 | on the seventy-fifth day they sent a written notice |
| 26 | and they said we want our money back. |

16

09/13/2005 THU 10:45 FAX                                              ☒011/028

| | |
|---|---|
| 1 | Proceedings                                    10 |
| 2 | They cancelled it. Two years later, and |
| 3 | that was it, 2002. |
| 4 | Two years later, 2004, what happened to |
| 5 | Manhattan value of real estate adjacent to the new |
| 6 | Jets Stadium?  Its  gone up substantially. |
| 7 | Out of the woodwork comes a lawsuit. |
| 8 | That is what this case is really about, the |
| 9 | short form is you have the contract in the form you |
| 10 | seen here, undertaking no. representations whatsoever |
| 11 | about the property.  To convey as is, a right to look |
| 12 | it over for 75 days, an absolute right to walk away |
| 13 | and get back the small deposit, $250,000. |
| 14 | At the end of 75 days, they say we want our |
| 15 | money back.  We are walking away. |
| 16 | THE COURT:   Here is the Court's problem, |
| 17 | on the face of it the complaint alleges that the |
| 18 | information given was either willfully and negligently |
| 19 | misleading, right? |
| 20 | MR. MARASSE:           Absolutely, Your |
| 21 | Honor. |
| 22 | MR. SHERMAN:    Yes. |
| 23 | THE COURT:    So I understand what your |
| 24 | defense is and I understand your large view of the |
| 25 | case and how it developed, and you may well be |
| 26 | correct.  And you may well be correct on the merits |

09/18/2008 THU 10:45  FAX

@012/028

Proceedings                                11

1   that there was no misleading information given, that

2   this was not an attempt by the seller to back out of

3   the deal by feeding misleading information; but that

4   is all factual.

5          What is there in the contract, or what

6   defect is in the complaint that would move me to grant

7   this motion and dismiss the complaint entirely without

8   making any factual determination as to whether or not

9   there was in fact misleading information given,

10  because the law abhors a fraud, and if there was an

11  attempt to mislead the plaintiff, to dissuade the

12  plaintiff from executing on the contract, and that was

13  done by fraudulent means, the law looks for a remedy

14  in a situation like that, because otherwise a valuable

15  contract right would be destroyed through wrongful

16  means.

17         So that is what I am looking at.  Just on a

18  3211 motion.

19         MR. SHERMAN:    They have pleaded fraud as

20  the 5th or five cause of action.  They have two causes

21  of action for specific performance.  They say we were

22  selling them the property --

23         THE COURT:    Are you seeking to dismiss the

24  entire complaint or just those?

25         MR. SHERMAN:      We are, but I am

26

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

|    |    |
|----|----|
| 1  | Proceedings                    12 |
| 2  | addressing pieces of it. |
| 3  | As to the two causes of action for specific |
| 4  | performance the law is quite clear. Whether they now |
| 5  | say they were defrauded or withheld information was in |
| 6  | bad fate is one thing, the law. |
| 7  | What is not in dispute is that they said and |
| 8  | they exercised their contractual right to cancel the |
| 9  | contract and get their money back. They got their |
| 10 | money back. The law is very clear, once a contract is |
| 11 | cancelled, the downpayment is returned. |
| 12 | There is no right to exist for specific |
| 13 | performance. |
| 14 | THE COURT: That is an interesting point. |
| 15 | Would you say they would have a claim for |
| 16 | damages, potential damages? |
| 17 | MR. SHERMAN: But as to a claim for |
| 18 | specific performance, they had a contractual right. |
| 19 | They knew it, and they said in writing, you will find |
| 20 | among the exhibits a letter which they said we are |
| 21 | exercising our right under 29A of the contract, cancel |
| 22 | the contract and we want our money back. |
| 23 | They gave them the money back. |
| 24 | THE COURT: By bringing this action |
| 25 | seeking specific performance, but aren't they asking |
| 26 | for a decision of their rejection of the contract? |

05/18/2005 THU 16:49  FAX                                          ☒014/028

13

<center>Proceedings</center>

1

2      MR. SHERMAN:    Sure they are, but they are

3   not entitled to that.

4          THE COURT:    Again, let's assume for

5   purposes of this motion that there was a fraud

6   committed, a wilful, knowing fraud on the part of

7   defendants; wouldn't the plaintiff be entitled, if

8   they were successful in proving the fraud, wouldn't

9   they be entitled to rescind their rejection of the

10   contract and compel specific performance?

11          MR. SHERMAN:    No, they did make an

12   election of remedies.  Remember, they are not saying

13   anything two years later that they were not in a

14   position to say at the time that they cancelled the

15   contract, if they really believed that they were being

16   somehow defrauded by being deprived of documents --

17          THE COURT:    There might be, and I don't

18   know if there is, but I always love to erect unfair

19   scenarios, factual scenarios on 3211 motion because

20   that is hard to deal with.

21          Let's assume there was something that came

22   to their attention two years afterwards that revealed

23   the fraud that occurred, when the contract was, during

24   the 75-day period.  And perhaps it has to do with the

25   value of the property; I don't know.

26          The statute of limitation certainly had a

14

|    | Proceedings |
|----|-------------|
| 1  |  |
| 2  | run, and the fraud had not run. |
| 3  | MR. SHERMAN:    No. |
| 4  | THE COURT:    And they changed their |
| 5  | position arguably because of the fraudulent |
| 6  | representation, wouldn't they be entitled as one |
| 7  | alternative of relief to rescind that action that is |
| 8  | made because it was predicated upon fraud, and to |
| 9  | restore themselves to the position of the contracting |
| 10 | purchasers? |
| 11 | MR. SHERMAN:    Your Honor, I think that |
| 12 | your hypothetical is one that could not apply to a |
| 13 | contract which contained the language, the disclaimers |
| 14 | found in paragraph 38 of the rider. |
| 15 | You may have a fraud claim.  People |
| 16 | misrepresent the value of companies of real estate all |
| 17 | the time.  I told you in my introductory short form |
| 18 | this was "as is", but take a look at the language that |
| 19 | is on page ten of the rider, the very top, 38. |
| 20 | THE COURT:    Well, the purchaser |
| 21 | acknowledges that the seller, except as specifically |
| 22 | set forth elsewhere in this contract, has made no |
| 23 | representations. |
| 24 | Now, we know that during that study period |
| 25 | they are able to ask for documentation.  Some of those |
| 26 | documents may contain representations. |

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

Proceedings                           15

Now, I got to make a factual determination as to whether those representations were accurate or they were misrepresentations.

So notwithstanding the fact you have a merger clause in here, the merger clause cannot include what it specifically excludes, and it specifically excludes those representations made elsewhere pursuant to the contract, and we all know that document requests were made or information requests were made, and therefore I am assuming that some sort of representations were made.

MR. SHERMAN:    I don't think turning over documents is tantamount to making representations.

THE COURT:    When a purchaser in a situation like this makes a request of a defendant, for example, the financials or rent roll, yes, you are making a representation that the document you are delivering is accurate.

MR. SHERMAN:    I think normally in corporate contracts there is a representation the financials are true and accurate.

THE COURT:    So we are at such an early stage in the litigation. I don't know what to ask you, and I am assuming the worse in your position obviously.

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

@017/028

|  | Proceedings | 16 |

1
2      It may have been just studies, environmental
3   studies, things of that nature. I don't know what
4   they were looking at or concerned with, but I am
5   concerned that the complaint sets forth that
6   potential.
7      What I am really suggesting is this motion
8   sounds like it ought to be a motion for summary
9   judgment; once we have done some preliminary
10  discovery, or at least I can deal with some facts here
11  because again from the prospective of the 3211 motion
12  I have to assume facts in the complaint is as the
13  plaintiff has alleged.
14      MR. SHERMAN:    Let me try this one.  What
15  do you do with the equitable doctrine of laches?
16      What do you do in a situation where someone
17  asks his money back, gets it back and doesn't allege
18  he learned anything in two years, and only starts a
19  suit for specific performance two years later?
20      When does laches, which is recognized as a
21  defense for a claim for specific performance, when
22  does that have bite?
23      THE COURT:    Do you have case law to the
24  effect that waiting two years without anything else
25  happening to either party is sufficient laches to
26  essentially establish a short statute of limitation?

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

```
 1                            Proceedings              17
 2              MR. SHERMAN:    I think--
 3              THE COURT:    Do you have authority for
 4     that?
 5              MR. SHERMAN:    I think we have some cases
 6     for that.
 7              THE COURT:    What are the facts in those
 8     cases?   Laches, when all fails argue laches.
 9              MR. SHERMAN:    I am not sure that that is
10     the situation.  Remember --
11              THE COURT:    Has your client been hurt by
12     the delay?  No, your client still owns the property.
13     There has been no prejudice to the defendant.
14              MR. SHERMAN:    The prejudice is he owned
15     the property.  He has to continue to pay the cost of
16     maintaining the property.  The City taxes as you
17     know --
18              THE COURT:    The plaintiff would love to
19     relieve him of that burden.
20              MR. SHERMAN:    That maybe, but the risk
21     of -- at the time that plaintiff walked away from the
22     deal, plaintiff thought it was too risky to proceed.
23     So that risk was then born.
24              THE COURT:    That is easy for you to say on
25     this kind of a motion, since I am not considering any
26     of the facts in the case.  I don't know why he walked
```

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

24

09/18/2008 THU 16:59 FAX                                                  Ø019/028

Proceedings                                      18

1
2     away or it walked away, Jericho Group walked away.  I
3     don't know that, unless it's set forth by the
4     plaintiff that the plaintiff simply walked away,
5     because they were concerned about the deal.  I have to
6     assume again the facts as alleged.
7              MR. SHERMAN:    I think even in the
8     complaint they allege, they alleged what they weren't
9     told, that there had been an oil spill, that the
10    permit had expired.  What they alleged in fact made
11    the property less valuable in the contract price.
12             THE COURT:    Let me take a look at the
13    allegations in the complaint.
14             When was the contract finally declared null
15    and void, what was the date?
16             MR. SHERMAN:    The notice was given on the
17    last day, which was September 3, 2002.
18             THE COURT:    I see we really have two
19    contracts here, the original contract of sale and then
20    we have the amended, and they are seeking specific
21    performance on each or just specific performance on
22    the first?
23             MR. SHERMAN:    No, they plead for a
24    specific performance on both.  I would like to at some
25    point address the claims with respect to the so-called
26    amended contract.

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

25

|   |   |
|---|---|
| 1 | Proceedings                                    19 |
| 2 | THE COURT:  Explain to me what this claim of |
| 3 | deceit that you set forth, which is your fifth cause |
| 4 | of action.  I am not sure if I quite follow, |
| 5 | plaintiff. |
| 6 | MR. GOEBEL:    I am Robert Goebel. |
| 7 | THE COURT:    I would rather have the |
| 8 | attorney. |
| 9 | MR. GOEBEL:    I am the attorney, Robert |
| 10 | Goebel. |
| 11 | THE COURT:    Stand up, please. |
| 12 | MR. GOEBEL:    Paragraph 31, Your Honor, of |
| 13 | the contract states that the that annexed to the |
| 14 | contract is a true and complete Amtrak agreement.  It |
| 15 | turns out -- the Amtrak agreement is basically an |
| 16 | agreement that the seller purportedly had with Amtrak, |
| 17 | and basically the agreement was to provide for |
| 18 | allowance of the seller, of the owner of the property |
| 19 | to build above the railways, the railroad tracks. |
| 20 | Without an agreement that provides for that there is |
| 21 | no way you can develop the site because the tracks run |
| 22 | right through the property. |
| 23 | So it's basically worthless property that |
| 24 | can't be developed, or it is not worth nearly as much, |
| 25 | but it cannot be developed. |
| 26 | THE COURT:    The property is just off |

03/19/2003 THU 10:30 FAX                                      @021/028

```
 1                        Proceedings              20
 2    Eleventh Avenue?
 3              MR. GOEBEL:    There are the lots, 36th
 4    Street and 37th Street and Eleventh Avenue, two lots.
 5              THE COURT:    On which side of Eleventh
 6    Avenue?
 7              MR. GOEBEL:    I think it's on the east
 8    side.
 9              THE COURT:    You are right.  Going up
10    Eleventh Avenue.  Going up Eleventh Avenue it is on my
11    right-hand side.
12              MR. GOEBEL:    That is correct.  They told
13    us when we signed the contract they represented in
14    paragraph 31A that annexed thereto is a true and
15    complete copy of the Amtrak agreement.  It turns out
16    that there were many of the exhibits were missing.
17              THE COURT:    So they didn't give you
18    complete copy of the Amtrak agreement?
19              MR. GOEBEL:    We tried to get copies of
20    the exhibits from both the seller and also from
21    Amtrak, and Amtrak bounced us around.  They basically
22    said go back to the seller.  The seller said we've
23    given you everything we are required to give you, and
24    then near the very end of the study period, about 70
25    days into the study period, Your Honor, they told us
26    they didn't have the exhibits.
```

05/19/2005 THU 16:51 FAX

21

Proceedings

1

2    THE COURT:    They didn't have their own

3    lease with Amtrak?

4        MR. GOEBEL:      They didn't have their own

5    exhibits with Amtrak.

6        THE COURT:    Is this reflected in the

7    correspondence you had with them?

8        MR. GOEBEL:    Yes.

9        THE COURT:    Are there motion papers or

10    not?

11        MR. GOEBEL:    I believe it is  reflected

12    in there.

13        In any case, Your Honor, it is attached to

14    the exhibit to the motion papers.  So I think we dealt

15    with that in the papers.

16        But they tell us 70 days into the study

17    period they don't have the exhibits that we asked

18    for.

19        Now, the property was apparently filed for

20    big development by their architect in 1989, '90, about

21    15 years ago.  But subsequent to the Amtrak agreement,

22    the date of the Amtrak agreement I think is in the

23    '80s, in any case they have had the exhibits when

24    they filed, numerous files which they didn't give us,

25    by the way, when they were supposed to:

26        THE COURT:    You now know there was an

05/15/2005 THU 10:51 FAX                                                    @023/028

|    | Proceedings                                              22 |
|----|-------------------------------------------------------------|
| 1  |                    *Proceedings*                        22   |
| 2  | agreement by Amtrak that permit construction above the      |
| 3  | tracks.                                                      |
| 4  |           MR. GOEBEL:    We don't know the scope.           |
| 5  |           THE COURT:    You still have not seen the         |
| 6  | document?                                                    |
| 7  |           MR. GOEBEL:    I think we still have not          |
| 8  | seen the exhibits.  But in any case, this was very          |
| 9  | near the end of the study period.  This along with          |
| 10 | other non disclosures rendered our study period, due        |
| 11 | diligence during study period relatively meaningless,       |
| 12 | because they didn't give us what they were supposed to      |
| 13 | give us.                                                     |
| 14 |           At one point there was correspondence back        |
| 15 | and forth.  They said they only had to give us what         |
| 16 | was in their possession, but there are three places in      |
| 17 | the contract where it deals with what they had to           |
| 18 | provide us and when with documents.                         |
| 19 |           The second one in the agreement says they         |
| 20 | have to provide us with everything in their possession      |
| 21 | or custody and control.                                     |
| 22 |           So with respect to certain things, they           |
| 23 | didn't disclose to us or give us, Your Honor, they          |
| 24 | took the position it was not in there possession.  But      |
| 25 | it was in their custody and control when subsequently       |
| 26 | when we learned about the filings of 1989 and 1990, we      |

29

Proceedings                          23

1
2    want to see the architectural plans and
3    specifications, they took the position it was not in
4    their control, that it was not in their possession, so
5    they didn't have to give it to us.
6              THE COURT:   Let me frame the question if I
7    can for my purposes and for purposes of the record.
8              From what counsel has told me, he put some
9    meat on the bone now, he said during the 75-day period
10   they asked for a copy of the lease with Amtrak because
11   obviously if they didn't have a right to build above
12   the Amtrak tracks, the property could be used for
13   what, a parking lot, and that would be it.
14             Did you supply a copy of the Amtrak contract
15   to the purchaser during that 75-day period?
16             MR. SHERMAN:   The copy that we have was
17   supplied on the day of the execution of the contract,
18   and it's an exhibit to the contract.
19             THE COURT:   Was it complete?
20             MR. SHERMAN:   It didn't contain exhibits.
21             THE COURT:   What were the exhibits?
22             MR. SHERMAN:   I don't know.  We don't
23   have the exhibits.  They didn't ask about it.
24             MR. GOEBEL:   Why should we ask?
25             MR. SHERMAN:   They knew what they gotten,
26   they knew what the copy was, and they knew the

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

yu/ly/zuvy, inu 10:31  FAX                                    ☒025/028

24

1                          Proceedings

2    exhibits were not there on the day the contract was

3    not signed.

