**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

 JERICHO GROUP, LTD.,                          :
                                               :
             Plaintiff,                        :
                                               :
                                               :
          - against -                          :    **No. 07-CV-1792 (RCC) (DCF)**
                                               :
                                               :    **ECF CASE**
 MIDTOWN DEVELOPMENT, L.P., EDWARD             :
 IMPERATORE and MAURICE STONE,                 :
                                               :
             Defendants.                       :
                                               :
-------------------------------------------------------------------X

<u>**DECLARATION OF TODD R. GEREMIA**</u>

I, TODD R. GEREMIA, declare the following under penalty of perjury under the laws of

the United States:

1.      I am an associate at the law firm Jones Day, co-counsel with Phillips Nizer LLP

to defendants Midtown Development, L.P., Edward Imperatore, and Maurice Stone.  I submit

this declaration to put before the Court copies of certain documents that are pertinent to

defendants' opposition to plaintiff's motion to remand and also to assert certain facts concerning

the procedural history of this dispute.

2.      Attached to this declaration, under the identified exhibit tabs, are copies of the

following documents:

Exhibit A          Record on Appeal in *Jericho Group, Ltd. v. Midtown*
                   *Development, L.P.*, Index No. 113274/04 (1st Dep't Aug.
                   17, 2006), submitted in November 2005

Exhibit B          Affirmation by Robert B. Goebel in Support of Motion for
                   Reargument, or Alternatively, Leave to Appeal to Court of
                   Appeals and for an Immediate Stay, dated September 18,
                   2006

Exhibit C          Affirmation of Todd R. Geremia in Opposition to
                   Respondent's Motion for Reargument and Leave to
                   Appeal, dated September 25, 2006

Exhibit D          Letter from Herbert Rubin, Esq. to Clerk of Appellate
                   Division, First Department, dated October 9, 2006

Exhibit E          Affirmation of Herbert Rubin, for Plaintiff, in Support of
                   Motion to Vacate Judgment, to Amend Complaint and for
                   Preliminary Injunction, dated October 30, 2006

Exhibit F          Defendant's Notice of Appeal, dated February 22, 2007

Exhibit G          Plaintiff's Request for Judicial Intervention, dated February
                   28, 2007; Plaintiff's Request for Preliminary Conference,
                   dated February 27, 2007; notice dated March 16, 2007,
                   indicating assignment of Honorable Charles E. Ramos to
                   *Jericho Group, Ltd. v. Midtown Development, L.P.*, Index
                   No. 600566/2007 (Sup. Ct. N.Y. Cty.)

Exhibit H          Notice of Pendency filed by Plaintiff, dated September 29,
                   2005

Exhibit I          Order of Supreme Court of the State of New York, New
                   York County, canceling Notice of Pendency, dated August
                   30, 2006

3.      Defendants Midtown Development, L.P., Edward Imperatore, and Maurice Stone

perfected their appeal to the Supreme Court of the State of New York, Appellate Division, First

Department on March 19, 2007, for the First Department's June Term.


4.      Plaintiff Jericho Group, Ltd. did not appeal from the Order of the Supreme Court

of the State of New York, New York County, dated February 2, 2007, denying Plaintiff's motion

to serve an amended complaint and for a preliminary injunction.

5.      Defendants Midtown Development, L.P., Edward Imperatore, and Maurice Stone respectfully request leave to file a Second Amended Notice of Removal pursuant to 28 U.S.C. § 1653, to supplement their allegations to establish that this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).  Defendants' proposed Second Amended Notice of Removal is attached hereto as Exhibit J.

6.      I declare under penalty of perjury that the foregoing is true and correct.

Executed within the United States on April 13, 2007.

_____/s/ *Todd R. Geremia*_____
                     Todd R. Geremia

# EXHIBIT A
# TO GEREMIA DECLARATION
# Part 1

New York County Clerk's Index No. 0113274/2004

# New York Supreme Court

## APPELLATE DIVISION—FIRST DEPARTMENT

◆◆

JERICHO GROUP, LTD.,

*Plaintiff-Respondent,*

—against—

MIDTOWN DEVELOPMENT, L.P.,

*Defendant-Appellant.*

## RECORD ON APPEAL

ROBERT B. GOEBEL
14 Walworth Avenue
Scarsdale, New York 10583
(914) 725-5243

*Attorney for Plaintiff-Respondent
Jericho Group, Ltd.*

FREDRICK E. SHERMAN
TODD R. GEREMIA
JONES DAY
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Defendant-Appellant
Midtown Development, L.P.*

REPRODUCED ON RECYCLED PAPER

# TABLE OF CONTENTS

PAGE

Defendant's Pre-argument Statement, dated July 5, 2005 .................. 1

Defendant's Notice of Appeal, dated July 5, 2005 ......................... 4

Order Appealed From, dated May 16, 2005 .............................. 6

Defendant's Notice of Motion to Dismiss the Complaint,
dated January 7, 2005 .............................................. 34

    Annexed to Motion—
    First Amended Verified Complaint, dated November 29, 2004 ........ 36

Affirmation of Edward G. Imperatore, for Defendant, in Support
of Motion to Dismiss the Complaint, dated January 6, 2005 ........... 64

    Exhibit A to Imperatore Affirmation—
    Contract, dated June 18, 2002 ...................................... 75

    Exhibit B to Imperatore Affirmation—
    Letter from Edward G. Imperatore to Michael A. Szegda,
    dated July 15, 2002 ............................................... 93

    Exhibit C to Imperatore Affirmation—
    Letter from Michael A. Szegda to Edward G. Imperatore,
    dated July 17, 2002 ............................................... 95

    Exhibit D to Imperatore Affirmation—
    Letter from Edward G. Imperatore to Michael A. Szegda,
    dated July 25, 2002 ............................................... 97

    Exhibit E to Imperatore Affirmation—
    Letter from Michael A. Szegda to Edward G. Imperatore,
    dated July 29, 2002 ............................................... 98

ii

PAGE

Exhibit F to Imperatore Affirmation—
Letter from Edward G. Imperatore to Michael A. Szegda,
dated July 30, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Exhibit G to Imperatore Affirmation—
Letter from Michael A. Szegda to Maurice Stone,
dated August 19, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

Exhibit H to Imperatore Affirmation—
Letter from Edward G. Imperatore to Michael A. Szegda,
dated August 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Exhibit I to Imperatore Affirmation—
Letter from Michael A. Szegda to Maurice Stone,
dated August 28, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Exhibit J to Imperatore Affirmation—
Letter from Edward G. Imperatore to Michael A. Szegda,
dated August 29, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Exhibit K to Imperatore Affirmation—
Letter from Michael A. Szegda to Edward G. Imperatore,
dated September 3, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Exhibit L to Imperatore Affirmation—
Letter from Maurice Stone to Michael A. Szegda,
dated September 5, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

Exhibit M to Imperatore Affirmation—
Letter from Maurice Stone to Michael A. Szegda,
dated September 10, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Exhibit N to Imperatore Affirmation—
Letter from Maurice Stone to Michael A. Szegda,
dated September 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

Exhibit O to Imperatore Affirmation—
Memorandum from Maurice Stone to Maria Walsh,
dated September 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

iii

PAGE

Exhibit P to Imperatore Affirmation—
Letter from Maurice Stone to Michael A. Szegda,
dated June 19, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Exhibit Q to Imperatore Affirmation—
Letter from Michael A. Szedga to Edward G. Imperatore,
dated September 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Exhibit R to Imperatore Affirmation—
Letter from Edward G. Imperatore to Michael A. Szegda,
dated September 3, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Exhibit S to Imperatore Affirmation—
Letter from Michael A. Szedga to Edward G. Imperatore,
dated August 30, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

Exhibit T to Imperatore Affirmation—
Letter from Edward G. Imperatore to Michael A. Szegda,
dated September 3, 2002 with attachment . . . . . . . . . . . . . . . . . . . . . . . . 124

Exhibit U to Imperatore Affirmation—
Letter from Michael A. Szegda to Maurice Stone,
dated August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Exhibit V to Imperatore Affirmation—
Letter from Maurice Stone to Michael A. Szegda,
dated August 14, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Exhibit W to Imperatore Affirmation—
Letter from Michael A. Szegda to Maurice Stone,
dated August 1, 2002 and Letter from Michael A. Szegda
to Maurice Stone, dated July 17, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 131

Exhibit X to Imperatore Affirmation—
Letter from Edward G. Imperatore to Michael A. Szegda,
dated August 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Affidavit of Benjamin A. Shafran, dated February 23, 2005 . . . . . . . . . . . . . 135

iv

PAGE

Exhibit A to Shafran Affidavit—
Plans for Riverview ............................................. 137

Affidavit of Samuel Pfeiffer, for Plaintiff, in Opposition to Motion
to Dismiss the Complaint, dated February 27, 2005 ................. 140

Exhibit 1 to Pfeiffer Affidavit—
Letter from Michael A. Szegda to Edward G. Imperatore,
dated September 3, 2002 with attachment .......................... 158

Exhibit 2 to Pfeiffer Affidavit—
Letter from Edward G. Imperatore to Michael A. Szegda,
dated September 4, 2002 with attachment .......................... 161

Exhibit 3 to Pfeiffer Affidavit—
Letter from Michael A. Szegda to Edward G. Imperatore,
dated September 4, 2002 .......................................... 164

Exhibit 4 to Pfeiffer Affidavit—
Letter from Shulem Pfeiffer to Murray Stone,
dated October 18, 2002 with attachment .......................... 166

Exhibit 5 to Pfeiffer Affidavit—
Letter from Edward G. Imperatore to Shulem Pfeiffer,
dated October 25, 2002 .......................................... 169

Exhibit 6 to Pfeiffer Affidavit—
Letter from Maurice Stone to Shulem Pfeiffer,
dated January 19, 2004 .......................................... 171

Certification Pursuant to CPLR 2105 ................................ 173

**1**

Defendant's Pre-argument Statement, dated July 5, 2005
[pp. 1-3]

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-------------------------------------------------------------X
                               :

**JERICHO GROUP, LTD.**             :
                               :
                               :     **Index No. 0113274/2004**
              **Plaintiff,**       :     **(Justice Ramos, Part 53)**
                               :

            **-against-**          :

**MIDTOWN DEVELOPMENT, L.P.**  :     **PRE-ARGUMENT STATEMENT**
                               :
                               :
              **Defendant.**      :
-------------------------------------------------------------X

      Defendant Midtown Development, L.P. ("Midtown"), pursuant to § 600.17 of the Rules

of the Supreme Court, Appellate Division, First Department, respectfully submits the following

Pre-Argument Statement:

     1.     The title of this action is as it appears in the above caption.

     2.     The full names of the parties are as they appear in the above caption.

     3.     The name, address, and telephone number of counsel for Midtown is as follows:

          JONES DAY
          Fredrick E. Sherman
          Todd R. Geremia
          222 East 41st Street
          New York, New York 10017
          (212) 326-3939

     4.     The name, address, and telephone number of counsel for Plaintiff Jericho Group,

Ltd. ("Jericho") is as follows:

          Robert B. Goebel
          14 Walworth Avenue
          Scarsdale, New York  10583
          (914) 725-5243

NEW YORK
COUNTY CLERK'S OFFICE

JUL 0 6 2005

NOT COMPARED
WITH COPY FILED

**2**

5.     This appeal is taken from an order of the Honorable Charles Edward Ramos of the Supreme Court of the State of New York, County of New York (IAS Part 53), filed May 18, 2005 (the "Order"). Jericho served Notice of Entry of the Order on June 7, 2005, by overnight mail.

6.     Jericho seeks damages and specific performance for an alleged breach of a contract for the purchase and sale of real estate. Jericho also asserts a cause of action for "deceit," allegedly in connection with Midtown's performance under the contract.

7.     The Order appealed from denied Midtown's motion to dismiss the amended complaint pursuant to CPLR 3211(a)(7) and 3211(a)(1). A copy of the Order appealed from is attached hereto.

8.     The Order appealed from should be reversed on the ground that the court erred as a matter of law in denying Midtown's motion to dismiss the amended complaint. All of Midtown's causes of actions should be dismissed under settled law that, having elected to cancel the contract at issue and after having its downpayment refunded, Jericho may not now assert claims for either specific performance or damages under the contract that it elected to cancel. Further, Midtown did not, as a matter of law, agree to amend the contract to extend it. In any event, Jericho is not entitled to any remedy other than the remedy expressly set forth in the contract—return of the downpayment, which Jericho has already received. Still further, Jericho has waived any right to enforce a contract it cancelled, and all of its causes of action should be dismissed on the equitable grounds of estoppel and laches. In addition, Jericho's cause of action for "deceit" should be dismissed because (a) Jericho expressly agreed in the contract that it entered into the contract without relying on representations by Midtown or its broker, (b)

# 3

Midtown did not have any duty to make the representations that Jericho claims Midtown should have made, and (c) the deceit cause of action is duplicative of Jericho's breach of contract causes of action. These and other grounds for reversing the Order are set forth in more detail in Midtown's memoranda of law in support of its motion to dismiss the amended complaint and in the transcript of the May 12, 2005 oral argument before Justice Ramos on Midtown's motion to dismiss.

9.    There is no related action or proceeding now pending in this Court or in any other jurisdiction.

Dated: July 5, 2005

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306

By: _____
    Fredrick E. Sherman
    Todd R. Geremia

Attorneys for Defendant,
Midtown Development, L.P.

**4**

Defendant's Notice of Appeal, dated July 5, 2005
[pp. 4-5]

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
                                                            :
**JERICHO GROUP, LTD.**                                     :
                                                            :
                                Plaintiff,                  :    **Index No. 0113274/2004**
                                                            :    **(Justice Ramos, Part 53)**
                                                            :
                    -against-                               :
                                                            :    **NOTICE OF APPEAL**
**MIDTOWN DEVELOPMENT, L.P.**                               :
                                                            :
                                                            :
                                Defendant.                  :
------------------------------------------------------------X

      PLEASE TAKE NOTICE that Defendant Midtown Development, L.P. ("Midtown")
hereby appeals to the New York Supreme Court, Appellate Division, First Department, from a
May 16, 2005 order of the Honorable Charles Edward Ramos of the Supreme Court of the State
of New York, New York County, filed May 18, 2005 (the "Order"). Plaintiff, Jericho Group,
Ltd. served Notice of Entry of the Order on June 7, 2005, by overnight mail. A copy of the
Order is annexed hereto. This appeal is taken from each and every part of the Order to the extent
the Court denied Midtown's motion to dismiss the amended complaint pursuant to CPLR
3211(a)(7) and 3211(a)(1).

Dated: July 5, 2005

NEW YORK
COUNTY CLERK'S OFFICE

JUL 0 6 2005

NOT COMPARED
WITH COPY FILED

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone:     (212) 326-3939
Facsimile:     (212) 755-7306

By: _____
    Fredrick E. Sherman
    Todd R. Geremia

Attorneys for Defendant,
Midtown Development, L.P.

# 5

TO:

CLERK OF THE SUPREME COURT
NEW YORK COUNTY
60 Centre Street
New York, New York 10007

Robert B. Goebel, Esq.
14 Walworth Avenue
Scarsdale, New York 10583

Attorney for Plaintiff,
Jericho Group, Ltd.

**6**
Order Appealed From, dated May 16, 2005
[pp. 6-33]

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ **Charles Edward Ramos**                    PART **53**
                              *Justice*

0113274/2004

JERICHO GROUP, LTD                          INDEX NO.    _____
          vs
MIDTOWN DEVELOPMENT, LP                      MOTION DATE   _____

SEQ 1                                        MOTION SEQ. NO.  _____

DISMISS                                      MOTION CAL. NO.  _____

The following papers, numbered 1 to _____ ... this motion to/for _____

|                                                                  | PAPERS NUMBERED |
|------------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____                          | _____ |
| Replying Affidavits _____                                      | _____ |

**Cross-Motion:**    ☐ Yes    ☐ No

Upon the foregoing papers, it is ordered that this motion

the Court's transcript.            Motion denied as reflected in

FILED

MAY 18 2005

NEW YORK
COUNTY CLERK'S OFFICE

Dated: _____ 5/14/05

                                                    J.S.C.

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):**

**Check one:**    ☐ **FINAL DISPOSITION**    ☑ **NON-FINAL DISPOSITION**

**Check if appropriate:**    ☐ **DO NOT POST**    ☐ **REFERENCE**

05/19/2005 THU 16:45 FAX                                              002/025

1

2

3    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK: CIVIL PART  53
4    ------------------------------------------------X
     JERICHO GROUP, LTD.
5
                                        Plaintiff,
6              -against-

7    MIDTOWN DEVELOPMENT, LP,
                                        Defendant.
8    ------------------------------------------------X

9    INDEX 113274/04
                                 60 Centre Street
10                               New York, NY 10007.
                                 May 12, 2005
11
     B E F O R E:
12
            HONORABLE CHARLES E. RAMOS, JUSTICE.
13

14   A P P E A R A N C E S:

15
            ROBERT B. GOEBEL, ESQ.
16          Attorney for Plaintiff
            14 Walworth Avenue
17          Scarsdale, NY 10583
     BY:    RICHARD L. MARASSE, ESQ.
18

19          JONES DAY, ESQ.
            Attorneys for Defendant
20          221 East 41st Street
            New York, NY   10017
21   BY:    FREDERICK E. SHERMAN, ESQ.
            TODD R. GEREMIA, ESQ.
22
                          oOo
23

24                        MILLICENT J. ANGIULLI
                          Official Court Reporter
25

26

8

2

| 1 | Proceedings |
|---|---|
| 2 | |
| 3 | THE COURT:    Okay, motion sequence number |
| 4 | one, which means we have not committed any error yet. |
| 5 | Who has the plaintiff? |
| 6 | MR. MARASSE:    I am the plaintiff, but I |
| 7 | am not the movant. |
| 8 | THE COURT:    I just want to know who is the |
| 9 | plaintiff. |
| 10 | MR. MARASSE:    This is a case involving a |
| 11 | breach of a complex contract or real estate involving |
| 12 | real estate over the Javitz Center in Manhattan, and |
| 13 | we filed a motion for damages -- refiled a complaint |
| 14 | for damages and for specific performance and for |
| 15 | contract, and-- |
| 16 | THE COURT:    Is it one of those warehouses |
| 17 | in the area. |
| 18 | MR. MARASSE:    There was nothing on the |
| 19 | property. |
| 20 | THE COURT:    It's empty land over there? |
| 21 | |
| 22 | MR. MARASSE:    It was knocked down.  I |
| 23 | think it is still empty land.  This was couple years |
| 24 | ago, in 2002, and Jericho contracted, and after the |
| 25 | amendment now we feel we are entitled to damages |
| 26 | because of failures under the contract by the |

05/19/2005 THU 15:47  FAX                                                    @004/025

```
                                                                        3
 1                              Proceedings
 2       defendants to perform under the terms of the contract.
 3                   THE COURT:    What did the contract call
 4       for?
 5                   MR. MARASSE:    Specifically we believe
 6       there were several acts of bad fate in terms of the
 7       contract.  There was a period when disclosure--
 8                   THE COURT:    What was the contract for?
 9                   What did the party of the first part not do
10       to the party of the second part?
11                   MR. MARASSE:    Eventually go to
12       Development or sell it to some one with Development,
13       and during the contracting process the contract
14       specifically set up a period called the study period.
15       Certain documents were going to be produced, and it is
16       our contention that there was wilful withholding of
17       key documents during that period, bad fate
18       withholding.
19                   THE COURT:  The contract provided for-- it
20       was an executed contract?
21                   MR. MARASSE:    Yes.
22                   THE COURT:     Purchased by or contract
23       amount?
24                   MR. MARASSE:    28 million dollars.
25                   THE COURT:    And as a consequence of that
26       contract the defendants were conveyed title?
```

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

10

Proceedings                                         4

1

2       MR. MARASSE:     To convey title.

3       THE COURT:      And during this period of

4   time, after the contract was executed there was some

5   sort of disclosure that went forward.

6       MR. MARASSE:     There was an obligation to

7   provide documentation to the right of purchase.

8       THE COURT:     So I take it it was somewhat

9   executory in terms of the contract.  There was a

10  second step.

11      MR. MARASSE:     There was  a  period  called

12  a study period with a definite time limit.  We allege

13  that the documentation that should have been provided

14  during that period was not, and we allege it was done

15  in bad fate.

16      THE COURT:     As a consequence of not

17  providing the information, what happened, you withdrew

18  from the deal or you went through with the deal?

19      MR. MARASSE:     At the end of the day, the

20  contract was terminated.

21      THE COURT:     Because the information given

22  to your client made your client back off?

23      MR. MARASSE:     Our client felt, the client

24  felt at that time he did not have sufficient

25  information to feel comfortable going ahead, so he

26  ultimately exercised his right to terminate.

**11**

5

```
 1                          Proceedings
 2                 THE COURT:    Was there any cost to your
 3      client to exercise, is there a forfeiture of any
 4      deposit?
 5                 MR. MARASSE:    No.
 6                 THE COURT:    So now I have a feel for what
 7.     the case is about, why don't I hear from the
 8      defendants, since it is there motion.
 9                 THE COURT:    Defendant or defendants.  One
10      defendant?
11                 MR. SHERMAN:    Just one defendant, Midtown
12      Development.
13                 Your Honor, my name is Fred Sherman.  I am
14      with Jones Day.  We represent Midtown Development, and
15      it is our motion.
16                 THE COURT:    Step over by the lectern.
17      Take your papers, and the court reporter can hear you
18      more clearly, and I can hear you.
19                 This is a motion to dismiss under CPLR 3212
20      summary judgment?
21                 MR. SHERMAN:    It is a motion to dismiss,
22      although it does refer to some documents referred to
23      in the complaint.
24                 THE COURT:    All right.
25                 MR. SHERMAN:    The short story of this
26      case is as follows, there was a contract executed
```

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

**12**

09/19/2009 THU 19:47  FAX                                    @007/028

1                       Proceedings                        6

2    between the two parties who were the parties to this

3    action on June 12, 2002.

4              The contract was for purchase and sale of

5    two lots.

6              THE COURT:   Wasn't it June 18, 2002.

7              MR. SHERMAN:     My mistake, June 18, 2002.

8    The contract was for purchase and sale of two lots of

9    real estate on the West Side of Midtown Manhattan,

10   11th Avenue.

11             The purchase price was 28 million dollars.

12   There was, pursuant to contract, a down payment paid

13   upon execution, of $250,000.  The contract called for

14   the seller to convey the property as is.

15             The contract contained no representations at

16   all of any kind with respect to the condition of the

17   property, environmental circumstances, permits and so

18   on.  The buyer had a 70-day, 75-day period from the

19   execution of the contract, which was called a study

20   period, in which it could inspect the premises,

21   examine it, satisfy itself or not satisfy itself as to

22   the suitability of the real estate for whatever its

23   purposes were, and during that 70 day --

24             THE COURT:   The first part of this

25   contract sounds like a letter of intent.  It's a small

26   deposit.  $250,000 downpayment is -- usually it would

**13**

05/19/2005 THU 16:47  FAX                                                    @008/028

```
 1                              Proceedings           7
 2     be couple million dollars down payment on a contract
 3     of this type.  For $250,000, it's like you gave them
 4     an option and they studied it for 75 days.
 5               MR. SHERMAN:    Yes, and they'd decide in
 6     their own complete discretion whether they want it or
 7     not.
 8               THE COURT:    They do their own due
 9     diligence?
10               MR. SHERMAN:    Yes.
11               THE COURT:    Any obligation on the part
12     of defendant to supply them with information?
13               MR. SHERMAN:    There is an obligation on
14     defendant's part to provide them with information
15     within the seller's control.
16               THE COURT:    The rider, I take it, is what
17     is important here.
18               What paragraph of the rider?
19               MR. SHERMAN:    Let me finish the short
20     story, and I want to talk about the contract terms to
21     you.
22               THE COURT:    It's my courtroom, so I get to
23     ask you questions.
24               MR. SHERMAN:    Of course, you can ask me
25     questions.
26               THE COURT:    What paragraph is it, 29?
```

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

14

8

| | Proceedings |
|---|---|
| 1 | |
| 2 | MR. MARASSE:      Paragraph 29A. |
| 3 | THE COURT:      Let me read it to myself and |
| 4 | when you are speaking I will have an idea of what you |
| 5 | are talking about. |
| 6 | These are the rail yards? |
| 7 | This is the same property that is now |
| 8 | subject of the New York Jets Stadium? |
| 9 | MR. SHERMAN:      No, but it's in the |
| 10 | neighborhood. |
| 11 | MR. SHERMAN:      The property that the Jets |
| 12 | are considering is owned by the Port Authority. |
| 13 | THE COURT:      I thought it was the Transit |
| 14 | Authority. |
| 15 | MR. SHERMAN:      The Transit Authority. |
| 16 | THE COURT:      Amtrak has an easement below |
| 17 | grade for rail lines. |
| 18 | MR. SHERMAN:      Yes. |
| 19 | THE COURT:      I see paragraph 11C, that the |
| 20 | seller will make available to the purchaser such |
| 21 | documents within the seller's current custody and |
| 22 | control related to the condition of the property which |
| 23 | the purchaser reasonably request. |
| 24 | Is there any other obligation on the part of |
| 25 | the seller to supply information to the purchaser? |
| 26 | MR. SHERMAN:      I think there is an earlier |

|   | Proceedings | 9 |

1                Proceedings

2 section which says virtually the same thing, but that

3 is--

4          THE COURT:    So did they send specific

5 request in writing to the seller?

6          MR. SHERMAN:    They sent some requests,

7 and the requests were fulfilled.

8          THE COURT:    Are they taking the position

9 now that the response was inadequate or somehow

10 misleading?

11          MR. SHERMAN:    They certainly are taking

12 that position.

13          THE COURT:    How do I decide that on a

14 motion to dismiss?

15          MR. SHERMAN:    I don't know that you can

16 decide if that issue were critical to deciding the

17 case.

18          The short story of the case was, as you just

19 read, they had a 75-day period to satisfy themselves

20 or not.  They had an absolute right within the 75-day

21 period to decide to terminate, to cancel the contract

22 without giving any reason.

23          As you said this contract in many  ways is

24 like an option.  On the last day of the study period,

25 on the seventy-fifth day they sent a written notice

26 and they said we want our money back.

09/13/2003 THU 10:49 FAX                                                    @011/028

10

|  |  |
|---|---|
| 1 | Proceedings |
| 2 | They cancelled it.  Two years later, and |
| 3 | that was it, 2002. |
| 4 | Two years later, 2004, what happened to |
| 5 | Manhattan value of real estate adjacent to the new |
| 6 | Jets Stadium?  Its gone up substantially. |
| 7 | Out of the woodwork comes a lawsuit. |
| 8 | That is what this case is really about, the |
| 9 | short form is you have the contract in the form you |
| 10 | seen here, undertaking no representations whatsoever |
| 11 | about the property.  To convey as is, a right to look |
| 12 | it over for 75 days, an absolute right to walk away |
| 13 | and get back the small deposit, $250,000. |
| 14 | At the end of 75 days, they say we want our |
| 15 | money back.  We are walking away. |
| 16 | THE COURT:    Here is the Court's problem, |
| 17 | on the face of it the complaint alleges that the |
| 18 | information given was either willfully and negligently |
| 19 | misleading, right? |
| 20 | MR. MARASSE:        Absolutely, Your |
| 21 | Honor. |
| 22 | MR. SHERMAN:    Yes. |
| 23 | THE COURT:    So I understand what your |
| 24 | defense is and I understand your large view of the |
| 25 | case and how it developed, and you may well be |
| 26 | correct.  And you may well be correct on the merits |

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

05/17/2005 THU 16:45 FAX                                                  @012/028

11

                                   Proceedings

 1

 2    that there was no misleading information given, that

 3    this was not an attempt by the seller to back out of

 4    the deal by feeding misleading information; but that

 5    is all factual.

 6            What is there in the contract, or what

 7    defect is in the complaint that would move me to grant

 8    this motion and dismiss the complaint entirely without

 9    making any factual determination as to whether or not

10    there was in fact misleading information given,

11    because the law abhors a fraud, and if there was an

12    attempt to mislead the plaintiff, to dissuade the

13    plaintiff from executing on the contract, and that was

14    done by fraudulent means, the law looks for a remedy

15    in a situation like that, because otherwise a valuable

16    contract right would be destroyed through wrongful

17    means.

18            So that is what I am looking at.  Just on a

19    3211 motion.

20            MR. SHERMAN:    They have pleaded fraud as

21    the 5th or five cause of action.  They have two causes

22    of action for specific performance.  They say we were

23    selling them the property --

24            THE COURT:    Are you seeking to dismiss the

25    entire complaint or just those?

26            MR. SHERMAN:     We are, but I am

            MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

**18**

12

1                              Proceedings

2    addressing pieces of it.

3                 As to the two causes of action for specific

4    performance the law is quite clear.  Whether they now

5    say they were defrauded or withheld information was in

6    bad fate is one thing, the law.

7                 What is not in dispute is that they said and

8    they exercised their contractual right to cancel the

9    contract and get their money back.  They got their

10   money back.  The law is very clear, once a contract is

11   cancelled, the downpayment is returned.

12                 There is no right to exist for specific

13   performance.

14                 THE COURT:    That is an interesting point.

15                 Would you say they would have a claim for

16   damages, potential damages?

17                 MR. SHERMAN:    But as to a claim for

18   specific performance, they had a contractual right.

19   They knew it, and they said in writing, you will find

20   among the exhibits a letter which they said we are

21   exercising our right under 29A of the contract, cancel

22   the contract and we want our money back.

23                 They gave them the money back.

24                 THE COURT:    By bringing this action

25   seeking specific performance, but aren't they asking

26   for a decision of their rejection of the contract?

05/19/2005 THU 16:49 FAX                                    @014/025

13

Proceedings

1

2     MR. SHERMAN:    Sure they are, but they are

3  not entitled to that.

4         THE COURT:    Again, let's assume for

5  purposes of this motion that there was a fraud

6  committed, a wilful, knowing fraud on the part of

7  defendants; wouldn't the plaintiff be entitled, if

8  they were successful in proving the fraud, wouldn't

9  they be entitled to rescind their rejection of the

10  contract and compel specific performance?

11         MR. SHERMAN:    No, they did make an

12  election of remedies. Remember, they are not saying

13  anything two years later that they were not in a

14  position to say at the time that they cancelled the

15  contract, if they really believed that they were being

16  somehow defrauded by being deprived of documents --

17         THE COURT:    There might be, and I don't

18  know if there is, but I always love to erect unfair

19  scenarios, factual scenarios on 3211 motion because

20  that is hard to deal with.

21         Let's assume there was something that came

22  to their attention two years afterwards that revealed

23  the fraud that occurred, when the contract was, during

24  the 75-day period. And perhaps it has to do with the

25  value of the property; I don't know.

26         The statute of limitation certainly had a

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

05/19/2005 THU 16:49 FAX                                    015/028

|   | 14 |
|---|---|
| 1 | Proceedings |
| 2 | run, and the fraud had not run. |
| 3 | MR. SHERMAN:    No. |
| 4 | THE COURT:    And they changed their |
| 5 | position arguably because of the fraudulent |
| 6 | representation, wouldn't they be entitled as one |
| 7 | alternative of relief to rescind that action that is |
| 8 | made because it was predicated upon fraud, and to |
| 9 | restore themselves to the position of the contracting |
| 10 | purchasers? |
| 11 | MR. SHERMAN:    Your Honor, I think that |
| 12 | your hypothetical is one that could not apply to a |
| 13 | contract which contained the language, the disclaimers |
| 14 | found in paragraph 38 of the rider. |
| 15 | You may have a fraud claim.  People |
| 16 | misrepresent the value of companies of real estate all |
| 17 | the time.  I told you in my introductory short form |
| 18 | this was "as is", but take a look at the language that |
| 19 | is on page ten of the rider, the very top, 38. |
| 20 | THE COURT:    Well, the purchaser |
| 21 | acknowledges that the seller, except as specifically |
| 22 | set forth elsewhere in this contract, has made no |
| 23 | representations. |
| 24 | Now, we know that during that study period |
| 25 | they are able to ask for documentation.  Some of those |
| 26 | documents may contain representations. |

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

21

05/13/2005 THU 15:49  FAX

016/028

15

|    | Proceedings |
|----|-------------|
| 1  |  |
| 2  | Now, I got to make a factual determination |
| 3  | as to whether those representations were accurate or |
| 4  | they were misrepresentations. |
| 5  | So notwithstanding the fact you have a |
| 6  | merger clause in here, the merger clause cannot |
| 7  | include what it specifically excludes, and it |
| 8  | specifically excludes those representations made |
| 9  | elsewhere pursuant to the contract, and we all know |
| 10 | that document requests were made or information |
| 11 | requests were made, and therefore I am assuming that |
| 12 | some sort of representations were made. |
| 13 | MR. SHERMAN:    I don't think turning over |
| 14 | documents is tantamount to making  representations. |
| 15 | THE COURT:    When a purchaser in a |
| 16 | situation like this makes a request of a defendant, |
| 17 | for example, the financials or rent roll, yes, you are |
| 18 | making a representation that the document you are |
| 19 | delivering is accurate. |
| 20 | MR. SHERMAN:    I think normally in |
| 21 | corporate contracts there is a representation the |
| 22 | financials are true and accurate. |
| 23 | THE COURT:    So we are at such an early |
| 24 | stage in the litigation.  I don't know what to ask |
| 25 | you, and I am assuming the worse in your position |
| 26 | obviously. |

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

It may have been just studies, environmental studies, things of that nature. I don't know what they were looking at or concerned with, but I am concerned that the complaint sets forth that potential.

What I am really suggesting is this motion sounds like it ought to be a motion for summary judgment; once we have done some preliminary discovery, or at least I can deal with some facts here because again from the prospective of the 3211 motion I have to assume facts in the complaint is as the plaintiff has alleged.

MR. SHERMAN: Let me try this one. What do you do with the equitable doctrine of laches?

What do you do in a situation where someone asks his money back, gets it back and doesn't allege he learned anything in two years, and only starts a suit for specific performance two years later?

When does laches, which is recognized as a defense for a claim for specific performance, when does that have bite?

THE COURT: Do you have case law to the effect that waiting two years without anything else happening to either party is sufficient laches to essentially establish a short statute of limitation?

## 23

17

| 1 | Proceedings |
|---|---|

2  MR. SHERMAN:    I think--

3  THE COURT:    Do you have authority for

4  that?

5  MR. SHERMAN:    I think we have some cases

6  for that.

7  THE COURT:    What are the facts in those

8  cases?    Laches, when all fails argue laches.

9  MR. SHERMAN:    I am not sure that that is

10  the situation.  Remember --

11  THE COURT:    Has your client been hurt by

12  the delay?  No, your client still owns the property.

13  There has been no prejudice to the defendant.

14  MR. SHERMAN:    The prejudice is he owned

15  the property.  He has to continue to pay the cost of

16  maintaining the property.  The City taxes as you

17  know --

18  THE COURT:    The plaintiff would love to

19  relieve him of that burden.

20  MR. SHERMAN:    That maybe, but the risk

21  of -- at the time that plaintiff walked away from the

22  deal, plaintiff thought it was too risky to proceed.

23  So that risk was then born.

24  THE COURT:    That is easy for you to say on

25  this kind of a motion, since I am not considering any

26  of the facts in the case.  I don't know why he walked

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

09/18/2006 THU 10:50  FAX                                          ☒019/028

18

|     | Proceedings |
| --- | --- |
| 1   |             |

1           Proceedings

2   away or it walked away, Jericho Group walked away.  I

3   don't know that, unless it's set forth by the

4   plaintiff that the plaintiff simply walked away·

5   because they were concerned about the deal.  I have to

6   assume again the facts as alleged.

7           MR. SHERMAN:    I think even in the

8   complaint they allege, they alleged what they weren't

9   told, that there had been an oil spill, that the

10  permit had expired.  What they alleged in fact made

11  the property less valuable in the contract price.

12          THE COURT:    Let me take a look at the

13  allegations in the complaint.

14          When was the contract finally declared null

15  and void, what was the date?

16          MR. SHERMAN:    The notice was given on the

17  last day, which was September 3, 2002.

18          THE COURT:    I see we really have two

19  contracts here, the original contract of sale and then

20  we have the amended, and they are seeking specific

21  performance on each or just specific performance on

22  the first?

23          MR. SHERMAN:    No, they plead for a

24  specific performance on both.  I would like to at some

25  point address the claims with respect to the so-called

26  amended contract.

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

25

19

|     |     |
| --- | --- |
| 1 | Proceedings |
| 2 | THE COURT:  Explain to me what this claim of |
| 3 | deceit that you set forth, which is your fifth cause |
| 4 | of action.  I am not sure if I quite follow, |
| 5 | plaintiff. |
| 6 | MR. GOEBEL:    I am Robert Goebel. |
| 7 | THE COURT:    I would rather have the |
| 8 | attorney. |
| 9 | MR. GOEBEL:    I am the attorney, Robert |
| 10 | Goebel. |
| 11 | THE COURT:    Stand up, please. |
| 12 | MR. GOEBEL:    Paragraph 31, Your Honor, of |
| 13 | the contract states that the that annexed to the |
| 14 | contract is a true and complete Amtrak agreement.  It |
| 15 | turns out -- the Amtrak agreement is basically an |
| 16 | agreement that the seller purportedly had with Amtrak, |
| 17 | and basically the agreement was to provide for |
| 18 | allowance of the seller, of the owner of the property |
| 19 | to build above the railways, the railroad tracks. |
| 20 | Without an agreement that provides for that there is |
| 21 | no way you can develop the site because the tracks run |
| 22 | right through the property. |
| 23 | So it's basically worthless property that |
| 24 | can't be developed, or it is not worth nearly as much, |
| 25 | but it cannot be developed. |
| 26 | THE COURT:    The property is just off |

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

03/14/2003 THU 10:30 FAX                                                      @021/028

```
 1                           Proceedings                    20
 2      Eleventh Avenue?
 3              MR. GOEBEL:     There are the lots, 36th
 4      Street and 37th Street and Eleventh Avenue, two lots.
 5              THE COURT:     On which side of Eleventh
 6      Avenue?
 7              MR. GOEBEL:     I think it's on the east
 8      side.
 9              THE COURT:     You are right.  Going up
10      Eleventh Avenue.  Going up Eleventh Avenue it is on my
11      right-hand side.
12              MR. GOEBEL:     That is correct.  They told
13      us when we signed the contract they represented in
14      paragraph 31A that annexed thereto is a true and
15      complete copy of the Amtrak agreement.  It turns out
16      that there were many of the exhibits were missing.
17              THE COURT:     So they didn't give you
18      complete copy of the Amtrak agreement?
19              MR. GOEBEL:     We tried to get copies of
20      the exhibits from both the seller and also from
21      Amtrak, and Amtrak bounced us around.  They basically
22      said go back to the seller.  The seller said we've
23      given you everything we are required to give you, and
24      then near the very end of the study period, about 70
25      days into the study period, Your Honor, they told us
26      they didn't have the exhibits.
```

05/19/2005 THU 16:51 FAX

21

| | Proceedings |
|---|---|
| 1 | |
| 2 | THE COURT:    They didn't have their own |
| 3 | lease with Amtrak? |
| 4 | MR. GOEBEL:    They didn't have their own |
| 5 | exhibits with Amtrak. |
| 6 | THE COURT:    Is this reflected in the |
| 7 | correspondence you had with them? |
| 8 | MR. GOEBEL:    Yes. |
| 9 | THE COURT:    Are there motion papers or |
| 10 | not? |
| 11 | MR. GOEBEL:    I believe it is reflected |
| 12 | in there. |
| 13 | In any case, Your Honor, it is attached to |
| 14 | the exhibit to the motion papers.  So I think we dealt |
| 15 | with that in the papers. |
| 16 | But they tell us 70 days into the study |
| 17 | period they don't have the exhibits that we asked |
| 18 | for. |
| 19 | Now, the property was apparently filed for |
| 20 | big development by their architect in 1989, '90, about |
| 21 | 15 years ago.  But subsequent to the Amtrak agreement, |
| 22 | the date of the Amtrak agreement I think is in the |
| 23 | '80s, in any case they have had the exhibits when |
| 24 | they filed, numerous files which they didn't give us, |
| 25 | by the way, when they were supposed to: |
| 26 | THE COURT:    You now know there was an |

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

05/15/2003 THU 10:51  FAX                                                     ☒023/028

|   |                                                                              22 |
|---|---|
| 1 | Proceedings |
| 2 | agreement by Amtrak that permit construction above the |
| 3 | tracks. |
| 4 | MR. GOEBEL:    We don't know the scope. |
| 5 | THE COURT:    You still have not seen the |
| 6 | document? |
| 7 | MR. GOEBEL:    I think we still have not |
| 8 | seen the exhibits.  But in any case, this was very |
| 9 | near the end of the study period.  This along with |
| 10 | other non disclosures rendered our study period, due |
| 11 | diligence during study period relatively meaningless, |
| 12 | because they didn't give us what they were supposed to |
| 13 | give us. |
| 14 | At one point there was correspondence back |
| 15 | and forth.  They said they only had to give us what |
| 16 | was in their possession, but there are three places in |
| 17 | the contract where it deals with what they had to |
| 18 | provide us and when with documents. |
| 19 | The second one in the agreement says they |
| 20 | have to provide us with everything in their possession |
| 21 | or custody and control. |
| 22 | So with respect to certain things, they |
| 23 | didn't disclose to us or give us, Your Honor, they |
| 24 | took the position it was not in there possession.  But |
| 25 | it was in their custody and control when subsequently |
| 26 | when we learned about the filings of 1989 and 1990, we |

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

## 29

23

                              Proceedings

1
2   want to see the architectural plans and
3   specifications, they took the position it was not in
4   their control, that it was not in their possession, so
5   they didn't have to give it to us.
6           THE COURT:   Let me frame the question if I
7   can for my purposes and for purposes of the record.
8           From what counsel has told me, he put some
9   meat on the bone now, he said during the 75-day period
10  they asked for a copy of the lease with Amtrak because
11  obviously if they didn't have a right to build above
12  the Amtrak tracks, the property could be used for
13  what, a parking lot, and that would be it.
14          Did you supply a copy of the Amtrak contract
15  to the purchaser during that 75-day period?
16          MR. SHERMAN:   The copy that we have was
17  supplied on the day of the execution of the contract,
18  and it's an exhibit to the contract.
19          THE COURT:   Was it complete?
20          MR. SHERMAN:   It didn't contain exhibits.
21          THE COURT:   What were the exhibits?
22          MR. SHERMAN:   I don't know.  We don't
23  have the exhibits.  They didn't ask about it.
24          MR. GOEBEL:   Why should we ask?
25          MR. SHERMAN:   They knew what they gotten,
26  they knew what the copy was, and they knew the

        MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

30

09/19/2002 THU 10:31  FAX                                                    ☒025/026

24

1                             Proceedings

2    exhibits were not there on the day the contract was

3    not signed.

4                THE COURT:    This is a motion under 3211,

5    not 3212, without those exhibits in my possession I

6    have to assume that those exhibits would permit the

7    owner of the property to build as high as the local

8    regulations would permit, or those exhibits would say

9    no, you cannot build at all.

10               So those exhibits would really determine to

11   me what the value of the property is.

12               MR. SHERMAN:    I don't know that exhibits

13   would provide that information rather than the

14   agreement itself.

15               THE COURT:   What does the agreement say?

16               MR. SHERMAN:    I don't know what the

17   agreement says.

18               MR. GOEBEL:    Paragraph 31, Your Honor.

19               THE COURT:   How can I decide this?  Either

20   the -- from what the plaintiff is alleging I think the

21   plaintiff has at least a valid cause of action.

22               MR. SHERMAN:    Let's assume for moment,

23   you think it's a valid cause of action for breach of

24   representation that they got a copy of the contract,

25   how does that become a deceit or fraud in this

26   action?

MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

05/19/2005 THU 16:52 FAX                                    @026/026

```
                                                    25
 1  ‖                    Proceedings
 2  ‖           Why is that not a breach of contract; how
 3  ‖   does he turn it into a fraud issue?
 4  ‖           THE COURT:    The fraud of the deceit is
 5  ‖   when you are asked to turn over a document, instead of
 6  ‖   turning over the complete document you turn over half
 7  ‖   the document.
 8  ‖           MR. SHERMAN:    The document that they had
 9  ‖   wasn't a question of being asked to turn over, was
10  ‖   attached to the contract and they had that on the day
11  ‖   they signed the contract.
12  ‖           THE COURT:    I see.
13  ‖           MR. SHERMAN:    It says a copy of the
14  ‖   Amtrak contract was attached to the contract of
15  ‖   purchase and sale.
16  ‖           THE COURT:    Was it clear from the Amtrak
17  ‖   contract that was attached to the purchase and sale
18  ‖   agreement, that the Amtrak contract was incomplete?
19  ‖           MR. SHERMAN:    Yes, because it didn't have
20  ‖   some of these exhibits.
21  ‖           THE COURT:    Did they then request those
22  ‖   exhibits?
23  ‖           MR. SHERMAN:    After 60 days, two months
24  ‖   into the so-called study period.  It is not as though
25  ‖   they read it on day one and say we need those
26  ‖   exhibits.
```

32

03/18/2005 THU 18:32 FAX                                        027/028

26

1                          Proceedings

2              THE COURT:    The answer is yes, during the

3    75-day period they requested the exhibits.

4              MR. SHERMAN:    And we told them we don't

5    have it.

6              THE COURT:    It does strike me as somewhat

7    odd that the owner of the property would not have a

8    full copy of the lease.

9              MR. GOEBEL:    The most important piece.

10             THE COURT:    Indeed it strikes me as not

11   credible.

12             The motion is denied, get your answer in.

13   Thank you very much.

14             Plaintiff, once the answer has been filed,

15   contact Mr. Diaz, he will set you up for a preliminary

16   conference date and we will set schedules for

17   discovery, documents, whatever.

18             Thank you very much.

19                        ***

20

21

22

23

24

25

26        ;

33

27

1                          Proceedings

2

3                    C E R T I F I C A T I O N

4

5        I, Millicent J. Angiulli, an Official Court
      Reporter of the State of New York, do hereby
6     certify that the foregoing is a true and accurate
      transcript of my  stenographic notes

7

8.

9              MILLICENT J. ANGIULLI
               Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

       MILLICENT ANGIULLI - OFFICIAL COURT REPORTER

## 34

**Defendant's Notice of Motion to Dismiss the Complaint, dated January 7, 2005**
**[pp. 34-35]**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------X

JERICHO GROUP, LTD.,                                    Index No. 113274/04

                          Plaintiff,

            -against-                          **NOTICE OF MOTION TO**
                                               **DISMISS THE COMPLAINT**
MIDTOWN DEVELOPMENT, L.P.,

                          Defendant.

-------------------------------------------------------------------X

PLEASE TAKE NOTICE that upon the annexed affirmation of Edward G. Imperatore,

Esq., dated January 6, 2005, the exhibits annexed thereto, the accompanying memorandum of

law, and the First Amended Verified Complaint annexed hereto, Defendant Midtown

Development L.P. will move this Court, at the Motion Support Office Courtroom (Room 130),

New York County Courthouse, located at 60 Centre Street, New York, New York on January 24,

2005, at 9:30 a.m., or as soon thereafter as counsel may be heard, for an order pursuant to CPLR

3211(a) dismissing the complaint, and for such other relief as this Court deems just and proper.

## 35

PLEASE TAKE FURTHER NOTICE, that pursuant to CPLR 2214(b), answering papers, if any, are required to be served upon the undersigned at least seven days before the return date of this motion, or by January 17, 2005.

Dated: January 7, 2005

JONES DAY

By: _____

Fredrick E. Sherman
Todd Geremia

222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

# 36

**Annexed to Motion –
First Amended Verified Complaint, dated November 29, 2004
[pp. 36-63]**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JERICHO GROUP, LTD.,                                    Index No.  113274/04

                                        Plaintiff,    **FIRST AMENDED
VERIFIED
          -against-    COMPLAINT**

MIDTOWN DEVELOPMENT, L.P.,


                                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

       Plaintiff, Jericho Group, Ltd., by its attorney, Robert B. Goebel, Esq. as and for its

First Amended Complaint, respectfully alleges as follows:


## <u>GENERAL BACKGROUND APPLIABLE TO ALL CAUSES OF ACTION</u>

A.     **<u>The Parties</u>**

      1.     Plaintiff is a New York corporation, having an office at c/o Wasserman

Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, New York 11211, Attention:  Shulem

Pfeiffer (hereinafter sometimes referred to as "Plaintiff" or "Jericho").

      2.     Upon information and belief, Defendant Midtown Development, L.P. is a

New York limited partnership, having an office at c/o 40 Arcorp Properties, Pershing

Road, Weehawken, New Jersey 07086 (hereinafter sometimes referred to as "Defendant"

or "Midtown").

**B.**     <u>The Property</u>

3.        The subject litigation pertains to the purchase by Jericho and sale by Midtown of two (2) parcels of real estate located in the Borough of Manhattan, County, City and State of New York.  Specifically, these two parcels are identified on the Tax Map of the City of New York as Block 708, Lot 1 and Block 709, Lot 17, being located between 36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York. (hereinafter such two lots are collectively sometimes referred to as the "Property").

4.        The Property and its location are unique, one of a kind, and special.

5.        The Property consists of development sites, which are encumbered by railroad easements and rights of way in favor of "Amtrak".  The scope, location and the extent of these easements and the economic terms upon which the holder of these easements would permit development above these easement areas encompassed by the easements were absolutely crucial to Jericho's determination of the use, development and value of the Property.  Also, the existence, if any, of hazardous materials and/or non-compliance with environmental laws is also materially relevant.

**C.**     <u>The Original Contract of Sale</u>

6.        With respect to the sale and purchase of the Property, Midtown as the "Seller" and Jericho as the "Purchaser" entered into a Contract of Sale dated June 18, 2002 (the "Original Contract of Sale").

7.        In connection with entering into the Original Contract of Sale Midtown wanted to limit the representations or warranties regarding the subject Property.

## 38

8.    To justify the purchase price and to satisfy prospective lenders, Jericho

needed to know, in part, the following information:

- To what extent, would "Amtrak" allow the owner of the Property to develop the Property above the railroad easements held by Amtrak?

- What type of development would be permitted on the Property and how large could it be?

- What kind of structural foundation support would the development have if constructed above the easement areas?

- What was the then current zoning for the Property and what was currently permitted as of right?

- Were there any prior submissions to governmental authorities or agencies with respect to prior proposed development of the Property and were there any permits and approvals issued?  And if so what happened and how will this effect future proposed development?

- Were there any existing environmental or hazardous materials issues?

9.    In order to bridge the gap, the parties structured the transaction as a so

called "as is" sale and purchase transaction with limited representations regarding the

aforesaid concerns that Jericho had[1] and in lieu thereof the parties negotiated and agreed

to a 75 day "Study Period" to allow Jericho to perform the due diligence.

10.    This structure provided Midtown with an "as is" deal and at the same time

provided Jericho with the right to investigate by performing due diligence.

11.    In that regard, as discussed below, Midtown agreed to cooperate with

Jericho and its representatives including Midtown's covenant to timely make available to

Jericho and its representatives all pertinent material.

---

[1] Midtown did represent, however in Paragraph 31 of the Original Contract of Sale that: "a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks", was annexed to the Original Contract of Sale.  As discussed below, this representation was materially false.

- 3 -

# 39

12.     Jericho, in material reliance upon these due diligence provisions, executed and delivered the Original Contract of Sale and the "Downpayment" to Harwood Lloyd LLC, as Escrowee ("Harwood").

13.     As discussed below, Midtown by withholding crucial materials and information during the "Study Period", materially breached its covenants and obligations under the Original Contract of Sale and, as amended, with respect to the due diligence and entitlements granted to Jericho.

14.     Jericho reasonably and foreseeably relied upon Midtown's expected performance of these obligations to Jericho's material detriment.

15.     Had Jericho not reasonably relied upon Midtown's expected performance of its obligations, Jericho may have been able to timely obtain from third parties materials and information, which should have properly been delivered to Jericho by Midtown; and which was in the custody and/or control of Midtown.

16.     As a result of these breaches by Midtown, Midtown willfully caused Jericho to wrongfully lose the benefits of the due diligence period provisions and consequently the opportunity to purchase the Property.

**D.      Amendment to the Original Contract of Sale**

17.     As discussed below, the Original Contract of Sale was amended by Midtown and Jericho by Midtown's offer dated July 15, 2002 (as remade and/or reconfirmed from time to time) to amend the Original Contract of Sale, and by Jericho's acceptance of Midtown's offer by letter dated August 28, 2002, as discussed.  Also, as discussed below, Midtown did not have the right to reject Jericho's acceptance of

- 4 -

# 40

Midtown's offer because: (x) the offer became irrevocable at least through the end of the originally scheduled due diligence period based upon Midtown's conduct and because Jericho reasonably and forseeably relied thereon; (y) Midtown is estopped from rejecting Jericho's acceptance of the because Jericho reasonably and foreseeably relied to its material detriment upon Midtown's acts and omissions including but not limited to Midtown manifesting that the offer was still on the table immediately prior to Jericho acceptance of the offer; and/or (z) Midtown acted in bad faith.

**E.**    **Midtown's Wrongful Conduct; Reasonable and Foreseeable Reliance by Jericho**

   18.    In sum:

- Midtown breached its obligations with respect to the "Original Contract of Sale"; Midtown misrepresented that a copy of the Amtrak Agreement was annexed to the Original Contract of Sale; and to make matters even more damaging to Jericho, it was not until the last day of the originally scheduled expiration of the Study Period that Midtown disclosed for the very first time that Midtown did not have the Exhibits to the Amtrak Agreement; Midtown failed to make required submissions and deliveries to Jericho of due diligence materials; Midtown failed to disclose the oil spill as discussed below and Midtown failed to disclose that there was no environmental report for the Property; Midtown failed to disclose that the Property was not currently approved for 729,164 buildable square feet as represented in writing by Midtown's exclusive broker, Brown Harris Stevens; Midtown failed to disclose the various conflicts of interest among Midtown, its principals and Midtown's counsel and the escrow agent; and Midtown breached its implied duty to Jericho to act in good faith.
- Midtown wrongfully rejected the contract amendment and therefore wrongfully repudiated the Original Contract of Sale, as amended.

**F.**    **Certain Provisions of the Original Contract of Sale**

   19.    Paragraph 29(a) of the Original Contract of Sale grants Purchaser a 75-day period from the execution by both parties of the Original Contract of Sale (referred to

**41**

therein as the "Study Period") to perform such tests or inspections as Purchaser shall elect to perform with respect to the Property, which absent an extension of such period as described hereinbelow, would have expired on or about September 3, 2002.

20.     The Original Contract of Sale also set forth various provisions expressly agreed to by Midtown which required Midtown to make submissions to Jericho, and allow Jericho to conduct its due diligence.  Thus, paragraph 29(a) of the Original Contract of Sale further states that: "Seller shall allow Purchaser and its representatives access to Property at all reasonable times, shall cooperate with Purchaser and its representatives and shall make available to Purchaser and its representatives such material pertinent to such tests and/or inspections as Seller may have in it possession."  Paragraph 29(b) of the Original Contract of Sale states that: "Purchaser has agreed to accept the Property in "AS IS" condition <u>subject to its inspection rights</u>. . . ." *[emphasis added]*.  Paragraph 29(c) of the Original Contract of Sale states that: "Immediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within <u>Seller's current custody or control</u> *[emphasis added]* relating to the condition of the Property, which Purchaser reasonably requests."[2]

## JERICHO'S ACCEPTANCE OF MIDTOWN'S OFFER TO AMEND THE ORIGINAL CONTRACT OF SALE

21.     After execution and delivery of the Original Contract of Sale there were substantial problems with Midtown's performance of its obligations to submit to Jericho

---

[2] The inspection rights were particularly important to Plaintiff because this is a so called "as is" transaction; and because of the location of the Property with respect to "Amtrak's" railroad tracks and also because there might exist significant environmental and hazardous material issues.  Since this is an "as is" transaction, Plaintiff was contractually entitled to have the opportunity to learn all it could about the Property in accordance with the terms and conditions negotiated and agreed to in the Original Contract of Sale.

## 42

all of the required due diligence material to allow Jericho to commence and complete its due diligence during the Study Period.

22.    Jericho considered three ways this situation could be handled, to wit: (i) The Study Period could be extended pursuant to mutually agreeable terms to allow Jericho the opportunity to seek to obtain missing information and missing material from sources other than from Midtown including but not limited to obtaining missing documentation from "Amtrak" and missing documentation from applicable governmental authorities regarding an oil spill hereinafter described with respect to its effect on the Property, (ii) Jericho could continually seek to obtain required and anticipated performance from Midtown, and/or (iii) Jericho could seek to obtain the missing materials and information from other sources even without the extension of the Study Period to the extent possible.

23.    Jericho elected to pursue in varying degrees all of such courses of action so that it could be in a position to purchase the Property.

24.    With respect to an extension of the Study Period, Edward G. Imperatore ("Imperatore"), counsel to Midtown and a member attorney of Harwood, sent a letter dated July 15, 2002 to Michael Szegda, Esq. ("Szegda"), counsel to Jericho.  In this letter, Midtown made the following offer/proposal to amend the Original Contract of Sale to extend the Study Period from on or about September 3, 2002 through December 31, 2002 (the "Extension Period"):

> "1.    Jericho must pay Midtown $250,000.00 to cover its expenses of "carrying" the Sites, and such payment would not constitute a portion of the Deposit under the Contract, would not constitute an offset against the Purchase Price set forth in the Contract and would be completely non-refundable;

# 43

> 2.    Jericho must place an additional $500,000.00 in
> Deposit under the Contract, making the total Deposit
> $750,000.00; and
>
> 3.    Jericho must concede that $250,000.00 of such Deposit
> would be non-refundable in the event Jericho fails to close
> under the Contract and would not constitute an offset against
> the Purchase Price in the event Jericho does close."

25.    This offer commenced a series of letters back and forth between Midtown and Jericho regarding an extension of the Study Period.[3]

26.    As can be seen (see *Footnote 4* and discussion herein) there was almost certainty and no controversy with respect to an extension of the Study Period by the parties to December 31, 2002; the applicable issue was an extension beyond December 31, 2002 to July 1, 2003.

27.    It was very foreseeable to Midtown and it's counsel that Jericho would rely on an extension of the Study Period to December 31, 2002.

---

[3] Jericho promptly responded on July 17, 2002 and proposed an extension until July 1, 2003 and offered to deposit an additional $500,000.00 into escrow to be used to fund certain real estate tax obligations with respect to the Property which Midtown wanted reimbursement for. On July 25, 2002, eight days later, Imperatore responded to Szegda's letter of July 17, 2002 regarding an extension of the Study Period. Imperatore stated that: "Midtown is still willing to permit Jericho to extend the "Study Period" through December 31, 2002 in accordance with the terms of my July 15, 2002 letter." Also in his July 25, 2002 letter, Imperatore offered Jericho the right to terminate the contract prior to expiration of the Study Period. This was not acceptable to Jericho because Jericho wanted to purchase the Property and Jericho expected Midtown to perform its obligations under the Original Contract of Sale. Szegda promptly responded to Imperatore on July 29, 2002 proposing to extend the Study Period to December 31, 2002 with Jericho having the right to further extend the Study Period until July 1, 2003 by payment of $1,000,000.00 to Midtown as an increase to the purchase price payable to Midtown outside of escrow and non-refundable in all events. On July 30, 2002, in Imperatore's response to Szegda, Imperatore repeated Midtown's prior offer to extend the term of the Study Period through December 31, 2002 while also stating that Midtown would not extend the Study Period beyond December 31, 2002 as had been requested by Jericho. Also, Imperatore's July 30, 2002 letter, repeated Midtown's amenability to resolve the situation by giving Jericho the right to terminate the contract prior to the end of the Study Period. Again Jericho did not want to do this because Jericho wanted to purchase the Property. With the Study Period getting very tight, Szegda wrote to Stone on August 19, 2002 and proposed that Jericho would pay Midtown $750,000.00 out of escrow and non-refundable as an increase to the purchase price for an extension of the Study Period to July 1, 2003.

- 8 -

# 44

28.    Thus, upon information and belief, as of the delivery of Imperatore's July 30, 2002 reply letter (see *Footnote 4* herein), all of the parties and their counsel understood the offer to amend the Original Contract of Sale to extend the Study Period through December 31, 2002 to still be "on the table" and the parties proceeded on that basis, including with respect to Jericho's continual requests for various due diligence materials and Midtown's responses thereto.

29.    On August 21, 2002, Imperatore wrote, in part, that Midtown did not agree to Jericho's August 19, 2002 letter (see *Footnote 4* herein) to extend the Study Period to July 1, 2003 in exchange for a $750,000.00 non-refundable payment. Again, he stated that Midtown was unwilling to consider extending the Study Period to July 1, 2003. He said nothing about the status of Midtown's July 15, 2002 offer to extend the Study Period to December 31, 2002 and again only stated that Midtown was unwilling to extend to July 1, 2003.[4]

30.    Under tremendous pressure, by letter dated August 28, 2002, Szegda informed Maurice Stone, Esq. ("Stone"), an attorney at Harwood assisting Imperatore, that Jericho accepted Midtown's offer regarding the extension through December 31, 2002 of the Study Period.[5]

.

---

[4] He went on to state that: "Should Jericho desire to exercise its right to extend the Study Period to October 4, 2002 by making the additional payment, which is provided for in the Contract, please provide Midtown with the notice required in the Contract". As it turned out, as far as Jericho can determine, the contract right referred to by Imperatore to extend the Study Period to October 4, 2002 by making an additional payment simply did not exist under the Original Contract of Sale.

[5] According to Midtown's July 15, 2002 offer, it would cost Jericho $250,000.00 of nonrefundable monies plus an increase to the Downpayment of another $250,000.00.

# 45

31.    In Szegda's letter he expressly stated on behalf of Jericho that the acceptance was made without prejudice to Jericho's current rights under the Original Contract of Sale.

32.    Then, for the very first time, and one day after Jericho's acceptance of Midtown's offer, Imperatore announced:

> "Because Jericho several times rejected proposals set forth in my July 15 and July 27, 2002 letters by counterproposals demanding extensions of the Study Period under the Contract through, at least, July 1, 2003, Midtown deems those proposals as rejected, to be null and void."[6]

33.    Jericho and its counsel were astounded by Imperatore's response on behalf of Midtown.  Up to that point, the parties had sent numerous letters to each other and Midtown continually referred Jericho to Midtown's July 15, 2002 offer.  Jericho and Midtown had been in constant communications up to August 27.  It would have been an easy and simple matter for the offeror, Midtown, to expressly inform the offeree, Jericho, of its position that the offer was no longer on the table in any form but this was not done.

34.    Instead, Midtown consistently referred Jericho to its July 15, 2002 letter and/or Midtown would state that it would not extend the Study Period to July 1, 2003 or beyond December 31, 2002.

35.    Based on the conduct of the parties Midtown's July 15, 2002 offer was still on the table when Jericho sent its acceptance letter dated August 28, 2002.  Also, Midtown could foresee that Jericho would rely on having an extension of the Study Period at least through December 31, 2002; again the only issue was a longer extension.

---

[6] Reference by Imperatore to a July 27, 2002 letter is probably incorrect because Jericho does not have a copy of said letter and has no record of receiving same.

## 46

36.    From July 15, 2002 to August 29, 2002, Midtown allowed and/or caused Jericho to believe the offer to extend the Study Period to still be on the table.

37.    Furthermore, based upon the doctrine of promissory estoppel, Midtown's July 15, 2002 offer was irrevocable at least until the expiration of the Study Period and therefore could not be terminated by revocation and/or rejection.

38.    Alternatively, the time period for the Study Period should have been tolled until such time as Midtown complied with its obligations under the Original Contract of Sale pertaining to the Study Period.

### NO "TIME OF THE ESSENCE"

39.    On September 4, 2002 Imperatore wrote that: "Midtown will not extend the Study Period afforded by the Contract even one day."

40.    Midtown can not change the Original Contract of Sale by making the expiration date of the Study Period time of the essence.

41.    At a minimum, Jericho was entitled to a reasonable extension of the Study Period consistent with reasonable extensions of closing dates in transactions where there is no time of the essence provided for.  In fact, the Original Contract of Sale expressly provides for approximately a minimum of 44 days of extended time allowed for the purchaser to close before the closing date becomes subject to time of the essence.

42.    Midtown would not be harmed by a reasonable extension of the Study Period especially if it did not affect the Closing Date.

### RETURN OF THE DOWNPAYMENT

- 11 -

# 47

43.     Thereafter, because Midtown was in breach of its obligations under the
Original Contract of Sale (and as amended) and to safeguard the return of the
Downpayment, and with no opportunity to conduct further due diligence and move
forward with the transaction and under tremendous pressure from Midtown, Szegda
wrote that unless the oil spill could be dealt with by Midtown and Midtown provided
Jericho with the requested due diligence documents, Jericho was requesting a return of its
Downpayment.  Imperatore responded that Midtown was not willing to return Jericho's
Downpayment unless Midtown received a general release of Midtown from Jericho by
September 6, 2002 and that Midtown expected that its refund of the Downpayment to
Jericho would constitute a termination of the contract in all respects.

44.     Jericho was unwilling to agree to release Midtown and was unwilling to
agree to an "accord and satisfaction"of any kind.  After protesting this issue, Midtown
ultimately conceded this point, and withdrew its requirement for a general release and
refunded the Downpayment.

45.     Midtown then demanded confirmation from Jericho that Jericho's letter
requesting return of the Downpayment was intended as the exercise of Jericho's right
under Paragraph 29(a) of the Original Contract of Sale to cancel said contract.  On
September 12, 2002, solely in order to protect and expedite the return of Jericho's
Downpayment, Szegda sent such confirmation.  Nevertheless, Jericho terminated the
Original Contract of Sale due to Midtown's material breach of its obligations to Jericho.

## **DUE DILIGENCE**

46.     As stated above, there were certain areas of concern that Jericho had with
respect to the Property (i.e. development potential, zoning, environmental and Amtrak).

**48**

Accordingly, the parties agreed that Jericho would have the Study Period provisions including Midtown's obligations to cooperate and provide the due diligence materials it agreed to provide.

47.    Paragraph 30(b) of the Original Contract of Sale states that Purchaser is required to accept fee simple title to the Property subject to, in part: "(iii) Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller, Jerrart Venture and Amtrak which is attached hereto as Exhibit B (the "Amtrak Agreement")." Paragraph 31 of the Original Contract of Sale states: "Seller represents that annexed hereto, as Exhibit B, is a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks."

48.    As stated above, the exhibits were not attached to the back of the Amtrak Agreement annexed to the Original Contract of Sale and were not included in any submissions to Plaintiff by Midtown or its counsel. Subsequently, it was not until on or about the expiration of the original Study Period, that Midtown inexplicably informed Jericho for the very first time that it did not have them. By then, Jericho did not have the information that it required to make the decision to go forward with the transaction. This was solely the result of Midtown's misrepresentation.

49.    It was only a few days earlier, on August 29, 2002 that Midtown wrongfully rejected Jericho's acceptance of the offer to extend the Study Period to December 31, 2002.

# 49

50.    If Jericho had not reasonably and foreseeably relied upon the aforesaid representation Jericho would have stepped up its efforts much earlier in the Study Period to seek to obtain a copy of such agreement directly from Amtrak.

51.    Nevertheless, Jericho spoke with at least three individuals at Amtrak and was told that Jericho had to obtain the Amtrak documents from Midtown.

52.    Not only was Midtown in breach its representation in Paragraph 31 of the Original Contract of Sale but also Midtown caused Jericho substantial delay in intensifying its efforts in the pursuit of a complete copy of the Amtrak Agreement. The Amtrak Agreement involved the very essence of the subject transaction.

53.    Prior to the execution and delivery of the Original Contract of Sale, and during the Study Period, Brown Harris Stevens, the exclusive broker for Midtown, represented in writing that the Property could be developed for 729,164 buildable square feet. Apparently as of the Study Period this also was erroneous; and had this been disclosed Jericho would have negotiated a longer Study Period at least with respect to this zoning issue.

54.    Upon information and belief, Midtown's submissions to Jericho did not include numerous due diligence items that Midtown was required to timely deliver to Jericho under the terms of the Original Contract of Sale as herein discussed, including but not limited to documents and/or drawings regarding presumably proposed development and use of the Property, the oil spill and environmental matters related to the Property.

# 50

55.    Had Jericho not reasonably relied upon the expected complete performance of Midtown it would not have lost so much time during the Study Period in gathering information from third parties.

56.    By an additional letter dated July 17, 2002, Szegda informed Stone that he had learned that more than twenty of the documents and/or drawings previously filed by Midtown's professionals, Cooper, Robinson & Partners ("Cooper Robinson") on behalf of Midtown regarding the possibilities for development and use of the Property, were inexplicably not previously delivered by Midtown.

57.    Cooper Robinson indicated that they would have to locate and retrieve these items from archives.

58.    By letter dated August 1, 2002, Szegda reminded Stone that Jericho was still waiting to receive the items requested in his July 17, 2002 letter and that Jericho's architects stated that they could not proceed with "due diligence" without these items.

59.    In a further letter dated August 13, 2002, Szegda called to Midtown's attention that:

    (i.)    The National Railroad Passenger Corporation Temporary Permit to enter upon the Property previously delivered by Midtown to Jericho was undated and unsigned;

    (ii.)    The survey of the Property located between 36th Street and 37th Street had not been delivered to Jericho;

    (iii.)    An environmental impact statement had been delivered, but there was no environmental report delivered;

    (iv.)    Jericho was unable to timely ascertain the scope of the Amtrak easement because Jericho had reasonably relied upon Midtown's representation in the Original Contract of Sale that a true copy of the Amtrak Agreement was annexed as Exhibit B.

- 15 -

**51**

60.    On August 30, 2002, Szegda wrote to Imperatore that Jericho disagrees with Midtown's contention that its obligation to provide Jericho with "due diligence" materials is limited to materials that Midtown has in its own possession.[7]

61.    Szegda asked for the Study Period to begin to run from the day that the documents and drawings filed with the City of New York in 1990 were actually delivered to Jericho.

62.    On September 2, 2002, Szegda wrote Imperatore, again requesting a copy of Exhibits A-1, A-2, A-3, B-1 and C-1 to the "Amtrak Agreement".

63.    By letter dated on or about September 3, 2002, Szegda wrote to Imperatore and stated that Jericho was informed by Seller's exclusive broker, Brown Harris Stevens, only the day before that the New York State Department of Environmental Conservation ("NYDEC") had a file regarding the previously referred to oil spill and was advised over the telephone by the regional office of NYDEC that Jericho should make a formal request under the Freedom of Information Act.

64.    Jericho was to learn sometime after the Study Period that Midtown had actual knowledge and writings in its possession pertaining to the oil spill.

65.    Had Jericho known earlier of this environmental situation it would have had time prior to the expiration of the Study Period to make such formal request. Without the extension of the Study Period this would be a waste of time and effort.

---

[7] Szegda pointed out that Paragraph 29(c) of the Original Contract of Sale requires Seller to make available to Purchaser or its representatives such documents which are within Seller's custody or control which Purchaser reasonably requests and that Paragraph 33 of the Original Contract of Sale provides that Seller shall make available to Purchaser copies of all documentation with respect to permits and/or approvals which Midtown may have obtained with respect to development of the Property. Upon information and belief, Midtown breached this obligation.

- 16 -

## 52

66.     On September 3, 2002, Imperatore wrote Szegda that, Midtown does not then nor at the time of the commencement of the Study Period have the Amtrak exhibits and that Jericho was simply wasting time.  This was the first time that Midtown stated that it did not have the Exhibits.

67.     The very late disclosure of the non-existence of an environmental report, very late information regarding the oil spill and the very late disclosure by Midtown of the unavailability from Midtown of the Amtrak exhibits materially impaired Jericho's entitlement to perform due diligence in accordance with the Original Contract of Sale. All of this information was particularly known by Midtown as of the execution and delivery by the parties to the Original Contract of Sale.

68.     Upon information and belief, Midtown knew at the time of contract signing that there was an incomplete Amtrak Agreement attached to the Original Contract of Sale, and had a good faith obligation to disclose this prior to the signing of the contract.

69.     As stated above, the subject sale and purchase transaction specifically was structured to accommodate Midtown's desire to limit its representations and warranties regarding the Property and its desire to sell the Property on an "as is" basis and Jericho's requirement to learn as much about the Property with the cooperation and assistance which Midtown covenanted to provide to Jericho.

70.     Upon information and belief, Midtown had in its possession and/or control all of the missing information and materials to allow Jericho to complete its due diligence and willfully refused to deliver same to Jericho.  Midtown breached its covenants and obligations under the Original Contract of Sale and Jericho reasonably and foreseeably

## 53

relied upon the expected complete performance by Midtown, to Jericho's material detriment.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Midtown's Material Breach of Original Contract of Sale—Specific Performance)

71.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 70 above as if fully set forth herein.

72.    Midtown purposely and willfully materially breached the Original Contract of Sale as follows:

(i.)    Midtown wrongfully failed to timely provide applicable materials, which it had in its custody and/or control and, upon information and belief, wrongfully limited its production of materials to Plaintiff solely to those that were in Midtown's possession at the time of the execution and delivery of the Original Contract of Sale.

(ii.)    Prior to the execution and delivery of the Original Contract of Sale and during nearly the entire Study Period, Midtown and its exclusive broker wrongfully failed to disclose the occurrence of a prior oil spill which, upon information and belief, affected the Property.

(iii.)    Prior to the execution and delivery of the Original Contract of Sale and during nearly the entire Study Period, Midtown and its exclusive broker wrongfully failed to disclose the existence of an "open file" with the NYDEC regarding the oil spill. Midtown only informed Jericho of the existence of an open file at the offices of NYDEC on or about September 2, 2002 (just one day prior to the expiration of the Study Period).

(iv.)    Prior to the execution and delivery of the Original Contract of Sale, Midtown wrongfully failed to disclose the non-existence of a Phase I environmental report with respect to the Property, which was unusual and not customary under the circumstances because there was an environmental impact statement. Midtown only informed Jericho in the middle of August 2002 of the non-existence of a Phase I environmental report.

**54**

(v.) Prior to the execution and delivery of the Original Contract of Sale and during the due diligence period, Midtown and its exclusive broker wrongfully failed to disclose that the applicable development permits pertaining to the Property that had been obtained by Midtown could no longer be routinely renewed.

(vi.) Upon information and belief, Midtown knowingly failed to attach the exhibits to the Amtrak Agreement to the Original Contract of Sale and Midtown misrepresented that a true copy of the Amtrak Agreement was attached as Exhibit B. Midtown only informed Jericho on or about the last day of the Study Period that it did not have copies of the Exhibits to the Amtrak agreement.

(vii.) With respect to all of the foregoing, Midtown also breached its implied duty to act in good faith under the terms of the Original Contract of Sale; and in addition, Midtown wrongfully coerced Jericho into terminating the Original Contract of Sale so as to protect the return of the Downpayment; and as discussed below Midtown wrongfully failed to disclose and concealed the fact that Imperatore, an attorney member of Harwood, upon information and belief, individually and/or with family and affiliates owned and/or controlled Midtown.

Upon information and belief, Midtown had in its possession and/or control the Exhibits to the Amtrak agreement; and the environmental materials and files regarding the oil spill and willfully failed to deliver the same to Jericho in order to coerce Jericho into canceling the Original Contract of Sale.

73.    Consistent with Midtown's refusal to perform its obligations under the Original Contract of Sale, on several occasions Midtown offered Jericho the right to an early termination of the contract with an early return of the Downpayment. However, this was not what Jericho had bargained for and not what Midtown had agreed to.

- 19 -

## 55

74.    As a direct result of Midtown's material breach of the Original Contract of Sale, Plaintiff lost a substantial and valuable contractual right and benefit with respect to the Study Period to determine the situation regarding certain areas of concern with respect to the Property and therefore lost the right, opportunity and entitlement to acquire the Property.

75.    Defendant placed Plaintiff in an unfair, unreasonable and unbargained-for position where its only prudent action was to terminate the Original Contract Sale in order to protect and obtain the uncontested return of the Downpayment; and Jericho was entitled to a reasonable extension of the Study Period especially under the circumstances and there was no <u>time of the essences</u>.

76.    Because Midtown insisted upon an "as is" deal, the Study Period was intended to provide Plaintiff with a fair and reasonable opportunity to determine, in part, what the Property was worth and what it could be used for and developed.

77.    Had Plaintiff been allowed to have this opportunity that it had bargained for, it would likely have purchased the Property.  The opportunity was wrongfully limited by Midtown's misconduct.

78.    There are no contractual limitations under the Original Contract of Sale on the kinds of rights and remedies available to the Purchaser as a result of a breach by Midtown with respect to the Study Period.

79.    Despite, Midtown's demand for a general release Jericho properly refused to release Midtown in exchange for the return of the Downpayment and the parties understood that the return of the Downpayment to Jericho and the cancellation of the

# EXHIBIT A
# TO GEREMIA DECLARATION
## Part 2

contract did not constitute a release or an accord and satisfaction with respect to Jericho's claims under the Original Contract of Sale.

80.     The Property and its location are unique, special and one of a kind; and Jericho has no adequate remedy at law.  Plaintiff was and continues to be ready, willing and able to perform the obligations of the Purchaser under the Original Contract of Sale.

81.     As a result of the foregoing, the Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the Original Contract of Sale including a reasonable extension to the Study Period subject to such terms and conditions, which the Court determines to be equitable and fair.

## AS AND FOR A SECOND CAUSE OF ACTION
## (Midtown's Material Breach of Original Contract of Sale)

### (In the Alternative)

82.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 81 above as if fully set forth herein.

83.     Midtown wrongfully materially breached the Original Contract of Sale.

84.     As a result of all of the foregoing, Plaintiff has been wrongfully deprived of its opportunity to purchase the Property in accordance with the Original Contract of Sale, and has been damaged.

85.     As a result of the foregoing, in the alternative, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court.

## AS AND FOR A THIRD CAUSE OF ACTION
## (Midtown's Material Breach and Wrongful Repudiation and/or Rejection of Amendment to Original Contract of Sale—Specific Performance)

86.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 85 above as if fully set forth herein.

87.    Midtown wrongfully rejected and/or repudiated acceptance by Jericho of Midtown's July 15, 2002 proposal for the amendment to the Original Contract of Sale which amendment was validly entered into when Jericho notified Midtown on August 28, 2002 that it accepted Midtown's July 15, 2002 offer as remade, ratified and/or reconfirmed, as aforesaid, to extend the Study Period through December 31, 2002.

88.    Based upon the course of dealings, the letters back and forth and the conduct between and among the parties and their attorneys, and Midtown's continued manifestations that its July 15, 2002 offer was what Midtown was prepared to proceed with, both parties understood that Midtown's July 15, 2002 offer was still on the table on August 28, 2002 when Jericho sent its acceptance letter.

89.    Furthermore, Midtown's July 15, 2002 offer was irrevocable at least through the expiration of the Study Period based upon Defendant's misconduct which deprived Plaintiff of the benefits of the Study Period, equitable considerations and equitable/promissory estoppel and therefore could not be terminated by revocation by Midtown and/or rejection by Jericho.

90.    Furthermore, Midtown's breach of the Original Contract of Sale and its failure to timely deliver to Jericho all applicable due diligence materials in its custody and control and its failure to make various material disclosures to Jericho which were

# 58

known to Midtown, necessitated either a reasonable extension of the Study Period upon reasonable terms and/or a reasonable tolling of the expiration of the Study Period.

91.    Midtown should not be permitted to unfairly preclude and diminish the exercise of Jericho's rights with respect to the Study Period.

92.    Had it not been for Jericho's reasonable reliance upon Midtown's covenants and obligations under the Original Contract of Sale to Jericho's material detriment Jericho might have been able to timely obtain necessary materials and information prior to the end of the Study Period (e.g. making applications pursuant to the Freedom of Information Act).

93.    As a result of the foregoing, Plaintiff has been deprived of its opportunity to purchase the Property in accordance with the amendment to the Original Contract of Sale.

94.    Plaintiff was and continues to be ready, willing and able to perform the obligations of the Purchaser under the amended Original Contract of Sale.

95.    The Property and its location are unique, special and one of a kind; and Jericho has no adequate remedy at law.

96.    As a result of the foregoing, the amended Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the amended Original Contract of Sale including a reasonable extension of the Study Period subject to such terms and conditions, which the Court determines to be equitable and fair.

**59**

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Midtown's Material Breach And Wrongful Repudiation And/Or
### Rejection Of Amendment To Original Contract Of Sale)

### (In The Alternative)

97.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 96 above as if fully set forth herein.

98.     As a result of the foregoing, Plaintiff has been deprived of its opportunity to purchase the Property in accordance with the amendment to the Original Contract of Sale.

99.     As a result of the foregoing, in the alternative, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Midtown's Deceit)

### (In The Alternative)

100.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 99 above as if fully set forth herein.

101.     Plaintiff's counsel received a letter dated November 4, 2004 from Zurich North America, an insurance company, addressed to Janice Berrios at Port Imperial Ferry Corporation regarding the subject litigation, with respect to which, Midtown is an additional insured party. Thus, upon information and belief Midtown is affiliated with Port Imperial Ferry Corporation and upon information and belief Imperatore and/or family and/or affiliates own or control Midtown and upon information and belief

- 24 -

## 60

Imperatore is a principal/member of Harwood, the escrow agent under the Original Contract of Sale.

102.    These relationships create various conflicts of interest which Jericho was never given the opportunity to consent to.

103.    Midtown had a duty to Jericho to act in good faith; and Harwood, as escrow agent, had fiduciary duties with respect to the parties to the contract documents.

104.    Upon information and belief Midtown, its counsel and Harwood intentionally, willfully and knowingly deceived and concealed these relationships and conflicts of interest to the material detriment of Jericho.  For example, Harwood, as escrow agent, was more aggressive towards Jericho than it would have been had these relationships and conflicts not existed.

105.    Midtown knowingly failed to timely disclose and concealed the unavailability of the Exhibits to the Amtrak agreement.

106.    Midtown knowingly failed to timely disclose and concealed the occurrence and ramifications of the oil spill.

107.    Midtown knowingly failed to timely disclose the expiration of the Amtrak permits.

108.    Midtown's conduct was intentional and willful and Midtown knew that Jericho would reasonably rely upon such deceit and concealment to its material detriment.

# 61

109.    As a result of the foregoing, in the alternative, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court.

**WHEREFORE,** Plaintiff requests judgment as follows:

1.    On the First Cause of Action, judgment that: as a result of the foregoing, the Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the Original Contract of Sale including a reasonable extension of the Study Period, subject to such terms and conditions, which the Court determines to be equitable and fair;

2.    On the Second Cause of Action, in the alternative, judgment that: As a result of the foregoing, Midtown is liable to Plaintiff for damages in an amount of not less than Fifty Million Dollars ($50,000,000.00), as determined by the Court;

3.    On the Third Cause of Action, judgment that: As a result of the foregoing, the amended Original Contract of Sale should be declared to be reinstated, in full force and effect, and Midtown should be ordered to specifically perform its obligations under the amended Original Contract of Sale including a reasonable extension of the Study Period subject to such terms and conditions, which the Court determines to be equitable and fair;

4.    On the Fourth Cause of Action, in the alternative, judgment that: As a result of the foregoing, Midtown is liable to Jericho for damages in an amount of not less than Fifty Million Dollars ($50,000,000), as determined by the Court; and

- 26 -

# 62

5.    On the Fifth Cause of Action, in the alterative, judgment that: As a result of the foregoing, Midtown is liable to Plaintiff for damages in an amount not less than Fifty Million Dollars ($50,000,000.00) to be determined by the Court;

# 63

awarding Plaintiff such other and further relief as the Court may deem just

and proper, together with the costs and disbursements of this action.

Dated:    November 29, 2004

ROBERT B. GOEBEL
*Attorney for Plaintiff*
14 Walworth Avenue
Scarsdale, New York 10583
(914) 725-5243

# 64

**Affirmation of Edward G. Imperatore, for Defendant, in Support of Motion to Dismiss the Complaint, dated January 6, 2005**
**[pp. 64-74]**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------X

JERICHO GROUP, LTD.,                           Index No. 113274/04

Plaintiff,

-against-

MIDTOWN DEVELOPMENT, L.P.,

Defendant.

-------------------------------------------------------------------X

## AFFIRMATION OF EDWARD G. IMPERATORE IN SUPPORT OF MIDTOWN'S MOTION TO DISMISS

EDWARD G. IMPERATORE, an attorney duly admitted to practice law in the States of New York and New Jersey, affirms the truth of the following under penalty of perjury, pursuant to Rule 2106 of the New York Civil Practice Law and Rules:

1.      I am a member of the law firm Harwood Lloyd, LLC in Hackensack, New Jersey. Our firm represented Midtown Development, L.P. in connection with its negotiation with plaintiff Jericho Group, Ltd. for the sale of the real property that is the subject of this dispute. I submit this affirmation in support of Midtown's motion to dismiss the complaint and am fully familiar with the facts set forth herein.

### PERTINENT PROVISIONS OF THE CONTRACT

2.      On June 18, 2002, Midtown and Jericho entered into a Contract for the sale of two parcels of real estate in Manhattan (the "Contract"). The two parcels are identified on the Tax Map of the City of New York as Block 708, Lot 1 and Block 709, Lot 17, being located between

## 65

36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York. A true and correct copy of the Contract between Jericho and Midtown, including a rider to it, is attached hereto as Exhibit A.

3.    The Contract provided that the purchase price for the property was $28 million, Contract ¶ 2, and that Jericho would pay $250,000 to Midtown upon execution of the Contract as a downpayment. Contract Rider ¶ 28(a).

4.    The Contract contains a merger clause, which provides, "It is understood and agreed that all understandings and agreements heretofore had between the parties hereto are merged into this contract, which alone fully and completely expresses their agreement." Contract ¶ 25. The parties also agreed that any changes or modifications to the Contract had to be in writing and signed:

> This Contract constitutes the entire agreement between the parties hereto. No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the party against whom the change, modification or discharge is claimed or sought to been enforced[.]

*Id.* ¶ 42. *See also id.* ¶ 26 ("This agreement may not be changed or terminated orally.").

5.    In the event of a Seller's default, the Contract provides: "If the Seller shall default in the performance of this Contract, the Purchaser's rights are as set forth in Paragraph 22 of the Contract." Contract Rider ¶ 40(b). Paragraph 22 provides: "In the event that the seller is unable to convey title in accordance with the terms of this contract, the sole liability of the seller will be to refund to the purchaser the amount paid on account of the purchase price and upon such refund any payment being made this contract shall be considered cancelled." Contract ¶ 22.

6.    Jericho agreed to purchase the "Property in 'AS IS' condition subject to its inspection rights during the Study Period." Contract Rider ¶ 29(b). The "Study Period," as set

## 66

forth in the Contract, was a seventy-five day period from the date of the execution by both

parties of the Contract during which Jericho was permitted to perform "such environmental

and/or architectural/engineering and or other tests and/or inspections as Purchaser, in its sole

discretion, shall elect to perform." *Id.* ¶ 29(a). The Contract provided that, if Jericho made a

"reasonable request," Midtown was to provide to Jericho "documents . . . relating to the

condition of the Property" during the study period. (Contract Rider ¶ 29(c)  Because Jericho and

Midtown executed the Contract on June 18, 2002, the study period expired on September 3,

2002.

      7.     The Contract provided that Jericho was entitled to cancel the Contract in its

discretion upon written notice to Midtown before the conclusion of the study period and that,

upon timely receipt of a notice of cancellation, Jericho would receive its downpayment back:

> If prior to the conclusion of the Study Period, Purchaser shall
> determine, in its sole and absolute discretion that the Property is
> not suitable for its needs, the Purchaser shall have the right to
> cancel this Contract upon written notice to Seller and the
> Escrowee. Purchaser need not specify any reason for such
> cancellation. Upon the timely receipt of such notice of
> cancellation, the Escrowee shall promptly return to Purchaser the
> monies paid upon execution hereof.

Contract Rider ¶ 29(a).

      8.     The Contract provided that the closing was to take place on the fifteenth day after

the conclusion of the study period, or on September 18, 2002. *Id.* ¶ 32.

### PROPOSALS AND COUNTERPROPOSALS TO EXTEND THE STUDY PERIOD

      9.     In July 2002, Jericho requested that Midtown extend the study period through

December 31, 2002. By letter dated July 15, 2002 to Jericho's counsel, Midtown made the

following proposal to amend the Contract to extend Jericho's Study Period from September 3,

2002 to December 31, 2002:

**67**

This will acknowledge Jericho's request to extend the "Study Period" provided by the Contract of Sale between Midtown and Jericho dated June 18, 2002 . . . through December 31, 2002.

As I told you, Midtown is not particularly amenable to Jericho's request, particularly because Midtown carefully refrained from making any representations concerning zoning or permits in the Contract. However, Midtown is willing to grant Jericho's request on the following conditions:

1. Jericho must pay Midtown $250,000.00 to cover its expenses of "carrying" the Sites, and such payment would not constitute a portion of the Deposit under the Contract, would not constitute an offset against the Purchase Price set forth in the Contract and would be completely non-refundable;

2. Jericho must place an additional $500,000.00 in Deposit under the Contract, making the total Deposit $750,000.00; and

3. Jericho must concede that $250,000.00 of such Deposit would be non-refundable in the event Jericho fails to close under the Contract and would not constitute an offset against the Purchase Price in the event Jericho does close.

Assuming Jericho accepts this proposal, we would present it as an amendment to the Contract which would be signed by both parties.

A true and correct copy of the above-quoted letter is attached hereto as Exhibit B.

10.     On July 17, 2002, Jericho rejected Midtown's proposal, claiming that it "no longer makes sense," and making an express "counterproposal" that the Contract be amended to give Jericho an "option" to extend the study period until July 1, 2003. On Jericho's counterproposal, it would agree to deposit an additional $500,000 into escrow to be used to fund certain real estate taxes for the property. A copy of Jericho's July 17 letter is attached hereto as Exhibit C.

11.     On July 25, 2002 Midtown rejected Jericho's July 17, 2002 counterproposal, but stated that it was "still willing to permit Jericho to extend the 'Study Period' through December

4

## 68

31, 2002 in accordance with the terms of [the] July 15, 2002 letter." A true and correct copy of Midtown's July 25 letter is attached hereto as Exhibit D.

12.     On July 29, 2002, however, Jericho again rejected Midtown's July 15 proposal. Jericho instead made yet another counter proposal: that it be granted a free extension of the study period through December 31, 2002, and that on that date it would have the option to further extend the Study Period to July 31, 2003 by paying Midtown $1 million. A copy of Jericho's July 29 letter is attached hereto as Exhibit E.

13.     On July 30, 2002, Midtown categorically rejected Jericho's July 29, 2002 counterproposal. I wrote to Jericho's counsel as follows:

> Midtown and I are extremely disturbed by . . . your confirming letter dated July 29, 2002, because Jericho seems not to have read (or understood) my letter dated July 15, 2002 concerning the terms upon which Midtown would extend Jericho's "Study Period" under the Contract through December 31, 2002. . . . I do not foresee Midtown extending the Study Period beyond [December 31, 2002]. . . . Midtown would in no event extend the "Study Period" to that date "gratis", which appears to be Jericho's current proposal.

> [I]t seems that Jericho may wish to terminate the Contract prior to the expiration of the current "Study Period". Midtown is amenable to that resolution but is not amenable to what it considers to be ridiculous proposals by Jericho for extending the "Study Period" for a year.

A true and correct copy of my July 30 letter to Jericho's counsel is attached hereto as Exhibit F.

14.     Jericho responded to Midtown's July 30 letter on August 19, 2002. In that letter, Jericho once again proposed that the study period be extended to July 1, 2003. This time, Jericho offered to pay Midtown $750,000, out of escrow and non-refundable as an increase to the purchase price for an extension of the study period to July 1, 2003. A copy of Jericho's August 19 letter is attached hereto as Exhibit G.

## 69

15.    Midtown rejected Jericho's August 19 counteroffer in a letter to Jericho's counsel dated August 21, 2002. In that letter, Midtown again made clear that it was unwilling to extend the study period to July 1, 2003, as Jericho had repeatedly proposed, and that Jericho's choices at that time were to either cancel the Contract before expiration of the study period or proceed to closing in accordance with the terms of the Contract:

> Midtown is unwilling to consider to extend the Study Period from its current expiration date of September 4, 2002 to July 1, 2003. Should Jericho desire to exercise its right to extend the Study Period to October 4, 2002 by making the additional payment, which is provided for in the Contract, please provide Midtown with the notice required in the Contract.
>
> Should your client not terminate the Contract prior to the expiration of the Study Period . . . we assume that Jericho will proceed to closing as required by the Contract or forfeit its deposit.

A true and correct copy of Midtown's August 21 letter to Jericho is attached hereto as Exhibit H.

16.    On August 28, 2002, Jericho attempted to "accept" Midtown's July 15 proposal to extend the study period through year-end 2002—a proposal that by that time Jericho had already rejected on three separate occasions, most recently on August 19. However, Jericho's letter also made clear, as Midtown understood as well, that no amendment to the Contract would be effective unless formalized in a signed writing:

> Jericho has determined to accept the proposal of Midtown regarding the extension of the study period as set forth in Ed Imperatore's letter dated July 15, 2002, and as reiterated in his letter dated July 27, 2002. Please prepare a draft of an appropriate amendment to the referenced contract and forward it to me . . . as soon as possible so that we can finalize the matter prior [sic] well before the current expiration date of the study period.

A copy of Jericho's August 28 letter is attached hereto as Exhibit I.

17.    Midtown replied to Jericho's purported "acceptance" the next day, on August 29, 2002. Midtown made clear that Jericho's repeated rejections of Midtown's July 15 proposal to

**70**

extend the study period extinguished that proposal and that, therefore, Midtown regarded its July 15 proposal as "null and void":

> Because Jericho several times rejected proposals set forth in my July 15 and July 27, 2002 letters by counterproposals demanding extensions of the Study Period under the Contract through, at least, July 1, 2003, Midtown deems those proposals, as rejected, to be null and void. Therefore, Midtown directs Jericho to proceed according to the Contract in all respects, with the understanding that the Study Period expires by its own terms [on] September 3, 2002.

A true and correct copy of Midtown's August 29 letter is attached hereto as Exhibit J.

18.     In light of their inability to agree to extend the study period beyond the September 3, 2002 date, the parties never executed an amendment to the Contract.

## JERICHO CANCELS THE CONTRACT

19.     Instead, on September 3, 2002—the very day that the study period expired in accordance with the terms of the Contract—Jericho wrote to Midtown to cancel the Contract and request the return of its down payment. Jericho also made a last-ditch effort to seek an agreement to extend the study period, thus recognizing that the parties had not reached such an agreement. It wrote as follows:

> [U]nless you advise us in writing that Midtown is willing . . . to extend the study period for a sufficient period to allow Jericho to investigate this matter [a purported oil spill on the property], and, in any case provide Jericho with the requested due diligence documentation, Jericho requests that the monies paid upon execution of the Contract be returned to it in accordance with the Contract's terms.
>
> Said monies should be wired to our IOLA Trust Account. Wiring instructions are transmitted herewith.

A copy of Jericho's September 3 letter is attached hereto as Exhibit K.

20.     By letters dated September 5, 2002 and September 10, 2002, Harwood Lloyd, acting as appointed Escrow Agent under the Contract, stated that Jericho was not entitled to

7

**71**

return of its downpayment unless it provided clear notice that Jericho was canceling the

Contract.  On September 5, Harwood Lloyd wrote that

> Jericho cannot have it 'both ways'.  Either Jericho formally cancels
> the Contract by notice as required by Paragraph 29 or it must
> proceed to close at its own risk.  This Firm, as Escrow Agent under
> the Contract, requires Jericho . . . to send us the notice confirming
> Jericho's cancellation of the Contract.  Assuming we receive such
> notice, this Firm will promptly return the Downpayment to Jericho
> . . . .

A true and correct copy of Harwood Lloyd's September 5 letter to Jericho's counsel is attached

hereto as Exhibit L.

     21.     On September 10, 2002, Harwood Lloyd wrote to both Jericho and Jericho's

counsel by certified mail, requesting a response to Harwood Lloyd's September 5 letter.

Harwood Lloyd repeated that, unless it received an unequivocal confirmation that "Jericho

intended to cancel the Contract by its repeated requests for return of its Downpayment, this Firm,

as Escrow Agent under the Contract, cannot presently return the Downpayment to Jericho."

Harwood Lloyd asked Jericho to confirm that it intended to cancel the Contract by September 12,

2002 or that it would proceed to closing by September 18, 2002 in accordance with the terms of

the Contract.  A true and correct copy of Harwood Lloyd's September 10 letter is attached hereto

as Exhibit M.

     22.     On September 12, 2002, Jericho finally responded by making clear that it had

indeed intended to cancel the Contract on September 3:

> [T]his letter will serve as confirmation that our letter on behalf of
> Jericho dated September 3, 2002, requesting the return of Jericho's
> down payment[,] was intended as the exercise of Jericho's right
> under paragraph 29(a) of the referenced contract to cancel said
> contract and receive the return of monies paid upon execution
> thereof.

A copy of Jericho's September 12 letter is attached hereto as Exhibit N.

23.    On September 13, 2002, Midtown returned Jericho's down payment.  True and correct copies of the wiring instructions and the PNC Bank Domestic Wire Draft dated September 13, 2002 are attached hereto as Exhibit O.

## JERICHO'S ELEVENTH-HOUR REQUESTS FOR DOCUMENTS AND MIDTOWN'S RESPONSES

24.    As the study period came to a close, Jericho made several requests for documents that Jericho now claims Midtown concealed.  The parties' contemporaneous correspondence shows that Midtown did not conceal any documents from Jericho.

25.    The day after the parties executed the Contract, Midtown provided Midtown with, among other things, an environmental impact statement, drawings, zoning approvals, site map and title information, surveys, and documents defining the scope of Amtrak's easements and Midtown's right to build over the easement.  A true and correct copy of the letter from Midtown to Jericho describing the materials that Midtown delivered to Jericho on June 19, 2002 is attached hereto as Exhibit P.

26.    Only one day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Amtrak and Midtown.  A copy of Jericho's September 2, 2002 letter to Midtown requesting these exhibits to the Amtrak agreement is attached hereto as Exhibit Q.  The Amtrak agreement was attached to the Contract, but the exhibits to it were not.  The day after Jericho asked for these exhibits, Midtown informed Jericho by letter that Midtown did not have the exhibits and did not have them when the parties executed the Contract either.  Midtown pointed out in its letter that Jericho had had seventy-five days under the Contract to seek to obtain the exhibits from Amtrak and meet with Amtrak to discuss Amtrak's easements, but that it had not attempted to do so.  A true and correct copy of Midtown's September 3, 2002 letter to Jericho is attached hereto as Exhibit R.

**73**

27.     On August 30—only a few days before the study period was to expire—Jericho informed Midtown by letter of "scuttlebutt" it had heard that there may have been an oil spill on the property and asked Midtown for any documents relating to it. A copy of that letter is attached hereto as Exhibit S. On August 23, 2002, Midtown's broker transmitted to Jericho's broker an e-mail from Midtown's counsel noting that "[w]e have no papers confirming the successful cleanup of the oil spill from properties neighboring the Sites." By this e-mail, Midtown also gave Jericho all of the information necessary to obtain any such documents from the New York Department of Environmental Conservation. Midtown reiterated all of this information to Jericho by letter dated September 3, 2002. A true and correct copy of that letter, and the August 23, 2002 e-mail attachment to it discussed above, is attached hereto as Exhibit T.

28.     On August 13, 2002, Jericho asked whether Midtown had a "Phase I environmental report" relating to the property. Midtown informed Jericho the day after Jericho made this request that no such report was performed for the property. Copies of Jericho's August 13 letter and Midtown's August 14 response to that letter are attached hereto as Exhibits U and V.

## 74

29.    Jericho wrote to Midtown on August 1, 2002 that Midtown had not provided Jericho with certain architectural drawings and documents, which it had earlier requested on July 17, 2002. A copy of Jericho's August 1 letter is attached hereto as Exhibit W. The next day, Midtown responded that the drawings Jericho had requested from Midtown's architects had been available to Jericho for "several weeks" at the offices of Midtown's architects, but that Jericho had not paid for them and picked them up. And, although Midtown was not obligated to do so, Midtown directed its architects to provide copies of the documents to Jericho at Midtown's own expense. A copy of Midtown's August 2, 2002 letter to Jericho is attached hereto as Exhibit X. The documents that Jericho requested from Midtown's architects were in fact delivered to Jericho by August 7, as evidenced by an August 30, 2002 letter from Jericho to Midtown which is attached hereto as Exhibit S.

Dated:  Hackensack, New Jersey
         January 6, 2005

_____
EDWARD G. IMPERATORE, ESQ.

11

# 75

## Exhibit A to Imperatore Affirmation –
## Contract, dated June 18, 2002
### [pp. 75-92]

NY 023 Contract of Sale 6-30-75 (NYBTU 8041)

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT-THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

**NOTE: FIRE LOSSES.** This form of contract contains no express provisions as to risk of loss by fire or other casualty before delivery of the deed. Unless express provision is made, the provisions of Section 5-1311 of the General Obligations Law will apply. This section also placed risk of loss upon purchaser if title or possession is transferred prior to closing.

**THIS AGREEMENT,** made the _18_ day of June _____, in the year two thousand two
**BETWEEN**

MIDTOWN DEVELOPMENT, L.P., a New York limited partnership with an office at 40 Arcorp Properties, Pershing Road, Weehawken, New Jersey

hereinafter described as the seller, and Jaricho Group, Ltd., a New York corporation as nominee for a limited liability company to be hereafter formed, with offices c/o ~~Sragdax & Gerhtvgxat 200 Eart 42nd Street, New York, New York, 10017~~
Wasserman Two Irrevocable Trust, 155 Lee Avenue, Brooklyn, New York 11211

hereinafter described as the purchaser,

**WITNESSETH,** that the seller agrees to sell and convey, and the purchaser agrees to purchase.

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the
See schedule A annexed hereto, being Lot 1 in Block 708 and Lot 17 in Block 709.

The Property is located between 36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York and is more particularly described by the legal descriptions set forth in Exhibit A hereto.

The development of the Property is and will be subject to and in conformance with any requirements and restrictions imposed by any governmental entity (the "Zoning Requirements") and the Property is subject to certain easements and rights in favor of the National Railroad Passenger Corporation ("Amtrak").

1. This sale includes all right, title and interest, if any, of the seller in and to any land lying in the bed of any street, road or avenue opened or proposed, in front of or adjoining said premises, to the center line thereof, and all right, title and interest of the seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to said premises by reason of change of grade of any street; and the seller will execute and deliver to the purchaser, on closing of title, or thereafter, on demand, all proper instruments for the conveyance of such title and the assignment and collection of any such reward.

2. The price is twenty-eight million ($28,000,000) Dollars, payable as follows:

See Rider paragraph 28.

Dollars,

on the signing of this contract, by check subject to collection, the receipt of which is hereby acknowledged,

Dollars,

in cash or good certified check to the order of the seller on the delivery of the deed as hereinafter provided:

Dollars,

by taking title subject to a
at the rate of
mortgage now a lien on said premises in that amount, bearing interest
per cent per annum, the principal being due and payable

Dollars,

by the purchaser or assigns executing, acknowledging and delivering to the seller a bond or, at the option of the seller, a note secured by a purchase money
mortgage on the above premises, in that amount, payable

payable
together with interest at the rate of

76

3. ~~Any bond or note and mortgage to be given hereunder shall be drawn on the standard forms of New York Board~~ of Title Underwriters for mortgages of like lien; and shall be drawn by the attorney for the seller at the expense of the purchaser, who shall also pay the mortgage recording tax and recording fees.

4. If such purchase money mortgage is to be a subordinate mortgage on the premises it shall provide that it shall be subject and subordinate to the lien   of the existing              mortgage   of $
any extensions thereof and to any               or consolidated mortgage    which may be placed on the premises in lieu thereof, and to any extensions thereof provided (a) that the interest rate thereof shall not be greater than       per cent per annum and (b) that, if the principal amount thereof shall exceed the amount of principal owing and unpaid on said existing mortgage at the time of placing such new mortgage or consolidated mortgage, the excess be paid to the holder of such purchase money mortgage in reduction of the principal thereof. Such purchase money mortgage shall also provide that such payment to the holder thereof shall not alter or affect the regular installments, if any, of principal payable thereunder and shall further provide that the holder thereof will, on demand and without charge therefor, execute, acknowledge and deliver ~~any agreement or agreements further to effectuate such subordination~~

5. If there be a mortgage on the premises the seller agrees to deliver to the purchaser at the time of delivery of the deed a proper certificate executed and acknowledged by the holder of such mortgage and in form for recording, certifying as to the amount of the unpaid principal and interest thereon, date of maturity thereof and rate of interest thereon, and the seller shall pay the fees for recording such certificate. Should the mortgagee be a bank or other institution as defined in Section 274-a, Real Property Law, the mortgagee may, in lieu of the said certificate, furnish a letter signed by a duly authorized officer, or employee, or agent, containing the information required to be set forth in said certificate. Seller represents that such mortgage will not be in default at or as a result of the delivery of the deed hereunder and that neither said mortgage, nor any modification thereof contains any provision to accelerate payment, or to change any of the other terms or provisions thereof by reason of the delivery of the deed hereunder.

6. Said premises are sold and are to be conveyed subject to:

   a. Zoning regulations and ordinances of the city, town or village in which the premises lie which are not violated by existing structures.

   b. Consents by the seller or any former owner of premises for the erection of any structure or structures on, under or above any street or streets on which said premises may abut.

   c. Encroachments of stoops, areas, cellar steps, trim and cornices, if any, upon any street or highway.

   d. Certain rights and easements in favor of Amtrak.
      See also Paragrph 30 of the Rider.

7. ~~All notes or notices of violations of law or municipal ordinances orders or requirements noted in or issued by the~~ Departments of Housing and Buildings, Fire, Labor, Health, or other State or Municipal Department having jurisdiction, against or affecting the premises at the date hereof, shall be complied with by the seller and the premises shall be conveyed free of the same, and this provision of this contract shall survive delivery of the deed hereunder. The seller shall furnish the ~~purchaser with an authorization to make the necessary searches therefor.~~

nk clause 8 if
s property is
i located in
a City of New
ork
mms 9 is
ally omitted
sai in the
ty  of New
rk

8. All obligations affecting the premises incurred under the Emergency Repairs provisions of the Administrative Code of the City of New York (Sections 564-18.0, etc.) prior to the delivery of the deed shall be paid and discharged by the seller upon the delivery of the deed. This provision shall survive the delivery of the deed.

9. If, at the time of the delivery of the deed, the premises or any part thereof shall be or shall have been affected by an assessment or assessments which are or may become payable in annual installments, of which the first installment is then a charge or lien, or has been paid, then for the purposes of this contract all the unpaid installments of any such assessment, including those which are to become due and payable after the delivery of the deed, shall be deemed to be due and payable and to be liens upon the premises affected thereby and shall be paid and discharged by the seller, upon the delivery of the deed.

10. The following are to be apportioned: (a) Rents as and when collected.  (b) Interest on mortgages.  (c) Premiums ~~on existing transferable insurance policies or renewals of those expiring prior to the closing.~~ (d) Taxes and sewer rents, if any, on the basis of the fiscal year for which assessed (e) Water charges on the basis of the calendar year.  (f) Fuel, if any.

11. If the closing of the title shall occur before the tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation.

12. ~~If there be a water meter on the premises, the seller shall furnish a reading to a date not more than thirty days prior~~ to the time herein set for closing title, and the unfixed meter charge and the unfixed sewer rent, if any, based thereon for the ~~intervening time shall be apportioned on the basis of such last reading.~~

13. The deed shall be the usual  bargain and sale, with covenants,     deed in proper statutory short form for record and shall be duly executed and acknowledged so as to convey to the purchaser the fee simple of the said premises, free of all encumbrances, except as herein stated, and shall contain the covenant required by subdivision 5 of Section 13 of the Lien Law.

If the seller is a corporation, it will deliver to the purchaser at the time of the delivery of the deed hereunder a resolution of its Board of Directors authorizing the sale and delivery of the deed, and a certificate by the Secretary or Assistant Secretary of the corporation certifying such resolution and setting forth facts showing the conveyance is in conformity with the requirements of Section 909 of the Business Corporation Law. The deed in such case shall contain a recital sufficient to establish compliance with said section.

14. At the closing of the title the seller shall deliver to the purchaser a certified check to the order of the recording officer of the county in which the deed is to be recorded for the amount of the documentary stamps to be affixed thereto in accordance with Article 31 of the Tax Law and a certified check to the order of the appropriate country officer for any other tax payable by reason of the delivery of the deed; and a return, if any be required, duly signed and sworn to be the seller; and the purchaser also agrees to sign and swear to the return and to cause the check and the return to be delivered to the

**77**

appropriate county officer promptly after the closing of title.

15.    In addition, the seller shall at the same time deliver to the purchaser a certified check to the order of the Finance Administrator for the amount of the Real Property Transfer Tax imposed by Title II of Chapter 46 of the Administrative Code of the City of New York and will also deliver to the purchaser the return required by the said statute and the regulations issued pursuant to the authority thereof, duly signed and sworn to by the seller; the purchaser agrees to sign and swear to the return and to cause the check and the return to be delivered to the City Register promptly after the closing of the title.

16.    The seller shall give and the purchaser shall accept a title such as ~~any reputable title insurance company~~. a Member of the Title Insurance Rate Service Association, Inc., will be willing to approve and insure.

~~17.    All sums paid on account of this contract, and the reasonable expenses of the examination of the title to said premises and of the survey, if any, made in connection therewith are hereby made liens on said premises, but such liens shall not continue after default by the purchaser under this contract.~~

18.    All fixtures and articles of personal property attached or appurtenant to or used in connection with said premises are represented to be owned by the seller, free from all liens and encumbrances except as herein stated, and are included in this sale; without limiting the generality of the foregoing, such fixtures and articles of personal property including plumbing, heating, lighting and cooking fixtures, air conditioning fixtures and units, ranges, refrigerators, radio and television aerials, bathroom and kitchen cabinets, mantels, door mirrors, venetian blinds, shades, screens, awnings, storm windows, window ~~boxes, storm doors, mail boxes, weather vanes, flagpoles, pumps, shrubbery and outdoor statuary.~~

19.    The amount of any unpaid taxes, assessments, water charges and sewer rents which the seller is obligated to pay and discharge, with the interest and penalties thereon to a date not less than two business days after the date of closing title, may at the option of the seller be allowed to the purchaser out of the balance of the purchase price, provided official bills therefor with interest and penalties thereon figured to said date are furnished by the seller at the closing.

20.    If at the date of closing there may be any other liens or encumbrances which the seller is obligated to pay and discharge, the seller may use any portion of the balance of the purchase price to satisfy the same, provided the seller shall simultaneously either deliver to the purchaser at the closing of title instruments in recordable form and sufficient to satisfy such liens and encumbrances of record together with the cost of recording or filing said instruments; or, provided that the seller has made arrangements with the title company employed by the purchaser in advance of closing, seller will deposit with said company sufficient monies, acceptable to and required by it to insure obtaining and the recording of such satisfactions and the issuance of title insurance to the purchaser either free of any such liens and encumbrances, or with insurance against enforcement of same out of the insured premises. The purchaser, if request is made within a reasonable time prior to the date of closing of title, agrees to provide at the closing separate certified checks as requested, aggregating the amount of the balance of the purchase price, to facilitate the satisfaction of any such liens or encumbrances. The existence of any such taxes or other liens and encumbrances shall not be deemed objections to title if the seller shall comply with the foregoing requirements.

21.    If a search of the title discloses judgments, bankruptcies or other returns against other persons having names the same as or similar to that of the seller, the seller will on request deliver to the purchaser an affidavit showing that such judgments, bankruptcies or other returns are not against the seller.

22.    In the event that the seller is unable to convey title in accordance with the terms of this contract, the sole liability of the seller will be to refund to the purchaser the amount paid on account of the purchase price ~~and to pay the net cost of examining the title, which cost is not to exceed the charges fixed by the New York Board of Title Underwriters, and the net cost of any survey made in connection therewith incurred by the purchaser,~~ and upon such refund any payment being made this contract shall be considered canceled.

23.    The deed shall be delivered upon the receipt of said payments at the office of Purchaser's lender's counsel.
at _____ o'clock on _____ , in the year

24.    The parties agree that Brown Harris Stevens and Benjamin A. Shadrin   is the broker who brought about this sale and the seller agrees to pay any commission earned thereby.                          P.A.

25.    It is understood and agreed that all understandings and agreements heretofore had between the parties hereto are merged in this contract, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation, neither party relying upon any statement or representation, not embodied in this contract, made by the other. The purchaser has inspected the buildings standing on said premises and is thoroughly acquainted with their condition and agrees to take title "as is" and in their present condition and subject to reasonable use, wear, tear, and natural deterioration between the date thereof and the closing of title.

26.    This agreement may not be changed or terminated orally. The stipulations aforesaid are to apply to and bind the heirs, executors, administrators, successors and assigns of the respective parties.

27.    If two or more persons constitute either the seller or the purchaser, the word "seller" or the word "purchaser" shall be construed as if it read "sellers" or "purchasers" whenever the sense of this agreement so requires.
This Agreement is modified by the Rider to Contract of Sale dated of*
IN WITNESS WHEREOF, this agreement has been duly executed by the parties hereto.

In presence of:

MIDTOWN DEVELOPMENT, LP Seller

By _____

*even date herewith and attached
hereto and made a part hereof.

Jericho Group Ltd., Purchaser

By _George Klein_____

**78**

ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

... of New York, County of                    } ss.:

he    day of                    in the year
... me, the undersigned, personally appeared

...nally known to me or proved to me on the basis of satisfactory
...ence to be the individual(s) whose name(s) is (are) subscribed to the
...in instrument and acknowledged to me that he/she/they executed the
...e in his/her/their capacity(ies), and that by his/her/their signature(s) on
instrument, the individual(s), or the person upon behalf of which the
...ividual(s) acted, executed the instrument.

USE ACKNOWLEDGMENT FORM BELOW WITHIN NEW YORK STATE ONLY:

State of New York, County of                    } ss.

On the    day of                    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to the
within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on
the instrument, the individual(s), or the person upon behalf of which the
individual(s) acted, executed the instrument.

ACKNOWLEDGMENT FORM FOR USE WITHIN NEW YORK STATE ONLY:
(New York Subscribing Witness Acknowledgment Certificate)
...ate of New York, County of                    } ss.:

...the    day of                    in the year
...fore me, the undersigned, personally appeared

...e subscribing witness to the foregoing instrument, with whom I am
...rsonally acquainted, who, being by me duly sworn, did depose and
...y that he/she/they reside(s) in

...f the place of residence is in a city, include the street and street number, if any,
...ereof); that he/she/they know(s)

...o be the individual described in and who executed the foregoing
...strument; that said subscribing witness was present and saw said

...execute the same; and that said witness at the same time subscribed
...is/her/their name(s) as a witness thereto.

ACKNOWLEDGMENT FORM FOR USE OUTSIDE NEW YORK STATE ONLY:
(Out of State or Foreign General Acknowledgment Certificate)

                    } ss.:
(Complete Venue with State, County, Province or Municipality)

On the    day of                    in the year
before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory
evidence to be the individual(s) whose name(s) is (are) subscribed to
the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their capacity(ies), that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument, and
that such individual made such appearance before the undersigned
in the

(Insert the city or other political subdivision and the state or country or
other place the acknowledgment was taken).

Closing of title under the within contract is hereby adjourned to
o'clock at                    ; title to be closed and all adjustments to be made
as of
Dated,
For value received, the within contract and all the right, title and interest of the purchaser thereunder are hereby assigned,
transferred and set over unto
and said assignee hereby assumes all obligations of the purchaser thereunder.
Dated,

_____
Purchaser

_____
Assignee of Purchaser

CONTRACT OF SALE
(AMENDED 1975)

TITLE NO.

TO

FIDELITY NATIONAL TITLE INSURANCE
COMPANY OF NEW YORK
INCORPORATED 1928
"Appreciate the Fidelity Difference"
Member New York State Land Title Association

DISTRICT
SECTION
BLOCK
LOT
COUNTY OR TOWN

RECORDED AT REQUEST OF
Fidelity National Title Insurance Company of New York
RETURN BY MAIL TO

JUN-12-02   11:10AM   FROM-Harwood Lloyd                    2014889005            T-388  P.004/017  F-870

## RIDER TO CONTRACT OF SALE

Dated: June _13_, 2002

between

### MIDTOWN DEVELOPMENT, L.P., Seller

and

### JERICHO GROUP, LTD., as nominee, Purchaser

28.  The total purchase price twenty eight million ($28,000,000) dollars (the "Purchase Price") shall be paid as follows:

a) two hundred fifty  ($250,000) dollars has been paid to the Escrowee upon execution hereof, by check subject to collection, the receipt of which is acknowledged by the Escrowee (the "Downpayment") (The term "Downpayment" as used in this Contract, both in the printed form and in this Rider, shall mean so much of the funds referred to in this paragraph 28 which have been received by the Escrowee hereunder);

b) the balance shall be paid to Seller or as Seller shall direct, at closing, by good certified or official bank teller's check or checks drawn on a bank or banks which is/are (a) member(s) of the New York City Banker's Clearinghouse, or , if Seller shall so request, by wire transfer or transfers; and

c)      The Downpayment shall not be refundable to Purchaser except as provided in Paragraph 29 hereof.

29.  a)    Purchaser shall have seventy-five (75) days from the date this Contract has been executed by both parties (the "Study Period"), to cause to be performed, at Purchaser's cost and

1044235
(37)SlabakisJerichoRider

1

80

expense, such environmental and/or architectural/engineering and or other tests and/or inspections as Purchaser, in its sole discretion, shall elect to perform.  In accordance with the terms of Paragraph 29(b) below, Seller shall allow Purchaser and its representatives access to Property at all reasonable times, shall cooperate with Purchaser and its representatives and shall make available to Purchaser and its representatives such material pertinent to such tests and/or inspections as Seller may have in it possession.  If prior to the conclusion of the Study Period, Purchaser shall determine, in its sole and absolute discretion that the Property is not suitable for its needs, the Purchaser shall have the right to cancel this Contract upon written notice to Seller and the Escrowee.  Purchaser need not specify any reason for such cancellation.  Upon the timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser the monies paid upon execution hereof.

     b)     During the Study Period, Purchaser, personally or through its authorized agents or representatives, shall be entitled to enter upon the Property, at all reasonable times upon reasonable advance notice to Seller to make preliminary above surface architectural studies for Purchaser's intended improvements.  Notwithstanding Purchaser's entitlement to conduct such studies, Purchaser has agreed to accept the Property in "AS IS" condition subject to its inspection rights during the Study Period and Purchaser shall have no right to terminate this Agreement other than as provided in 29(a) above.  Purchaser's entry onto the Property and all of the foregoing activities shall be subject to the following conditions:

     (1)     Purchaser shall not unreasonably interfere with the Amtrak's service operation, shall minimize disruption to such operation, shall not enter or interfere with Amtrak's right of way absent Amtrak's express written consent and shall be subject in all events to Amtrak's rights under the Amtrak Agreement (as defined hereunder).

1044235
(57)Shabakis/JerichoRider

2

81

(2)     Purchaser shall not disturb the surface or subsurface of the Property.

(3)     Purchaser shall indemnify and hold harmless Seller and Amtrak and their respective partners, directors, officers, employees and agents from and against all liability, claims, losses, damages, injuries to persons or to property and expense (including, without limitation, reasonable legal fees and disbursements) suffered by Seller or Amtrak or their respective partners, directors, officers, employees or agents by reason of or resulting from such entry or any activities conducted or undertaken on or in connection with the Property by or on behalf of Purchaser.

(4)     Such entry and all activities conducted by or on behalf of Purchaser shall be in compliance with all applicable federal, state and local laws, rules, regulations, ordinances, orders and permits and with any requirements of Amtrak.

(5)     Purchaser and its contractors and representatives shall procure the following insurance coverage to cover the risks associated with such activities, in the minimum amounts set forth below:

(A)     Workers' Compensation Insurance in accordance with statutory requirements and Employer's Liability Insurance with a minimum limit of $500,000 each accident;

(B)     Commercial General Liability Insurance (occurrence form), including premises, contractual liability, products/completed operations, independent contractors and broad form property damage coverage with the following limits of liability: Bodily Injury - $1,000,000 each occurrence; Property Damage - $1,000,000 each occurrence, or $2,000,000 combined single limit;

(C)     Comprehensive Automobile Liability Insurance, including coverage for all owned, non-owned and hired automobiles used in the performance of the work with the

1044235
(S7)SlatackisJerichoRider                            3

## 82

JUN-12-02  11:20AM  FROM-Harwood Lloyd                    2014886006          T-388  P.007/017  F-870

following minimum limits of liability: Bodily Injury - $1,000,000 each occurrence; Property Damage
- $1,000,000 each occurrence, or $2,000,000 combined single limit;

      (D)    Environmental/Pollution Liability, including bodily injury and property
damage liability associated with the removal and/or disposal of hazardous wastes and/or materials
with the following minimum limits of liability: Bodily Injury - $2,000,000 each occurrence;
Property Damage - $2,000,000 each occurrence or $4,000,000 combined single limit; and

      (E)    Such railroad liability and other insurances as required by Amtrak.
All insurance shall provide for thirty (30) days' written notice prior to cancellation, shall name Seller
and Amtrak as additional insureds, and shall provide that all liability coverage is primary and without
the right of contribution from insurance carried by Seller.  Notwithstanding the foregoing, nothing
contained herein shall impose any obligation on Seller or limit any obligation imposed upon
Purchaser hereunder.

      (6)    Prior to entry of the Property, Purchaser shall: (i) provide Seller three days'
written notice of its intent to enter the Property, (ii) submit binders of insurance to Seller with said
notice and (iii) submit a copy of Amtrak's consent to any studies to be performed on or adjacent to
Amtrak's right of way.

      (7)    Seller shall provide notice to, and provide reasonable assistance to Purchaser
to request permission from, Amtrak in respect of Purchaser's request, if any, to enter upon the area of
easements in favor of Amtrak, it being understood, however, that Seller makes no representation
with respect to Amtrak's permitting such entry or the terms upon which it may permit such entry.

      (8)    Seller shall at all reasonable times during such entry and after the secession
thereof have the right to inspect all activities of Purchaser and its architects on the Property. Seller

1044235
(57)SlatakisJerichoRider                    4

JUN-12-02　th:20AM　FROM-Harwood Lloyd　　　　　201488005　　　T-888　P.008/017　F-870

shall also have the right (but not the obligation) to inspect and copy all data and reports collected by or for Purchaser in the course of these activities.

(9)　　Unless required by law or court order, Purchaser shall not disclose the substance of any activities performed hereunder and Purchaser shall treat as confidential all maps, data, reports, and other written proprietary information received from Seller. Purchaser and its personnel will not publish, in any technical articles or otherwise, information obtained from these activities. The obligations of confidentiality set forth above shall not apply to any information which: (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or its partners, directors, officers, employees, agents, representatives or subcontractors; (ii) was generally available to the public on the date of this Agreement; (iii) was known to Purchaser prior to its dealings with Seller; or (iv) was lawfully received by Purchaser from a third party without restriction on disclosure and provided such third party is not under an obligation of non-disclosure with Seller. In the event that Purchaser does not acquire the Property, Purchaser shall deliver to Seller any and all information about the Property received directly from Seller, including materials disclosed within ten (10) days after request by Seller.

(10)　　Purchaser shall not generate any waste on the Property.

(11)　　Upon completion of such entry, Purchaser shall promptly restore the Property, at Purchaser's sole cost and expense, to the state and condition thereof prior thereto and shall promptly repair all damage caused by or resulting from such entry.

c)　　Immediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which Purchaser reasonably requests. Seller shall

## 84

JUN-12-02   11:21AM   FROM-Harwood Lloyd                    2014895005              T-388  P.008/017  F-870

also make its representatives available to meet with representatives of Purchaser, at Purchaser's cost and expense, concerning such matters at a time and place that shall be mutually convenient to Purchaser and Seller.

30.    a)    The Seller represents that it is the fee owner of the premises and not a contract vendee therefor.

b)    At the Closing, Seller shall convey to Purchaser, by Bargain and Sale Deed with Covenants against Grantor's Acts (the "Deed"), fee simple title to the Property free and clear of any and all liens and/or encumbrances except for the following (the "Permitted Exceptions"):

(i)    The lien for general real estate taxes for the calendar year or other applicable tax period during which the Closing shall occur and subsequent years (and/or periods);

(ii) The exceptions to title enumerated on Exhibit C attached hereto and such other exceptions as may be approved in writing by Purchaser; and

(iii) Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller, Jerrart Venture and Amtrak which is attached hereto as Exhibit B (the "Amtrak Agreement").

c)    Purchaser shall promptly after execution of this Agreement cause title to be examined and a title report and a commitment for an owner's title insurance policy for the Property to be prepared by Purchaser's Title Company (the "Title Company"). Within three (3) days of its receipt of such title report, Purchaser shall deliver copies thereof to Seller's attorneys, Harwood Lloyd, LLC, together with a notice setting forth any matters contained in the title report which materially would interfere with the development of the Property that are not Permitted Exceptions, to which Purchaser objects. Within thirty (30) days after delivery to Seller's attorneys of any such notice of objections to

1044235
(37)Slabakis/Jericho Rider                          6

## 85

JUN-12-02   11:21AM   FROM-Harwood Lloyd                2014886005              T-388  P.010/017  F-870

title, Seller shall advise Purchaser whether Seller shall undertake to remove such matters and endeavor to clear title.

        d)      If, as of the date of the Closing, Seller is unable to convey title to the Property to Purchaser in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser at or prior to the Closing, to adjourn the Closing, from time to time, to enable Seller to endeavor to clear such title. If Seller does not so elect to adjourn the Closing, or if at the adjourned Closing Date, Seller remains unable to clear title in accordance with the provisions of this Agreement, Purchaser may either: (i) waive such title defects and close title in accordance with this Agreement, with no reduction of or any credit or allowance against the Purchase Price, and with no claims against Seller; or (ii) terminate this Agreement by written notice delivered at or before the Closing, in which event Seller and Purchaser shall jointly instruct the Escrow Agent to promptly return the Deposit to Purchaser, and this Agreement shall thereupon become void and of no further effect and neither party shall have any rights against or obligations of any nature to the other under this Agreement or by reason hereof. If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment in accordance with its terms. Nothing contained in this Article or elsewhere in this Agreement shall be deemed to require Seller to take or bring any action or proceeding to remove any defect in or objection to title or expend any sums to cure such title defects and exceptions. Purchaser shall not have any claim, cause or right of action against Seller, at law or in equity, whether for damages, or specific performance or otherwise, by reason of Seller's failure to clear any such title defects or exceptions.

## 86

c)      The occurrence of the Closing and delivery to and acceptance of the Deed by Purchaser shall be deemed to be full performance, discharge and satisfaction of every agreement and obligation on Seller's part required to be performed under this Agreement.

31.      Seller represents that annexed hereto, as Exhibit B, is a true copy of its agreement(s) with Amtrak Corporation permitting development of the premises over Amtrak's railroad tracks.

32.      Closing shall take place on the fifteenth (15th) day after the conclusion of the Study Period, at the offices of Purchaser's lending institution or such lending institution's attorneys.  If Purchaser does not close by such date, Seller shall be entitled to set a date for closing by giving fourteen (14) days written notice to Purchaser which date shall be TIME OF THE ESSENCE. In the event Purchaser desires to extend the closing date for an additional thirty (30) days past the time of the essence closing date set by Seller, Purchaser may do so provided that Purchaser pays a non-refundable payment of $100,000.00 to Seller along with a writing specifying an adjourned closing date within thirty (30) days of the Seller's time of the essence closing date, which shall be TIME OF THE ESSENCE.  The parties agree that fourteen (14) days shall be a reasonable notice period and failure by Seller to send such notice to Purchase shall not be deemed to be a waiver of Seller's rights to get a time of the essence closing date. Failure by Purchaser to close on such date shall entitle the Seller to direct the Escrow Agent to pay the Downpayment to Purchaser and for the Purchaser to retain the Downpayment as liquidated damages and Purchaser shall thereupon have no rights to purchase the Property.

33.      At closing, Seller should assign to Purchaser, without recourse, any such permits and/or approvals which Seller may have obtained with respect to the development of the premises. Within two (2) business days from the date hereof, Seller shall make available to the Purchaser

1044235
(S7)SlabakishJerishoRider                    8

## 87

copies of all documentation pertaining to such permits and/or approvals.  Seller makes no representation that any of such permits and/or approvals are in force and effect or that any of same are transferable.

34.     Except as may be herein otherwise provided to the contrary, all apportionments shall be as of 11:59 p.m. on the day immediately proceeding the date of closing of title on the basis of a 365 day year and the actual number of days in any month.

35.     The existence of liens or encumbrances upon the premises, to which the Purchaser is not obligated under the terms hereof to take subject, shall not be objections to title provided that properly executed instruments in recordable form necessary to satisfy the same are delivered to the Purchaser at the Closing, together with recording and/or filing fees.  Such liens or encumbrances may be paid out of the cash consideration paid by the Purchaser.  Unpaid liens for taxes, water charges and assessments shall not be objections to title, but the amount thereof plus interest and penalties thereon shall be deducted from the cash consideration to be paid hereunder and allowed to the Purchaser, subject to the provisions for apportionment of taxes and water charges contained herein.

36.     Franchise, transfer, inheritance, estate, license or similar taxes, charges, or liens of any nature not hereinbefore excepted shall not be an objection to title provided that Purchaser's title company agrees to insure the Purchaser against collection of said liens out of the premises.

37.     If a proceeding is pending to correct or reduce the assessed valuation of the premises for a period extending after the Purchaser's acquisition of title, such proceeding shall be continued by the Seller (or Seller's predecessor, as the case may be) and the Purchaser agrees to pay its proportionate share of the fees and disbursements in the event that such a reduction is obtained.  This provision shall survive the delivery of the deed.

1044235
(S7)SlabakisJerichoRider

## 88

JUN-12-02   11:22AM   FROM-Harwood Lloyd                    2914888006           T-388  P.012/017  F-879

38.     Except as provided in paragraph 29 hereof, the Purchaser represents that it has inspected the premises to its satisfaction and is purchasing the Premises in "as is" condition as of the date hereof, ordinary wear and tear excepted. This Contract, as written, contains all of the terms and conditions of the agreement entered into between the parties. The Purchaser acknowledges that the Seller, except as specifically set forth elsewhere in this Contract, has made no representations, is unwilling to make any representations, and has held out no inducements to the Purchaser, other than those herein expressed. The Purchaser further acknowledges and warrants that Seller is not liable or bound in any manner by (i) expressed or implied warranties, guarantees, promises, statements, representations or information pertaining to the premises as to the physical condition, income, expense, operation, or to what use the premises can be applied, including but not limited to any matter or thing affecting or relating to the said premises, except as herein specifically set forth; and (ii) any verbal or written statements, representations, real estate broker's "set ups" or information pertaining to the above premises furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth herein.

39.     If the payment made on account of the purchase price at the time of the execution of this Contract is by check, subject to collection, and if said check fails due collection, and Purchaser does not replace said check with an official teller's check or good certified check within five (5) business days after written notice thereof, the Seller at its option, may declare this Contract null and void and of no force and effect. Seller may thereupon pursue its remedies against Purchaser upon said check or in any manner permitted by law, such remedies being cumulative.

40.     (a)     If the Purchaser shall default in the performance of this Contract, then the Seller shall as its sole remedy, retain the Downpayment as liquidated damages. This Contract shall

## 89

thereupon become null and void subject to any rights of Seller pursuant to Paragraph 29(b) of this Rider, and neither party shall have further rights as against the other.

        (b)     If the Seller shall default in the performance of this Contract, the Purchaser's rights are as set forth in Paragraph 22 of the Contract.

    41.    (a)     The Escrowee acknowledges receipt from Purchaser, subject to collection, of the money paid upon execution hereof and agrees to hold and pay over the proceeds thereof and the balance of the Downpayment in accordance with the terms of this Contract, but only upon notice to the adverse party. Said money shall be deposited by the Escrowee in a non-interest bearing attorney trust account.

        (b)     The Escrowee shall not be responsible for the genuiness of any certificate or signature and may rely conclusively upon and shall be protected when acting upon any notice, affidavit, request, consent, instruction, check, or other instrument believed by it in good faith to be genuine or to be signed or presented by the proper person, or duly authorized, or property made. The Escrowee shall have no responsibility except for the performance of its express duties provided for hereunder and no additional duties shall be inferred herefrom or implied hereby.

        (c)     The Escrowee shall not be responsible or liable for any act or omission on its part in the performance or its duties as Escrowee under this contract unless act or omission constitutes bad faith, fraud or negligence.

        (d)     The parties acknowledge that the Escrowee is the firm of attorneys representing the Seller in connection with this contract and the transaction contemplated thereby. The parties agree that, in the event any dispute arises regarding this contract, the Escrowee may continue to represent the Seller as the Seller's legal counsel in connection therewith, irrespective of

1044235
(S7)SlotzkisJerichoRider                    11

## 90

whether the Escrowee continues to hold in escrow the money paid upon execution hereof.

(c)    The Escrowee shall not be required to institute or defend any action involving any matter referred to herein or which affects his duties or liabilities hereunder unless or until requested to do so by any party to this contract and then only upon receiving full indemnity, in character satisfactory to the Escrow Agent, against any and all claims, liabilities, and expenses in relation thereto. In the event of any dispute among the parties hereto with relation to the Escrowee or its duties, (i) the Escrow Agent may act or refrain from acting in respect of any matter referred to herein in full reliance upon and by and with the advice of counsel selected by it and shall be fully protected in so acting or in refraining from acting upon the advice of such counsel, or (ii) the Escrowee may refrain from acting until required to do so by an order of a court of competent jurisdiction.

(f)    The parties further agree that the Escrowee may also discharge its liability hereunder by commencing an interpleader action against Seller and the Purchaser, and/or their respective successors or assigns, in any court of competent jurisdiction, and depositing the money paid upon execution hereof, together with accrued interest, with the Clerk of such court (or such other officer of such court who shall be authorized to accept such property).

42.    This Contract constitutes the entire agreement between the parties hereto.  No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the party against whom the change, modification or discharge is claimed or sought to been enforced; nor shall any waiver of the

conditions or provisions of this contract or of any of the rights of either of the parties hereunder be

effective or binding unless such waiver shall be in writing and signed by the party claimed to have

given, consented or suffered the waiver.

43.     No provision, covenant or representation contained in this contract shall survive the

delivery of the deed except as expressly provided.  Acceptance of the deed shall be deemed a

conclusive acknowledge by Purchaser that Seller has performed all of the obligations of the Seller

hereunder except such as may expressly be stated to survive the delivery of the deed.

44.     All notices required under this Contract ("Notices") shall be in writing and shall be

sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified

at its address first above set forth or to such other address as such party shall have specified most

recently by like Notice.  At the same time any Notice is given to either party, a copy shall be sent to

its attorney.  For the purposes of this paragraph 44, the attorneys for the parties are as follows:

<div align="center">

Attorneys for Seller:

Edward Imperatore, Esq.
Harwood Lloyd, LLC
130 Main Street
Hackensack, NJ  07601


Attorney for Purchaser:

Szegda & Gerbing
300 East 42nd Street
New York, New York 10017

Attn:  Michael A. Szegda, Esq.

</div>

92

JUN-12-02  11:24AM  FROM-Harwood Lloyd                    2014888805            T-388  P.017/017  F-478

45.    This Rider is intended to modify the printed portion of this Contract. In the event of conflict between any provision contained in the printed portion and any provision contained in this Rider, the provision in this Rider shall be controlling and this Contract interpreted accordingly.

46.    This Contract may be signed in counterparts, both of which together shall constitute as single instrument. Signatures transmitted by telephone facsimile shall be binding and valid as if manually affixed to any counterpart.

MIDTOWN DEVELOPMENT, L.P, Seller

By:

JERICHO GROUP, LTD., as nominee, Purchaser

By: George Klein

**93**

Exhibit B to Imperatore Affirmation –
Letter from Edward G. Imperatore to Michael A. Szegda, dated July 15, 2002   *MLS*
[pp. 93-94]

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET
HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

FRANK V. D. LLOYD O†
MICHAEL B. OROPOLLO
RICHARD J. RYAN
DAVID F. MCBRIDE †
EDWARD G. IMPERATORE †
FRANK MOLANAH †
RUSSELL A. PEPE O†
GREGORY J. IRWIN O†
BRIAN E. GALLAGHER O
CHARLES E. POWERS, JR. O
DAVID T. ROBERTSON O
PETER E. MUELLER
MICHAEL J. BRADY †
DAVID M. REPETTO
THOMAS A. KEENAN O

RICHARD W. LE BLANCO
CURTIS J. TURPAN
ELIZABETH F. LORELL
JOSEPH P. SCORESE †
JOHN R. GONZO
DAVID T. PFUND †

VICTOR C. HARWOOD, III 1920-1991
FRANCIS V. D. LLOYD 1917-1974
JOHN W. GRIGGS 1929-1940
CHARLES C. SHENIER 1928-1970
EMIL M. WULSTER 1929-1978
DANIEL BRADY 1953-1979
GEORGE A. BROWN 1914-1945
AUGUST SCHEIDLER 1886-1991

PETER CIOLINO
ANTHONY J. SCILTO
W. FLETCHER MOCK, JR.
PETER VANDERVOORT
OF COUNSEL

THOMAS LOKATH
JOSEPH H. KENNEDY †
MAURICE L. STONE
COUNSEL

PAUL E. KIEL
LINDA M. MESCE †
KRISTINE DENNING †
ROBERT M. ADAMS
IAN C. DORIS O
IFEOMA ANTONIA OLEJEHE †
MELISSA A. HARTIGAN
DOUGLAS F. CIOLEK
LENA V. BALLAS †
DAVID S. BLOW
EILEEN P. KUZMA †
VALERIE STEINER †
RAFAEL ALBAN †
ALEXANDER G. PAPPAS
GABRIEL ADAMO
MICHAEL A. GALLARDO †

O CERTIFIED BY THE SUPREME COURT
OF NJ AS CIVIL TRIAL ATTORNEY
† ALSO ADMITTED IN NY

TR'S DIRECT DIAL: (201) 487-2608
IT EMAIL: EImperatore@Harwoodlloyd.com
IT FAX NO.: (201) 489-5005
R TO: Hackensack
NO.: 5152-1

July 15, 2002

**VIA TELECOPIER AND CERTIFIED MAIL/RRR**

Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

> **Re:** **Sale of Midtown Development, LP ("Midtown") Properties to**
> **Jericho Group ("Jericho") –**
> **Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")**

Dear Mr. Szegda:

This will acknowledge Jericho's request to extend the "Study Period" provided by the Contract of Sale between Midtown and Jericho dated June 18, 2002 (the "Contract") through December 31, 2002.

As I told you, Midtown is not particularly amenable to Jericho's request, particularly because Midtown carefully refrained from making any representations concerning zoning or permits in the Contract. However, Midtown is willing to grant Jericho's request on the following conditions:

1. Jericho must pay Midtown $250,000.00 to cover its expenses of "carrying" the Sites, and such payment would not constitute a portion of the Deposit under the Contract, would not constitute an offset against the Purchase Price set forth in the Contract and would be completely non-refundable;

1052943.1

**94**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re: Midtown to Jericho
June 19, 2002
Page 2

2. Jericho must place an additional $500,000.00 in Deposit under the Contract, making the total Deposit $750,000.00; and

3. Jericho must concede that $250,000.00 of such Deposit would be non-refundable in the event Jericho fails to close under the Contract and would not constitute an offset against the Purchase Price in the event Jericho does close.

Assuming Jericho accepts this proposal, we would present it as an amendment to the Contract, which would be signed by both parties.

Midtown looks forward to your response.

Very truly yours,

EDWARD G. IMPERATORE

EGI:mak
cc:  **Midtown Partners**          **(Via Telecopier)**
     **Elaine Osborn Emmet**       **(Via Telecopier)**

1052943.1

**95**

Exhibit C to Imperatore Affirmation –
Letter from Michael A. Szegda to Edward G. Imperatore, dated July 17, 2002
[pp. 95-96]

JUL-17-02 02:47 PM  SZEGDA RESIDENCE           2017503571              P.02

### SZEGDA & GERBING

ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
Members of the Bars of
New York and New Jersey

(212) 856-9300
Fax: (212) 370-9816

July 17, 2002

VIA FACSIMILE
(201) 487-4758

Edward G. Imperatore, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development,
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Mr. Imperatore:

This letter is in response to your letter dated July 15, 2002. Although last week, Jericho made a request to extend the study period under the referenced contract until December 31, 2002, upon my clients' further reflection and receipt of additional information from the land attorneys and architects whom Midtown had employed to obtain its permits and variances, the proposal no longer makes sense.

At the time Jericho entered into the contract, its principals had been led to believe by the brokers involved that Midtown's permits and variances could be extended and/or that Jericho would have the ability to develop at least 700,000 square feet as a matter of right. They have recently learned that this is not the case. In order to file any plans with New York City, they will have to start *de novo*, including new environmental studies, etc. Moreover, they have learned that the City is in process of formulating a master plan for development of the west side of midtown and will not even accept a proposal for review until the master plan is completed, which is projected for December 2002 at the earliest and possibly not until March 2003. They also understand that one proposal before the Board of Estimates would change the zoning of the tract of land between 9th and 11th Avenues and 36th and 39th Streets to allow commercial development only.

Accordingly an extension of the study period until December 31, 2002, will accomplish little, if anything. Jericho will need an extension until at least July 1, 2003, in order to get any meaningful "reading" from the City as to how the property may be developed. As matters stand today, one could not even build a one-story taxpayer.

JUL-_ -02 02:46 PM  SZECDA RESIDENCE                 2417502571              P.03

Edward G. Imperatore, Esq.
July 17, 2002
Page 2

My clients are aware that Midtown refrained from making any representation in the contract concerning zoning and/or permits and they are not asking that Midtown do so at this time, merely that Midtown afford them realistically sufficient time to make such determination on their own. They are committed to spend the $1,000,000 to $2,000,000 in soft costs they believe necessary bring this project to fruition, and desire to engage architects and zoning attorneys as soon as possible, but they will need better cooperation on Midtown's part.

In light of the other monies my clients will be required to expend, the proposal contained in your letter of July 15th is a bit pricey. Jericho's counterproposal is as follows: amend the contract presently to provide that Jericho may extend the study period thereunder at any time prior to its present expiration (on or about September 1, 2002) until July 1, 2003, by depositing an additional five hundred thousand ($500,000) dollars into escrow and authorizing the Escrow Agent to release to Midtown (i) at such time an amount equal to the pro rata portion (i.e., September 1, 2002, to December 31, 2002) of the real estate taxes paid for the first half of fiscal year 2002/03, and (ii), on January 1, 2003, if the contract is then still in force and effect, an amount equal to the real estate taxes payable for the second half of fiscal year 2002/03. To our knowledge, real estate taxes are Midtown's only "carrying" charges.

If this proposal is acceptable, Jericho will commit to the immediate engagement of professionals to commence preparation of studies, reports and/or plans and will agree to turn over to Midtown all work product in the event Jericho determined not to go forward with the purchase, whether at the conclusion of the current study period or the conclusion of the study period as extended.

Please present this counterproposal to the partners of Midtown.

Very truly yours,

Michael A. Szegda

MAS:ps

M.Imperatore.071602

## 97

**Exhibit D to Imperatore Affirmation –**
**Letter from Edward G. Imperatore to Michael A. Szegda, dated July 25, 2002**

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

ITER'S DIRECT DIAL: (201) 487-2608
SECT EMAIL: EImperatore@Harwoodlloyd.com
SECT FAX NO.: (201) 489-5005
PLY TO: Hackensack
E NO.: 5152-1

July 25, 2002

**VIA TELECOPIER**
Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

> Re:   **Midtown to Jericho**
> **West Side Properties - New York, New York**
> **Lot 1, Block 708 and Lot 17, Block 709**

Dear Mr. Szegda:

I have discussed your counter-proposal set forth in your July 17, 2002 letter with the Midtown partners, and they are not willing to extend the "Study Period" to July 2003 on the terms as set forth in your letter.

Midtown is still willing to permit Jericho to extend the "Study Period" through December 31, 2002 in accordance with the terms of my July 15, 2002 letter. If this is not acceptable to Jericho and Jericho wishes to terminate the Contract prior to expiration of the current "Study Period", Midtown would be amenable to that resolution.

Very truly yours,

EDWARD G. IMPERATORE

EGI/mak
cc:   **Midtown Partners**   (Via Telecopier)
      **Ms. Elaine Osborn Emmet**   (Via Telecopier)

1055183

**98**

Exhibit E to Imperatore Affirmation –
Letter from Michael A. Szegda to Edward G. Imperatore, dated July 29, 2002

JUL-29-02  12:59 PM  SZEGDA RESIDENCE                    2017503571                    P.02

**SZEGDA & GERBING**
ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN F. GERBING
MEMBERS AT THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-9300
FAX: (212) 370-9616

July 29, 2002

VIA FACSIMILE
(201) 487-4758

Edward G. Imperatore, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Mr. Imperatore:

My client's current proposal is for Midtown to extend the study period under the referenced contract to December 31, 2002. If by such date, Jericho determines there is a possibility of going forward with the acquisition, Jericho will pay Midtown the sum of one million ($1,000,000) dollars in consideration of a further extension of the study period until July 31, 2003. This sum will be over and above the contract price, will be paid outside of escrow and will be non-refundable in all events.

Please convey this proposal to the partners of Midtown. We will appreciate your early reply. Thank you.

Very truly yours,

Michael A. Szegda

MAS:ps

J:IMP\IMPERATORE.072902

**99**

Exhibit F to Imperatore Affirmation –
Letter from Edward G. Imperatore to Michael A. Szegda, dated July 30, 2002
[pp. 99-100]

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

TER'S DIRECT DIAL: (201) 487-2608
ECT EMAIL: EImperatore@Harwoodlloyd.com
ECT FAX NO.: (201) 489-5005
'LY TO: Hackensack
NO.: 5152-1

July 30, 2002

**VIA TELECOPIER**

Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

Re:    **Sale of Midtown Development, LP ("Midtown") Properties to**
**Jericho Group ("Jericho") -**
**Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")**

Dear Mr. Szegda:

Midtown and I are extremely disturbed by the conversations I had with Mr. Pfeiffer and with you last Friday and your confirming letter dated July 29, 2002, because Jericho seems not to have read (or understood) my letter dated July 15, 2002 concerning the terms upon which Midtown would extend Jericho's "Study Period" under the Contract through December 31, 2002. As I told both you and Mr. Pfeiffer, I do not foresee Midtown extending the "Study Period" beyond that date. And, as I told you, Midtown would in no event extend the "Study Period" to that date "gratis", which appears to be Jericho's current proposal.

In these circumstances, it seems that Jericho may wish to terminate the Contract prior to the expiration of the current "Study Period". Midtown is amenable to that resolution but is not amenable to what it considers to be ridiculous proposals by Jericho for extending the "Study Period" for a year. To reiterate Midtown's position, Jericho signed a Contract in which Midtown made no representations concerning zoning or approvals. For Jericho now to seek a virtually

**100**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re: Midtown to Jericho
July 30, 2002
Page 2

open-ended "option" on the Sites, purportedly to secure zoning or approvals acceptable to Jericho, is in bad faith.

Very truly yours,

EDWARD G. IMPERATORE

EGI:mak
cc:    Midtown Partners          (Via Telecopier)
       Elaine Osborn Emmet       (Via Telecopier)

1052943.1

**101**

Exhibit G to Imperatore Affirmation –
Letter from Michael A. Szegda to Maurice Stone, dated August 19, 2002
[pp. 101-102]

AUG-19-02 11:11 PM  SZEGDA RESIDENCE            2017502574        P.02

## SZEGDA & GERBING
### ATTORNEYS AT LAW
### 300 EAST 42ND STREET
### NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-9300
FAX (212) 370-9619

August 19, 2002

VIA FACSIMILE
(201) 487-4758

Maurice L. Stone, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development,
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Maurice:

This letter will confirm that Jericho is now prepared to pay Midtown the sum of seven hundred fifty thousand ($750,000) dollars, out of escrow, for an extension of the study period under the referenced contract until July 1, 2003. Such sum would be non-refundable in the event Jericho determined not to go forward with the acquisition or would have the effect of increasing the purchase price to twenty-eight million seven hundred fifty thousand ($28,750,000) dollars in the event Jericho closes.

As I have explained to you in our sundry conversations, Jericho is seeking the extension of the study period in order to obtain a level of comfort as to how the New York City Board of Estimate might allow the properties to be developed. Since all of Midtown's variances, permits, etc., have expired, in order to develop the properties, a new proposal based upon new environmental studies, testing etc. must be submitted to the Board of Estimate. However, because the Board of Estimate is in process of formulating a master plan for development of the west side of midtown, it will not even accept a proposal for review until the master plan is completed which is not expected to happen until December 2002 at the earliest.

Jericho is willing to incur the (considerable) cost and expenses of engaging architects, zoning attorneys, environmental experts and other professionals to conduct studies and testing and preparing a proposal to submit to the Board of Estimate with no guarantee that any level of development will be approved. But it will require a few months after its proposal has been submitted for dialogue to occur between its professionals and the City officials before it will be able to make an informed judgment that the project is viable.



Maurice L. Stone, Esq.
August 19, 2002
Page 2

   Please present this new proposal to the partners of Midtown and remind them that any new purchaser coming into the picture would require at least as much time as Jericho, if not more time, to conduct any meaningful study of the properties.

Very truly yours,

Michael A. Szeyda

MAS:ps

**103**

Exhibit H to Imperatore Affirmation –
Letter from Edward G. Imperatore to Michael A. Szegda, dated August 21, 2002
[pp. 103-104]

# HARWOOD LLOYD, LLC



COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

WRITER'S DIRECT DIAL: (201) 359-3575
DIRECT EMAIL: EImperator@Harwoodlloyd.com
DIRECT FAX NO.: (201) 489-5005
REPLY TO: Hackensack
FILE NO.: 5152-1

August 21, 2002

**VIA TELECOPIER**

Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

Re:     **Contract of Sale dated July 18, 2002 (The "Contract")**
**Sale of Sites by Midtown Development, LLC ("Midtown")**
**to Jericho Group Ltd. ("Jericho")**

Dear Mr. Szegda:

Midtown rejects your client's offer expressed in your August 19, 2002 letter to extend the Study Period to July 1, 2003 in exchange for a $750,000 non-refundable payment. As we have repeatedly expressed to both you and your client, in writing and in telephone conversations, Midtown is unwilling to consider to extend the Study Period from its current expiration date of September 4, 2002 to July 1, 2003. Should Jericho desire to exercise its right to extend the Study Period to October 4, 2002 by making the additional payment, which is provided for in the Contract, please provide Midtown with the notice required in the Contract.

Should your client not terminate the Contract prior to the expiration of the Study Period, as set forth in the Contract, we assume that Jericho will proceed to closing as required by the Contract or forfeit its deposit.

1061720

**104**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Jericho Group, Ltd.
Re:  West Side Properties - New York, NY
Page 2

Please be guided accordingly.

Very truly yours,

Edward G. Imperatore

EGI:dmc
cc:    Midtown Partners
       (Via Telecopier)

1044566

## 105

**Exhibit I to Imperatore Affirmation –**
**Letter from Michael A. Szegda to Maurice Stone, dated August 28, 2002**

SZEGDA & GERBING

ATTORNEYS AT LAW

300 EAST 42ND STREET

NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-9300

FAX: (212) 370-9616

August 28, 2002

VIA FACSIMILE
(201) 487-4758
and
U.S. POSTAL SERVICE

Maurice I. Stone, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development,
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Maurice:

Without prejudice to its current rights under the referenced contract, Jericho has determined to accept the proposal of Midtown regarding extension of the study period as set forth in Ed Imperatore's letter dated July 15, 2002, and as reiterated in his letter dated July 27, 2002. Please prepare a draft of an appropriate amendment to the referenced contract and forward it to me (by facsimile at [201] 750-3574) as soon as possible so that we can finalize the matter prior well before the current expiration date of the study period.

Very truly yours,

Michael A. Szegda

MAS:ps

Mf.stone.082802

## 106

Exhibit J to Imperatore Affirmation –
Letter from Edward G. Imperatore to Michael A. Szegda, dated August 29, 2002

# HARWOOD LLOYD. LLC

COUNSELLORS AT LAW

130 MAIN STREET
HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

FRANK V. D. LLOYD ◊†
MICHAEL B. OROPOLLO
RICHARD J. RYAN
DAVID F. MCBRIDE †
EDWARD G. IMPERATORE †
FRANK HOLAHAN †
RUSSELL A. PEPE ◊†
GREGORY J. IRWIN ◊†
BRIAN C. GALLAGHER ◊
CHARLES E. POWERS, JR. ◊
DAVID T. ROBERTSON ◊
PETER E. MUELLER
MICHAEL J. BRADY †
DAVID M. REPETTO
THOMAS A. KEENAN ◊

RICHARD W. LE BLANCO
CURTIS J. TURPAN
ELIZABETH F. LORELL
JOSEPH P. SCORESE †
JOHN R. GONZO
DAVID T. PFUND †

VICTOR C. HARWOOD, III 1880-1963
FRANCIS V. D. LLOYD 1917-1976
JOHN W. GRIGGS 1929-1980
CHARLES C. SHENIER 1929-1970
EMIL M. WULSTER 1929-1978
DANIEL GILADY 1963-1975
GEORGE A. BROWN 1941-1948
AUGUST SCHEDLER 1946-1981

PETER CIOLINO
ANTHONY J. SCIUTO
W. FLETCHER HOCK, JR.
PETER VANDERVOORT
OF COUNSEL

THOMAS LOXKITH
JOSEPH M. KENNEDY †
MAURICE L. STONE
COUNSEL

PAUL E. KIEL
LINDA M. MESCE †
KRISTINE DENNING †
ROBERT M. ADAMS
IAN C. DORIS ◊
IFEOMA ANTONIA OLEJIOKE †
MELISSA A. HARTIGAN
DOUGLAS F. DOLEK
LENA V. BALLAS †
DAVID S. BLOW
EILEEN P. KUZMA †
VALERIE STEINER †
RAFAEL ALBAN †
ALEXANDER G. PAPPAS
GABRIEL ADAMO
MICHAEL A. GALLARDO †

◊ CERTIFIED BY THE SUPREME COURT
OF NJ AS CIVIL TRIAL ATTORNEY
† ALSO ADMITTED IN NY

WRITER'S DIRECT DIAL: (201) 487-2608
DIRECT EMAIL: EImperatore@Harwoodlloyd.com
DIRECT FAX NO.: (201) 489-5005
REPLY TO: Hackensack
FILE NO.: 5152-1

August 29, 2002

**VIA TELECOPIER & REGULAR MAIL**
Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

Re:    **Sale of Midtown Development, LP ("Midtown") Properties to
       Jericho Group ("Jericho")
       Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")**

Dear Mr. Szegda:

This is in response to your August 28, 2002 letter to my colleague Murray Stone.

Because Jericho several times rejected proposals set forth in my July 15 and July 27, 2002 letters by counterproposals demanding extensions of the Study Period under the Contract through, at least, July 1, 2003, Midtown deems those proposals, as rejected, to be null and void. Therefore, Midtown directs Jericho to proceed according to the Contract in all respects, with the understanding that the Study Period expires by its own terms next Tuesday, September 3, 2002.

Please be guided accordingly.

Very truly yours,

EDWARD G. IMPERATORE

EGI/dmc
cc:    **Midtown Partners (Via Telecopier)**

1064020

## 107

Exhibit K to Imperatore Affirmation –
Letter from Michael A. Szegda to Edward G. Imperatore, dated September 3, 2002

SEP-03-02 05:01 PM  SZEGDA RESIDENCE          2017503571          F.01

*Imperatore*

### SZEGDA & GERBING
ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN F. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-8300
FAX (212) 370-9615

September 3, 2002

VIA FACSIMILE
(201) 487-4758

Midtown Development LLC
40 Arcorp Properties
Pershing Road
Weehawken, New Jersey

Edward G. Imperatore, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

> Re: Contract dated June 18, 2002, between Midtown Development,
> LLC ("Midtown") and Jericho Group Ltd. ("Jericho")(hereinafter
> called the "Contract")

Gentlemen:

We have now received your formal response to our letter dated August 30, 2002.

Be advised that, unless you advise us in writing that Midtown is willing (i) to make an affirmative representation that the oil spill referred to in my earlier letter of today's date has been cleaned up and paid for or (ii) to undertake whatever cleanup may be necessary at its cost and expense or (iii) to extend the study period for a sufficient period to allow Jericho to investigate this matter, and, in any case provide Jericho with the requested due diligence documentation, Jericho requests that the monies paid upon execution of the Contract be returned to it in accordance with the Contract's terms..

Said monies should be wired to our IOLA Trust Account. Wiring instructions are transmitted herewith.

Very truly yours,

Michael A. Szegda

MAS:ps
cc: Jericho Group Ltd.

**108**

Exhibit L to Imperatore Affirmation –
Letter from Maurice Stone to Michael A. Szegda, dated September 5, 2002
[pp. 108-109]

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

ITEM'S DIRECT DIAL: (201) 359-3647
ECT EMAIL:    MStone@Harwoodlloyd.com
ECT FAX NO.:   (201) 489-5005
PLY TO:      Hackensack
E NO.:       5152-1

September 5, 2002

**VIA TELECOPIER**
Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

    Re:    **Sale of Midtown Development, LP ("Midtown") Properties to Jericho Group ("Jericho") Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")**

Dear Mr. Szegda:

    We are in receipt of your September 4, 2002 letter to Edward Imperatore.

    Stripped of all rhetoric, Midtown understands that as of September 3, 2002, Jericho intended to cancel the Contract in order to obtain a refund of its Downpayment. However, your recent letters do not expressly state that, as is required and necessary. Instead, your recent letters raise a host of new proposals, all of which Midtown has rejected.

    As a condition to refunding Jericho's Downpayment, Midtown therefore expects you (or Jericho) to confirm unequivocally that Jericho is canceling the Contract as condition to refunding Jericho's Downpayment.

1065066

**109**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re: Midtown to Jericho
September 5, 2002
Page 2

Paragraph 29 of the Contract sets forth a specific procedure for Jericho to cancel the Contract. Specifically, the Contract states that,:

> **"If prior to the conclusion of the Study Period, Purchaser shall determine, in its sole and absolute discretion that the Property is not suitable for its needs, the Purchaser shall have the right to cancel this Contract upon written notice to Seller and the Escrowee. Purchaser need not specify any reason for such cancellation. Upon timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser the monies paid upon execution hereof". [Emphasis added].**

To this point, neither you nor Jericho has actually provided any notice that Jericho was canceling the Contract. In light of your most recent letters, we cannot imagine that Jericho would seek a refund of its Downpayment and still rely on a Contract that it has repudiated.

Nevertheless, we must state that Jericho cannot have it "both ways". Either Jericho formally cancels the Contract by notice required by Paragraph 29 or it must proceed to close at its own risk. This Firm, as Escrow Agent under the Contract, requires Jericho (or you) to send us the requisite notice confirming Jericho's cancellation of the Contract. Assuming we receive such notice, this Firm will promptly return the Downpayment to Jericho without seeking a General Release in substitution for that notice.

I await your response.

Very truly yours,

Maurice L. Stone

MLS/dmc
cc:    Midtown Partners (Via Telecopier)
        Edward G. Imperatore, Esq.

1065066

# 110

**Exhibit M to Imperatore Affirmation –**
**Letter from Maurice Stone to Michael A. Szegda, dated September 10, 2002**
**[pp. 110-111]**

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

STEN'S DIRECT DIAL: (201) 359-3647
BEST EMAIL: MStone@Harwoodlloyd.com
BEST FAX NO.: (201) 489-5005
PLY TO: Hackensack
E NO.: 5152-1

September 10, 2002

**VIA CERTIFIED MAIL/RETURN**
**RECEIPT REQUESTED AND TELECOPIER**
Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

**VIA CERTIFIED MAIL/RETURN**
**RECEIPT REQUESTED**
Jericho Group, Ltd.
c/o Wasserman Two Irrevocable Trust
155 Lee Avenue
Brooklyn, NY 11211

Re:  Sale of Midtown Development, LP ("Midtown") Properties to
Jericho Group ("Jericho")
Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")

Gentlemen:

Since we have received no response to our September 5, 2002 letter to Michael Szegda, Esq., a copy of which is attached, requesting an unequivocable confirmation that Jericho intended to cancel the Contract by its repeated requests for return of its Downpayment, this Firm, as Escrow Agent under the Contract, cannot presently return the Downpayment to Jericho.

1065979

**111**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Jericho Group, Ltd.
Re: Midtown to Jericho
September 10, 2002
Page 2

Absent Jericho's providing us with confirmation not later than the close of business Thursday, September 12, 2002 that it intended to cancel the Contract, please be advised that Midtown expects Jericho to close in accordance with Paragraph 32 of the Contract. Paragraph 32 requires a closing on the fifteenth (15th) day after the conclusion of the Study Period. As you are aware, the Study Period expired on September 3, 2002. Therefore, Jericho is required to close on the Sites on Wednesday, September 18, 2002. Midtown is ready, willing, able and available to close on that date. Please notify us of the time and place for the Closing (at the office of Jericho's lender or its attorney) as required by Paragraph 32.

Please be guided accordingly.

Very truly yours,

Maurice L. Stone

MLS/dmc
cc:    Midtown Partners (Via Telecopier)
        Edward G. Imperatore, Esq.

1065070

## 112

Exhibit N to Imperatore Affirmation –
Letter from Maurice Stone to Michael A. Szegda, dated September 12, 2002

SEP-12-02  04:43 PM  SZEGDA RESIDENCE                2017503571                P.02

**SZEGDA & GERBING**
ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(818) 950-9322
Fax (818) 579-9116

September 12, 2002

VIA FACSIMILE
(201) 487-4758

Maurice I. Stone, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development,
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Maurice:

Reference is made to your letter dated September 10, 2002.

Although Jericho's principals felt, and still feel, that, under the circumstances which
came to light in the month of August, either some affirmative response with respect to the oil
spill or an extension of the study period and the request for production of documents was
warranted, this letter will serve as confirmation that our letter on behalf of Jericho dated
September 3, 2002, requesting the return of Jericho's down payment was intended as the exercise
of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and
receive the return of the monies paid upon execution thereof.

Very truly yours,

Michael A. Szegda

MAS:ps

ML4tone:1991.2012

# 113

**Exhibit 0 to Imperatore Affirmation –**
**Memorandum from Maurice Stone to Maria Walsh, dated September 13, 2002**
**[pp. 113-116]**

## M E M O R A N D U M

TO:         Maria Walsh

FROM:     Maurice L. Stone

DATE:     09/13/2002

RE:         Midtown/Jericho
               5152-1

---

Maria,

Please trigger a wire transfer (instructions attached) of the deposit monies being held in our PNC Bank trust account in the amount of $250,000.00 with regard to the above-noted transaction.

If you have any questions or comments, do not hesitate to contact me at extension 3547.

Thank you.

MLS/dmc
Attachments

1066960

114

SEP-01-02 05:19 PM  SZEGDA RESIDENCE          2017503571          P.R2

## SZEGDA & GERBING
### ATTORNEYS AT LAW
### 300 EAST 42ND STREET
### NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-8300
FAX (212) 370-8512

## WIRING INSTRUCTIONS

Szegda & Gerbing
IOLA Trust Account
AC 811352801
Sterling National Bank & Trust Company of New York
622 Third Avenue
New York, New York 10017
ABA # 026007773

**115**



FOR CLEAR COPY, PRESS FIRMLY

HARWOOD LLOYD, LLC
IOLTA ATTY TRUST ACCT

DATE June 17, 2002

| | DOLLARS | CENTS |
|---|---|---|
| CURRENCY | | |
| COINS | | |
| CHECKS 1811 ACH | 250,000 | 00 |
| 2201 | | |

TOTAL 250,000 00

Ⓟ **PNCBANK**

PNC Bank, N.A.    060
New Jersey

5152-1

⑆6400⑉6020⑆ 810191395 6⑆

TOTAL ITEMS  01    $          $        250,000.00

---

ACCOUNT NUMBER **9886608 63701**                                          **2201**

ACCOUNT NAME  Wasserman Two Irrevocable Trust   DATE June 13, 2002 12/210

PAY TO THE ORDER OF  Harwood Lloyd Attorney Trust Account      | $250,000.00

—Two hundred fifty thousand and XX/100    DOLLARS

◻ **CHASE**  JPMorgan Chase Bank
225 Havemeyer Street
Brooklyn, NY 11211                    6

Deposit: Lot 1, Block 708 and
Lot 17, Block 709

⑆002201⑆ ⑈0260000⑈                    89

# EXHIBIT A
# TO GEREMIA DECLARATION
# Part 3

**116**

# Domestic Wire/International Wire/International Draft    ◆ PNCBANK

I hereby authorize PNC Bank to effect the following transfer:    Date 9-13-02    Time

| From | |
|---|---|
| Account Name Harwood Lloyd LLC | Taxpayer Identification Number 22-1969658 |
| Address 130 Main St. | Telephone Number (201)487-1080 |
| City, State, ZIP Code Hackensack NJ 07601 | Debit Account Number 8101913956 |
| Identification of Person Initiating Wire G0290 096630/554 -NJ 1-31-05 | |

| To | Domestic Wire | |
|---|---|---|
| Amount $250,000.00 | Beneficiary's Account Number 811352801 | ABA Number (if known) 026007773 |
| Beneficiary's Bank Sterling Nat'l Bank & Trust NY | Branch Address 622 Third Avenue | City, State, ZIP Code NY NY 10017 |
| Beneficiary Name/Payee Name Szegda & Gerbino Idta Trust Act | Beneficiary Address | City, State, ZIP Code |

| International Wire | | | |
|---|---|---|---|
| Amount $ | Currency | Beneficiary's Account Number | Beneficiary's Bank |
| Branch Address | | City/ Province/ State | Country |
| Beneficiary Name | | Beneficiary Address | Country |

| International Draft | | |
|---|---|---|
| Amount $ | | Currency |
| Payee Name | Address | Country |

| Additional Information |
|---|
| |

| Settlement | | |
|---|---|---|
| Domestic Wire | International Wire/Draft - U.S. Currency | International Wire/Draft - Foreign Currency |
| Amount of Wire $250,000.00 | Amount $ | Amount $ |
| Wire Fee $ | Wire/Draft Fee $ | Exchange Rate |
| Total Charge $ | Total Charge $ | U.S. Equivalent |

| Market | Telephone | Fee $ |
|---|---|---|
| DEL, NEP, PHL, PNJ, SCP .............................. 800-272-4912 | | |
| CPA, KYI, NWP, OHK, PGH .............................. 800-762-9475 | | Total Charge $ |
| International Wires/Drafts .............................. 800-870-5322 | | |

All Wire Rooms operate from 8:30 a.m. to 4:00 p.m.

I understand that this funds transfer request is subject to the terms and conditions as stated on the reverse side.

| Client Signature *Jean C. Hallaghan* | Branch Number | Branch Representative |
|---|---|---|

| For Internal Use Only | | |
|---|---|---|
| Wire Room Operator | Confirmation Number | Wire Placed By | Time Placed |

Wire Confirmation: If the wire is $10,000.00 or over, it must be confirmed by another Authorized Employee in the Cost Center by the Wire Room.
Wire will not be sent if confirmation is not completed.)

| Branch Wire Call Back Confirmation By | Time Confirmed | Wire Room Operator Confirming |
|---|---|---|

7-0300    ** Only if $10,000 or OVER    White - Wireroom    Canary - Customer

# 117

### Exhibit P to Imperatore Affirmation –
### Letter from Maurice Stone to Michael A. Szegda, dated June 19, 2002
### [pp. 117-118]

# HARWOOD LLOYD, LLC

### COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

FRANK V. D. LLOYD ◊†
MICHAEL B. OROPOLLO
RICHARD J. RYAN
DAVID F. MCBRIDE †
EDWARD G. IMPERATORE †
FRANK HOLAHAN †
RUSSELL A. PEPE ◊†
GREGORY J. IRWIN ◊†
BRIAN C. GALLAGHER ◊
CHARLES E. POWERS, JR. ◊
DAVID T. ROBERTSON ◊
PETER E. MUELLER
MICHAEL J. BRADY †
DAVID M. REPETTO
THOMAS A. KEENAN ◊

RICHARD W. LE BLANCO
CURTIS J. TURPAN
ELIZABETH F. LORELL
JOSEPH F. SCORESE †
JOHN R. GONZO
DAVID T. PFUND †

VICTOR C. HARWOOD, II 1960-1999
FRANCIS V. D. LLOYD 1917-1974
JOHN W. ORGOS 1929-1980
CHARLES C. SHENIER 1916-1970
EMIL M. WULSTER 1913-1975
DANIEL GILADY 1963-1975
GEORGE A. BROWN 1934-1986
AUGUST SCHEDLER 1986-1999

PETER CIOLINO
ANTHONY J. SCIUTO
W. FLETCHER HOCK, JR.
PETER VANDERVOORT
OF COUNSEL

THOMAS LOHSTH
JOSEPH M. KENNEDY †
MAURICE L. STONE
COUNSEL

PAUL E. KIEL
LINDA M. MESCE †
KRISTINE DENNING †
ROBERT M. ADAMS
IAN C. DORES ◊
IFEOMA ANTONIA OLEJEKE †
MELISSA A. HARTIGAN
DOUGLAS F. COLEX
LENA V. BALLAS †
DAVID B. BLOW
OLEEN P. KLIZMA †
VALERIE STEINER †
RAFAEL ALBAN †
ALEXANDER G. PAPPAS
GABRIEL ADAMO
MICHAEL A. GALLARDO †

◊ CERTIFIED BY THE SUPREME COURT
OF NJ AS CIVIL TRIAL ATTORNEY
† ALSO ADMITTED IN NY

WRITER'S DIRECT DIAL: (201) 359-3647
DIRECT EMAIL: MStone@Harwoodlloyd.com
DIRECT FAX NO.: (201) 489-5005
REPLY TO: Hackensack
FILE NO.: 5152-1

June 19, 2002

### VIA FEDERAL EXPRESS

Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

Re:   Midtown to Jericho
       West Side Properties - New York, New York
       Lot 1, Block 708 and Lot 17, Block 709

Dear Mr. Szegda:

In accordance with the Contract of Sale dated June 18, 2002, I am enclosing the following due diligence items:

1. Environmental Impact Statement dated December 15, 1989.

2. City Planning Commission ("CPC") Approved Drawings dated August 21, 1989.

3. Zoning approvals, including Board of Estimate Resolution and CPC Resolutions and Special Permits (now expired).

4. Memorandum showing location of sites (with attachments):

    a.   Site map.

    b.   Title information.

1047799

**118**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re: Midtown to Jericho
June 19, 2002
Page 2

5. Surveys:

    a. Block 709, Lot 17.

    b. Block 708, Lot 1.

6. Documents defining Amtrak easement (including predecessor easement in favor of Conrail) and Developer's right to build over such easement.

    a. Agreement dated April 23, 1990 regarding Developer's right to build at specific heights over rail and Amtrak's right to build and use a temporary ramp to gain access to its easement.

    b. Information regarding Amtrak standards for construction within and over easement.

    c. Form of Amtrak Permit for activities within easement.

7. 1989 Drawings showing proposed Transitway Plan.

8. Draft Report of Far West Midtown Transportation Study.

Please call me should you have any questions.

Very truly yours,

Maurice L. Stone

MLS/dmc
Enclosures
cc    (w/o encl.):    Midtown Partners    (Via Telecopier)

**119**

Exhibit Q to Imperatore Affirmation –
Letter from Michael A. Szedga to Edward G. Imperatore, dated September 2, 2002

SEP-03-02 12:58 PM  SZEGDA RESIDENCE                    2017503571              P.02



## SZEGDA & GERBING

ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN F. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-2300
FAX:(212) 370-8610

September 2, 2002

VIA FACSIMILE
(201) 487-4758

Edward G. Imperatore, Esq.
Hurwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development,
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Mr. Imperatore:

Exhibit B to the referenced contract, an agreement dated April 23, 1990, among Midtown, Jerrart Venture and National Railroad Passenger Corporation, makes reference to Exhibits A-1, A-2, A-3, B-1 and C-1, none of which were attached thereto. Please provide a copy of these exhibits directly to our client by facsimile at (718) 792-7160.

Very truly yours,

Michael A. Szegda

MAS:ps

cc: Jericho Group Ltd.

MTimperatore 090202

**120**

Exhibit R to Imperatore Affirmation –
·Letter from Edward G. Imperatore to Michael A. Szegda, dated September 3, 2002
[pp. 120-121]

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

TER'S DIRECT DIAL:  (201) 487-2608
EC'' EMAIL:   EImperatore@Harwoodlloyd.com
ECT FAX NO.:  (201) 489-5005
LY TO:   Hackensack
NO.:   5152-1

September 3, 2002

**VIA TELECOPIER & REGULAR MAIL**

Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

> Re:   **Sale of Midtown Development, LP ("Midtown") Properties to
> Jericho Group ("Jericho")
> Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")**

Dear Mr. Szegda:

This is in response to your letter to me dated September 2, 2002. In fact, I received that letter minutes ago.

Midtown does not now (and did not at the commencement of the Contractual "Study Period") have the Exhibits referred in your letter, so it could not provide those Exhibits to Jericho. More to the point, Jericho has had 75 days under the Contract to obtain such Exhibits from the National Rail Corporation, more commonly known as "Amtrak", and, indeed, to meet with Amtrak concerning all issues relating to Amtrak's easement across the Sites and Jericho's right to build over that easement. It never did so.

Jericho is now simply wasting time. It is 2:45 p.m. on the last day of Jericho's Contractual "Study Period", and, should Jericho not send us **by 5:00 p.m.** its request for refund of its Downpayment, Midtown will demand that Jericho proceed to closing **strictly** according to the Contract.

1064020

121

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re:  Midtown to Jericho
August 29, 2002
Page 2

Please be guided accordingly.

Very truly yours,

EDWARD G. IMPERATORE

EGI/ama
cc:    **Midtown Partners (Via Telecopier)**

1064020

**122**

Exhibit S to Imperatore Affirmation –
Letter from Michael A. Szedga to Edward G. Imperatore, dated August 30, 2002
[pp. 122-123]

AUG- 9-0: 03:27 PM   SZEGDA RESIDENCE          2017503571

## SZEGDA & GERBING

ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-2300
FAX (212) 370-9516

August 30, 2002

VIA FACSIMILE
(201) 487-4758

Edward G. Imperatore, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development,
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Mr. Imperatore:

In your letter dated August 29, 2002, you stated that "the Study Period expires, by its own terms next Tuesday, September 3, 2002." I interpret such to mean that we will have until 5:00 p.m. on September 3, 2002, to give notice to you that Jericho is electing to terminate the referenced contract (which may be sent by facsimile transmission), and, if such notice is given, that Jericho shall receive the return of the Downpayment. Please confirm that you agree with my interpretation as correct.

In a letter dated August 1, 2002, we requested certain documents and drawings prepared by Midtown's architects in 1990 as being necessary to Jericho's due diligence investigation of the property. The requested documents were delivered to our office on either August 6th or August 7th. In your letter dated August 2, 2000, you stated that "pursuant to Paragraph 29(a) of the Contract of Sale, Midtown's obligation is merely to provide Jericho with such 'due diligence' materials that Midtown had in its own possession."

Our client's principals have pointed out to us that it is Paragraph 29(c) and Paragraph 33 of the Contract of Sale, and not Paragraph 29(a) which address this issue. Paragraph 29(c) provides, in pertinent part, "[i]mmediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the Property, which Purchaser reasonably requests" (emphasis added). Paragraph 33 provides, in pertinent part, "[w]ithin two (2) business days from the date hereof, Seller shall make available to the Purchaser copies of all documentation pertaining to such permits and/or approvals" (i.e., the permits and/or approvals which Midtown may have obtained with respect to the development of the premises).

123

Edward G. Imperatore, Esq.
August 30, 2002
Page 2

    Our client's principals believe that documents and/or drawings in the possession of the firm of architects engaged by Midtown to develop the property are documents and/or drawings under Midtown's custody or control and that such documents and/or drawings were documentation pertaining to the permits and/or approvals which Midtown had obtained (albeit expired) with respect to the development of the premises. For this reason, our client's principals believe that the seventy-five (75) day study period should not have begun to run until the date the 1990 documents and drawings were delivered by Midtown's architects. Please advise whether Midtown will concur in such interpretation.

    Finally, in a letter to your colleague, Maurice Stone, dated August 13, 2002, we requested whether any environmental studies had been performed specifically with respect to these properties and, if any written reports existed, to have copies thereof. We also asked "[i]f no written report was prepared, kindly advise whether your client received any oral reports concerning the existence of hazardous materials at the property." Mr. Stone's response on August 14, 2002, was that "[n]o Phase I Environmental Report or Study was performed on the Property" and did not specifically address our request.

    We raise this issue only because our client's principals have very recently heard scuttlebutt that there may have been an oil spill on the properties which may or may not have been cleaned up. Please advise, immediately, if there is any truth to this information and also whether Midtown, or any of its representatives, ever received any notice, written or oral, from the City of New York or any agency thereof, or from any third party, of the existence or possible existence of an oil spill or any other hazardous material on either of the properties, and, if so, the disposition thereof. Notwithstanding all that has preceded, our client is disposed to proceed with the contract, but needs this information in order to make an informed decision whether or not to do so.

Very truly yours,

Michael A. Szegda

MAS:ps

cc: Maurice L. Stone, Esq.

**124**

Exhibit T to Imperatore Affirmation –
Letter from Edward G. Imperatore to Michael A. Szegda, dated September 3, 2002
with attachment
[pp. 124-126]

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

WRITER'S DIRECT DIAL: (201) 487-2608
DIRECT EMAIL: EImperatore@Harwoodlloyd.com
DIRECT FAX NO.: (201) 489-5005
REPLY TO: Hackensack
FILE NO.: 5152-1

September 3, 2002

**VIA TELECOPIER & REGULAR MAIL**
Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

Re:     Sale of Midtown Development, LP ("Midtown") Properties to
        Jericho Group ("Jericho")
        Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")

Dear Mr. Szegda:

In response to your August 30, 2002 letter, Midtown concurs with your interpretation that should Jericho provide Midtown with written notice that it is electing to terminate the Contract by 5:00 p.m. today, Midtown must return the Downpayment to Jericho as quickly as possible.

As to the other issues raised in your letter, Midtown responds as follows:

- Midtown rejects Jericho's position that the contractual "Study Period" would commence as of the date Jericho received the drawings and materials from Alexander Cooper, Midtown's architect. As stated in my August 2, 2002 letter, a copy of which is attached, Midtown complied with all of its obligations under Contract, and did in

1064439

**125**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re: Midtown to Jericho
September 3, 2002
Page 2

fact make available to Jericho copies of all architectural documents and drawings that it had in its possession. Moreover, despite the fact that Midtown had no obligation to do so, Midtown arranged to have the documents and drawings it did not have in its possession retrieved from Cooper's archives and sent to Jericho.

- Jericho has known at least since my letter dated August 14, 2002, a copy of which is attached, that Midtown performed no environmental studies with respect to the Sites.

- Finally, Jericho has known since Midtown's broker's e-mail to Jericho's broker dated August 23, 2002, a copy of which is also attached, that Midtown has no information with respect to whether or not an oil spill from adjacent properties onto the Sites was cleaned up. Nevertheless, Midtown provided Jericho in that e-mail with all information necessary to make that determination.

In short, Jericho's options are limited to either terminating the Contract by the end of business today and receiving a refund of the Downpayment or proceeding to Closing in accordance with the Contract. If Jericho elects to proceed to Closing in accordance with the Contract, Jericho ought to understand that Midtown, having already rejected Jericho's numerous attempts to amend, revise or sidestep the Contract it freely signed, would enforce the Contract strictly.

Very truly yours,

EDWARD G. IMPERATORE

EGI/dmc
cc:    **Midtown Partners (Via Telecopier)**

1064020

## 126

**Stone, Maurice**

| | |
|---|---|
| **From:** | EMMET [eemmet@optonline.net] |
| **Sent:** | Tuesday, September 03, 2002 4:31 AM |
| **To:** | mstone@harwoodlloyd.com |
| **Subject:** | Fw: Jericho-Midtown |

```
----- Original Message -----
From: "EMMET" <eemmet@optonline.net>
To: <benshafran@liacom.net>
Sent: Friday, August 23, 2002 10:39 AM
Subject: Fw: Jericho-Midtown


>
> ----- Original Message -----
> From: "Astore, Anna" <AAstore@harwoodlloyd.com>
> To: <eemmet@optonline.net>
> Sent: Thursday, August 22, 2002 8:29 PM
> Subject: Jericho-Midtown
>
>
> > We have no papers confirming the successful cleanup of the oil spill
from
> > properties neighboring the Sites, in fact, we have not had contact
with
> > NYDEC in years.  However, NYDEC should have the necessary papers
filed
> > under:
> >
> > Javits Center Project
> > Project ID Number 5P00334
> > Spill Number 9709152
> >
> > NYDEC investigator had been Chris Tomosello but he is long departed.
Our
> > last contact Louise Munster at 718-482-4912.
> >
> > Edward G. Imperatore
> >
> > Anna Astore
> >
> >
>
**********************************************************************
****
> > *****************************
> > This e-mail and any documents accompanying this e-mail contain
information
> > which is confidential and/or legally privileged.  The information is
> > intended only for the use of the individual or entity named on this
> > e-mail.
> > If you are not the intended recipient, you are hereby notified that
any
> > disclosure, copying, distribution, or the taking of any action in
reliance
> > on the contents of this e-mail information, is strictly prohibited
and
> that
> > the documents should be returned to Harwood Lloyd, LLC immediately.
In
> this
> > regard, if you have received this e-mail in error, please notify us
by
```

1

**127**

Exhibit U to Imperatore Affirmation –
Letter from Michael A. Szegda to Maurice Stone, dated August 13, 2002
[pp. 127-128]

AUG-13-02 12:32 PM  SZEGDA RESIDENCE          2017503574          P.02

# SZEGDA & GERBING
### ATTORNEYS AT LAW
### 300 EAST 42ND STREET
### NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN F. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-8300
Fax: (212) 370-9818

August 13, 2002

VIA FACSIMILE
(201) 487-4758
    and
UNITED STATES POSTAL SERVICE

Maurice I. Stone, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

> Re: Contract dated June 18, 2002, between Midtown
> Development, LLC ("Midtown") and Jericho Group Ltd.
> ("Jericho")

Dear Maurice:

Included in your original due diligence package was a three page document entitled "National Railroad Passenger Corporation Temporary Permit to Enter upon Property." It was undated and unsigned. Please ascertain whether a signed copy exists and, if so, furnish our client a copy.

Also included were surveys of the block between 37th and 38th streets (correct) and the block between 38th and 39th streets (incorrect). Our client needs a copy of the survey of the block between 36th and 37th streets.

Our client has also noted that, while an environmental impact statement pertaining to the area in which the property is located was included in the due diligence package, there was no report of any environmental study pertaining specifically to this property. Our client finds this somewhat unusual since filings with NYC generally require at least a Phase I environmental report. Please ascertain whether an environmental study of this

128

AUG-13-82 12:32 PM  SZEGDA RESIDENCE                2917583574          P.03

Maurice I. Stone, Esq.
August 13, 2002
Page 2

property was done and whether any such report was prepared (whether for your client or any of the professionals retained by your client) and, if so, furnish our client a copy. If no written report was prepared, kindly advise whether your client received any oral reports concerning the existence of hazardous materials at the property.

Finally, during the "walk through" of the property last week, our client's principals observed that Amtrak had only a single railroad track crossing the property. Do you or your clients know if this is the extent of Amtrak's easement or whether it covers a greater portion of the property? Please advise.

Thank you for your assistance.

Very truly yours,

Michael A. Szegda

MAS:ps

**129**

Exhibit V to Imperatore Affirmation –
Letter from Maurice Stone to Michael A. Szegda, dated August 14, 2002
[pp. 129-130]

*Ed.*

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1835

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

WRITER'S DIRECT DIAL:

DIRECT EMAIL:     (201) 359-3647
DIRECT FAX NO.:   MStone@Harwoodlloyd.com
REPLY TO:         (201) 489-5005
FILE NO.:         Hackensack
                  5152-1

August 14, 2002

**VIA FEDERAL EXPRESS**

Michael Szegda, Esq.
Jericho Group, Ltd.,
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

Re:    Sale of Midtown Development, LP ("Midtown") Properties to
       Jericho Group ("Jericho") -
       Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")

Dear Mr. Szegda:

I have received your August 13, 2002 correspondence and would like to respond to your inquires as follows:

1. The temporary permit was a form previously sent to Midtown. The permit was never signed and, may or may not be the permit form that Amtrak is now utilizing. I suggest you contact Amtrak to arrange to obtain a current permit.

2. Enclosed is a copy of the Survey print for the 36th-37th Street Property.

3. No Phase I Environmental Report or Study was performed on the Property.

1060536.1

## 130

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re:  Midtown to Jericho
August 14, 2002
Page 2

4.  The extent of Amtrak's easement is set forth in the documents provided to you.  I
believe that the easement area is larger than the single track but I suggest that you
have a surveyor clarify the exact extent of the easement.

Very truly yours,

MAURICE L. STONE

MLS:mak
Encl.
cc:    Edward G. Imperatore, Esq.

## 131

Exhibit W to Imperatore Affirmation –
Letter from Michael A. Szegda to Maurice Stone, dated August 1, 2002 and Letter from
Michael A. Szegda to Maurice Stone, dated July 17, 2002
[pp. 131-132]

AUG-01-02 04:14 PM   SZECDA RESIDENCE          2017503571          P.02

### SZEGDA & GERBING
ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-9300
Fax (212) 370-9416

August 1, 2002

VIA FACSIMILE
(201) 487-4758

Maurice I. Stone, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown Development,
LLC ("Midtown") and Jericho Group Ltd. ("Jericho")

Dear Maurice:

Reference is made to my letter to you dated July 17, 2002, a copy of which is transmitted herewith. Our clients advise that they still have not received the 1990 documents/drawings referred to therein. Also transmitted herewith is a copy of letter from their architects confirming that they cannot proceed with "due diligence" without these items.

Please advise.

Very truly yours,

Michael A. Szegda

MAS:ps
cc: Mr. Sam Pfeiffer
    Mr. Peter Brassard.

132

AUC-01-02 04:44 PM   SZEGDA RESIDENCE          2017502571          P.03

# SZEGDA & GERBING

## ATTORNEYS AT LAW
### 300 EAST 42ND STREET
### NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-0300
Fax (212) 370-9515

July 17, 2002

VIA FACSIMILE
(201) 487-4758

Maurice L. Stone, Esq.
Harwood Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re:    Contract of sale dated June 18, 2002, between Midtown
Development LLC ("Midtown") and Jericho Group Ltd.
("Jericho")

Dear Maurice:

Further to our telephone conversation of yesterday, I have transmitted herewith an excerpt from the records of the Board of Estimate of the City of New York detailing the documents and/or drawings filed by Cooper, Robertson & Partners ("Cooper, Robinson") in connection with Midtown's application for its zoning resolution, which was included in the "due diligence" package forwarded to us under cover of your letter dated June 19, 2002. More than twenty of the documents and/or drawings itemized thereon bear a 1990 date and none of these 1990 documents/drawings were included in your "due diligence" package.

Our clients have advised us that their architects and zoning attorneys have advised them that, without the 1990 documents/drawings, they cannot begin a meaningful analysis of the project. Our clients have further advised us that they have spoken with Mr. David McGregor of Cooper, Robinson, who advised them that the 1990 documents/drawings were not available in his office but would have to be retrieved from archives.

Please arrange for these documents/drawings to be delivered to our client as soon as possible. Thank you.

Very truly yours,

Michael A. Szegda

MAS:ps

cc: Jericho Group Ltd.

**133**

Exhibit X to Imperatore Affirmation –
Letter from Edward G. Imperatore to Michael A. Szegda, dated August 2, 2002
[pp. 133-134]

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

ITEM'S DIRECT DIAL: (201) 487-2608
ECT EMAIL: EImperatore@Harwoodlloyd.com
ECT FAX NO.: (201) 489-5005
'LY TO: Hackensack
: NO.: 5152-1

August 2, 2002

**VIA TELECOPIER**

Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

Re:    Sale of Midtown Development, LP ("Midtown") Properties to
Jericho Group ("Jericho") -
Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")

Dear Mr. Szegda:

This is in response to your letter dated August 1, 2002 requesting certain documents and drawings prepared by our architects, Alexander Cooper and Partners, in 1990.

You should know that pursuant to Paragraph 29 (a) of the Contract of Sale, Midtown's obligation is merely to provide Jericho with such "due diligence" materials that Midtown had in its own possession. Midtown has long since produced those materials. However, I am informed by Alexander Cooper and Partners that the documents and drawings you requested from that Firm have been available to you for several weeks but you have yet to pay for them and pick them up. Therefore, without prejudice to Midtown's position that it has no obligation to provide such drawings and documents to you, I have directed Alexander Cooper and Partners to send them to you at Midtown's expense this one time. You should be receiving them shortly.

1056824.1

**134**

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re: Midtown to Jericho
August 2, 2002
Page 2

Midtown expects Jericho to complete its "diligence" in accordance with the Contract and then to proceed as the Contract requires.

Please be guided accordingly.

Very truly yours,

EDWARD G. IMPERATORE

EGI:mak
cc:    **Midtown Partners**        **(Via Telecopier)**
       **David McGregor**          **(Via Telecopier)**

# 135

Affidavit of Benjamin A. Shafran, dated February 23, 2005
[pp. 135-136]

23 Feb 05 04:02p     Robert B Goebel          2127372610         P.1

## Affidavit

BENJAMIN A. SHAFRAN duly sworn, deposes and says under penalties of perjury:

1.    I am a licensed real estate broker.  I was one of the real estate brokers involved in the sale of the Property, which is the subject matter of the litigation between Jericho Group, Ltd., as Plaintiff and Midtown Development, L.P., as Defendant.  Except as noted herein, I am fully familiar with the facts set forth herein.

2.    The other broker involved in the proposed transaction was Brown Harris Stevens, Residential Sales, LLC by Elaine Osborn Emmet.

3.    Prior to the execution and delivery of the subject Contract, Ms. Osborn Emmet delivered to me the materials regarding the Property, attached hereto as Exhibit A, including the plans for the project being referred to as "Riverview," 36th and 37th Streets at 11th Avenue, New York City.

4.    Together with this submission to me, she indicated that there was an Amtrak Agreement signed with Amtrak in 1990 affording specific rights with respect to construction of a platform over Amtrak's right-of-way; and that there were provisions with Amtrak that provide rights to build foundations in the Amtrak right-of-way to support that platform.

136

5.    I also can state that apparently there was a massive oil spill, which I did
not know about prior to the contract signing. I only generally learned about the oil spill
toward the end of the Study Period after specific inquiries were made by Jericho.
Subsequent to that, on or about September 24 I went with Sam Pfeiffer to the New York
State Department of Environmental Conservation where we reviewed information on file
regarding the oil spill and its cleanup.

_____
BENJAMIN A. SHAFRAN

Sworn to before me this ___ day
of February, 2005

_____
Notary Public

MICHAEL GOLDMAN
Notary Public - State of New York
No. 02GO6093138
Qualified in Nassau County
My Commission Expires May 27, 2007

2

# 137

Exhibit A to Shafran Affidavit –
**Plans for Riverview**
[pp. 137-139]

Exhibit A

## RIVERVIEW

### FAR WEST MIDTOWN; HIGH DENSITY, OFFICE CORE
### The 74 to ELEVENTH AVENUE CORRIDOR
Department of City Planning; Winter 2001

*Directly across from main entrance to Convention Center and public Plaza*

The highly impacted parcels, commencing at the corner of 37th Street and 11th Avenue set the key development in effect framing the Convention Center. They will distinguish the Plaza directly to the south, and define Far West Midtown.

Location: (1 & 1) 11th Ave. (30th and 37th Streets) Block 708-Lot-1;  64,137 sf
           (2) 28th – 38th Streets (10th and 11 Ave.)  Block 708-Lot-17;  29,305 sf
                                                                TOTAL:  85,512 sf

Taxes (1 & 2) 125 & 9,090; (2) 805,002 Total Tax  $245,000.

PROPOSED ZONING:        10-15 FAR      u5 to: 1,607,100 square feet

CURRENT APPROVED ZONING:                        729,864 square feet

(1) 225,000 sf, 600 room hotel,
(1-a) 418,700 sf, mixed uses, 48
      story residential tower
(2) 86,000 sf, 80 + car garage

For information call:

Elaine Gaitsch-Emmet

Brown-Harris Stevens
1 212 555-1212
1 212 555-1212 – fax
elainegaitsch@aol.com

1 dsh 555-1212 – entry
elainegaitsch@aol.com

138

**MEMORANDUM**

TO:      File

FROM:    Ed Imperatore

DATE:    March 30, 1998

RE:      Midtown Development, L.P. - Hotel Site
         5152-1

The attached map references the locations of the Hotel, Residential/Mixed Use and Garage development sites of Midtown Development  The following is the tax Block and Lot references with accompanying square footage and approved zoning floor areas for all the lots:

| MAP REFERENCE | BLOCK/LOT LOCATION | LOT SQUARE FOOTAGE | APPROVED ZONING FLOOR AREA |
|---|---|---|---|
| 1 | 706-1 36th & 11th Ave. | 64,187 SF | 243,469 SF (Hotel) |
| 1(a) | 36th to 37th Sts. | | 419,765 SF (Residential/Mixed Use) |
| 2 | 709-17 37th to 38th Sts. | 29,625 SF | 65,950 SF (Garage)  728,904 |
| 3 | 713-15 38th to 39th Sts. | 20,303 SF | Current Zoning |
| | 1072-24 43rd St. | 20,083 SF | Current Zoning |
| | 1076-24 47th St. | 20,083 SF | Current Zoning |

**139**



# 140

**Affidavit of Samuel Pfeiffer, for Plaintiff, in Opposition to Motion to Dismiss the Complaint,
dated February 27, 2005
[pp. 140-157]**

**SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK**

-----------------------------------------------------------X

JERICHO GROUP, LTD.,

<div align="center">Plaintiff,</div>

-against-

MIDTOWN DEVELOPMENT, L.P.,

<div align="center">Defendant.</div>

-----------------------------------------------------------X

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF BROOKLYN   )

Index No. 113274/04

**Affidavit in Opposition
to Defendant's Motion
To Dismiss Complaint**

## Affidavit in Opposition to
## Defendant's Motion To Dismiss Complaint

SAMUEL PFEIFFER, being duly sworn, deposes and says under penalties of perjury:

1.    I am a principal of Jericho Group, Ltd., the Plaintiff ("Jericho" or the "Plaintiff") in the above-captioned action and I submit this Affidavit in support of Plaintiff's opposition to Defendant's Motion to Dismiss the First Amended Verified Complaint dated November 29, 2004 (the "Complaint"). I also submit an Affidavit from Benjamin A. Shafran ("Shafran") dated February 23, 2005 (the "Shafran Affidavit"), and

# 141

a Memorandum of Law dated February 25, 2005 from Jericho's counsel. Except as noted herein, I am fully familiar with the facts set forth herein.[1]

      2.      I was one of the principals involved in the negotiations on behalf of Jericho for the purchase of the subject real property from the Defendant in the above-captioned action ("Midtown" or "Defendant"). I communicated with the brokers and with Midtown's counsel directly, as well as through Jericho's counsel.

## Contract; The Property; Conflicts of Interest; No Limitation of Jericho's Rights and Remedies; The Study Period

      3.      (a)      Pursuant to a June 18, 2002 contract (the "Contract")[2] Midtown agreed to convey to Jericho in accordance with the terms and conditions of the Contract two parcels of real property having a tax map designation in the City of New York as Block 708, Lot 1 and Block 709, Lot 17 (collectively the "Property").

            (b)      With regard to the purchase of the Property, the purchase included but was not limited to: plans and approvals for a 729,164 square foot development as part of the Special Jacob Javits Convention Center District being referred to as "Riverview," 36th and 37th Streets at 11th Avenue, New York City (the "Approved Project"). The Approved Project also included a signed and complete "Amtrak Agreement" affording Midtown specific assignable rights with respect to construction of a platform over Amtrak's railroad right-of-way; including but not limited to the right to

---

[1] Except as otherwise set forth herein, terms used herein shall have the meaning set forth in the Complaint.
[2] A copy of the June 18, 2002 Contract between Midtown as seller and Jericho as Purchaser (without the Exhibits) is annexed as Ex. A to the Affirmation of Edward G. Imperatore dated January 6, 2005 ("Imperatore Affirmation") in support of Defendant's Motion to Dismiss the Complaint. Midtown also submitted a Memorandum of Law dated January 7, 2005 ("Midtown's Memorandum").

# 142

build foundations in the Amtrak right-of-way to support that platform. Various materials evidencing and pertaining to the aforesaid Approved Project were submitted to Jericho in April 2002 by Shafran prior to the execution and delivery of the Contract (see Shafran Affidavit submitted herewith). Part of these materials annexed to the Shafran Affidavit contain a Memorandum to Files from Midtown's counsel, which provides for a table of columns setting forth approved zoning floor area for the applicable Lots broken down into three components for "Riverview": the hotel, the residential/mixed use and the garage.

  (c) Approvals and special permits had also been issued for "Riverview" involving various aspects of the Approved Project. These approvals and special permits had been renewed numerous times but were expired prior to the entering into the Contract. Jericho did not know this prior to execution and delivery of the Contract. During the Study Period, Jericho, through its own professionals, learned that the approvals and special permits could not be renewed; although we were given assurances by Brown Harris Stevens and by Defendant that these approvals and special permits were and continued to be routinely renewable. This turned out not to be the case to the shock and dismay of all the brokers and to Jericho and its principals and representatives.

  (d) In addition to the approvals and special permits, there was special zoning under which "Riverview" was approved for development as of right, especially involving part of the development over the Amtrak railroad right-of-way. Notwithstanding representations made by Defendant, either to Brown Harris Stevens and subsequently to Jericho and/or made directly to Jericho by Defendant, Jericho was to

# 143

learn after the Contract signing that the required zoning no longer existed with respect to "Riverview" and could not be renewed.

(e)    Midtown apparently had let the approvals and special permits expire in the calendar year 2001; so Midtown must have known prior to the Contract and during the Contract period that it was not possible to renew the approvals and special permits and that the zoning for "Riverview" no longer existed.[3] How can Midtown not disclose this very relevant and material fact? And how could they pretend that this issue did not exist?

(f)    Brown Harris Stevens & Associates, Inc. and Capin & Associates, Inc. have stated to Jericho that had they known about these misrepresentations by Defendant they never would have marketed the Property to Jericho, or at least would have marketed the Property in a different manner (i.e., a transaction conditional upon obtaining permit approvals during the 12 to 24 month permitting period).

(g)    Only after the Contract was executed and delivered and the Downpayment made, did we learn of these material deficiencies and misrepresentations. Had Jericho known before Jericho signed the Contract that the Property wasn't what was represented Jericho would have passed over the transaction or negotiated a different type of deal at a different purchase price taking into consideration that the Property was worth very little without the benefit of proper zoning, routinely renewable approvals and special

---

[3] Jericho only learned of these matters by its own investigation, through its own attorneys and other professionals. Midtown's architect, Cooper, Robertson, was never made available to Jericho, and Cooper, Robertson had not been authorized by Midtown to facilitate Jericho's due diligence. In fact, there were other materials described in a letter from Jericho's counsel dated August 1, 2002 (a copy of which is annexed as Ex. W to the Imperatore Affirmation), which were not, for at least the first approximately 50 days of the Study Period, made available to Jericho, but which were in the possession of Cooper, Robertson.

# 144

permits and an agreement with Amtrak regarding the construction over the Amtrak railroad right-of-way. In Jericho's Counsel's letters dated July 17, 2002 and August 19, 2002 (a copy of each is annexed as Exs. C and G respectively to the Imperatore Aff.), he calls to Midtown's attention the following: Jericho had been led to believe by the brokers after the Contract was signed that the permits and variances for "Riverview" (i.e., the approved project) could be extended as a matter of right. In addition, Jericho had learned that Jericho would have to start <u>de novo</u> in that a master plan for the West Side of Midtown was being considered, which would cause further delays in the approval process. All of these matters absolutely had to have been known by Midtown before Contract signing. Notably, the July 17 letter was not responded to by Midtown.

    4.    (a)    Midtown's counsel, Harwood Lloyd, LLC ("Escrowee" or "Harwood") prepared, redrafted and submitted the Contract and all drafts of the Contract. There are various conflicts of interest involving the relationship between and among Midtown, its counsel and/or its members and affiliates. Had this been disclosed by Midtown, Jericho would not have agreed to the appointment of Harwood as the escrow agent for the transaction.

    (b)    Jericho also dealt with various brokers including Brown Harris Stevens and Capin & Associates, Inc. for the subject transaction who were representing and being paid by Midtown. In such capacity such parties when communicating with Jericho were acting as the agent and/or authorized representative of Midtown. Jericho accepted their representations as being made on behalf of Midtown. Such communications were made orally and in writing and, in many instances, the letters referred to in this litigation were sent after telephone conversations had occurred.

<div align="center">5</div>

# 145

5.    (a)    Jericho deposited with Midtown's counsel, Harwood the sum of $250,000 to be held in escrow in accordance with the terms of the Contract.

(b)    Midtown apparently asserts that because Jericho terminated the Contract and received the return of the Downpayment, that it had no further rights or remedies with respect to the Contract; and that the Contract limits Jericho's remedies to a cancellation and the return of the Downpayment (see Midtown's Memorandum, Paragraph IIIA).  Defendant relies upon Paragraphs 22 and 40(b) of the Contract.  Paragraph 40(b) of the Contract provides that, "If the Seller shall default in the performance of this Contract, the Purchaser's rights are set forth in Paragraph 22 of the Contract."  All Paragraph 22 of the Contract provides:  "In the event that the seller is unable to convey title in accordance with the terms of this contract, the sole liability of the seller will be to refund to the purchaser the amount paid on account of the purchase price and upon such refund any payment being made this contract shall be considered cancelled."

(c)    Jericho understood Paragraph 22 to mean that the Defendant, if it shall be unable to convey title, is required to refund to Jericho the Downpayment and the Contract is cancelled.  This was solely limited to pertain to Midtown's inability to convey title.  Midtown neglected to set forth or propose any limitations under Paragraph 22 in the event of a default by Midtown under the Contract.

(d)    Midtown knows that Jericho's and Midtown's intention, understanding and agreement regarding these two Paragraphs of the Contract are the same.  In fact, Midtown and Harwood demanded a general release from Jericho as a

# 146

precondition to returning the Downpayment to Jericho. (See two letters, each dated September 4, 2002, annexed as Exs. 2 and 3 hereto.) Midtown and Harwood knew that Jericho had the right notwithstanding the cancellation of the Contract and the return of the Downpayment, and notwithstanding Paragraph 22, to pursue with rights and remedies against Midtown and/or Harwood. Midtown and Harwood subsequently withdrew their demand because a General Release was not a requirement under the Contract.

6.    With respect to the "Study Period," the parties agreed that Midtown, in part, had the following obligations:

(i)    to allow Jericho and its representatives access to the Property at all reasonable times and to cooperate with Jericho and its representatives and make available to Jericho and its representatives such material pertinent to tests and/or inspections as Midtown may have in its possession (see Paragraph 29(a) of the Contract).

(ii)    upon execution of the Contract, Midtown was required to make available to Jericho or its representatives such documents within Midtown's current custody or control pertaining to the Property (see Paragraph 29(c) of the Contract).

(iii)    within two business days from the date of the Contract, Midtown agreed to make available to Jericho copies of all documentation pertaining to permits and/or approvals (see Paragraph 33 of the Contract).

(iv)    to make truthful and complete timely disclosure regarding any material matter pertaining to the Property, including but not limited to development issues such as "Riverview," the "Amtrak Agreement" (hereinafter defined) and environmental matters.[4]

(v)    to act in good faith with respect to all of its obligations under the Contract

7.    Plaintiff will prove that Midtown materially breached these obligations to Jericho with respect to the "Study Period" and otherwise acted in bad faith.

8.    It was a material inducement to Jericho to execute and deliver the Contract and the Downpayment and to perform its obligations with respect to the "Study Period"[5] that Jericho, in fact, have the opportunity to review, consider and research accurate information pertaining to various areas that would typically concern a purchaser and/or a lender regarding this type of real property.

9.    Jericho was deprived of this opportunity because Midtown failed to perform its obligations with respect thereto.

10.    Midtown failed to provide complete and accurate information and material regarding the Property both before the Contract execution and during the Study Period.

---

[4] To the extent the parties made any representations and warranties in the Contract, such representations and warranties are supposed to be true and correct when made.

[5] The expense of all tests and inspections was borne by Jericho (see Paragraph 29(a) of the Contract). In addition Paragraphs 29(b) (1) (2)(3)(4)(5)(6)(9)(10) and (11) all place obligations and burdens upon Jericho with respect to the Study Period, which Jericho agreed to in consideration for Midtown's agreeing to perform its obligations.

**148**

11.    Midtown materially breached its obligations under the Contract and otherwise acted in bad faith. The following is a brief list:

(i)    Prior to the execution and delivery of the Contract, Midtown misrepresented either through the brokers and/or directly to Jericho that "Riverview" could go forward immediately because of the approved plans for the Approved Project and approvals, zoning compliance, availability of routine renewal of the approvals and special permits and necessary documentation and agreements with Amtrak. All of which turned out to be false to the material detriment of Jericho.

(ii)    Midtown knowingly and willfully failed to deliver at all or otherwise in a timely manner all items required to be delivered by Midtown under the Contract, including but not limited to any materials regarding environmental matters and the massive oil spill, the lack of as of right development rights, a fully executed Amtrak Agreement with Exhibits, and the unavailability of required zoning and routine reissuance of the approvals and the special permits for "Riverview";

(iii)    Midtown wrongfully misrepresented under Paragraph 31 of the Contract to Jericho that the Amtrak Agreement was annexed to the Contract when admittedly Midtown knew that the Amtrak Exhibits were missing, which fact was not disclosed by Midtown to Jericho until September 3, 2002 (see letter dated September 3, 2002 annexed as Ex. R to the Imperatore Affirmation; see

# 149

*also* Paragraph 26 of the Imperatore Affirmation)[6]; also the Amtrak Agreement was not signed. Midtown had to have known that it did not have a signed Amtrak Agreement together with the Exhibits when it executed and delivered the Contract. However, there is no possibility that Midtown could have completed the entire approval process for "Riverview" without this documentation; so someone, either Midtown, its counsel, its architects and engineers must have the Amtrak Agreement or has access to it;

(iv)    Midtown failed to disclose the prior occurrence of a massive oil spill pertaining to the Property, which required cleanup and environmental monitoring (see letter dated September 3, 2002 annexed as Ex. T to the Imperatore Affirmation). Midtown's agent, Brown Harris Stevens continually informed Jericho during the Study Period that there was no environmental situation pertaining to the Property. These assurances were made on behalf of Midtown. Again, Midtown had to have known about this massive oil spill prior to the execution and delivery of the Contract (see discussion below);

(v)    Midtown and its counsel failed to disclose that Imperatore and/or Harwood had a direct or indirect beneficial ownership in Midtown.[7] Had Jericho known about these conflicts, it never would have agreed to the appointment of Harwood as the escrow agent;

---

[6] Upon information and belief Midtown and Harwood knew that the Amtrak Exhibits were missing from the Amtrak Agreement when Jericho executed and delivered the Contract and the Downpayment to Midtown.
[7] This non-disclosure is especially material because Harwood acted as the Escrow Agent in the transaction and used its position to initially demand a general release from Jericho; and thereafter to demand a clarification letter from Jericho.

# 150

(vi)    Jericho was rebuffed by Midtown subsequent to the

Contract termination in Jericho's attempts to settle the controversy and to move

forward with the transaction.  In response to Jericho's attempts, both in writing

and orally, Midtown's counsel sent post-termination letters addressed to me and

Jericho threatening and intimidating us from pursuing our rights with respect to

the subject transaction.  This caused us to proceed very cautiously and, as a result,

caused substantial delays in our commencement of the subject action, which we

would have preferred not to delay.[8]

12.    Jericho had the absolute right and entitlement to terminate the Contract

and receive the return of the Downpayment without waiving any of its rights and

remedies against Midtown.[9]  It was an "as is" deal but under all circumstances subject to

the Study Period.  Jericho bargained for a Study Period during which it would have the

right and ability to review and consider all relevant matters pertaining to the Property and

substantially relied upon, in part, the cooperation and delivery provisions agreed to by

Midtown for the benefit of Jericho.  Such reliance by Jericho was necessitated by the fact

that certain matters such as the Amtrak Agreement, environmental conditions, prior

history of development, proposals and plans, and issued permits were particularly within

the scope and knowledge of Midtown, and it was expedient and customary for this

material to be provided by the seller for this type of transaction, which Midtown

contractually agreed to do.  Not only was the submitted material inaccurate and/or not

complete, but also this misled Jericho, which involved substantial loss of the benefits of

---

[8] Jericho should not be penalized or otherwise adversely affected by alleged delays which were solely caused by Midtown.

[9] Midtown and its Counsel knew this to be the case when they demanded a general release from Jericho as a condition to the return of the Downpayment.

# 151

the Study Period. Such false information was provided to Jericho in the form of written and oral communications from Midtown and its agents and/or representatives both prior to and during the Study Period.

13.    The Study Period would be meaningless to Jericho (or to anyone else for that matter) without these cooperation and delivery provisions.

**Amtrak Agreement**

14.    There were a few written representations made by Midtown for the benefit of Jericho under the Contract. The most important and significant one which Jericho reasonably relied upon provides that annexed to the Contract as Ex. B is a true copy of Midtown's Agreement dated April 23, 1990 ("Amtrak Agreement") with Amtrak Corporation ("Amtrak")[10] permitting development of the premises over Amtrak's railroad tracks. As it turns out, Exhibits to said Amtrak Agreement, of which there are many, were not attached and were missing. Had Jericho known this, and not relied upon Midtown's misrepresentation, Jericho would have negotiated different terms and conditions prior to signing and delivering the Contract and the Downpayment.

15.    Jericho wrote to Midtown by letter dated August 13, 2002 that it was unable to determine the scope of the Amtrak Easements. (See letter dated August 13, 2002 annexed as Ex. U to the Imperatore Affirmation.) It wasn't until Midtown's counsel notified Jericho's counsel by letter dated September 3, 2002 that Jericho learned that Midtown did not have the Exhibits; that they were missing (see letter dated

---

[10] The Amtrak Agreement is actually by and among Midtown, Jerrart Venture, an Illinois General Partnership, and National Railroad Passenger Corporation (defined as "Amtrak" under the Amtrak Agreement).

12

# 152

September 3, 2002, annexed as Ex. R to the Imperatore Affirmation). By letter dated August 14, 2002 (annexed as Ex. V to the Imperatore Affirmation), Midtown's counsel states that, "The extent of Amtrak's easement is set forth in the documents provided to you." This was untrue; nor did Midtown disclose that the Exhibits were missing.

16.    Accordingly, not only had Midtown wrongfully induced Jericho to proceed with and execute and deliver the Contract, but also it waited until the expiration of the Study Period to inform Jericho that the Exhibits were missing. Similarly, Midtown never disclosed that there had been an undisclosed oil spill affecting the Property until September 2, 2002 when the broker, on behalf of Midtown, informed Jericho. How could they not have known this? It is neither possible nor believable that neither Midtown nor its professionals have any of this documentation.

## **Environmental Situation**

17.    Midtown failed to disclose until August 14, 2002 that there was no environmental report. Furthermore, Midtown waited until September 2, 2002 (see Ex. 1 annexed hereto) to disclose through Midtown's broker that there had, in fact, been a massive oil spill, which, in fact, had to be cleaned up and monitored. These problems should have been disclosed prior to Contract execution. There was little that Jericho could do to get comfortable with the oil spill situation with the Study Period scheduled to expire according to Midtown on September 3, 2002.

18.    As it turns out, the oil spill was very substantial and required very substantial cleanup and monitoring. This was the real situation despite the fact that

# 153

Brown Harris Stevens had been telling Jericho all along that there was no environmental situation to be concerned about.

19.    We only were informed by Midtown's broker on or about September 1, 2002 that the New York State Department of Environmental Conservation had a file on the oil spill (see letter dated September 3, 2002 annexed hereto as Ex. 1). We were to learn later that this file contains numerous materials documenting the oil spill and its cleanup.

20.    In addition, Jericho wrote to Midtown's counsel on October 18, 2002 notifying them that Jericho had obtained a copy of a letter from Midtown's counsel to New York State Department of Environmental Conservation dated June 29, 1998 (see Ex. 4 annexed hereto): Midtown had an obligation to provide Jericho with all information and documents pertaining to the oil spill at the time the Study Period was commenced and even prior to the execution of the Contract as well. Midtown had to have known about the oil spill prior to the execution and delivery of the Contract. There would have had to have been communications (orally and in writing) by and among the governmental officials and the various owners of the affected sites.

**Contract Amendment**

21.    When Jericho accepted Midtown's offer to extend the Study Period, Jericho believed that Midtown's offer to extend the Study Period was still on the table (see Complaint, Paragraphs 28, 33 and 35). Midtown never revoked its July 15, 2002 offer and instead chose to remake and reiterate said offer by letters dated July 25, July 30 and August 21, 2002. To its material detriment, Jericho reasonably relied on each of

14

**154**

these letters, and such reliance was reasonable under the circumstances.  Such reliance

directly caused Jericho to run out of time because Midtown wrongfully determined that

the Study Period expired on September 3, 2002 and was not extended to December 31,

2002.

22.    In Szegda's acceptance letter dated August 28, 2002 (annexed as Ex. I to

the Imperatore Aff.), he incorrectly refers to Midtown's proposal dated July 27 (which

proposal letter does not exist); Jericho meant to refer to Midtown's proposal letter dated

July 30, 2002 as well as to the July 15, 2002 Letter.  Similarly, in Midtown's rejection

letter dated August 29, 2002 (see Letter annexed as Ex. J to Imperatore Affirmation),

Midtown meant to refer to the same July 30, 2002 Letter as well as to the July 15, 2002

Letter.

### Midtown Wrongfully Rejects Jericho's Acceptance

23.    Midtown's letter dated August 29, 2002 (see letter annexed as Ex. J to

Imperatore Affirmation) makes it abundantly clear that Midtown wrongfully rejected

Jericho's acceptance on August 28 and wrongfully repudiated the Amendment.  Jericho

immediately advised Szegda not to let the Downpayment end up tied up in litigation; nor

risk losing the Downpayment, and that Jericho would address its grievances with

Midtown after we received the return of the Downpayment.  Accordingly, Jericho

subsequently exercised its rights under Paragraph 29(a) of the Contract. (See letter dated

Sept. 3, 2002 annexed as Ex. K  to Imperatore Aff.)

# 155

24. Jericho reluctantly made this decision even though it believed at the time that property values in the applicable geographic area were on the rise; this has, in fact, occurred.

## Deceit

25. As stated herein and in the Complaint, Midtown acted in bad faith, failed to comply with its implied duty to act in good faith, misled and misrepresented matters to Jericho, deceived and concealed material facts and information, which under any standard constitutes fraud and deceit and otherwise willfully breached its contractual obligations to Jericho.

**156**

### CONCLUSION

26.    For all of the reasons set forth herein, and for the reasons set forth in the Plaintiff's Memorandum of Law submitted herewith, it is respectfully requested that Defendant's motion for an order dismissing the Complaint should be denied in all respects.

_____
SAMUEL PFEIFFER

Sworn to before me this 27 day
of February, 2005

_____
Notary Public

SOLOMON ITZKOWITZ
Notary Public, State of New York
No. 011T4705441
Qualified in Kings County
Commission Expires July 30, 2006

# 157

Exhibits to Pfeiffer Affidavit
Index of Exhibits to Pfeiffer Affidavit

Exhibit 1
Szegda letter dated September 3, 2002 addressed to Imperatore (re: oil spill; and Amtrak)

Exhibit 2
Imperatore Letter dated September 4, 2002 addressed to Szegda (re: time of the essence; and general release)

Exhibit 3
Szegda Letter dated September 4, 2002 addressed to Imperatore (re: oil spill; and general release)

Exhibit 4
Jericho Letter dated October 18, 2002 to Midtown's counsel (re: oil spill)

Exhibit 5
Imperatore Letter dated October 25, 2002 addressed to Samuel Pfeiffer and Jericho (re: letter of intimidation)

Exhibit 6
Maurice Stone Letter dated January 19, 2004 addressed to Samuel Pfeiffer and Jericho (re: letter of intimidation)

## 158

Exhibit 1 to Pfeiffer Affidavit –
Letter from Michael A. Szegda to Edward G. Imperatore, dated September 3, 2002
with attachment
[pp. 158-160]

### SZEGDA & GERBING

ATTORNEYS AT LAW

300 EAST 42ND STREET

NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-9300

FAX: (212) 370-9615

9/3/02

September 2, 2002

VIA FACSIMILE
(201) 487-4758

Edward G. Imperatore, Esq.
Harwood, Lloyd. LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown
Development, LLC ("Midtown") and Jericho Group Ltd.
("Jericho")

Dear Mr. Imperatore:

We have yet to receive your formal response to our letter dated August 30, 2002, notwithstanding our conversation of Friday afternoon.

Our client has informed us that it received information from your broker only yesterday (a copy of which is tranmitted herewith) to the effect that NYDEC has a file on what I referred to in my letter to you dated August 30, 2002 as a "possible oil spill:" Javits Center Project, Project ID Number 5P00334, Spill Number 9709152. One of our client's principals telephoned the regional office of NYDEC today in an attempt to learn the extent of the spill and whether it was cleaned up, but was able to glean only that the file, apparently, is still open. He was also told that, in order to inspect the file, he would have to make a formal request under the Freedom of Information Act. Proceeding under this regimen would take 4-8 weeks and the study period expires this afternoon.

We have just received your reply to our letter of today's dated faxed to you earlier today. The referenced contract does not provide that Jericho is required to obtain documents from Amtrack. Rather, section 31 of the referenced contract recites that Exhibit B is a true copy of the agreement permitting development over Amtrack's railroad tracks. The exhibits referred to in my earlier letter could radically alter that

159

Edward G. Imperatore, Esq.
September 2, 2002
Page 2

agreement, for example, by reciting that the rights granted thereunder were personal to the named parties, or in any other fashion.

Moreover, Jericho's representatives have spoken with John Youngdahl, Mark Brendar and Sheila Mae Sopper of Amtrack, each of whom advised our client that it should obtain the documents from Midtown and also that they believed the permit was no longer in effect.

Very truly yours,

Michael A. Szegda

MAS:ps

cc: Jericho Group Ltd.

160

*Sam Pfeifer*

*718-782-7100*

## eemmet

| | |
|---|---|
| From: | "EMMET" <eemmet@optonline.net> |
| To: | <benshafran@iiacom.net> |
| Sent: | Friday, August 23, 2002 10:39 AM |
| Subject: | Fw: Jericho-Midtown |

----- Original Message -----
From: "Astore, Anna" <AAstore@harwoodlloyd.com>
To: <eemmet@optonline.net>
Sent: Thursday, August 22, 2002 8:29 PM
Subject: Jericho-Midtown


> We have no papers confirming the successful cleanup of the oil spill from
> properties neighboring the Sites, in fact, we have not had contact with
> NYDEC in years.  However, NYDEC should have the necessary papers filed
> under:
>
> Javits Center Project
> Project ID Number 5P00334
> Spill Number 9709152
>
> NYDEC investigator had been Chris Tomosello but he is long departed. Our
> last contact Louise Munster at 718-482-4912.
>
> Edward G. Imperatore
>
> Anna Astore
>
>
**************************************************************************
> ***************************
> This e-mail and any documents accompanying this e-mail contain information
> which is confidential and/or legally privileged.  The information is
> intended only for the use of the individual or entity named on this
> e-mail.
> If you are not the intended recipient, you are hereby notified that any
> disclosure, copying, distribution, or the taking of any action in reliance
> on the contents of this e-mail information, is strictly prohibited and
that
> the documents should be returned to Harwood Lloyd, LLC immediately.  In
this
> regard, if you have received this e-mail in error, please notify us by
> return e-mail or telephone (201-487-1080) immediately, delete the e-mail
and
> all attachments and destroy all hard copies of same.
>
>
>

8/29/2002

**161**
Exhibit 2 to Pfeiffer Affidavit –
Letter from Edward G. Imperatore to Michael A. Szegda, dated September 4, 2002
with attachment
[pp. 161-163]

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

HACKENSACK, NEW JERSEY 07601

FACSIMILE (201) 487-4755

(201) 487-2608
EImperatore@Harwoodlloyd.com
(201) 489-5005
Hackensack
5152-1

September 4, 2002

**VIA TELECOPIER**
Michael Szegda, Esq.
Jericho Group, Ltd.
c/o Szegda & Gerbing
300 East 42nd Street
New York, NY 10017

    Re:    Sale of Midtown Development, LP ("Midtown") Properties to
           Jericho Group ("Jericho")
           Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")

Dear Mr. Szegda:

    I am in receipt of your letter dated September 3, 2002 in which you requested that Midtown make certain representations with respect to the oil spill from adjacent properties. As Midtown has made clear in the Contract and as you well know, Midtown has never made and is not now willing to make any representation with respect to environmental matters. Secondly, Midtown has never offered to "undertake whatever cleanup may be necessary" at its cost and expense. Finally, as you well know, Midtown will not extend the Study Period afforded by the Contract even this day. Indeed that Study Period expired last evening.

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Michael Szegda, Esq.
Re: Midtown to Jericho
September 3, 2002
Page 2

Nevertheless, Midtown is willing to wire the amount of Jericho's Downpayment to your Trust Account provided that we receive Jericho's General Release of Midtown, in the fashion described below, by the close of business, Friday, September 6, 2002.   As you can understand, Midtown must insist upon having such a Release by that deadline, given the number and frequency of Jericho's attempts to amend, revise or sidestep Contractual requirements without basis.   Midtown expects that its refund of the Downpayment to Jericho will constitute a termination of the Contract in all respects.

We anticipate that you will be able to provide us a copy of a signed General Release by telecopier today and an original by overnight mail tomorrow.  As soon as we have received a copy we will make the necessary wire arrangements and as soon as we receive the original we will commence wiring.

We trust this is satisfactory.

Very truly yours,

EDWARD G. IMPERATORE

EGI/dmc
cc:     Midtown Partners (Via Telecopier)

163

# GENERAL RELEASE

This Release, dated September _____, 2002, is given

**BY** the Releasor(s)  **JERICHO GROUP, LTD.,** a New York Corporation (hereinafter "Jericho")

**TO** the Releasee(s)

   **MIDTOWN DEVELOPMENT, L.P.,** a New York limited Partnership (hereinafter "Midtown")

1.    **Release.**  Jericho releases and gives up the following claims and rights which it may have against Midtown:

   Any and all claims that were made or could have been made in connection with the Contract of Sale dated June 18, 2002 between Midtown and Jericho for the sale and purchase of real property being in Lot 1 in Block 708 and Lot 17 in Block 709 in the City, County and State of New York located between 36th and 37th Streets and 11th Avenue and between 37th and 38th Streets and 11th Avenue in the City of New York.

2.    **Payment.**  Jericho has been paid One ($1.00) Dollar and other valuable consideration, the sufficiency of which is herein acknowledged, for making this Release.  Jericho agrees that it will not seek anything further including any other payment from Midtown.

3.    **Who is Bound.**  Jericho, including its subsidiaries, affiliates and related companies, is bound by this Release.  Any entity or person who succeeds to Jericho's rights and responsibilities is also bound.  This Release is made for Midtown's benefit and all who succeed to its rights and responsibilities, such as its successors or assigns.

4.    **Signatures.**  Jericho agrees to the terms of this Release.

ATTEST                                    JERICHO GROUP, LTD.
                                          a New York Corporation

By: _____ , Pres.

1

## 164

Exhibit 3 to Pfeiffer Affidavit –
Letter from Michael A. Szegda to Edward G. Imperatore, dated September 4, 2002
[pp. 164-165]

### SZEGDA & GERBING

ATTORNEYS AT LAW
300 EAST 42ND STREET
NEW YORK, NEW YORK 10017

MICHAEL A. SZEGDA
JOAN P. GERBING
MEMBERS OF THE BARS OF
NEW YORK AND NEW JERSEY

(212) 856-9300
FAX (212) 370-9818

September 4, 2002

VIA FACSIMILE
(201) 487-4758

Edward G. Imperatore, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, New Jersey 07601

Re: Contract dated June 18, 2002, between Midtown
Development, LLC ("Midtown") and Jericho Group Ltd.
("Jericho")

Dear Mr. Imperatore:

This will acknowledge receipt of your letter dated today's date which was received by facsimile at approximately 12:15 p.m. We have had the opportunity to review your letter and the requests contained therein with our client.

To set the record straight, although the possibility of the property being contaminated by an oil spill was of genuine concern to our client if it were to go forward with the acquisition of the property, we did not request that Midtown make any representation about the oil spill or undertake to clean it up at its cost and expense. What was written was that, unless you were to advise us that Midtown was willing to make such representation or undertaking or extend the study period, Jericho was requesting the return of the monies paid upon the execution of the referenced contract in accordance with its terms. In other words, had you advised us that your client was willing to make the representation or undertaking, Jericho's request would have been a nullity. As you did not do so, Jericho request was an operative election.

We have since learn from NYDEC (a representative of that agency returned my telephone call today), that the file is indeed open and that the spill was extensive. But this of no consequence to our client today.

**165**

Edward G. Imperatore, Esq.
September 4, 2002
Page 2

However, we find appalling your statement that "Midtown is willing to wire the amount of Jericho's Downpayment...provided we receive Jericho's General Release of Midtown.... by close of business, Friday, September 6, 2002." First, it was our understanding that our client had deposited its downpayment with Harwood Lloyd, LLC, which firm was holding the monies in a fiduciary capacity to be disbursed in accordance with the terms of the contract, not at the whim of Midtown. Second, nowhere in the four corners of the contract does it provide that Jericho is required to give Midtown a general release as a condition to receiving the return of its monies.

If it is your argument that, unless Midtown is released, it will contest the validity and/or timeliness of our letter, such argument fails. We did precisely what you instructed us to do. You agreed that such notice could be given by us by facsimile transmission, to be received by 5:00 p.m. on September 3, 2002. In fact, in a letter from your colleague, Maurice Stone, which was faxed to me at 4:48 p.m. and which, being twelve (12) pages of text, almost prevented me from getting my letter faxed timely, he stated "Jericho should either proceed to close in accordance with the Contract or seek a refund prior to 5:00 p.m. today" (emphasis supplied). By my watch, my letter was sent by 4:58 p.m.

Demand is made that the Downpayment be returned immediately and without condition in accordance with the instructions contained in my letter dated September 3, 2000.

Very truly yours,

Michael A. Szegda

MAS:ps
cc: Jericho Group Ltd.

## 166

Exhibit 4 to Pfeiffer Affidavit –
Letter from Shulem Pfeiffer to Murray Stone, dated October 18, 2002 with attachment
[pp. 166-168]

### JERICHO GROUP LTD
155 Lee Ave.
Brooklyn, N.Y. 11211

TEL: 347-267-3479
FAX: 718-782-7160

October 18, 2002

Murray Stone, Esq.
Harwood Lloyd, LLP
130 Main Street
Hackensack, New Jersey, 07601

Re: Contract dated June 18, 2002, between Midtown
Development, LLC (Midtown) and Jericho Group Ltd (Jericho)

Dear Mr. Stone:

Please respond to my letter dated September 18, 2002. (copy enclosed).    I have obtained
a copy of a letter from your firm to New York State Department of Environmental Conservation,
dated June 29, 1998, concerning the oil spill at this Site.

According to our Contract, Midtown had to provide this information and all the
subsequent information and documents, regarding the oil spill, to Jericho, as part of the Diligence
material that your firm provided to us with your letter dated June 19, 2002, or at-least when we
specifically requested them from your firm and Midtown, in August and September 2002.

Thanking you in advance.

Sincerely yours

JERICHO GROUP LTD

By:  Shulem. Pfeiffer. V.P.

**167**

*f20M MLY An NYDEC*

*9/24/02*

# HARWOOD LLOYD, LLP

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

303 GEORGE STREET

NEW BRUNSWICK, NEW JERSEY 08901

(732) 828-6017

FACSIMILE (732) 828-0149

VICTOR C. HARWOOD, SI †§
FRANK V. D. LLOYD ?†
MICHAEL B. OROPOLLO
RICHARD J. RYAN
LEONARD P. ROSA ?†
EDWARD G. IMPERATORE †
FRANK HOLAHAN †
RUSSELL A. PEPE ?†
GREGORY J. IRWIN ?†
ANTHONY K. CARLINO †
THOMAS B. HANRAHAN ?
BRIAN C. GALLAGHER §
JONATHAN BUBROW
CHARLES E. POWERS, JR. §
DAVID T. ROBERTSON §
PETER E. MUELLER
MICHAEL J. BRADY †
DAVID M. REPETTO

PETER CIOLINO
W. FLETCHER HOCK, JR.
PETER VANDERVOORT
DAVID F. MCBRIDE †
AUGUST SCHEDLER
OF COUNSEL

FRANCIS V. D. LLOYD (1917-1974)
JOHN W. GRIGGS (1929-1980)
CHARLES C. SHENIER (1928-1970)
EMIL M. WULSTER (1929-1978)
DANIEL GRADY (1953-1975)
GEORGE A. BROWN (1941-1986)

LINDA A. OLSEN
JOSEPH M. KENNEDY †
RICHARD W. LE BLANCO
THOMAS A. KEENAN *§
PAUL E. KIEL
MAURICE L. STONE
CURTIS J. TURPAN
DONALD M. BARONE
WILLIAM H. GOWEN
ROBERT F. MCANANLY, JR.
ELIZABETH F. LORELL
MICHAEL A. MONAHAN §
ANN M. MCGUFFIN
JOHN J. ROBERTELLI
JOHN R. GONZO

DAVID T. PFUND †
LINDA M. MESCE †
JOHN D. ROCHER
KRISTINE DENNING †
ROBERT M. ADAMS
IAN C. DORIS
MELISSA A. HARTIGAN
SEAN F. MULLIGAN
GREGG A. ILARDI
DOUGLAS F. CIOLEK
RICHARD J. CONTE †
DAVID S. BLOW
CHRISTINE M. VANEK

§ CERTIFIED CIVIL TRIAL ATTORNEY
* CERTIFIED CRIMINAL TRIAL ATTORNEY
† ALSO ADMITTED IN NY

NEW YORK OFFICE

350 FIFTH AVENUE, SUITE 3304

EMPIRE STATE BUILDING

NEW YORK, NEW YORK 10118

(212) 268-5136

FACSIMILE (212) 564-1135

DIRECT FAX NO.    201-489-5005
REPLY TO    Hackensack
FILE NO.    5152-2 (420)

June 29, 1998

**VIA TELECOPIER & CERTIFIED MAIL RRR**
Christopher Tomasello
New York State Department of
    Environmental Conservation
222-34 96th Avenue
Queens Village, New York  11429

*file*

          Re:  **Jacob Javits Center**
               **West 34th at 11th Avenue**
               **PIN #SP00334**
               **SPILL #97-09102**
               **Freedom of Information Act Request**

Dear Mr. Tomasello:

        Pursuant to our telephone conversation today please be advised
that this firm represents Midtown Development, LP ("Midtown")
owners of Lot 1 in Block 708 the former conrail property located at
36th Street and 11th Avenue.

        It has come to our attention that an environmental contractor,
Milro Associates is performing remediation and investigation work
on behalf of the State pertaining to the Jacob Javitz project
referenced above.

        We herein request access to your files to review the progress
of the work being performed on the above-referenced project
pursuant to the Freedom of Information Act (FOIA).  Kindly fax to
my attention any forms required to be completed to obtain access to
your files pursuant to the FOIA.

**168**

HARWOOD LLOYD, LLP
COUNSELLORS AT LAW

Mr. Christopher Tomasello
New York State Department of
   Environmental Conservation
Re:  **Jacob Javits Center**
     **West 34th at 11th Avenue**
     **PIN #SP00334**
     **SPILL #97-09102**
     **Freedom of Information Act Requested**
June 29, 1998
Page 2


     If you have any questions or require additional information,
please contact me as soon as possible.

                         **Very truly yours,**


              By:  _____
                   JOSEPH M. KENNEDY

JMK:hep

565806.1

**169**

Exhibit 5 to Pfeiffer Affidavit –
Letter from Edward G. Imperatore to Shulem Pfeiffer, dated October 25, 2002
[pp. 169-170]

OCT-25-02   12:43PM   FROM-Harwood Lloyd                    2014895005          T-862   P.002/003   F-135

# HARWOOD LLOYD, LLC

COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 288-5136
FACSIMILE (212) 564-435

242 OLD NEW BRUNSWICK ROAD
SUITE 100
PISCATAWAY, NEW JERSEY 08854
(732) 562-1200
FACSIMILE (732) 562-1400

(201) 359-3647
eimperatore@Harwoodlloyd.com
(201) 489-5005
Hackensack
5152-1

October 25, 2002

**VIA TELECOPIER AND
CERTIFIED MAIL RRR**
**7000 1670 0011 6585 5282**
Shulem Pfeiffer, V.P.
Jericho Group, Ltd.
155 Lee Avenue
Brooklyn, New York 11211

> Re:  **Sale of Midtown Development, LP ("Midtown") Properties to
> Jericho Group ("Jericho")
> Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Sites")**

Dear Mr. Pfeiffer:

I am in receipt of your letter to Murray Stone dated October 18, 2002, in which you enclose a letter to Mr. Stone purportedly dated September 18, 2002. We never received the September 18, 2002 letter, probably because you did not prepare it until last week.

In any event, Jericho appears inclined to contend that its own attorney was not authorized to terminate a Contract that once existed between Midtown and Jericho with respect to the Sites. You acknowledge in your letter purportedly dated September 18, 2002 that Jericho's attorney, Michael Szegda, "cancelled the Contract" and accepted in return Jericho's Downpayment of $250,000.00 in accordance with the Contract. Significantly, you did not send a copy of that letter to Mr. Szegda.

In any event, we view Jericho's attempt now to assert some rights in a Contract that has long since been terminated to be nothing less than fraudulent. Should Jericho persist in this attempt by, among other things, questioning Midtown's ownership of the Sites, misinforming third parties that Jericho has any interest in the Sites or in any other way interfering with

1066875

**170**

COUNSELLORS AT LAW

Shulem Pfeiffer, V.P.
Jericho Group, Ltd.
Re:  Midtown to Jericho
September 10, 2002
Page 2

Midtown's ownership of the Sites, we will have no alternative but to consider bringing an action against Jericho and, if appropriate, Jericho's principals for fraud, slander of title, tortious interference with prospective economic advantage and all other proper claims and to seek in such action consequential and punitive damages, sanctions, attorneys' fees and costs against Jericho, its principals, if appropriate, and Mr. Szegda, if warranted.

I trust Midtown's position is clear.  Do not attempt to contact me or any Midtown representative, including its Broker.

Very truly yours,

Edward G. Imperatore

EGI:js
cc:  **Midtown Partners (Via Telecopier)**
**Maurice L. Stone, Esq.**
**Michael Szegda, Esq. (Via Telecopier)**

1066875

**171**

Exhibit 6 to Pfeiffer Affidavit –
Letter from Maurice Stone to Shulem Pfeiffer, dated January 19, 2004
[pp. 171-172]

# HARWOOD LLOYD, LLC

### COUNSELLORS AT LAW

130 MAIN STREET

HACKENSACK, NEW JERSEY 07601

(201) 487-1080

FACSIMILE (201) 487-4758

350 FIFTH AVENUE, SUITE 3304
EMPIRE STATE BUILDING
NEW YORK, NEW YORK 10118
(212) 268-5136
FACSIMILE (212) 564-1135

WWW.HARWOODLLOYD.COM

DIRECT DIAL:      (201)359-3647
DIRECT EMAIL:     MStone@HarwoodLloyd.com
DIRECT FAX:       (201) 489-5005
REPLY TO:         Hackensack
FILE NO.:         5152-1

January 19, 2004

### VIA REGULAR MAIL AND CERTIFIED MAIL/RRR

Shulem Pfeiffer, V.P.
Jericho Group Ltd.
155 Lee Avenue
Brooklyn, NY 11211

> **Re:** **Contract of Sale dated June 18, 2002 (the "Contract") between Midtown Development, L.P. ("Midtown") and Jericho Group, Ltd. ("Jericho") for Lot 1, Block 708 and Lot 17, Block 709 in Manhattan (the "Property") Terminated by Purchaser September 3, 2002**

Dear Mr. Pfeiffer:

We are in receipt of your January 5, 2004 letter and we are, in fact, amazed at your gall in sending it. Please be reminded that your group, Jericho, terminated the "Contract" to which you refer more then sixteen (16) months ago and we returned the Deposit to Jericho in accordance with specific instructions given us by Jericho and its attorney, Mr. Szegda.

I believe that Edward Imperatore's October 25, 2002 response to your October, 2002 correspondence, a copy of which is attached, is very clear and absolutely controlling. There is not now, and has not been for more than sixteen (16) months, any Contract between Midtown and Jericho concerning the Property because Jericho terminated that Contract pursuant to its terms in September 2002.

1171180_1.DOC

172

HARWOOD LLOYD, LLC
COUNSELLORS AT LAW

Shulem Pfeiffer, V.P.
January 19, 2004
Page 2


Should you, Jericho or its principals assert any claim or hold itself out as having any rights or interest concerning the Property, Midtown will consider bringing an action against Jericho and, if appropriate, Jericho's principals and agents for fraud, slander of title, tortious interference with prospective economic advantage and all other proper claims and to seek in such action consequential and punitive damages, sanctions, attorneys' fees and costs against Jericho, its principals, if appropriate, and Mr. Szegda, if warranted.

I trust Midtown's position remains clear.  Please be guided accordingly.

Very truly yours,

Maurice L. Stone

MLS:mak
Encl.
Cc    (w/encl.):    Michael Szegda, Esq.        (Via Regular Mail)
       (w/encl.):    Midtown Partners            (Via Telecopier)

1171180_1.DOC

**173**
Certification Pursuant to CPLR 2105

# CERTIFICATION PURSUANT TO CPLR 2105

I, Todd R. Geremia, an associate of the firm of Jones Day LLP, attorney for Defendant-Appellant, hereby certify pursuant to Section 2105 of the CPLR that the foregoing papers constituting the Record on Appeal have been personally compared by me with the originals filed and have been found to be true and complete copies of said originals and the whole thereof, all of which are now on file in the office of the Clerk of the Supreme Court, County of New York.

Dated:  November 4, 2005

Attorney for Defendant-Appellant

# EXHIBIT B
# TO GEREMIA DECLARATION

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION – FIRST DEPARTMENT
-----------------------------------------------------------------X

JERICHO GROUP, LTD,

                  Plaintiff-Respondent,

          -against-

MIDTOWN DEVELOPMENT, L.P.,

                  Defendant-Appellant.

-----------------------------------------------------------------X

New York County
Index No. 0113274/04
(Ramos, J.)

**AFFIRMATION IN SUPPORT OF
MOTION FOR REARGUMENT OR,
ALTERNATIVELY, LEAVE TO
APPEAL TO COURT OF APPEALS
AND FOR AN IMMEDIATE STAY**

      **ROBERT B. GOEBEL**, an attorney duly admitted to practice before the Courts of the

State of New York, affirms under penalties of perjury the following:

      1.   I am the attorney for Plaintiff-Respondent Jericho Group, Ltd. on this motion, and as

such, am fully familiar with the facts and circumstances set forth herein.

      2.   This affirmation, along with the accompanying affirmation of Sanford F. Young, Esq.

(appellate counsel) is being submitted in support of the instant motion for an Order:

             a.      Pursuant to Court Rule 600.14(a) granting reargument of this Court's

Decision dated August 17, 2006 which reversed the Order appealed from of the

Supreme Court, New York County dated May 16, 2005 and entered on May 18,

2005 (The Honorable Charles Edward Ramos, presiding) which Order denied

Defendant-Appellant's motion to dismiss the Amended Complaint, and upon such

reargument, vacating said Decision and thereupon reinstating and affirming the

Order appealed from of the Supreme Court, New York County; or

             b)      In the alternative, pursuant to CPLR 5602(a)(1)(l) and Court Rule

600.14(b), granting Plaintiff-Respondent leave to appeal to the Court of Appeals;

and

c)    Pending the decision of this motion, granting an immediate stay, pursuant

to CPLR 5519(c):

(i)    staying the entry of a Judgment dismissing the action;

(ii)    staying Defendant's pending motion or any further motions seeking

an order, *inter alia*, vacating the *lis pendens* and costs and fees; and

(iii)    otherwise staying the Supreme Court of the County Clerk and

Registrar from vacating or otherwise lifting the *lis pendens*; and

d)    For such other relief as the Court may deem just and proper.

3.    As a fuller discussion of the merits of this motion as to why we submit the Court

should vacate and recall its Decision and thereby affirm the Order appealed from and the other

relief we request is set forth in Mr. Young's Affirmation, they will not be repeated here.

## I. LITIGATION BACKGROUND

4.    Defendant previously submitted to the lower Court a Motion dated on or about

January 6, 2005 to Dismiss (the "Motion to Dismiss") the Verified Complaint in this litigation.

The Motion to Dismiss was denied by the lower Court by order dated May 16, 2005 (the

"Original Order")(a copy of the Original Order is contained in the record on appeal at 6-33)

incorporating therein the transcript of said hearing before this Court.[1]  The focus of the Court

was whether or not Defendant had committed fraud. This Court stated that:  "What I am really

suggesting is this motion sounds like it ought to be a motion for summary judgment. . . ."

(Original Order p. 16, lines 7-9; R 22.).[2]  Defendant's counsel asked this Court how a breach of

contract turns into a fraud issue, and the Court stated, a fraud is when you are asked to turn over

---

[1] In denying the Defendant's Motion to Dismiss, this Court stated that Defendant's testimony by its counsel was not credible (Original Order, p. 26, lines 10-11; R 32). This Court also stated that: ". . . from what the plaintiff is alleging, I think the plaintiff has at least a valid cause of action." (Original Order, p. 24, lines 20-21; R 30)

[2] Reference to "Record" or "R" shall mean the Record on Appeal in this appeal.

2

a document and instead of turning over the complete document you turn over half the document (Original Order p. 25; R 31).

5.      After the lower Court's denial of the Motion to Dismiss, Defendant filed a Notice of Appeal dated July 5, 2005 (R 5,6), a Brief dated November 7, 2005 and a Reply Brief dated December 15, 2005 with the Appellate Division First Department.

6.      By decision of the First Department entered August 17, 2006 (the "Appellate Decision"), the First Department reversed the Original Order and granted the Defendant's Motion to Dismiss.

7.      After the Original Order, Defendant filed a Verified Answer dated June 17, 2005 (Exhibit 1 annexed hereto) to the First Amended Verified Complaint dated November 29, 2004 (R 36-63).  As contemplated by the lower Court in the Original Order, discovery ensued.  On or about September 8, 2005, discovery commenced and concluded after approximately ten (10) months on or about June 30, 2006 pursuant to numerous discovery/conference orders issued by the lower Court.  Discovery included interrogatories, document production and depositions conducted by Plaintiff's counsel and Defendant's counsel,[3]

## II. DISCOVERY AND APPELLATE TIME PERIOD OVERLAP

8.      The discovery period and the time period that the First Department was deciding the Appeal completely overlap and new judicial admissions and new information disclosed from discovery and motion practice was not before the lower Court and this Court at the time they rendered their decisions.  Plaintiff has obtained substantial new facts and information that would be decisive regarding reargument of Plaintiff's claims if such facts and information were before the Court.  In addition, there were substantial judicial admissions made by Defendant, which

---

[3] Reference herein to "Excerpts" shall mean excerpts from deposition transcripts for the following individuals: Edward G. Imperatore 11/8/05 and 6/15/06; Paul Selver, Esq.; Elaine Osborn Emmet; David McGregor; Edward Ross; and Brian Gallagher, Esq.

were made in depositions and affidavits/affirmations after the Original Order and could not have been asserted by Plaintiff before this Court regarding the Motion to Dismiss. The depositions (as well as other discovery) took place from September 2005 to June 15, 2006.

9.     Discovery has disclosed all kinds of information and material which was not previously before the courts and should entitle Plaintiff to reargument of its claims.

### III. DEFENDANT'S SUMMARY JUDGMENT MOTION

10.     Very recently, on or about July 11, 2006, Defendant filed with the lower Court and served Plaintiff with a Notice of Motion[4] seeking Summary Judgment pursuant to CPLR 3212(b) ("Defendant's Summary Judgment Motion"). At that time, the First Department had not yet rendered its decision regarding Defendant's Appeal.

11.     Thereafter, Plaintiff immediately commenced preparing opposition and cross-motion papers with respect to Defendant's Motion for Summary Judgment together with motion papers for permission for leave to amend the Complaint to conform it to the facts and circumstances as they have unfolded through discovery. Plaintiff did not get the opportunity to submit such papers, however, because prior to the date upon which Plaintiff was to serve and file such papers, the First Department issued the Appellate Decision.

12.     As aforesaid, Plaintiff had obtained substantial new facts, documents and material through discovery. These new materials surfaced from and after the Original Order and included document production from "Amtrak" pursuant to a Freedom of Information Act ("FOIA") request made by Plaintiff. These new materials have provided Plaintiff with new information

---

[4] Defendant's Summary Judgment Motion papers consist of a Memorandum of Law, an Affirmation of Edward G. Imperatore, Esq. (the "Imperatore Aff 2"), Affidavit of Elaine Osborn Emmet ("Emmet Aff"), Defendant's real estate broker, and Affirmation of Todd Geremia, Esq., ("Geremia Aff") together with certain exhibits annexed thereto; this motion was apparently discontinued by Defendant.

supporting Plaintiff's causes of action set forth in the Complaint, and also sets forth facts for causes of action not previously known by or previously available to Plaintiff.

## IV. DEFENDANT'S FRAUD

13.     Defendant committed fraud upon Plaintiff. New information obtained through discovery and certain judicial admissions by Defendant conclusively establish this fraud. This is a very simple set of facts. Defendant employed Elaine Osborn Emmet of Brown Harris Stevens ("BHS") as the listing broker. BHS marketed the property for Defendant as having "Currently Approved Zoning" for development as of right of 729,164 buildable square feet (Exhibit 2 annexed hereto) which was knowingly false when made.

14.     At the beginning of the Study Period, Defendant led Plaintiff to believe that there were no other due diligence materials. Under letter dated June 19, 2002 (Exhibit 3 annexed hereto), simultaneously with the exchange of the signed Contract of Sale and delivery of the down payment, Plaintiff received a box of documents from Defendant pursuant to paragraphs 29(a) and 33(c). This box should have contained everything. This was falsely represented to be all of the due diligence documents because long after the Study Period Plaintiff received through discovery many materials and documents that were not provided to Plaintiff either as of the contract signing or thereafter pursuant to oral and written requests.

15.     Throughout the Study Period Defendant represented that it had satisfied its obligations under the Contract of Sale by this original submission.[5]     Throughout Defendant's brief submitted to this Court, Defendant fails to take into account that each of paragraphs 29(a),

---

[5] By letter dated August 2, 2002 from Mr. Imperatore to Mr. Szegda (R 133, 134), Mr. Imperatore represents that "Midtown's obligation is merely to provide Jericho with such 'due diligence' materials that Midtown had in its own possession. Midtown has long since produced those materials." In a letter dated September 3, 2002 from Mr. Imperatore to Mr. Szegda (R 124, 125), Midtown represents that it has complied with all its obligations under the Contract and did, in fact, "make available to Jericho copies of all architectural documents and drawings that it had in its possession (R 125). In the same letter Midtown represents that it has no information "with respect to whether or not an oil spill from adjacent properties onto the sites was cleaned up." (R 125) It is incontrovertible from the production of documents that these representations were knowingly false when made.

29(c) and 33 of the Contract of Sale all fit together and each such provision was bargained for. Defendant should not be permitted to willfully escape performance to rely upon any one of such paragraphs when it is not in compliance at the same time with the others. As has unfolded through discovery, Defendant has willfully breached each and every one of these paragraphs.

16.    Furthermore, Plaintiff made oral and written requests at various times during the Study Period seeking to receive missing due diligence materials some of which have now been produced as part of this litigation.

17.    During the beginning of the 1990's, certain improvements to the Property were to be constructed on platforms above active railroad tracks operated by "Amtrak" pursuant to an April 23, 1990 Development Agreement annexed to the Contract of Sale (R 75-92). Special Permits were issued by various governmental agencies on or about February 22, 1990, which permits had long-since expired on or about July 2, 2001, approximately one year before the Contract of Sale was signed. Defendant did not explain to Plaintiff the simple fact that not only had the Special Permits lapsed, but also that the Special Permits could not be renewed and were worthless, according to Paul Selver, Esq., the Defendant's very long-standing land use attorney.[6]

18.    Defendant represented to Plaintiff that a) annexed to the Contract of Sale was a true copy of the April 23, 1990 Amtrak Development Agreement (R at 85), notwithstanding the fact that Defendant has admitted in ¶ 26 of the affirmation of Mr. Imperatore dated January 6, 2005 ("Imperatore Aff 1") (R at 64) in support of Defendant's motion to dismiss that Defendant did not have the exhibits; b) on May 12, 2005 before the lower Court Defendant represented to the lower Court that the exhibits were missing (R at 23); c) during the November 8, 2005 deposition of Imperatore, he represented that he learned in the mid-90s that the exhibits were missing and he

---

[6] It was only as a result of Plaintiff coincidentally bumping into Mr. Selver that Plaintiff learned that the Special Permits were worthless and could not be renewed. Effectively, according to Selver, there consequently was no zoning for the Property. (Selver excerpts, Exhibit 22 at 38-42, 47-59)

did nothing and told no one about it (Imperatore excerpts, Exhibit 21 at 45-47); not true. As a result of newly discovered material and documents produced in discovery by Amtrak in February and March 2006 and Cooper Robertson & Partners ("CRP") in March 2006, Plaintiff learned that Mr. Imperatore contacted Amtrak in September, 1998 to complete the development issues with Amtrak purportedly for the benefit of prospective purchasers[7] of the site; such newly discovered materials included letters, memoranda of meetings with Amtrak and submissions of revised plans and so forth between Amtrak and Defendant (Exhibit 5 annexed hereto).

19.     In an August 13, 2002 letter (R 127, 128) from Michael Szegda, Esq. (representing Plaintiff) to Maurice Stone, Esq., Szegda requested any written or oral reports concerning the existence of hazardous materials at the Property. In a reply letter dated August 14, 2002 (R 129, 130) from Stone to Szegda, Stone stated there was no Phase I Environmental Report; he did not respond to whether Defendant had received any oral reports concerning the existence of hazardous material at the Property. Defendant's agent, Brown Harris Stevens[8], represented to Plaintiff during the "Study Period" that there was no environmental situation pertaining to the property. These were intentional, false representations. It was during discovery that Plaintiff learned about two April 2001 letters from Stone (Exhibit 6 annexed hereto) to the DEC making an FOIA request regarding the Property.

20.     Imperatore has admitted during his deposition that he did not provide Plaintiff with the environmental material (Imperatore Excerpts, Exhibit 21 at 115).

---

[7] In fact, a prospective purchaser cancelled its contract with Defendant by written notice dated October 15, 1998 (Exhibit 4 annexed hereto).

[8] During Mr. Imperatore's deposition, he stated that the Defendant had no relationship with Brown Harris Stevens. He recanted when it was pointed out to him that Brown Harris Stevens and Capin Associates were named in ¶ 24 of the Contract of Sale as the brokers for the transaction and were to be paid by Defendant (R 77).

7

21.    In Szegda's letter of August 30, 2002 (R 122, 123), he again requested a response to whether there were any environmental reports or any oral reports concerning the existence of hazardous materials at the Property. Mr. Szegda stated that notwithstanding rumors of oil spills, that the Plaintiff was still inclined to proceed with the contract but did need information regarding the rumors of oil spills to make an informed decision. On September 3, 2002 (R 124-125), Defendant wrote to Plaintiff that Defendant had no information with respect to whether oil spills from adjacent properties were cleaned up. We now know that this was completely false. Again, this was a fraud.

22.    Through discovery, it is incontrovertible that Defendant had a substantial file regarding oil spills from adjacent properties. Because these documents indicate that the oil spills were being cleaned up at the cost of the responsible property owner and/or the State of New York, and were otherwise remediated and under control, Plaintiff would have been able to satisfy itself of this particular concern. Instead, Defendant lied and concealed all of the information and materials it had in its file and knowledge; and also that Defendant had made multiple concealed FOIA requests to the New York State Department of Environmental Conservation ("DEC")[9]. Mr. Imperatore admitted that he had not provided his file to Plaintiff during the Study Period (Imperatore Excerpts, Exhibit 21 at 115). These items are not in the Record because they were first produced by Defendant as part of document production during discovery.

23.    In the June 18, 2002 Contract, Defendant falsely represented that attached to the Contract was a true copy of the April 1990 so-called Amtrak Development Agreement. However, all of the exhibits to the Amtrak Development Agreement were missing from the copy annexed to the Contract. Amtrak is the owner of certain easements for railroad tracks through

---

[9] Notwithstanding the impossibility of obtaining the DEC files prior to the end of the Study Period from the DEC, Defendant still did not disclose the material it had in its possession.

8

the subject Property. Defendant's long-standing position regarding this false representation in the Contract was that the exhibits were missing and that they did not know where they were, even though this agreement with Amtrak was so vital.

24.    They also represented to Plaintiff in a letter dated September 3, 2002 (R 124,125), that they had provided Plaintiff with all of the documents and documents and information regarding Amtrak that it had in its possession. As first disclosed in discovery, this was an outright fraud.

25.    Incredibly, discovery disclosed that there were concealed meetings, letters and submissions in 1998-1999 between Amtrak and Defendant for in part the purpose of resolving development issues including but not limited to the exhibits. None of this newly discovered information was delivered to Plaintiff as part of the due diligence materials regarding Amtrak. This was an outright lie. In addition, there were undisclosed plans prepared in the calendar year 2000 for a parking garage. Regardless of whether Defendant breached its obligations to produce the due diligence materials in accordance with paragraphs 29(a), (c) and 33 of the contract, Defendant blatantly lied and deceived Plaintiff by falsely representing that it had given Plaintiff all of the due diligence materials regarding Amtrak.

26.    Plaintiff believes that, at the time when the parking garage plans were prepared in the year 2000, Defendant based upon its concealed meetings with Amtrak in 1998-1999, had all of the necessary relevant material, knowledge and information sufficient to supersede the missing exhibits or otherwise allow the development of the Property over the railroad tracks without objection from Amtrak. This may explain why the missing exhibits allegedly were not done. In any case, there was fraudulent disclosure and concealment perpetrated by Defendant upon Plaintiff.

27.    Defendant has now completely changed its story that the exhibits were merely missing. Now Defendant alleges that its representation in paragraph 31 of the Contract was true because the exhibits were not missing but, rather, they were never done. If the exhibits were never done, why did Defendant direct Plaintiff to obtain the exhibits directly from Amtrak? And why did Amtrak tell Plaintiff to get them from Defendant? If the exhibits were never done, Defendant must have known that years ago and years before the Contract was signed. Had Defendant truthfully and timely informed Plaintiff that the exhibits were never done, Plaintiff would have proceeded with the transaction. Notwithstanding this new story, if the exhibits were never done, Defendant should have so informed Plaintiff of that very critical fact because "missing" means something is in existence but not then locatable.    Plaintiff would have been willing to proceed with the transaction if the exhibits had never been done or would have had the opportunity to negotiate during the Study Period with Amtrak.

## V.  APPELLATE DECISION

28.    The Appellate Decision reversed this Court on the law. In doing so, it states the following:

(i)    "On June 18, 2002, Jericho Group Ltd. entered into a contract to purchase two undeveloped properties on 11[th] Avenue from Midtown Development, L.P." (Appellate Division at 35)[10]

(ii)    "By e-mail dated August 23, 2002, Midtown let Jericho know that it had no information concerning the cleanup of an oil spill on properties neighboring the land Jericho sought to purchase. However, Midtown gave Jericho the name of a contact

---

[10] In ¶ 2 of an Affirmation dated September 1, 2006 recently submitted by Defendant's counsel, in support of Defendant's Motion to Cancel the Notice of Pendency, he states, "Defendant Midtown Development, L.P. owns two, two-acre parcels of real property in midtown Manhattan. *See Jericho Group, Ltd. v. Midtown Dev't, L.P.*, Index No. 113274 slip. Op at 35 (1[st] Dept Aug. 17, 2006)" Why is Defendant now citing to the Appellate Division's Decision that Defendant is the owner of the real property? (see discussion hereinafter)

person at the New York Department of Environmental Conservation, his telephone

number, and a project number and spill number for the incident at issue, so that Jericho

could find out the status of any spill and/or cleanup." [11](Appellate Decision at 38, 39)[12]

      (iii)    "On the day before the study period expired, Jericho asked Midtown for

the exhibits to a development agreement between Midtown and Amtrak. The agreement

had been included with the contract, but not the exhibits. Midtown responded that it did

not have the requested exhibits. It also reminded Jericho that it had 75 days during the

study period to request the exhibits from Amtrak, or to meet with employees from

Amtrak to discuss any issues regarding its easement." (Appellate Decision at 39)[13]

      (iv)    "Two years later, Jericho instituted this action." (Appellate Decision at

40); "The assertions in this complaint brought two years subsequent to the cancellation of

the agreement . . . ." (Appellate Decision at 42)[14]

      (v)    <u>"Had Midtown willfully or deliberately breached its obligations under</u>

<u>paragraph 29 (a) of the contract</u> [*emphasis added*], Jericho's first two causes of action

would not have been barred by its termination of the contract and recovery of its down

payment (<u>Mokar Props. Corp. v. Hall</u> 6 A.D.2d 536, 539-40 [1958]). However, Jericho's

allegations, to the extent they allege willful or deliberate breach of contract, are either

contradicted by the documentary evidence submitted on the motion . . . or premised on a

---

[11] On September 3, 2002, one of the principals of Plaintiff telephoned the regional office of the NYDEC in an attempt to learn the extent of the spill. He was able to ascertain only that the file was open. He was told in order to inspect the file he would have to make a formal FOIA request which would take four to eight weeks (R 158).

[12] Midtown failed to disclose even to the lower Court, this Court and to Plaintiff the existence of their substantial file pertaining to the oil spills.

[13] Defendant fails to disclose to the lower Court, this Court and Plaintiff the fact that the exhibits were never done, and at all relevant times Defendant knew this.

[14] In its Appellate Decision, the First Department made several references to a two-year period, which is hereinafter discussed in the Section entitled "Laches".

misreading of Midtown's obligations under paragraph 29(a). Thus, the rule articulated in

Mokar is inapplicable to these facts." (Appellate Decision at 42-43) [15]

    (vi)  "Midtown's obligation to provide documents flowed from the 'due

diligence' requirements of paragraph 29 (a) of the contract. . . . Accordingly, Jericho's

allegations that Midtown intended to breach a contractual obligation does not support an

action for fraud." (Appellate Decision at 45) [16]

    (vii)  "As to the escrow agent, the contract expressly provided that Midtown's

lawyers would act in this role. There is no evidence that there was any misconduct with

respect to the escrow account which would support a claim of fraud." (Appellate

Decision at 45) [17]

    (viii)  "Further, the record is plain that Midtown provided Jericho with

information in its possession, and that it alerted Jericho as to additional sources of

information as to the railway easement and the alleged oil spill." (Appellate Decision at

45) [18]

---

[15] There are newly made judicial admissions and newly discovered facts and information that extensively confirm Defendant's willful or deliberate breach of its obligations under ¶ 29 (a) (as well as under ¶¶ 29(c) and 33) of the Contract of Sale. These newly made judicial admissions by Defendant and new information were not readily available to the Plaintiff as of the time of the Defendant's Motion to Dismiss.

[16] As hereinafter discussed, there were various letters given by Defendant to Plaintiff that Plaintiff reasonably relied upon in deciding whether to proceed with the transaction, and newly discovered information regarding the alleged fraudulent misconduct by the Defendant, including "inducement to cancel letters" from an "unknown escrow agent". Equally as important were Defendant's obligations set forth in the provisions of ¶¶ 29(c) and 33 (R 83 and R 86, 87), each of which required Defendant to produce due diligence materials and Defendant knew that its representations regarding its performance were deceitful and fraudulent at all relevant times.

[17] Either the seller/Imperatore or an unknown party acted without permission as escrow agent; which role was not consented to by Plaintiff and, in fact, Imperatore testified that it was not him because he had no authority. (Imperatore Excerpts, Exhibit 21 at 34-36).

[18] While Midtown provided Jericho with only minimal contact information pertaining to the alleged oil spill, it also represented, by letter dated September 3, 2002 (R 124, 125) that it did not have any materials in its files regarding the oil spill or spills. The newly discovered information incontrovertibly confirms that Defendant had a substantial file regarding the oil spill; and not only that, but also Defendant made FOIA requests (Exhibit 6 annexed hereto)

(ix)    "Paragraph 22 of the contract limits Midtown's liability for breach to
return of Jericho's down payment."  (Appellate Decision at 46)[19]

## VI.  BRIEF SUMMARY OF CERTAIN FACTS

29.    The following is a brief summary of certain judicial admissions and newly discovered
facts not previously readily available or known to Plaintiff as of the Motion to Dismiss (in no
particular order of importance).

(i)    When Defendant first delivered the "due diligence" materials by cover
letter dated June 19, 2002, it was understood by the parties in good faith that the due
diligence material represented all the applicable materials.  Furthermore, in his letter
dated August 2, 2002, Mr. Imperatore represents that the due diligence material it had in
its possession has long since been produced by Midtown.  Again, based upon discovery,
this representation was false, especially with respect to the initial June 19, 2002
submission by Defendant of due diligence materials.

(ii)    Defendant fraudulently responded to Plaintiff's written and oral request
for information that Defendant had in its possession or knowledge regarding the existence
of hazardous materials at the Property.  Defendant had a substantial file on one or more
oil spills pertaining to the Property, which it did not disclose to Plaintiff, and further, had
concealed that it actually had made FOIA requests upon the DEC, which were never
disclosed to Plaintiff during the Study Period

---

upon the New York State Department of Environmental Conservation (the "DEC"), which were not provided to
Jericho during the Study Period.

[19] This presumes that Midtown acted in good faith and did not cause the cancellation of the Contract of Sale (*see*
Mokar Properties Corp. v. Hall, 6 A.D.2d 536, 179 N.Y.S.2d 814 (1st Dep't 1958).  Judicial admissions and newly
discovered information not readily available to Plaintiff prior to the Original Order confirms the fraudulent
misconduct by Defendant.  In addition, based on Defendant's Summary Judgment Motion papers, Defendant has not
newly asserted and has dropped and abandoned this position, and such abandonment should be treated as a judicial
admission.

(iii)    Defendant intentionally conducted itself in a manner to cause Plaintiff to

reconsider proceeding with the transaction. (Exhibit 7 annexed hereto)

(iv)    Not only did Mr. Imperatore and Defendant know that the exhibits to the

Amtrak Agreement were not attached to the document, which was attached as Exhibit B

to the Contract of Sale, which Amtrak Agreement Defendant had represented in ¶ 31 of

the Contract of Sale to be a true copy permitting development over the Amtrak railroad

tracks, but also Defendant now alleges in its Summary Judgment Motion papers that the

exhibits were never done.[20]  Defendant nevertheless sent/directed Plaintiff to get the

exhibits from Amtrak[21] knowing that they were never done.[22]  If the exhibits were never

done, why did Defendant direct Plaintiff to get the exhibits from Amtrak?  And why did

Amtrak direct Plaintiff to get the exhibits from Defendant?  During the hearing before the

lower Court on Defendant's Motion to Dismiss, the Defendant failed to represent that the

exhibits were never done; instead, Defendant represented to the lower Court that the

exhibits were missing.  (R 29)

(v)    For purposes of obtaining the so-called "Special Permits" for the

development of a large scale hotel residential and garage development over an active

railroad yard, Mr. Imperatore provided CRP, Defendant's architects, with "Amtrak"

---

[20] In making such affirmation, Imperatore relies upon a September 1998 letter that he wrote to Amtrak asking
Amtrak whether it had a copy of those exhibits.  It is curious why he relies upon a September 1998 letter, which was
almost four years prior to the subject contract, which letter was never even shown to Jericho during the Study
Period.  In ¶ 26 of Imperatore's Affirmation in Support of Defendant's Motion to Dismiss before this Court, dated
January 6, 2005 ("Imperatore Aff 1")(R 64-74), he represents that Defendant informed Plaintiff that Defendant did
not have the exhibits when he knew, or must have known, that the exhibits were never done, since that is
Defendant's latest story.

[21] Plaintiff's representatives had already spoken in mid-August 2002 at the request of Defendant with John
Youngdahl, Mark Brender and Sheila Mae Sopper of Amtrak each of whom advised Plaintiff that it should obtain
the documents from Defendant. (R 159)

[22] Mr. Imperatore also affirms that Jericho had 75 days under the Contract of Sale to seek to obtain the exhibits from
Amtrak.  He fails to disclose in such affirmation that Defendant had approximately 15 years to finish or locate the
exhibits with Amtrak.

14

information needed by the architects to prepare the plans, which information may not yet have been agreed to in 1989 and 1990 by Amtrak. Apparently, Defendant was willing to take the risk that a definitive agreement with Amtrak would occur with the specifications proposed by Defendant for purposes of obtaining the Special Permits (McGregor Excerpts, Exhibit 23 at 47-51). Upon information and belief, this fact was never disclosed to the public agencies involved in the decision to grant the Special Permits; nor was this disclosed to Plaintiff. So when this 1990 large-scale project was approved for the Special Permits, presumably these Special Permits were based upon a definitive agreement with Amtrak that, apparently, was never concluded; especially since Defendant now admits that the exhibits were never done and Defendant never disclosed this information to Plaintiff. .

    (vi)    Various critical letters, meeting minutes and submissions by and between Defendant and Amtrak occurred in the latter part of 1998 and into 1999 (hereinafter discussed); some of these newly discovered materials were produced by Amtrak in this litigation (Exhibit 5 annexed hereto) and some by CRP in this litigation (Exhibit 8 annexed hereto)[23], but were not given or disclosed to Plaintiff during the Study Period. For example, there were sketches in 1998 prepared by CRP of a proposed hotel that were never shown to Plaintiff during the Study Period (Exhibit 8 annexed hereto).

    (vii)    There were newly discovered plans prepared by Peter Claman's firm, Schuman, Lichtenstein, Claman, Efron Architects ("SLCE"), an additional architectural firm, some time in the summer and fall of the year 2000 pertaining to a development centering around the construction of a proposed parking garage development (Exhibit 9 annexed hereto), and which set forth on the plans areas pertaining to Amtrak's easements.

---

[23] Curiously, these materials from Amtrak and CRP do not overlap.

These were not given to Plaintiff during the Study Period.  Upon information and belief, SLCE had everything it needed from Amtrak to prepare plans for the proposed Parking Garage Development.  Such information may have superseded the exhibits to the Amtrak Agreement or otherwise established or resolved all necessary construction issues pertaining to Amtrak.  However, Defendant never submitted these materials to Plaintiff during the Study Period.

(viii)    During Mr. Imperatore's first deposition, he stated that a Mr. Thomas Scullin (who he referred to as a bus operator, and not an attorney), handled the negotiations regarding the Amtrak Agreement for Defendant (Imperatore Excerpts, Exhibit 21 at  45 ); that he was not personally involved in the final stages of the Amtrak Agreement; that he learned that the exhibits were missing in the mid-90s and that he did nothing and told no one (Imperatore Excerpts, Exhibit 21 at 45-47). [24]

(xi)    Mr. Imperatore testified at his deposition that he had some kind of sub-contract agreement with Harwood Lloyd (Imperatore Excerpts, Exhibit 21 at 12, 13) and that he had no knowledge of escrow procedures or the authority to open an escrow and escrows had to be handled by certain Harwood Lloyd members other than himself (Imperatore Excerpts, Exhibit 21 at 34-36)  Mr. Imperatore testified that he was not the escrow agent (Imperatore Excerpts, Exhibit 21 at 165).

(xii)    Mr. Imperatore, during his deposition, admitted that Defendant had not disclosed to Plaintiff the ownership interests in Defendant held by Mr. Imperatore and affiliates of Mr. Imperatore (Imperatore Excerpts, Exhibit 21 at 38-39).  It has been discovered that the Imperatores and affiliates own a little less than 50% of the Defendant.

---

[24] This contradicts testimony given by McGregor at CRP that Imperatore was the person that he looked to for any information required to perform CRP's architectural services (*i.e.*, to draft plans and obtain the Special Permits). (McGregor Excerpts, Exhibit 23 at 47-51)

(xiii)    During discovery, Plaintiff learned about Maurice Stone, Esq. FOIA requests made upon the DEC in April 2001 (Exhibit 6 annexed hereto).  During Imperatore's deposition, Imperatore admits that he did not provide Plaintiff with the relevant materials that they had regarding the oil spills (Imperatore Excerpts, Exhibit 21 at 115).

(xiv)    During discovery, Plaintiff learned that a "Conrail" entity called CRC Properties Inc. was granted a 5% Class B Limited Partner interest in Mid-Town Development Limited Partnership.  Upon information and belief, this Conrail entity is part of Amtrak, so essentially Amtrak directly or indirectly may own a 5% limited partnership interest in said limited partnership and/or the Property.  This was a complete revelation, especially where Defendant had directed Plaintiff to go to Amtrak for the exhibits (rather than Defendant getting the exhibits for Plaintiff).

(xv)    There were two undisclosed potential adverse possession situations that Defendant was facing regarding the Property during the Study Period, which was only disclosed by Mr. Imperatore to Plaintiff during his second deposition (Imperatore Excerpts, Exhibit 21 at 194-201).  Again, this is bad faith.  The fact that Defendant was facing two separate independent undisclosed adverse possession situations at the same time that it was unilaterally declaring and setting the September 18, 2002 closing date, indicates that, for this reason alone, Defendant was not ready and able to close on its declared closing date.[25]

---

[25] If this had been disclosed, it would have been grounds for a reasonable extension of time for these situations to be resolved.

## VII. OWNERSHIP ENTITY; PARTNERSHIP DOCUMENTS; STANDING TO SUE

30.     In ¶ 2 of the Affirmation dated September 1, 2006 by Todd Geremia with respect to

Defendant's motion to vacate the lis pendens, Mr. Geremia cites the Appellate Decision for the

statement/premise, "Defendant Midtown Development, L.P. owns two 2-acre parcels of real

property in midtown Manhattan." Nowhere in the Appellate Decision did the First Department

factually determine that Defendant is the owner of the Property (these issues have never been

considered). Moreover, upon reexamination by Plaintiff of the entire litigation file, it appears

that Defendant has not previously admitted ownership of the Property (*see e.g.* the Answer,

Exhibit 1 annexed hereto). Defendant has failed to produce the applicable limited partnership

filings for Defendant or for Mid-town Development Limited Partnership (Exhibit 10 annexed

hereto); fails to allege and establish that it is the record owner of the Property anywhere in this

litigation; and for the very first time Defendant admits ownership but in so doing Defendant

relies upon statements of fact set forth in the First Department's Appellate Decision, which have

not yet been determined in this litigation.

31.     Upon information and belief, Defendant may not be validly formed or validly existing

or may otherwise not be properly filed in the State of New York as a New York Limited

Partnership. Defendant was made a party to the Complaint as "Midtown Development, L.P."

because that entity name is set forth as the seller in the June 18, 2002 Contract of Sale.

However, an entity called Mid-Town Development Limited Partnership is listed in the land

records as the owner of the Property.

32.     Defendant has created uncertainty by its failure to produce all of the partnership

documents including but not limited to certificates and amendments of limited partnership

documents with respect to Defendant and Mid-Town Development Limited Partnership.

33.    Upon information and belief, neither Defendant nor Mid-Town Development Limited Partnership are validly existing in the State of New York and/or has not complied with the New York State Revised Limited Partnership Law with respect to filing requirements. If this were true then, upon information and belief Defendant lacked standing to appeal the Original Order.

34.    Moreover, in the event that Defendant validly exists and has complied with all New York State filing requirements, Defendant would still lack standing because it is not the record owner of the Property.

35.    The First Department in <u>Bay Shore Family Partners L.P. v. Foundation of Jewish Philanthropies</u> 239 A.D.2d 373 (2d Dep't 1997) stated that: "A limited partnership is formed at the time a certificate of limited partnership is filed with the Department of State. . . . Since the plaintiff was not in existence at the time the contract was executed and was not validly created by the time of the scheduled closing, it lacks the capacity to seek enforcement of the Contract." In <u>Boslow Family Limited Partnership v. Glickenhaus & Co.</u>, 23 A.D.3d 248 (1st Dep't 2005), the First Department held that failure to file a certificate of limited partnership prior to the alleged breaches of contract rendered it non-existent at the time of such breaches and, therefore, did not have a capacity to sustain damages by reason of the existence of the contract.

36.    These concerns arose long after the Original Order and were investigated after Defendant refused to produce the requested limited partnership documents.

## VIII. HARWOOD LLOYD TESTIMONY

37.    In the Appellate Decision the First Department of this Court stated that the Contract provided that Defendant's lawyers would act as escrow agent, but this did not allow for Mr. Imperatore to the individual escrow agent for HL. Mr. Imperatore denies that he was the escrow

agent and directed Plaintiff to Brian Gallagher, an attorney at HL (Imperatore Excerpts, Exhibit 21 at 117, 118).

38.    Plaintiff, in good faith, took the deposition of Brian Gallagher, Esq., an equity attorney at HL on June 12, 2006 at the offices of HL located in Hackensack, New Jersey.  As hereinafter discussed, this deposition was a complete "farce" and a "sham" by Defendant and HL.

39.    Mr. Gallagher was one of two individuals singled out by Mr. Imperatore as the persons at HL who possessed the most knowledge.  It turns out Mr. Gallagher knew next to nothing about the contested transaction and admitted that he:  had never read the contested Contract of Sale; had never read the escrow provisions; did not even know that there were escrow provisions in the Contract and, was not familiar with any of the various September 2002 letters between the parties and their counsel; had never prepared such letters as escrow agent; and essentially only knew what he had learned during his admittedly brief preparation for his deposition.  Mr. Gallagher's deposition confirms that there was no member of HL who acted as escrow agent.  So Mr. Imperatore and his colleague Mr. Stone, who admittedly were not authorized to act as escrow agent, were left to themselves to operate as undisclosed escrow agent.  Certain letters dated September 5 and 10, 2002, which purported to set forth the authorized positions of the escrow agent, were in reality the positions of the seller made under the aegis of the law firm; and were submitted to Plaintiff under false pretense.  Plaintiff reasonably relied upon these allegedly and admittedly unauthorized statements by Mr. Imperatore and Mr. Stone in certain of the letters, including critical letters dated September 5, 2005 (R 108, 109) and September 10, 2002 (R 110, 111) as well as correspondence wherein Mr.

Imperatore demands a general release as a condition to the return of the down payment (Exhibit 11 annexed hereto).

40.    Obviously Imperatore, directly or indirectly was issuing letters under HL's letterhead, which were not authorized by the escrow agent.

## IX. AMTRAK

### Defendant's Newly Concocted Theory for
### Defendant's False Representation in Paragraph 31 of the Contract of Sale

41.    Imperatore now affirms that:

> Midtown's statement to Jericho was truthful. Midtown did not have the exhibits referred to in the Amtrak Agreement when Jericho requested them and did not have those exhibits when the parties executed the contract or at any other time. . . . And to my knowledge, the exhibits referred to in the 1990 agreement between Amtrak and Midtown do not exist. (Imperatore Aff 2, ¶ 26)

42.    This is a new revelation. Defendant never before stated to Plaintiff that the exhibits do not exist (see Imperatore Aff 1 ¶ 26, R 72); nor did Imperatore state this in his deposition on November 8, 2005.

43.    Moreover, Todd Geremia, in support of Defendant's Motion for Summary Judgment affirms in his Affirmation dated July 7, 2006 that:

> On July 5, 2006, Jericho's counsel produced to Midtown's counsel a copy of the April 23, 1990 Amtrak agreement, as it was disclosed to Jericho by Amtrak in response to a FOIA request that Jericho made to Amtrak. A true and correct copy of a July 5, 2006 transmittal letter from Jericho's counsel and a true and correct copy of the April 23, 1990 Amtrak agreement that was attached to that letter is attached hereto as . . . . As reflected in this exhibit, the copy of the Amtrak agreement that Amtrak produced to Jericho, and that in turn Jericho produce to Midtown, did not include any of the exhibits referred to in the Amtrak agreement.

44.    This is incredible that Defendant and Mr. Imperatore newly allege that because the exhibits do not exist that somehow makes it correct for Defendant to make the ¶ 31 representation in the Contract of Sale. Mr. Imperatore knew that the exhibits were neither

21

completed nor attached to the Amtrak Development Agreement when it was executed and delivered. In any case, Mr. Imperatore testified that he knew from the mid-1990s[26] that the Amtrak exhibits were missing (Imperatore Excerpts, Exhibit 21 at 47). Defendant nevertheless attached the Amtrak Development Agreement as Exhibit B to the Contract of Sale without the missing exhibits, without any disclosure of that fact and without disclosure that the exhibits did not exist.

45.    In ¶ 26 of the Imperatore Aff 1 (R 72), Mr. Imperatore states that Plaintiff should have obtained the exhibits from Amtrak during the Study Period. This is disingenuous[27] and deceitful because Mr. Imperatore now states that he knew that the exhibits did not exist, but he nevertheless told Plaintiff to obtain the exhibits from Amtrak. Why would Mr. Imperatore direct Plaintiff to Amtrak for the exhibits if they did not exist?[28]

46.    Are there exhibits; were the exhibits never done; have the exhibits been superseded; who could Plaintiff believe? In a newly discovered letter dated February 8, 1989, written on behalf of Midtown to Amtrak's general counsel, it is stated that ". . . . we are comfortable with the agreement with your changes and in fact are circulating that agreement for signature (Exhibit 12 annexed hereto).

---

[26] This is also a new revelation to Plaintiff.

[27] It is also disingenuous for Defendant to chide and blame Plaintiff for not obtaining the exhibits from Amtrak during the 75 day Study Period; Defendant had approximately 15 years to obtain or complete the exhibits from Amtrak and it now admits that it failed to do so. Also, Plaintiff did not have a full 75 day Study Period because the Defendant only caused the 1988-90 architectural drawings and plans prepared by CRP to be delivered to Plaintiff on or about August 6, 2002, and that was the date that the Study Period really should have been deemed to have commenced on.

[28] Plaintiff had previously contacted Amtrak to obtain the exhibits and was rebuffed by three different individuals at Amtrak.

**Plaintiff's December 29, 2005 FOIA Request Upon Amtrak**

47.    Certain material was produced in this litigation by Amtrak to Plaintiff in response to a written FOIA request dated December 29, 2005. Based upon these new materials, which were not produced to Plaintiff by Defendant during the Study Period and other correspondence produced by Amtrak, there obviously are more materials pertaining to Defendant and Amtrak from and after November 1998. For example, by a newly discovered letter dated November 5, 1998 (included in Exhibit 8 annexed hereto), Imperatore wrote to CRP requesting that CRP conform the foundation plans to Amtrak's new track alignment. The response that has been produced by CRP (rather than by Amtrak) is a transmittal sheet dated November 19, 1998 (Exhibit 8 annexed hereto) addressed to Mr. Imperatore, which states: "The plan shows the new Amtrak track alignment as well as the assumed right-of-way for a light rail system. The sections show a vertical clearance of 18'-6" from top of rail." All of these letters were not delivered to Plaintiff during the Study Period and could not have been asserted in Plaintiff's Complaint (*i.e.*, new material). Plaintiff had no knowledge of these materials until discovery from these third parties. Upon information and belief, these revised "Amtrak" plans were never shown to Plaintiff during the Study Period.

48.    Also as a result of the aforesaid FOIA request made by Plaintiff's counsel Amtrak produced the following letters: October 5, 1998 from Imperatore to Lewis; October 6, 1998 from Imperatore to Lewis; October 13, 1998 from Imperatore to Lewis; and October 29, 1998 from Lewis to Imperatore. These letters, and upon information and belief, any attachments thereto, were never submitted to Plaintiff prior to discovery, and may not have been produced by Defendant had Plaintiff's counsel not made the FOIA request and not subpoenaed CRP.

23

49.    These newly discovered materials indicate that there was extensive material regarding Amtrak not shown to Plaintiff during the Study Period.

**Cooper Robertson & Partners ("CRP") and Mr. McGregor**

50.    In connection with document production, Mr. McGregor, on behalf of CRP, produced 18 pages of material (Exhibit 8 annexed hereto). The following is a brief summary of some of these 18 pages:

| Date of Item | New Item Transmitted and Comment |
|---|---|
| 10/9/98 | This is a transmittal coversheet together with a memorandum from Tom Wittrock of CRC to Ed Imperatore setting forth issues regarding Amtrak that purportedly came up at a meeting on October 8, 1998 with Larry Lewis and Michael Postus of Amtrak Of note are the following: The track alignments had changed since 11/9/89; side clearance between the center rail and any obstruction should be a minimum of 9'; Amtrak prefers piles instead of concrete footings or steel sheets; a minimum vertical clearance is required; ventilation openings will be required; an access ramp will be required. The new federal life safety code requires egress from tunnels for evacuation in the event of an emergency; and he states there are numerous issues related to construction over an active railway line. |
| 11/5/98 | Transmittal letter from Ed Imperator to David McGregor wherein Imperatore writes "In accordance with our telephone call last week, I enclose a set of current survey plans and site maps for the Midtown sites that Amtrak provided us." He requested that McGregor ask Wittrock to adapt his foundation plan to these plans. |
| 11/19/98 | Transmittal cover letter from Tom Wittrock of CRP to Mr. Imperatore enclosing the so-called revised transit-way plan and sections, and states that: "the plan shows the new Amtrak track alignment as well as the assumed right of way for a light rail system. The sections show a vertical clearance of 18'-6 " from top of rail." |
| 7/15/99 | This is a memorandum from Tom Wittrock to David McGregor with attached sketches showing a possible configuration for a hotel on the residential tower site. He states that we were asked to see how the hotel would lay out without changing the existing approved zoning envelope, |

| | Wittrock goes on to provide seven numbered paragraphs of comments. |
|---|---|

51.    Defendant fraudulently lied to Plaintiff when it represented to Plaintiff that it had provided Plaintiff with everything it had.

### Defendant's Privilege Log

52.    During discovery, Defendant had set forth numerous documents in its extensive privilege log, some of which were challenged by Plaintiff on the basis that the privilege asserted was not available to Defendant.  Such challenges were carefully decided by the lower Court.  Plaintiff only challenged a few of these listed items because Plaintiff relied on the fact that Defendant had represented that the entity called "Arcorp" was a principal of Defendant or consisted of one or more of the principals of Defendant; and also that, at all relevant times, Mr. Imperatore was acting as counsel to Defendant.  Upon information and belief, Defendant independently made similar representations to the lower Court prior to review by the lower Court.  On June 15, 2006, several months subsequent to the determination of Plaintiff's challenges to Defendant's privilege log, Mr. Imperatore testified when asked where does an entity known as Arcorp fit in, he answered, "it doesn't, Sir"; and he testified that Arcorp is not related to Midtown Development, L.P. at all (page 158, lines 5-11 of Imperatore Excerpts, Exhibit 21).  He also testified that he was not involved in the final negotiation, execution and delivery of the Amtrak Agreement; and that he was not counsel to Defendant in the early 1990s.

53.    Also, independent of the foregoing, but relevant to Defendant's privilege log, Defendant's production of documents and to Mr. Imperatore's testimony is that the Record in this action should reflect that Mr. Imperatore, notwithstanding his assertions to the contrary, acted at

least from time to time solely as a partner/principal of Defendant, rather than as counsel (Exhibit

13 annexed hereto).

## X. MR. IMPERATORE'S STATUS AND RELATIONSHIP WITH HARWOOD LLOYD

54.     The following excerpts are from Mr. Imperatore's deposition on November 8, 2005.

(Exhibit 21 at 12-13).

Q.      What was your title?
A.      My title was partner, but I have an arrangement with the firm.  So I'm not, I don't
        share in any profits and I don't have any authority within the firm.  I'm styled a
        partner and I'm a member of the firm but I'm not a participant in the true sense as
        a partner.  I have my own subcontract agreement with the firm.
Q.      So you're basically what would be known as a contract partner?
A.      No.
Q.      No?
A.      No. The firm has contract partners, Sir.  I have a subcontract with the firm which
        compensates me outside the firm's normal compensation agreements.

55.     To add to this, Brian Gallagher, represented to be a senior equity partner of HL, gave

the following testimony at his deposition on June 12, 2006. (Exhibit 24 at 7, 8)

Q.      Do you know an individual named Edward Imperatore?
A.      Yes.
Q.      How do you know him?
A.      He has a contract partnership relationship with our firm.
Q.      How is that set up?
A.      He has a contract.  He has an agreement with our firm and he works here I
don't know the exact terms of this agreement because I never read it, but some of the
work that he does – actually most of the work that he does he does in his group and the
profits are shared between Mr. Imperatore and Harwood Lloyd.
Q.      When you refer to "his group" what does that reference mean, what does
that refer to?
A.      He has a practice, and basically over the years it has been Mr. Imperatore
and a number of other attorneys who have worked with him, some of whom are basically
just working on Mr. Imperatore's matters, some of whom are partners of our firm who do
both Harwood Lloyd work and Ed Imperatore work.  And as he needs people to help we
provide help to him, be it a partner or an associate.

## XI.  CONFLICTS OF INTEREST

56.  HL was the party named as "Escrow Agent" in the subject Contract of Sale, but obviously the only persons sending out letters purportedly on behalf of the escrow agent were Imperatore and Stone.

57.  Mr. Imperatore testified that he had a special arrangement with HL in that he is not an equity or contract partner, and accordingly he says that he has no power or authority to act on behalf of Escrow Agent.

58.  At his second deposition, on June 15, 2006, Mr. Imperatore reconfirmed his statement that he had no power or authority  (Exhibit 21 at 156, 174).

59.  Mr. Imperatore admitted during his deposition that these interests were not disclosed to Plaintiff before the Contract of Sale was signed and before the down payment was made (Exhibit 21 at 38).

60.  When a dispute arose regarding: a) Defendant's fraudulent behavior and fraudulent representations; Defendant's failure to disclose the existence of all kinds of materials notwithstanding a substantial file regarding one or more of the "oil spills"; Defendant's deceitful concealment of complete information regarding Amtrak, which it had in its file; its fraudulent misrepresentations that it had given Plaintiff everything it had in its file regarding Amtrak; the concealment of the non-renewability of the "Special Permits"; and g) no "as of right" zoning, Mr. Imperatore put his seller's hat on, making all kinds of demands under the auspices of "escrow agent," including a demand for a general release from Plaintiff, and numerous letters to Pfeiffer, which Gallagher admitted that he had never seen before.[29]

---

[29] Furthermore, the general release had never been discussed between the parties and the form of general release submitted by Defendant was not even reciprocal.

27

61.     When push came to shove, Defendant and Mr. Imperatore as de facto escrow agent used HL as an impermissible advantage to press Plaintiff into protecting the return of the down payment, and to push an invalid, unauthorized purported attempt to cancel the Contract of Sale by attorney Szegda.[30]

62.     The provisions for an escrow arrangement pursuant to the Contract of Sale established a fiduciary relationship among the parties. From the time the down payment was made to the escrow agent, the escrow agent became the trustee of both the Plaintiff and Defendant. For the reasons set forth herein, HL, for the sole benefit of Defendant, breached its fiduciary obligations to Plaintiff. *See* Avalon East, Inc. v. Monaghan, 43 Misc.2d 401, 251 N.Y.S.2d 290 (NY Sup Ct, 1964).

## XII. LACHES

63.     Defendant alleges that Plaintiff's purported two-year delay in bringing this action has unduly prejudiced Defendant. The First Department referred to a two-year period a couple of times in the Appellate Decision.

64.     Plaintiff learned through discovery that Mr. Imperatore, on or about October 18, 2002, explicitly informed Ms. Emmet and demanded that the Property be kept off the market. Mr. Imperatore stated, "Do not keep any prospective buyers warm . . . . Do not attend hearings on our behalf." He concludes by stating, "I trust our position is clear." (Exhibit 14 annexed

---

[30] The notice provisions of the Contract of Sale were not adhered to (¶¶ 29 (a), 44 of Contract of Sale); the purported cancellation notice was given by counsel rather than by Plaintiff (¶¶ 29 (a), 44 of Contract of Sale); Plaintiff's counsel was not authorized, nor did he have the authority to cancel the Contract of Sale; and the September 12, 2002 clarification letter that Defendant relies upon could not resuscitate a fatally defective September 3, 2002 notice, which Defendant's counsel admitted in the September 5, 2002 letter that the September 3, 2002 letter was not a valid cancellation. However, it was only after Imperatore demanded a release, and only after HL extracted this backwards and retroactive, convoluted, unauthorized purported cancellation of the Contract of Sale from an attorney who had no authority to do so, and in violation of the provisions of the Contract of Sale, did Mr. Imperatore authorize release the down payment to Plaintiff's counsel.

hereto.) This newly discovered letter confirms that Defendant elected to keep the Property off the market.

65.    Upon information and belief, Mr. Imperatore wrote to Ms. Emmet on November 4, 2002 wherein he advised Ms. Emmet that Plaintiff had recently purported to rescind the termination of the Contract and that Defendant had already threatened to sue Plaintiff if it attempted to rescind the termination (Exhibit 15 annexed hereto). This newly discovered letter confirms that Plaintiff did not sit back and wait around to sue.

66.    Also, Defendant's position on this issue is disingenuous. Defendant has actively discouraged Plaintiff from participating in any manner in the subject transaction. For example, Mr. Imperatore states in a newly discovered e-mail to Ms. Emmet dated July 26 , 2004, that he was successful in chasing Plaintiff away (Exhibit 7 annexed hereto). Defendant cannot on the one hand claim laches on the part of Plaintiff while, on the other hand, Defendant is chasing Plaintiff away and also at the same time Defendant intentionally elects to keep the Property off the market in anticipation of favorable new zoning (Exhibit 14 annexed hereto)

67.    In a recent First Department 2004 Decision, the general facts involved the following: the Plaintiff sought specific performance of a real estate contract; there was a 2-year delay between the signing of the contract of sale and the purchaser's attempt to enforce it; and there was a steep increase in the market value of the Property. EMF General Contracting Corp v. Bisbee, 6A.D.3d 45, 774 N.Y.S.2d 39 (1st Dept. 2004. The First Department noted that, because of the passage of time before the action was commenced and the property's increase in value, consideration of a number of rules and cases is required. In this regard, the Court pointed out that the trial court had not found that the buyer was behaving in any sort of disingenuous or manipulative fashion for the purpose of delaying the purchase in order to see whether the market

value of the property went up or down; rather the buyer was legitimately attempting to resolve the real defects in title. If anyone was disingenuous, it is the Defendant for the reasons herein set forth.

## XIII. MISCELLANEOUS

68.    In a letter dated January 19, 1998 (Exhibit 16 annexed hereto), Defendant states in a proposal for the sale of the subject property that Defendant has to notify its partner "Consolidated Rail Corporation" with respect to the Contract of Sale; thus confirming that Defendant has a partner in the subject property who may in fact be a successor in interest such as Amtrak.

69.    In Defendant's brief on appeal, Defendant highlights that Plaintiff performed its due diligence at the last minute and accordingly, was dilatory. In fact, in a letter dated July 17, 2002, from Szegda to Stone (Exhibit 17 annexed hereto), Szegda emphasizes that the Plaintiff's architects and zoning attorneys have informed them that without the 1990 documents/drawings they cannot begin a meaningful analysis of the project; and Plaintiff's architects and engineers wrote to Plaintiff on July 31, 2002 that they were still waiting for the plans and drawings from Defendant (Exhibit 17 annexed hereto). These materials should have been in the box of due diligence items submitted on June 19, 2002.[31]

70.    In Ms. Emmet's handwritten notes from November 27, 2001, she writes "zoning is in place as represented with the caveat that the special permits have lapsed and would need to be reactivated." (Exhibit 18 annexed hereto) This written notation is underneath the names Ed

---

[31]  The documents were actually finally obtained from CRP on or about August 7, 2002 instead of as required under paragraphs 29(a) and (c) and 33 of the contract. Defendant's response on August 2, 2002 (R 133) relies upon Paragraph 29(a) of the contract. Such reliance is misplaced because in fact Defendant must have had the materials in its possession but nevertheless under paragraphs 29(c) and 33 of the contract Defendant was required to timely deliver these materials within two business days of the contract. For this reason alone, Defendant should have at least in good faith entered into an extension of the Study Period.

Imperatore and Murray Stone and probably reflects one or two telephone conversations with them. The property was marketed with the representation by BHS and Ms. Emmet that the zoning was in place even though it wasn't and Mr. Imperatore and his group no doubt knew that.

72.    Discovery disclosed a three page letter dated April 19, 2000 (Exhibit 19 annexed hereto) wherein Mr. Selver wrote to the City Planning Commission setting forth certain requested changes with respect to the original issuance of the special permits. Neither this letter nor the reply letter were produced by Defendant during the Study Period.

72.    In a letter dated October 4, 2000, from Mr. Imperatore to Mr. Thomas Eschman (Exhibit 20 annexed hereto) Mr. Imperatore refers to plans to develop the site as a public parking and bus storage garage. Neither this letter nor any other documents pertaining to this proposed plan were disclosed to Plaintiff during the Study Period.

### XIV.  PARAGRAPH 22 OF THE CONTRACT OF SALE

73.    In a case where the Plaintiff sought specific performance after the return of the down payment, the Appellate Division, Second Department affirmed the lower Court's decision denying the Defendant/Seller's Motion to Dismiss on the basis of documentary evidence. The Court held that: "No defense was conclusively established by the defendant's submission of the instant Contract, because the plaintiffs' opposing papers raised substantial issues of fact regarding bad faith on the seller's part and whether the seller's waiver of the disputed Contract time period left the Contract in full effect entitling the buyer to specific performance." Paynter v. Vishnia 114 A.D.2d 404, 405, 494 N.Y.S.2d 44, 45 (2d Dept. 1985). It is a question of fact whether Defendant's behavior and misrepresentations leave the original Contract of Sale in full force and effect (or should be reinstated) or the purported cancellation be rescinded entitling Plaintiff to specific performance.

31

74.     In a 2003 Decision, the Second Department, in affirming the lower Court's Decision, expressly held that the return of the Downpayment does not preclude the buyer from seeking specific performance of the Contract. Radd v. Dragos, 302 A.D.2d 509, 510, 755 N.Y.S.2d 255, 256 (2d Dept. 2003.

75.     In Mokar Properties Corp. v. Hall, 6 A.D.2d 536, 179 N.Y.S.2d 814 (1st Dept. 1958, the plaintiff alleged that defendants had contracted in writing to sell two parcels of real property to plaintiff. Plaintiff paid $25,000 down on the signing of the contract. Plaintiff further alleged that the defendants failed to produce any of the documents required by the Contract of Sale with respect to objections to title. The Contract of Sale provided that in the event the seller was unable to convey title, the sole liability of the seller would be to refund the amount paid on deposit plus the net cost of examining title, and that upon such refund the Original Contract of Sale would be considered cancelled. Two weeks after the scheduled closing date, the defendant repaid to plaintiff the down payment plus the cost of title examination. The First Department noted that the limitation of liability of the seller was to be applicable only in the event that the seller was "unable" to convey title in accordance with the terms of the contract, and that implicit in such limitation is the obligation to act in good faith; that a party cannot exculpate himself from liability by relying on a condition precedent when his own conduct causes the non-performance of the condition. Id. at 539, 179 N.Y.S.2d at 819.

76.     If Paragraph 22 were to be applicable, the First Department in Mokar Properties, makes it clear that implicit in such a limitation with respect to remedies is the obligation to act in good faith and if the seller has not acted in good faith, that he "cannot then limit his damages by shielding himself behind such self-created or easily scaled barriers." Id. at 540, 179 N.Y.S.2d at 819.

32

77.     The Second Department in <u>BGW Development Corp. v. Mount. Kisco Lodge No.</u> <u>1152 of the Benevolent and Protective Order of Elks of the United States of America, Inc.,</u> 247 A.D.2d 565, 669 N.Y.S.2d 56 (2d Dept. 1998) goes one step further than the first department in <u>Mokar Properties</u>. In <u>BGW Development</u>, the applicable Contract of Sale provided that in the event the seller shall be unable to convey marketable title then the sole obligation of the seller shall be to return to purchaser the down payment, plus interest, and the net cost of examination of title. The Court stated that: "Despite the fact that the contract specifically contemplated a limitation on the damages recoverable by the plaintiff, the clause is unenforceable under the circumstances of this case. A vendor of real property who breaches the Contract in bad faith cannot limit the damages recoverable by the injured purchaser by relying on a contractual limitation such as the one at bar." <u>Id</u>. at 568, 669 N.Y.S.2d at 60.

78.     Accordingly, even if Defendant's original Contract of Sale were determined to provide a limitation remedies or on the damages recoverable by Plaintiff with respect to a default or a breach by Defendant, this limitation is unenforceable under the circumstances of this case.

79.     Moreover, Mokar determined that this type of provision is only applicable where the seller is "unable" to convey title (*see infra* at ¶ 96 hereof)

80.     In a very recent Decision, May 16, 2006, <u>Sevilla v Valiotis</u>, New York Slip Op 03877 (2d Dept.) the Second Department held that where a contract provides that in the event a seller cannot convey a clear title, the contract limitation of remedies to the refund of the buyer's deposit and the termination of the contract contemplates the existence of a situation beyond the control of the parties, "and implicitly requires the seller to act in good faith (quoting <u>Mokar</u>). Accordingly, the Second Department affirmed the buyer's motion for summary judgment on its cause of action seeking specific performance of the contract by the seller.

## CONCLUSION

For all of the reasons set forth herein, Plaintiff respectfully requests that Defendant's

motion to reargue be granted, or alternatively, leave to appeal to the Court of Appeals be granted.

Dated: Scarsdale New York
September 18 , 2006

_____
Robert B. Goebel

# EXHIBIT C
# TO GEREMIA DECLARATION

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION—FIRST DEPARTMENT

-----------------------------------------------------------------X

JERICHO GROUP, LTD.,

                             **Plaintiff-Respondent,**

             -against-                   **New York County Clerk's**
                                          **Index No. 113274/04**

MIDTOWN DEVELOPMENT, L.P.,

                             **Defendant-Appellant.**

-----------------------------------------------------------------X

### AFFIRMATION OF TODD R. GEREMIA IN OPPOSITION TO RESPONDENT'S MOTION FOR REARGUMENT AND LEAVE TO APPEAL

TODD R. GEREMIA, an attorney duly admitted to practice law in the State of New York, affirms the truth of the following under penalty of perjury, pursuant to Rule 2106 of the New York Civil Practice Law and Rules:

1.      I am an associate in the law firm Jones Day, counsel to defendant-appellant Midtown Development, L.P. in this case. I submit this affirmation in support of Midtown's opposition to Jericho's motion for reargument, leave to appeal, and for a stay pending determination of this motion and any other post-appeal motions in this case. I am fully familiar with the facts stated herein.

### INTRODUCTION

2.      Jericho's motion should be summarily denied. The Court wrote a carefully reasoned Decision and Order that granted Midtown's motion to dismiss the complaint on multiple, alternative grounds, with costs to Midtown. Moreover, after giving Jericho a full

opportunity to orally present all of the same arguments it makes in its papers, Justice Mazzarelli (the presiding Justice on the panel that heard this appeal) denied Jericho's application for an interim stay of the Final Order pending the Court's determination of this motion. *See* Ex. A, hereto. Jericho has not shown how even one, let alone *all*, of the Court's alternative grounds for dismissing this case is based on a wholesale misapprehension of the record or the long-established legal authority on which the Court's Final Order was based.

      3.      Instead, Jericho's motion for reargument is centered on what it claims is "newly discovered evidence" that, according to Jericho, requires the Court to reverse its own decision. That is, of course, not the way appellate procedure works. *See* MARK DAVIES, ET AL., N.Y. CIVIL APPELLATE PRACTICE § 19.1, at 497 (1996) ("Practice Tip: Newly discovered evidence may not be introduced in a motion to reargue."). The time for Jericho to try to enlarge the record was before the Court rendered its decision, not to wait until after the Court entered its decision and then claim that "newly discovered evidence" is somehow pertinent to this appeal. In any event, as we explain in detail below, the "new evidence" that Jericho improperly tries to put before the Court on this motion, in a desperate, throw-in-the-kitchen-sink manner, is not "new," nor would it lead this Court to reconsider its decision even if it were properly part of the record.

      4.      Indeed, Jericho's motion for reargument is an apt metaphor for Jericho's entire lawsuit. In June 2002, Jericho entered into an "as is," "no representations" contract to purchase several acres of undeveloped Manhattan property from Midtown, but then expressly cancelled that contract and received back its downpayment before the scheduled closing. *Two years later,* after Midtown's property (located across from the Javits Center) had dramatically increased in value, Jericho brought this opportunistic strike suit, alleging that there were certain representations and documents that Jericho purportedly needed before it could have decided

whether to purchase the property. In the same "wait and see" vein, Jericho now contends that

there is "newly discovered evidence that came to light" which warrants undoing this Court's

work, reinstating Jericho's lawsuit after a judgment of dismissal has been entered, and

maintaining Jericho's grip on a property that it had determined *four years ago* was either too risky

or too expensive to buy. It is time for this case to end, as the Court has already ordered that it

must.

## BACKGROUND

5.    This is not a complicated case. Defendant Midtown Development, L.P. owns two

parcels of real property in Manhattan. (R.75, R.84, Contract ¶ 30(a)). The property is located on

Eleventh Avenue between 36th and 38th Streets. (R.75).

6.    On June 18, 2002, Midtown entered into a contract to sell its property to plaintiff,

Jericho Group, Ltd., for $28 million. (R.75). The contract provided for an "AS IS" sale and

disclaimed any representations as to the condition of the property or the use to which it could be

put. (R.77, R.80, R.88, Contract ¶¶ 25, 29(b), 38). The contract gave Jericho, the buyer, a

seventy-five day "Study Period" to evaluate the property and the right to cancel the contract and

get back its $250,000 downpayment at any time during this period. (R.79-80, Contract ¶ 29(a)).

7.    By letter dated September 12, 2002, Jericho cancelled the contract and requested

the return of its downpayment:

> [T]his letter will serve as confirmation that our letter on behalf of
> Jericho dated September 3, 2002, requesting the return of Jericho's
> down payment was intended as the exercise of Jericho's right
> under paragraph 29(a) of the referenced contract to cancel said
> contract and receive the return of the monies paid upon execution
> thereof.

(R.112). Midtown promptly thereafter returned the downpayment to Jericho. (R.47, Compl. ¶

44; R.113-16).

8.     Two years later, in September 2004, Jericho commenced this lawsuit. Its amended complaint asserted four causes of action for breach of the parties' contract, including two causes of action for specific performance, and a cause of action for fraud that was also based on Midtown's alleged breach of the contract and Midtown's alleged failure to disclose certain information concerning the property or the contract. *See Jericho Group, Ltd. v. Midtown Development, L.P.*, Index No. 113274, slip. op. at 40 (1st Dep't Aug. 17, 2006) (attached, and hereinafter "Final Order").

9.     Midtown moved to dismiss the complaint on, among other grounds, that Jericho may not seek to enforce a contract that it cancelled. *See id.* at 41. The lower court (Ramos, J.) denied Midtown's motion in its entirety from the bench, and Midtown appealed. (R.4-32). On August 17, 2006, this Court entered a unanimous Decision and Order that reversed the lower court's order, granted Midtown's motion, dismissed Jericho's complaint on multiple, alternative grounds, and awarded costs to Midtown. *See* Final Order at 35. As directed by the Court's Order, the Clerk has entered a final judgment dismissing the complaint and taxing costs against Jericho. *See* Final Judgment, attached hereto.

10.     Jericho's motion for reargument is based on only one of the Court's multiple grounds for dismissing the complaint: that, even assuming Midtown had breached the contract, the record showed that Midtown did not engage in a "willful or deliberate" breach, as this Court held Jericho must properly allege to rescind its express termination of the contract and seek specific performance or damages. *See* Affirmation of Sanford F. Young ("Young Aff.") ¶ 6 (this ground is "pivotal to the instant motion"). Perhaps not by accident, Jericho's counsel's affirmation omits a critical page of the Court's Order (page 42) where the Court gave two *other* grounds for dismissing Jericho's causes of action for breach of contract, including that Jericho's

4

allegations did not establish that Midtown had breached the contract at all, let alone willfully or deliberately. Just as Jericho omits this critical page of the Court's Order, its motion for reargument disregards the Court's other, independent grounds for dismissing Jericho's breach of contract claims.

11.     On the facts, Jericho's motion focuses on its allegation that Midtown purportedly "willfully" breached the contract by not providing Jericho with certain non-existent "exhibits" to a development agreement that was attached to the parties' contract. *See* Young Aff. ¶ 24. Once again, Jericho's counsel omits the page of the opinion where the Court noted that Jericho did not even ask Midtown for these exhibits until "the day before the study period expired," a fact that shows Jericho manufactured this issue as a pretext for bringing its meritless lawsuit. Final Order at 39. As the Court's Final Order later noted—in support of its alternative holding that there was no "actionable fraud" in this case—"Jericho made requests for documents on the eve of the expiration [of the study] period which could have been made much earlier." *Id.* at 45-46.

12.     A *complete* copy of the Court's twelve-page Final Order is attached to this affirmation and also described further below. This complete copy of the Court's Final Order shows on its face that Jericho's motion should be summarily denied, with an appropriate sanction on Jericho and attorney's fees and costs to Midtown.

## ARGUMENT

### A.    JERICHO'S MOTION FOR REARGUMENT IS IMPROPERLY BASED ON PURPORTED "NEWLY DISCOVERED EVIDENCE"

13.     Jericho's motion for reargument is procedurally defective, and it fails to address in any meaningful way the Court's Final Order and the exacting standard that Jericho must meet to overturn it. As Jericho repeatedly makes clear, the centerpiece of its motion is what it claims is

"newly discovered evidence."[1] This is an utterly frivolous ground for reargument. In addition, what Jericho calls "newly discovered evidence" is neither new, nor would it warrant reconsideration of this Court's Final Order even if this Court were to consider it.

### A Motion for Reargument May Not Be Based on "Newly Discovered Evidence"

14.      First, a motion to reargue must be based on "points claimed to have been *overlooked or misapprehended* by the court, with *proper reference to the portions of the record* and the authorities relied upon." 22 N.Y.C.R.R. § 600.14(a) (emphasis added). This Court of course could not have "overlooked or misapprehended" facts that were not in the record.

15.      Second, it is well-established that a motion for reargument may *not* be based on "newly discovered evidence." This is black-letter appellate procedure: "A motion to reargue may not be used to bring before the court newly discovered evidence." DAVIES, N.Y. CIVIL APPELLATE PRACTICE § 19.1, at 497; *see also* 1 THOMAS R. NEWMAN, N.Y. APPELLATE PRACTICE § 10.03, at 10-4 (2004) ("The motion for reargument must be based on the record on which the appeal was decided. The court does not consider additional facts first brought to its attention . . . in support of the motion."). Indeed, in a short primer on post-appeal procedure, Jericho's own counsel has previously parroted the rule that "a motion for reargument to an appellate court generally is not based on newly discovered facts, because *the facts of the case are frozen in the record and cannot be supplemented*." Sanford F. Young, *Appeals From Intermediate Courts*

---

[1] *See* Young Aff. ¶ 9 ("newly discovered evidence . . . prove [sic] that Midtown willfully and deliberately breached"); *see also, e.g.*, Goebel Aff. ¶ 8 ("new judicial admissions and new information disclosed from discovery"); *id.* ¶ 10 ("all kinds of information and material which was not previously before the courts"); *id.* ¶ 12 ("substantial new facts, documents and material through discovery").

*Require Careful Adherence to Applicable Statutes and Rules*, N.Y. STATE BAR JOURNAL 8, 8 (Mar. 1999) (emphasis added). There is no reason to deviate from this rule here.[2]

16.    Third, Jericho should not be heard on its untimely request now. Jericho claims that its purported "newly discovered evidence" consists of material that it obtained during discovery in this case.[3] *See* Young Aff. ¶ 9 ("newly discovered evidence that came to light as a result of [] extensive discovery"). But discovery in this case closed *before* the Court issued its Final Order, and Jericho never sought to supplement the record in either the lower court or in this Court at any time during the more than *seven months* that this Court had the case under submission or the year-and-a-half since Midtown made its motion to dismiss. (Midtown moved to dismiss the complaint in January 2005; Jericho chose not to commence any discovery until October 2005; the appeal was perfected in November 2005 and argued in January 2006; discovery closed in June 2006; and the Court issued its Final Order on August 17, 2006.)

17.    Finally, Jericho plainly knew how to avail itself of appropriate procedures to supplement the record before this Court with "newly discovered evidence." Just before oral argument on the appeal—at a time when Jericho had already reviewed Midtown's documents and had deposed the witness designated by Midtown as having the most knowledge of the pertinent facts—Jericho made a motion to supplement the record in this Court with material produced

---

[2] Jericho's counsel makes a bold, reckless, and false claim that Midtown's counsel "committed a fraud on the Court" (Young Aff. ¶ 10), but then, as we explain in detail below, never provides any basis for this outrageous assertion.

[3] That claim is incorrect. In fact, much of what Jericho contends is "newly discovered evidence" consists of material that it had in its possession for *years* before it commenced this lawsuit. *See, e.g.*, Goebel Aff. ¶ 13 (reciting as "conclusive[]" evidence of "fraud" a broker listing sheet that makes the same purportedly "knowingly false" representation as a nearly identical document that is in the record on appeal (R.137) and that *Jericho* submitted in opposition to Midtown's motion to dismiss); *id.* ¶ 69 (discussing letters that Jericho sent to Midtown in July 2002).

during discovery. *See* Ex. B hereto.[4]  With no explanation, Jericho *withdrew* that motion before the Court decided it, as the Court's opinion noted. *See* Final Order at 46 ("Motion seeking leave to supplement record is hereby withdrawn.").  Having withdrawn its motion to supplement the record, Jericho should not be heard to complain now, after the Court has carefully considered this appeal and rendered a thorough, well-reasoned decision disposing of it, that there were pertinent facts that Jericho chose not to put before the Court that might somehow change the result.  The time for Jericho to seek to supplement the record was *before* this Court issued its decision, not afterwards.

**Jericho's Evidence Is Neither "New," Nor Does It Warrant Reversal of the Court's Order**

18.    In any event, what Jericho claims is "newly discovered evidence" is simply not. Though Jericho attempts to throw as many "new facts" as it can muster on the wall and see what will stick—without making any serious effort to show how most of those facts bear in any way on the Court's Final Order[5]—its papers in support of this motion highlight what Jericho calls "two critical matters": (i) the exhibits to a development agreement between Amtrak and Midtown, and

---

[4] On September 18, 2006, in arguing its application for an interim stay pending the Court's determination of this motion, Jericho's counsel misrepresented to Justice Mazzarelli and, separately, to a Court Attorney that its motion to supplement sought to include only memoranda of law and not material produced during discovery.  In fact, Jericho's motion expressly sought "to include [] letters dated September 18, 2002 and October 18, 2002 from Shulem Pfeiffer . . . to Maurice Stone" and a "letter dated January 5, 2004 from Shulem Pfeiffer to Maurice Stone." *See* Ex. B, Affirmation in Support of Motion to Supplement Record ¶ 7.  These items, according to Jericho, were necessary to make "a complete and accurate record." *Id.* ¶ 8.  All of these letters were produced by Midtown during discovery and were not part of the lower court record on Midtown's motion to dismiss.

[5] Exemplary of Jericho's "new facts" is its notion, stated "[u]pon information and belief," that the "party to the Complaint [is] 'Midtown Development, L.P.,'" but "an entity called Mid-Town Development Limited Partnership is listed in the land records as the owner of the Property."  Affirmation of Robert B. Goebel ¶ 31.  Thus, according to Jericho, the "issue" of whether a hyphen is properly included in Midtown's name warrants reversal of this Court's Final Order.

8

(ii) "information on [an] oil spill." Young Aff. ¶¶ 21-22. No new facts came to light during discovery with respect to either of these areas.

19.    As the Court noted in its Final Order, Jericho waited until the last day of the study period to ask Midtown for the exhibits to the Amtrak agreement, and Midtown promptly responded (the next day) that it did not have them:

> On the day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. The agreement had been included with the contract, but not the exhibits. Midtown responded that it did not have the requested exhibits.

Final Order at 39. The Midtown letter to which the Court referred stated, in pertinent part, "Midtown does not now (and did not at the commencement of the Contractual 'Study Period') have the Exhibits referred [to] in your letter, so it could not provide those Exhibits to Jericho." (R.120)

20.    *All* of the evidence produced during discovery shows that Midtown does not and did not have the exhibits to the Amtrak agreement, as its contemporaneous letter in the record on appeal stated. Most significantly, Jericho itself made a request to Amtrak under the Freedom of Information Act for all documents related to Midtown's property. *See* Affirmation of Robert B. Goebel ("Goebel Aff.") ¶ 47. In response to that request, Amtrak produced a letter dated September 1998—*four years* before Midtown entered into its contract with Jericho—in which Midtown stated to Amtrak, "[P]lease be aware that we are unable to locate the Exhibits to the Agreement; we hope that Amtrak has in its files a complete copy of it." Goebel Aff. Ex. 5 at 3. Amtrak did not provide Midtown with a copy of the exhibits to the agreement in response to Midtown's request. *See* Affirmation of Edward G. Imperatore, dated June 29, 2006, ¶ 26 (attached hereto as Ex. C). Moreover, after taking extensive discovery from various non-parties, including Amtrak, Midtown's broker, its land-use lawyer, its architect, and another prospective

buyer of Midtown's properties, Jericho has not uncovered a shred of evidence to show that these Amtrak exhibits have ever even existed. There is thus nothing "new" about the repeatedly corroborated fact, which is reflected in contemporaneous documents in the record on appeal, that Midtown does not have, and did not have at any pertinent time, the exhibits to the Amtrak agreement.

21.    There is also no "newly discovered evidence" about the oil spill. Only four days before the study period expired, Jericho asked Midtown to "advise, immediately, if there is any truth to [the] information," which Jericho characterized as "scuttlebutt," that "there may have been an oil spill on the properties which may or may not have been cleaned up" and also to "advise" whether Midtown had ever "received any notice, written or oral about the spill from the City of New York or any agency thereof, or from any third party" about the spill and its disposition. (R.123, emphasis in original).

22.    At the threshold, Jericho signed a contract in which it expressly agreed that Midtown "has made *no representations [and] is unwilling to make any representations*" about the property or its condition. (R.88, Contract ¶ 38 (emphasis added); *see also* R.77, Contract ¶ 25 ("neither party" is "relying upon any statement or representation, not embodied in this contract, made by the other")). Accordingly, Midtown was not contractually obligated to make the requested representations about the oil spill or "advise" Jericho in any manner, let alone "immediately." For this reason alone, the Court did not err in holding that "[t]he assertions in this complaint [including Jericho's allegations about the oil spill] . . . do not support Jericho's allegation that Midtown breached the contract." Final Order at 42.

23.    Nevertheless, as the Court's Final Order noted, Midtown informed Jericho during the study period that there had been an oil spill on properties neighboring Midtown's sites and

10

> gave Jericho the name of a contact person at the New York
> Department of Environmental Conservation, his telephone number,
> and a project number and spill number for the incident at issue, so
> that Jericho could find out the status of any spill and/or cleanup.

Final Order at 39. In its reargument motion, Jericho contends that, even though Midtown gave

Jericho these detailed instructions for obtaining current information about the spill, Midtown

nevertheless breached the contract because it allegedly withheld a file from the New York

Department of Environmental Conservation about the oil spill. Goebel Aff. ¶ 22. But the

"evidence" that Jericho now claims supports this contention is not "new." Nor does it provide

any basis for the Court to reverse its well-reasoned Final Order.

24.    First, as discovery showed, Jericho itself obtained the pertinent file from the New

York Department of Environmental Conservation in September 2002, *two years* before it

commenced this lawsuit. *See* Ex. D, Deposition of Samuel Pfeiffer ("Pfeiffer Dep.") at 320, 324-

25 & excerpts from Ex. 15 to the Pfeiffer Dep. There was thus no excuse for Jericho's failure to

make these documents part of the lower court record if, as Jericho now belatedly contends, they

warranted denying Midtown's motion to dismiss or affirming the lower court's order.

25.    Second, none of the documents that Jericho obtained before it commenced this

lawsuit or during discovery show that Midtown breached the contract. Jericho's reargument

motion tries to create the misimpression that Midtown had a generalized, ambiguously defined

duty to spontaneously disclose all documents and all "environmental material" that Jericho might

deem to be part of "due diligence." *See, e.g.*, Goebel Aff. ¶ 20 (stating that Midtown "did not

provide Plaintiff with the environmental material"); *id.* ¶ 29(vi) ("[v]arious critical letters,

meeting minutes and submissions by and between Defendant and Amtrak," which Jericho did not

ask for during the study period); *id.* ¶ 29(vii) ("newly discovered plans prepared by Peter

Claymen's firm" that were not requested by Jericho). This is a "misreading of Midtown's

11

obligations," as the Court correctly ruled. Final Order at 43. The contract provides that Midtown was obligated to disclose only those "documents" in its current possession or control that Jericho "reasonably requests," not everything that Jericho might silently imagine to be "due diligence" material. (R.83, Contract ¶ 29(c))

26.    Third, even if Jericho's request concerning the oil spill might be considered a "reasonabl[e] request[]" for "documents" (and it was not), Jericho was asking Midtown to "advise" about "any notice" to Midtown from the "City of New York or any agency thereof, or from any third party" about the oil spill. (R.123) *There is no such document*, because, as discovery showed, Midtown has never received any notice from the City, State, any City or State agency, or any "third party" about the oil spill, most likely because the spill did not emanate from Midtown's property and Midtown has never been held responsible for cleaning it. *See* Ex. C ¶ 30. Indeed, in its entire bulky submission on this motion for reargument, Jericho does not include a *single document* about the oil spill that, according to it, Jericho requested and Midtown had and should have disclosed to Jericho. Nor was Jericho's principal able to identify such a document, even after he used the very information that Midtown provided to him to obtain documents concerning the spill from the New York Department of Environmental Conservation. *See* Ex. D, Pfeiffer Dep. at 325.

**B.    THIS COURT CORRECTLY DECIDED THE APPEAL ON MULTIPLE, ALTERNATIVE GROUNDS**

27.    Jericho alternatively contends that, "taking the Record as it is" (as any movant must on a motion for reargument), the Court erred in dismissing the complaint. Young Aff. ¶ 8. Jericho does not raise a single issue of law that the Court purportedly "overlooked or misapprehended," however. *See* 22 N.Y.C.R.R. § 600.14(a) (standard on a motion for reargument). Nor does it give any coherent reasons why even *one* of the Court's multiple,

12

alternative grounds for dismissing the complaint warrants reconsideration of this Court's thorough opinion, let alone explain why *all* of these grounds should be overturned, the judgment of dismissal vacated, and the complaint reinstated.

### Jericho's Breach of Contract Claims Were Properly Dismissed on Multiple Grounds

28.     The Court dismissed Jericho's causes of action for breach of the contract on three alternative grounds, and each of them was correct.

29.     *First*, the Court ruled that the "assertions in this complaint, brought two years subsequent to the cancellation of the agreement, do not support Jericho's allegation that Midtown breached the contract." Final Order at 42.

30.     Jericho does not even attempt to argue that the Court should reconsider and reverse this holding. But, on this ground alone, the Court's order dismissing Jericho's causes of action for breach of the contract is unassailable and correct. Jericho's complaint alleges that Midtown breached the contract by "failing to disclose" (i) "the occurrence of a prior oil spill"; (ii) "the existence of an 'open file' with the NYDEC [New York Department of Environmental Conservation] regarding the oil spill"; (iii) "the non-existence of a Phase I environmental report"; (iii) "that the applicable development permits pertaining to the Property that had been obtained by Midtown could no longer be routinely renewed"; and (iv) "that the Property was not currently approved for 729,164 buildable square feet as represented in writing by Midtown's exclusive broker." (R.40, R.53-54, Compl. ¶¶ 18, 72.)

31.     *None* of these allegations gives rise to an actionable claim for breach, because, as noted, the contract expressly provides that Midtown "has made no representations" and was "unwilling" to make any extra-contractual representations and that Jericho agreed to purchase the property in "as is" condition. (R.88, Contract ¶ 38; *see also* R.77, Contract ¶ 25 ("neither party"

is "relying upon any statement or representation, not embodied in this contract, made by the other"); R.79-80, Contract ¶ 29(a) ("as is" sale); R.86-87, Contract ¶ 33 ("Seller makes no representation that any of such permits and/or approvals are in force and effect or that any of same are transferable.")). The contract further makes clear that Midtown "is not liable or bound in any manner" by, *inter alia*, "representations or information pertaining to the premises . . . or to what use the premises can be applied" or "any verbal or written statements [or] representations . . . by any real estate broker." (R.88, Contract ¶ 38 (emphasis added)).

32.     In light of these explicit contractual disclaimers, the Court correctly held that "the assertions in this complaint . . . do not support Jericho's allegation that Midtown breached the contract." Final Order at 42; *see also, e.g., Couch v. Schmidt*, 204 A.D.2d 951, 951, 612 N.Y.S.2d 511, 512 (2d Dep't 1994) (alleged misrepresentations did not give rise to cause of action for breach of "as is" contract that "specifically provided that the seller . . . made no representations").

33.     **Second**, the Court ruled that an "additional ground for dismissal" of Jericho's causes of action for specific performance "is the settled rule that a party cannot seek specific performance of a cancelled real estate contract." Final Order at 42; *see also, e.g., Gartner v. Lowe*, 299 A.D.2d 198, 198, 749 N.Y.S.2d 134, 135 (1st Dep't 2002) (applying the rule that "plaintiff purchaser was not entitled to specific performance" because the contract was "validly canceled"). Once again, Jericho says *nothing* about this alternative ground in its motion for reargument, but, as Midtown showed in its briefs on appeal, there is a long and unbroken line of authority applying the rule that a party may not seek specific performance of a contract that it cancelled.[6]

---

[6] *See also Abely v. Hayden*, 155 A.D.2d 254, 256, 547 N.Y.S.2d 25, 27 (1st Dep't 1989) ("We dismiss the . . . cause of action for specific performance [of a real estate sales contract],

34.    *Third*, the Court held that, even assuming Jericho had properly alleged a cause of

action for breach of contract, Jericho's allegations did not show that Midtown had "willfully or

deliberately" breached the contract, as required by the rule of *Mokar Properties Corp. v. Hall*, 6

A.D.2d 536, 179 N.Y.S.2d 814 (1st Dep't 1958), under which a contract vendee must allege a

willful or deliberate breach before it may seek to revive a terminated contract and claim damages.

*See* Final Order at 42-43. The Court ruled that Jericho's allegations of breach "are either

contradicted by the documentary evidence submitted on the motion or premised on a misreading

of Midtown's obligations under [the contract]." *Id.* at 43.

35.    This is the only ground for dismissal that Jericho even attempts to address in its

reargument motion. As noted above, however, the Court correctly and alternatively ruled that

Jericho had *not* properly alleged that Midtown breached the contract. *See* Final Order at 42.

Among other things, Midtown was not obligated to make the representations alleged in the

complaint, nor was it obligated to give Jericho documents that it never requested from Midtown.

*See supra* ¶¶ 25, 30-31.

36.    Moreover, the record shows that Midtown did not "willfully or deliberately"

breach the contract, even assuming for the sake of argument that Jericho had properly alleged a

breach. Once again, Jericho's motion for reargument focuses on the exhibits to the Amtrak

---

(continued...)

plaintiff having elected to cancel the contract instead."); *Finkelman v. Wood*, 203 A.D.2d 236,
237, 609 N.Y.S.2d 655, 656 (2d Dep't 1994) ("[T]he contract was cancelled. Thus, the plaintiffs
are not entitled to specific performance."); *Bennett v. John*, 151 A.D.2d 711, 711, 543 N.Y.S.2d
143, 144 (2d Dep't 1989) ("[T]he contract to sell the premises to the plaintiff had been cancelled
and [] the downpayment . . . had been returned . . . . Accordingly, the defendants are entitled to
dismissal of that branch of the complaint which sought specific performance of the contract.");
*Eight Hundred Corp. v. 217 State St. Realty Corp.*, 169 A.D.2d 810, 812, 565 N.Y.S.2d 179, 180
(2d Dep't 1991) ("[T]he parties to the contract of sale agreed to its cancellation. Therefore,
neither [plaintiff] nor its assignees had the right to subsequently require [defendant] to perform
its obligations under the contract.").

agreement and the oil spill and argues that its allegations with respect to these items present

questions of fact. *See* Young Aff. ¶ 36. But the record on appeal shows that Midtown promptly

responded to all of Jericho's inquiries and, when Midtown did not have information that Jericho

requested, volunteered information about where Jericho should look for it. *See, e.g.*, R.120-21,

R.124-26. As the Court noted in the closely related context of dismissing Jericho's fraud claim,

"the record is plain that Midtown provided Jericho with information in its possession, and that it

alerted Jericho as to additional sources of information as to the railway easement and the alleged

oil spill." Final Order at 45. This is not "willful or deliberate" conduct. *See, e.g., Dauria v. City

of New York*, 127 A.D.2d 459, 460, 511 N.Y.S.2d 271, 273 (1st Dept. 1987) ("[P]laintiffs have

not conclusively shown that [defendant's] actions were willful or in bad faith" where "[t]he record

indicates that [defendant] attempted to comply with plaintiffs' discovery requests.").

37.     The Court similarly and accurately ruled that "Jericho made requests for

documents on the eve of the expiration period which could have been made much earlier." Final

Order at 45-46. As noted, Jericho did not ask Midtown for the exhibits to the Amtrak agreement

until the *day before* the study period expired, and it first raised the issue of the oil spill only four

days before the study period expired. (R.119, R.123) The documents in the record on appeal thus

refute Jericho's conclusory allegations that information about the oil spill and the exhibits to the

Amtrak agreement were "absolutely crucial" or "materially relevant" to Jericho (R.37, Compl. ¶

5), and therefore support the Court's order dismissing the complaint.[7] *See Baystone Equities, Inc.*

---

[7] The contract expressly stated that it was Jericho's obligation to conduct environmental
tests on the property (R.79-80, Contract ¶ 29(a)), and a serious buyer's due diligence entails
conducting a basic, "Phase I" environmental assessment, which Jericho never did. *See
Environmental Due Diligence and Environmental Issues for the Sophisticated Real Estate
Practice*, 520 PLI/Real 1135, 1139-40 (2005) (purchaser's due diligence, at a minimum,
"requires the preparation of a Phase I environmental assessment," which will reveal the presence
of any "hazardous substances or petroleum products on a property"); *see also* Ex. D, Pfeiffer
Dep. at 198:3-203:20.

*v. Gerel Corp.*, 305 A.D.2d 260, 260, 759 N.Y.S.2d 78, 78 (1st Dept. 2003) ("dismissal of the complaint was warranted" where "plaintiff's allegations in this action for . . . specific performance of contracts for the sale of real property" were "refuted by the documentary evidence"); *Washington Mut. Bank, F.A. v. SIB Mortg. Corp.* 21 A.D.3d 953, 955, 801 N.Y.S.2d 821, 822 (2d Dept. 2005) (defendant's motion to dismiss properly granted where "the documentary evidence utterly refute[d] plaintiff's factual allegations").

### Jericho Gives No Reason for Reconsidering the Court's Alternative Grounds for Dismissing Jericho's Claim for Breach of a Non-Existent "Amendment" to the Contract

38.    Jericho states, on the one hand, that it is not seeking reargument of this Court's dismissal of Jericho's causes of action for breach of what it called an "amendment" to the contract, whereby, according to Jericho, the parties purportedly agreed to extend the study period by more than three months. *See Young Aff.* ¶ 65 ("we are not arguing for purposes of the instant motion" the "issue of the offers and counter-offers regarding possible extension of the study period"). At other points, however, Jericho makes a conclusory statement that "Midtown should have given Jericho the requested extension of the Study Period." Young Aff. ¶ 8(d); *see also id.* ¶ 78 ("[W]e submit that Midtown's refusal to extend the Study time [sic] was also in breach.").

39.    Jericho does not make any effort to explain how the Court "overlooked or misapprehended" the applicable law in ruling, on two alternative grounds, that "there was never any agreement to extend the study period," and thus Midtown could not be deemed to have breached it. Final Order at 43-44. The Court correctly relied on firmly established law in holding that the parties' well-documented negotiations showed that they never agreed upon such an amendment, and, in addition, both parties made clear in writing that they would not be bound by any agreement to extend the study period unless they executed a formal amendment to the

contract, which they never did. *See id.* at 44. Both of these rulings were correct, and there is no

reason—and Jericho does not even try to provide one—to modify either one in any way.

### Jericho Blatantly Misreads the Limitation-on-Liability Clause

40.    Jericho challenges this Court's determination that an express limitation-of-liability

provision in the contract foreclosed Jericho's claims for damages. *See* Young Aff. ¶ 80. As an

initial matter, the Court's ruling on this issue was not dispositive of the appeal because the Court

had already ruled, on no fewer than *five* separate grounds, that Jericho had not properly pleaded a

liability case for breach. *See* Final Order at 41-44. Thus, merits aside, Jericho cannot show that

this issue of damages is a controlling question of law that would warrant granting a motion for

reargument. *See McGill v. Goldman*, 261 A.D.2d 593, 594, 691 N.Y.S.2d 75, 76 (2d Dept.1999)

(motion for reargument "should have been denied" where "plaintiffs failed to demonstrate that the

court . . . misapplied any controlling principle of law").

41.    There is also no merit to Jericho's argument. The sole ground for it is that the

Court engaged in an "incorrect reading of the Contract." Young Aff. ¶ 80. But it is *Jericho's*

*counsel*, not the Court, who misreads the contract. Jericho contends, with manufactured

emphasis, that the limitation-of-liability provision **"applies to one and only one situation: '[i]n**

**the event that the seller is unable to convey a good and clear title in accordance with the**

**terms of this contract . . .'"** Young Aff. ¶ 81 (all emphasis applied by Jericho's counsel). That

is *not* what the contract says. The contract provides, "In the event that the seller is unable to

convey title in accordance with the terms of this contract, the sole liability of the seller will be to

refund to the purchaser the amount paid on the account of the purchase price . . . ." (R.77,

Contract ¶ 22). The words that Jericho's counsel screams with layers of emphasis in his

affirmation ("good and clear") are simply not in the contract.

42.    As Midtown argued in its briefs on appeal—and the Court agreed—this limitation-of-liability provision is directly applicable here.  Midtown could not "convey title in accordance with the terms of this contract" because *Jericho cancelled the contract* before the title was to be conveyed at the closing.  *See also* Final Order at 46 ("Paragraph 22 of the contract limits Midtown's liability for breach to return of Jericho's down payment.").  Under the plain language of this clause, it applies and limits Midtown's liability to return of Jericho's downpayment, which Jericho has already received.  *See Progressive Solar Concepts, Inc. v. Gabes*, 161 A.D.2d 752, 753, 556 N.Y.S.2d 105, 107 (2d Dep't 1990) ("[T]he parties to a contract for the sale of real property may agree . . . that no damages will be payable at all once the status quo has been restored.").  Contrary to Jericho's counsel's wishful reading, the limitation-of-liability provision is not limited to the "one and only one situation" where, due to title defects, a buyer is unable to convey a "good and clear" title, as many such provisions are.  *See, e.g., S.E.S. Importers, Inc. v. Pappalardo*, 53 N.Y.2d 455, 466, 442 N.Y.S.2d 453, 459 (1981) (damages limited "in the event the seller should be unable to convey good title"); *Sevilla v. Valiotis*, 29 A.D.3d 775, 776, 815 N.Y.S.2d 229, 230 (2d Dept. 2006) (same, "in the event that the seller cannot convey a clear title").  It is thus Jericho, not the Court, that has "overlooked [and] misapprehended" the pertinent contractual provision.  22 N.Y.C.R.R. § 600.14(a).

* * *

43.    There is, in sum, no basis for this Court to reconsider its thorough, carefully reasoned decision.  Jericho's motion is improperly predicated on "newly discovered evidence."  And Jericho has not shown that any, let alone *all*, of the Court's alternative bases for dismissal are based on a wholesale misunderstanding of applicable law.  Nor has Jericho shown that the Court overlooked any pertinent facts in the record.  Instead, it is Jericho who continues to engage, as the

Court ruled, in an egregious "misreading" of the contract and a fast-and-loose treatment of the record.

**C.    JERICHO HAS NOT PRESENTED ANY GROUNDS FOR LEAVE TO APPEAL**

44.    Jericho makes a perfunctory, one-page argument that the Court should grant it leave to appeal to the Court of Appeals. *See* Young Aff. ¶¶ 84-85. Jericho does not, however, identify a single controversial issue of law raised by the Court's order that would warrant review by the Court of Appeals. Jericho lists several argumentative "legal issues," but it does not even try to explain or cite any authorities to show that these issues are "novel" or "involve a conflict with prior decision[s] of this court or involve a conflict among the departments of the Appellate Division." *See* 22 N.Y.C.R.R. § 500.22(c)(4). Nor can it. The Court's Final Order was based on long-established principles of contract and property law and basic notions, such as that a plaintiff cannot assert breach of an illusory "amendment" and that a plaintiff cannot assert breach claims that are based on a material misreading of the pertinent contractual provisions. Moreover, even if there were a novel issue of law in this case, Jericho could not establish that the Court of Appeals could properly reach it, because this Court dismissed Jericho's complaint on multiple, alternative bases. *See* DAVIES, N.Y. CIVIL APPELLATE PRACTICE § 15:5, at 461 ("[T]he Court of Appeals must be able to reach the main issue being appealed."); *cf. Bower Assocs. v. Town of Pleasant Valley*, 2 N.Y.3d 617, 626, 781 N.Y.S.2d 240, 244-245 (2004) (applying the rule that the Court of Appeals will not reach a moot issue).

45.    Jericho alternatively contends that this case "has great public interest" because it involves valuable property in New York City and is thus worthy of discretionary appellate review. *See* Young Aff. ¶ 85. While the property is valuable to Midtown, this opportunistic lawsuit, brought by a buyer who cancelled its contract and then sat on its purported "rights" for two years

before emerging from the ether after the properties had increased dramatically in value, is without any colorable basis in law or fact—as the Court's Order awarding costs to Midtown reflects. The "public interest," if any, in Jericho's frivolous lawsuit is to see that it ends now without any further drain on the resources of the State's courts or Midtown. *See* N.Y. JUR. 2D APPELLATE REVIEW § 299 (leave to appeal will be denied where "the only likely effect of further proceedings would be the needless delay of relief").

**D.    THE COURT SHOULD DENY JERICHO'S MOTION FOR A STAY**

46.    Finally, in a last act of desperation, Jericho seeks an "immediate stay pending the decision on this motion" and any "future motion practice in Supreme Court" by Jericho. Young Aff. ¶ 87 & p. 32. Justice Mazzarelli has already denied Jericho's request for an interim stay after Justice Mazzarelli and a Court Attorney collectively heard more than a half-hour of oral argument on Jericho's application for an interim stay. *See* Ex. A. For all of the same reasons presented to Justice Mazzarelli, Jericho's related request for a stay pending any "future motion practice" should also be denied.

47.    First, as set forth above, Jericho's motion for reargument and for leave to appeal to the Court of Appeals, as well as any other post-judgment "motion practice in Supreme Court" that Jericho is contemplating, is meritless and should be denied. For this reason alone, Jericho's motion for a stay should also be denied. *See Petkovsek v. Snyder*, 251 A.D.2d 1088, 1088, 674 N.Y.S.2d 210, 211 (4th Dep't 1998) (stay pending appeal properly denied on ground that "the underlying issues lack merit").

48.    Second, Midtown will be prejudiced by any stay. *See* 12 JACK B. WEINSTEIN, HAROLD L. KORN & ARTHUR R. MILLER, NEW YORK CIVIL PRACTICE ¶ 5519.13, at 55-168 (2d ed. 2005) (factors to be considered on a motion for a stay pending appeal "are the merits of the appeal, harm that might accrue to the appellant if the stay is denied, and potential prejudice to the

respondent if the stay is granted"). Jericho filed a notice of pendency in this case in September 2005 and knew, when it did, that Midtown had plans to sell its property and a pending contract with a prospective purchaser. *See* Ex. E hereto (letter from Jericho's counsel and deposition excerpts showing Jericho's awareness of the contract and its amount). The notice of pendency that Jericho filed blocked the sale of Midtown's property to that prospective purchaser, and, as a practical matter, made Midtown's property unsaleable for the duration of Jericho's lawsuit. *See generally 5303 Realty Corp. v. O & Y Equity Corp.*, 64 N.Y.2d 313, 320, 486 N.Y.S.2d 877, 881 (1984) ("[T]he statutory scheme [for a notice of pendency] permits a party to effectively retard the alienability of real property without any prior judicial review. . . .").

49.     In light of the Court's Final Order dismissing the complaint, Midtown is entitled to mandatory cancellation of the notice of pendency, and promptly made a motion in the lower court to obtain this relief. *See* CPLR 6514(a) (lower court "shall" cancel notice of pendency if, *inter alia*, "enforcement of a final judgment against the plaintiff has not been stayed"). Jericho now seeks to stay enforcement of this Court's order solely so that it can avoid cancellation of the notice of pendency and thus continue to encumber Midtown's property with its baseless lawsuit, perhaps in the vain hope that Jericho might extract a "payoff" from Midtown. *See* Young Aff. ¶ 2(d) (seeking a stay of Midtown's motion to cancel and any order "vacating or otherwise lifting the *lis pendens*").

50.     According to Jericho's counsel, a stay will not prejudice Midtown because "it is believed that Midtown is not in the midst of any potential sales or closings of the property," though Jericho's counsel does not explain why or how he "believe[s]" he knows what Midtown plans to do with its property. Young Aff. ¶ 89. The notice of pendency impedes "potential sales" and completely *blocks* any closing on the property, however. And, contrary to Jericho's counsel's

unsupported statement of his "belief," Midtown has already shown that it wants to market and sell

its property and that there are interested buyers for it, but the notice of pendency that has been

clouding the title to this property for the past year is thwarting Midtown's efforts at a critical time

when Midtown is concerned that the property's value may soon be on the decline. *See*

Affirmation of Edward G. Imperatore, dated Sept. 18, 2006, ¶ 8 (attached hereto as Ex. F).  The

Court should not continue this extreme prejudice to Midtown by staying its Final Order or the

entry of an order by the lower court canceling the notice of pendency. *See, e.g., Eisner v.*

*Gooldberger*, 28 A.D.3d 354, 355, 814 N.Y.S.2d 58, 58 (1st Dep't 2006) ("Since [movant's]

request for a stay appears to be merely to avoid enforcement of the judgment against them . . ., the

court did not improvidently exercise its discretion in denying the stay."); *Hausner v. Hausner*, 12

Misc. 2d 719, 721, 165 N.Y.S.2d 800, 802 (Sup. Ct. Onondaga Cty. 1953) (denying stay pending

appeal where "plaintiff seeks a stay so as to effectively tie up some $8,600 of the defendant's

funds").

51.     Finally, Jericho does not make any showing that it will be prejudiced in the

absence of a stay.  Jericho has no right to Midtown's property and no right to continue to restrain

the sale of Midtown's property.  Jericho has had its day in court.  And the Court's carefully

reasoned Final Order shows that all of Jericho's causes of action, including its causes of action for

specific performance, are meritless as a matter of law or alleged fact, or both.

52.     Moreover, not only will a sale of Midtown's property not harm Jericho in any

legally cognizable way, but Jericho has not even offered to post an undertaking in an appropriate

amount to secure Midtown against any loss in the exceedingly likely event that this Court's Final

Order dismissing Jericho's complaint remains intact at the conclusion of these post-appeal

proceedings. *See, e.g., Lancaster v. Kindor*, 64 N.Y.2d 1013, 1013, 478 N.E.2d 196, 196 (1985)

(noting that a stay pending appeal to the Court of Appeals was conditioned on "the posting of a bond"). Jericho is well aware that any such undertaking would have to be in the amount of at least $120 million, the sale price on the contract that Midtown had with a prospective purchaser during nearly the entire time from when Jericho filed the notice of pendency until this Court dismissed the complaint. *See* Ex. E. Rather than post such a bond in support of its stay motion, Jericho asks this Court—which has already ruled there is no merit to Jericho's lawsuit—to continue to restrain Midtown's property after a judgment of dismissal has been entered *at no cost to Jericho*. Jericho should not be afforded this extraordinary and unwarranted relief, for free.

**E.    JERICHO AND ITS COUNSEL SHOULD BE SANCTIONED FOR MAKING THIS FRIVOLOUS MOTION**

53.    The Court should impose a sanction on Jericho and its counsel for making this baseless motion for reargument and award Midtown its reasonable attorney's fees. Unwarranted motions for reargument are, unfortunately, a common occurrence in contemporary appellate litigation, but this motion exceeds the bounds of all permissible appellate advocacy.

54.    Jericho's motion is based on the wholly improper ground of "newly discovered evidence." *See supra* ¶¶ 14-17. Worse yet, Jericho's supposedly "new evidence" is not new. The "critical" facts on which Jericho bases its motion have not changed one iota since Midtown made its motion to dismiss: (i) Midtown does not have and has never has had the exhibits to its development agreement with Amtrak, as discovery simply corroborated (*see supra* ¶¶19-20); and (ii) *for two years before it commenced this lawsuit*, Jericho had in its possession a copy of a file from the New York Department of Environmental Conservation pertaining to the oil spill (which it incorrectly accuses Midtown of breaching the contract by failing to disclose), but made an apparently deliberate choice not to make these documents part of the lower court record. (R.153 ¶¶ 19-20, affidavit from Jericho's principal dated February 2004 asserting that Jericho was

24

informed on "September 1, 2002 that the New York State Department of Environmental Conservation had a file on the spill" and attaching a letter that Jericho obtained "from file at NYDEC" on "9/24/02"). *See also supra* ¶¶ 21-26.

55.     In addition, when Jericho "take[s] the Record as it is" (Young Aff. ¶ 8), it misrepresents it in an egregious manner.  Jericho does not address two of the three alternative grounds on which the Court dismissed Jericho's cause of action for breach of contract, and *its counsel omits the page of the Court's decision where the Court set forth those two alternative grounds.  See supra* ¶¶ 10, 28-33.  Moreover, in arguing that the Court should reconsider and reverse its alternative ground for dismissing Jericho's damage claims, Jericho's counsel materially misquotes the provision of the contract on which the Court's holding was based. *See supra* ¶¶ 40-42.  Further still, Jericho seeks reargument of this Court's ruling that Midtown did not breach a non-existent "amendment" to the contract; but Jericho does not even try to argue that either of the Court's two, alternative grounds for dismissing this cause of action was based on a misapprehension of the well-established law or the record facts on which the Court's alternative holdings were based. *See supra* ¶¶ 38-39.

56.     In other ways as well, Jericho continues to engage in the same sort of "misreading of Midtown's obligations" under the contract that this Court noted in its Final Order (at 43).  Jericho's motion is pervaded with the misleading and incorrect notion that Midtown had an open-ended obligation to disclose any and all documents or information that might be relevant to the property at issue or Midtown's interactions with Amtrak, but that is not what the contract provides. *See supra* ¶ 25; *see also* R.83, Contract ¶ 29(c) (Midtown obligated to "make available" documents in its possession or control that Jericho "reasonably requests").  Jericho also continues to ignore that it executed a contract in which it expressly agreed that Midtown had "made no

representations [and] is unwilling to make any representations" about the property (R.88, Contract ¶ 38), and that, in the teeth of these and other disclaimers, Jericho's amended complaint is largely based on allegations that Midtown breached the contract by failing to make a laundry list of *representations* about the property or its condition. *See supra* ¶¶ 22, 29-31.

   57. Jericho's motion for reargument is, in short, "completely without merit" and, on this motion, Jericho "asserts material factual statements that are false." 22 N.Y.C.R.R. § 130-1.1(c)(1) & (3). By seeking a stay of this Court's Final Order without any basis for doing so, Jericho and its counsel have also engaged in conduct "undertaken primarily to delay or prolong the resolution of the litigation, or to harass and maliciously injure" Midtown. *See id.* § 130-1.1(c)(2). For any *one* of these reasons, an award of attorney's fees and costs, and an order sanctioning Jericho and its counsel, would be well-warranted. We respectfully submit that, because all three of these grounds are reflected here, the Court should enter an order (i) awarding Midtown its costs and attorney's fees in connection with this motion, and (ii) directing that Jericho and its counsel be sanctioned in an amount that the Court deems appropriate. *See id.* § 130-1.1(a) (court may award "reimbursement for actual expenses reasonably incurred and reasonable attorney's fees, resulting from frivolous conduct"); *id.* (court may "impose financial sanctions upon any party or attorney in a civil action or proceeding who engages in frivolous conduct").

## CONCLUSION

58.    The Court should therefore deny Jericho's motion in its entirety, with attorney's

fees and costs to Midtown and an appropriate sanction on Jericho and its counsel.

Dated:  New York, New York
        September 25, 2006

_____
        TODD R. GEREMIA

27

# EXHIBIT D
# TO GEREMIA DECLARATION

# HERZFELD & RUBIN, P.C.

ATTORNEYS AT LAW
40 WALL STREET
NEW YORK, N Y 10005-2349
TELEPHONE: (212) 471-8500
FAX: (212) 344-3333
WWW.HERZFELD-RUBIN.COM

October 9, 2006

**Herbert Rubin, Esq.**
Direct Line: (212) 471-8457
Direct Fax: (212) 232-6610
hrubin@herzfeld-rubin.com

*Via Hand Delivery*
Clerk, Appellate Division
27 Madison Avenue
New York, New York

Re:    Jericho Group, Ltd. v. Midtown Development, L.P.
       Index No. 0113274/04
       Motion to Reargue-Decision of August 17, 2006

Dear Sir:

Please note that this firm has been substituted as attorneys for plaintiff-respondents ("Plaintiff"). We write to respectfully request that plaintiff's motion to reargue the Courts' decision of August 17, 2006, be deemed withdrawn.

The motion to reargue had been filed primarily on the basis of materials produced during discovery which occurred between the date of the order of the Supreme Court which was being appealed and the argument of the appeal. Hence they were not part of the Record on Appeal. Plaintiff argues that materials produced during discovery, in fraud of Plaintiff and of the Court, had been willfully withheld when previously demanded. The materials belatedly produced were not only critical but showed that other critical materials were fraudulently withheld.

Defendant-appellant, in response, does not deny that the materials had been withheld. Rather, essentially it insists that the belatedly produced materials, since they were not part of the appellate record, may not be considered by this Court on this motion. It contends that plaintiff's argument may be made only to the Supreme Court.

To avoid loss of time, and with due concern for prudent use of the Court's resources, we conclude, as new counsel, that it is appropriate to withdraw this motion before this Court and present the documents and arguments of fraud in the Supreme Court.

An additional factor in our decision to request withdrawal of the motion relates to Plaintiffs request that pending the decision on this motion, the *lis pendens* filed by Plaintiff be continued in place.

HERZFELD & RUBIN LLP
1925 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2783
TELEPHONE (301) 553-0451

CHASE KURSHAN HERZFELD & RUBIN, LLC
54 REGENT STREET, SUITE 508
LIVINGSTON, NEW JERSEY 07039-1617
TELEPHONE (973) 535-8840

RUBIN MEYER DORU & TRANDAFIR
SOCIETATE CIVILA DE AVOCATI
7, STRADA PUTUL CU PLOPI
BUCHAREST 1, ROMANIA
TELEPHONE (40) (21) 311-1460
FAX (40) (21) 311-1465

HERZFELD & RUBIN, P.C.

Clerk of The Court
October 9, 2006
Page 2


It developed that on September 28, 2006, both parties were informed that, unknown to them, the Supreme Court, acting on this Court's August 17 decision, had made an order, entered on September 11, 2006, cancelling the *lis pendens*. The issue as to the *lis pendens* which was part of the relief sought under the pending motion is therefore moot.

Accordingly, we concluded that it was no longer appropriate to maintain the motion in this Court. Rather, as we have informed defendant-appellant, we are in the course of seeking relief in the Supreme Court for defendant-appellant's fraud.


Respectfully submitted,

Herbert Rubin


cc:     Mr. Todd Geremia
        Jones Day
        Attorneys for Defendant
        222 East 41st Street
        New York, NY 10017

# EXHIBIT E
# TO GEREMIA DECLARATION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
JERICHO GROUP, LTD.,                                Index No. 113274/04
                                                    (Part 53)
          Plaintiff,                                (Justice Ramos)

       -   against –                                **AFFIRMATION IN SUPPORT**
                                                    **OF MOTION TO VACATE**
MIDTOWN DEVELOPMENT, L.P.,                           **JUDGMENT, TO AMEND**
                                                    **COMPLAINT AND FOR**
                    Defendant.                       **PRELIMINARY INJUNCTION**
-------------------------------------------------------------------x

      Herbert Rubin, an attorney duly admitted to practice law before the courts of the

State of New York, affirms under penalty of perjury as follows:

      1.    I am the Senior Member of the firm of Herzfeld & Rubin, P.C., attorneys for

Jericho Group, Ltd. ("Jericho"), the plaintiff in this action. I make this affirmation in support of

Jericho's motion (a) pursuant to CPLR 5015(a)(2) and (a)(3), to vacate the judgment dismissing

Jericho's complaint entered on September 19, 2006; (b) pursuant to CPLR 3025, for leave to

serve a Second Amended Complaint; and (c) pursuant to CPLR Article 63, for a preliminary

injunction barring defendant from transferring or encumbering the real property identified below

during the pendency of this action. The facts set forth below are drawn from the proposed

Second Amended Complaint, verified by Jericho's officer Samuel Pfeiffer, annexed as Exhibit

HH hereto.[1] Mr. Pfeiffer, in his accompanying affirmation, authenticates the Exhibits annexed

hereto and confirms the accuracy of the facts herein stated.

### The Nature And Prior Course Of The Litigation

      2.    This action arises out of a contract (the "Contract") which was the subject of a

decision of the Appellate Division, First Department on August 17, 2006. That decision reversed

the May 16, 2005 decision of this Court denying defendant's CPLR 3211(a) motion to dismiss

---

[1] CPLR 105(u) provides that a verified pleading "may be utilized as an affidavit wherever the latter is required."

the First Amended Complaint in this action, by which Jericho had sought to enforce the Contract. Copies of the Appellate Division's decision and this Court's decision are annexed hereto as Exhibits A and B.

3.    Under the Contract, defendant Midtown had agreed to sell certain property on the West Side of Manhattan (the "Property") to Jericho. The Contract, dated June 18, 2002, provided for a 75 day "Study Period," during which time Jericho was to engage in a due diligence investigation into the condition and other relevant facts regarding the Property. The Contract required Midtown to produce documents and information in its possession, custody or control which were relevant to Jericho's conduct of its due diligence investigation. A copy of the Contract is annexed hereto as Exhibit C.

4.    During the Study Period, and at the conclusion thereof, Midtown represented that it had complied with all of its obligations to provide Jericho with documents and information. It falsely denied that it had documents which the Contract required Midtown to produce. Such documents, in fact, were in Midtown's possession or under its control. Midtown also misrepresented other facts regarding material documents. Midtown refused Jericho's request to extend the Study Period to permit Jericho to obtain such documents. Because it did not have the unproduced documents and information, Jericho was induced to seek the return of the $250,000 Jericho had deposited under the Contract.

5.    This Court in its May 16, 2005 decision stated, among other things, that there were fact issues as to whether there was "misleading information given," and as to whether there was "an attempt by the seller [i.e., Midtown] to back out of the deal by feeding misleading information ...."

6.    This Court further stated:

What is there in the contract or what defect is in the complaint that would move me to grant this motion and dismiss the complaint entirely without making any factual determination as to whether or not there was in fact misleading information given, because the law abhors a fraud, and if there was an attempt to mislead the plaintiff, to dissuade the plaintiff from executing on the contract, and that was done by fraudulent means, the law looks for a remedy in a situation like that, because otherwise a valuable contract right would be destroyed through wrongful means.

7.    This Court also stated:

And [if] they [Jericho] changed their position arguably because of the fraudulent representation, wouldn't they be entitled as one alternative of relief to rescind that action that is made because it was predicated on fraud, and to restore themselves to the position of the contracting purchasers?

8.    Finally, this Court concluded that Midtown's representation during the Study Period and at the court hearing that it did not have certain documents requested by Jericho was "not credible."

9.    Midtown appealed to the Appellate Division following this Court's May 16, 2005 order denying Midtown's CPLR 3211(a) motion. Pending the appeal period Jericho conducted depositions and other discovery. That discovery, as is set forth below, uncovered documentary evidence which demonstrated, among other things, willful and deliberate breaches of the obligations of Midtown. In addition to being breaches, they constituted palpable, garden variety fraud on Jericho. More than that, the conduct was also a fraud on this Court and ultimately, on the Appellate Division.

10.    No mechanism was available to place before the Appellate Decision, as part of the Record on Appeal, the disclosures during the discovery period, while the appeal was pending, which demonstrates the willful and deliberate breaches by Midtown, its fraud on Jericho and its fraud on this Court. Accordingly they could not be considered by the Appellate Division in its decision. Jericho's dilemina is underlined by Midtown's Appellate Division Reply Brief which

3

articulated the principle that matters not in the Record on Appeal may not be considered by the Appellate Division. See Exhibit D hereto.

11.    The Appellate Division, lacking the benefit of the documents which became available during the discovery, reversed this Court's decision, basing its decision upon selected Midtown documents, among other things. In declaring the reversal, however, it made the following significant pronouncement:

> Had Midtown willfully or deliberately breached its obligations under paragraph 29(a) of the contract, Jericho's first two causes of action (for specific performances or alternatively, for damages for breach of contract) would not have been barred by its termination of the contract and recovery of its down payment.

12.    The proposed Second Amended Complaint is made on the basis of the newly discovered evidence which impacts on the causes of action set forth below, and which was disclosed by the discovery conducted after the May 16, 2005 Order. A copy is annexed as Exhibit HH. It seeks, after the judgment filed pursuant to the August 17, 2006 Appellate Division decision (Exhibit E hereto) is vacated, to replead and amend Jericho's claims essentially on the basis of the newly discovered evidence. It also adds as defendants Maurice Stone and Edward Imperatore, as tortfeasors in the tortious misconduct of Midtown.

### The Parties To The Action

13.    Plaintiff Jericho Group, Ltd. ("Jericho") is a New York corporation, having an office at 519 Flushing Avenue, Brooklyn, New York 11205.

14.    Defendant Midtown Development, L.P. ("Midtown") is a New York limited partnership, having an office at c/o 40 Arcorp Properties, Pershing Road, Weehawken, New Jersey 07086.

15.    Defendants Maurice Stone ("Stone") and Edward Imperatore ("Imperatore") were at relevant times officers of Midtown and were lawyers for Midtown who participated in the

tortious acts described in the transactions in issue.  Imperatore had, at relevant times, an economic interest in Midtown.

## The Property In Issue

16.    The Contract is an instrument under which Midtown agreed to sell to Jericho two parcels of real estate located in the Borough of Manhattan, County, City and State of New York.

17.    Specifically, these two parcels are identified on the Tax Map of the City of New York as Block 708, Lot 1 and Block 709, Lot 17, being located between 36th and 37th Streets and 11th Avenue, New York, New York and between 37th and 38th Streets and 11th Avenue, New York, New York (hereinafter said lots are collectively referred to as the "Property").

18.    The Property and its location are unique, one of a kind, and special.

19.    The Property consists of development sites which are encumbered by railroad easements and rights of way in favor of "Amtrak".

## The Contract And Its Relevant Provisions

20.    Pursuant to the Contract, Midtown agreed to sell the Property to Jericho for $28,000,000.  In the negotiation of the Contract and subsequent communications with Jericho concerning the subject matter of the Contract, Midtown was represented by Imperatore and Stone.

21.    The Contract, by its terms, limited Midtown's representations and warranties regarding the Property.  The parties structured the transaction as an "as is" sale and purchase transaction which provided Jericho with a 75-day "Study Period" to allow Jericho to obtain the additional information it required to permit it to decide whether to proceed to a closing.  Plaintiff paid a deposit of $250,000 on signing the Contract.  To balance the limited representations and warranties, among the representations and warranties by Midtown were commitments to provide documents which were relevant to the study.

5

22.    The Contract provided in this regard, in pertinent part as follows:

> 29.   a)    Purchaser shall have seventy-five (75) days from the date this Contract has been executed by both parties (the "Study Period"), to cause to be performed, at Purchaser's cost and expense, such environmental and/or architectural/engineering and or other tests and/or inspections as Purchaser, in its sole discretion, shall elect to perform. In accordance with the terms of Paragraph 29(b) below, Seller shall allow Purchaser and its representatives access to Property at all reasonable times, <u>shall cooperate with Purchaser and its representatives and shall make available to Purchaser and its representatives such material pertinent to such tests and/or inspections as Seller may have in its possession</u>. If prior to the conclusion of the Study Period, Purchaser shall determine, in its sole and absolute discretion that the Property is not suitable for its needs, the Purchaser shall have the right to cancel this Contract upon written notice to Seller .... Purchaser need not specify any reason for such cancellation. Upon the timely receipt of such notice of cancellation, the Escrowee shall promptly return to Purchaser the monies paid upon execution hereof.

> \* \* \* \* \*

> c)    Immediately upon execution of this Agreement, Seller shall make available to Purchaser or its representatives, such documents within Seller's current custody or control relating to the condition of the Property, which Purchaser reasonably requests....

23.    In addition, the Contract provided in pertinent part in paragraph 30(b)(iii) that Midtown would convey title to the Property to Jericho free and clear of liens and encumbrances except for "(iii) Encumbrances related to Amtrak's rights to the Property as set forth on the Agreement dated as of April 23, 1990 between Seller [i.e., Midtown], Terrant Venture and Amtrak which is attached hereto as Exhibit B (the 'Amtrak Agreement')."

24.    The copy of the Amtrak Agreement attached to the Contract made reference to Exhibits to the Amtrak Agreement concerning easements on the Property and restrictions on its use, but no Exhibits were attached to that copy of the Amtrak Agreement.

25.    The Contract further provided in pertinent part, in paragraph 33;

> At closing, Seller should assign to Purchaser, without recourse, any such permits and/or approvals which Seller may have obtained with respect to the development of the premises. <u>Within two (2) business days from the date hereof, Seller shall make available to the Purchaser copies of all documentation pertaining to such permits and/or approvals.</u> Seller makes no representation that any of such permits and/or approvals are in force and effect or that any of same are transferable.

### Events During The Study Period

26.    On June 19, 2002, the first day of the Study Period, Midtown sent certain documents to Jericho in purported compliance with the Contract, under cover of a letter from Stone. Stone's letter stated: "In accordance with the Contract of Sale I am enclosing the following due diligence items ...." The items listed in the letter and provided to Jericho included an "Environmental Impact Statement dated December 15, 1989." A copy of the letter is annexed hereto as Exhibit F.

27.    In July, 2002, Jericho asked Midtown to contact Amtrak to set up a meeting with Jericho so that Jericho could obtain relevant information about the property from Amtrak. Midtown refused this request, and advised Jericho to contact Amtrak directly. Jericho did so, but Amtrak refused to deal with Jericho, with which it had no relation.

28.    On July 17, 2002, Jericho wrote to Stone to advise that Jericho had obtained information showing that more than 20 documents filed by Midtown's architect with the City which should have been in Midtown's "due diligence" package had not been provided by Midtown.

29.    A copy of that letter is annexed hereto as Exhibit G. In the letter, Jericho advised that without the documents filed by Midtown's architect, Jericho's architect and zoning attorneys

7

could not begin a meaningful analysis of the Property, and asked that these documents be provided as soon as possible.

30.     By letter dated August 1, 2002, Jericho advised Stone that it had not received the documents requested in the July 17 letter. Jericho attached a letter from its architect explaining the need for the documents in order to proceed with the architect's development analysis.

31.     A copy of the letter and attachment is annexed hereto as Exhibit H. By letter dated August 2, 2002 (Exhibit I hereto), Imperatore disclaimed Midtown's responsibility for providing the documents filed by its architect, stating:

> You should know that pursuant to Paragraph 29 (a) of the Contract of Sale, Midtown's obligation is merely to provide Jericho with such "due diligence" materials that Midtown had <u>in its own possession</u>. <u>Midtown has long since produced those materials.</u> (emphasis added).

32.     Midtown nevertheless advised in that letter that it had directed the architect to provide further documents to Jericho.

33.     Jericho received these documents on or about August 7, 2002. It was thus delayed by 49 days from June 19 in starting a meaningful due diligence analysis.

34.     By letter to Stone of August 13, 2002 (Exhibit J hereto), Jericho's counsel made the following request:

> Our client has also noted that, while an environmental impact statement pertaining to the area in which the property is located was included in the due diligence package, there was <u>no report of any environmental study pertaining specifically to this property</u>. Our client finds this somewhat unusual since filings with NYC generally require at least a Phase I environmental report. <u>Please ascertain whether an environmental study of this property was done and whether any such report was prepared (whether for your client or any of the professionals retained by your client) and, if so, furnish our client a copy.</u> If no written report was prepared, <u>kindly advise whether your client received any oral reports concerning the existence of hazardous materials at the property.</u> (emphasis added)

35.    By letter dated August 14 (Exhibit K), Stone answered that letter, stating only that "[n]o Phase I Environmental Study was performed on the Property."

36.    In early August, 2002, Jericho had orally requested from Midtown the copies of Exhibits referenced in the Amtrak Agreement but not attached to the copy of that Agreement which Midtown had provided to Jericho. Midtown advised Jericho that it had misplaced the Exhibits, and told Jericho that it should obtain the Exhibits from Amtrak. Amtrak responded to Jericho's requests for Exhibits by stating that Amtrak had no relationship with Jericho, and that Jericho should get the Exhibits from Midtown, or have Midtown contact Amtrak. Midtown refused to make this contact.

37.    On or about August 20, 2002, Jericho orally advised Midtown that Jericho had heard something about an oil spill on the Property and asked if Midtown knew anything about such an event. The same day, August 22, 2002, Midtown sent an e-mail message to its broker stating the following:

> We have no papers confirming the successful cleanup of the oil spill from properties neighboring the Sites, in fact, we have not had contact with NYDEC in years. However, NYDEC should have the necessary papers filed under:
>
> Parts Center Project
> Project 1D Number SP00334
> Spill Number 9709152
>
> NYDEC investigatory had been Chris Tomosello but he is long departed. Our last contact Louise Munster at (718) 482-4912.

(emphasis added). A copy is annexed hereto as Exhibit L.

38.    As reflected on Exhibit L, on August 23, 2002 the above message was allegedly transmitted from the Midtown broker who received it, Elaine Emmett, to another Midtown

9

broker, Benjamin Shafren.  There was no suggestion in either the August 22 message or the

August 23 transmittal that the August 22 message be passed on to Jericho.

      39.     Failing to hear from Midtown regarding any oil spill, Jericho's counsel wrote on

August 30, 2002 to Imperatore in pertinent part:

> In a letter to your colleague, Maurice Stone, dated August 13,
> 2002, we requested whether any environmental studies had been
> performed specifically with respect to these properties and, if any
> written reports existed, to have copies thereof.  We also asked "if
> no written report was prepared, kindly advise whether your client
> received any oral reports concerning the existence of hazardous
> materials at the property."  Mr. Stone's response on August 14,
> 2002, was that "[n]o Phase I Environmental Report or Study was
> performed on the Property" and did not specifically address our
> request.
>
> We raise this issue only because our client's principals have very
> recently heard scuttlebutt that there may have been an oil spill on
> the properties which may or may not have been cleaned up.  Please
> advise, immediately, if there is any truth to this information and
> also whether Midtown, or any of its representatives, ever received
> any notice, written or oral, from the City of New York or any
> agency thereto, or from any third party, of the existence or possible
> existence of an oil spill or any other hazardous material on either
> of the properties, and, if so, the disposition thereof.
> <u>Notwithstanding all that has preceded, our client is disposed to
> proceed with the contract, but needs this information in order to
> make an informed decision whether or not to do so</u> (emphasis
> added).

A copy is annexed hereto as Exhibit M.

      40.     Jericho, by its counsel's August 30 letter, also rejected Midtown's argument that

it was not required by paragraph 29 (a) of the Contract to provide documents which had been

filed by Midtown's architect.  It stated:

> Our client's principals have pointed out to us that it is Paragraph
> 29(c) and Paragraph 33 of the Contract of Sale, and not Paragraph
> 29(a) which address this issue.  Paragraph 29(c) provides, in
> pertinent part, "[i]mmediately upon execution of this Agreement,
> Seller shall make available to Purchaser or its representatives, such
> documents within Seller's current <u>custody or control</u> relating to the

10

Property, which Purchaser reasonably requests" (emphasis added).
Paragraph 33 provides, in pertinent part, "[w]ithin two (2) business
days from the date hereof, Seller shall make available to the
Purchaser copies of all documentation pertaining to such permits
and/or approvals" (i.e., the permits and/or approvals which
Midtown may have obtained with respect to the development of
the premises).

Our client's principals believe that documents and/or drawings in
the possession of the firm of architects engaged by Midtown to
develop the property are documents and/or drawings under
Midtown's custody or control and that such documents and/or
drawings were documentation pertaining to the permits and/or
approvals which Midtown had obtained (albeit expired) with
respect to the development of the premises. For this reason, our
client's principals believe that the seventy-five (75) day study
period should not have begun to run until the date the 1990
documents and drawings were delivered by Midtown's architects.
Please advise whether Midtown will concur in such interpretation.

41. Despite Jericho's oral inquiry and the two communications of August 22 and

August 23, Midtown did not respond to Jericho's inquiry about the oil spill until September 3.

On that day, instead of producing the documents in its possession or control, it falsely stated that

Jericho had relevant information through the e-mail message set forth in paragraph 38 above,

allegedly sent on August 23 to "Jericho's broker", which, in fact, was not Jericho's broker but

Midtown's broker. See Exhibit N hereto. The August 22 e-mail message was never passed on to

Jericho by Mr. Shafren, the Midtown broker to whom it was forwarded. Jericho did not receive

that message until September 2, 2002, when it was faxed to Jericho by Ms. Emmett, the Midtown

broker to whom Midtown had sent the August 22 message.

42. During August, Jericho made strenuous efforts with at least three Amtrak offices

to obtain the Amtrak exhibits referred to in paragraph 36 above, which Midtown had allegedly

misplaced. These efforts were frustrated when Amtrak responded that it had no relationship with

Jericho and Jericho should get the Exhibits from Midtown.

11

43.     Following further oral inquiries to Midtown concerning these Exhibits, Jericho's counsel wrote to Imperatore on September 2, 2002, referring to the missing Exhibits to the Amtrak Agreement and asking that copies be sent directly to Jericho by facsimile.  See Exhibit O hereto.

44.     In a letter dated September 3, 2002 (Exhibit P hereto), Midtown, through Imperatore, responded to Jericho's request for copies of the Exhibits to the Amtrak Agreement, stating:

> Midtown does not now (and did not at the commencement of the Contractual "Study Period") have the Exhibits referred in your letter, so it could not provide those Exhibits to Jericho.  More to the point, Jericho has had 75 days under the Contract to obtain such Exhibits from the National Rail Corporation, more commonly known as "Amtrak", and, indeed, to meet with Amtrak concerning all issues relating to Amtrak's easement across the Sites and Jericho's right to build over that easement.  It never did so.

45.     Jericho's counsel immediately sent by fax the following response:

> The referenced contract does not provide that Jericho is required to obtain documents from Amtrack [sic].  Rather, section 31 of the referenced contract recites that Exhibit B is a true copy of the agreement permitting development over Amtrak's railroad tracks.  The exhibits referred to in my earlier letter could radically alter that agreement, for example, by reciting that the rights granted thereunder were personal to the named parties, or in any other fashion.
>
> Moreover, Jericho's representatives have spoken with John Youngdahl, Mark Brendar and Sheila Mac Sopper of Amtrack, each of whom advised our client that it should obtain the documents from Midtown ....(emphasis added).

A copy is annexed hereto as Exhibit Q.

46.     In a separate September 3, 2002 letter (Exhibit N, referred to above), Imperatore, addressing Jericho's oil spill inquiry, made the false statement that the August 22 e-mail message

to Midtown's broker had been sent by that broker on August 23 to Jericho's broker, when in fact

the person to whom it was allegedly sent was another of Midtown's brokers and not a Jericho

broker.  Midtown, through Imperatore, deceitfully stated in this September 3 letter:

> Jericho has known at least since my letter dated August 14, 2002, a
> copy of which is attached, that Midtown performed no
> environmental studies with respect to the Sites.
>
> Finally, Jericho has known since Midtown's broker's e-mail to
> Jericho's broker dated August 23, 2002, a copy of which is also
> attached, that Midtown has no information with respect to whether
> or not an oil spill from adjacent properties onto the Sites was
> cleaned up.  Nevertheless, Midtown provided Jericho in that e-mail
> with all information necessary to make that determination.

(emphasis added).

47.    Midtown knew, because of its own inquiries to the DEC in 1998 and 2001, as set

forth below, that documents in the DEC's file identified in the referenced e-mail could only be

obtained through a Freedom of Information Law request, and that it would take many weeks to

obtain a response to such a request.

48.    Imperatore, in the same September 3, 2002 letter, responded to Jericho's August

30 comments about the belated delivery of the documents filed by Midtown's architect.  He

erroneously stated that Midtown had "complied with all of its obligations under the Contract"

and that it had made "available to Jericho copies of all architectural documents and drawings that

it had in its possession." (emphasis added)  Midtown rejected Jericho's position that the Study

Period commenced as of the date Jericho received the documents from Midtown's architect.

49.    Following receipt from Midtown's broker on September 2 of the faxed e-mail

message about the oil spill, Jericho immediately contacted the New York State Department of

Environmental Conservation by telephone.  As Jericho's counsel advised Imperatore by letter the

following day, in the letter annexed as Exhibit Q, referred to above;

> One of our client's principals telephoned the regional office of
> NYDEC today in attempt to learn the extent of the spill and
> whether it was cleaned up, but was able to glean only that the file,
> apparently, is still open. He was also told that, in order to inspect
> the file, he would have to make a formal request under the
> Freedom of Information Act. <u>Proceeding under this regimen
> would take 4-8 weeks and the study period expires this afternoon.</u>

(emphasis added).

   50. Jericho responded separately to Midtown's September 3 comments regarding the

oil spill by letter dated September 3, 2002, stating:

> Be advised that, unless you advise us in writing that Midtown is
> willing (i) to make an affirmative representation that the oil spill
> referred to in my earlier letter of today's date has been cleaned up
> and paid for or (ii) to undertake whatever cleanup may be
> necessary at its cost and expense or (iii) to extend the study period
> for a sufficient period to allow Jericho to investigate this matter,
> and, in any case provide Jericho with the requested due diligence
> documentation, Jericho requests that the monies paid upon
> execution of the Contract be returned to it in accordance with the
> Contract's terms.

A copy is annexed hereto as Exhibit R.

   51. Jericho's request for the return of its deposit was based on concerns that a) the oil

spill belatedly identified by Midtown, but about which it provided no information, would require

an expensive cleanup by Jericho; (b) the unseen Exhibits to the Amtrak Agreement not produced

by Amtrak might contain facts restricting Jericho's use of the Property to an unknown extent; (c)

Midtown's for 49 day failure to produce documents filed by its architect; and (d) Midtown's

evasions and delayed compliance with its obligations to provide documents to Jericho, created a

need to protect the deposit by seeking a return of same at that stage of the transaction.

   52. Midtown's response, in a September 4, 2002 letter from Imperatore (Exhibit S

hereto), was as follows:

> Midtown has made clear in the Contract and as you well know,
> Midtown has never made and is not now willing to make any

<div align="center">14</div>

> representation with respect to environmental matters. Secondly,
> Midtown has never offered to "undertake whatever cleanup may be
> necessary" at its cost and expense. Finally, as you well know,
> Midtown will not extend the Study Period afforded by the Contract
> <u>even one day</u>. Indeed, that Study Period expired last evening.
> (emphasis added).

53.     Midtown advised in this letter that it would return Jericho's down payment only if

Jericho provided Midtown with a general release. By responding letter of September 4, 2003,

Jericho advised Midtown that there was no basis for Jericho's request for a general release, and

demanded the return of its down payment. A copy is annexed as Exhibit T. Jericho repeated in

that letter its concern about "the possibility of the property being contaminated by an oil spill

...." Jericho made it clear that the reason for seeking the return of its deposit was Midtown's

refusal to alleviate that concern by making a "representation concerning the oil spill" or by

undertaking "to clean it up at [Midtown's] cost and expense."

54.     By letters from Stone of September 5 and September 10, 2002 (Exhibit U hereto),

Midtown advised Jericho that it would not return Jericho's down payment unless Jericho gave

notice that Jericho was canceling the Contract.

### The Ineffectual Contract Cancellation

55.     Jericho's counsel responded to Midtown's September 5 and 10 letters by letter

dated September 12, 2002, stating:

> Although Jericho's principals felt, and still feel, that under the
> circumstances which came to light in the month of August, either
> some affirmative response with respect to the oil spill or an
> extension of the study period and the request for production of
> documents was warranted, this letter will serve as confirmation
> that our letter on behalf of Jericho dated September 3, 2002,
> requesting the return of Jericho's down payment was intended as
> the exercise of Jericho's right under paragraph 29(a) of the
> referenced contract to cancel said contract and receive the return of
> the monies paid upon execution thereof.

A copy is annexed as Exhibit V.

15

56.    Counsel's September 12 letter was sent without the knowledge of Jericho and without Jericho's authorization, and was not "cc'd" to Jericho. Jericho had advised Midtown on several occasions, that Mr. Szegda, the attorney who authored and sent the September 12 letter, did not have authority to cancel the Contract. In addition to the absence of authorization, the September 12 letter did not comply with the requirements of the Contract for cancellation of the Contract. The Contract provided in paragraph 29 that if the "Purchaser" (i.e., Jericho) determined at its sole and absolute discretion that the Property was not suitable for its needs, "the Purchaser shall have the right to cancel this Contract upon written notice to the Seller [Midtown] and the Escrowee [Midtown's law firm]".

57.    The Contract further provided, in paragraph 42:

> This Contract constitutes the entire agreement between the parties hereto. No provision of this contract shall be changed or modified, nor shall this Contract be discharged in whole or in part, except by an agreement in writing signed by the party against whom the change, modification or discharge is claimed or sought to been [sic] enforced; nor shall any waiver of the conditions or provisions of this contract or of any of the rights of either of the parties hereunder be effective or binding unless such waiver shall be in writing and signed by the party claimed to have given, consented or suffered the waiver.

58.    In addition, paragraph 44 of the Contract provided:

> All notices required under this Contract ("Notices") shall be in writing and shall be sent by certified mail, return receipt requested, postage prepaid, addressed to the party to be notified at its address first above set forth or to such other address as such party s hall have specified most recently by like Notice. At the same time any Notice is given to either party, a copy shall be sent to its attorney. For the purposes of this paragraph 44 the attorneys for the parties are as follows:

Attorneys for Seller:

Edward Imperatore, Esq.
Harwood Lloyd, LLC
130 Main Street

Hackensack, NJ 07601

Attorney for Purchaser:

Szegda & Gerbing
300 East 42nd Street
New York, New York 10017
Attn: Michael A. Szegda, Esq.

59.    The September 12 letter, Exhibit V, was not signed by the party (Jericho) against which the cancellation was to be enforced, and was not sent to "the party to be notified" (Midtown, as distinguished from its attorney).

60.    By letter dated September 18, 2002, Jericho's Vice President advised Midtown that the Contract had not been properly cancelled, and asked Midtown to "inform Jericho in writing ... when and how you [Midtown] want to proceed with the Contract." Thereafter, Jericho requested a response to its September 18 letter in a letter of October 18, 2002. Copies of these letters are annexed as Exhibit W.

61.    Jericho reasserted its position that the Contract had not been properly cancelled in conversations with Midtown in 2003, and in letters to Midtown's counsel dated January 5, January 23, and February 16, 2004. Jericho again asked in these letters that Midtown advise Jericho how and when Midtown wanted to proceed with the Contract. Copies are annexed hereto, collectively, as Exhibit X.

62.    The Contract provided for a closing 15 days after the end of the Study Period, and further provided that if Jericho did not close by such date, Midtown could set a "time of the essence" closing date on 14 days' notice. Midtown never gave such notice.

**Disclosure To Jericho Of The Facts**
**Misrepresented And Concealed By Midtown**

63.    In the discovery conducted by Jericho pending Midtown's appeal of the denial of its CPLR 3211(a) motion, referred to above, Midtown produced documents showing that the

17

representation in the August 22 e-mail (Exhibit L), to Midtown's broker that Midtown had "not had contact with NYDEC in years" was false, in that among the documents produced in the discovery proceedings were letters to the DEC from Stone dated April 9 and April 11, 2001, little more than a year earlier. The documents unambiguously were seeking information concerning the oil spill at the Property. Imperatore was copied on the letter of April 9, 2001. Copies are annexed collectively as Exhibit Y.

64.     Moreover, in the first of those letters, Stone recited a meeting with the DEC in the summer of 1998 concerning DEC's "progress in investigating and remediating the spill," and advising that Midtown wanted to "update its records with respect to the investigation and remediation of the spill ...." The second of the April 2001 letters requested documents in the DEC's files concerning the oil spill, pursuant to the Freedom of Information Act.

65.     Midtown also produced approximately 100 pages of documentation from the DEC, evidently provided pursuant to Midtown's April 2001 inquiries, among others, concerning the oil spill. None had been produced during the Study Period. These documents showed, in the clearest terms, that the DEC had conducted a study of the oil spill and reported thereon, and that substantial remediation work with respect to the oil spill had been performed at the end of 1997 and through May, 1998 at the expense of the DEC. Copies are annexed hereto collectively as Exhibit Z.

66.     These documents demonstrate, among other things, that

(a)     Midtown and its attorneys lied in stating, in Imperatore's counsel's September 3, 2002 letter, that Midtown "has no information with respect to whether or not [the] oil spill ... was cleaned up." They also showed Midtown had engaged in outright lies to this Court in its papers and at the May 16 hearing.

(b)     Midtown's statements, in Stone's August 14, 2002 letter, in response to Jericho's August 13, 2002 inquiry as to whether an environmental study had been done and "any [environmental] report" prepared, that "[no] Phase I Environmental Study" had been performed, was grossly misleading and false, in that no mention was made of the study performed by the DEC, of which Midtown and its attorneys were well aware at the time.

(c)     in responding to Jericho's August 30, 2002 request as to whether Midtown had notice from any source of an oil spill and the disposition thereof, by stating that "Midtown has performed no environmental studies" (emphasis added), Midtown and its counsel were being willfully evasive and deliberately concealing the fact that more than 100 pages of extremely relevant documents were in its possession.

67.    The DEC documents in Midtown's possession also demonstrate that the September 4, 2002 assertions by Midtown and its counsel that Midtown had no obligation to, and would not, make any representation regarding environmental matters, and had never offered to undertake a clean-up, were only a smoke screen. In light of the fact that Midtown had the DEC documents and could readily have given them to Jericho, Midtown's assertions were manifestly made to evade the production of the DEC documents which would have shown Jericho would have no responsibility to remediate and need have no concern on this point if it proceeded to the closing.

68.    At his deposition in this action in December 2005, during the pending Appellate Division appeal, Imperatore, the author of several of the written communications to Jericho's counsel identified above, highlights Midtown's fraud by stating that in 2002 he was not concerned about the spill at all, because "[i]t must be remediated by the State of New York." A copy of that page of the transcript is annexed hereto as Exhibit AA.

69.     Midtown also produced, during discovery, 34 pages of copies of photographs taken in June, 1998, depicting the area in which the oil spill occurred and the effects of the oil spill. Most significantly, those photographs were accompanied by a copy of an invoice for developing the photographs which showed that they had been taken by or at the behest of Midtown's counsel. These photographs, plainly show an environmental study and/or report providing information regarding the clean up. This most graphic evidence established the fraud on Jericho and on the Court of Midtown's responses to the inquiries cited in paragraphs 66(a) and (b) above. Copies are annexed hereto collectively as Exhibit BB.

70.     The photographs also demonstrate that Midtown's representation that Midtown had performed no environmental studies at the site was not merely grossly misleading, but a flagrant falsehood. Jericho also learned, while Midtown's appeal from the dismissal order was pending, that in conducting its search for the Exhibits attached to the Amtrak Agreement, Jericho had been misdirected to a time consuming wild goose chase which had been doomed to failure from the start. Mr. Imperatore, who (a) advised in early August, 2002 that Midtown had "misplaced" those Exhibits and told Jericho to get them from Amtrak, and (b) told Jericho's counsel in writing on September 3, 2002 that Midtown did not "now" have the Exhibits and that Jericho should have gotten the Exhibits from Amtrak, stated under penalty of perjury in a June 29, 2006 affirmation submitted to this Court: "to my knowledge the exhibits referred to in the 1990 agreement between Amtrak and Midtown do not exist." (emphasis added). A copy of that page of his affirmation is annexed hereto as Exhibit CC.

71.     Mr. Imperatore's June, 2006 affirmation was submitted in support of a summary judgment motion by Midtown. Midtown went even further, in its memorandum of law in support of that motion, to state that it had no evidence that the documents had "ever" existed.

(emphasis in original). A copy of that page of the memorandum is annexed hereto as Exhibit DD. Mr. Imperatore's letter of September 3, 2002 letter advising Jericho that Midtown did not "now" have the Exhibits, and telling Jericho that it had had 75 days in which to obtain the Exhibits from Amtrak, can now be seen as callous and cynical fraud by a lawyer which merits the sternest response by this court.

72.    The critical importance to a potential purchaser of the existence or non-existence of the Exhibits to the Amtrak Agreement is demonstrated by documents produced by Amtrak in the course of discovery in response to a Freedom of Information Law inquiry. Among the documents produced were letters from Mr. Imperatore, dated September 23 and October 13, 1998, asking for the "missing" exhibits in connection with a potential sale by Midtown of the affected property to third parties. Copies are collectively as Exhibit EE. Mr. Imperatore and Midtown obviously were aware of the importance to a potential purchaser of material in the Exhibits which might create problems for a purchaser. The knowledge that there were no Exhibits would remove that concern. Midtown, manifestly knowing that there were no Exhibits, did not wish to remove that concern and was using the existence of possible problems to trick Jericho into deciding to forego the purchase of the property.

73.    Beyond the issue of misrepresentations as to the non-existent Exhibits, discovery showed that Midtown possessed, but did not produce during the Study Period, certain modifications to and clarifications of the Amtrak Agreement, and architectural plans prepared in 2000 relating to a proposed parking garage development on the Property which rendered the document production incomplete. These documents were among those required by paragraph 33 of the Contract to be produced within two business days of the execution of the contract. In addition, these documents should have been produced pursuant to paragraph 29(c) of the

Contract, after Jericho requested the missing Exhibits to the Amtrak Agreement, since they contained information which would have resolved Jericho's concerns about what the missing Exhibits might show. Copies are collectively annexed as Exhibit FF. Defendants conduct meets the Court's and the Appellate Division's test for the relief sought.

74.    The foregoing precludes any debate as to the willful, deliberate and fraudulent conduct of defendants, beginning with Midtown's first incomplete production on June 19 to its final declarations of September 3, declaring that it had "complied with all of its obligations under the contract." The conduct of Midtown and its attorneys was that of an arrogant fraud. It fully meets the tests of both this court at the May 16 hearing referred to in paragraph 7 above and of the Appellate Division in paragraph 11 for the relief requested on this motion.

### Midtown's Commission Of Fraud Upon The Court

75.    With his affirmation of January 6, 2005 (Exhibit GG), Imperatore submitted to this Court as Exhibits, several of the false or misleading letters from Imperatore and Stone identified above:  the June 19, 2002 letter covering documents supposedly submitted in complete compliance with Midtown's due diligence obligations (Exhibit F); the incomplete August 14, 2002 response to Jericho's inquiry regarding environmental matters (Exhibit K); the September 3, 2002 letter disclaiming knowledge regarding the oil spill cleanup or lack thereof (Exhibit N), and accompanying e-mail message (Exhibit L); and the September 3, 2002 letter advising that Midtown did not "now" have copies of the Exhibits to the Amtrak Agreement and advising that Midtown should have gotten the Exhibits from Amtrak (Exhibit P). As discovery and the subsequent court proceedings demonstrated, each of those documents were false and/or so evasive as to constitute fraud. Added to that are the responses to the Court at the May 16 hearing and the Imperatore January 6, 2005 affirmation in this court in which Midtown's counsel

persisted in representing that there had been full production of documents, which were brazen frauds on the court.

76.    Mr. Imperatore asserted in paragraph 24 of his January 6, 2005 affirmation: "The parties' contemporaneous correspondence shows that Midtown did not conceal any documents from Jericho."

77.    In paragraph 27 of his January 6, 2005 affirmation Mr. Imperator falsely repeats that the August 23, 2002 e-mail message regarding the oil spill, was sent from Midtown's broker "to Jericho's broker."

78.    When this Court asked, at the May 2005 hearing on Midtown's dismissal motion, whether Jericho had sent "specific request[s] [for documents] in writing to the Seller" Midtown's counsel responded: "They sent some requests, and the requests were fulfilled." (emphasis added)  See Exhibit B, p. 9.

79.    The subsequent disclosure of Midtown's failure to produce the extensive oil spill files and the fact that the addressee of the August 23 E-mail was not Jericho's broker as testified by Mr. Imperator expose Mr. Imperatore's statements to the court as blatant lies.  The denial of possession of the Amtrak Exhibits, after putting Jericho to a wild goose chase, with full knowledge that such Exhibits never existed, is another brazen fraud.  These unquestionably were frauds on this court.

80.    Midtown's false and misleading submissions were included in the Record on Appeal, and formed the basis for arguments in Midtown's briefs.  Manifestly, they misled the Appellate Division.  For example, the Appellate Division, accepting Midtown's recitals, stated in its August 17, 2006 Decision: "By e-mail dated August 23, 2002 Midtown let Jericho know that it had no information concerning the cleanup of [the] oil spill."  The Appellate Division also was

23

led by Midtown's false statements to state: "the record is plain that Midtown provided Jericho with information in its possession."

81.     The materiality of these false statements is established by the recital by the Appellate Division in its decision dismissing the complaint which is quoted in paragraph 11 above. The Appellate Division found that to the extent Jericho was alleging willful and deliberate conduct, such allegations were "contradicted by the documentary evidence." Such evidence consisted of the false, deceitful and fraudulent documents that Midtown and its counsel placed in the record. The additional documentary evidence ultimately produced from Midtown's own records, which could not be included in the Record on Appeal, constitutes evidence that Midtown's misrepresentations in the appellate division, likewise, were willful, deliberate and fraudulent. That they were calculated to cause, and did cause, uncertainty and doubt in Jericho's thinking as to whether to proceed with the Contract, and caused it to seek a return of its deposit and to refrain from proceeding to closing, is undeniable.

82.     Thus fraud was committed by defendants in both this Court and the Appellate Division.

**Recapitulation**

83.     As set forth above, the misconduct of defendants is as follows:

        a.     Oil Spill. Willful and deliberate failure to produce documents in Midtown's possession or control regarding the oil spill, including photographs commissioned and obtained by defendants, Freedom of Information requests to the Department of Environmental Control ("DEC"), responses by the DEC and correspondence and documents relating to the oil spill; false representations that Midtown had produced such due diligence materials as were in its possession and had complied with all contractual requirements; false

24

representations that Midtown had not had contact with the DEC in years and that the e-mail message about the oil spill had been sent to Jericho's broker; and false and misleading responses to Jericho's specific requests for environmental reports and studies and for information about the cleanup of the oil spill.

        b.    <u>Exhibits to the Amtrak Agreement</u>. Advising Jericho, despite defendants' knowledge that the Exhibits to the Amtrak Agreement did not exist, that Midtown had misplaced the Exhibits; that Jericho should get the Exhibits from Amtrak; and that Midtown did not "now," in September 2002, have the Exhibits, and, finally, that they never existed.

        c.    <u>Modifications and Clarifications to the Amtrak Agreement and Relevant Architectural Drawings</u>. Knowingly, deliberately and willfully failing to produce documents which would have alleviated Jericho's concerns about the "missing" Amtrak Exhibits and modifications which they might have contained.

        d.    <u>Documents Submitted by Midtown's Architects to the City of New York</u>. Failing to produce documents as required by the Contract, and refusing to grant an extension of the Study Period because of the long delay in their production.

        e.    <u>Improper Termination of the Contract by Midtown</u>. Asserting that the Contract was terminated and refusing to proceed with the sale of the Property, knowing that Jericho's attorney had no power to take such action and that proper procedures for cancellation had not been followed.

    84.    As set forth above, the knowingly false and misleading nature of defendants' misrepresentations, and their willful and deliberate concealment of material facts, was demonstrated by the documents produced by Midtown and Amtrak during the course of discovery, and by Imperatore's sworn statement to the Court that the Exhibits to the Amtrak

Agreement did not exist. That defendants' knowing misrepresentations and concealments, as the documents demonstrate, caused Jericho not to proceed to a closing and to ask for the return of its deposit. But for defendants' knowing misrepresentations and concealments, Jericho would have proceeded to close the purchase transaction.

### The Present Motion

85.     The foregoing facts constitute compelling evidence in support of Jericho's motion to vacate the judgment. As shown in the accompanying memorandum of law, the criteria for vacating a judgment pursuant to CPLR 5015(a)(2) (newly discovered evidence) and 5015(a)(3) (fraud) have been satisfied here. As noted above, there was no mechanism for bringing the newly discovered facts to the attention of this Court or the Appellate Division prior to entry of the judgment. In addition, the requirement of CPLR 5015 that the new facts conform to the comments of both this Court at the May 16 hearing and of the Appellate Division's opinion quoted in paragraph 11, and "probably would have produced a different result" as required by the statute.

86.     Following the vacatur of the judgment, Jericho should be allowed to serve a Second Amended Complaint setting forth causes of action based on the newly discovered evidence and including a cause of action for fraud on the court. In addition, as demonstrated in the accompanying memorandum, the well known criteria for obtaining leave to amend a pleading under CPLR 3025, including the provision of that rule that leave shall be "freely granted," militate strongly in favor of granting such leave under the present circumstances.

87.     Finally, Jericho's motion for a preliminary injunction should be granted. The likelihood that it will succeed on the merits of its newly pleaded claims is demonstrated in the accompanying memorandum. The risk that absent such relief Jericho will suffer irreparable

harm, through the loss of the opportunity to purchase the real property at issue, is clear. Real property is by definition unique, and the loss of rights therein cannot be remedied by money damages. Since the Notice of Pendency filed at the outset of this action has been vacated, Midtown is now free to deal with the Property to Jericho's detriment unless enjoined from doing so. Midtown's motion to vacate the notice of pendency, which this court granted after the Appellate Division on August 17, 2006 rendered its decision, demonstrates the eminent danger of action by Midtown to frustrate Jericho's right to specific performance of the contract. In the alternative Jericho respectfully requests leave to refile its notice of pendency nunc pro tunc.

88.    Finally, the balance of the equities favors the granting of a preliminary injunction barring Midtown from transferring or encumbering the property pending the determination of this action. Jericho risks the loss of a valuable right which it would have exercised years ago but for defendants' fraud. Midtown, having committed the fraud, cannot claim that any equities weigh in its favor.

89.    I respectfully request, for the reasons set forth above and in the accompanying memorandum of law, that Jericho's motion be granted in all respects.

90.    This motion is brought on by Order To Show Cause rather than Notice of Motion because prompt judicial intervention is needed to avoid irreparable harm to Jericho by a transfer or encumbering of the property pending a decision of this motion.

91.    No prior request has been made in any court for the relief sought herein.

27

92.    Upon being informed of the time, date and place that this application for an Order

To Show Cause can be heard, affirmant will contact counsel for Midtown so that it may have an

opportunity to appear and be heard at that time.

Dated: New York, New York
       October 30, 2006

_____
       Herbert Rubin

# EXHIBIT F
# TO GEREMIA DECLARATION

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

----------------------------------------------------------X

JERICHO GROUP, LTD.

              **Plaintiff,**

           -against-

MIDTOWN DEVELOPMENT, L.P.

              **Defendant.**

----------------------------------------------------------X

**Index No. 0113274/2004**
**(Justice Ramos, Part 53)**

**NOTICE OF APPEAL**

      PLEASE TAKE NOTICE that Defendant Midtown Development, L.P. hereby appeals to the Appellate Division, First Department, of the Supreme Court of the State of New York from that part of an order of the Supreme Court of the State of New York, New York County (Ramos, J.), filed on February 20, 2007 (the "Order"), which vacated a judgment entered in the New York County Clerk's Office on September 19, 2006 pursuant to a decision and order of the Appellate Division dated and entered August 17, 2006. A copy of the Order appealed from is annexed hereto. This appeal is taken from each and every part of the Order to the extent the Court granted Plaintiff's motion to vacate the Judgment pursuant to CPLR 5015(a).

Dated: New York, New York
       February 22, 2007

                         JONES DAY
                         222 East 41st Street
                         New York, New York  10017
                         Telephone:   (212) 326-3939

                         By: _____
                              Fredrick E. Sherman
                              Todd R. Geremia

                         -- and --

                         PHILLIPS NIZER LLP
                         Alfred D. Lerner
                         George Berger

666 Fifth Avenue
New York, New York 10103-0084
Telephone: (212) 977-9700

Co-Counsel for Defendant,
Midtown Development, L.P.

TO:
CLERK OF THE SUPREME COURT          Herbert Rubin, Esq.
NEW YORK COUNTY                     HERZFELD & RUBIN, P.C.
60 Centre Street                    40 Wall Street
New York, New York 10007            New York, New York 10005

                                    Attorneys for Plaintiff,
                                    Jericho Group, Ltd.

# EXHIBIT G
# TO GEREMIA DECLARATION

UCS-840 (REV 1/2000)

## REQUEST FOR JUDICIAL INTERVENTION

SUPREME    COURT,  NEW YORK   COUNTY     INDEX NO.  600566/07

DATE PURCHASED: 2/22/07

PLAINTIFF(S):
**JERICHO GROUP, LTD.**

IAS entry date

Judge Assigned

DEFENDANT(S):

**MIDTOWN DEVELOPMENT, L.P., EDWARD IMPERATORE AND
MAURICE STONE.**

Date issue joined: _ N/A      Bill of particulars served (Y/N):     [  ] Yes      [ X ] No

NATURE OF JUDICIAL INTERVENTION (check ONE box only AND enter information)

[ X ]   **Request for preliminary conference**         [  ]   Notice of petition (return date:           )
                                                             Relief sought

[  ]    Note of issue and/or certificate of            [  ]   Notice of medical or dental malpractice
        readiness                                             action (specify:           )

[  ]    Notice of motion (return date:       )         [  ]   State of net worth
        Relief sought

[  ]    Order to show cause                            [  ]   Writ of habeas corpus
        (clerk enter return date:       )
        Relief sought                                  [  ]   Order  (specify:

[  ]    Other ex parte application  (specify:

~~RECEIVED~~
~~FEB 28 2007~~
~~NEW YORK~~
~~COUNTY CLERKS OFFICE~~

NATURE OF ACTION OR PROCEEDING (check ONE box only)

RECEIVED

FEB 2 8 2007

TRIAL SUPPORT OFFICE

| MATRIMONIAL | | MALPRACTICE | |
|---|---|---|---|
| [  ]   Contested | -CM | [  ]   Medical/Podiatric | -MM |
| [  ]   Uncontested | -UM | [  ]   Dental | -DM |
| | | [  ]   *Other Professional | -OPM |
| **COMMERCIAL** | | | |
| [ X ]   **Contract** | -CONT | [  ]   Motor Vehicle | -MV |
| [  ]   Corporate | -CORP | [  ]   *Products Liability | -PL |
| [  ]   Insurance (where insurer is a party, | | | |
|          except arbitration) | -INS | [  ]   Environmental | -EN |
| [  ]   UCC (including sales, negotiable | | [  ]   Asbestos | -ASB |
|          instruments) | -UCC | [  ]   Breast Implant | -BI |
| [  ]   *Other Commercial | -OC | [  ]   *Other Negligence | -OTN |
| **REAL PROPERTY** | | [  ]   *Other Tort (including intentional) | -OT |
| [  ]   Tax Certiorari | -TAX | | |
| [  ]   Foreclosure | -FOR | SPECIAL PROCEEDINGS | |
| [  ]   Condemnation | -COND | [  ]   Art. 75 (Arbitration) | -ART75 |
| [  ]   Landlord/Tenant | -LT | [  ]   Art. 77 (Trusts) | -ART77 |
| [  ]   *Other Real Property | -ORP | [  ]   Art. 78 | -ART78 |
| | | [  ]   Election Law | -ELEC |
| | | [  ]   Guardianship (MHL Art. 81) | -GUARD81 |
| **OTHER MATTERS** | | [  ]   *Other Mental Hygiene | -MHYG |
| [  ]   * | -OTH | [  ]   *Other Special proceeding | -OSP |

TORTS

Check "YES" or "NO" for each of the following questions:

Is this action/proceeding against a

| YES | NO | | YES | NO | |
|---|---|---|---|---|---|
| [ ] | [ X ] | Municipality:<br>(Specify _____ ) | [ ] | [ X ] | Public Authority:<br>(Specify _____ ) |

| YES | NO | |
|---|---|---|
| [ X ] | [ ] | Does this action/proceeding seek equitable relief? |
| [ ] | [ X ] | Does this action/proceeding seek recovery for personal injury? |
| [ ] | [ X ] | Does this action/proceeding seek recovery for property damage? |

Pre-Note Time Frames:
(This applies to all cases except contested matrimonial and tax certiorari cases)

Estimated time period for case to be ready for trial (from filing of RJI to filing of Note of Issue):

9  Expedited:  0-8 months        X  Standard:  9-12 months        9  Complex:  13-15 months

Contested Matrimonial Cases Only:  (Check and give date)
Has summons been served?                    No      Yes, Date

Was a Notice of No Necessity filed?        No      Yes, Date

ATTORNEY (S) FOR PLAINTIFF(S):

| Self<br>Rep. * | Name | Address | Phone# |
|---|---|---|---|
| | Herzfeld & Rubin, P.C. | 40 Wall Street, New York, New York 10005 | (212) 471-8500 |

ATTORNEY(S) FOR DEFENDANT(S):

| Self<br>Rep. * | Name | Address | Phone# |
|---|---|---|---|
| | Midtown Development, L.P. | c/o.40 Arcorp Properties, Pershing Road, Weehawken, N.J. 07086 | (201) 866-5175 |

Self Represented: parties representing themselves, without an attorney, should check the "Self Rep."
x and enter their name, address, and phone # in the space provided above for attorneys.

INSURANCE CARRIERS:
N/A

RELATED CASES: (IF NONE, write "NONE" below)

| Title | Index # | Court | Nature of Relationship |
|---|---|---|---|
| JERICHO GROUP, LTD v. MIDTOWN DEV., L.P | 113274/04 | Supreme, New York | See * below |

    I AFFIRM UNDER PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND
HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN
FILED IN THIS ACTION OR PROCEEDING.

Dated:  New York, New York
          February 28, 2007

                                    _____
                                    **Herbert Rubin**
                                    (PRINT OR TYPE NAME)
                        **HERZFELD & RUBIN, P.C., 40 WALL STREET**
                        **NEW YORK, NEW YORK 10005; (212) 471-8500**
                        ATTORNEYS FOR PLAINTIFF, JERICHO GROUP, LTD.

* Prior action by plaintiff against defendant Midtown Development, L.P. arising out of same contract as present action.
Judgment in prior action was vacated by order of Justice Ramos entered on 2/20/07, with leave to commence new action.

ATTACH RIDER SHEET IF NECESSARY TO PROVIDE REQUIRED INFORMATION.

## RIDER TO REQUEST FOR JUDICIAL INTERVENTION

Additional Defendants' Addresses


Edward Imperatore, Esq.
c/o Phillips Nizer LLP
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601

Maurice Stone
114 Avondale Road
Ridgewood, New Jersey 07540

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------x

JERICHO GROUP, LTD.,                                    Index No. 600566/07

                              Plaintiff,

          - against -                                   **REQUEST FOR**
                                                        **PRELIMINARY**
MIDTOWN DEVELOPMENT, L.P., EDWARD                       **CONFERENCE**
IMPERATORE and MAURICE STONE,

                              Defendants.

---------------------------------------------------------------------x

The undersigned requests a preliminary conference.

The nature of this action is: specific performance of a contract for the sale of real estate and related relief.

The names, addresses and telephone numbers of all attorneys appearing in the action are as follows:

Herzfeld & Rubin, P.C.
Attorney for Plaintiff
40 Wall Street
New York, New York 10005
(212) 471-8500

Defendants have not yet appeared by counsel. Counsel for defendant Midtown Development, L.P. in the related action in this Court (Index No. 113274/04) are: Jones Day, 222 East 41st Street, New York, New York 10017, (212) 326-3939.

Annexed hereto is an Affirmation of Good Faith pursuant to 22 NYCRR 202.12(a).

Dated: New York, New York
       February 27, 2007

                                        Respectfully submitted,

                                        _____
                                        Herbert Rubin
                                        Herzfeld & Rubin, P.C.
                                        Attorneys for Plaintiff
                                        40 Wall Street
                                        New York, New York 10005       RECEIVED
                                        (212) 471-8500
                                                                       FEB 2 8 2007

                                                                       TRIAL SUPPORT OFFICE



"CourtAlert"
<Subscriber_Service@CourtA
lert.com>

03/16/2007 10:18 PM
Please respond to
"CourtAlert"
<Support@CourtAlert.com>

To   dpjacobson@jonesday.com, clayne@jonesday.com

cc

Subject   CourtAlert 24 - New appearance - case: NY 600566/07
(360353/600001)

**Attn:JONES DAY**
**Cte: DAVID JACOBSON**
**Alert: NEW APPEARANCE**

Case: JERICHO GROUP vs MIDTOWN DEVELOPMENT
New York 600566/07 (360353/600001)
Attorney: Geremia, Sherman
*********************************

Appearance Type: Initial (First Time On)
New Appearance Date: Apr 5, 2007
Appearance Part: IAS PRELIM CONFERENCE 53

Comments Entered: 9:30

Judge: Hon. RAMOS, CHARLES E.
Case Classification: COMMERCIAL CASES

*********************************

- For additional information about this transaction follow the link to CourtAlert.com at http://www.CourtAlert.com/casefr
- For Explanation of this Alert, Please Click Here.
- Legal Notice, click http://www.Courtalert.com/caNotice.asp

D070316/742/121013/24

# EXHIBIT H
# TO GEREMIA DECLARATION

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

------------------------------------------------------------X

**JERICHO GROUP, LTD.,**

                                        **Plaintiff,**

                                                              **Index No. 113274/04**

            -against-

                                                              Notice of Pendency

**MIDTOWN DEVELOPMENT, L.P.,**

                                        **Defendant.**

------------------------------------------------------------X

**STATE OF NEW YORK**      )
                           ) ss.:
**COUNTY OF NEW YORK**      )

Notice is hereby given that an action has been commenced and is now pending in this court by Jericho Group, LTD., the above-named plaintiff against Midtown Development, L.P. the above-named defendant for breach of contract, wrongful repudiation of a contract amendment and specific performance. The specific performance by the said defendant pertains to a written Contract of Sale dated the 18th day of June, 2002 (and alleged by plaintiff to have been amended on August 28, 2002) made by and between the said plaintiff and defendant, whereby defendant, among other things, agreed to execute, acknowledge and deliver in proper form for recording to Plaintiff a good and sufficient Bargain and Sale Deed with Covenants against Grantor's Acts for the real property hereinafter and therein described, free and clear of all liens and encumbrances, except as otherwise permitted in said Contract, and to deliver the possession of said premises in the manner as said Contract specified and stipulated. The following is a description of the real property affected by said action: Block 708 Lot 1 and Block 709 Lot 17 in New York County as shown on the Tax Map of the City of New York, being located between 36th and 37th Streets and 11th Avenue, and between 37th and 38th Streets and 11th Avenue, New York, New York.

Dated, September 29, 2005.

                                        _____
                                        Attorney for Plaintiff
                                        **ROBERT B. GOEBEL**
                                        **ATTORNEY AT LAW**
                                        **14 Walworth Avenue**
                                        **Scarsdale, New York 10583**
                                        **(914) 725-5243- Telephone**
                                        **(914) 725-3809 - Facsimile**
                                        **r.b.goebel@att.net**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------X

JERICHO GROUP, LTD.,

                              Plaintiff,

              -against-                                    Index No. 113274/04

MIDTOWN DEVELOPMENT, L.P.,                    Notice of Pendency

                              Defendant.

------------------------------------------------------------------X

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )


To the Clerk of the County of New York:

   The number of each block on the land map which is affected by the notice is hereby
designated as follows: Block 708 Lot 1, and Block 709 Lot 17 on the Tax Map of the
City of New York. Please record this attached Notice of Pendency as soon as possible in
the proper office in the County of New York.


Dated, September 20, 2005.


                                        _Robert B. Goebel_
                                        _____
                                        Attorney for Plaintiff
                                        ROBERT B. GOEBEL
                                        ATTORNEY AT LAW
                                        14 Walworth Avenue
                                        Scarsdale, New York 10583
                                        (914) 725-5243- Telephone
                                        (914) 725-3809 - Facsimile
                                        r.b.goebel@att.net

To the Clerk of the County of New York:

The number of each block on the land map which is affected by the notice is hereby designated as follows: Block 708 Lot 1, and Block 709 Lot 17 on the Tax Map of the City of New York. Please record this attached Notice of Pendency as soon as possible in the proper office in the County of New York.

Dated, September 29, 2005.

_____

Attorney for Plaintiff
**ROBERT B. GOEBEL**
**ATTORNEY AT LAW**
**14 Walworth Avenue**
**Scarsdale, New York 10583**
**(914) 725-5243- Telephone**
**(914) 725-3809 - Facsimile**
**r.b.goebel@att.net**

# AFFIRMATION OF SERVICE

I, Robert B. Goebel, an attorney admitted to practice law in the State of New York and not a party to this action, hereby affirms under penalties of perjury that Notice of Pendency was served on counsel for Defendant by mailing today a copy of such document to each of the following:

Frederick E. Sherman
Todd R. Geremia
Jones Day
Attorneys for Defendant
222 East 41st Street
New York, New York 10017

Dated September 29, 2005

_Robt B. Goebel_
Robert B. Goebel
Attorney for Plaintiff

# EXHIBIT I
# TO GEREMIA DECLARATION

**SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY**

PRESENT: *C E Ramos*                                   PART 53

*Justice*

Jericho Group LTD                        INDEX NO. 113274/04

                                         MOTION DATE _____

- v -

Midtown Development LP                   MOTION SEQ. NO. 003

                                         MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:**  ☐ Yes  ☒ No

Upon the foregoing papers, it is ordered that ~~this motion~~

in light of the attached order of the Appellate Division entered 8/17/06 dismissing the complaint in its entirety, defendents' motion to cancel the notice of pendency is hereby granted.

FILED

SEP 11 2006

COUNTY CLERK'S OFFICE
NEW YORK

Dated: 8/30/06

**CHARLES E. RAMOS**
J.S.C.

Check one:  ☐ FINAL DISPOSITION  ☒ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST  ☐ REFERENCE

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

# EXHIBIT J
# TO GEREMIA DECLARATION

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

 **JERICHO GROUP, LTD.,**                               :
                                                        :
                **Plaintiff,**                          :
                                                        :
                                                        :
                **- against -**                         :    **No. 07-CV-1792 (RCC) (DCF)**
                                                        :
                                                        :    **ECF CASE**
**MIDTOWN DEVELOPMENT, L.P., EDWARD**                   :
**IMPERATORE and MAURICE STONE,**                       :
                                                        :
                                                        :
                **Defendants.**                         :
-----------------------------------------------------------------X

### [PROPOSED] SECOND AMENDED NOTICE OF REMOVAL

Defendants Midtown Development, L.P. ("Midtown"), Edward Imperatore, and Maurice Stone hereby file this Second Amended Notice of Removal of the above-captioned action and state the grounds for removal as follows:

1.     On February 22, 2007, plaintiff, Jericho Group, Ltd., filed a Summons and Verified Complaint against Defendants in the Supreme Court of the State of New York, New York County (the "State Court Action"). A copy of the Summons and Verified Complaint filed in the State Court Action is attached hereto as Exhibit A. A copy of a Request for Judicial Intervention and Request for Preliminary Conference, filed by Plaintiff in the State Court Action, is attached hereto as Exhibit B. No other process, pleadings, or orders have been served upon Defendants in connection with the State Court Action.

2.     On February 26, 2007, Plaintiff served each Defendant with a copy of the Summons and Verified Complaint. Defendants filed a Notice of Removal on March 1, 2007 and an Amended Notice of Removal on March 8, 2007. Defendants submit this Second Amended

Notice of Removal pursuant to 28 U.S.C. § 1653, to supplement their allegations to establish that this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (diversity of citizenship).  *See CBS Inc. v. Snyder*, 762 F. Supp. 71, 75 (S.D.N.Y. 1991) (defendant may amend notice of removal under 28 U.S.C. § 1653 to "set forth more specifically grounds for removal which were imperfectly stated in the original petition").

3.      The State Court Action is removable to this Court because the Court has original jurisdiction over the State Court Action.  The State Court Action is between citizens of different states and the matter in controversy in it exceeds the sum of $75,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(a).

## Plaintiff Is a Citizen of New York

4.      At the time of the commencement of the State Court Action and at the time of removal, plaintiff, Jericho Group, Ltd., was incorporated in the State of New York, with its principal place of business at 519 Flushing Avenue, Brooklyn, New York.  *See* Verified Complaint in the State Court Action ¶ 1.

## All Defendants Are Citizens of States Other Than New York

### A.      *The Individual Defendants Are Citizens of New Jersey*

5.      At the time of the commencement of the State Court Action and at the time of removal, Defendant Edward Imperatore was and is a citizen and resident of the State of New Jersey.  The address of Edward Imperatore is 105 Serpentine Road, Tenafly, New Jersey.

6.      At the time of the commencement of the State Court Action and at the time of removal, Defendant Maurice Stone was and is a citizen and resident of the State of New Jersey. The address of Maurice Stone is 114 Avondale Road, Ridgewood, New Jersey.

### B.    *Midtown Development, L.P. Is Not a Citizen of New York*

7.      At the time of the commencement of the State Court Action and at the time of removal, defendant Midtown Development, L.P. was and is a limited partnership organized under the laws of the State of New York.  The citizenship of a partnership is determined by the citizenship of all of its partners, not by the state under whose laws it is organized or the location of its place of business or property.  *See Carden v. Arkoma Assocs.*, 494 U.S. 185 (1990).

8.      At the time of the commencement of the State Court Action and at the time of removal, Midtown's only general partner was and is Jerrart Venture.  At the time of the commencement of the State Court Action and at the time of removal, Midtown's only limited partner was and is Consolidated Rail Corporation, as successor in interest to CRC Properties, Inc.

*Midtown's Only Limited Partner Is a Citizen of Pennsylvania*

9.      At the time of the commencement of the State Court Action and at the time of removal, Consolidated Rail Corporation was and is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

*Midtown's Only General Partner Is Not a Citizen of New York*

10.     At the time of the commencement of the State Court Action and at the time of removal, Jerrart Venture ("Jerrart") was and is a general partnership organized under the laws of the State of Illinois.  At the time of the commencement of the State Court Action and at the time of removal, Jerrart's only partners were and are WR West Side Associates ("WR West Side") and Hadrian Properties Ltd. ("Hadrian").

*Hadrian Properties Ltd. Is a Citizen of New Jersey and Pennsylvania*

11.     At the time of the commencement of the State Court Action and at the time of removal, Hadrian was and is a limited partnership organized under the laws of the State of New Jersey.  At the time of the commencement of the State Court Action and at the time of removal, Hadrian's only general partners were and are Hadrian Properties LLC and Fafner Enterprises, Inc.  At the time of the commencement of the State Court Action and at the time of removal, Hadrian's only limited partners were and are Arthur E. Imperatore, India H. Imperatore, defendant Edward G. Imperatore, and Arthur E. Imperatore, Jr.

12.     At the time of the commencement of the State Court Action and at the time of removal, Hadrian Properties LLC was and is a limited liability company organized under the laws of the State of New Jersey.  The citizenship of a limited liability company is determined by the citizenship of all its members.  *See Handelsman v. Bedford Village Associates Ltd. Partnership*, 213 F.3d 48, 51-52 (2d Cir. 2000).

13.     At the time of the commencement of the State Court Action and at the time of removal, the sole member of Hadrian Properties LLC was and is Arthur E. Imperatore.  At the time of the commencement of the State Court Action and at the time of removal, Arthur E. Imperatore was and is a citizen and resident of the State of New Jersey.  The address of Arthur E. Imperatore is 38 King Avenue, Weehawken, New Jersey.

14.     At the time of the commencement of the State Court Action and at the time of removal, Fafner Enterprises, Inc. was and is a New Jersey corporation with its principal place of business in Edgewater, New Jersey.  Its certificate of incorporation was revoked by the New Jersey State Treasurer in January 2007, but at the time of the commencement of the State Court Action and at the time of removal, Fafner Enterprises, Inc. could sue and be sued under New

Jersey law.  *See* N.J. Stat. Ann. 14A:12-9(2)(e) & 12-1(1)(a)(g).  It is therefore deemed a citizen of the State of New Jersey.  *See Dyotherm Corp. v. Turbo Mach. Co.*, 48 F.R.D. 380, 384 (E.D. Pa. 1969); *see also Bazak Int'l Corp. v. William Wedeen & Co.*, 496 F. Supp. 847, 848-49 (S.D.N.Y. 1980).

15.    At the time of the commencement of the State Court Acton and at the time of removal, India H. Imperatore was and is a citizen and resident of the State of Pennsylvania.  The address of India H. Imperatore is 1271 State Road, Lincoln University, Pennsylvania.

16.    At the time of the commencement of the State Court Action and at the time of removal, Arthur E. Imperatore, Jr. was and is a citizen and resident of the State of New Jersey. The address of Arthur E. Imperatore, Jr. is 223 Glenwood Road, Englewood, New Jersey.

*WR West Side Associates Is Not a Citizen of New York*

17.    At the time of the commencement of the State Court Action and at the time of removal, WR West Side was and is a limited partnership organized under the laws of the State of Illinois.  At the time of the commencement of the State Court Action and at the time of removal, WR West Side's only general partners were and are Edward W. Ross and the Jerrold Wexler Declaration of Trust dated October 15, 1990.  At the time of the commencement of the State Court Action and at the time of removal, WR West Side's only limited partners, for purposes of determining diversity of citizenship pursuant to 28 U.S.C. § 1332(a), were and are R-WIN Venture, the Jerrold Wexler Revocable Trust dated January 29, 1992, the Susan Wexler Trust Number 18, Javid LLC, and defendant Edward G. Imperatore.  *See* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Remand, *Jericho Group, Ltd. v. Midtown Dev., L.P.*, No. 07-CV-1792(RCC) (DCF) (S.D.N.Y. filed Apr. 13, 2007), at pp. 9-13.

18.    At the time of the commencement of the State Court Action and at the time of removal, Edward W. Ross was and is a citizen and resident of the State of Illinois.  The address of Edward W. Ross is 1240 North Lake Shore Drive, 29 A/B, Chicago, Illinois.

19.    At the time of the commencement of State Court Action and at the time of removal, the sole trustee of the Jerrold Wexler Declaration of Trust dated October 15, 1990 was and is Martin F. Hauselman.  The citizenship of a trust is determined by the citizenship of its trustee, provided that the trustee has the power to hold, manage, and dispose of assets for the benefit of the beneficiaries of the trust.  *See E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 931 (2d Cir. 1998); *Wells Fargo Bank N.W., N.A. v. TACA Int'l Airlines, S.A.*, 314 F. Supp. 2d 195, 199 (S.D.N.Y. 2003).  Martin F. Hauselman has the power to hold, manage, and dispose of assets for the benefit of the Jerrold Wexler Declaration of Trust dated October 15, 1990.

20.    At the time of the commencement of the State Court Action and at the time of removal, Martin F. Hauselman was and is a citizen and resident of the State of Illinois.  The address of Martin F. Hauselman is 818 West Junior Terrace, Chicago, Illinois.

21.    At the time of the commencement of the State Court Action and at the time of removal, R-WIN Venture was and is a limited partnership organized under the laws of the State of Illinois.  At the time of the commencement of the State Court Action and at the time of removal, R-WIN Venture's only partners were and are Edward W. Ross, Renee Ross, Ilene Ross, Nancy Ross Agostini, and William Ross.

22.    At the time of the commencement of the State Court Action and at the time of removal, Renee Ross was and is a citizen and resident of the State of Illinois.  The address of Renee Ross is 1240 North Lake Shore Drive, 29 A/B, Chicago, Illinois.

23.     At the time of the commencement of the State Court Action and at the time of removal, Ilene Ross was and is a citizen and resident of the State of Illinois.  The address of Ilene Ross is 2322 Winnetka Road, Northfield, Illinois.

24.     At the time of the commencement of the State Court Action and at the time of removal, Nanci Ross Agostini was and is a citizen and resident of the State of Illinois.  The address of Nanci Ross Agostini is 2250 Bracken Lane, Northfield, Illinois.

25.     At the time of the commencement of the State Court Action and at the time of removal, William Ross was and is a citizen and resident of the State of Florida.  The address of William Ross is 27231 Liriope Court, Wesley Chapel, Florida.

26.     At the time of the commencement of the State Court Action and at the time of removal, the sole trustee of the Jerrold Wexler Revocable Trust dated January 29, 1992 was and is Susan Wexler Mazzoni.  Susan Wexler Mazzoni has the power to hold, manage, and dispose of assets for the benefit of the trust.  At the time of the commencement of the State Court Action and at the time of removal, Susan Wexler Mazzoni was and is a citizen and resident of the State of Illinois.  The address of Susan Wexler Mazzoni is 55 West Delaware Place, Unit 1120, Chicago, Illinois.

27.     At the time of the commencement of the State Court Action and at the time of removal, the sole trustee of the Susan Wexler Trust Number 18 was and is Gregory Ciokajlo. Gregory Ciokajlo has the power to hold, manage, and dispose of assets for the benefit of the trust.  At the time of the commencement of the State Court Action and at the time or removal, Gregory Ciokajlo was and is a resident of the State of Illinois.  The address of Gregory Ciokajlo is 336 Delta Road, Highland Park, Illinois.

28.     At the time of the commencement of the State Court Action and at the time of removal, Javid LLC was and is a limited liability company organized under the laws of the State of Illinois.  At the time of the commencement of the State Court Action and at the time of removal, the sole members of Javid LLC were and are David Kipnis and Jeffrey Wolfson.

29.     At the time of the commencement of the State Court Action and at the time of removal, David Kipnis was and is a citizen and resident of the State of Illinois.  The address of David Kipnis is 1065 Eastwood Road, Glencoe, Illinois.

30.     At the time of the commencement of the State Court Action and at the time of removal, Jeffrey Wolfson was and is a citizen and resident of the State of Michigan.  The address of Jeffrey Wolfson is 7923 Loral Pine Drive, Ada, Michigan.

**The Jurisdictional Amount and Other Requirements for Removal Are Met**

31.     The amount in controversy in the above-captioned action exceeds the sum of $75,000, exclusive of interests and costs.  Plaintiff seeks damages of "not less than $100,000,000."  *See* Verified Complaint in the State Court Action ¶ 162.  Plaintiff also seeks specific performance of a contract for the sale of real property that is valued at more than $75,000, exclusive of interest and costs.  *See id.* ¶¶ 4-5, 8, 162.

32.     All Defendants join in this Amended Notice of Removal.

33.     The United States District Court for the Southern District of New York embraces the place where the State Court Action is pending.

34.     On March 1, 2007, Defendants filed a notice of filing of the Notice of Removal with the Clerk of the Court of the Supreme Court of the State of New York, New York County, as required by 28 U.S.C. § 1446(d).

Dated: New York, New York
　　　April 13, 2007

Respectfully submitted,

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939


By:　 / s / Todd R. Geremia
　　　Fredrick E. Sherman (FS 5442)
　　　Todd R. Geremia (TG 4454)


—and—

PHILLIPS NIZER LLP
Alfred D. Lerner (AL 5927)
George Berger (GB 8924)
666 Fifth Avenue
New York, New York  10103-0084
Telephone:  (212) 977-9700

Attorneys for Defendants,
Midtown Development, L.P., Edward
Imperatore, and Maurice Stone