UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

JERICHO GROUP, LTD.,                            :
                                                :
                  Plaintiff,                    :
                                                :
                                                :
            - against -                         :    No. 07-CV-1792 (RCC) (DCF)
                                                :
                                                :    ECF CASE
MIDTOWN DEVELOPMENT, L.P., EDWARD                :
IMPERATORE and MAURICE STONE,                   :
                                                :
                                                :
                  Defendants.                   :

------------------------------------------------------------X

## DECLARATION OF EDWARD IMPERATORE

I, EDWARD G. IMPERATORE, declare as follows:

1.      I am a defendant in above-captioned case.

2.      I am a citizen of the United States of America.

3.      My domicile is in the State of New Jersey, and my home address is 105 Serpentine Road, Tenafly, New Jersey. That was also my home address for all of February and March of 2007. For all of February and March of 2007, I intended, and still intend now, for my domicile to remain in the State of New Jersey.

4.      I am a limited partner in WR West Side Associates, a limited partnership organized under Illinois law. I am also a limited partner in Hadrian Properties, Ltd., a limited partnership organized under New Jersey law.

5.      WR West Side Associates and Hadrian Properties, Ltd. are the only partners in Jerrart Venture, which is a general partnership organized under Illinois law. Jerrart Venture is now, and has been since May 28, 1987, the only general partner in Midtown Development, L.P.

A copy of the Joint Venture Agreement of Jerrart Venture, dated February 3, 1987, is attached hereto as Exhibit A.

6.      Midtown Development, L.P., which is also a defendant in the above-captioned action, is a limited partnership organized under New York law.  A copy of the partnership agreement for Midtown Development, L.P. and a First Amendment to it, dated March 18, 1987, is attached hereto as Exhibit B.  A copy of a Second Amendment to the Certificate of Limited Partnership for Midtown Development, L.P., dated May 28, 1987, is attached as Exhibit J to the Affidavit of Herbert Rubin, dated March 29, 2007 and submitted in support of plaintiff's motion to remand, filed in this action on March 30, 2007.

7.      When Midtown Development, L.P. was formed, its only limited partner was CRC Properties, Inc.  CRC Properties, Inc. merged into Consolidated Rail Corporation in May 1999.  A "Certificate of Ownership and Merger, Merging CRC Properties, Inc. (a Delaware Corporation) Into Consolidated Rail Corporation (a Pennsylvania Corporation)," dated May 17, 1999, is attached hereto as Exhibit C.

8.      Consolidated Rail Corporation, as successor in interest to CRC Properties, Inc., was the only limited partner of Midtown Development, L.P. in February and March of 2007 and is still today the only limited partner of Midtown Development, L.P.  Consolidated Rail Corporation is a Pennsylvania corporation, with its principal place of business in Philadelphia, Pennsylvania.

9.      I declare under penalty of perjury that the foregoing is true and correct.

Executed within the United States on April **6**, 2007.

_____
EDWARD G. IMPERATORE

# EXHIBIT A
# TO IMPERATORE DECLARATION

JOINT VENTURE AGREEMENT

OF

JERRART VENTURE

AGREEMENT made as of February 3, 1987 by and between
WR West Side Associates, an Illinois limited partnership ("WR")
and Hadrian Properties Ltd., a New Jersey limited partnership
("Hadrian").  Each of the foregoing is sometimes called Partner and
both of the foregoing are sometimes collectively referred to as
"Partners".

1.  Name and Business.  The parties do hereby form a joint
venture under the name of Jerrart Venture, an Illinois general
partnership, (hereinafter called "Partnership") to carry on the
business of investing in real property by directly or indirectly
acquiring and holding an interest in the property described in
Exhibit A attached hereto and made a part hereof ("Property") or
in a general or limited partnership owning or acquiring the Property
and/or other property, and improving, developing, holding for in-
vestment, maintaining, operating, mortgaging, managing, leasing,
exchanging, otherwise exploiting and ultimately disposing of the
Property and/or other property; to engage in any other lawful
activity; and to invest in other properties and investments and
to engage in any and all activities related and incidental thereto
as may be deemed appropriate by the Partners.

2.  Office.  The office of the partnership shall be located
at such location or locations as the Partners may from time to
time designate.

3.  Term.  The term of the Partnership shall begin on February
3, 1987 and shall continue until December 31, 2037 unless sooner

MID 00790

terminated as provided herein.

4.  <u>Capital Contributions</u>.  On not less than 15 days prior
written call for capital contributions, the Partners shall
contribute capital to or make loans to the Partnership in such
total amount as the Partners shall determine from time to time
is required in the interest of the Partnership and such capital
or loans shall be contributed or made by the Partners in the
respective percentages set forth in Paragraph 6.  Loans to the
Partnership made by the Partners pursuant to this Paragraph 4
shall be on such terms as the Partners shall determine from time
to time.

5.  <u>Profit and Loss</u>.  The net profits of the Partnership
shall be divided among the Partners and the net losses of the
Partnership shall be borne by the Partners in the respective
percentages set out in Paragraph 6.

6.  <u>Partners' Percentages</u>.  The respective percentages re-
ferred to in preceding Paragraphs 4 and 5 are as follows:

|  |  |
|---|---|
| WR | 50% |
| Hadrian | 50% |

7.  <u>Management, Duties, and Restrictions</u>.

(a)  The Partners shall have full charge of the
management, conduct, and operation of the partnership business
in all respects and in all matters, including but not limited to
full power to make all decisions with respect to acquisition,
improvement, operation, maintenance, leasing, and use of the
Property and other property, to become a general or limited partner
in other partnerships in furtherance of the Partnership business,
to borrow money, and to mortgage, sell, and convey the personal

MID 00791

and real property, or any part thereof, owned by the Partnership
on such terms as they may determine.

      (b)  The Partners are authorized and empowered to determine
all questions relating to the conduct and management of the Part-
nership business, and the determination of the Partners on any such
question (excepting, and not including, the determination of the
interest or share of any Partner in the capital, net profits, or
net losses of the Partnership, or the claims of any Partner against
the Partnership, or its claims against such Partner) shall be
binding on all Partners.  The Partners are authorized and empowered,
on behalf of the Partnership, to establish and maintain reserves
for working capital and against future expenses, replacements, and
capital improvements, to borrow (from any Partner or third party)
or lend money, make, deliver, or accept any commercial paper,
execute any mortgage, bond, lease, deed, release, or agreement,
purchase or contract to purchase, or sell or contract to sell any
property, compromise or release any of its claims or debts, hire
any person or discharge any person, and obligate the Partnership
in an amount and withdraw any money of the Partnership.  Each of
the  Partners agrees to execute or cause to be executed such
personal guarantees as may from time to time be required by lenders
in connection with loans made to the Partnership.  No Partner,
except with the consent of all other Partners, shall withdraw
its capital contribution, in whole or in part, or assign, create
a security interest in, or sell its share in the Partnership or
in its capital, assets, or property (except in accordance with the
express provisions of this Agreement), or enter into any agreement

MID 00792

as a result of which any other person, firm, or corporation shall become interested with it in the Partnership, or do any act detrimental to the best interests of the Partnership, or which would make it impossible to carry on the ordinary business of the Partnership.

(c)  Each Partner may have other business interests and may engage in any other business or trade, profession, or employment whatsoever, on its own account, or in partnership with or as an employee of or as an officer, director, or shareholder of any other person, firm, or corporation, and it shall not be required to devote its entire time to the business of the Partnership.  No Partner shall be obligated to devote more time and attention to the conduct of the business of the Partnership than shall be deemed by all of the Partners, including such Partner, to be required for the business of the Partnership.  Without the consent of the other Partners, no Partner shall receive any salary or other special compensation for services to be rendered by it.

(d)  Except with respect to the provisions of Paragraphs 11 and 12, below, the affirmative vote of both WR and Hadrian is required for all acts and decisions of the Partnership and the signatures of both WR and Hadrian are necessary to bind the Partnership.

8.  Banking.  All funds of the Partnership shall be deposited and kept in its name in such Partnership bank account or accounts as shall be designated by the Partners.  All withdrawals therefrom shall be made upon checks signed by any one Partner or more than one Partner as shall be determined by the Partners.

MID 00793

9. _Books_. The Partnership shall maintain full and accurate books of account which shall be kept at the principal Partnership office. All transactions of or relating to the Partnership or its business shall be entered in such books. Each Partner shall have access to and the right to inspect and copy such books and all other Partnership records.

10. _Annual Accounting_. (a) As of the last day of December of each year during the continuance of the Partnership, commencing December 31, 1987, a full, true, and accurate account shall be made in writing of all of the assets and liabilities of the Partnership, and of all of its receipts and disbursements, and the assets, liabilities, and income, both gross and net, shall be ascertained, and the net profits or net losses shall be fixed and determined; and the account of each Partner shall thereupon be credited or debited, as the case may be, with its share (as specified in Paragraph 6) of such net profits or losses. In preparing such account, there shall be charged all expenses of the business, and also, all losses and other charges incident or necessary to the carrying on of the business.

(b) The funds of the Partnership shall be distributed to the Partners in proportion to the outstanding capital contributions at such time and in such amounts as the Partners may see fit. Net profits shall augment the individual capital accounts of each Partner and net losses shall diminish the capital accounts in accordance with the respective interests set forth in Paragraph 6.

11. _Failure to Contribute Capital_. In the event that any Partner's capital contribution or loan is not received by the

MID 00794

in the call therefor) then the remedies which shall be available
to the Partnership or to the Partners in law or in equity shall
be the following:

(a)  The percentage interest in the capital and the
future profits and losses of the Partnership of the delinquent
Partner shall be accordingly reduced and the aggregate interests
of the non-delinquent Partners in the capital and future profits
and losses of the Partnership shall be correspondingly increased
on a basis pro-rated in accordance with their interests in the Part-
nership profits and losses prior to the call.  In making such
adjustment, the delinquent Partner's failure to make a loan shall
be treated as though it had failed to make a capital contribution
in the amount of such loan.