4              THE COURT:    This is a motion under 3211,

5    not 3212, without those exhibits in my possession I

6    have to assume that those exhibits would permit the

7    owner of the property to build as high as the local

8    regulations would permit, or those exhibits would say

9    no, you cannot build at all.

10             So those exhibits would really determine to

11   me what the value of the property is.

12             MR. SHERMAN:    I don't know that exhibits

13   would provide that information rather than the

14   agreement itself.

15             THE COURT:    What does the agreement say?

16             MR. SHERMAN:    I don't know what the

17   agreement says.

18             MR. GOEBEL:    Paragraph 31, Your Honor.

19             THE COURT:    How can I decide this?  Either

20   the -- from what the plaintiff is alleging I think the

21   plaintiff has at least a valid cause of action.

22             MR. SHERMAN:    Let's assume for moment,

23   you think it's a valid cause of action for breach of

24   representation that they got a copy of the contract,

25   how does that become a deceit or fraud in this

26   action?

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

05/19/2005 THU 16:52 FAX                                                @026/026

Proceedings                                25

1
2              Why is that not a breach of contract; how
3       does he turn it into a fraud issue?
4              THE COURT:    The fraud of the deceit is
5       when you are asked to turn over a document, instead of
6       turning over the complete document you turn over half
7       the document.
8              MR. SHERMAN:    The document that they had
9       wasn't a question of being asked to turn over, was
10      attached to the contract and they had that on the day
11      they signed the contract.
12             THE COURT:    I see.
13             MR. SHERMAN:    It says a copy of the
14      Amtrak contract was attached to the contract of
15      purchase and sale.
16             THE COURT:    Was it clear from the Amtrak
17      contract that was attached to the purchase and sale
18      agreement, that the Amtrak contract was incomplete?
19             MR. SHERMAN:    Yes, because it didn't have
20      some of these exhibits.
21             THE COURT:    Did they then request those
22      exhibits?
23             MR. SHERMAN:    After 60 days, two months
24      into the so-called study period.  It is not as though
25      they read it on day one and say we need those
26      exhibits.

32

03/13/2006 THU 16:52 FAX                                    Ø027/028

```
 1                        Proceedings                    26
 2              THE COURT:   The answer is yes, during the
 3    75-day period they requested the exhibits.
 4              MR. SHERMAN:   And we told them we don't
 5    have it.
 6              THE COURT:   It does strike me as somewhat
 7    odd that the owner of the property would not have a
 8    full copy of the lease.
 9              MR. GOEBEL:   The most important piece.
10              THE COURT:   Indeed it strikes me as not
11    credible.
12              The motion is denied, get your answer in.
13    Thank you very much.
14              Plaintiff, once the answer has been filed,
15    contact Mr. Diaz, he will set you up for a preliminary
16    conference date and we will set schedules for
17    discovery, documents, whatever.
18              Thank you very much.
19                           ***
20
21
22
23
24
25
26        ;
```

05/19/2005 THU 16:52  FAX                                    ☒028/028

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Proceedings                                    27

C E R T I F I C A T I O N

I, Millicent J. Angiulli, an Official Court
Reporter of the State of New York, do hereby
certify that the foregoing is a true and accurate
transcript of my  stenographic notes

MILLICENT J. ANGIULLI
Official Court Reporter

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

Mazzarelli, J.P., Saxe, Nardelli, Sweeny, McGuire, JJ.

7703        Jericho Group, Ltd.,                    Index 113274/04
                    Plaintiff-Respondent,

                    -against-

            Midtown Development, L.P.,
                    Defendant-Appellant.
            _____

Jones Day, New York (Frederick E. Sherman of counsel), for
appellant.

Robert B. Goebel, Scarsdale, for respondent.
            _____

    Order, Supreme Court, New York County (Charles Edward Ramos,

J.), entered May 18, 2005, which denied defendant's CPLR

3211(a)(7) motion to dismiss the amended complaint, unanimously

reversed, on the law, with costs, the motion granted and the

complaint dismissed.  The Clerk is directed to enter judgment

accordingly.

    On June 18, 2002, Jericho Group Ltd. entered into a contract

to purchase two undeveloped properties on 11th Avenue from

Midtown Development, L.P.  One lot was located between 36th and

37th streets, and the other was between 37th and 38th Streets.  The

purchase price was $28 million.  Jericho deposited $250,000 into

an escrow account at the time of execution of the contract, and

agreed to pay the balance of the purchase price at closing.

Paragraph 41(d) of the contract provided that Midtown's counsel

would serve as the escrow agent.  Paragraph 22 of the contract

provided:

35

> "In the event that the seller is unable to convey title in
> accordance with the terms of this contract, the sole
> liability of the seller will be to refund to the purchaser
> the amount paid on account of the purchase price, and upon
> such refund any payment being made [under] this cont[r]act
> shall be considered canceled."

Both of the properties were encumbered by railroad easements and

rights of way in favor of Amtrak. A rider to the sales contract

provided:

> "29. (a) [Jericho] shall have seventy five days from the
> date this Contract has been executed by both parties ("the
> Study Period"), to cause to be performed, at Purchaser's
> cost and expense, such environmental and/or
> architectural/engineering and other tests and/or inspections
> as [Jericho], in its sole discretion, shall elect to
> perform.  In accordance with the terms of Paragraph 29(b)
> below, [Midtown] shall allow Jericho and its representatives
> access to [the] Property at all reasonable times, shall
> cooperate with [Jericho] and its representatives and shall
> make available to [Jericho] and its representatives such
> material pertinent to such tests and/or inspections as
> seller may have in it[s] possession.  If, prior to the
> conclusion of the Study Period, [Jericho] shall determine,
> in its sole and absolute discretion that the Property is not
> suitable for its needs, [Jericho] shall have the right to
> cancel this Contract upon written notice to Seller and
> Escrowee.  Upon timely receipt of such notice of
> cancellation, the Escrowee shall promptly return to
> [Jericho] the monies paid in execution hereof."

The closing was scheduled for 15 days after the 75-day study

period, on September 18, 2002.  The Rider also provided, at

paragraph 29(c) that if Jericho made a "reasonable request,"

Midtown was to provide Jericho with "documents . . . relating to

the condition of the property during the study period."

In July 2002, Jericho requested an extension of the study

period from September 2, 2002 to December 31, 2002.  Midtown sent

Jericho a letter, dated July 15, 2002, stating that it was "not particularly amenable to Jericho's request, particularly because Midtown refrained from making any representations concerning zoning or permits in the Contract." However, it offered to grant the requested extension on the conditions that Jericho: (1) paid a nonrefundable fee of $250,000 for the carrying of the sites; (2) placed an additional $500,000 in escrow for the down payment; and (3) agreed that $250,000 of the down payment would be non-refundable in the event Jericho failed to close under the contract. The letter then states, "[a]ssuming Jericho accepts this proposal, we would present it as an amendment to the Contract, which would be signed by both parties."

Jericho did not agree to these terms, and on July 17, 2002 counter-proposed that the Contract be amended to extend the study period until July 1, 2003. As part of the counter-proposal, Jericho agreed to deposit an additional $500,000 in escrow to be used to fund certain real estate taxes on the property. By letter dated July 25, 2002, Midtown rejected the counter-proposal, but stated that it was still willing to extend the study period through December 31, 2002 in accordance with its earlier proposed terms. Jericho rejected this offer and made a second counter proposal. It requested that it be granted a free extension of the study period through December 31, 2002, and on that date it would have the option to further extend the study

37

period to July 31, 2003 by paying Midtown $1 million.  Midtown
rejected this second counter-proposal.  Jericho made a third
proposal that the study period be extended to July 1, 2003, this
time contingent upon its payment of a nonrefundable payment of
$750,000, which was also rejected.

Finally, on August 28, 2002, approximately a week before the
end of the study period, Jericho sent a letter to Midtown, which
stated:

> "Without prejudice to its current rights under the
> referenced contract, Jericho has determined to accept the
> proposal of Midtown regarding the extension of the study
> period as set forth in [Midtown's] letter dated July 15,
> 2002, and as reiterated in [their] letter dated July 27,
> 2002.  Please prepare a draft of an appropriate amendment to
> the referenced contract and forward it to me [] as soon as
> possible so that we can finalize the matter prior [sic] well
> before the current expiration of the study period."

On August 28, 2002, Midtown faxed a letter which notified Jericho
that its July 15, 2002 offer had been repeatedly rejected and was
deemed, as rejected, null and void.

On August 30, 2002, Jericho informed Midtown that it had
heard something about an oil spill at or near the property.  It
requested that Midtown inform it about the alleged oil spill and
whether or not it had been cleaned up.  This was not the first
correspondence between the parties on this subject.  By e-mail
dated August 23, 2002, Midtown let Jericho know that it had no
information concerning the cleanup of an oil spill on properties
neighboring the land Jericho sought to purchase.  However,

38

Midtown gave Jericho the name of a contact person at the New York
Department of Environmental Conservation, his telephone number,
and a project number and spill number for the incident at issue,
so that Jericho could find out the status of any spill and/or
cleanup.

On the day before the study period expired, Jericho asked
Midtown for the exhibits to a development agreement between
Midtown and Amtrak.  The agreement had been included with the
contract, but not the exhibits.   Midtown responded that it did
not have the requested exhibits.  It also reminded Jericho that
it had 75 days during the study period to request the exhibits
from Amtrak, or to meet with employees of Amtrak to discuss any
issues regarding its easement.  On September 3, 2002, counsel for
Jericho sent Midtown a letter stating:

> "Be advised that, unless you advise us in writing the
> Midtown is willing (i) to make an affirmative representation
> that the oil spill referred to in my earlier letter of
> today's date has been cleaned up and paid for or (ii) to
> undertake whatever cleanup may be necessary at its cost and
> expense or (iii) to extend the Study Period for a sufficient
> time to allow Jericho to investigate this matter, and, in
> any case provide Jericho with the requested due diligence
> documentation, Jericho requests that the monies paid upon
> execution of the contract be returned to it in accordance
> with the Contract's terms."

Midtown responded by requesting an express statement from Jericho
as to whether it intended to cancel the Contract.  It indicated
that in the absence of such express statement, it would presume
that Jericho intended to proceed to closing on September 18, 2002

39

pursuant to the terms of the contract.

On September 12, 2002, Jericho sent Midtown a letter

stating:

> "Although Jericho's principals felt, and still feel, that,
> under the circumstances which came to light in the month of
> August, either some affirmative response with respect to the
> oil spill or an extension of the study period and the
> request for production of documents was warranted, this
> letter will serve as confirmation that our letter on behalf
> of Jericho dated September 3, 2002, requesting the return of
> Jericho's down payment was intended as the exercise of
> Jericho's right under paragraph 29(a) of the referenced
> contract to cancel said contract and receive the return of
> the monies paid upon execution thereof."

Midtown returned the $250,000 down payment the next day.

Two years later Jericho instituted this action. Its amended
complaint contained five causes of action, with several
alternative requests for relief. The first claim asserted breach
of the contract of sale and seeks reinstatement of the contract
and specific performance thereunder. A second claim, also for
breach of the sales contract, sought $50 million in damages. The
third cause of action alleged that Midtown wrongfully repudiated
its July 15, 2002 offer to extend the study period through
December 31, 2002, and it sought reinstatement of the original
contract of sale. The fourth claim mirrored the allegations in
the third cause of action and sought $50 million in damages. In
the fifth and final cause of action, Jericho claimed that Midtown
defrauded it by failing to disclose (1) its business relationship
with the escrow agent; (2) the unavailability of the exhibits to

an agreement with Amtrak which would have clarified questions about the scope of the railway's easement; and (3) the occurrence and ramifications of an oil spill.  The fifth cause of action also sought $50 million in damages.

Midtown moved to dismiss the complaint, and Jericho opposed. In the order appealed, the IAS court denied Midtown's motion.  We reverse and dismiss the complaint.

Standard of Review

On a motion to dismiss pursuant to CPLR 3211, the complaint is afforded a liberal construction (*Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977]).  The facts alleged in the complaint are presumed to be true, and it is the role of the court to "accord plaintiffs the benefits of every possible inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Arnav Indus., Inc. Retirement Trust v Brown, Raysman, Millstein, Felder & Steiner*, 96 NY2d 300, 303 [2001]).  However, dismissal is warranted if the documentary evidence contradicts the claims raised in the complaint (*id.; Mobil Oil Corp. v Joshi*, 202 AD2d 318, 318-319 [1994]).

Breach of the Original Contract

The first and second causes of action, alleging breach of the contract to purchase the subject property, should have been dismissed.  On September 3, 2002, the last day of the study period, Jericho requested return of its down payment unless it

41

received certain "due diligence" information from Midtown.
Midtown advised Jericho that it would not return the down payment
unless, pursuant to the terms of the contract, Jericho
acknowledged in writing that the contract was cancelled.   On
September 13, Jericho sent a letter stating that it was
exercising its option to cancel the contract, and it demanded the
return of its down payment.

The assertions in this complaint, brought two years
subsequent to the cancellation of the agreement, do not support
Jericho's allegation that Midtown breached the contract to sell
the subject property, but, instead indicate that Jericho cancelled
the contract and recovered its down payment (see *Eight Hundred
Corp. v 217 State Street Realty Corp.*, 169 AD2d 810 [1991]).   An
additional ground for dismissal of the first and third causes of
action is the settled rule that a party cannot seek specific
performance of a cancelled real estate contract (*Degree Sec.
Sys., Inc. v F.A.B. Land Corp.*, 17 AD3d 402, 403 [2005] [specific
performance unavailable where a contact for sale of real estate
was validly cancelled]; *see also Gartner v Lowe*, 299 AD2d 198
[2002], *lv denied* 100 NY2d 501 [2003]; *Abely v Hayden*, 155 AD2d
254, 256 [1989]; *Bennett v John*, 151 AD2d 711 [1989]).

Had Midtown willfully or deliberately breached its
obligations under paragraph 29(a) of the contract, Jericho's
first two causes of action would not have been barred by its

42

termination of the contract and recovery of its down payment
(*Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958]).
However, Jericho's allegations, to the extent they allege willful
or deliberate breach of contract, are either contradicted by the
documentary evidence submitted on the motion (*see Arnav, supra*)
or premised on a misreading of Midtown's obligations under
paragraph 29(a). Thus, the rule articulated in *Mokar* is
inapplicable to these facts.

## Breach of the Agreement to Extend the Study Period to December 2002

We also dismiss the third and fourth causes of action on the
ground that there was never any agreement to extend the study
period through December 2002. On July 15, 2002 and on July 25,
2002, Midtown offered to extend the study period to December
2002. Midtown's July 15 letter set forth the terms of the
extension in detail, and required that if the extension were
agreed upon, the terms had to be spelled out, signed by both
parties, and incorporated as an amendment to the original
contract. In response to both the July 15 and the July 25
offers, Jericho proposed counteroffers. In August of 2002
Jericho attempted to accept the earlier extension offer, in a
letter which acknowledged its understanding that Midtown
conditioned any extension of the study period upon the execution
of a formalized signed writing (*see BMH Realty Ltd. v 399 E. 72nd
St. Owners, Inc.*, 221 AD2d 165 [1995] ["the documents themselves

43

make clear that the parties did not intend to be bound until a formal agreement was executed"]; *Brause v Goldman*, 10 AD2d 328, 332-333 [1960], *affd* 9 NY2d 620 [1961] [same]).

Further, it is a fundamental tenet of contract law that a counteroffer constitutes a rejection of an offer as a matter of law (*J. Grotto & Assocs., Inc. v Hiro Real Estate Co.*, 271 AD2d 360 [2000]; *Kleinberg v Ambassador Assocs.*, 103 AD2d 347, 348 [1984], *affd* 64 NY2d 733 [1984]; *Greystone Partnerships Group Inc. v Koninklijke Luchtvaaart Maatschappij*, 815 F Supp 745, 753 [SD NY 1993]). Rejection by counteroffer extinguishes the offer and renders any subsequent acceptance thereof inoperative (*Kleinberg, supra*). Here, all of Midtown's offers to extend the study period to December 2002 were met by counteroffers by Jericho, for different extensions on different terms. Accordingly, the December 2002 study period extension offer was "null and void" by the time Jericho determined to accept it. We thus dismiss the third and fourth causes of action, premised upon an alleged agreed-upon extension of the study period.