(b)  The non-delinquent Partners may elect to have the
Partnership purchase the entire Partnership interest of the
delinquent Partner for a purchase price equal to the "net invest-
ment" theretofore made by the delinquent Partner less his pro-rata
share of depreciation with respect to the Partnership's property
theretofore recorded on the books of the Partnership as of the
due date as stated in the call.  "Net investment" means the total
cash or agreed value of other property theretofore contributed by
such delinquent Partner to the capital of the Partnership.  Such
election must be made within sixty (60) days after the date when
such additional contribution is due in accordance with the terms of
this Paragraph 11.  If such election is made, the purchase price
of the delinquent Partner's interest shall be paid to him in cash
not later than sixty (60) days after such election is made.  The

MID 00795

delinquent Partner shall thereupon cease to be a Partner and shall have no further Partnership obligations and the Partnership shall indemnify and hold harmless the delinquent Partner against any such further obligations including but not limited to any guarantee by such delinquent Partner of any Partnership loans.

(c)  The non-delinquent Partners may elect to admit additional Partners to the Partnership to supply the capital contribution of the delinquent Partner or to purchase the entire Partnership interest of the delinquent Partner on the terms set forth in Paragraph 11 (b), or both.

(d)  The non-delinquent Partners may enforce the delinquent Partner's obligation to make a capital contribution or loan, as the case may be, by a suit for specific performance, the Partners hereby acknowledging that it will be impossible to ascertain the damage to the Partnership caused by the delinquent Partner's failure to make such capital contribution or loan.

12.  _Transfers_.  Except as hereinafter provided, no Partner may make any _inter vivos_ transfer of its interest in the Partnership or any part thereof other than by _bona fide_ sale.  In the event of a contemplated _bona fide inter vivos_ sale by a Partner of all or any part of its interest in the Partnership, the Partnership and each of the other Partners shall have the prior right to purchase said interest or said part thereof in the manner hereinafter provided:

(a)  All offers to purchase must be in writing.  The selling Partner shall forthwith give the Partnership and all the other Partners written notice of the name and address of the offeror

MID 00796

and the price and all terms and conditions of the proposed sale
together with a true and complete copy of the written offer.

(b)  The non-selling Partners on behalf of the Partnership
shall within thirty (30) days after mailing of the selling Partner's
notice serve their notice on the selling Partner and all the other
Partners of the Partnership's election to purchase, or its election
not to purchase, all of the interest which is the subject matter
of the proposed sale at the price and upon the terms and conditions
specified in the selling Partner's notice.

(c)  In the event that the Partnership shall elect not
to purchase the full interest to be sold in the manner set forth
in Paragraph 12 (b), each of the non-selling Partners may, within
thirty (30) days after the mailing of the notice with respect to
the Partnership's decision give notice to the selling Partner and to
the remaining Partners, of its desire to exercise its option to
purchase its pro-rata share (based on the ratio of such interest
or part thereof which equals the ratio of its share in net profits
and losses to the share in net profits and losses of all Partners
other than the selling Partner) of the selling Partners' interest
or part thereof as is within the contemplated sale upon the terms
and conditions and at the price specified in the selling Partner's
notice to it.  A second option, to be exercised within forty-five
(45) days after the mailing of the said Partnership's decision
is hereby granted to the Partners who exercised such first option
to acquire (pro-rata as among themselves in accordance with their
interests as of the date of the giving of the original notice)

the share as to which a Partner has not exercised its first
option.

(d)  Unless the Partnership or the remaining Partners
shall have exercised their options within said seventy-five (75) day
period in such a manner as to purchase all of such interest of the
selling Partner as is within the contemplated sale, the selling
Partner shall be free to dispose of such interest for an additional
period of sixty (60) days but only in the manner and on the terms
stated by it in its original notice to the Partnership and the other
Partners.  In the event that the selling Partner fails thus to
dispose of said interest or part thereof during such period, the
provisions hereof shall be applicable to any further contemplated
disposition by said Partner of its interest or any part thereof.

(e)  No purported assignment of any Partner's interest
shall be valid unless made in accordance with the terms and pro-
visions of this Agreement and if such assignment is to one not
theretofore a party to this Agreement unless such assignee shall
prior to the making of such assignment execute and deliver to the
other Partners an instrument in writing signifying its consent to
be bound by the terms of this Agreement as then amended and
assuming as a Partner all the terms and provisions of this Agree-
ment as then amended.  It is mutually agreed that the continuing
and surviving Partners shall accept as a Partner in this Partnership
any assignee who has succeeded to an interest in accordance with
this subparagraph.

13.  Withdrawal of a Partner.  (a)  In the event that any
Partner withdraws from the Partnership prior to the expiration of

MID 00798

the term of this Partnership or the dissolution of the Partnership pursuant to the provisions of Paragraph 15, (the "Withdrawing Partner") each of the remaining Partners shall have the option, exercisable within sixty (60) days after receipt of written notice of such withdrawal, to purchase its pro-rata share (as defined in Paragraph 12 (c)) of the entire interest of the Withdrawing Partner in the Partnership and in the Partnership assets at a price equal to 80% of the Withdrawing Partner's net cash investment in the Partnership and in the assets as of the last day of the month in which such notice of withdrawal is given.  If one or more of the remaining Partners does not purchase its proportionate share of the Withdrawing Partner's interest, the remaining portion of the Withdrawing Partner's interest may be purchased proportionately by those of the remaining Partners who wish to purchase the balance of said interest.  The net cash investment of a Withdrawing Partner shall be the cash invested by said Partner minus withdrawals or distributions of any kind which have been paid or credited to said Partner.  The net cash investment of any Withdrawing Partner shall be determined by the certified public accounting firm then employed by the Partnership, and said determination by said accountants shall be final and conclusive on the Partners and their successors in interest.

      (b)  If the option set forth above in this Paragraph 13 (a) is not exercised with respect to a Withdrawing Partner's entire interest, then on the effective date of said withdrawal the remaining Partners (if there are more than one) shall be treated as having formed a new Partnership without the Withdrawing Partner

MID 00799

on terms and conditions identical hereto (including the provisions

of this Paragraph 13) and such new Partnership, or if no new

Partnership is formed, then the non-withdrawing Partner, on the

one hand, and the Withdrawing Partner, on the other, shall own

the Partnership assets (other than the Withdrawing Partner's

interest in the Partnership) as tenants in common until such time

as the same may be, and are sold with the consent of co-tenants

owning a 75.00 per cent or greater interest in the tenancy in

common.  In determining whether co-tenants owning a 75.00 per cent

or greater interest in the tenancy in common consent to the sale

or other disposal of the Partnership assets (other than the

Withdrawing Partner's interest in the Partnership), the non-

withdrawing Partners and the Withdrawing Partner shall be deemed

to own the same percentage interest in the tenancy in common that

they would have held in the Partnership itself if the Partnership

continued to hold the entire interest in the Partnership assets

at the time consent to said sale is sought.  Other decisions re-

lating to the management and operation of the property owned by

the Partnership immediately prior to the withdrawal of the With-

drawing Partner shall be made solely by the new Partnership or

the non-withdrawing Partner, as the case may be, in accordance

with the provisions of Paragraph 7 without regard to the consent

of the Withdrawing Partner thereto.  In the event the option set

forth in this Paragraph 13 (b) is not exercised with respect to

a Withdrawing Partner's entire interest, the Withdrawing Partner

hereby waives, for the benefit of its heirs, successors, assigns,

legal representatives, trustees, successor trustees and con-

MID 00800

servators, any rights which it may have pursuant to the Uniform
Partnership Act as enacted in the State of Illinois.

14. <u>Bankruptcy of a Partner</u>.  (a)  Notwithstanding anything
to the contrary contained in this Agreement, in the event that any
Partner shall be adjudicated a bankrupt, each of the other Partners
shall have the option, exercisable within ninety (90) days after
such adjudication, to purchase its pro-rata share (as defined in
Paragraph 12 (c)) of the bankrupt's entire interest in the Partner-
ship and in the Partnership assets at a price equal to 80% of the
net cash investment of the said bankrupt Partner in the Partnership
and in the Partnership assets as of the last day of the month in
which such adjudication occurs.  If one or more of said other
Partners does not purchase its proportionate share of the bankrupt
Partner's interest, the remaining portion of the bankrupt Partner's
interest may be purchased proportionately by those of the purchasing
Partners who wish to purchase the balance of said interest.  The
net cash investment of any bankrupt Partner shall be the cash in-
vested by the bankrupt Partner minus withdrawals or distributions
of any kind which have been paid or credited to said bankrupt
Partner.  The net cash investment of any bankrupt Partner shall be
determined by the certified public accounting firm then employed
by the Partnership, and said determination by said accountants
shall be final and conclusive on the Partners and their successors
in interest.

(b)  If the option set forth in Paragraph 14 (a) is not
exercised as to the bankrupt Partner's entire interest, then as of

MID 00801

the last day of the month in which such adjudication of bankruptcy
occurs the non-bankrupt Partners shall be treated as having formed
a new Partnership without said bankrupt Partner on the terms and
conditions identical hereto (including the provisions of this
Paragraph 14) and such new Partnership, or if no new Partnership
is formed, then the non-withdrawing Partner, on the one hand, and
such bankrupt Partner or the successor or successors in interest
thereof, shall own the Partnership assets of this Partnership as
tenants in common until such time as the same may be, and are sold
with the consent of co-tenants owning a 75.00 per cent or greater
interest in the tenancy in common.  In determining whether co-tenants
owning a 75.00 per cent or greater interest in the tenancy in common
consent to the sale of the Partnership assets (other than the
bankrupt Partner's interest in the Partnership), the remaining
Partners and the bankrupt Partner shall be deemed to own the same
percentage interest in the tenancy in common that they would have
held in the Partnership itself if the Partnership continued to hold
the entire interest in the Partnership assets at the time consent
to said sale is sought.  Other decisions relating to the management
and operation of the property owned by the Partnership immediately
prior to the withdrawal of the Withdrawing Partner shall be made
solely by the new Partnership or the non-withdrawing Partner, as
the case may be, in accordance with the provisions of Paragraph 7
without regard to the consent of the bankrupt Partner thereto.