Fraud

Jericho's fifth cause of action, presumably alleging fraud and deceit, averred that as a result of Midtown's misrepresentations, it suffered $50 million in damages. Jericho contends that because it was not provided with (1) information concerning the fact that the escrow agent had an ownership

44

interest in Midtown; (2) exhibits to an agreement with Amtrak
which would have clarified questions about the scope of the
railway's easement; and (3) information concerning the occurrence
and ramifications of an oil spill, it was unable to conduct due
diligence review of the purchase offer.

However, none of these allegations constitute actionable
fraud. Midtown's obligation to provide documents flowed from the
"due diligence" requirements of Paragraph 29(a) of the contract
(see *Tesoro Petroleum Corp. v Holburn Oil Co.*, 108 AD2d 607
[1985], *appeal dismissed* 65 NY2d 637 [1985]). Accordingly,
Jericho's allegations that Midtown intended to breach a
contractual obligation does not support an action for fraud (see
*Third Ave. LLC· v Greble & Finger*, 8 AD3d 75, 76 [2004]; *Modell's
N.Y., Inc. v Noodle Kidoodle, Inc.*, 242 AD2d 248, 249 [1997];
*Devlin v 645 First Ave. Manhattan Co.*, 229 AD2d 343, 349 [1996];
*Tesoro, supra*). As to the escrow agent, the contract expressly
provided that Midtown's lawyers would act in this role. There is
no evidence that there was any misconduct with respect to the
escrow account which would support a claim of fraud. Further,
the record is plain that Midtown provided Jericho with
information in its possession, and that it alerted Jericho as to
additional sources of information as to the railway easement and
the alleged oil spill. It should also be noted that Jericho made
requests for documents on the eve of the expiration period which

45

could have been made much earlier.  As there was no evidence of actionable fraud, we dismiss the fifth cause of action.

Damages

Finally, it bears noting that the relief sought by the second and fourth causes of action ($50 million) would not have been available to plaintiff even if the alleged breach of contract had occurred.  Paragraph 22 of the contract limits Midtown's liability for breach to return of Jericho's down payment.  As the down payment was returned when the contract was cancelled, two years before this action was commenced, Jericho has no further recourse against Midtown with respect to that agreement (*Progressive Solar Concepts, Inc. v Gabes*, 161 AD2d 752, 753 [1990]).

> M-68 - *Jericho Group, Ltd. v Midtown Development, L.P.*
>
> Motion seeking leave to supplement record is hereby withdrawn.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  AUGUST 17, 2006

*Catherine O'Hagan Wolfe*
CLERK

46

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:COMMERCIAL DIVISION
------------------------------------------X
JERICHO GROUP LTD.,

                                    Plaintiff,

        -against-
                                                    Index No. 113274/04

MIDTOWN DEVELOPMENT L.P.,

**FILED**

                                    Defendant.
------------------------------------------X

**FEB 20 2007**

NEW YORK
COUNTY CLERK'S OFFICE

Charles Edward Ramos, J.S.C.:

        In motion 06, plaintiff Jericho Group Ltd. moves (1)
pursuant to CPLR 5015(a)(2) and (3) to vacate the judgment
entered on September 19, 2006 dismissing plaintiff's complaint;
(2) pursuant to CPLR 3025 to serve a second amended complaint;
and (3) pursuant to CPLR Article 63 for a preliminary injunction
barring defendant from transferring or encumbering the real
property which is the subject of this action.

        This action was initiated in September 2004.  It arises from
a contract pursuant to which defendant agreed to sell to
plaintiff certain property for $28 million (the "Contract").  The
contract, dated June 18, 2002, provides for a 75 day study period
(the "Study Period"), expiring on September 3, 2002, during which
defendant was to "cooperate ... and make available ... such
material pertinent to such tests and/or inspections as Seller may
have in its possession."  Paragraph 29(a).[1]  The Contract

_____

[1] Paragraph 29(c) provides: "Immediately upon execution of
this Agreement, Seller shall make available to Purchaser or its
representatives, such documents within Seller's current custody
or control relating to the condition of the Property, which
Purchaser reasonably requests.  Seller shall also make its
representatives available to meet with representatives of
Purchaser, as Purchaser's cost and expense."

required Midtown to produce certain documents within two days of signing the agreement. Paragraph 33.[2] Attached to the contract was the Amtrak Agreement concerning Amtrak's easements on the property and certain restrictions on the use of the property which also referenced exhibits, (the "Exhibits") but they were not attached.

The theory of this case is that soon after executing the Contract, Midtown had a change of heart, deciding not to sell the property to Jericho. By refusing to respond to Jericho's questions about the property, Jericho alleges that Midtown allowed Jericho to conclude that problems existed with the property.[3] In fact, there were no such problems. However, without the information, Jericho had no choice but to forego the purchase.

During the Study Period, Midtown provided some documents (Letter 6/19/02 to Michael Szegda from Marvin Stone) and Jericho

---

[2] Paragraph 33 provides: "Within two (2) business days from the date hereof, Seller shall make available to the purchaser copies of all documentation pertaining to such permits and/or approvals. Seller makes no representation that any of such permits and/or approvals are in force and effect or that any of same are transferrable."

[3] According to Robert Goebel's affirmation in support of plaintiff's motion to the First Department to reargue, which plaintiff later withdrew, discovery in this action appears to support the theory. In an October 18, 2002 letter, Edward G. Imperatore, Esq., a Midtown principal, instructed Midtown's broker Elaine Osborn Emmet "do not keep any prospective buyers warm. Do not attend hearings on our behalf." In a July 26, 2004 e-mail to Emmet, Imperatore stated that he was successful in chasing plaintiff away and the defendant intentionally elects to keep the property off the market in anticipation of favorable new zoning. This e-mail has not been produced to this Court.

2

made requests for more documents.

In this motion, plaintiff contends that during the Study Period, defendant falsely denied that it had documents which it was required to produce and misled plaintiff that substantial documents existed in the custody and control of another when in fact these documents never existed.

Midtown refused Jericho's request to extend the study period. Without the concealed documents, and believing that documents existed which it could not obtain, Jericho was allegedly fraudulently induced to seek the return of its $250,000 deposit.

On September 12, 2002, Jericho's counsel sent a letter to Midtown canceling the contract and requesting the return of the deposit. Midtown returned the deposit on September 13, 2002. Now in its second amended complaint, Jericho asserts that counsel had no authority to cancel the contract and that counsel's letter failed to comply with the requirements under the contract.[4]

Procedural History

In the first complaint, plaintiff alleged: (1) breach of contract by failing to agree to extension of study period and seeking specific performance; (2) breach of contract for wrongful repudiation by failing to produce documents; and (3) breach of

---

[4] Jericho raised this argument in its opposition to Midtown's appeal and Midtown objected in its reply arguing that Jericho could not raise a new argument on appeal. While the Appellate Division did not mention this alleged infirmity in its decision on the motion to dismiss, it held the cancellation to be valid.

3

contract by failing to extend the study period.  In an amended
complaint, plaintiff added a cause of action identical to the
third, but seeking damages, and a fifth cause of action for fraud
by failing to disclose (1) its business relationship with the
escrow agent; (2) the nonexistence of the Amtrak exhibits; and
(3) information in its possession concerning the oil spill.
Jericho Group, Ltd. v Midtown Dev., L.P.,
32 AD3d 294 (1st Dept 2006).[5]

On January 7, 2005, defendant filed a motion to dismiss the
amended complaint.  The motion was denied on the record at oral
argument on May 12, 2005.  Defendant appealed.  The Appellate
Division First Department reversed in a decision dated August
17, 2006 and dismissed the entire case.  The Appellate Division
dismissed the breach of contract causes of action based on
Jericho's cancellation letter and recovery of its $250,000
deposit.  Significantly, the Appellate Division stated:

> Had Midtown willfully or deliberately breached its
> obligations under paragraph 29(a) of the contract,
> Jericho's first two causes of action (for specific
> performance or alternatively, for damages for breach of
> contract) would not have been barred by its termination
> of the contract and recovery of its down payment.

The second and fourth causes of action were also dismissed
because the contract limited damages to return of the deposit.
The fifth cause of action was dismissed to the extent it relied
on breach of the agreement to provide documents because alleging
that a party intends to breach a contract is insufficient to

---

[5] This Court was not provided with a copy of the amended
complaint.

4

allege fraud. The Appellate Division states "[b]y e-mail dated August 23, 2002, Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the lands Jericho sought to purchase." at p. 38. The Appellate Division held that Midtown fulfilled its obligation to produce documents or directed Jericho to sources of information. Since the contract explicitly disclosed the escrow agent's relationship with Midtown, that part of the fifth cause of action was also dismissed.

On December 23, 2005, Jericho moved to supplement the record before the Appellate Division. That motion was withdrawn.

While the appeal was pending, discovery in this action continued. A preliminary conference was held on September 12, 2005. The parties had drafted their own preliminary conference order and stipulated to certain dates, all of which were changed by the Court, except the December 2, 2005 deadline for impleader and motions to amend pleadings. Plaintiff served its first document request on September 26, 2005. The Court held another 10 discovery conferences, not including telephone conference calls to resolve picayune disputes, at which all deadlines in the preliminary conference order were repeatedly extended en masse.[6] Finally, plaintiff filed a note of issue and certificate of readiness on June 9, 2006.

Midtown filed a motion for summary judgment in July 2006.

---

[6] Defendant's recalcitrance and plaintiff's lethargy gave a whole new meaning to the term discovery abuse.

5

The Appellate Division dismissed the action on August 17, 2006.

On September 18, 2006, in the Appellate Division, Jericho moved to reargue and for an interim stay of the entry of a final judgment on the basis of some newly discovered evidence, which Jericho now submits in support of this motion.  The Appellate Division denied the motion to stay and gave the parties a briefing schedule for the motion to reargue.

Based on the Appellate Division decision, defendant's motion for summary judgment was denied as moot and on September 19, 2006, a final judgment dismissing the action was entered by this Court.

By letter dated October 9, 2006, Jericho withdrew the motion to reargue.

Fraud on the Court

Jericho now claims that Midtown made two significant misrepresentations; one involving an oil spill that was completely cleaned up by the New York State Department of Environmental Conservation ("NYDEC") and the other regarding the Exhibits which never existed.  As a result of this alleged fraud, Jericho seeks to vacate the judgment and amend the complaint.

Oil

On August 20 and 30, 2002, Jericho requested from Midtown information about an oil spill.  On September 3, 2002, Midtown asserted that it had responded to this request, but Jericho insists it had not.  Instead, on August 22, 2002, Midtown sent an

6

e-mail message to its own broker Elaine Osborn Emmet stating that it had "not had contact with NYDEC in years," but this response was not forwarded to Jericho until September 2, 2002. In a letter dated September 3, 2002, Midtown directed Jericho to contact NYDEC which Jericho did immediately. NYDEC stated that a FOIA request was necessary and a response would take 4 to 8 weeks.

On September 24, 2002, Jericho obtained documents from NYDEC which established that Midtown had in fact been in contact with NYDEC in April 2001 and had met with NYDEC in 1998 all concerning the oil spill. By letter dated October 18, 2002, Jericho demanded an explanation from Midtown as to why it failed to provide these NYDEC documents to Jericho initially on June 19, 2002, as required by the contract, or in August or September 2002 when Jericho specifically requested information about the oil spill. Midtown responded with an October 25, 2002 letter which threatened Jericho with civil litigation instead of addressing its failure to timely produce the NYDEC documents during the Study Period.

In addition during discovery in this action, Midtown produced about 100 pages which NYDEC had produced to Midtown in 1998 which establish that NYDEC had remediated the oil spill from 1997 to 1998 at NYDEC's expense. These documents completely and totally contradict Midtown's statement to Jericho in its September 3, 2002 letter signed by Edward G. Imperatore, Esq., that "Midtown has no information with respect to whether or not

7



an oil spill from adjacent properties onto the Sites was cleaned up."

Likewise, Imperatore stated in his deposition in December 2005 that in 2002 he was not concerned about the spill because "it must be remediated by the State of New York." However, this was not how he responded to Jericho's due diligence questions during the Study Period.

In 2002, in response to Jericho's question whether an environmental study had been performed, Midtown stated that "no Phase I environmental Study" had been performed. Midtown also stated in 2002 that "Midtown has performed no environmental studies." In fact, NYDEC had performed a study and the documents Midtown produced to Jericho in this action establish that Midtown knew about it. During discovery in this action, Midtown produced photos of the oil spill it had taken in June 1998. Clearly, Midtown had some information about the spill when in 2002 it stated to Jericho that it had none.

The significance of all of the NYDEC documents is that Jericho would have no responsibility to remediate the property, one of the reasons that Jericho concluded it could not go forward with the deal and sent the September 12, 2002 cancellation.

<u>Amtrak</u>

In 2002, with regard to the Amtrak Exhibits, Midtown stated that it did not have the Exhibits so it directed Jericho to Amtrak. According to Jericho's September 2, 2002 letter to Midtown, Amtrak refused to deal with Jericho since it had no

8

relationship with Jericho;[7] Midtown refused to intercede on
Jericho's behalf.[8]

With regard to the Exhibits, the Appellate Division stated

"On the day before the study period expired, Jericho
asked Midtown for the exhibits to a development
agreement between Midtown and Amtrak. The agreement
had been included with the contract, but not the
exhibits. Midtown responded that it did not have the
requested exhibits. It also reminded Jericho that it
had 75 days during the study period to request the
exhibits from Amtrak, or to meet with employees of
Amtrak to discuss any issues regarding the easement."

In fact, the Exhibits did not exist and never existed. In
response to Jericho's December 29, 2005 FOIA request to Amtrak,
Amtrak produced documents[9] demonstrating that Mr. Imperatore
wrote to Amtrak on September 23 and October 13, 1998 requesting
the Exhibits and learned from Amtrak that the Exhibits did not
exist. Imperatore stated in an affirmation dated June 29, 2006
submitted to this Court "to my knowledge the exhibits referred to
in the 1990 agreement between Amtrak and Midtown do not exist."
According to Midtown's memo of law accompanying that affidavit,
the exhibits never existed.

Jericho also obtained from Amtrak in February through March

---

[7] Jericho's prior attorney Mr. Goebel states in his
September 18, 2006 affirmation in support of reargument to the
Appellate Division that Jericho's conversations with Amtrak
occurred in Mid-August of 2002. It is unclear whether Mr. Goebel
had personal knowledge of the conversations.

[8] If true, this failure would be a violation of the
Contract.

[9] It is unclear to the Court when these documents were
produced by Amtrak to plaintiff.

9

2006, Midtown's modifications and clarifications to the Amtrak Agreement and architectural plans prepared by Midtown in 2000 relating to a proposed parking garage on the property. None of these documents were produced to Jericho during the Study Period, this Court or the Appellate Division.

In addition to breaching the contract by failing to produce the above listed documents, Jericho contends that Midtown misled this Court and the Appellate Division by repeatedly stating that it had complied with its disclosure obligations under the contract.

Motion to Vacate Judgment

Plaintiff seeks relief under CPLR 5015 and asks this Court to vacate the judgment. The problem is that the judgment is based on the Appellate Division's decision dismissing this action, which this Court is without authority to vacate or modify. *Fleet Credit Corp. v Cabin Serv. Co.*, 210 AD2d 57 (1st Dept 1994). CPLR 5015(a) requires that such a request be made to the Court that rendered the decision. Indeed, plaintiff moved for reargument before the Appellate Division based on the NYDEC documents and Midtown's revelation about the non-existence of Amtrak Exhibits, but that motion was withdrawn in favor of filing this motion before this Court. The Appellate Division may vacate its order or this Court may vacate its judgment under CPLR 5015(a)(3) for fraud or misrepresentation[10] or CPLR 5015(a)(2)

---

[10] There is no time limit under CPLR 5015(a)(3). *Aames Capital Corp. v Davidsohn*, 2005 NY Slip Op 9470.

10

if there are "new facts which with due diligence, could not have been produced earlier." *Stone v Bridgehampton Race Circuit*, 244 AD2d 403 (2d Dept 1997), appeal dismissed, 92 NY2d 846 (1998).