  15.  <u>Procedure on Liquidation</u>.  At the termination of this
Partnership by the expiration of its term, or whenever the Partners

MID 00802

determine that the Partnership should be liquidated, the Partners shall proceed with reasonable promptness to liquidate the business of the Partnership. The profits and losses of the business during the period of liquidation shall be divided among or be borne by the Partners in the respective percentages in which they shared in such profits and losses prior to the event which resulted in such liquidation. After the payment of Partnership debts, expenses of liquidation, and any loans by Partners to the Partnership, the proceeds of liquidation, as realized, shall be distributed, first, in discharge of the undrawn profits of the Partners, and then proportionately in discharge of the respective capital accounts. Any excess shall be distributed among the Partners in the respective percentages in which they shared Partnership profits immediately prior to the event which resulted in such liquidation. In connection with such liquidation, the Partners shall have the sole discretion as to whether to sell any Partnership asset, including but not limited to real estate, and if so, whether at public or private sale and for what amount and on what terms, or whether (if sale thereof is not required to enable payment of debts, expenses of liquidation, loans by Partners, and undrawn profits of the Partners) to distribute and transfer the same to and among the Partners in kind by transferring interests therein in the respective percentages in which profits and losses were shared immediately prior to the event which resulted in such liquidation. In the event that the Partners determine to sell any real property, they shall not be required to sell the same promptly, but they shall have full right and discretion to determine the time when and manner in which such sale or sales shall be had, having due regard to the activity and

MID 00803

condition of the real estate market and general financial and economic conditions.

16. <u>Notices</u>. Wherever provision is made in this Agreement for the giving, service, or delivery of any notice, call, statement, or other instrument, it shall be deemed to have been duly given, served, and delivered, if served personally or if mailed by United States registered or certified mail, addressed to the party entitled to receive the same at the most recent address communicated in writing by such party to the other Partners. Any notice, call, statement, or other instrument shall be deemed to have been given, served, and delivered three days after the date on which such notice was mailed as herein provided.

17. <u>Merger of Prior Agreements</u>. This Agreement contains the sole and entire Agreement and understanding of the parties with respect to the entire subject matter hereof. Any and all prior discussions, negotiations, commitments, and understandings relating thereto are hereby merged herein. This Agreement cannot be changed or terminated orally.

18. <u>Benefit</u>. The covenants and agreements herein contained shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

19. <u>Governing Law</u>. This Agreement shall be governed by the

law of the State of New York.

In witness whereof, the parties hereto have executed this Agreement as of the day and year first above written.

WR West Side Associates

By: _____
Jerrold Wexler

By: _____
Edward W. Ross
Its General Partners

Hadrian Properties Ltd.

By:  Fafner Enterprises, Inc.

By: _____
President

By: _____
Arthur E. Imperatore
Its General Partners

## EXHIBIT A

Parcel No. 1

BEGINNING at a point in the northerly line of West 38th Street, distant 340 feet 7 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 38th Street; (1) running thence westerly, along the northerly line of West 38th Street, 109 feet 5 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 98 feet 9 inches to the center line of block; (3) thence easterly, parallel with the northerly line of West 38th Street and along the center line of block, 50 feet 0 inches; (4) thence northerly, parallel with the westerly line of Tenth Avenue, 46 feet 4 inches; (5) thence easterly, parallel with the southerly line of West 39th Street, 7 feet 0 inches; (6) thence northerly, parallel with the westerly line of Tenth Avenue, 7 feet 0 inches; (7) thence westerly, parallel with the southerly line of West 39 Street, 7 feet 0 inches; (8) thence northerly, parallel with the westerly line of Tenth Avenue, 45 feet 5 inches to a point in the southerly line of West 39th Street; (9) thence easterly, along the southerly line of West 39th Street, 96 feet 8 inches; (10) thence southerly, along a line forming an angle of 79 degrees 19 minutes 10 seconds on its westerly side with the preceding course, 200 feet 11 3/4 inches to the point or place of BEGINNING.

CONTAINING 20,303.35 square feet, more or less, or 0.4661 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORTATION PURPOSES:

Parcel No. 1

THIS easement right is across and through the aforesaid described Parcel No 1 and is situate below the upper inclined plane having an elevation of 23.61 at the northerly line of West 38th Street and an elevation of 21.86 at the southerly line of West 39th Street. The elevations refer to datum used by the Topgraphical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 23.61 feet at the northerly line of West 38th Street and an elevation of 21.86 feet at the southerly line of West 39th Street, bounded and described as follows:

BEGINNING at a point in the northerly line of West 38th Street, distant 380 feet 4 1/2 inches westerly of the corner formed by the intersection of the northerly line of West 38th Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 38th Street, 56 feet 11 7/8 inches; (2) thence northerly, along a line forming an angle of 79 degrees 17 minutes 17 seconds on its easterly side with the preceding course, 201 feet 0 inches to a point in the southerly line of West 39th Street; (3) thence easterly, along the southerly line of West 39th Street, 56 feet 11 7/8 secondss; (4) thence southerly, along a line forming an angle of 100 degrees 42 minutes 43 seconds on its easterly side with the southerly line of West 39th Street, 201 feet 0 inches to the point or place of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

Parcel No. 2

BEGINNING at a point in the northerly line of West 43rd Street distant 125 feet 0 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 43rd Street; (1) running thence westerly, along the northerly line of West 43rd Street, 100 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 44th Street; (3) thence easterly, along the southerly line of West 44th Street, 100 feet 0 inches; (4) thence southerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to the point or place of BEGINNING.

CONTAINING 20,083 square feet, more or less, or 0.461 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORATION PURPOSES:

Parcel No. 2

THIS easement right is across and through the aforesaid described Parcel No. 2 and is situate below the upper inclined plane having an elevation of 17.08 at the northerly line of West 43rd Street and an elevation of 19.18 at the southerly line of West 44th Street. The elevations refer to the datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, Mean sea level, Sandly Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 17.08 feet at the northerly line of West 43rd Street and an elevation of 19.18 feet at the southerly line of West 44th Street bounded and described as follows:

BEGINNING at a point in the northerly line of West 43rd Street, distant 145 feet 10 inches westerly of the corner formed by the intersection of the northerly line of West 43rd Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 43rd Street, 56 feet 0 inches; (2) thence northerly, along a line forming an angle of 89 degrees 54 minutes 40 seconds on its easterly side with the preceding course, 200 feet 10 inches, to a point in the southerly line of West 44th Street; (3) thence easterly, along the southerly line of West 44th Street, 56 feet 0 inches; (4) thence southerly, along a line forming an angle of 90 degrees 5 minutes 20 seconds on its easterly side with the southerly line of West 44th Street, 200 feet 10 inches to the point of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

Parcel No. 3

BEGINNING at a point in the northerly line of West 47th Street distant 125 feet 0 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 47th Street; (1) running thence westerly, along the northerly line of West 47th Street, 100 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 48th Street; (3) thence easterly, along the southerly line of West 48th Street, 100 feet 0 inches; (4) thence southerly, parallel with the westerly line of a Tenth Avenue, 200 feet 10 inches to the point or place of BEGINNING.

CONTAINING 20,083 square feet, more or less, or 0.461 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORTATION PURPOSES:

Parcel No.3

THIS easement right is across and through the aforesaid described Parcel No.3 and is situate below the upper inclined plane having an elevation of 27.87 at the northerly line of West 47th Street and an elevation of 30.00 at the southerly line of West 48th Street. The elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 27.87 feet at the northerly line of West 47th Street and an elevation of 30.00 feet at the southerly line of West 48th Street, bounded and described as follows:

BEGINNING at a point in the southerly line of West 47th Street, distant 145 feet 3 inches westerly of the corner formed by the intersection of the northerly line of West 47th Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 47th Street, 56 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 48th Street; (3) thence easterly, along the southerly line of West 48th Street, 56 feet 0 inches; (4) thence southerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to the point of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

## PARTNERSHIP AFFIDAVIT

STATE OF NEW JERSEY )
                     )    SS.
COUNTY OF HUDSON    )

       **EDWARD W. ROSS**, being duly sworn upon his oath, deposes and says:

1. I am a General Partner of **WR WEST SIDE ASSOCIATES**, which in turn is a General Partner of **JERRART VENTURE**, an Illinois General Partnership (the "Partnership") duly formed in and governed by the laws of the State of Illinois.

2. The Partnership was formed pursuant to a Joint Venture Agreement dated February 3, 1987 (the "Partnership Agreement"), a true copy of which is attached to this Affidavit.

3. There has been no change in the Partnership Agreement between the date of formation of the Partnership and the date of this Affidavit, and the general partners of the Partnership are WR West Side Associates and Hadrian Properties, Ltd.

4. I, on behalf of WR West Side Associates., and Arthur E. Imperatore on behalf of Hadrian Properties, Ltd., are authorized by the Partnership Agreement to execute the Deed and all other closing documents relative to the sale of **Lot 24, Block 1076, New York, New York** (the "Property").

5. This Affidavit is made to induce Purchaser to accept conveyance of the Property, known full well that Purchaser will rely on the facts set forth in this Affidavit.

                             By: _____
                                 EDWARD W. ROSS

**SWORN AND SUBSCRIBED** to before
me this 5th day of March, 2003.

_____

OFFICIAL SEAL
PATRICE A ALPERT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/26/05

                               MID 00809

*1103951*

# EXHIBIT B
# TO IMPERATORE DECLARATION

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

# MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

MID 00759

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Table of Contents |  | 1 |
| Glossary |  | 4 |
| ARTICLE I | Definitions | 5 |
| Section 1.1. | Definitions | 6 |
| ARTICLE II | Purpose | 7 |
| Section 2.1. | Purpose; Limitations | 7 |
| ARTICLE III | Formation of the Partnership | 8 |
| Section 3.1. | Formation; Name | 8 |
| Section 3.2. | Principal Office | 8 |
| Section 3.3. | Termination | 8 |
| ARTICLE IV | Capital; Additional Funds; Loans by Partners | 8 |
| Section 4.1. | Amounts Contributed | 8 |
| Section 4.2. | Additional Funds | 8 |
| Section 4.3. | No Additional Capital Contributions | 9 |
| Section 4.4. | Loans of Partners | 9 |
| Section 4.5. | Interest | 9 |
| Section 4.6. | Capital Accounts | 9 |
| ARTICLE V | Management of the Partnership | 10 |
| Section 5.1. | Management | 10 |
| Section 5.2. | Limited Partners | 12 |
| Section 5.3. | Duties and Independent Activities | 12 |
| Section 5.4. | Limitation of Liability | 13 |
| Section 5.5. | Indemnification | 13 |
| Section 5.6. | Actions Requiring Consent | 13 |
| Section 5.7. | Partition | 13 |
| Section 5.8. | Deposits of Funds | 13 |
| Section 5.9. | Fees | 14 |
| ARTICLE VI | Cash Distributions | 14 |
| Section 6.1. | Times of Distribution | 14 |