Here Jericho's "new evidence" consists of the NYDEC documents which Midtown produced to Jericho in discovery in this action in November 2005.[11] However, Jericho admittedly reviewed the NYDEC documents in September 24, 2002 and saw NYDEC's correspondence with Midtown. Indeed, by letter to Midtown dated October 18, 2002, Jericho provided Midtown with a copy of Midtown's June 29, 1998 letter to DEC and demanded an explanation from Midtown as to why this 1998 was not produced to Jericho during the study period. The October 18, 2002 letter and attachment were annexed to Jericho's opposition to Midtown's motion to dismiss submitted to this Court and on appeal to the Appellate Division. While Jericho's attorney did not learn of the NYDEC documents and Midtown's possession of them until November 2005, Jericho itself knew of the correspondence between Midtown and DEC well before this action was filed in 2004. These documents could have been submitted by plaintiff in 2005 to oppose defendant's motion to dismiss and would have established that Midtown violated the contract. Therefore, relief cannot be granted under CPLR 5015(a)(2).

However, Jericho has presented sufficient evidence of fraud with regard to the NYDEC documents to satisfy CPLR 5015(a)(3).

---

[11]2Midtown actually made the documents available for Jericho's review in October 2005.

11

Midtown repeatedly said to this Court that it had complied with its disclosure obligation in 2002 when it clearly had not. Indeed, the Appellate Division relied on this misrepresentation. In its August 17, 2006 decision, the Appellate Division states "[b]y e-mail dated August 23, 2002, Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the lands Jericho sought to purchase." at p. 38. The Appellate Division concluded that Midtown had provided Jericho all of the information in Midtown's possession regarding the oil spill, which we now know to be false. The e-mail was sent to Elaine Osborn Emmet, undisputedly Midtown's broker who immediately sent it to Benjamin Shafren. However, Mr. Shafren never sent it to Jericho.[12]

Midtown asserted first in papers submitted to this Court then to the Appellate Division, that Shafren was Jericho's broker. Imperatore Affirmation in Support of Motion to Dismiss paragraph 27, January 6, 2005, Exhibit T. However, in the contract, paragraph 24 provides that both Emmet's firm and Shafren's firm are named as brokers for the transaction and were to be paid by Midtown. Further, in his affidavit submitted in opposition to defendant's motion to dismiss, Samuel Pfeiffer

---

[12] Midtown attempts to make an issue of fact where none exists. Emmet states in her July 7, 2006 affidavit that Shafren brought Jericho to the deal. However, this affidavit was submitted after argument on the motion to discuss and in support of defendant's motion for summary judgment which was denied as moot based on the Appellate Division's decision date). This affidavit would be unacceptable for a motion to dismiss which could be based only on the complaint and uncontroverted documentary evidence.

12

countered that Shafren was not Jericho's broker.

Midtown also complains that Jericho did not inquire about the oil spill until four days before the end of the Study Period. However, Jericho could not have inquired earlier as it had no notice of the oil spill prior to four days before (the NYDEC documents confirm that Midtown did know about the oil spill as early as 1998). Midtown attempts to recharacterize Jericho's request as one for a representation about the oil spill. Midtown was not required to make any representations about the oil spill, but paragraph 29 of the contract clearly required Midtown to disclose documents in its custody or control that Jericho requests. Midtown failed to do so.

Likewise, CPLR 5015(a)(3) applies to the Amtrak Exhibits. They never existed, but Midtown communicated to Jericho, to this Court and to the Appellate Division that the Exhibits did in fact exist when it stated that "it did not now have the exhibits" or that it "misplaced" the Exhibits. Indeed, Midtown chastised Jericho for not getting the Exhibits directly from Amtrak. Meanwhile, Amtrak refused to deal with Jericho. It was not until July 2006, when Midtown filed a motion for summary judgment that Midtown admitted that the Exhibits never existed.

Midtown objects arguing that Jericho's facts regarding Amtrak are not "new." Rather, Midtown argues that Jericho waited until the last day of the study period before asking Midtown for the Exhibits. Indeed, the First Department ruled against Jericho based on Midtown's assertion that it "does not now have the

Exhibits referenced [to] in your letter, so it could not provide those Exhibits to Jericho." Amtrak produced a letter in response to Jericho's FOIA request which states that Midtown requested the Amtrak Exhibits as well, four years earlier. According to Midtown this proves that it did not and does not have the Exhibits.

The problem with Midtown's defense is that it is only half of the story. While it is true that the FOIA documents confirmed that Midtown does not now and never had the Exhibits, they also confirmed that the Exhibits never existed. Accordingly, when (1) Midtown gave Jericho documents that said "Exhibits attached" and (2) when Midtown responded to Jericho that (a) it does not now have the Exhibits and/or (b) it lost the Exhibits, it misled Jericho. The Exhibits never existed. Midtown knew this in 1998 when Amtrak told Midtown. Further, the Court rejects Midtown's objection as the basis of this Court's decision is CPLR 5015(a)(3) not (2). It is fraud or misrepresentation to say that something exits when it does not. Nevertheless, CPLR 5015(a)(2) is also satisfied as the truth did not come to light until early 2006 when Amtrak produced documents and Midtown made its motion for summary judgment.

Contrary to Midtown's objection that Jericho could have made the Amtrak FOIA request earlier, Jericho had no obligation to make the FOIA request during the Study Period as Midtown was required by the Contract to provide such documents to Jericho.

Another of Midtown's procedural complaints is that Jericho

14

failed to enlarge the record on appeal by adding the newly

discovered evidence.  In fact, in December 2005, Jericho moved to

supplement the record with letters dated September 18, 2002 and

October 18, 2002 and January 5, 2004 from Shulem Pfeiffer to

Maurice Stone.  However, Jericho withdrew the motion to

supplement the record.  Midtown's complaint is rejected as

Jericho was limited to documents before the trial court.  *In re

Kent*, 29 AD3d 123 (1st Dept 2006); *Hardial v City of New York*,

195 AD2d 295 (1st Dept 1993).

Accordingly, this Court vacates its judgment as this court

will not be a party to defendant's fraud on the Court.  However,

this Court cannot reverse the Appellate Division's dismissal of

the complaint.

<u>Motion to Amend Complaint</u>

Plaintiff moves for permission to serve an amended

complaint.  In the second amended complaint, plaintiff alleges:

(1) fraud against all defendants for giving plaintiff misleading

or incomplete information and failing to provide information when

it was required to do so and seeks damages; (2) fraud against all

defendants and seeking specific performance; (3) breach of

contract against Midtown for violating paragraphs 29 and 33 by

failing to produce documents; (4) breach of contract against

Midtown for failure to extend the study period; (5) for a

declaratory judgment that contract was never cancelled; (6) for a

declaratory judgment that study period should have been extended;

(7) against all defendants for fraud on the court by submitting

15

affidavits and letters to the Court stating that all of Midtown's disclosure obligations were satisfied. Jericho also seeks to add Midtown's attorneys Edward Imperatore, also a principal of Midtown, and Maurice Stone.

Midtown argues that discovery in this case closed in June 2006 when plaintiff filed the note of issue, well before the Appellate Division issued its decision August 17, 2006. Midtown also argues that it would be prejudiced by amendment now. According to Midtown, it has incurred great time and expense in getting Jericho's case dismissed. Second, it paid taxes on the property during the course of the litigation while a notice of pendency was filed against the property.

The time to amend the complaint is not typically limited in a preliminary conference order. Here, however, the parties drafted their own PC order which the court modified. The Court has an obligation to enforce stipulations between parties. Montgomery Medical P.C. v Myles, 12 Misc 3d 1162A (Dist. Ct., Nassau County 2006). The parties regularly met with the Court and the deadlines were repeatedly extended. It is unclear from the discovery orders what the final date for amendment was. CPLR 3025(b) provides that a motion to amend may be made at any time. While the parties are free to stipulate otherwise, where as here fraud on the court has been established, this Court will not enforce the stipulation. Moreover, defendant has failed to demonstrate real prejudice. It still owns valuable property that continues to increase in value. If plaintiff were successful in

16

this action, it would be required to reimburse defendant for any expenses it incurred during the relevant period.

Nonetheless, the motion is denied because there is no complaint pending before this Court, having been dismissed by the Appellate Division.  Plaintiff is welcome to file a new complaint in a new action or seek relief from the Appellate Division or any other strategy it chooses.  Accordingly, it is unnecessary to address the various arguments raised by defendant.

Likewise, Jericho's motion for a preliminary injunction is denied as no action is pending.

Accordingly, it is

ORDERED that plaintiff's motion is granted to the extent that the judgment is vacated and otherwise denied.

Dated: February 2, 2007

HON. CHARLES E. RAMOS
J.S.C.

Counsel are hereby directed to obtain an accurate copy of this Court's opinion from the record room and not to rely on decisions obtained from the internet which have been altered in the scanning process.

FILED

FEB 20 2007

NEW YORK
COUNTY CLERKS OFFICE

17

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

JERICHO GROUP, LTD.,

Index No. .  .      .     .

Plaintiff,

- against -

**NOTICE OF PENDENCY**

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE,

Defendants.

------------------------------------------------------------X

*6 00566/07*

2007 FEB 22  PM 4: 55
FILED
COUNTY CLERK
N.Y. COUNTY

**PLEASE TAKE NOTICE** that an action has been commenced in the

Supreme Court of the State of New York, County of New York, upon the complaint filed

in the Office of the Clerk of said County by the above-named plaintiff against the above

named defendants in which plaintiff seeks, *inter alia*, a judgment for specific

performance of a contract whereby defendant Midtown Development, L.P. agreed to sell

to plaintiff certain real property consisting of two parcels of land located between 36th

and 37th Streets and 10th and 11th Avenues and between 37th and 38th Streets and 10th

and 11th Avenues, in the Borough of Manhattan, City of New York, State of New York,

identified as Block 708, Lot 1 and ~~Block 709, Lot 17~~ on the land map of the County of

New York.

To the Clerk of the County of New York:

Please index the foregoing Notice of Pendency against defendant Midtown Development, L.P. and Block 708, Lot 1 and Block 709, Lot 17, on the land map of the County of New York.

Dated:   New York, New York
         February 22, 2007

                              HERZFELD & RUBIN, P.C.


                         By:_____
                               Herbert Rubin
                               Attorneys for Plaintiff
                               40 Wall Street
                               New York, New York 10005
                               (212) 471-8500

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

JERICHO GROUP, LTD.,

                               Index No. 600566/07

                Plaintiff,

       - against -                 **NOTICE OF PENDENCY**

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE,

                Defendants.
-----------------------------------------------------------------x

      **PLEASE TAKE NOTICE** that an action has been commenced in the Supreme Court of the State of New York, County of New York, upon the complaint filed in the Office of the Clerk of said County by the above-named plaintiff against the above named defendants in which plaintiff seeks, *inter alia*, a judgment for specific performance of a contract whereby defendant Midtown Development, L.P. agreed to sell to plaintiff certain real property consisting of two parcels of land located between 36th and 37th Streets and 10th and 11th Avenues and between 37th and 38th Streets and 10th and 11th Avenues, in the Borough of Manhattan, City of New York, State of New York, identified as ~~Block 709, Lot 4~~ and Block 709, Lot 17 on the land map of the County of New York.

To the Clerk of the County of New York:

Please index the foregoing Notice of Pendency against defendant Midtown Development, L.P. and Block 708, Lot 1 and Block 709, Lot 17, on the land map of the County of New York.

Dated:  New York, New York
        February 22, 2007

HERZFELD & RUBIN, P.C.

By:_____
        Herbert Rubin
        Attorneys for Plaintiff
        40 Wall Street
        New York, New York 10005
        (212) 471-8500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JERICHO GROUP, LTD.,                                    :
                                                        :
               Plaintiff,                               :
                                                        :
                                                        :
        - against -                                     :    No. 07-CV-1792 (RCC) (DCF)
                                                        :
                                                        :    ECF CASE
MIDTOWN DEVELOPMENT, L.P., EDWARD                       :
IMPERATORE and MAURICE STONE,                           :
                                                        :
                                                        :
               Defendants.                              :
-----------------------------------------------------------------X

## AMENDED NOTICE OF REMOVAL

Defendants Midtown Development, L.P. ("Midtown"), Edward Imperatore, and Maurice

Stone hereby file this Amended Notice of Removal of the above-captioned action and state the

grounds for removal as follows:

1.      On February 22, 2007, plaintiff, Jericho Group, Ltd., filed a Summons and

Verified Complaint against Defendants in the Supreme Court of the State of New York, New

York County (the "State Court Action"). A copy of the Summons and Verified Complaint filed

in the State Court Action is attached hereto as Exhibit A.

2.      On February 26, 2007, Plaintiff served each Defendant with a copy of the

Summons and Verified Complaint. Defendants filed a Notice of Removal on March 1, 2007.

This Amended Notice of Removal is being filed on March 8, 2007, within thirty days after the

receipt by the Defendants of a copy of the initial pleading in the State Court Action. *See In re*

*CBS Inc. v. Snyder*, 762 F. Supp. 71, 73 (S.D.N.Y. 1991) ("A petition for removal may be

amended freely within the statutory 30-day period calculated from the date of service of the

initial state court pleading."). No other process, pleadings, or other orders have been served upon Defendants in connection with the State Court Action.

3.    The State Court Action is removable to this Court because the Court has original jurisdiction over the State Court Action. The State Court Action is between citizens of different states and the matter in controversy in it exceeds the sum of $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a).

4.    At the time of the commencement of the State Court Action and at the time of removal, plaintiff, Jericho Group, Ltd., was and is incorporated in the State of New York, with its principal place of business at 519 Flushing Avenue, Brooklyn, New York. *See* Verified Complaint in the State Court Action ¶ 1.

5.    At the time of the commencement of the State Court Action and at the time of removal, defendant Midtown Development, L.P. was and is a limited partnership organized under the laws of the State of New York. The citizenship of a partnership is determined by the citizenship of all of its partners, not by the state under whose laws it is organized or the location of its place of business or property. *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990).

6.    At the time of the commencement of the State Court Action and at the time of removal, Midtown's only general partners were and are Arthur E. Imperatore and Edward W. Ross. At the time of the commencement of the State Court Action and at the time of removal, Midtown's only limited partner was and is Consolidated Rail Corporation, as successor in interest to CRC Properties, Inc.

7.    At the time of the commencement of the State Court Action and at the time of removal, Arthur E. Imperatore was and is a citizen and resident of the State of New Jersey. The address of Arthur E. Imperatore is 38 King Avenue, Weehawken, New Jersey.

8.      At the time of the commencement of the State Court Action and at the time of removal, Edward W. Ross was and is a citizen and resident of the State of Illinois. The address of Edward W. Ross is 1240 North Lakeshore Drive, 29 A/B, Chicago, Illinois.

9.      At the time of the commencement of the State Court Action and at the time of removal, Consolidated Rail Corporation was and is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

10.     At the time of the commencement of the State Court Action and at the time of removal, Defendant Edward Imperatore was and is a citizen and resident of the State of New Jersey. The address of Edward Imperatore is 105 Serpentine Road, Tenafly, New Jersey.

11.     At the time of the commencement of the State Court Action and at the time of removal, Defendant Maurice Stone was and is a citizen and resident of the State of New Jersey. The address of Maurice Stone is 114 Avondale Road, Ridgewood, New Jersey.

12.     The amount in controversy in the above-captioned action exceeds the sum of $75,000, exclusive of interests and costs. Plaintiff seeks damages of "not less than $100,000,000." *See* Verified Complaint in the State Court Action ¶ 162. Plaintiff also seeks specific performance of a contract for the sale of real property that is valued at more than $75,000, exclusive of interest and costs. *See id.* ¶¶ 4-5, 8, 162.

13.     All Defendants join in this Amended Notice of Removal.

14.     The United States District Court for the Southern District of New York embraces the place where the State Court Action is pending.

15.     On March 1, 2007, Defendants filed a notice of filing of the Notice of Removal with the Clerk of the Court of the Supreme Court of the State of New York, as required by 28 U.S.C. § 1446(d).