-1-

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE VII | Profits, Gains and Losses | 14 |
| Section 7.1. | Allocation of Net Profits and Net Losses | 14 |
| Section 7.2. | Allocation of Gains | 15 |
| ARTICLE VIII | Sales and Mortgage Proceeds | 15 |
| Section 8.1. | Sale and Refinancing | 15 |
| Section 8.2. | Reduction of Reserve | 16 |
| ARTICLE IX | Transfers of Limited Partners' Interests | 16 |
| Section 9.1. | Transfers by Limited Partners | 16 |
| Section 9.2. | Assignment of Rights to Distributions by Limited Partners | 17 |
| Section 9.3. | Costs and Expenses | 17 |
| ARTICLE X | Withdrawal and Removal of Partners | 17 |
| Section 10.1. | Limited Partners | 17 |
| Section 10.2. | Net Worth | 17 |
| Section 10.3. | General Partners | 17 |
| Section 10.4. | Additional Partners | 18 |
| ARTICLE XI | Option to Purchase | 18 |
| Section 11.1. | Right of First Refusal | 18 |
| Section 11.2. | Assignability | 19 |
| ARTICLE XII | Termination of Dissolution of Partnership | 19 |
| Section 12.1. | By Agreement or Upon Sale of Assets | 19 |
| Section 12.2. | Retirement of General Partner | 19 |
| Section 12.3. | Interest of Retired General Partner | 20 |
| Section 12.4. | Retirement in Violation of Agreement; Insolvency | 20 |
| Section 12.5. | Termination | 20 |

MID 00761

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **ARTICLE XIII** | Books and Reports | 21 |
| Section 13.1. | Books of Accounts | 21 |
| Section 13.2. | Goodwill | 21 |
| Section 13.3. | Statements | 21 |
| Section 13.4. | Election under Section 754 of the Code | 22 |
| **ARTICLE XIV** | Further Documents | 22 |
| Section 14.1. | Execution by Limited Partners | 22 |
| **ARTICLE XV** | Amendment of Agreement | 22 |
| Section 15.1. | Amendment by Majority Action | 22 |
| Section 15.2. | Delivery of Copies | 23 |
| **ARTICLE XVI** | Miscellaneous | 23 |
| Section 16.1. | Notices | 23 |
| Section 16.2. | Complete Agreement | 23 |
| Section 16.3. | Severability | 24 |
| Section 16.4. | Ratification | 24 |
| Section 16.5. | Binding upon Successors | 24 |
| Section 16.6. | Rights of Third Parties | 24 |
| Section 16.7. | Governing Law | |
| Section 16.8. | Captions | 24 |
| Section 16.9. | Counterparts | 24 |
| Section 16.10. | Sense and Gender of Words | 24 |
| Section 16.11. | Investment Representation | 24 |

* * * * *

| Exhibit A | Real Property Description |
|---|---|
| Exhibit B | Form of Certificate of Limited Partnership |

-3-

MID 00762

3:49

# GLOSSARY

| Term | Provision of Agreement |
|------|------------------------|
| Act | 1.1.1 |
| Affiliate | 1.1.2 |
| Approved General Partner Designee | 1.1.3 |
| Building | 1.1.4 |
| CRCP | Heading |
| Capital Contributions | 1.1.5 |
| Certificate of Limited Partnership | 1.1.6 |
| Certificate of Occupancy | 1.1.7 |
| Class A Limited Partner | 1.1.8 |
| Class B Limited Partner | 1.1.9 |
| Class C Limited Partner | 1.1.10 |
| Code | 1.1.11 |
| Conrail | 2.1 |
| General Partners | 1.1.12 |
| Immediate Family | 1.1.13 |
| In Interest | 1.1.14 |
| Indemnified Parties | 5.5 |
| Limited Partners | 1.1.15 |
| Net Losses | 1.1.16 |
| Net Profits | 1.1.16 |
| Partners | 1.1.17 |
| Partnership | 1st Recital |
| Person | 1.1.18 |
| Property | 1.1.19 |
| Sale | 8.1 |

MID 00763

AGREEMENT, made as of the _____ day of _____, 1985, by and among ARTHUR E. IMPERATORE, JERROLD WEXLER and EDWARD W. ROSS, as general partners, and CRC PROPERTIES, INC. ("CRCP"), a Delaware corporation, as limited partner.

## W I T N E S S E T H:

WHEREAS, the parties hereto desire to form a limited partnership (the "Partnership") to acquire, own, improve and manage certain real property described in Exhibit A annexed hereto in the City, County and State of New York;

NOW, THEREFORE, in consideration of the premises, the parties do hereby agree as follows:

## ARTICLE I

## Definitions

SECTION 1.1. Definitions. As used herein, the following terms shall have the following respective meanings:

1.1.1 "Act" means the Uniform Limited Partnership Act of the State of New York.

1.1.2 "Affiliate" means any Person controlled by, controlling or as under common control with any General Partner.

1.1.3 "Approved General Partner Designee" means the following Persons:

C.A. Cataldo
Edward G. Imperatore
Ira A. Kipnis
Richard Melosh
Armand Pohan
Donald A. Smith

1.1.4 "Buildings" means the buildings and improvements which comprise a part of the Property (as hereinafter defined), as the same may be altered and reconstructed and/or erected from time to time.

1.1.5 "Capital Contributions" means the amounts contributed and to be contributed by the partners to the Partnership pursuant to the provisions of this Agreement.

-5-

1.1.6  "Certificate of Limited Partnership" means the Certificate of Limited Partnership of the Partnership, as amended from time to time. Unless the context requires otherwise, any reference to the "Certificate of Limited Partnership" shall be to the Certificate of Limited Partnership as the same shall be in effect at the time to which such reference relates. The Certificate of Limited Partnership annexed hereto as Exhibit B shall be filed by the General Partners promptly after execution of this Agreement; and the General Partners shall cause the publication required by law.

1.1.7  "Certificate of Occupancy" means a certificate or certificates issued by the New York City Department of Buildings (or its successor) to the Partnership and/or the General Partner(s) or to a builder or renovator hired by the Partnership and/or the General Partner(s) stating that the hotel, parking garage, office building or other substantial structure to be erected by the Partnership on the Property is in proper condition to be occupied.

1.1.8  "Class A Limited Partner" means additional limited partners admitted to the Partnership by the General Partners pursuant to Section 10.4, and their successors and permitted assigns.

1.1.9  "Class B Limited Partner" means CRCP and any successors to or permitted assigns of its interest in the Partnership and any Person admitted as additional Class C Limited Partners by the General Partners.

1.1.10  "Class C Limited Partner" means the interest of a General Partner if converted pursuant to Sections 10.3, 12.3 or 12.4.

1.1.11  "Code" means the Internal Revenue Code of 1954, as amended.

1.1.12  "General Partners" means Arthur E. Imperatore, Jerrold Wexler and Edward W. Ross, and any successors or substitutes as general partners of the Partnership; and any reference to a "General Partner" shall be to any one of the General Partners at the time to which such reference relates.

1.1.13  "Immediate Family" means husband, wife, children, stepchildren, grandchildren, step-grandchildren, father, mother, nephews, nieces, brothers and sisters.

1.1.14  "In Interest" means any specified percentage or fraction of the interest of the Partners (or the members of a Class of Partners) who, in the aggregate, shall at the time to which such reference relates be entitled under the provisions of Section 7.1 to the specified percentage or fraction of the Net Profits and Net Losses to

MID 00765

which all of the Partners (or all of the members of such Class) are entitled thereunder at such time.

1.1.15 "Limited Partners" mean the Class A, Class B and Class C Limited Partners and their successors and permitted assigns.

1.1.16 "Net Profits" and "Net Losses" mean the net income and net loss, respectively, of the Partnership determined in accordance with the same method of accounting used by the Partnership for Federal income tax purposes.

1.1.17 "Partners" means the General Partners and the Limited Partners as constituted from time to time, and any reference to a "Partner" shall be to any one of the Partners at the time to which such reference relates.

1.1.18 "Person" means any natural person, corporation, partnership, joint venture, association or other business or legal entity.

1.1.19 "Property" means (a) the real property (land), situate in New York, New York, described on Exhibit A hereto, as the same may be improved from time to time, (b) buildings at any time situate thereon, (c) all personal property relating thereto, (d) all air-rights above the surface of the land, and (e) all mineral and other rights below the surface of the land, if any.


ARTICLE II

Purpose

SECTION 2.1. Purpose; Limitations. The purpose of the Partnership is to acquire, own, improve, and manage the Property, and any property received in a like kind exchange, and to engage in any other activities relating to the Property. The Partnership shall not engage in any other business except with the consent of all of the Partners. The Partners hereby approve of the purchase of the Property by the Partnership from Consolidated Rail Corporation, a Pennsylvania corporation.


-7-

MID 00766

## ARTICLE III

### Formation of the Partnership

SECTION 3.1.  Formation; Name.  The parties do hereby form the Partnership under the name MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP, in accordance with the Act.

SECTION 3.2.  Principal Office.  The principal office of the Partnership shall be located c/o Palatine Realty Corp., 630 Fifth Avenue, New York, New York 10020 or at such other place as the General Partners may determine.  The General Partners shall give notice to the Limited Partners promptly after any change in the location of the principal office of the Partnership.

SECTION 3.3.  Termination.  The Partnership shall terminate on December 31, 2083 or at such earlier time as otherwise provided herein.

## ARTICLE IV

### Capital; Additional Funds; Loans by Partners

SECTION 4.1.  Amounts Contributed.  The Partners have contributed to the capital of the Partnership the following amounts, in cash:

| | | |
|---|---|---|
| General Partners | | |
| Arthur E. Imperatore | $ 47.50 | |
| Jerrold Wexler | 23.75 | |
| Edward W. Ross | 23.75 | |
| Class B Limited Partner | 5.00 | |
| | $100.00 | |

Subject to Sections 4.2.1 and 5.1, below, it is the intent of the parties that at all times the Class B Limited Partner shall be and remain a five-percent Partner in interest in the Partnership notwithstanding the fact that the General Partners will fund or cause to be provided substantial additional monies to the Partnership.

SECTION 4.2.  Additional Funds.
4.2.1  Upon or prior to acquisition of the Property by the Partnership, the General Partners shall provide all sums required in order to fund the purchase of the Property; provided, however, that no such funding shall diminish the five percent (5%) interest of the

-8-

MID 00767

Class B Limited Partner in cash distributions (Article VI) and sale and refinancing proceeds (Article VIII), unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata.