Dated: New York, New York
       March 8, 2007

Respectfully submitted,

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939

By: ___/ s / Todd R. Geremia_____
     Fredrick E. Sherman (FS 5442)
     Todd R. Geremia (TG 4454)

—and—

PHILLIPS NIZER LLP
Alfred D. Lerner (AL 5927)
George Berger (GB 8924)
666 Fifth Avenue
New York, New York  10103-0084
Telephone:  (212) 977-9700

Attorneys for Defendants,
Midtown Development, L.P., Edward
Imperatore, and Maurice Stone

## CERTIFICATE OF SERVICE

I certify that on March 8, 2007, I caused the foregoing AMENDED NOTICE OF

REMOVAL to be served by First Class U.S. mail to the following counsel for plaintiff:

> Herbert Rubin
> HERZFELD & RUBIN, P.C.
> 40 Wall Street
> New York, New York  10005
>
> *Attorneys for Plaintiff,*
> *Jericho Group, Ltd.*

Dated: New York, New York
       March 8, 2007

                                    _____ / s / Todd R. Geremia_____
                                            Todd R. Geremia

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK

3  COUNTY OF NEW YORK

4  _____

5  JERICHO GROUP, LTD.,

6                          Plaintiff,

7      - against -

8  MIDTOWN DEVELOPMENT, L.P.,

9                          Defendant.

10 _____

11

12

13

14

15         DEPOSITION OF EDWARD G. IMPERATORE

16              New York, New York

17             Tuesday, November 8, 2005

18

19

20 Reported by:
   MICHELE ROSSI, RPR

21

22

23

24

25

1                                          2

2

3                    November 8, 2005

4                     10:00 a.m.

5

6

EDWARD IMPERATORE November 8 2005

7

8              DEPOSITION of EDWARD G. IMPERATORE,

9      held at the offices of JONES DAY, 222 East

10     41st Street, New York, New York 10017-6702,

11     before Michele Rossi, a Registered

12     Professional Reporter and Notary Public

13     within and for the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1                                                    3

2

3      ROBERT B. GOEBEL, ESQ.
          Attorney for Plaintiff
4            14 Walworth Avenue
             Scarsdale, New York 10583

5

6

7      LAW OFFICES OF LISA M. SOLOMON
          Attorney for Plaintiff
8            305 Madison Avenue, Suite 4700
             New York, New York 10165

9
       BY:   LISA M. SOLOMON, ESQ.
10

11

       JONES DAY
12        Attorneys for Defendant
             222 East 41st Street

EDWARD IMPERATORE November 8 2005

13      New York, New York 10017-6702

14      BY:   FREDRICK E. SHERMAN, ESQ.

15            - AND -

16            TOOD R. GEREMIA, ESQ.

17

18

19

20

21

22

23

24

25

1                                               4

2           IT IS HEREBY STIPULATED AND AGREED by and

3       between the attorneys for the respective parties;

4           THAT all objections, except as to the form of

5       the question, shall be reserved to the time of

6       the trial; and

7           THAT failure to object to any question or to

8       move to strike any testimony at this examination

9       shall not be a bar or waiver of the right to make

10      such objection or motion at the time of the trial

11      of this action, and is hereby reserved; and

12          THAT this examination may be signed and sworn

13      to by the witness examined herein before a Notary

14      Public, but failure to do so or to return the

15      original of the examination to the attorney for

16      the party on whose behalf the examination is

17      taken shall not be deemed a waiver of the rights

18      provided by Rules 3116 and 3117 of the Civil

EDWARD IMPERATORE November 8 2005

19    Practice Law and Rules of Testimony, and shall be

20    controlled thereby; and

21        THAT certification and filing of the original

22    of this examination are waived; and

23        THAT counsel for the witness examined herein

24    shall be provided with a copy of this examination

25    at no charge.


1                                              5

2    E D W A R D    G.    I M P E R A T O R E,

3             stating his business address as 130 Main

4             Street, Hackensack, New Jersey 07601,

5             having been duly sworn by the Notary

6             Public (Michele Rossi, RPR), was

7             examined and testified as follows:

8    EXAMINATION BY MR. GOEBEL:

9             MR. GOEBEL:  Mark this as Plaintiff's

10        Exhibit 1.

11             (Plaintiff's Exhibit 1, Record on

12        Appeal, marked for identification, as of this

13        date.)

14        Q    So you know the way this works, I'm

15    going to ask you some questions and if they're

16    not clear, you'll tell me to try to clarify.  If

17    there's something you don't understand, we'll

18    stop and we'll try to address the issue with your

19    misunderstanding or my misstating a question.

20    Does that sound okay?

21        A    I'll do it.

22        Q    Please state your name for the record?

23        A    My name is Edward Gerard Imperatore,

24    I-M-P-E-R-A-T-O-R-E.

7    substantial. He'll tell you everyone who

8    knows anything if you just ask the question,

9    but the question with substantial is the

10   problem.

11      Q    Who are the principal owners, the

12   principal owners, the individuals, who are the

13   principal owners of Midtown directly or

14   indirectly?

15      A    Sir, I'm having trouble with directly or

16   indirectly.

17      Q    Well, what I mean by indirectly is, you

18   have an entity called Midtown Limited

19   Partnership. It's got constituent entities.

20   Gerart is one general partner. One or two other

21   general partners.

22            Inside those general partnerships there

23   may be other level of entities, but when you go

24   from top to bottom and you get to an individual

25   who owns something that owns something that owns

1                                          25

2    something, who are those individuals?

3       A    The general partner of Gerart, the

4    general partners of Gerart, which owns Midtown

5    with Conrails, a small part being owned by

6    Conrail, Edward W. Ross and Arthur Imperatore

7    Senior, they're the general partners.

8       Q    Please continue. I didn't ask you who

9    the general partners were. I asked you who the

10   individual beneficial owners were.

11      A    Arthur E. Imperatore Senior is also the

12   general partner of Hadrian, which is an owner of

EDWARD IMPERATORE November 8 2005

13  Gerart.  And the partners in Hadrian include, and

14  I think are limited to, members of his immediate

15  family.

16      Q    Who is his immediate family?

17      A    My uncle Arthur is immediate family.

18  And to a small degree, myself.

19      Q    You think or you know?

20      A    I know.

21      Q    You know?

22      A    But I don't know, as I sit here today,

23  whether one of those members participates in

24  individually or through her trust.

25      Q    If you were to calculate percentages,


1                                         26

2  Arthur, yourself, Arthur Imperatore, your uncle?

3      A    Senior.

4      Q    Senior?

5      A    Yourself and any other family,

6  Imperatores, family members, what percent of the

7  deal of Midtown do you own?

8      A    The Hadrian partnership owns 50 percent

9  of Gerart.  And Gerart owns 47.5 percent of

10  Midtown.

11      Q    Who owns the other 53 percent of

12  Midtown?

13      A    Conrail owns 5 percent.

14      Q    Conrail being?

15      A    Well, the former Conrail, the

16  consolidated rail corporation, which has -- which

17  may not actually exist as a separate entity

18  anymore.

EDWARD IMPERATORE November 8 2005

19    Q    They own 5 percent of Midtown?

20    A    Yes.

21    Q    That plus the 47-1/2 percent you

22    mentioned, who owns the balance?

23    A    The balance is owned by W.R. West Side,

24    another partnership.

25    Q    who are the partners?


1                                               27

2    A    The general partner is Edward W. Ross.

3    Q    How much did does he own in that general

4    partnership?  Is it a general partnership or a

5    limited partnership?

6    A    I think it's a limited partnership.

7    Q    With general Ross as the partner?

8    A    I believe that's correct.

9    Q    What is his interest in that entity?

10    A    I think it's 1 percent.

11    Q    And the other 99 percent?

12    A    The other remainders are owned by

13    members of his family or their trust.

14    Q    Mr. Ross's family?

15    A    Yes.

16         MR. SHERMAN:  Excuse me, I asked what

17         was the question.

18         MR. GOEBEL:  I asked him as to whether

19         that question was members of Ross's family.

20         MR. SHERMAN:  I just didn't hear.

21    A    Or members of the late Jerry Wexler's

22    family or their trust.  And and a small equity

23    interest held by Irv Markin, Ira Kipmus and

24    myself.  And myself with some consistency, if I

EDWARD IMPERATORE November 8 2005

25    recall.


1                                                28
2        Q    What are your interest in that limited
3    partnership, what percent of the west side, the
4    one that you just said you had an interest in?
5        A    It's 2 percent subject to some
6    contingencies.
7        Q    So would it be fair to say that you
8    owned 2 percent of Midtown?
9        A    No.
10       Q    Which of these individuals that you've
11   identified did do you speak with on some kind of
12   periodic or regular basis?
13       A    I speak to Edward W. Ross.  I speak with
14   my uncle Arthur E. Imperatore Senior and I speak
15   with his, my uncle Arthur's stepson, Armond Pohan
16   with some frequency.
17       Q    Since the time the litigation was
18   commenced, have you had any discussions with
19   Amtrak?  Amtrak the now known as railroad company
20   known as the Amtrak?
21       A    No.
22       Q    You haven't spoken with them?
23       A    No.
24       Q    Do they know about this litigation?
25       A    I don't know.


1                                                29
2        Q    Have your counsel spoken with them at
3    all?

EDWARD IMPERATORE November 8 2005

4      A    Not to my knowledge.

5      Q    The individuals, Ed Ross, Arthur

6   Imperatore Senior, and a couple of other, those

7   other people that have smaller interests, those

8   individuals you named, are they aware of this

9   litigation?

10     A    Well, sir, Mr. Kipmus and Mr. Markin,

11  are deceased, so their estates are, I guess you

12  could say, owners, have equity interest in W.R.

13  West Side.

14         With respect to the members of the Ross

15  and Wexler families or their trusts, I certainly

16  can't speak for the Ross family.  Mr. Ross is

17  familiar with it.  I believe as to the Wexler

18  family, they've received notice through their

19  trusts or through their entities or individually,

20  as the case may be.  I believe they have been

21  informed.

22     Q    Who is an individual on behalf of

23  Midtown responsible for communications with the

24  various parties?

25     A    I would say most cases, I would inform

1                                          30

2   the principals of the two partnerships.  And they

3   would give information as appropriate, as they

4   deemed necessary to their own partners.  In

5   Hadrian on the one side and then W.R. West Side

6   on the other, generally.

7      Q    Did you meet or talk with any of these

8   individuals in preparation for this deposition?

9      A    No.

Page 24

EDWARD IMPERATORE November 8 2005

10    Q    Are you saying Arthur Imperatore Senior

11  is your uncle?

12    A    Yes.

13    Q    By reason of?

14    A    My father, my late father was his oldest

15  brother and raised him.  Seven sons in the

16  family, three sisters in the family.  My uncle is

17  my last surviving uncle.  So he is my natural

18  uncle and my only surviving uncle in that family.

19    Q    And your uncle is involved in real

20  estate transactions?

21    A    From time to time.

22    Q    When was Midtown formed?

23    A    I believe in 1987.

24    Q    And were the same individuals as you

25  referred to partners or principals from the


1                                          31

2  beginning?

3    A    Yes, sir.  Unfortunately, we lost Jerry

4  Wexler tragically in 1992 or 1993.  He was alive

5  then.  So he was the general partner of W.R. West

6  Side and was involved with Midtown at that time.

7  Mr. Kipmus and Mr. Markin were then alive and I'm

8  not sure that on behalf of Mr. Ross or Mr. Wexler

9  that their families trusts or other entities were

10  participants at that time.

11          On the Hadrian side of, there really

12  hasn't been a change, although as I've testified

13  in one instance, I don't know if one member of my

14  uncle's family participates even now through a

15  trust or individually.  Certainly at that time,

Page 25

16    she pointed through a trust and others in the

17    family may have payment understand in a trust at

18    that time.  That's quite a few years ago.

19        Q    But as far as you know, there were no

20    third party transfers?

21        A    There were none.

22        Q    Who had the individual to buy the

23    property?

24        A    Both my uncle and Jerry Wexler.

25        Q    Have you seen or reviewed any or all of


1                                          32

2    the litigation documents in this case?

3            MR. SHERMAN:  Objection to the form.

4        Q    To your recollection, what documents

5    have you reviewed, what litigation documents have

6    you reviewed?

7        A    I've seen the pleadings, the motion

8    papers.

9        Q    Motions papers being what, consists of

10    what?

11        A    Midtown's motion to dismiss, the

12    response to that.  I don't believe that I have

13    really reviewed all of the discovery demands on

14    both sides.  I have reviewed Jericho's demand for

15    documents.

16        Q    Did you provide an affirmation in this

17    litigation?

18        A    Yes.

19        Q    And that affirmation was for what

20    purpose?

21        A    To support Midtown's motion to dismiss

Page 26

Edward G  Impertore Deposition 2-Continued 6-15-06

1                                           150

2        SUPREME COURT OF THE STATE OF NEW YORK

3                  COUNTY OF NEW YORK

4        _____

5    JERICHO GROUP, LTD.,

6                          Plaintiff,

7        - against -

8    MIDTOWN DEVELOPMENT, L.P.,

9                          Defendant.

10       _____

11

12

13

14       CONTINUED DEPOSITION OF EDWARD G. IMPERATORE

15                  New York, New York

16              Thursday, June 15, 2006

17

18

19   Reported by:
     MICHELE ROSSI, RPR
20

21

22

23

24

25

1                                           151

2                       June 15, 2006

3                       10:10 a.m.

4

5

6

7              CONTINUED DEPOSITION of EDWARD G.

Page 1

Edward G  Impertore Deposition 2-Continued 6-15-06

8     IMPERATORE, held at the offices of JONES DAY,

9     222 East 41st Street, New York, New York

10    10017-6702, before Michele Rossi, a

11    Registered Professional Reporter and Notary

12    Public within and for the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25


1                                              152

2

3     ROBERT B. GOEBEL, ESQ.
        Attorney for Plaintiff
4          14 Walworth Avenue
           Scarsdale, New York 10583
5

6

7     JONES DAY
        Attorneys for Defendant
8          222 East 41st Street
           New York, New York 10017-6702
9
      BY:   FREDRICK E. SHERMAN, ESQ.
10
                  - AND -
11
            TODD R. GEREMIA, ESQ.
12

13

14

15
                        Page 2

Edward G  Impertore Deposition 2-Continued 6-15-06

16

17

18

19

20

21

22

23

24

25

1                      Imperatore              153

2    E D W A R D    G.    I M P E R A T O R E,

3              having been previously sworn by the

4              Notary Public (Michele Rossi, RPR), was

5              further examined and further testified

6              as follows:

7    EXAMINATION BY MR. GOEBEL:

8        Q    Good morning.  We last took your

9    deposition on November 8, 2005.

10              Was your testimony, as far as your

11   recollection, true, correct and complete?

12       A    Yes.

13       Q    Have you signed your deposition

14   transcript to that effect?

15       A    No, I have not.

16       Q    What was the methodology in connection

17   with the production of documents by defendant?

18       A    I recall that we gathered boxes of

19   material that I had in my law offices.  I checked

20   to see what boxes of material there might have

21   been elsewhere, including the offices of

22   Mr. Ross.

Edward G  Impertore Deposition 2-Continued 6-15-06

11    expense of counsel to use Jones Day would be paid

12    by Midtown?

13        A    I think I offered that.

14        Q    Did they accept?

15        A    I don't recall.

16        Q    Did you communicate with or otherwise

17    discuss the litigation and your deposition in

18    discovery and production of discovery documents

19    with Mr. Ross prior to this deposition?

20        A    That would be privileged.  I am attorney

21    for Midtown.  Mr. Ross is one of the principals

22    of Midtown through W.R. West Side.  He's general

23    manager of W.R.; he is general partner of W.R.

24    West Side, which is one of the parties that

25    comprises Midtown.  He's my client.

1                        Imperatore          192

2        Q    He's your client as counsel?

3        A    Midtown is my client.  Mr. Ross is a

4    principal of Midtown so he is my client, sir.

5        Q    Did you speak to Mr. Maurice Stone in

6    connection with this litigation?

7        A    I believe I told him that the litigation

8    had commenced and I don't believe I discussed it

9    further with him.

10        Q    Did he tell you whether he had been

11    contacted by me on behalf of Jericho?

12        A    I don't recall.

13        Q    Did he know about the litigation before

14    you spoke to him?

15            MR. SHERMAN:  Objection to the form.

16        A    I think not.

17        Q    Who is Peter Clayman?

18        A    Peter Clayman is an architect with a

Page 33

## COUNTY CLERK, NEW YORK COUNTY

### 60 CENTRE STREET, NEW YORK CITY

STATE OF NEW YORK, 

COUNTY OF NEW YORK, 

} ss.:

Let a copy of the foregoing Limited Partnership Certificate or a notice containing the substance thereof be published once in each week for six successive weeks in the New York Law Journal and *Town / Village*

two newspapers of the County of New York.

Dated, New York,

6/21/85

County Clerk, New York County.