4.2.2 If, at any time at which the Partnership requires additional funds for the conduct of its business, and such funds are not available from other sources (e.g., loans from banks or other institutional lenders, which loans may be secured by Partnership assets), the General Partners may fund such additional cash needs of the Partnership; provided, however, that no such funding by any General Partner shall diminish the five percent (5%) Partnership interest in cash distributions (Article VI) and sale and refinancing proceeds (Article VIII) of the Class B Limited Partner nor shall any distribution to the Class B Limited Partner be deferred or subordinated by reason thereof. General Partners' advances shall be deemed loans and shall be repaid with interest at the "prime rate" at Citibank, N.A., New York, New York, in effect at the time of the making of the loan, plus one percent (1%); during the term of the loan the interest rate is to be adjusted at the first day of each calendar quarter to reflect changes in the "prime rate."

SECTION 4.3.  No Additional Capital Contributions.  No Limited Partner (and, except as otherwise required by law, no General Partner) shall be required to make any contributions to the capital of the Partnership in addition to those provided for in this Agreement.  Without limiting the generality of the foregoing, no Partner shall be obligated at any time, except as otherwise required by law, to restore or otherwise to be responsible for any negative balance in its or his capital account if such negative balance exists in compliance with the provisions of this Agreement.

SECTION 4.4  Loans of Partners.  No Partner shall be required to make any loan to the Partnership.  No loan shall be made to the Partnership without the consent of the Class B Limited Partner if such loan requires a pledge of any partnership interest in the Partnership.

SECTION 4.5.  Interest.  No interest shall be paid by the Partnership on the capital account of any Partner.

SECTION 4.6.  Capital Accounts.  The Partnership shall maintain a capital account for each partner.  Said capital accounts shall be increased by the amounts of all income and gain allocated the respective Partners pursuant to the provisions of this Agreement.  Said capital accounts shall be decreased by the amounts of all losses allocated to the respective Partners pursuant to the provisions of this Agreement and by all amounts distributed by the Partnership to the respective Partners.

-9-

MID 00768

# ARTICLE V

## Management of the Partnership

SECTION 5.1.  Management.  The General Partners shall have exclusive authority to manage and conduct the Partnership business and the decision of any of the General Partners shall bind the Partnership in all matters.  In addition to and not in limitation of the powers given to the General Partners by law, the General Partners shall have the right, authority and power to do any and all acts necessary, proper, convenient or advisable to accomplish the purposes of the Partnership and manage the Partnership business, including but not limited to the following:

(a)  to expend Partnership funds (whether derived from borrowings, capital or income) in the exercise of any rights or powers possessed by the General Partners under this Agreement;

(b)  to acquire, hold, alter, convert, improve, repair, raze, replace, rebuild or dispose of any real property, interest therein, or appurtenance thereto, as well as personal or mixed property connected therewith, including the purchase, lease, sublease, development, improvement, maintenance, exchange, trade or sale of such properties, at such price, rental or amount, for cash, securities or other property, and upon such terms, as the General Partners deem in their discretion to be in the best interest of the Partnership;

(c)  subject to Section 5.6 below, to purchase and sell personal property incidental to the operation of the Partnership's real property and to borrow money to finance the purchase of such personal property;

(d)  to purchase from others, at the expense of the Partnership, contracts of liability, casualty and other insurance that the General Partners deem advisable, appropriate or convenient for the protection of the properties or affairs of the Partnership or for any other purpose convenient or beneficial to the Partnership;

(e)  to invest Partnership funds in commercial paper, government securities, certificates of deposit, banker's acceptances or similar investments;

(f)  to borrow money required for the business and affairs of the Partnership from others and to secure the repayment of such borrowings by executing mortgages or deeds of trust, assignments and/or security agreements, pledging or otherwise encumbering or subjecting to security interests all or any part of the Partnership's assets, and to refund, refinance, increase, modify, consolidate or extend the

-10-

MID 00769

maturity of any indebtedness created by such borrowing, or any such mortgage, deed of trust, assignment, security agreement, pledge, encumbrance or other security device;

(g)  to enter into such agreements, contracts, documents and instruments with such parties and to give such receipts, releases and discharges with respect to all of the foregoing and any matters incidental thereto as the General Partners may deem advisable, appropriate or convenient;

(h)  to place record title to, or the rights to use, Partnership assets in the name or names of a nominee or nominees for any purpose convenient or beneficial to the Partnership;

(i)  to employ from time to time any persons for the operation and management of the Partnership business, including but not limited to supervisory and managing agents, building management agents, insurance brokers, real estate brokers, loan brokers, independent contractors, attorneys, accountants and bookkeepers, on such terms and for such compensation as the General Partners shall determine; provided, if any person so employed or engaged is an Affiliate, the terms thereof shall meet the requirements set forths in subparagraph (j) following;

(j)  to manage the Partnership assets or to contract either totally or partially for management services by another person (which may be an Affiliate); provided, no contract, commitment or arrangement shall be made with any Affiliate of a General Partner unless on an arm's length basis and on terms at least as competitive as those available from a non-Affiliate.  The management designee shall receive reasonable compensation for management services performed;

(k)  to determine the nature of the development and manner of use of the Property and to make changes or alterations to the Property and in its development and use, to raze all or part of the Property and to construct new or additional improvements thereon, all without being required to consult with or obtain the consent of the Limited Partners;

(l)  to pay, collect, compromise, arbitrate or otherwise adjust any and all claims or demands of or against the Partnership;

(m)  to become a limited or general partner in a partnership with others, but only for the purposes stated in Section 2.1, and to dilute Partners' profit percentages pro rata in connection with such partnership if such partnership includes a bank or other institutional lender which requires an "equity kicker" in order to provide required financing and to execute a partnership agreement for such partnership

-11-

containing such terms and provisions as the General Partners in their sole discretion consider desirable for the purpose of developing the Property consistent with the provisions of this Agreement.

(n) subject to Section 5.8, to establish, maintain and draw upon checking, savings and other accounts in the name of the Partnership in such bank or banks as the General Partners may from time to time select, and to designate others to draw upon such accounts;

(o) to execute, acknowledge or verify and file any notification, application, statement or other filing in the name of or on behalf of the Partnership that the General Partners consider to be required or desirable to be filed pursuant to legal requirements;

(p) to take all actions and execute all documents and instruments necessary or advisable in the discretion of the General Partners to implement and further the purpose of the Partnership and to operate the Partnership business;

(q) to do any and all of the foregoing for such consideration and upon such other terms or conditions as the General Partners in their discretion shall determine to be appropriate.

SECTION 5.2. Limited Partners. The Limited Partners shall take no part in the management and operation of the Partnership business and shall have no authority to act on behalf of or bind the Partnership.

SECTION 5.3. Duties and Independent Activities. The General Partners shall devote such of their time as they may deem necessary to the Partnership business. Any of the Partners may, without restriction, engage in and possess an interest in other business ventures and property of every nature and description (regardless of location and proximity to the Property and whether or not in competition therewith) independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage and development of real property and the Partnership shall have no rights in and to said independent ventures and investments or to the income or profits derived therefrom. The fact that a Partner, or a member of his family, or an Affiliate is employed by, or is directly or indirectly interested in or connected with any person or entity employed by the Partnership to render or perform a service, or from whom or which the Partnership may buy merchandise or other property, or to whom the Partnership shall lease any part of the Property, shall not prohibit the General Partners from employing such person, or from otherwise dealing with him, and the Partnership shall have no rights in or to any income or profits derived therefrom.

-12-

MID 00771

SECTION 5.4. <u>Limitation of Liability</u>. Neither the General Partners nor any agent or Affiliate of the General Partners shall be liable, responsible or accountable in damages or otherwise to the Partnership or any Limited Partner for any action taken or failure to act on behalf of the Partnership within the scope of the authority conferred on the General Partners by this Agreement or by law, unless such action or omission was performed or omitted fraudulently or in bad faith or constituted gross negligence.

SECTION 5.5. <u>Indemnification</u>. The Partnership shall indemnify and hold harmless the General Partners, and each of their agents and Affiliates (collectively, the "Indemnified Parties") from and against any loss, expense, damage or injury suffered or sustained by them or any of them by reason of any acts, omissions or alleged acts or omissions arising out of his or their activities on behalf of the Partnership or in furtherance of the interests of the Partnership, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim provided that the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claims are based were in good faith and were not performed or omitted fraudulently or in bad faith or as a result of gross negligence by such Indemnified Party. Such indemnification shall be made only to the extent of the Partnership assets.

SECTION 5.6. <u>Actions Requiring Consent</u>. Prior to the issuance of a Certificate of Occupancy, the General Partners, on behalf of the Partnership, shall have the right to sell all or substantially all of the assets of the Partnership without the consent of the Class B Limited Partner (and the proceeds of the sale shall be distributed as provided in Article VIII). After the issuance of a Certificate of Occupancy, except with the prior written consent of the Class B Limited Partner, the Partnership shall at no time sell all or substantially all of the assets of the Partnership; provided, however, that the Class B Limited Partner shall be deemed conclusively to have consented to any proposed sale of all or substantially all of the assets of the Partnership if the Class B Limited Partner does not exercise its right of first refusal set forth in Article XI within the forty-five day time limit set forth in Article XI.

SECTION 5.7. <u>Partition</u>. No Partner shall have the right to require partition of the Property of the Partnership or to compel any sale or appraisal of the Partnership's assets or any sale of a deceased Partner's interest in the Partnership's assets, notwithstanding any provision of law to the contrary.

SECTION 5.8. <u>Deposits of Funds</u>. The Partnership's funds shall be deposited by the General Partners in one or more banks or trust companies in New York City in the Partnership's name, and shall not be

-13-

commingled with funds not belonging to the Partnership. The Partnership's funds shall be used by the General Partners only for the business of the Partnership, including distributions to the Partners as provided in this Agreement.

SECTION 5.9. Fees. Except with the unanimous written consent of the Partners, no Partner shall receive any fee, salary or other compensation for serving as a Partner.

## ARTICLE VI

### Cash Distributions

SECTION 6.1. Times of Distribution. Distributions of cash shall be made by the Partnership (a) at the times and in the amounts required by the provisions of Article VIII applicable upon the occurrence of the events therein described, and (b) otherwise at the time or times determined by the General Partners. Within the first 120 days of each fiscal year, the General Partners shall cause the Partnership to distribute, under clause (b) of the preceding sentence, all cash (net cash flow) which the General Partners, in their sole discretion, determine not to be needed for the Partnership's business.