CERTIFICATE OF LIMITED PARTNERSHIP

OF

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

The undersigned, desiring to form a limited partnership pursuant to the Uniform Limited Partnership Act of the State of New York, certify as follows:

1. <u>Name</u>. The name of the Partnership is MID-TOWN DE-VELOPMENT LIMITED PARTNERSHIP.

2. <u>Character of Business</u>. The character of the business of the Partnership is to acquire, own, improve, and manage the Property (which means (a) the real property (land) described in Exhibit A hereto, as the same may be improved from time to time, (b) buildings at any time situate thereon, (c) all personal property relating thereto, (d) all air-rights above the surface of the land, and (e) all mineral and other rights below the surface of the land, if any) and any property received in a like kind exchange, and to engage in any other activities relating to the Property. The Partnership shall not engage in any other business except with the consent of all of the partners.

3. <u>Principal Place of Business</u>. The principal place of business of the Partnership is c/o Palantine Realty Corp., 630 Fifth Avenue, New York, New York 10020.

4. <u>Members</u>. The name and residence of each General Partner is as follows:

| Name | Place of Residence |
|------|-------------------|
| Arthur E. Imperatore | 10 Claremont Road<br>Fort Lee, New Jersey  07024 |
| Jerrold Wexler | 2800 Lake Shore Drive<br>Chicago, Illinois  60657 |
| Edward W. Ross | 1240 North Lake<br>Shore Drive<br>Chicago, Illinois  60610 |

The name and address of the Class B Limited Partner is as follows:

| Name | Address |
|------|---------|
| CRC Properties, Inc. | 150 Allendale Road<br>King of Prussia,<br>Pennsylvania  19406 |

5. <u>Term</u>. The term for which the Partnership is to exist is until December 31, 2083. The Partnership shall be terminated prior to the date set forth above: (a) if the General Partners determine and the Class B Limited Partner consents in writing to such termination; (b) if the Partnership sells or otherwise disposes of its entire interest in all or substantially all of its assets, unless the Partnership receives as a part or all of the consideration for such sale or other disposition a mortgage note or other obligations; provided, however, that the General Partners may elect to dissolve the Partnership even if it receives a mortgage note or other obligations upon the sale of all or substantially all of the Partnership's assets if the Partnership receives the written opinion of tax counsel that such dissolution will not adversely impact the Limited Partner by accelerating or changing the nature of income recognition; (c) if the Partnership sells or receives full payment of the notes or obligations referred to

in clause (b); or (d) upon the retirement or withdrawal of any General Partner, or upon the death or adjudication of incompetency of any General Partner which is not a corporation, unless either (i) the remaining General Partner(s), if any, or (ii) a majority in interest of the Limited Partners, shall determine within thirty days after such event to continue the business of the Partnership and shall so notify all of the Partners, and, if there shall be no remaining General Partner, shall designate a substitute General Partner who has agreed in writing to serve in such capacity.

6.  _Contributions_.  The Class B Limited Partner has contributed Five and 00/100 ($5.00) Dollars in cash.

7.  _Additional Contributions_.  The Class B Limited Partner has not agreed to make any additional contributions to the Partnership.

8.  _Return of Contribution_.  No times are provided for the return of the Class B Limited Partner's contribution.

9.  _Share of Profits_.  The share of profits or compensation by way of income which the Class B Limited Partner is entitled to receive is five percent (5%), subject to the following provisions:

A.  _Additional Funds_.  Upon or prior to acquisition of the Property by the Partnership, the General Partners shall provide all sums required in order to fund the purchase of the Property; provided, however, that no such funding shall diminish the five percent (5%) interest of the Class B Limited Partner in cash distributions (Article 9B, below) and sale and refinancing proceeds (Article 9C, below),

3

unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata.

B. Cash Distributions. Distributions of cash shall be made by the Partnership (a) at the times and in the amounts required by the provisions of Article 9C, below, applicable upon the occurrence of the events therein described, and (b) otherwise at the time or times determined by the General Partners. Within the first 120 days of each fiscal year, the General Partners shall cause the Partnership to distribute, under clause (b) of the preceding sentence, all cash (net cash flow) which the General Partners, in their sole discretion, determine not to be needed for the Partnership's business. Subject to the provisions of Article 9A, above, and distributions shall be made 95% to the General Partners and 5% to the Class B Limited Partner. If Class A or Class C Limited Partners are admitted to the Partnership, the interest of the General Partners shall be reduced accordingly.

C. Sale and Mortgage Proceeds. If the Partnership shall at any time realize net cash proceeds as a consequence of the refinancing of any mortgage on the Property or of the sale of the Property or any interest therein (including the exchange, condemnation or similar eminent domain taking, casualty, or other disposition of all or substantially all of the Partnership's assets, or from the sale of easements,

4

rights-of-way or similar interests in the Partnership's Property or any other similar items which in accordance with generally accepted accounting principles are attributable to capital; provided, however, that a sale shall not include a tax-free exchange under Section 1031 of the Internal Revenue Code), such net cash proceeds shall be distributed promptly after such refinancing or sale in the following order of priority:

1. First, to the payment, or as a reserve for payment, of any indebtedness of the Partnership;

2. Next, to the establishment of any reserve required by any mortgage or determined by the General Partners to be reasonably necessary to provide for any liabilities or obligations of the Partnership, including contingent or unforeseen liabilities; and

3. The balance, if any, as follows: (i) If a Certificate of Occupancy (as defined in Section 1.1.7 of the Agreement of Limited Partnership of the Partnership ["Agreement"]) has not been issued, then the balance shall be distributed 50% to the General Partners and 50% to the Class B Limited Partner, (ii) If a Certificate of Occupancy has been issued, then, subject to the provisions of Article 9A, the balance shall be distributed 95%

5

to the General Partners and 5% to the Class B
Limited Partner.   If a Certificate of Occupancy
has been issued and if at that time there are
Class A and/or Class C Limited Partners, the 95%
interest of the General Partners shall be de-
creased accordingly.

If the General Partners shall determine that any reserve described
above is no longer needed for a new reserve, any reduction in such
reserve shall be treated as cash proceeds to which the above pro-
visions apply.

10.   Right of First Refusal - Assignability.

(a)   In the event that after the issuance of a Certificate of
Occupancy, the General Partners, on behalf of the Partnership, re-
ceive a written offer from a bona fide offeree to purchase all or any
substantial portion of the Property, then the General Partners shall
immediately deliver a true and complete copy of the offer to the Class
B Limited Partner and the Class B Limited Partner shall have an as-
signable right and option exercisable within forty-five (45) days after
its receipt of said copy of the offer to purchase the assets of the
Partnership referred to in the offer for the purchase price and upon
the same terms and conditions referred to in the offer.   The option
shall be exercised by giving written notice to the Partnership within
the aforesaid forty-five (45) day time limit.

(b)   The right of first refusal granted to the Class B Lim-
ited Partner pursuant to Article 10(a), above, shall be freely assign-
able by the Class B Limited Partner after its receipt of a copy of the

6

offer described in Article 10(a). In the event of the exercise of the Class B Limited Partner's right of first refusal within said forty-five (45) day period, closing shall be held at 10:00 A.M. at the principal office of the Partnership in New York, New York, and deed, bill of sale, checks, and the like, delivered, on the sixtieth (60th) day following the date of the exercise of the option, unless some other time, date, and place is agreed to in writing by the Partnership and the Class B Limited Partner or its assignee. Payment by check shall mean bank check, certified check or wire transfer (acceptable to the General Partners).

11.  Transfer by Limited Partners.

A. A Limited Partner may assign all or part of its interest as a Limited Partner in the Partnership, provided that (a) the assignee shall not be a natural person younger than twenty-one (21) years of age or a natural person who shall have been adjudged incompetent; (b) the assignment shall be in writing in form reasonably satisfactory to the General Partners; (c) the assignee shall have agreed in a writing in form reasonably satisfactory to the General Partners to be bound by the terms of this Agreement and to give or confirm each consent and approval given herein by the original parties hereto; (d) a majority of interest in the General Partners shall have consented in writing to the assignment, which consent shall not be unreasonably withheld; and (e) if required by the General Partners, the assignment shall be effective as of the first day of a fiscal quarter. The assignee of an interest in the Partnership may be admitted

7

as a Limited Partner only with the consent of the General Partners, which consent shall not be unreasonably withheld.

B.  The General Partners hereby consent to the assignment by the Class B Limited Partner of all or any part of its partnership interest to any corporation controlling, controlled by or under common control with the Class B Limited Partner, which consent shall be effective upon the General Partners' receipt of the documents referred to in Article 11A, above.

C.  Any purported assignment not meeting the requirements set forth in Article 11A shall be void and shall not bind the Partnership.

D.  For purposes of this Article 11, the term "assign" includes the making of any pledge, hypothecation, encumbrance, sale or other disposition.

12.  Additional Partners.

(a)  Class "A" Limited Partners

(i)  No Limited Partner may withdraw from the Partnership, except with the approval of the General Partners, which consent shall not be unreasonably withheld.  Upon the death, bankruptcy, incompetency or dissolution of a Limited Partner, its successor in interest may be admitted as a Limited Partner and shall, upon such admission, have all of the rights and obligations of a Limited Partner under this Agreement, and the Partnership shall not be dissolved upon any such occurrence.

8

(ii) No General Partner may retire, nor may any General Partner sell, assign or otherwise transfer his or its interest to any other Person, other than to an Approved General Partner Designee (as defined in Section 1.1.3 of the Agreement), nor may any other Person (other than an Approved General Partner Designee) be admitted to the Partnership as a general partner without the prior written consent of the Class B Limited Partner. Each General Partner may assign a portion of his general partner's interest, without the consent of any other Partner, if the assignee is a person who is already a Partner or is a member of the Immediate Family (as defined in Section 1.1.13 of the Agreement) of the assignor or a trust for the primary benefit of such a person and if such assignee who holds such assigned interest is a Class C Limited Partner and not as a General Partner.

(iii) Subject to compliance with Article 11, the General Partners may assign (without the consent of the Class B Limited Partner) a portion of their equity interest, either to new investors (Class A Limited Partners), or to the Partnership (which will then issue interests to Class A Limited Partners). The proceeds of such assignment and sale shall be used solely for Partnership purposes and the rights and

9

interests of the Class B Limited Partner shall in no way be diminished or impaired, unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata. If the new Class A Limited Partner is not a bank or institutional lender, the Class B Limited Partner's interest shall not be diluted.

(iv) If the General Partners wish to assign a portion of their equity interest to new investors (Class A Limited Partners) and not apply the proceeds solely for Partnership purposes, then the proceeds of sale shall be distributed as follows:

(a) if a Certificate of Occupancy has not been issued, fifty percent (50%) of the proceeds of the sale not applied to Partnership purposes shall be distributed to the Class B Limited Partner;

(b) if a Certificate of Occupancy has been issued, the proceeds of the sale not applied to Partnership purposes shall be distributed ninety-five percent (95%) to the General Partners and five percent (5%) to the Class B Limited Partner.

(b)   Class "C" Limited Partners

Class "C" Limited Partner means the interest of a General Partner

(i)   If converted pursuant to Article 12(a) hereof.

(ii)  If the Partnership is continued pursuant to the provisions of Article 5(d) above, the Partnership interest of the General Partner who shall have died or been adjudicated an incompetent or been dissolved without such Partner's consent or acquiescence shall automatically be converted into a Class C Limited Partner's interest, which shall consist of the same interests in the profits, losses, distributions and other items of the Partnership to which such General Partner would have been entitled but for the event which terminated his status as a General Partner.

(iii) If any General Partner shall (a) retire or withdraw in violation of the Agreement, (b) voluntarily dissolve or acquiesce in its dissolution, if such General Partner is a corporation, partnership or other entity which is not a natural person, (c) be adjudicated a bankrupt, (d) suffer or permit a receiver to be appointed to hold or administer any substantial portion of his assets and such appointment shall remain in effect for sixty (60) days, (e) make an assignment for the benefit of creditors, (f) admit by a pleading

11

the material allegations of any bankruptcy petition filed against him, then in any such event the interest if such General Partner shall automatically be converted into a Class C Limited Partner's interest and, notwithstanding any other provision of the Agreement, such former General Partner shall thereafter have no right to participate in any manner in the management of the Partnership's business or in any decision, consent or approval affecting any transaction or proposed transaction whatsoever.

13.    Interest of Class "A" and Class "C" Limited Partners.  If Class "A" or Class "C" Limited Partners are admitted to the Partnership, the interest of the Partners shall be reduced, subject to, and in accordance with Article 12(a)(iii) of this Certificate.

14.    Priority.  No right has been given to any Limited Partner for priority over any other Limited Partner as to contributions or as to compensation by way of income.

15.    Right to Continue Business.  The remaining General Partners are given the right to continue the business of the Partnership to the extent provided in Article 5(d) hereof.

16.    Distribution of Property.  No right has been given to any Limited Partner to demand or receive property other than cash in return for its contribution, except as set forth in Article 10 hereof regarding the right of first refusal granted to the Class B Limited Partner.

IN WITNESS WHEREOF, the undersigned have made, signed and acknowledged this Certificate of Limited Partnership this *11th* day of *June*, 1985.

GENERAL PARTNERS

ARTHUR E. IMPERATORE

JERROLD WEXLER

EDWARD W. ROSS

ATTEST:

LIMITED PARTNER

CRC PROPERTIES, INC.

By: _____
LAWRENCE A. HUFF
President

J. D. McGEEHAN     Secretary

(SEAL)

13

STATE OF   New Jersey          )
                               ) ss.:
COUNTY OF   Hudson             )

On this 4th  day of June   , 1985 before me personally came
ARTHUR E. IMPERATORE, to me known, and known to me to be the
individual described in and who executed the foregoing instrument
and he duly acknowledge to me that he resides at 10 Claremont Road,
Fort Lee, New Jersey 07024 and that he executed the foregoing Cer-
tificate of Limited Partnership of Mid-Town Development Limited Part-
nership as a General Partner.

<u>Notary Public</u>

LISA  CACCAVALE-SOTO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 10, 1990

STATE OF *Illinois*            )
                               ) ss.:
COUNTY OF *Cook*               )

On this 31st day of *May*   , 1985 before me personally came
JERROLD WEXLER, to me known, and known to me to be the indi-
vidual described in and who executed the foregoing instrument and he
duly acknowledge to me that he resides at 2800 Lake Shore Drive,
Chicago, Illinois 60657 and that he executed the foregoing Certificate
of Limited Partnership of Mid-Town Development Limited Partnership
as a General Partner.

*Christine Luezfeld*
Notary Public
*My Commission Expires:*
*August 21, 1985*

14

STATE OF *Illinois*      )
                         ) ss.:
COUNTY OF *Cook*         )

On this *31st* day of *May* , 1985 before me personally came EDWARD W. ROSS, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledge to me that he resides at 1240 North Lake Shore Drive, Chicago, Illinois 60610 and that he executed the foregoing Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.

*Christine Zuerfeld*
Notary Public
*My Commission Expires*
*August 26, 1985*

STATE OF PA            )
                       ) ss.:
COUNTY OF *Philadelphia* )

On this *1st* day of *June*, 1985, before me personally appeared LAWRENCE A. HUFF, to me known, who being by me duly sworn, did depose and say, that he resides at Oakwood Lane, Phoenixville, Pennsylvania 19460, that he is the President of CRC Properties, Inc. a Delaware corporation and the corporation described in and which executed the foregoing Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a Limited Partner; that he knows the seal of said Corporation; that the seal affixed to said Certificate is such corporate seal; that it was so affixed by order of the Board of Directors of said Corporation, and that he signed his name thereto by like order.

*Francis C. Flynn*
Notary Public

FRANCIS C. FLYNN
Notary Public, Philadelphia, Philadelphia Co.
My Commission Expires July 2, 1987

15

PARCEL 1 DESCRIPTION

BEGINNING at the corner formed by the intersection of the easterly line of Eleventh Avenue with the northerly line of West 36th Street;

1. Running thence northerly, along the easterly line of Eleventh Avenue, 98'-9";

2. thence easterly, parallel with the northerly line of West 36th Street, 175'-0";

3. thence northerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the southerly line of West 37th Street;

4. thence easterly, along the southerly line of West 37th Street, 275'-0";

5. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to the center line of block;

6. thence westerly, parallel with the northerly line of West 36th Street and along the center line of block, 75'-0";

7. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the northerly line of West 36th Street;

8. thence westerly, along the northerly line of West 36th Street, 375'-0" to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM AN EASEMENT RETAINED BY THE GRANTOR THEREOF.