6.1.2 Subject to the provisions of Sections 4.2.1 and 5.1, distributions shall be made 95% to the General Partners and 5% to the Class B Limited Partner. If Class A or Class C Limited Partners are admitted to the Partnership, the interest of the General Partners shall be reduced accordingly.

## ARTICLE VII

### Profits, Gains and Losses

SECTION 7.1. Allocation of Net Profits and Net Losses. Subject to the provisions of Sections 4.2.1 and 5.1, Net Profits and Net Losses for each fiscal year shall be allocated among the Partners in the following proportions:

| | |
|---|---|
| General Partners | 95% |
| Class B Limited Partner | 5% |

If Class A or Class C Limited Partners are admitted to the Partnership, the interest of the General Partners shall be reduced accordingly.

-14-

SECTION 7.2. <u>Allocation of Gains</u>. Gain realized upon the sale or other disposition of any portion of or any interest in the Property of the Partnership shall be allocated in the following order:

7.2.1 There shall first be allocated to those Partners, if any, who have deficits in their capital accounts an amount of such gain equal to the aggregate amount of such deficits, which amount shall be allocated in the same proportion as such deficits;

7.2.2 There shall next be allocated to each of the Partners an amount of such gain equal to cash distributions, if any, theretofore made to him pursuant to the provisions of Section 8.1 and not theretofore taken into account under this Section 7.2.2; and

7.2.3 Any remaining gain shall be allocated among the Partners in the same proportion set forth in Section 7.1.

## ARTICLE VIII

### Sale and Mortgage Proceeds

SECTION 8.1. <u>Sale and Refinancing</u>. If the Partnership shall at any time realize net cash proceeds as a consequence of the refinancing of any mortgage on the Property or of the sale of the Property or any interest therein (including the exchange, condemnation or similar eminent domain taking, casualty, or other disposition of all or substantially all of the Partnership's assets, or from the sale of easements, rights-of-way or similar interests in the Partnership's Property or any other similar items which in accordance with generally accepted accounting principles are attributable to capital; provided, however, that a sale shall not include a tax-free exchange under Section 1031 of the Code), such net cash proceeds shall be distributed promptly after such refinancing or sale in the following order of priority:

8.1.1 First, to the payment, or as a reserve for payment, of any indebtedness of the Partnership;

8.1.2 Next, to the establishment of any reserve required by any mortgage or determined by the General Partners to be reasonably necessary to provide for any liabilities or obligations of the Partnership, including contingent or unforeseen liabilities; and

8.1.3 The balance, if any as follows: (i) If a Certificate of Occupancy has not been issued, then the balance shall be distributed 50% to the General Partners and 50% to the Class B Limited Partner, (ii) If a Certificate of Occupancy has been issued, then, subject to the provisions of Sections 4.2.1 and 5.1(m), the balance shall be

-15-

distributed 95% to the General Partners and 5% to the Class B Limited Partner. If a Certificate of Occupancy has been issued and if at that time there are Class A and/or Class C Limited Partners, the 95% interest of the General Partners shall be decreased accordingly.

SECTION 8.2. Reduction of Reserve. If the General Partners shall determine that any reserve described in Section 8.1.2 is no longer needed for a new reserve, any reduction in such reserve shall be treated as cash proceeds to which the provisions of Section 8.1 apply.

## ARTICLE IX

### Transfers of Limited Partners' Interests

SECTION 9.1. Transfers by Limited Partners.
9.1.1 A Limited Partner may assign all or part of its interest as a Limited Partner in the Partnership, provided that (a) the assignee shall not be a natural person younger than 21 years of age or a natural person who shall have been adjudged incompetent; (b) the assignment shall be in writing in form reasonably satisfactory to the General Partners; (c) the assignee shall have agreed in a writing in form reasonably satisfactory to the General Partners to be bound by the terms of this Agreement and to give or confirm each consent and approval given herein by the original parties hereto; (d) a majority of interest in the General Partners shall have consented in writing to the assignment, which consent shall not be unreasonably withheld; and (e) if required by the General Partners, the assignment shall be effective as of the first day of a fiscal quarter. The assignee of an interest in the Partnership may be admitted as a Limited Partner only with the consent of the General Partners, which consent shall not be unreasonably withheld.

9.1.2 The General Partners hereby consent to the assignment by the Class B Limited Partner of all or any part of its partnership interest to any corporation controlling, controlled by or under common control with the Class B Limited Partner, which consent shall be effective upon the General Partners' receipt of the documents referred to in subsection (b) and (c) of Section 9.1.1.

9.1.3 Any purported assignment not meeting the requirements set forth in Section 9.1.1 shall be void and shall not bind the Partnership.

9.1.4 For purposes of this Section 9.1, the term "assign" includes the making of any pledge, hyopthecation, encumbrance, sale or other disposition.

MID 00775

SECTION 9.2. Assignment of Rights to Distributions by Limited Partners. Any Limited Partner may assign the right to receive distributions applicable to his Partnership interest, and such an assignment shall be effective notwithstanding failure to satisfy the conditions set forth in Section 9.1, provided that (a) the instrument of assignment shall be in form reasonably satisfactory to the General Partners; (b) a duly executed and acknowledged counterpart of such instrument shall be delivered to the Partnership; (c) the assignee shall not be a natural person younger than 21 years of age or a natural person who shall have been adjudged incompetent; and (d) if required by the General Partners, the assignment shall be effective as of the first day of a fiscal quarter. Any purported assignment which does not meet the requirements as set forth in this Section shall be void and shall not bind the Partnership.

SECTION 9.3. Costs and Expenses. All costs and expenses incurred by the Partnership in connection with any assignment described in this Article, including fees and disbursements of counsel and filing fees, shall be paid by the Partnership.

ARTICLE X

Withdrawal and Removal of Partners

SECTION 10.1. Limited Partners. No Limited Partner may withdraw from the Partnership, except with the approval of the General Partners, which consent shall not be unreasonably withheld. Upon the death, bankruptcy, incompetency or dissolution of a Limited Partner, its successor in interest may be admitted as a Limited Partner and shall, upon such admission, have all of the rights and obligations of a Limited Partner under this Agreement, and the Partnership shall not be dissolved upon any such occurrence.

SECTION 10.2. Net Worth. The General Partners represent and warrant that their net worth in the aggregate is in excess of $1,000,000, exclusive of any interest in the Partnership as of the date of this Agreement. The General Partners agree that, at all time while they are General Partners of the Partnership, they will maintain sufficient net worth, in the aggregate, to satisfy the net worth guidelines established in Internal Revenue Service Revenue Procedure 72-13 (or the applicable Code, rules or regulations then in effect).

SECTION 10.3. General Partners. No General Partner may retire, nor may any General Partner sell, assign or otherwise transfer his or its interest to any other Person, other than to an Approved General Partner Designee, nor may any other Person (other than an Approved General Partner Designee) be admitted to the Partnership as a general

-17-

partner, without the prior written consent of the Class B Limited Partner. Each General Partner may assign a portion of his general partner's interest, without the consent of any other Partner, if the assignee is a person who is already a Partner or is a member of the Immediate Family of the assignor or a trust for the primary benefit of such a person and if such assignee who holds such assigned interest is a Class C Limited Partner and not as a General Partner. The provisions of Section 9.1.1(a), (b), (c) and (e) shall apply to this Section 10.3.

SECTION 10.4.   Additional Partners.

10.4.1   Subject to compliance with Section 9.1.1, the General Partners may assign (without the consent of the Class B Limited Partner) a portion of their equity interest, either to new investors (Class A Limited Partners), or to the Partnership (which will then issue interests to Class A Limited Partners).   The proceeds of such assignment and sale shall be used solely for Partnership purposes and the rights and interests of the Class B Limited Partner shall in no way be dimished or impaired, unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata.   If the new Class A Limited Partner is not a bank or institutional lender, the Class B Limited Partner's interest shall not be diluted.

10.4.2   If the General Partners wish to assign a portion of their equity interest to new investors (Class A Limited Partners) and not apply the proceeds solely for Partnership purposes, then the proceeds of sale shall be distributed as follows:

(a)   if a Certificate of Occupancy has not been issued, fifty percent (50%) of the proceeds of the sale not applied to Partnership purposes shall be distributed to the Class B Limited Partner;

(b)   if a Certificate of Occupancy has been issued, the proceeds of the sale not applied to Partnership purposes shall be distributed ninety-five percent (95%) to the General Partners and five percent (5%) to the Class B Limited Partner.

## ARTICLE XI

### Option to Purchase

SECTION 11.1.   Right of First Refusal.   In the event that after the issuance of a Certificate of Occupancy, the General Partners, on behalf of the Partnership, receive a written offer from a bona fide offeree to purchase all or any substantial portion of the Property, then the General Partners shall immediately deliver a true and complete copy

MID 00777

of the offer to the Class B Limited Partner and the Class B Limited Partner shall have an assignable right and option exercisable within forty-five days after its receipt of said copy of the offer to purchase the assets of the Partnership referred to in the offer for the purchase price and upon the same terms and conditions referred to in the offer. The option shall be exercised by giving written notice to the Partnership within the aforesaid forty-five day time limit.

SECTION 11.2. Assignability. The right of first refusal granted to the Class B Limited Partner pursuant to Section 11.1, above, shall be freely assignable by the Class B Limited Partner after its receipt of a copy of the offer described in Section 11.1. In the event of the exercise of the Class B Limited Partner's right of first refusal within said forty-five day period, closing shall be held at 10:00 A.M. at the principal office of the Partnership in New York, New York, and deed, bill of sale, checks, and the like, delivered, on the sixtieth day following the date of the exercise of the option, unless some other time, date, and place is agreed to in writing by the Partnership and the Class B Limited Partner or its assignee. Payment by check shall mean bank check, certified check or wire transfer (acceptable to the General Partners).

## ARTICLE XII

### Termination or Dissolution of Partnership

SECTION 12.1. By Agreement or Upon Sale of Assets. The Partnership shall be terminated prior to the date set forth in Section 3.3 if (a) the General Partners determine and the Class B Limited Partner consents in writing to such termination; (b) the Partnership sells or otherwise disposes of its entire interest in all or substantially all of its assets, unless the Partnership receives as a part or all of the consideration for such sale or other disposition a mortgage note or other obligations; provided, however, that the General Partners may elect to dissolve the Partnership even if it receives a mortgage note or other obligations upon the sale of all or substantially all of the Partnership's assets if the Partnership receives the written opinion of tax counsel that such dissolution will not adversely impact the Limited Partners by accelerating or changing the nature of income recognition; (c) the Partnership sells or receives full payment of the notes or obligations referred to in clause (b); or (d) the Partnership is dissolved pursuant to Section 12.2.