16

## PARCEL 1  DESCRIPTION

BEGINNING at the corner formed by the intersection of the easterly line of Eleventh Avenue with the northerly line of West 36th Street;

1. Running thence northerly, along the easterly line of Eleventh Avenue, 98'-9";

2. thence easterly, parallel with the northerly line of West 36th Street, 175'-0";

3. thence northerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the southerly line of West 37th Street;

4. thence easterly, along the southerly line of West 37th Street, 275'-0";

5. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to the center line of block;

6. thence westerly, parallel with the northerly line of West 36th Street and along the center line of block, 75'-0";

7. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the northerly line of West 36th Street;

8. thence westerly, along the northerly line of West 36th Street, 375'-0" to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM AN EASEMENT RETAINED BY THE GRANTOR THEREOF.

PARCEL 2  DESCRIPTION

BEGINNING at a point in the southerly line of West 38th Street distant 350'-0" west of the corner formed by the intersection of the westerly line of Tenth Avenue with the southerly line of West 38th Street;

1.  Running thence southerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the northerly line of West 37th Street;

2.  thence westerly, along the northerly line of West 37th Street, 150'-0";

3.  thence northerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the southerly line of West 38th Street;

4.  thence easterly, along the southerly line of West 38th Street, 150'-0" to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM AN EASEMENT RETAINED BY THE GRANTOR THEREOF.



18

PARCEL 2   DESCRIPTION

BEGINNING at a point in the southerly line of West 38th Street distant 350'-0" west of the corner formed by the intersection of the westerly line of Tenth Avenue with the southerly line of West 38th Street;

1. Running thence southerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the northerly line of West 37th Street;

2. thence westerly, along the northerly line of West 37th Street, 150'-0";

3. thence northerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the southerly line of West 38th Street;

4. thence easterly, along the southerly line of West 38th Street, 150'-0" to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM AN EASEMENT RETAINED BY THE GRANTOR THEREOF.

M 628/85

DATA ENTERED

CERTIFICATE OF LIMITED PARTNERSHIP

OF

MID-TOWN DEVELOPMENT
LIMITED PARTNERSHIP

CERTIFIED COPY ISSUE
Fee Paid ———
Dated MAR 19 1987
County Clerk, N.Y. Co.
By

CERTIFIED COPY ISSUE
Fee Paid MAY 29 1987
Dated
County Clerk, N.Y. Co.
By

CERTIFIED COPY ISSUE
Fee Paid JUN 21 1985
Dated
County Clerk, N.Y. Co.
By

QUINN, COHEN, SHIELDS & BOCK
ATTORNEYS AT LAW
545 MADISON AVENUE
NEW YORK, N.Y. 10022

832-1806

'85 JUN 21 P3:18

FILED
COUNTY CLERK
N.Y. COUNTY

## SECOND AMENDMENT TO CERTIFICATE OF LIMITED PARTNERSHIP OF MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

The undersigned, being all of the General and Limited Partners of Mid-Town Development Limited Partnership (the "Partnership") desiring to amend the Certificate of Limited Partnership of the Partnership (the "Certificate") heretofore filed as Document M628/85 on June 21, 1985 in the office of the County Clerk and Clerk of the Supreme Court, New York County, certify as follows:

1. The Certificate is hereby amended by deleting Article 4 in its entirety and substituting the following therefor:

"4. Members. The name and address of the General Partner is as follows:

| Name | Address |
|------|---------|
| Jerrart Venture | 630 Fifth Avenue New York, NY 10020 |

*516-87B*

The name and address of the Class B Limited Partner is as follows:

| Name | Address |
|------|---------|
| CRC Properties, Inc. | 150 Allendale Road King of Prussia Pennsylvania 19406" |

IN WITNESS WHEREOF, the undersigned have made, signed and acknowledged this Amended Certificate of Limited Partnership this 28th day of May, 1987

WITHDRAWING  GENERAL PARTNERS

Arthur E. Imperatore

Jerrold Wexler

Edward W. Ross

LIMITED PARTNER

CRC PROPERTIES, INC.

BY: _____
    John Jaeger, President

JERRART VENTURE

BY: _____
    Arthur E. Imperatore

32464

STATE OF NEW JERSEY    )
                       ) SS.
COUNTY OF HUDSON       )

On this 23rd day of ~~May~~ JUNE, 1987, before me personally
came ARTHUR E. IMPERATORE, to me known, and known to me to
be the individual described in and who executed the foregoing
instrument and he duly acknowledged to me that he resides
at Pershing Road, Weehawken, New Jersey 07087 and that he
executed the foregoing Second Amendment to the Certificate
of Limited Partnership of Mid-Town Development Limited Part-
nership as a General Partner.

_____
Notary Public

LISA CACCAVALE-SOTO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 10, 1990

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )

On this 28th day of May, 1987, before me personally
came JERROLD WEXLER, to me known, and know to me to be the
individual described in and who executed the foregoing
instrument and he duly acknowledged to me that he resides
at 2800 Lake Shore Drive, Chicago, Illinois 60657 and that
he executed the foregoing Second Amendment to the Certificate
of Limited Partnership of Mid-Town Development Limited
Partnership as a General Partner.

_____
Notary Public
my Commission Expires:
August 21, 1989

STATE OF ILLINOIS    )
                          ) SS.
COUNTY OF COOK     )

On this _28th_ day of May, 1987 before me personally came EDWARD W. ROSS, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledged to me that he resides at 1240 North Lake Shore Drive, Chicago, Illinois 60610 and that he executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.

_Christine Freefeld_
NOTARY PUBLIC
My Commission Expires
August 21, 1989

PENNSYLVANIA
STATE OF ~~NEW YORK~~  )
      PHILADELPHIA SS.
COUNTY OF ~~NEW YORK~~  )

On this _13th_ day of ~~May~~ July, 1987, before me personally appeared JOHN JAEGER, to me know, who being by me duly sworn, did depose and say, that he resides at 8 Merrion Road, Merrion Station, Pennsylvania, that he is the President of CRC Properties, Inc., a Delaware corporation, and the corporation described in and which executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a Limited Partner; and that he signed his name thereto by order of the Board of Directors of said Corporation.

_James W. Hartman Jr._
NOTARY PUBLIC

JAMES W. HARTMAN, JR., NOTARY PUBLIC
PHILADELPHIA, PHILADELPHIA COUNTY
MY COMMISSION EXPIRES MAY 20, 1991
Member, Pennsylvania Association of Notaries

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SECOND AMENDMENT TO

CERTIFICATE OF LIMITED PARTNERSHIP

OF

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

McCarter & English

Attn.:  Stephen M. Vajtay, Jr., Attorney

550 Broad Street

Newark, New Jersey  07102

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



'87 SEP -4 A10:08

FILED
N.Y. COUNTY
COUNTY CLERK



FILED BY

INDEXED BY

THIS RECORD NOT TO
BE REMOVED FROM THE
COUNTY CLERK'S OFFICE

JOINT VENTURE AGREEMENT

OF

JERRART VENTURE

AGREEMENT made as of February 3, 1987 by and between WR West Side Associates, an Illinois limited partnership ("WR") and Hadrian Properties Ltd., a New Jersey limited partnership ("Hadrian"). Each of the foregoing is sometimes called Partner and both of the foregoing are sometimes collectively referred to as "Partners".

1. <u>Name and Business</u>. The parties do hereby form a joint venture under the name of Jerrart Venture, an Illinois general partnership, (hereinafter called "Partnership") to carry on the business of investing in real property by directly or indirectly acquiring and holding an interest in the property described in Exhibit A attached hereto and made a part hereof ("Property") or in a general or limited partnership owning or acquiring the Property and/or other property, and improving, developing, holding for investment, maintaining, operating, mortgaging, managing, leasing, exchanging, otherwise exploiting and ultimately disposing of the Property and/or other property; to engage in any other lawful activity; and to invest in other properties and investments and to engage in any and all activities related and incidental thereto as may be deemed appropriate by the Partners.

2. <u>Office</u>. The office of the partnership shall be located at such location or locations as the Partners may from time to time designate.

3. <u>Term</u>. The term of the Partnership shall begin on February 3, 1987 and shall continue until December 31, 2037 unless sooner

MID 00790

terminated as provided herein.

4. **Capital Contributions.** On not less than 15 days prior written call for capital contributions, the Partners shall contribute capital to or make loans to the Partnership in such total amount as the Partners shall determine from time to time is required in the interest of the Partnership and such capital or loans shall be contributed or made by the Partners in the respective percentages set forth in Paragraph 6. Loans to the Partnership made by the Partners pursuant to this Paragraph 4 shall be on such terms as the Partners shall determine from time to time.

5. **Profit and Loss.** The net profits of the Partnership shall be divided among the Partners and the net losses of the Partnership shall be borne by the Partners in the respective percentages set out in Paragraph 6.

6. **Partners' Percentages.** The respective percentages referred to in preceding Paragraphs 4 and 5 are as follows:

| | |
|---|---|
| WR | 50% |
| Hadrian | 50% |

7. **Management, Duties, and Restrictions.**

(a) The Partners shall have full charge of the management, conduct, and operation of the partnership business in all respects and in all matters, including but not limited to full power to make all decisions with respect to acquisition, improvement, operation, maintenance, leasing, and use of the Property and other property, to become a general or limited partner in other partnerships in furtherance of the Partnership business, to borrow money, and to mortgage, sell, and convey the personal

MID 00791

-2-

and real property, or any part thereof, owned by the Partnership on such terms as they may determine.

(b) The Partners are authorized and empowered to determine all questions relating to the conduct and management of the Partnership business, and the determination of the Partners on any such question (excepting, and not including, the determination of the interest or share of any Partner in the capital, net profits, or net losses of the Partnership, or the claims of any Partner against the Partnership, or its claims against such Partner) shall be binding on all Partners. The Partners are authorized and empowered, on behalf of the Partnership, to establish and maintain reserves for working capital and against future expenses, replacements, and capital improvements, to borrow (from any Partner or third party) or lend money, make, deliver, or accept any commercial paper, execute any mortgage, bond, lease, deed, release, or agreement, purchase or contract to purchase, or sell or contract to sell any property, compromise or release any of its claims or debts, hire any person or discharge any person, and obligate the Partnership in an amount and withdraw any money of the Partnership. Each of the Partners agrees to execute or cause to be executed such personal guarantees as may from time to time be required by lenders in connection with loans made to the Partnership. No Partner, except with the consent of all other Partners, shall withdraw its capital contribution, in whole or in part, or assign, create a security interest in, or sell its share in the Partnership or in its capital, assets, or property (except in accordance with the express provisions of this Agreement), or enter into any agreement

MID 00792

as a result of which any other person, firm, or corporation shall become interested with it in the Partnership, or do any act detrimental to the best interests of the Partnership, or which would make it impossible to carry on the ordinary business of the Partnership.

(c)  Each Partner may have other business interests and may engage in any other business or trade, profession, or employment whatsoever, on its own account, or in partnership with or as an employee of or as an officer, director, or shareholder of any other person, firm, or corporation, and it shall not be required to devote its entire time to the business of the Partnership.  No Partner shall be obligated to devote more time and attention to the conduct of the business of the Partnership than shall be deemed by all of the Partners, including such Partner, to be required for the business of the Partnership.  Without the consent of the other Partners, no Partner shall receive any salary or other special compensation for services to be rendered by it.

(d)  Except with respect to the provisions of Paragraphs 11 and 12, below, the affirmative vote of both WR and Hadrian is required for all acts and decisions of the Partnership and the signatures of both WR and Hadrian are necessary to bind the Partnership.

8.  Banking.  All funds of the Partnership shall be deposited and kept in its name in such Partnership bank account or accounts as shall be designated by the Partners.  All withdrawals therefrom shall be made upon checks signed by any one Partner or more than one Partner as shall be determined by the Partners.

9. _Books_. The Partnership shall maintain full and accurate books of account which shall be kept at the principal Partnership office. All transactions of or relating to the Partnership or its business shall be entered in such books. Each Partner shall have access to and the right to inspect and copy such books and all other Partnership records.

10. _Annual Accounting_. (a) As of the last day of December of each year during the continuance of the Partnership, commencing December 31, 1987, a full, true, and accurate account shall be made in writing of all of the assets and liabilities of the Partnership, and of all of its receipts and disbursements, and the assets, liabilities, and income, both gross and net, shall be ascertained, and the net profits or net losses shall be fixed and determined; and the account of each Partner shall thereupon be credited or debited, as the case may be, with its share (as specified in Paragraph 6) of such net profits or losses. In preparing such account, there shall be charged all expenses of the business, and also, all losses and other charges incident or necessary to the carrying on of the business.

(b) The funds of the Partnership shall be distributed to the Partners in proportion to the outstanding capital contributions at such time and in such amounts as the Partners may see fit. Net profits shall augment the individual capital accounts of each Partner and net losses shall diminish the capital accounts in accordance with the respective interests set forth in Paragraph 6.

11. _Failure to Contribute Capital_. In the event that any Partner's capital contribution or loan is not received by the
<!-- cut off -->within fifteen (15) days after its due date (as stated

MID 00794

in the call therefor) then the remedies which shall be available to the Partnership or to the Partners in law or in equity shall be the following:

(a) The percentage interest in the capital and the future profits and losses of the Partnership of the delinquent Partner shall be accordingly reduced and the aggregate interests of the non-delinquent Partners in the capital and future profits and losses of the Partnership shall be correspondingly increased on a basis pro-rated in accordance with their interests in the Partnership profits and losses prior to the call. In making such adjustment, the delinquent Partner's failure to make a loan shall be treated as though it had failed to make a capital contribution in the amount of such loan.

(b) The non-delinquent Partners may elect to have the Partnership purchase the entire Partnership interest of the delinquent Partner for a purchase price equal to the "net invest-ment" theretofore made by the delinquent Partner less his pro-rata share of depreciation with respect to the Partnership's property theretofore recorded on the books of the Partnership as of the due date as stated in the call. "Net investment" means the total cash or agreed value of other property theretofore contributed by such delinquent Partner to the capital of the Partnership. Such election must be made within sixty (60) days after the date when such additional contribution is due in accordance with the terms of this Paragraph 11. If such election is made, the purchase price of the delinquent Partner's interest shall be paid to him in cash not later than sixty (60) days after such election is made. The

MID 00795

delinquent Partner shall thereupon cease to be a Partner and shall have no further Partnership obligations and the Partnership shall indemnify and hold harmless the delinquent Partner against any such further obligations including but not limited to any guarantee by such delinquent Partner of any Partnership loans.

(c) The non-delinquent Partners may elect to admit additional Partners to the Partnership to supply the capital contribution of the delinquent Partner or to purchase the entire Partnership interest of the delinquent Partner on the terms set forth in Paragraph 11 (b), or both.

(d) The non-delinquent Partners may enforce the delinquent Partner's obligation to make a capital contribution or loan, as the case may be, by a suit for specific performance, the Partners hereby acknowledging that it will be impossible to ascertain the damage to the Partnership caused by the delinquent Partner's failure to make such capital contribution or loan.

12. _Transfers_. Except as hereinafter provided, no Partner may make any _inter_ _vivos_ transfer of its interest in the Partnership or any part thereof other than by _bona_ _fide_ sale. In the event of a contemplated _bona_ _fide_ _inter_ _vivos_ sale by a Partner of all or any part of its interest in the Partnership, the Partnership and each of the other Partners shall have the prior right to purchase said interest or said part thereof in the manner hereinafter provided:

(a) All offers to purchase must be in writing. The selling Partner shall forthwith give the Partnership and all the other Partners written notice of the name and address of the offeror

MID 00796

and the price and all terms and conditions of the proposed sale together with a true and complete copy of the written offer.

(b)  The non-selling Partners on behalf of the Partnership shall within thirty (30) days after mailing of the selling Partner's notice serve their notice on the selling Partner and all the other Partners of the Partnership's election to purchase, or its election not to purchase, all of the interest which is the subject matter of the proposed sale at the price and upon the terms and conditions specified in the selling Partner's notice.