SECTION 12.2. Retirement of General Partner. The Partnership shall be dissolved upon the retirement or withdrawal of any General Partner, or upon the death or adjudication of incompetency of any General Partner which is not a corporation, unless either (i) the re-

MID 00778

maining General Partner(s), if any, or (ii) a majority in interest of the Limited Partners, shall determine within thirty days after such event to continue the business of the Partnership and shall so notify all of the Partners, and, if there shall be no remaining General Partner, shall designate a substitute General Partner who has agreed in writing to serve in such capacity.

SECTION 12.3.  Interest of Retired General Partner.  If the Partnership is continued pursuant to the provisions of Section 12.2, the Partnership interest of the General Partner who shall have died or been adjudicated an incompetent or been dissolved without such Partner's consent or acquiescence shall automatically be converted into a Class C Limited Partner's interest, which shall consist of the same interests in the profits, losses, distributions and other items of the Partnership to which such General Partner would have been entitled but for the event which terminated his status as a General Partner.

SECTION 12.4.  Retirement in Violation of Agreement; Insolvency. If any General Partner shall (i) retire or withdraw in violation of this Agreement, (ii) voluntarily dissolve or acquiesce in its dissolution, if such General Partner is a corporation, partnership or other entity which is not a natural person, (iii) be adjudicated a bankrupt, (iv) suffer or permit a receiver to be appointed to hold or administer any substantial portion of his assets and such appointment shall remain in effect for sixty days, (v) make an assignment for the benefit of creditors, (vi) admit by a pleading the material allegations of any bankruptcy petition filed against him, then in any such event the interest of such General Partner shall automatically be converted into a Class C Limited Partner's interest and, notwithstanding any other provision of this Agreement, such former General Partner shall thereafter have no right to participate in any manner in the management of the Partnership's business or in any decision, consent or approval affecting any transaction or proposed transaction whatsoever.

SECTION 12.5.  Termination.  Upon the termination or dissolution of the Partnership, the assets of the Partnership shall be sold by the remaining General Partner(s), or substitute General Partner(s), as liquidating trustees, and, except as otherwise provided herein, the proceeds remaining after the payment of or provision for the debts of the Partnership shall be distributed to the Partners in the same manner and proportion as if such proceeds constituted proceeds to which the provisions of Section 8.1 applied.  A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to minimize the losses normally attendant upon a liquidation.  The General Partners may retain such amount as they deem reasonably necessary as a reserve for any contingent liabilities or obligations of the Partnership, which amount shall be paid over to a bank or trust company in New York, New York, as

MID 00779

escrow agent, to be held by it for the discharge of liabilities of the Partnership and the distribution of the balance, if any, among the Partners in the same manner and proportion as hereinabove provided for in this Section. Each of the Partners shall be furnished with a statement, reviewed by the Partnership's independent accountants, which shall set forth the assets and liabilities of the Partnership as of the date of the Partnership's dissolution. Upon completion of the liquidation, the General Partners shall execute and cause to be filed a Certificate of Dissolution of the Partnership and any and all other documents necessary with respect to termination of the Partnership.

## ARTICLE XIII

### Books and Reports

SECTION 13.1. Books of Accounts. The General Partners shall maintain, at the principal office of the Partnership, complete books of account, in which there shall be entered, fully and accurately, every transaction of the Partnership. The fiscal year of the Partnership shall be the calendar year. The books of account of the Partnership shall be kept in accordance with sound accounting practice and principles applied in a consistent manner. All determinations by the General Partners with respect to the treatment of any item or its allocation for Federal, state, or local tax purposes shall be binding upon all of the Partners. Any Limited Partner shall have the right from time to time, at its own expense, to cause its accountants and representatives to examine and audit the books and records of the Partnership, and the General Partners, upon not less than ten days' written notice, shall make such books and records available for such examinations and audits at reasonable hours during the business day.

SECTION 13.2. Goodwill. No value shall be placed for any purpose upon the Partnership's name or the right to its use, or upon the goodwill of the Partnership or its business. Upon termination or dissolution of the Partnership, neither the Partnership's name, nor the right to its use, nor the goodwill of the Partnership, shall be considered as an asset of the Partnership.

SECTION 13.3. Statements. Within a reasonable time after the end of each fiscal year and in any event on or before March 1 of the next fiscal year, the General Partners shall cause to be delivered to each Partner (a) an annual statement of the Partnership's receipts and expenses for such year and the capital account of such Partner as at the end of such year, reviewed or audited by the Partnership's independent certified public accountants, and (b) a report or a tax return setting forth such Partner's share of the Partnership's profit or loss

for such year and such Partner's allocable share of all items of income, gain, loss, deduction and credit, for Federal income tax purposes.

SECTION 13.4. Election under Section 754 of the Code. In the event of any transaction described in Section 743(b) of the Code and permitted by the provisions of this Agreement, the Partnership shall, upon the timely written request of the person succeeding to a Partnership interest in such transaction, make the election provided for in Section 754 of the Code.

## ARTICLE XIV

### Further Documents

SECTION 14.1. Execution by Limited Partners. At any time, upon the request of the General Partners, any Limited Partner shall expeditiously execute, acknowledge and swear to any certificate required by the law of New York, any amendment to or cancellation thereof required by law, and any certificate or affidavit of fictitious firm name, trade name or the like (and any amendments or cancellations thereof) required by law; and the General Partners shall use their best efforts to cause to be filed of record all such Certificates and instruments as shall be required so to be filed.

## ARTICLE XV

### Amendment of Agreement

SECTION 15.1. Amendment by Majority Action. This Agreement may be amended by a written instrument subscribed by all of the General Partners and a majority in interest of the Limited Partners (all of the Limited Partners voting as one class), but only if each of the following conditions shall be met:

15.1.1  This Section may not be so amended.

15.1.2  The Partnership shall have given each of the Limited Partners at least 30 days' written notice, in reasonable detail, of the text and purpose of the proposed amendment.

15.1.3  Subject to Sections 4.2.1 and 5.1(m) of this Agreement, the amendment shall neither increase the liabilities or obligations nor decrease the participation in profits, losses, gains, distributions or other items of any Partner who is not a signatory thereto.

MID 00781

15.1.4  The Partnership shall have received the written opinion of its counsel that adoption of the amendment will neither cause the Partnership to fail to constitute a limited partnership under the Act nor cause any Limited Partner to be deemed, in such capacity, to be a general partner.

SECTION 15.2. Delivery of Copies. Within thirty days after any amendment made under the provision of Section 15.1, the Partnership shall deliver copies thereof to each Partner.

## ARTICLE XVI

### Miscellaneous

SECTION 16.1. Notices. Any notice or other communication provided for or referred to in this Agreement shall be in writing and, if mailed at a United States Post Office in the State of New York, by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party may have previously specified by notice to the Partnership as the address to which notice shall be given to him), shall be deemed to be delivered on the second business day after such mailing:

16.1.1  If to the Partnership or the General Partners: c/o Palatine Realty Corp., 630 Fifth Avenue, New York, New York 10020.

16.1.2  If to the Class B Limited Partner: CRC Properties, Inc., 150 Allendale Road, King of Prussia, Pennsylvania 19406, with a copy to Consolidated Rail Corporation, 1818 Walnut Street, Philadelphia, Pennsylvania 19103, Attn.: Assistant Vice President-Real Estate.

16.1.3.  If to the Class A and/or Class C Limited Partners:  At such address as appears on the Certificate of Limited Partnership.

SECTION 16.2. Complete Agreement. This Agreement fully sets forth all of the agreements and understandings of the parties with respect to the Partnership, and cannot be changed or terminated orally or in any manner other than by a written instrument subscribed by the party to be charged. There are no representations, agreements, arrangements or understandings, oral or written, among the parties relating to the subject matter of this Agreement which are not expressly set forth herein.

-23-

MID 00782

SECTION 16.3. Severability. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, the applicable laws, ordinances, rules and regulations of the jurisdictions in which the Partnership engages in business. If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason and to any extent, be held to be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected, but rather shall be enforced to the full extent permitted by law.

SECTION 16.4. Ratification. Each person who becomes a Partner in the Partnership after the execution and delivery of this Agreement shall, by becoming a Partner, be deemed thereby to ratify and agree to all prior actions taken by the Partnership and the General Partners.

SECTION 16.5. Binding upon Successors. This Agreement shall be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns, and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

SECTION 16.6. Rights of Third Parties. None of the provisions of this Agreement shall be construed as having been made for the benefit of any creditor of either the Partnership or any of the Partners, or shall be enforceable (except as otherwise required by law) by any person not a party hereto.

SECTION 16.7. Governing Law. Irrespective of the place of execution or performance, the validity and construction of this Agreement shall be governed by the internal law of New York.

SECTION 16.8. Captions. The captions, heading and titles contained in this Agreement are solely for convenience of reference and shall not affect the interpretation of this Agreement or of any provision hereof.

SECTION 16.9. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed as an original, but all of which shall together constitute one instrument.

SECTION 16.10. Sense and Gender of Words. All terms and words used in this Agreement, regardless of the sense or gender in which they are used, shall be deemed to include each other sense and gender unless the context requires otherwise.

SECTION 16.11. Investment Representation. Each Partner represents that his interest in the Partnership is being purchased for his own account for investment, and not for distribution or resale to

MID 00783

others.  Each Partner agrees that he or it will not sell or otherwise transfer such interest unless the offering, sale or other transfer is registered under the Securities Act of 1933, as amended; provided, however, that this restriction shall not apply if an exemption from registration is then available.  Each Partner agrees that he will not dispose of his or its interest in the Partnership or any portion thereof, except in accordance with this Agreement and applicable state securities ("Blue Sky") and Federal securities law.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

GENERAL PARTNERS:

Arthur E. Imperatore

Jerrold Wexler

Edward W. Ross

CLASS B LIMITED PARTNER:

CRC PROPERTIES, INC.

By _____ President
    Laurence A. Tisch

MID 00784

SCHEDULE "A"

All those certain five parcels of land, more fully described below, together
with all of Seller's right title and interest in and to that area below the
adjoining streets.