(c)  In the event that the Partnership shall elect not to purchase the full interest to be sold in the manner set forth in Paragraph 12 (b), each of the non-selling Partners may, within thirty (30) days after the mailing of the notice with respect to the Partnership's decision give notice to the selling Partner and to the remaining Partners, of its desire to exercise its option to purchase its pro-rata share (based on the ratio of such interest or part thereof which equals the ratio of its share in net profits and losses to the share in net profits and losses of all Partners other than the selling Partner) of the selling Partners' interest or part thereof as is within the contemplated sale upon the terms and conditions and at the price specified in the selling Partner's notice to it.  A second option, to be exercised within forty-five (45) days after the mailing of the said Partnership's decision is hereby granted to the Partners who exercised such first option to acquire (pro-rata as among themselves in accordance with their interests as of the date of the giving of the original notice)

the share as to which a Partner has not exercised its first
option.

(d)  Unless the Partnership or the remaining Partners
shall have exercised their options within said seventy-five (75) day
period in such a manner as to purchase all of such interest of the
selling Partner as is within the contemplated sale, the selling
Partner shall be free to dispose of such interest for an additional
period of sixty (60) days but only in the manner and on the terms
stated by it in its original notice to the Partnership and the other
Partners.  In the event that the selling Partner fails thus to
dispose of said interest or part thereof during such period, the
provisions hereof shall be applicable to any further contemplated
disposition by said Partner of its interest or any part thereof.

(e)  No purported assignment of any Partner's interest
shall be valid unless made in accordance with the terms and pro-
visions of this Agreement and if such assignment is to one not
theretofore a party to this Agreement unless such assignee shall
prior to the making of such assignment execute and deliver to the
other Partners an instrument in writing signifying its consent to
be bound by the terms of this Agreement as then amended and
assuming as a Partner all the terms and provisions of this Agree-
ment as then amended.  It is mutually agreed that the continuing
and surviving Partners shall accept as a Partner in this Partnership
any assignee who has succeeded to an interest in accordance with
this subparagraph.

13.  <u>Withdrawal of a Partner</u>.  (a)  In the event that any
Partner withdraws from the Partnership prior to the expiration of

MID 00798

the term of this Partnership or the dissolution of the Partnership

pursuant to the provisions of Paragraph 15, (the "Withdrawing

Partner") each of the remaining Partners shall have the option,

exercisable within sixty (60) days after receipt of written notice

of such withdrawal, to purchase its pro-rata share (as defined in

Paragraph 12 (c)) of the entire interest of the Withdrawing Partner

in the Partnership and in the Partnership assets at a price equal

to 80% of the Withdrawing Partner's net cash investment in the

Partnership and in the assets as of the last day of the month

in which such notice of withdrawal is given.  If one or more of

the remaining Partners does not purchase its proportionate share

of the Withdrawing Partner's interest, the remaining portion of the

Withdrawing Partner's interest may be purchased proportionately by

those of the remaining Partners who wish to purchase the balance of

said interest.  The net cash investment of a Withdrawing Partner

shall be the cash invested by said Partner minus withdrawals or

distributions of any kind which have been paid or credited to said

Partner.  The net cash investment of any Withdrawing Partner shall

be determined by the certified public accounting firm then employed

by the Partnership, and said determination by said accountants shall

be final and conclusive on the Partners and their successors in

interest.

      (b)  If the option set forth above in this Paragraph 13

(a) is not exercised with respect to a Withdrawing Partner's entire

interest, then on the effective date of said withdrawal the re-

maining Partners (if there are more than one) shall be treated as

having formed a new Partnership without the Withdrawing Partner

MID 00799

on terms and conditions identical hereto (including the provisions of this Paragraph 13) and such new Partnership, or if no new Partnership is formed, then the non-withdrawing Partner, on the one hand, and the Withdrawing Partner, on the other, shall own the Partnership assets (other than the Withdrawing Partner's interest in the Partnership) as tenants in common until such time as the same may be, and are sold with the consent of co-tenants owning a 75.00 per cent or greater interest in the tenancy in common. In determining whether co-tenants owning a 75.00 per cent or greater interest in the tenancy in common consent to the sale or other disposal of the Partnership assets (other than the Withdrawing Partner's interest in the Partnership), the non-withdrawing Partners and the Withdrawing Partner shall be deemed to own the same percentage interest in the tenancy in common that they would have held in the Partnership itself if the Partnership continued to hold the entire interest in the Partnership assets at the time consent to said sale is sought. Other decisions relating to the management and operation of the property owned by the Partnership immediately prior to the withdrawal of the Withdrawing Partner shall be made solely by the new Partnership or the non-withdrawing Partner, as the case may be, in accordance with the provisions of Paragraph 7 without regard to the consent of the Withdrawing Partner thereto. In the event the option set forth in this Paragraph 13 (b) is not exercised with respect to a Withdrawing Partner's entire interest, the Withdrawing Partner hereby waives, for the benefit of its heirs, successors, assigns, legal representatives, trustees, successor trustees and con-

MID 00800

servators, any rights which it may have pursuant to the Uniform Partnership Act as enacted in the State of Illinois.

14. __Bankruptcy of a Partner__. (a) Notwithstanding anything to the contrary contained in this Agreement, in the event that any Partner shall be adjudicated a bankrupt, each of the other Partners shall have the option, exercisable within ninety (90) days after such adjudication, to purchase it's pro-rata share (as defined in Paragraph 12 (c)) of the bankrupt's entire interest in the Partner- ship and in the Partnership assets at a price equal to 80% of the net cash investment of the said bankrupt Partner in the Partnership and in the Partnership assets as of the last day of the month in which such adjudication occurs. If one or more of said other Partners does not purchase its proportionate share of the bankrupt Partner's interest, the remaining portion of the bankrupt Partner's interest may be purchased proportionately by those of the purchasing Partners who wish to purchase the balance of said interest. The net cash investment of any bankrupt Partner shall be the cash in- vested by the bankrupt Partner minus withdrawals or distributions of any kind which have been paid or credited to said bankrupt Partner. The net cash investment of any bankrupt Partner shall be determined by the certified public accounting firm then employed by the Partnership, and said determination by said accountants shall be final and conclusive on the Partners and their successors in interest.

(b) If the option set forth in Paragraph 14 (a) is not exercised as to the bankrupt Partner's entire interest, then as of

MID 00801

the last day of the month in which such adjudication of bankruptcy occurs the non-bankrupt Partners shall be treated as having formed a new Partnership without said bankrupt Partner on the terms and conditions identical hereto (including the provisions of this Paragraph 14) and such new Partnership, or if no new Partnership is formed, then the non-withdrawing Partner, on the one hand, and such bankrupt Partner or the successor or successors in interest thereof, shall own the Partnership assets of this Partnership as tenants in common until such time as the same may be, and are sold with the consent of co-tenants owning a 75.00 per cent or greater interest in the tenancy in common.  In determining whether co-tenants owning a 75.00 per cent or greater interest in the tenancy in common consent to the sale of the Partnership assets (other than the bankrupt Partner's interest in the Partnership), the remaining Partners and the bankrupt Partner shall be deemed to own the same percentage interest in the tenancy in common that they would have held in the Partnership itself if the Partnership continued to hold the entire interest in the Partnership assets at the time consent to said sale is sought.  Other decisions relating to the management and operation of the property owned by the Partnership immediately prior to the withdrawal of the Withdrawing Partner shall be made solely by the new Partnership or the non-withdrawing Partner, as the case may be, in accordance with the provisions of Paragraph 7 without regard to the consent of the bankrupt Partner thereto.

15.  <u>Procedure on Liquidation</u>.  At the termination of this Partnership by the expiration of its term, or whenever the Partners

MID 00802

determine that the Partnership should be liquidated, the Partners shall proceed with reasonable promptness to liquidate the business of the Partnership. The profits and losses of the business during the period of liquidation shall be divided among or be borne by the Partners in the respective percentages in which they shared in such profits and losses prior to the event which resulted in such liquidation. After the payment of Partnership debts, expenses of liquidation, and any loans by Partners to the Partnership, the proceeds of liquidation, as realized, shall be distributed, first, in discharge of the undrawn profits of the Partners, and then proportionately in discharge of the respective capital accounts. Any excess shall be distributed among the Partners in the respective percentages in which they shared Partnership profits immediately prior to the event which resulted in such liquidation. In connection with such liquidation, the Partners shall have the sole discretion as to whether to sell any Partnership asset, including but not limited to real estate, and if so, whether at public or private sale and for what amount and on what terms, or whether (if sale thereof is not required to enable payment of debts, expenses of liquidation, loans by Partners, and undrawn profits of the Partners) to distribute and transfer the same to and among the Partners in kind by transferring interests therein in the respective percentages in which profits and losses were shared immediately prior to the event which resulted in such liquidation. In the event that the Partners determine to sell any real property, they shall not be required to sell the same promptly, but they shall have full right and discretion to determine the time when and manner in which such sale or sales shall be had, having due regard to the activity and

MID 00803

condition of the real estate market and general financial and economic conditions.

16. <u>Notices</u>. Wherever provision is made in this Agreement for the giving, service, or delivery of any notice, call, statement, or other instrument, it shall be deemed to have been duly given, served, and delivered, if served personally or if mailed by United States registered or certified mail, addressed to the party entitled to receive the same at the most recent address communicated in writing by such party to the other Partners. Any notice, call, statement, or other instrument shall be deemed to have been given, served, and delivered three days after the date on which such notice was mailed as herein provided.

17. <u>Merger of Prior Agreements</u>. This Agreement contains the sole and entire Agreement and understanding of the parties with respect to the entire subject matter hereof. Any and all prior discussions, negotiations, commitments, and understandings relating thereto are hereby merged herein. This Agreement cannot be changed or terminated orally.

18. <u>Benefit</u>. The covenants and agreements herein contained shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

19. <u>Governing Law</u>. This Agreement shall be governed by the

law of the State of New York.

In witness whereof, the parties hereto have executed this Agreement as of the day and year first above written.

WR West Side Associates                    Hadrian Properties Ltd.

By: _____             By:  Fafner Enterprises, Inc.
    Jerrold Wexler

                                          By: _____
                                              President

By: _____
    Edward W. Ross                        By: _____
    Its General Partners                      Arthur E. Imperatore
                                              Its General Partners

MID 00805

EXHIBIT A

## Parcel No. 1

BEGINNING at a point in the northerly line of West 38th Street, distant 340 feet 7 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 38th Street; (1) running thence westerly, along the northerly line of West 38th Street, 109 feet 5 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 98 feet 9 inches to the center line of block; (3) thence easterly, parallel with the northerly line of West 38th Street and along the center line of block, 50 feet 0 inches; (4) thence northerly, parallel with the westerly line of Tenth Avenue, 46 feet 4 inches; (5) thence easterly, parallel with the southerly line of West 39th Street, 7 feet 0 inches; (6) thence northerly, parallel with the westerly line of Tenth Avenue, 7 feet 0 inches; (7) thence westerly, parallel with the southerly line of West 39 Street, 7 feet 0 inches; (8) thence northerly, parallel with the westerly line of Tenth Avenue, 45 feet 5 inches to a point in the southerly line of West 39th Street; (9) thence easterly, along the southerly line of West 39th Street, 96 feet 8 inches; (10) thence southerly, along a line forming an angle of 79 degrees 19 minutes 10 seconds on its westerly side with the preceding course, 200 feet 11 3/4 inches to the point or place of BEGINNING.

CONTAINING 20,303.35 square feet, more or less, or 0.4661 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORTATION PURPOSES:

## Parcel No. 1

THIS easement right is across and through the aforesaid described Parcel No 1 and is situate below the upper inclined plane having an elevation of 23.61 at the northerly line of West 38th Street and an elevation of 21.86 at the southerly line of West 39th Street. The elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 23.61 feet at the northerly line of West 38th Street and an elevation of 21.86 feet at the southerly line of West 39th Street, bounded and described as follows:

BEGINNING at a point in the northerly line of West 38th Street, distant 380 feet 4 1/2 inches westerly of the corner formed by the intersection of the northerly line of West 38th Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 38th Street, 56 feet 11 7/8 inches; (2) thence northerly, along a line forming an angle of 79 degrees 17 minutes 17 seconds on its easterly side with the preceding course, 201 feet 0 inches to a point in the southerly line of West 39th Street; (3) thence easterly, along the southerly line of West 39th Street, 56 feet 11 7/8 secondss; (4) thence southerly, along a line forming an angle of 100 degrees 42 minutes 43 seconds on its easterly side with the southerly line of West 39th Street, 201 feet 0 inches to the point or place of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

Parcel No. 2

BEGINNING at a point in the northerly line of West 43rd Street distant 125 feet 0 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 43rd Street; (1) running thence westerly, along the northerly line of West 43rd Street, 100 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 44th Street; (3) thence easterly, along the southerly line of West 44th Street, 100 feet 0 inches; (4) thence southerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to the point or place of BEGINNING.

CONTAINING 20,083 square feet, more or less, or 0.461 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORATION PURPOSES:

Parcel No. 2

THIS easement right is across and through the aforesaid described Parcel No. 2 and is situate below the upper inclined plane having an elevation of 17.08 at the northerly line of West 43rd Street and an elevation of 19.18 at the southerly line of West 44th Street. The elevations refer to the datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, Mean sea level, Sandly Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 17.08 feet at the northerly line of West 43rd Street and an elevation of 19.18 feet at the southerly line of West 44th Street bounded and described as follows:

BEGINNING at a point in the northerly line of West 43rd Street, distant 145 feet 10 inches westerly of the corner formed by the intersection of the northerly line of West 43rd Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 43rd Street, 56 feet 0 inches; (2) thence northerly, along a line forming an angle of 89 degrees 54 minutes 40 seconds on its easterly side with the preceding course, 200 feet 10 inches, to a point in the southerly line of West 44th Street; (3) thence easterly, along the southerly line of West 44th Street, 56 feet 0 inches; (4) thence southerly, along a line forming an angle of 90 degrees 5 minutes 20 seconds on its easterly side with the southerly line of West 44th Street, 200 feet 10 inches to the point of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

## Parcel No. 3

BEGINNING at a point in the northerly line of West 47th Street distant 125 feet 0 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 47th Street; (1) running thence westerly, along the northerly line of West 47th Street, 100 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 48th Street; (3) thence easterly, along the southerly line of West 48th Street, 100 feet 0 inches; (4) thence southerly, parallel with the westerly line of a Tenth Avenue, 200 feet 10 inches to the point or place of BEGINNING.

CONTAINING 20,083 square feet, more or less, or 0.461 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORTATION PURPOSES:

## Parcel No. 3

THIS easement right is across and through the aforesaid described Parcel No.3 and is situate below the upper inclined plane having an elevation of 27.87 at the northerly line of West 47th Street and an elevation of 30.00 at the southerly line of West 48th Street. The elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 27.87 feet at the northerly line of West 47th Street and an elevation of 30.00 feet at the southerly line of West 48th Street, bounded and described as follows:

BEGINNING at a point in the southerly line of West 47th Street, distant 145 feet 3 inches westerly of the corner formed by the intersection of the northerly line of West 47th Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 47th Street, 56 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 48th Street; (3) thence easterly, along the southerly line of West 48th Street, 56 feet 0 inches; (4) thence southerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to the point of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

## PARTNERSHIP AFFIDAVIT

STATE OF NEW JERSEY )
                      )    SS.
COUNTY OF HUDSON )

    EDWARD W. ROSS, being duly sworn upon his oath, deposes and says:

1. I am a General Partner of **WR WEST SIDE ASSOCIATES,** which in turn is a General Partner of **JERRART VENTURE,** an Illinois General Partnership (the "Partnership") duly formed in and governed by the laws of the State of Illinois.

2. The Partnership was formed pursuant to a Joint Venture Agreement dated February 3, 1987 (the "Partnership Agreement"), a true copy of which is attached to this Affidavit.

3. There has been no change in the Partnership Agreement between the date of formation of the Partnership and the date of this Affidavit, and the general partners of the Partnership are WR West Side Associates and Hadrian Properties, Ltd.

4. I, on behalf of WR West Side Associates., and Arthur E. Imperatore on behalf of Hadrian Properties, Ltd., are authorized by the Partnership Agreement to execute the Deed and all other closing documents relative to the sale of **Lot 24, Block 1076, New York, New York** (the "Property").

5. This Affidavit is made to induce Purchaser to accept conveyance of the Property, known full well that Purchaser will rely on the facts set forth in this Affidavit.

By: _____
               EDWARD W. ROSS

SWORN AND SUBSCRIBED to before
me this *5th* day of *March*, 2003.

_____

```
OFFICIAL SEAL
PATRICE A ALPERT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/25/05
```