Parcel 1

BEGINNING at the corner formed by the intersection of the easterly line of
Eleventh Avenue with the northerly line of West 36th Street;

       1.  Running thence northerly, along the easterly line of Eleventh
           Avenue, 98'-9";

       2.  thence easterly, parallel with the northerly line of West 36th
       Street, 175'-0";

       3.  thence northerly, parallel with the easterly line of Eleventh
       Avenue, 98'-9" to a point in the southerly line of West 37th Street;

       4.  thence easterly, along the southerly line of West 37th Street,
       275'-0";

       5.  thence southerly, parallel with the easterly line of Eleventh
       Avenue, 98'-9" to the center line of block;

       6.  thence westerly, parallel with the northerly line of West 36th
       Street and along the center line of block, 75'-0";

       7.  thence southerly, parallel with the easterly line of Eleventh
       Avenue, 98'-9" to a point in the northerly line of West 36th Street;

       8.  thence westerly, along the northerly line of West 36th Stret,
       375'-0" to the point or place of BEGINNING.


Reserving unto Seller the following described parcel as an easement for
railroad transportation purposes:

All that portion of the below described parcel lying below an upper inclined
plane having an elevation of 27.86 at the northerly line of West 36th Street and
an elevation of 26.14 at the southerly line of West 37th Street bounded and
described as follows:

BEGINNING at a point in the northerly line of West 36th Street distant 212'-2"

MID 00785

easterly from the corner formed by the intersection of the easterly
Eleventh Avenue with the northerly line of West 36th Street;

1. Running thence northerly, along a line forming an angle o
123 -10'-44" on its westerly side with the preceding cours
3/8" to a point of curvature;

2. thence still northerly, curving to the left on the arc of
having a radius of 600'-0" and a central angle of 11 -44'-46"
123'-0 1/8" to a point in the southerly line of West 37th Str

3. thence easterly, along the southerly line of West 37th St
59'-9 1/4";

4. thence southerly, curving to the right on the arc of a c
a radius of 656'-0" and a central angle of 13 -39'-15",
line forms an angle of 19 -31'-29" on its southerly side
southerly line of West 37th Street, 156'-4" to a point of ta

5. thence still southerly, along the line of tangency, 69'-
point in the northerly line of West 36th Street;

6. thence westerly, along the northerly line of West 36th
66'-11" to the point or place of BEGINNING.

Elevations refer to datum used by the Topographical Bureau, Borough
which is 2.75 feet above the United States Coast and Geodetic Survey
sea level, Sandy Hook, New Jersey.

## PARCEL II

BEGINNING at a point in the southerly line of West 38th Street di
west of the corner formed by the intersection of the westerly l
Avenue with the southerly line of West 38th Street;

1. Running thence southerly, parallel with the westerly l
Avenue, 197'-6" to a point in the northerly line of West 3
Street;

2. thence westerly, along the northerly line of West 37th
150'-0";

3. thence northerly, parallel with the westerly line of
197'-6" to a point in the southerly line of West 38th Str

4. thence easterly, along the southerly line of West 38t
150'-0" to the point or place of BEGINNING.

Reserving unto seller the following described parcel as an
railroad transportation purposes:

All that portion of the below described parcel lying below an upper inclined plane having an elevation of 25.66 at the northerly line of West 37th Street and an elevation of 23.99 at the southerly line of West 38th Street bounded and described as follows:

BEGINNING at a point in the southerly line of West 38th Street distant 357'-4 1/8" west of the corner formed by the intersection of the westerly line of Tenth Avenue with the southerly line of West 38th Street;

1.  Running thence southerly, along a line forming an angle of 79 -17'-17" on its westerly side ith the southerly line of West 38th Street, 163'-0 3/8" to a point of curvature;

2.  thence still southerly, curving to the right on the arc of a circle having a radius of 656'-0" and a central angle of 3 -20'13", 38'-2 1/2" to a point in the northerly line of West 37th Street;

3.  thence westerly, along the northerly line of West 37th Street, 57'-10 3/4";

4.  thence northerly, curving to the left on the arc of a circle having a radius of 600'-0" and a central angle of 4 -40'-45", whose radial line forms an angle of 15 -23'-28" on its southerly side with the northerly line of West 37th Street, 49'-0" to a point of tangency;

5.  thence still northerly, along the line of tangency, 152'-4 1/4" to a point in the southerly line of West 38th Street;

6.  thence easterly, along the southerly line of West 38th Street, 57'-0" to the point or place of BEGINNING.

Elevations refer to the datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey.


## PARCEL III

BEGINNING at a point in the northerly line of West 38th Street distant 340'-7" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 38th Street;

1.  Running thence westerly, along the northerly line of West 38th Street, 109'-5";

2.  thence northerly, parallel with the westerly line of Tenth Avenue, 98'-9" to the center line of block;

3.  thence easterly, parallel with the northerly line of West 38th Street and along the center line of block, 50'-0";

Page 3

# FIRST AMENDMENT TO AGREEMENT OF LIMITED PARTNERSHIP OF MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

Agreement made as of March 18, 1987 by and among Arthur E. Imperatore, Jerrold Wexler, and Edward W. Ross, the general partners of Mid-Town Development Limited Partnership, a New York limited partnership ("Partnership"), and CRC Properties, Inc., a Delaware corporation, the limited partner of the Partnership.

Whereas, the parties hereto established the Partnership by that certain Agreement Of Limited Partnership Of Mid-Town Development Limited Partnership ("Agreement") and Certificate thereof dated June 11, 1985; and

Whereas, the parties hereto being all of the partners of the Partnership desire to amend the Agreement as hereinafter set forth.

Now, therefore, it is agreed:

1. Section 8.1.3 of the Agreement is deleted in its entirety and the following substituted therefor:

"8.1.3  Subject to the provisions of Sections 4.2.1 and 5.1(m), the balance, if any, shall be distributed 95% to the General Partners and 5% to the Class B Limited Partner. If there are Class A and/or Class C Limited Partners, the 95% interest of the General Partners shall be decreased accordingly."

2. Section 10.4.2 of the Agreement is deleted in its entirety and the following substituted therefor:

"10.4.2  If the General Partners wish to assign a portion of their equity interest to new investors (Class A Limited Partners) and not apply the proceeds solely for Partnership purposes, then that portion of the proceeds of the sale not applied to Partnership purposes shall be distributed ninety-five per cent (95%) to the General Partners and five per cent (5%) to the Class B Limited Partner."

3.   Except as expressly amended herein, the Agreement is in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

GENERAL PARTNERS:

Arthur E. Imperatore

Jerrold Wexler

Edward W. Rose

CLASS B LIMITED PARTNER:

CRC PROPERTIES, INC.

By: _____
       President

# EXHIBIT C
# TO IMPERATORE DECLARATION

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 02:30 PM 05/25/1999
991208617 – 2015154

# CERTIFICATE OF OWNERSHIP AND MERGER
Merging
## CRC PROPERTIES, INC.
(a Delaware Corporation)
Into
## CONSOLIDATED RAIL CORPORATION
(a Pennsylvania Corporation)

Consolidated Rail Corporation, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania,

DOES HEREBY CERTIFY:

FIRST:    That this corporation was incorporated on the 10th day of February 1976, pursuant to 15 Pa. C.S.A. Sections 1301 et seq. of the Pennsylvania Business Corporation Law of 1988.  Merger of a Delaware subsidiary into a Pennsylvania parent corporation is permitted pursuant to 15 Pa. C.S.A. Sections 2501 et seq.

SECOND:    That this corporation owns all of the outstanding shares of the stock of CRC Properties, Inc., a corporation incorporated on the seventeenth day of August, 1983 pursuant to 8 Del. Code Ann. Sections 253 et seq. of the Delaware General Corporation Law.

THIRD:    That this corporation, by following resolutions of its Board of Directors, duly adopted at a meeting held on the 12th day of April, 1999, authorizing the

1

merger of CRC Properties, Inc. into Conrail subject to unanimous written consent of the Closing Committee of the Board of Directors, and following receipt of unanimous written consent of the Closing Committee of the Board of Directors, dated the 17th day of May, 1999, determined to and did merge into itself said CRC Properties, Inc.:

RESOLVED, that Consolidated Rail Corporation merge, and it hereby does merge into itself said CRC Properties, Inc. and assumes all its obligations;

FURTHER RESOLVED, that the merger shall become effective on May 31, 1999.

FURTHER RESOLVED, that the proper officer of this corporation be and he or she is hereby directed to make and execute a Certificate of Ownership and Merger setting forth a copy of the resolutions to merge said CRC Properties, Inc. and assume its liabilities and obligations, and the date of adoption thereof, and to cause the same to be filed with the Secretary of State and to do all acts and things whatsoever, whether within or without the State of Delaware, which may be in any wise necessary or proper to effect said merger.

FOURTH:    That this corporation survives the merger and may be served with process in the State of Delaware in any proceeding for enforcement of any obligation of CRC Properties, Inc., as well as for enforcement of any obligation of the surviving corporation arising from the merger, including any suit or other proceeding to enforce the

2

right of any stockholder as determined in appraisal proceedings pursuant to the provisions

of Section 262 of Title 8 of the Delaware Code, and it does hereby irrevocably appoint

the Secretary of State of Delaware as its agent to accept service of process in any such

suit or other proceeding.  The address to which a copy of such process shall be mailed by

the Secretary of State of Delaware is Vice President, Law, Consolidated Rail

Corporation, 2001 Market St., Philadelphia, PA 19101.  Until the surviving corporation

shall have hereafter designated in writing to the said Secretary of State a different address

for such purpose.  Service of such process may be made by personally delivering to and

leaving with the Secretary of State of Delaware duplicate copies of such process, one of

which copies the Secretary of State of Delaware shall forthwith send by registered mail to

Consolidated Rail Corporation at the above address.


    FIFTH:        Anything herein or elsewhere to the contrary notwithstanding, this

merger may be amended or terminated and abandoned by the Board of Directors of

Consolidated Rail Corporation at any time prior to the time that this merger filed with the

Secretary of State becomes effective.

IN WITNESS WHEREOF, said Consolidated Rail Corporation has caused this Certificate to be signed by James D. McGeehan, Assistant Corporate Secretary, this 17th day of May, 1999.

Consolidated Rail Corporation

By _____

James D. McGeehan

Assistant Corporate Secretary

CRCCERT.DOC

4