**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
  JERICHO GROUP, LTD.,                              :
                                             :
                  Plaintiff,                :
                                             :
           - against -                :    **No. 07-CV-1792 (CM) (DCF)**
                                           :
  **MIDTOWN DEVELOPMENT, L.P., EDWARD**  :    **ECF CASE**
  **IMPERATORE and MAURICE STONE,**        :
                                           :
                  Defendants.           :
-----------------------------------------------------------------X

## DECLARATION OF TODD R. GEREMIA

       I, TODD R. GEREMIA, declare the following under penalty of perjury under the laws of

the United States:

       1.     I am a partner in the law firm Jones Day, co-counsel with Phillips Nizer LLP to

defendants Midtown Development, L.P., Edward Imperatore, and Maurice Stone.  I submit this

declaration in opposition to a motion by the plaintiff, Jericho Group, Ltd., to reopen this closed

case and for sanctions against defendants and their counsel.

       2.     In support of its motion, Jericho submits a declaration from Chana Pfeiffer.  I

have never met or corresponded with Ms. Pfeiffer, and she has not had any role visible to me in

the more than three years that Midtown has been litigating with Jericho over the dispute that is

the subject matter of this action.  Nevertheless, Ms. Pfeiffer accuses me of giving intentionally

false "testimony" in defendants' notice of removal, filed with the Court on March 1, 2007.  (Doc.

No. 44 ¶ 21.)  According to Ms. Pfeiffer, I "knew that there were over thirty (30) partners to

Midtown Development, L.P. and failed to disclose them" in defendants' notice of removal. (Doc. No. 44 ¶ 24.) Ms. Pfeiffer's accusations against me are unfounded.

3.    I prepared defendants' notice of removal. Contrary to Ms. Pfeiffer's accusations, I did not make any knowingly false statements in it. Jericho filed the instant action on February 22, 2007 at the invitation of Justice Ramos of the Supreme Court, New York County, when that Court vacated a judgment of dismissal that had been entered in the State Court at the direction of the Appellate Division, First Department. The judgment of dismissal of Jericho's action has since been reinstated at the direction of the Appellate Division, which has reversed the Supreme Court's vacatur order. A copy of the Appellate Division's first dismissal order, entered August 17, 2006; the Appellate Division's corrected second dismissal order, entered January 16, 2008; and the reinstated final judgment of dismissal, entered in the New York County Clerk's Office on January 25, 2008, are attached hereto as Exhibit A.[1]

4.    Defendants removed Jericho's new action a week after Jericho filed it. In seeking to determine whether the parties were of diverse citizenship and preparing the notice of removal, I relied on the Agreement of Limited Partnership of Mid-Town Development Limited Partnership (hereinafter, the "Midtown Partnership Agreement") and a First Amendment to Agreement of Limited Partnership of Mid-Town Development Limited Partnership (hereinafter,

---

[1]    Jericho has refused to dismiss its second lawsuit—the action that this Court remanded to New York Supreme Court—even though it asserts claims for breach of contract and fraud that are based on the same transaction that was at issue in the action that the Appellate Court has dismissed. Since the Appellate Division's second dismissal order, Jericho is also increasingly lashing out at Midtown's counsel, both with this sanctions motion and also in the State Court. Notwithstanding the Appellate Division's order and the judgment of dismissal, Jericho has made a motion to amend its complaint in its second lawsuit to assert claims against Midtown's counsel in the underlying transaction pursuant to § 487 of the New York Judiciary Law. Jericho has also refused to cancel the notices of pendency that it filed against Midtown's properties in the New York County Clerk's Office.

the "First Amendment to the Midtown Partnership Agreement") to determine who Midtown's general and limited partners are. Copies of these documents are attached hereto as Exhibit B.

5.       When I prepared the notice of removal, I did not have, nor was I aware of, any further amendments to the Midtown Partnership Agreement other than the First Amendment. I also did not have, and was not aware of, any documents establishing Midtown's partners other than the Midtown Partnership Agreement and the First Amendment to the Midtown Partnership Agreement. At the outset of this litigation with Jericho, the only documents that our client had provided to Jones Day that established the partners in Midtown were the Midtown Partnership Agreement and the First Amendment to the Midtown Partnership Agreement. I also confirmed with our client during discovery in the State Court litigation that it had no further agreements or certificates for the Midtown partnership or any further amendments to the Midtown Partnership Agreement. At no time before Jericho submitted its motion to remand this action to State Court, on March 30, 2008, was I aware of any further amendments to the Midtown Partnership Agreement or any document establishing Midtown's partners other than the Midtown Partnership Agreement and the First Amendment to the Midtown Partnership Agreement.

6.       Both the Midtown Partnership Agreement and the First Amendment to the Midtown Partnership Agreement state that Midtown's only general partners are Arthur E. Imperatore, Jerrold Wexler (who is now deceased), and Edward W. Ross, and that Midtown's only limited partner is CRC Properties, Inc. *See* Ex. A, Midtown Partnership Agreement, at 25; *id.*, First Amendment to Midtown Partnership Agreement. Accordingly, when I prepared the notice of removal, I wrote, in what I then believed to be an accurate statement, that "Midtown's only general partners are Arthur E. Imperatore and Edward W. Ross" and that "Midtown's only

limited partner is Consolidated Rail Corporation, as successor to CRC Properties, Inc." (Doc. No. 1 ¶ 6.)

7.      Jericho included as an exhibit to its motion for a remand a Second Amendment to Certificate of Limited Partnership of Mid-Town Development Limited Partnership, dated May 28, 1987 (hereinafter, the "Second Amendment to the Midtown Partnership Agreement"). A copy of the Second Amendment to the Midtown Partnership Agreement that was attached as an exhibit to Jericho's remand motion is attached hereto as Exhibit C. I do not know when or where Jericho had obtained this document, but it had not been produced by either Jericho or Midtown during the litigation. The copy of the Second Amendment to the Midtown Partnership Agreement that Jericho submitted along with its remand motion bears a stamp from the New York County Clerk's Office. *See* Ex. C at 5.

8.      The Second Amendment to the Midtown Partnership Agreement states that Jerrart Venture is the only general partner of Midtown, that CRC Properties, Inc. was a Class B Limited Partner in Midtown, and that Arthur E. Imperatore, Jerrold Wexler, and Edward W. Ross were the "Withdrawing General Partners." Ex. C at 1-2. I did not have, had not seen, and was not aware of this Second Amendment to the Midtown Partnership Agreement, or any other amendment to the Midtown Partnership Agreement other than the First Amendment, when I drafted the notice of removal or at any time before Jericho filed its motion for a remand.

9.      Upon reviewing the Second Amendment to the Midtown Partnership Agreement, and becoming aware that Jerrart Venture is the only general partner in Midtown, I worked to determine, first, who are the partners in Jerrart Venture and then to determine whether

defendants had a basis for opposing Jericho's remand motion and asserting that the Court has diversity jurisdiction over this action.

10.    As defendants showed in their opposition to Jericho's motion for a remand and disclosed in a comprehensive factual submission accompanying that opposition, Jerrart Venture is an Illinois general partnership whose only two partners are WR West Side Associates, an Illinois limited partnership, and Hadrian Properties Ltd., a New Jersey limited partnership. (Doc. No. 11 at 6-7.) Defendants' opposition papers fully disclosed all of the individuals and entities that are general or limited partners in WR West Side Associates and Hadrian Properties Ltd. and attached as exhibits declarations from all of the individuals who have a partnership interest in WR West Side Associates and Hadrian Properties Ltd. (Doc. No. 11 at 6-13; *see also* Doc. Nos. 13-32.) Defendants also acknowledged and fully disclosed that a New York citizen, Tanya Wexler, has an interest in WR West Side Associates as the successor to Tanya Wexler Trust Number 18—which was a limited partner in WR West Side Associates—and submitted a declaration from Ms. Wexler attesting that she is domiciled in New York and that in 1997 she succeeded to all of the rights and interests of the Tanya Wexler Trust Number 18. (Doc. No. 10-11; *see also* Doc. No. 27.)

11.    In their opposition to Jericho's remand motion, defendants made a legal argument that, under the WR West Side Associates partnership agreement, the laws governing Illinois limited partnerships, and case law from this Court and the Supreme Court, Ms. Wexler should not be treated as a limited partner in WR West Side Associates for purposes of determining WR West Side Associates' citizenship because Ms. Wexler had not formally been made a substitute limited partner in WR West Side Associates in accordance with the partnership agreement. (Doc. No. 11 at 10-12, citing, *inter alia*, provisions of the Illinois' Revised Uniform Limited

Partnership Act, provisions of the WR West Side Associates partnership agreement dealing with the appointment of substitute limited partners, *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 907 F. Supp. 663, 669-71 (S.D.N.Y. 1995), and *Carden v. Arkoma Associates*, 494 U.S. 185, 193-95 (1990).)  Defendants further argued that, under 28 U.S.C. § 1653 and case law from this Court and the Second Circuit applying that provision, the Court should permit defendants to amend their notice of removal to correct the allegations describing Midtown's partners and the citizenship of the individuals and entities that constitute Midtown.  (Doc. No. 11 at 13-15.)

12.      Thus, notwithstanding that the original notice of removal submitted on March 1, 2007 had made what I know now to be incorrect statements about Midtown's partners, when the Court ruled on Jericho's motion for a remand and determined whether to assert jurisdiction over Jericho's action, the Court had before it all of the facts necessary to make this determination.  I did not make any statement in the original notice of removal that I knew to be false.  I also would not have filed an opposition to Jericho's motion for a remand unless I had a good-faith belief that defendants had a sound basis in law and fact for contending that the Court could properly assert diversity jurisdiction over this action and should grant defendants' request for leave to amend their notice of removal.

13.      I declare under penalty of perjury that the foregoing is true and correct.

Executed within the United States on April 22, 2008.

                              ___/s/ *Todd R. Geremia*___
                                      Todd R. Geremia

## CERTIFICATE OF SERVICE

On April 22, 2008, the foregoing DECLARATION OF TODD R. GEREMIA, executed

on April 22, 2008, with exhibits, was served on the office of the following counsel for plaintiff

by hand:

> Robert L. Rimberg
> GOLDBERG & RIMBERG, PLLC
> 115 Broadway, 3rd Floor
> New York, New York  10006
>
> *Attorneys for Plaintiff,*
> *Jericho Group, Ltd.*

Dated: New York, New York
      April 22, 2008

                                / s / Todd R. Geremia
                                  Todd R. Geremia

# EXHIBIT A

Mazzarelli, J.P., Saxe, Nardelli, Sweeny, McGuire, JJ.

7703        Jericho Group, Ltd.,                          Index 113274/04
                   Plaintiff-Respondent,

                        -against-

            Midtown Development, L.P.,
                   Defendant-Appellant.
            _____

Jones Day, New York (Frederick E. Sherman of counsel), for
appellant.

Robert B. Goebel, Scarsdale, for respondent.
            _____

        Order, Supreme Court, New York County (Charles Edward Ramos,

J.), entered May 18, 2005, which denied defendant's CPLR

3211(a)(7) motion to dismiss the amended complaint, unanimously

reversed, on the law, with costs, the motion granted and the

complaint dismissed.  The Clerk is directed to enter judgment

accordingly.

        On June 18, 2002, Jericho Group Ltd. entered into a contract

to purchase two undeveloped properties on 11th Avenue from

Midtown Development, L.P.  One lot was located between 36th and

37th streets, and the other was between 37th and 38th Streets.  The

purchase price was $28 million.  Jericho deposited $250,000 into

an escrow account at the time of execution of the contract, and

agreed to pay the balance of the purchase price at closing.

Paragraph 41(d) of the contract provided that Midtown's counsel

would serve as the escrow agent.  Paragraph 22 of the contract

provided:

                                35

"In the event that the seller is unable to convey title in
accordance with the terms of this contract, the sole
liability of the seller will be to refund to the purchaser
the amount paid on account of the purchase price, and upon
such refund any payment being made [under] this cont[r]act
shall be considered canceled."

Both of the properties were encumbered by railroad easements and

rights of way in favor of Amtrak.  A rider to the sales contract

provided:

"29. (a) [Jericho] shall have seventy five days from the
date this Contract has been executed by both parties ("the
Study Period"), to cause to be performed, at Purchaser's
cost and expense, such environmental and/or
architectural/engineering and other tests and/or inspections
as [Jericho], in its sole discretion, shall elect to
perform.  In accordance with the terms of Paragraph 29(b)
below, [Midtown] shall allow Jericho and its representatives
access to [the] Property at all reasonable times, shall
cooperate with [Jericho] and its representatives and shall
make available to [Jericho] and its representatives such
material pertinent to such tests and/or inspections as
seller may have in it[s] possession.  If, prior to the
conclusion of the Study Period, [Jericho] shall determine,
in its sole and absolute discretion that the Property is not
suitable for its needs, [Jericho] shall have the right to
cancel this Contract upon written notice to Seller and
Escrowee.  Upon timely receipt of such notice of
cancellation, the Escrowee shall promptly return to
[Jericho] the monies paid in execution hereof."

The closing was scheduled for 15 days after the 75-day study

period, on September 18, 2002.  The Rider also provided, at

paragraph 29(c) that if Jericho made a "reasonable request,"

Midtown was to provide Jericho with "documents . . . relating to

the condition of the property during the study period."

In July 2002, Jericho requested an extension of the study

period from September 2, 2002 to December 31, 2002.  Midtown sent

36

Jericho a letter, dated July 15, 2002, stating that it was "not particularly amenable to Jericho's request, particularly because Midtown refrained from making any representations concerning zoning or permits in the Contract." However, it offered to grant the requested extension on the conditions that Jericho: (1) paid a nonrefundable fee of $250,000 for the carrying of the sites; (2) placed an additional $500,000 in escrow for the down payment; and (3) agreed that $250,000 of the down payment would be non-refundable in the event Jericho failed to close under the contract. The letter then states, "[a]ssuming Jericho accepts this proposal, we would present it as an amendment to the Contract, which would be signed by both parties."

Jericho did not agree to these terms, and on July 17, 2002 counter-proposed that the Contract be amended to extend the study period until July 1, 2003. As part of the counter-proposal, Jericho agreed to deposit an additional $500,000 in escrow to be used to fund certain real estate taxes on the property. By letter dated July 25, 2002, Midtown rejected the counter-proposal, but stated that it was still willing to extend the study period through December 31, 2002 in accordance with its earlier proposed terms. Jericho rejected this offer and made a second counter proposal. It requested that it be granted a free extension of the study period through December 31, 2002, and on that date it would have the option to further extend the study

37

period to July 31, 2003 by paying Midtown $1 million.  Midtown

rejected this second counter-proposal.  Jericho made a third

proposal that the study period be extended to July 1, 2003, this

time contingent upon its payment of a nonrefundable payment of

$750,000, which was also rejected.

Finally, on August 28, 2002, approximately a week before the

end of the study period, Jericho sent a letter to Midtown, which

stated:

> "Without prejudice to its current rights under the
> referenced contract, Jericho has determined to accept the
> proposal of Midtown regarding the extension of the study
> period as set forth in [Midtown's] letter dated July 15,
> 2002, and as reiterated in [their] letter dated July 27,
> 2002.  Please prepare a draft of an appropriate amendment to
> the referenced contract and forward it to me [] as soon as
> possible so that we can finalize the matter prior [sic] well
> before the current expiration of the study period."

On August 28, 2002, Midtown faxed a letter which notified Jericho

that its July 15, 2002 offer had been repeatedly rejected and was

deemed, as rejected, null and void.

On August 30, 2002, Jericho informed Midtown that it had

heard something about an oil spill at or near the property.  It

requested that Midtown inform it about the alleged oil spill and

whether or not it had been cleaned up.  This was not the first

correspondence between the parties on this subject.  By e-mail

dated August 23, 2002, Midtown let Jericho know that it had no

information concerning the cleanup of an oil spill on properties

neighboring the land Jericho sought to purchase.  However,

38

Midtown gave Jericho the name of a contact person at the New York Department of Environmental Conservation, his telephone number, and a project number and spill number for the incident at issue, so that Jericho could find out the status of any spill and/or cleanup.

On the day before the study period expired, Jericho asked Midtown for the exhibits to a development agreement between Midtown and Amtrak. The agreement had been included with the contract, but not the exhibits. Midtown responded that it did not have the requested exhibits. It also reminded Jericho that it had 75 days during the study period to request the exhibits from Amtrak, or to meet with employees of Amtrak to discuss any issues regarding its easement. On September 3, 2002, counsel for Jericho sent Midtown a letter stating:

> "Be advised that, unless you advise us in writing the Midtown is willing (i) to make an affirmative representation that the oil spill referred to in my earlier letter of today's date has been cleaned up and paid for or (ii) to undertake whatever cleanup may be necessary at its cost and expense or (iii) to extend the Study Period for a sufficient time to allow Jericho to investigate this matter, and, in any case provide Jericho with the requested due diligence documentation, Jericho requests that the monies paid upon execution of the contract be returned to it in accordance with the Contract's terms."

Midtown responded by requesting an express statement from Jericho as to whether it intended to cancel the Contract. It indicated that in the absence of such express statement, it would presume that Jericho intended to proceed to closing on September 18, 2002

pursuant to the terms of the contract.

On September 12, 2002, Jericho sent Midtown a letter stating:

> "Although Jericho's principals felt, and still feel, that, under the circumstances which came to light in the month of August, either some affirmative response with respect to the oil spill or an extension of the study period and the request for production of documents was warranted, this letter will serve as confirmation that our letter on behalf of Jericho dated September 3, 2002, requesting the return of Jericho's down payment was intended as the exercise of Jericho's right under paragraph 29(a) of the referenced contract to cancel said contract and receive the return of the monies paid upon execution thereof."

Midtown returned the $250,000 down payment the next day.

Two years later Jericho instituted this action. Its amended complaint contained five causes of action, with several alternative requests for relief. The first claim asserted breach of the contract of sale and seeks reinstatement of the contract and specific performance thereunder. A second claim, also for breach of the sales contract, sought $50 million in damages. The third cause of action alleged that Midtown wrongfully repudiated its July 15, 2002 offer to extend the study period through December 31, 2002, and it sought reinstatement of the original contract of sale. The fourth claim mirrored the allegations in the third cause of action and sought $50 million in damages. In the fifth and final cause of action, Jericho claimed that Midtown defrauded it by failing to disclose (1) its business relationship with the escrow agent; (2) the unavailability of the exhibits to

40

an agreement with Amtrak which would have clarified questions about the scope of the railway's easement; and (3) the occurrence and ramifications of an oil spill. The fifth cause of action also sought $50 million in damages.

Midtown moved to dismiss the complaint, and Jericho opposed. In the order appealed, the IAS court denied Midtown's motion. We reverse and dismiss the complaint.

Standard of Review

On a motion to dismiss pursuant to CPLR 3211, the complaint is afforded a liberal construction (*Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977]). The facts alleged in the complaint are presumed to be true, and it is the role of the court to "accord plaintiffs the benefits of every possible inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Arnav Indus., Inc. Retirement Trust v Brown, Raysman, Millstein, Felder & Steiner*, 96 NY2d 300, 303 [2001]). However, dismissal is warranted if the documentary evidence contradicts the claims raised in the complaint (*id.; Mobil Oil Corp. v Joshi*, 202 AD2d 318, 318-319 [1994]).

Breach of the Original Contract

The first and second causes of action, alleging breach of the contract to purchase the subject property, should have been dismissed. On September 3, 2002, the last day of the study period, Jericho requested return of its down payment unless it

41

received certain "due diligence" information from Midtown.
Midtown advised Jericho that it would not return the down payment
unless, pursuant to the terms of the contract, Jericho
acknowledged in writing that the contract was cancelled.  On
September 13, Jericho sent a letter stating that it was
exercising its option to cancel the contract, and it demanded the
return of its down payment.

The assertions in this complaint, brought two years
subsequent to the cancellation of the agreement, do not support
Jericho's allegation that Midtown breached the contract to sell
the subject property, but instead indicate that Jericho cancelled
the contract and recovered its down payment (*see Eight Hundred
Corp. v 217 State Street Realty Corp.*, 169 AD2d 810 [1991]).  An
additional ground for dismissal of the first and third causes of
action is the settled rule that a party cannot seek specific
performance of a cancelled real estate contract (*Degree Sec.
Sys., Inc. v F.A.B. Land Corp.*, 17 AD3d 402, 403 [2005] [specific
performance unavailable where a contact for sale of real estate
was validly cancelled]; *see also Gartner v Lowe*, 299 AD2d 198
[2002], *lv denied* 100 NY2d 501 [2003]; *Abely v Hayden*, 155 AD2d
254, 256 [1989]; *Bennett v John*, 151 AD2d 711 [1989]).

Had Midtown willfully or deliberately breached its
obligations under paragraph 29(a) of the contract, Jericho's
first two causes of action would not have been barred by its

42

termination of the contract and recovery of its down payment

(*Mokar Props. Corp. v Hall*, 6 AD2d 536, 539-540 [1958]).

However, Jericho's allegations, to the extent they allege willful

or deliberate breach of contract, are either contradicted by the

documentary evidence submitted on the motion (*see Arnav, supra*)

or premised on a misreading of Midtown's obligations under

paragraph 29(a).  Thus, the rule articulated in *Mokar* is

inapplicable to these facts.

Breach of the Agreement to Extend the Study Period to December
2002

We also dismiss the third and fourth causes of action on the

ground that there was never any agreement to extend the study

period through December 2002.  On July 15, 2002 and on July 25,

2002, Midtown offered to extend the study period to December

2002.  Midtown's July 15 letter set forth the terms of the

extension in detail, and required that if the extension were

agreed upon, the terms had to be spelled out, signed by both

parties, and incorporated as an amendment to the original

contract.  In response to both the July 15 and the July 25

offers, Jericho proposed counteroffers.  In August of 2002

Jericho attempted to accept the earlier extension offer, in a

letter which acknowledged its understanding that Midtown

conditioned any extension of the study period upon the execution

of a formalized signed writing (*see BMH Realty Ltd. v 399 E. 72nd*

*St. Owners, Inc.*, 221 AD2d 165 [1995] ["the documents themselves

43

make clear that the parties did not intend to be bound until a formal agreement was executed"]; *Brause v Goldman*, 10 AD2d 328, 332-333 [1960], *affd* 9 NY2d 620 [1961] [same]).

Further, it is a fundamental tenet of contract law that a counteroffer constitutes a rejection of an offer as a matter of law (*J. Grotto & Assocs., Inc. v Hiro Real Estate Co.*, 271 AD2d 360 [2000]; *Kleinberg v Ambassador Assocs.*, 103 AD2d 347, 348 [1984], *affd* 64 NY2d 733 [1984]; *Greystone Partnerships Group Inc. v Koninklijke Luchtvaaart Maatschappij*, 815 F Supp 745, 753 [SD NY 1993]). Rejection by counteroffer extinguishes the offer and renders any subsequent acceptance thereof inoperative (*Kleinberg*, *supra*). Here, all of Midtown's offers to extend the study period to December 2002 were met by counteroffers by Jericho, for different extensions on different terms. Accordingly, the December 2002 study period extension offer was "null and void" by the time Jericho determined to accept it. We thus dismiss the third and fourth causes of action, premised upon an alleged agreed-upon extension of the study period.

Fraud

Jericho's fifth cause of action, presumably alleging fraud and deceit, averred that as a result of Midtown's misrepresentations, it suffered $50 million in damages. Jericho contends that because it was not provided with (1) information concerning the fact that the escrow agent had an ownership

44

interest in Midtown; (2) exhibits to an agreement with Amtrak which would have clarified questions about the scope of the railway's easement; and (3) information concerning the occurrence and ramifications of an oil spill, it was unable to conduct due diligence review of the purchase offer.

However, none of these allegations constitute actionable fraud. Midtown's obligation to provide documents flowed from the "due diligence" requirements of Paragraph 29(a) of the contract (*see Tesoro Petroleum Corp. v Holburn Oil Co.*, 108 AD2d 607 [1985], *appeal dismissed* 65 NY2d 637 [1985]). Accordingly, Jericho's allegations that Midtown intended to breach a contractual obligation does not support an action for fraud (*see Third Ave. LLC v Greble & Finger*, 8 AD3d 75, 76 [2004]; *Modell's N.Y., Inc. v Noodle Kidoodle, Inc.,* 242 AD2d 248, 249 [1997]; *Devlin v 645 First Ave. Manhattan Co.*, 229 AD2d 343, 349 [1996]; *Tesoro, supra*). As to the escrow agent, the contract expressly provided that Midtown's lawyers would act in this role. There is no evidence that there was any misconduct with respect to the escrow account which would support a claim of fraud. Further, the record is plain that Midtown provided Jericho with information in its possession, and that it alerted Jericho as to additional sources of information as to the railway easement and the alleged oil spill. It should also be noted that Jericho made requests for documents on the eve of the expiration period which

45

could have been made much earlier. As there was no evidence of actionable fraud, we dismiss the fifth cause of action.

Damages

Finally, it bears noting that the relief sought by the second and fourth causes of action ($50 million) would not have been available to plaintiff even if the alleged breach of contract had occurred. Paragraph 22 of the contract limits Midtown's liability for breach to return of Jericho's down payment. As the down payment was returned when the contract was cancelled, two years before this action was commenced, Jericho has no further recourse against Midtown with respect to that agreement (*Progressive Solar Concepts, Inc. v Gabes*, 161 AD2d 752, 753 [1990]).

> **M-68 - *Jericho Group, Ltd. v Midtown Development, L.P.***
>
> Motion seeking leave to supplement record is hereby withdrawn.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  AUGUST 17, 2006

*Catherine O'Hagan Wolfe*
CLERK

<u>CORRECTED ORDER - JANUARY 16, 2008</u>

Lippman, P.J., Buckley, Gonzalez, Sweeny, JJ.

2547N        Jericho Group, Ltd.,                    Index 113274/04
                 Plaintiff-Respondent,

                      -against-

             Midtown Development, L.P.,
                 Defendant-Appellant.
             ————————————————

Phillips Nizer LLP, New York (George Berger of counsel), for
appellant.

Herzfeld & Rubin, P.C., New York (David B. Hamm of counsel), for
respondent.
             ————————————————

    Order, Supreme Court, New York County (Charles E. Ramos,

J.), entered February 20, 2007, which, insofar as appealed from,

granted plaintiff's motion to vacate a judgment of dismissal

entered at the direction of this Court, unanimously reversed, on

the law, without costs, and the motion denied.  The Clerk is

directed to re-enter judgment in favor of defendant dismissing

the amended complaint.

    The prior action dismissed by this Court sought damages and

specific performance in connection with a contract for the

purchase of real estate, after plaintiff buyer had cancelled the

contract and defendant seller had returned the down payment.  In

reversing the motion court and dismissing the amended complaint,

this Court held, inter alia, that plaintiff had no cause of

action for fraud based on defendant's alleged failure to produce

                              46

certain documents requested by plaintiff at the end of the contractual due diligence period (32 AD3d 294, 300). Plaintiff now claims that in disclosure proceedings conducted during the pendency of the prior appeal, defendant produced, or admitted the nonexistence, of documents that it had previously represented it did not have, and thereby committed a fraud on the court. Such claim, however, goes to defendant's compliance with its contractual obligation to produce documents, i.e., the underlying transaction, not to "the very means by which the judgment was procured," and therefore does not avail to vacate the judgment pursuant to CPLR 5015(a)(3) (*Cofresi v Cofresi*, 198 AD2d 321, 321 [1993] [internal quotation marks omitted]). In any event, plaintiff fails to show fraud in the underlying transaction.

THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:    JANUARY 15, 2008

CLERK

47

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------------X

JERICHO GROUP, LTD.,

                        Plaintiff,                    Index No. 113274/04

               -against-                      JUDGMENT

MIDTOWN DEVELOPMENT, L.P.,

                        Defendant.

----------------------------------------------------------------------X

       Pursuant to a Corrected Order of the Appellate Division, First Department entered in this

action on January 16, 2008, that (i) unanimously reversed, on the law, without costs, an Order of

the Supreme Court, New York County (Charles E. Ramos, J.) entered February 20, 2007, which,

insofar as appealed from, granted Plaintiff's motion to vacate the Judgment of dismissal entered

in this action at the direction of the Appellate Division, First Department by Order entered

August 17, 2006; (ii) denied Plaintiff's motion to vacate the Judgment of dismissal; and (iii)

directed the Clerk to re-enter the Judgment in favor of Defendant dismissing the Amended

Complaint, it is hereby

       ADJUDGED that the Amended Complaint is DISMISSED.

Judgment signed and entered this _____25th_____ day of _____January_____,

2008.

_____
     Clerk

**FILED**

JAN 25 2008

NEW YORK
COUNTY CLERK'S OFFICE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------X

JERICHO GROUP, LTD.,

                                                      Index No. 113274/04

                          Plaintiff,

               -against-

MIDTOWN DEVELOPMENT, L.P.,

                          Defendant.

---------------------------------------------------------------------X

### AFFIRMATION OF TODD R. GEREMIA

       TODD R. GEREMIA, an attorney duly admitted to practice law in the State of New

York, affirms the truth of the following under penalty of perjury, pursuant to Rule 2106 of the

New York Civil Practice Law and Rules:

       1.     I am a partner in the law firm Jones Day, co-counsel for defendant Midtown

Development, L.P. in this action.  I submit this affirmation in connection with re-entry of the

Judgment in this action, in accordance with the Corrected Order of the Appellate Division, First

Department, entered on January 16, 2008.

       2.     Defendant Midtown Development, L.P. waives all costs in this action.

Dated: New York, New York
       January 23, 2008

**FILED**

JAN 2 5 2008

NEW YORK
COUNTY CLERK'S OFFICE

                               _____
                                    TODD R. GEREMIA

<u>CORRECTED ORDER - JANUARY 16, 2008</u>

Lippman, P.J., Buckley, Gonzalez, Sweeny, JJ.

2547N        Jericho Group, Ltd.,                    Index 113274/04
                    Plaintiff-Respondent,

                        -against-

             Midtown Development, L.P.,
                    Defendant-Appellant.
             _____

Phillips Nizer LLP, New York (George Berger of counsel), for
appellant.

Herzfeld & Rubin, P.C., New York (David B. Hamm of counsel), for
respondent.
             _____

        Order, Supreme Court, New York County (Charles E. Ramos,

J.), entered February 20, 2007, which, insofar as appealed from,

granted plaintiff's motion to vacate a judgment of dismissal

entered at the direction of this Court, unanimously reversed, on

the law, without costs, and the motion denied.  The Clerk is

directed to re-enter judgment in favor of defendant dismissing

the amended complaint.

        The prior action dismissed by this Court sought damages and

specific performance in connection with a contract for the

purchase of real estate, after plaintiff buyer had cancelled the

contract and defendant seller had returned the down payment.  In

reversing the motion court and dismissing the amended complaint,

this Court held, inter alia, that plaintiff had no cause of

action for fraud based on defendant's alleged failure to produce

                            46

certain documents requested by plaintiff at the end of the contractual due diligence period (32 AD3d 294, 300). Plaintiff now claims that in disclosure proceedings conducted during the pendency of the prior appeal, defendant produced, or admitted the nonexistence, of documents that it had previously represented it did not have, and thereby committed a fraud on the court. Such claim, however, goes to defendant's compliance with its contractual obligation to produce documents, i.e., the underlying transaction, not to "the very means by which the judgment was procured," and therefore does not avail to vacate the judgment pursuant to CPLR 5015(a)(3) (*Cofresi v Cofresi*, 198 AD2d 321, 321 [1993] [internal quotation marks omitted]). In any event, plaintiff fails to show fraud in the underlying transaction.

                    THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

                        ENTERED:   JANUARY 15, 2008

                                                        CLERK

**APPELLATE DIVISION SUPREME COURT FIRST DEPARTMENT**
**STATE OF NEW YORK**

I, JOHN W. McCONNELL, Clerk of the Appellate Division of the Supreme Court First Judicial Department, do hereby certify that I have compared this copy with the original thereof filed in said office on ___1|15|08___ and that the same is a correct transcript thereof, and of the whole of said original.
IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of this Court on ___1|23|08___.

                                                        CLERK

F I L E

JAN 2

NEW

COUNTY CLE

47

# EXHIBIT B

# AGREEMENT OF LIMITED PARTNERSHIP

## OF

## MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| Table of Contents |  |  | 1 |
| Glossary |  |  | 4 |
| ARTICLE I | Definitions |  | 5 |
| Section 1.1. | Definitions |  | 5 |
| ARTICLE II | Purpose |  | 7 |
| Section 2.1. | Purpose; Limitations |  | 7 |
| ARTICLE III | Formation of the Partnership |  | 8 |
| Section 3.1. | Formation; Name |  | 8 |
| Section 3.2. | Principal Office |  | 8 |
| Section 3.3. | Termination |  | 8 |
| ARTICLE IV | Capital; Additional Funds; Loans by Partners |  | 8 |
| Section 4.1. | Amounts Contributed |  | 8 |
| Section 4.2. | Additional Funds |  | 8 |
| Section 4.3. | No Additional Capital Contributions |  | 9 |
| Section 4.4. | Loans of Partners |  | 9 |
| Section 4.5. | Interest |  | 9 |
| Section 4.6. | Capital Accounts |  | 9 |
| ARTICLE V | Management of the Partnership |  | 10 |
| Section 5.1. | Management |  | 10 |
| Section 5.2. | Limited Partners |  | 12 |
| Section 5.3. | Duties and Independent Activities |  | 12 |
| Section 5.4. | Limitation of Liability |  | 13 |
| Section 5.5. | Indemnification |  | 13 |
| Section 5.6. | Actions Requiring Consent |  | 13 |
| Section 5.7. | Partition |  | 13 |
| Section 5.8. | Deposits of Funds |  | 13 |
| Section 5.9. | Fees |  | 14 |
| ARTICLE VI | Cash Distributions |  | 14 |
| Section 6.1. | Times of Distribution |  | 14 |

MID 00760

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **ARTICLE VII** | Profits, Gains and Losses | 14 |
| Section 7.1. | Allocation of Net Profits and Net Losses | 14 |
| Section 7.2. | Allocation of Gains | 15 |
| **ARTICLE VIII** | Sales and Mortgage Proceeds | 15 |
| Section 8.1. | Sale and Refinancing | 15 |
| Section 8.2. | Reduction of Reserve | 16 |
| **ARTICLE IX** | Transfers of Limited Partners' Interests | 16 |
| Section 9.1. | Transfers by Limited Partners | 16 |
| Section 9.2. | Assignment of Rights to Distributions by Limited Partners | 17 |
| Section 9.3. | Costs and Expenses | 17 |
| **ARTICLE X** | Withdrawal and Removal of Partners | 17 |
| Section 10.1. | Limited Partners | 17 |
| Section 10.2. | Net Worth | 17 |
| Section 10.3. | General Partners | 17 |
| Section 10.4. | Additional Partners | 18 |
| **ARTICLE XI** | Option to Purchase | 18 |
| Section 11.1. | Right of First Refusal | 18 |
| Section 11.2. | Assignability | 19 |
| **ARTICLE XII** | Termination of Dissolution of Partnership | 19 |
| Section 12.1. | By Agreement or Upon Sale of Assets | 19 |
| Section 12.2. | Retirement of General Partner | 19 |
| Section 12.3. | Interest of Retired General Partner | 20 |
| Section 12.4. | Retirement in Violation of Agreement; Insolvency | 20 |
| Section 12.5. | Termination | 20 |

MID 00761

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| **ARTICLE XIII** | **Books and Reports** | 21 |
| Section 13.1. | Books of Accounts | 21 |
| Section 13.2. | Goodwill | 21 |
| Section 13.3. | Statements | 21 |
| Section 13.4. | Election under Section 754 of the Code | 22 |
| **ARTICLE XIV** | **Further Documents** | 22 |
| Section 14.1. | Execution by Limited Partners | 22 |
| **ARTICLE XV** | **Amendment of Agreement** | 22 |
| Section 15.1. | Amendment by Majority Action | 22 |
| Section 15.2. | Delivery of Copies | 23 |
| **ARTICLE XVI** | **Miscellaneous** | 23 |
| Section 16.1. | Notices | 23 |
| Section 16.2. | Complete Agreement | 23 |
| Section 16.3. | Severability | 24 |
| Section 16.4. | Ratification | 24 |
| Section 16.5. | Binding upon Successors | 24 |
| Section 16.6. | Rights of Third Parties | 24 |
| Section 16.7. | Governing Law | |
| Section 16.8. | Captions | 24 |
| Section 16.9. | Counterparts | 24 |
| Section 16.10. | Sense and Gender of Words | 24 |
| Section 16.11. | Investment Representation | 24 |

* * * * *

| Exhibit A | Real Property Description |
|---|---|
| Exhibit B | Form of Certificate of Limited Partnership |

-3-

# GLOSSARY

| Term | Provision of Agreement |
|---|---|
| Act | 1.1.1 |
| Affiliate | 1.1.2 |
| Approved General Partner Designee | 1.1.3 |
| Building | 1.1.4 |
| CRCP | Heading |
| Capital Contributions | 1.1.5 |
| Certificate of Limited Partnership | 1.1.6 |
| Certificate of Occupancy | 1.1.7 |
| Class A Limited Partner | 1.1.8 |
| Class B Limited Partner | 1.1.9 |
| Class C Limited Partner | 1.1.10 |
| Code | 1.1.11 |
| Conrail | 2.1 |
| General Partners | 1.1.12 |
| Immediate Family | 1.1.13 |
| In Interest | 1.1.14 |
| Indemnified Parties | 5.5 |
| Limited Partners | 1.1.15 |
| Net Losses | 1.1.16 |
| Net Profits | 1.1.16 |
| Partners | 1.1.17 |
| Partnership | 1st Recital |
| Person | 1.1.18 |
| Property | 1.1.19 |
| Sale | 8.1 |

-4-

AGREEMENT, made as of the _____ day of _____, 1985, by and among ARTHUR E. IMPERATORE, JERROLD WEXLER and EDWARD W. ROSS, as general partners, and CRC PROPERTIES, INC. ("CRCP"), a Delaware corporation, as limited partner.

## W I T N E S S E T H:

WHEREAS, the parties hereto desire to form a limited partnership (the "Partnership") to acquire, own, improve and manage certain real property described in Exhibit A annexed hereto in the City, County and State of New York;

NOW, THEREFORE, in consideration of the premises, the parties do hereby agree as follows:

## ARTICLE I

## Definitions

SECTION 1.1. Definitions. As used herein, the following terms shall have the following respective meanings:

1.1.1 "Act" means the Uniform Limited Partnership Act of the State of New York.

1.1.2 "Affiliate" means any Person controlled by, controlling or as under common control with any General Partner.

1.1.3 "Approved General Partner Designee" means the following Persons:

C.A. Cataldo
Edward G. Imperatore
Ira A. Kipnis
Richard Melosh
Armand Pohan
Donald A. Smith

1.1.4 "Buildings" means the buildings and improvements which comprise a part of the Property (as hereinafter defined), as the same may be altered and reconstructed and/or erected from time to time.

1.1.5 "Capital Contributions" means the amounts contributed and to be contributed by the partners to the Partnership pursuant to the provisions of this Agreement.

-5-

1.1.6  "Certificate of Limited Partnership" means the Certificate of Limited Partnership of the Partnership, as amended from time to time.  Unless the context requires otherwise, any reference to the "Certificate of Limited Partnership" shall be to the Certificate of Limited Partnership as the same shall be in effect at the time to which such reference relates.  The Certificate of Limited Partnership annexed hereto as Exhibit B shall be filed by the General Partners promptly after execution of this Agreement; and the General Partners shall cause the publication required by law.

1.1.7  "Certificate of Occupancy" means a certificate or certificates issued by the New York City Department of Buildings (or its successor) to the Partnership and/or the General Partner(s) or to a builder or renovator hired by the Partnership and/or the General Partner(s) stating that the hotel, parking garage, office building or other substantial structure to be erected by the Partnership on the Property is in proper condition to be occupied.

1.1.8  "Class A Limited Partner" means additional limited partners admitted to the Partnership by the General Partners pursuant to Section 10.4, and their successors and permitted assigns.

1.1.9  "Class B Limited Partner" means CRCP and any successors to or permitted assigns of its interest in the Partnership and any Person admitted as additional Class C Limited Partners by the General Partners.

1.1.10  "Class C Limited Partner" means the interest of a General Partner if converted pursuant to Sections 10.3, 12.3 or 12.4.

1.1.11  "Code" means the Internal Revenue Code of 1954, as amended.

1.1.12  "General Partners" means Arthur E. Imperatore, Jerrold Wexler and Edward W. Ross, and any successors or substitutes as general partners of the Partnership; and any reference to a "General Partner" shall be to any one of the General Partners at the time to which such reference relates.

1.1.13  "Immediate Family" means husband, wife, children, stepchildren, grandchildren, step-grandchildren, father, mother, nephews, nieces, brothers and sisters.

1.1.14  "In Interest" means any specified percentage or fraction of the interest of the Partners (or the members of a Class of Partners) who, in the aggregate, shall at the time to which such reference relates be entitled under the provisions of Section 7.1 to the specified percentage or fraction of the Net Profits and Net Losses to

-6-

MID 00765

which all of the Partners (or all of the members of such Class) are entitled thereunder at such time.

1.1.15 "Limited Partners" mean the Class A, Class B and Class C Limited Partners and their successors and permitted assigns.

1.1.16 "Net Profits" and "Net Losses" mean the net income and net loss, respectively, of the Partnership determined in accordance with the same method of accounting used by the Partnership for Federal income tax purposes.

1.1.17 "Partners" means the General Partners and the Limited Partners as constituted from time to time, and any reference to a "Partner" shall be to any one of the Partners at the time to which such reference relates.

1.1.18 "Person" means any natural person, corporation, partnership, joint venture, association or other business or legal entity.

1.1.19 "Property" means (a) the real property (land), situate in New York, New York, described on Exhibit A hereto, as the same may be improved from time to time, (b) buildings at any time situate thereon, (c) all personal property relating thereto, (d) all air-rights above the surface of the land, and (e) all mineral and other rights below the surface of the land, if any.

## ARTICLE II

### Purpose

SECTION 2.1. Purpose; Limitations. The purpose of the Partnership is to acquire, own, improve, and manage the Property, and any property received in a like kind exchange, and to engage in any other activities relating to the Property. The Partnership shall not engage in any other business except with the consent of all of the Partners. The Partners hereby approve of the purchase of the Property by the Partnership from Consolidated Rail Corporation, a Pennsylvania corporation.

MID 00766

## ARTICLE III

### Formation of the Partnership

SECTION 3.1. Formation; Name. The parties do hereby form the Partnership under the name MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP, in accordance with the Act.

SECTION 3.2. Principal Office. The principal office of the Partnership shall be located c/o Palatine Realty Corp., 630 Fifth Avenue, New York, New York 10020 or at such other place as the General Partners may determine. The General Partners shall give notice to the Limited Partners promptly after any change in the location of the principal office of the Partnership.

SECTION 3.3. Termination. The Partnership shall terminate on December 31, 2083 or at such earlier time as otherwise provided herein.

## ARTICLE IV

### Capital; Additional Funds; Loans by Partners

SECTION 4.1. Amounts Contributed. The Partners have contributed to the capital of the Partnership the following amounts, in cash:

| | |
|---|---|
| General Partners | |
| Arthur E. Imperatore | $ 47.50 |
| Jerrold Wexler | 23.75 |
| Edward W. Ross | 23.75 |
| Class B Limited Partner | 5.00 |
| | $100.00 |

Subject to Sections 4.2.1 and 5.1, below, it is the intent of the parties that at all times the Class B Limited Partner shall be and remain a five-percent Partner in interest in the Partnership notwithstanding the fact that the General Partners will fund or cause to be provided substantial additional monies to the Partnership.

SECTION 4.2. Additional Funds.
    4.2.1 Upon or prior to acquisition of the Property by the Partnership, the General Partners shall provide all sums required in order to fund the purchase of the Property; provided, however, that no such funding shall diminish the five percent (5%) interest of the

-8-

Class B Limited Partner in cash distributions (Article VI) and sale and refinancing proceeds (Article VIII), unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata.

  4.2.2  If, at any time at which the Partnership requires additional funds for the conduct of its business, and such funds are not available from other sources (e.g., loans from banks or other institutional lenders, which loans may be secured by Partnership assets), the General Partners may fund such additional cash needs of the Partnership; provided, however, that no such funding by any General Partner shall diminish the five percent (5%) Partnership interest in cash distributions (Article VI) and sale and refinancing proceeds (Article VIII) of the Class B Limited Partner nor shall any distribution to the Class B Limited Partner be deferred or subordinated by reason thereof. General Partners' advances shall be deemed loans and shall be repaid with interest at the "prime rate" at Citibank, N.A., New York, New York, in effect at the time of the making of the loan, plus one percent (1%); during the term of the loan the interest rate is to be adjusted at the first day of each calendar quarter to reflect changes in the "prime rate."

  SECTION 4.3.  No Additional Capital Contributions.  No Limited Partner (and, except as otherwise required by law, no General Partner) shall be required to make any contributions to the capital of the Partnership in addition to those provided for in this Agreement.  Without limiting the generality of the foregoing, no Partner shall be obligated at any time, except as otherwise required by law, to restore or otherwise to be responsible for any negative balance in its or his capital account if such negative balance exists in compliance with the provisions of this Agreement.

  SECTION 4.4  Loans of Partners.  No Partner shall be required to make any loan to the Partnership.  No loan shall be made to the Partnership without the consent of the Class B Limited Partner if such loan requires a pledge of any partnership interest in the Partnership.

  SECTION 4.5.  Interest.  No interest shall be paid by the Partnership on the capital account of any Partner.

  SECTION 4.6.  Capital Accounts.  The Partnership shall maintain a capital account for each partner.  Said capital accounts shall be increased by the amounts of all income and gain allocated the respective Partners pursuant to the provisions of this Agreement.  Said capital accounts shall be decreased by the amounts of all losses allocated to the respective Partners pursuant to the provisions of this Agreement and by all amounts distributed by the Partnership to the respective Partners.

-9-

## ARTICLE V

### Management of the Partnership

SECTION 5.1. **Management.** The General Partners shall have exclusive authority to manage and conduct the Partnership business and the decision of any of the General Partners shall bind the Partnership in all matters. In addition to and not in limitation of the powers given to the General Partners by law, the General Partners shall have the right, authority and power to do any and all acts necessary, proper, convenient or advisable to accomplish the purposes of the Partnership and manage the Partnership business, including but not limited to the following:

(a) to expend Partnership funds (whether derived from borrowings, capital or income) in the exercise of any rights or powers possessed by the General Partners under this Agreement;

(b) to acquire, hold, alter, convert, improve, repair, raze, replace, rebuild or dispose of any real property, interest therein, or appurtenance thereto, as well as personal or mixed property connected therewith, including the purchase, lease, sublease, development, improvement, maintenance, exchange, trade or sale of such properties, at such price, rental or amount, for cash, securities or other property, and upon such terms, as the General Partners deem in their discretion to be in the best interest of the Partnership;

(c) subject to Section 5.6 below, to purchase and sell personal property incidental to the operation of the Partnership's real property and to borrow money to finance the purchase of such personal property;

(d) to purchase from others, at the expense of the Partnership, contracts of liability, casualty and other insurance that the General Partners deem advisable, appropriate or convenient for the protection of the properties or affairs of the Partnership or for any other purpose convenient or beneficial to the Partnership;

(e) to invest Partnership funds in commercial paper, government securities, certificates of deposit, banker's acceptances or similar investments;

(f) to borrow money required for the business and affairs of the Partnership from others and to secure the repayment of such borrowings by executing mortgages or deeds of trust, assignments and/or security agreements, pledging or otherwise encumbering or subjecting to security interests all or any part of the Partnership's assets, and to refund, refinance, increase, modify, consolidate or extend the

MID 00769

maturity of any indebtedness created by such borrowing, or any such mortgage, deed of trust, assignment, security agreement, pledge, encumbrance or other security device;

(g) to enter into such agreements, contracts, documents and instruments with such parties and to give such receipts, releases and discharges with respect to all of the foregoing and any matters incidental thereto as the General Partners may deem advisable, appropriate or convenient;

(h) to place record title to, or the rights to use, Partnership assets in the name or names of a nominee or nominees for any purpose convenient or beneficial to the Partnership;

(i) to employ from time to time any persons for the operation and management of the Partnership business, including but not limited to supervisory and managing agents, building management agents, insurance brokers, real estate brokers, loan brokers, independent contractors, attorneys, accountants and bookkeepers, on such terms and for such compensation as the General Partners shall determine; provided, if any person so employed or engaged is an Affiliate, the terms thereof shall meet the requirements set forths in subparagraph (j) following;

(j) to manage the Partnership assets or to contract either totally or partially for management services by another person (which may be an Affiliate); provided, no contract, commitment or arrangement shall be made with any Affiliate of a General Partner unless on an arm's length basis and on terms at least as competitive as those available from a non-Affiliate. The management designee shall receive reasonable compensation for management services performed;

(k) to determine the nature of the development and manner of use of the Property and to make changes or alterations to the Property and in its development and use, to raze all or part of the Property and to construct new or additional improvements thereon, all without being required to consult with or obtain the consent of the Limited Partners;

(l) to pay, collect, compromise, arbitrate or otherwise adjust any and all claims or demands of or against the Partnership;

(m) to become a limited or general partner in a partnership with others, but only for the purposes stated in Section 2.1, and to dilute Partners' profit percentages pro rata in connection with such partnership if such partnership includes a bank or other institutional lender which requires an "equity kicker" in order to provide required financing and to execute a partnership agreement for such partnership

MID 00770

containing such terms and provisions as the General Partners in their sole discretion consider desirable for the purpose of developing the Property consistent with the provisions of this Agreement.

(n) subject to Section 5.8, to establish, maintain and draw upon checking, savings and other accounts in the name of the Partnership in such bank or banks as the General Partners may from time to time select, and to designate others to draw upon such accounts;

(o) to execute, acknowledge or verify and file any notification, application, statement or other filing in the name of or on behalf of the Partnership that the General Partners consider to be required or desirable to be filed pursuant to legal requirements;

(p) to take all actions and execute all documents and instruments necessary or advisable in the discretion of the General Partners to implement and further the purpose of the Partnership and to operate the Partnership business;

(q) to do any and all of the foregoing for such consideration and upon such other terms or conditions as the General Partners in their discretion shall determine to be appropriate.

SECTION 5.2. Limited Partners. The Limited Partners shall take no part in the management and operation of the Partnership business and shall have no authority to act on behalf of or bind the Partnership.

SECTION 5.3. Duties and Independent Activities. The General Partners shall devote such of their time as they may deem necessary to the Partnership business. Any of the Partners may, without restriction, engage in and possess an interest in other business ventures and property of every nature and description (regardless of location and proximity to the Property and whether or not in competition therewith) independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage and development of real property and the Partnership shall have no rights in and to said independent ventures and investments or to the income or profits derived therefrom. The fact that a Partner, or a member of his family, or an Affiliate is employed by, or is directly or indirectly interested in or connected with any person or entity employed by the Partnership to render or perform a service, or from whom or which the Partnership may buy merchandise or other property, or to whom the Partnership shall lease any part of the Property, shall not prohibit the General Partners from employing such person, or from otherwise dealing with him, and the Partnership shall have no rights in or to any income or profits derived therefrom.

-12-

SECTION 5.4. <u>Limitation of Liability</u>. Neither the General Partners nor any agent or Affiliate of the General Partners shall be liable, responsible or accountable in damages or otherwise to the Partnership or any Limited Partner for any action taken or failure to act on behalf of the Partnership within the scope of the authority conferred on the General Partners by this Agreement or by law, unless such action or omission was performed or omitted fraudulently or in bad faith or constituted gross negligence.

SECTION 5.5. <u>Indemnification</u>. The Partnership shall indemnify and hold harmless the General Partners, and each of their agents and Affiliates (collectively, the "Indemnified Parties") from and against any loss, expense, damage or injury suffered or sustained by them or any of them by reason of any acts, omissions or alleged acts or omissions arising out of his or their activities on behalf of the Partnership or in furtherance of the interests of the Partnership, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim provided that the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claims are based were in good faith and were not performed or omitted fraudulently or in bad faith or as a result of gross negligence by such Indemnified Party. Such indemnification shall be made only to the extent of the Partnership assets.

SECTION 5.6. <u>Actions Requiring Consent</u>. Prior to the issuance of a Certificate of Occupancy, the General Partners, on behalf of the Partnership, shall have the right to sell all or substantially all of the assets of the Partnership without the consent of the Class B Limited Partner (and the proceeds of the sale shall be distributed as provided in Article VIII). After the issuance of a Certificate of Occupancy, except with the prior written consent of the Class B Limited Partner, the Partnership shall at no time sell all or substantially all of the assets of the Partnership; provided, however, that the Class B Limited Partner shall be deemed conclusively to have consented to any proposed sale of all or substantially all of the assets of the Partnership if the Class B Limited Partner does not exercise its right of first refusal set forth in Article XI within the forty-five day time limit set forth in Article XI.

SECTION 5.7. <u>Partition</u>. No Partner shall have the right to require partition of the Property of the Partnership or to compel any sale or appraisal of the Partnership's assets or any sale of a deceased Partner's interest in the Partnership's assets, notwithstanding any provision of law to the contrary.

SECTION 5.8. <u>Deposits of Funds</u>. The Partnership's funds shall be deposited by the General Partners in one or more banks or trust companies in New York City in the Partnership's name, and shall not be

-13-

commingled with funds not belonging to the Partnership. The Partnership's funds shall be used by the General Partners only for the business of the Partnership, including distributions to the Partners as provided in this Agreement.

SECTION 5.9. Fees. Except with the unanimous written consent of the Partners, no Partner shall receive any fee, salary or other compensation for serving as a Partner.

## ARTICLE VI

### Cash Distributions

SECTION 6.1. Times of Distribution. Distributions of cash shall be made by the Partnership (a) at the times and in the amounts required by the provisions of Article VIII applicable upon the occurrence of the events therein described, and (b) otherwise at the time or times determined by the General Partners. Within the first 120 days of each fiscal year, the General Partners shall cause the Partnership to distribute, under clause (b) of the preceding sentence, all cash (net cash flow) which the General Partners, in their sole discretion, determine not to be needed for the Partnership's business.

6.1.2 Subject to the provisions of Sections 4.2.1 and 5.1, distributions shall be made 95% to the General Partners and 5% to the Class B Limited Partners. If Class A or Class C Limited Partners are admitted to the Partnership, the interest of the General Partners shall be reduced accordingly.

## ARTICLE VII

### Profits, Gains and Losses

SECTION 7.1. Allocation of Net Profits and Net Losses. Subject to the provisions of Sections 4.2.1 and 5.1, Net Profits and Net Losses for each fiscal year shall be allocated among the Partners in the following proportions:

| | |
|---|---|
| General Partners | 95% |
| Class B Limited Partner | 5% |

If Class A or Class C Limited Partners are admitted to the Partnership, the interest of the General Partners shall be reduced accordingly.

-14-

MID 00773

SECTION 7.2. Allocation of Gains. Gain realized upon the sale or other disposition of any portion of or any interest in the Property of the Partnership shall be allocated in the following order:

7.2.1 There shall first be allocated to those Partners, if any, who have deficits in their capital accounts an amount of such gain equal to the aggregate amount of such deficits, which amount shall be allocated in the same proportion as such deficits;

7.2.2 There shall next be allocated to each of the Partners an amount of such gain equal to cash distributions, if any, theretofore made to him pursuant to the provisions of Section 8.1 and not theretofore taken into account under this Section 7.2.2; and

7.2.3 Any remaining gain shall be allocated among the Partners in the same proportion set forth in Section 7.1.

## ARTICLE VIII

### Sale and Mortgage Proceeds

SECTION 8.1. Sale and Refinancing. If the Partnership shall at any time realize net cash proceeds as a consequence of the refinancing of any mortgage on the Property or of the sale of the Property or any interest therein (including the exchange, condemnation or similar eminent domain taking, casualty, or other disposition of all or substantially all of the Partnership's assets, or from the sale of easements, rights-of-way or similar interests in the Partnership's Property or any other similar items which in accordance with generally accepted accounting principles are attributable to capital; provided, however, that a sale shall not include a tax-free exchange under Section 1031 of the Code), such net cash proceeds shall be distributed promptly after such refinancing or sale in the following order of priority:

8.1.1 First, to the payment, or as a reserve for payment, of any indebtedness of the Partnership;

8.1.2 Next, to the establishment of any reserve required by any mortgage or determined by the General Partners to be reasonably necessary to provide for any liabilities or obligations of the Partnership, including contingent or unforeseen liabilities; and

8.1.3 The balance, if any as follows: (i) If a Certificate of Occupancy has not been issued, then the balance shall be distributed 50% to the General Partners and 50% to the Class B Limited Partner, (ii) If a Certificate of Occupancy has been issued, then, subject to the provisions of Sections 4.7.1 and 5.1(m), the balance shall be

MID 00774

distributed 95% to the General Partners and 5% to the Class B Limited Partner. If a Certificate of Occupancy has been issued and if at that time there are Class A and/or Class C Limited Partners, the 95% interest of the General Partners shall be decreased accordingly.

SECTION 8.2. <u>Reduction of Reserve</u>. If the General Partners shall determine that any reserve described in Section 8.1.2 is no longer needed for a new reserve, any reduction in such reserve shall be treated as cash proceeds to which the provisions of Section 8.1 apply.

## ARTICLE IX

### Transfers of Limited Partners' Interests

SECTION 9.1. <u>Transfers by Limited Partners.</u>

9.1.1 A Limited Partner may assign all or part of its interest as a Limited Partner in the Partnership, provided that (a) the assignee shall not be a natural person younger than 21 years of age or a natural person who shall have been adjudged incompetent; (b) the assignment shall be in writing in form reasonably satisfactory to the General Partners; (c) the assignee shall have agreed in a writing in form reasonably satisfactory to the General Partners to be bound by the terms of this Agreement and to give or confirm each consent and approval given herein by the original parties hereto; (d) a majority of interest in the General Partners shall have consented in writing to the assignment, which consent shall not be unreasonably withheld; and (e) if required by the General Partners, the assignment shall be effective as of the first day of a fiscal quarter. The assignee of an interest in the Partnership may be admitted as a Limited Partner only with the consent of the General Partners, which consent shall not be unreasonably withheld.

9.1.2 The General Partners hereby consent to the assignment by the Class B Limited Partner of all or any part of its partnership interest to any corporation controlling, controlled by or under common control with the Class B Limited Partner, which consent shall be effective upon the General Partners' receipt of the documents referred to in subsection (b) and (c) of Section 9.1.1.

9.1.3 Any purported assignment not meeting the requirements set forth in Section 9.1.1 shall be void and shall not bind the Partnership.

9.1.4 For purposes of this Section 9.1, the term "assign" includes the making of any pledge, hyopthecation, encumbrance, sale or other disposition.

-16-

SECTION 9.2. Assignment of Rights to Distributions by Limited Partners. Any Limited Partner may assign the right to receive distributions applicable to his Partnership interest, and such an assignment shall be effective notwithstanding failure to satisfy the conditions set forth in Section 9.1, provided that (a) the instrument of assignment shall be in form reasonably satisfactory to the General Partners; (b) a duly executed and acknowledged counterpart of such instrument shall be delivered to the Partnership; (c) the assignee shall not be a natural person younger than 21 years of age or a natural person who shall have been adjudged incompetent; and (d) if required by the General Partners, the assignment shall be effective as of the first day of a fiscal quarter. Any purported assignment which does not meet the requirements as set forth in this Section shall be void and shall not bind the Partnership.

SECTION 9.3. Costs and Expenses. All costs and expenses incurred by the Partnership in connection with any assignment described in this Article, including fees and disbursements of counsel and filing fees, shall be paid by the Partnership.

## ARTICLE X

### Withdrawal and Removal of Partners

SECTION 10.1. Limited Partners. No Limited Partner may withdraw from the Partnership, except with the approval of the General Partners, which consent shall not be unreasonably withheld. Upon the death, bankruptcy, incompetency or dissolution of a Limited Partner, its successor in interest may be admitted as a Limited Partner and shall, upon such admission, have all of the rights and obligations of a Limited Partner under this Agreement, and the Partnership shall not be dissolved upon any such occurrence.

SECTION 10.2. Net Worth. The General Partners represent and warrant that their net worth in the aggregate is in excess of $1,000,000, exclusive of any interest in the Partnership as of the date of this Agreement. The General Partners agree that, at all time while they are General Partners of the Partnership, they will maintain sufficient net worth, in the aggregate, to satisfy the net worth guidelines established in Internal Revenue Service Revenue Procedure 72-13 (or the applicable Code, rules or regulations then in effect).

SECTION 10.3. General Partners. No General Partner may retire, nor may any General Partner sell, assign or otherwise transfer his or its interest to any other Person, other than to an Approved General Partner Designee, nor may any other Person (other than an Approved General Partner Designee) be admitted to the Partnership as a general

-17-

partner, without the prior written consent of the Class B Limited Partner. Each General Partner may assign a portion of his general partner's interest, without the consent of any other Partner, if the assignee is a person who is already a Partner or is a member of the Immediate Family of the assignor or a trust for the primary benefit of such a person and if such assignee who holds such assigned interest is a Class C Limited Partner and not as a General Partner. The provisions of Section 9.1.1(a), (b), (c) and (e) shall apply to this Section 10.3.

SECTION 10.4. Additional Partners.
10.4.1 Subject to compliance with Section 9.1.1, the General Partners may assign (without the consent of the Class B Limited Partner) a portion of their equity interest, either to new investors (Class A Limited Partners), or to the Partnership (which will then issue interests to Class A Limited Partners). The proceeds of such assignment and sale shall be used solely for Partnership purposes and the rights and interests of the Class B Limited Partner shall in no way be dimished or impaired, unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata. If the new Class A Limited Partner is not a bank or institutional lender, the Class B Limited Partner's interest shall not be diluted.

10.4.2 If the General Partners wish to assign a portion of their equity interest to new investors (Class A Limited Partners) and not apply the proceeds solely for Partnership purposes, then the proceeds of sale shall be distributed as follows:

(a) if a Certificate of Occupancy has not been issued, fifty percent (50%) of the proceeds of the sale not applied to Partnership purposes shall be distributed to the Class B Limited Partner;

(b) if a Certificate of Occupancy has been issued, the proceeds of the sale not applied to Partnership purposes shall be distributed ninety-five percent (95%) to the General Partners and five percent (5%) to the Class B Limited Partner.

## ARTICLE XI

### Option to Purchase

SECTION 11.1. Right of First Refusal. In the event that after the issuance of a Certificate of Occupancy, the General Partners, on behalf of the Partnership, receive a written offer from a bona fide offeree to purchase all or any substantial portion of the Property, then the General Partners shall immediately deliver a true and complete copy

-18-

MID 00777

of the offer to the Class B Limited Partner and the Class B Limited Partner shall have an assignable right and option exercisable within forty-five days after its receipt of said copy of the offer to purchase the assets of the Partnership referred to in the offer for the purchase price and upon the same terms and conditions referred to in the offer. The option shall be exercised by giving written notice to the Partnership within the aforesaid forty-five day time limit.

SECTION 11.2.  Assignability.  The right of first refusal granted to the Class B Limited Partner pursuant to Section 11.1, above, shall be freely assignable by the Class B Limited Partner after its receipt of a copy of the offer described in Section 11.1.  In the event of the exercise of the Class B Limited Partner's right of first refusal within said forty-five day period, closing shall be held at 10:00 A.M. at the principal office of the Partnership in New York, New York, and deed, bill of sale, checks, and the like, delivered, on the sixtieth day following the date of the exercise of the option, unless some other time, date, and place is agreed to in writing by the Partnership and the Class B Limited Partner or its assignee.  Payment by check shall mean bank check, certified check or wire transfer (acceptable to the General Partners).

# ARTICLE XII

## Termination or Dissolution of Partnership

SECTION 12.1.  By Agreement or Upon Sale of Assets.  The Partnership shall be terminated prior to the date set forth in Section 3.3 if (a) the General Partners determine and the Class B Limited Partner consents in writing to such termination; (b) the Partnership sells or otherwise disposes of its entire interest in all or substantially all of its assets, unless the Partnership receives as a part or all of the consideration for such sale or other disposition a mortgage note or other obligations; provided, however, that the General Partners may elect to dissolve the Partnership even if it receives a mortgage note or other obligations upon the sale of all or substantially all of the Partnership's assets if the Partnership receives the written opinion of tax counsel that such dissolution will not adversely impact the Limited Partners by accelerating or changing the nature of income recognition; (c) the Partnership sells or receives full payment of the notes or obligations referred to in clause (b); or (d) the Partnership is dissolved pursuant to Section 12.2.

SECTION 12.2.  Retirement of General Partner.  The Partnership shall be dissolved upon the retirement or withdrawal of any General Partner, or upon the death or adjudication of incompetency of any General Partner which is not a corporation, unless either (i) the re-

-19-

maining General Partner(s), if any, or (ii) a majority in interest of the Limited Partners, shall determine within thirty days after such event to continue the business of the Partnership and shall so notify all of the Partners, and, if there shall be no remaining General Partner, shall designate a substitute General Partner who has agreed in writing to serve in such capacity.

SECTION 12.3.   Interest of Retired General Partner.  If the Partnership is continued pursuant to the provisions of Section 12.2, the Partnership interest of the General Partner who shall have died or been adjudicated an incompetent or been dissolved without such Partner's consent or acquiescence shall automatically be converted into a Class C Limited Partner's interest, which shall consist of the same interests in the profits, losses, distributions and other items of the Partnership to which such General Partner would have been entitled but for the event which terminated his status as a General Partner.

SECTION 12.4.   Retirement in Violation of Agreement; Insolvency.  If any General Partner shall (i) retire or withdraw in violation of this Agreement, (ii) voluntarily dissolve or acquiesce in its dissolution, if such General Partner is a corporation, partnership or other entity which is not a natural person, (iii) be adjudicated a bankrupt, (iv) suffer or permit a receiver to be appointed to hold or administer any substantial portion of his assets and such appointment shall remain in effect for sixty days, (v) make an assignment for the benefit of creditors, (vi) admit by a pleading the material allegations of any bankruptcy petition filed against him, then in any such event the interest of such General Partner shall automatically be converted into a Class C Limited Partner's interest and, notwithstanding any other provision of this Agreement, such former General Partner shall thereafter have no right to participate in any manner in the management of the Partnership's business or in any decision, consent or approval affecting any transaction or proposed transaction whatsoever.

SECTION 12.5.   Termination.  Upon the termination or dissolution of the Partnership, the assets of the Partnership shall be sold by the remaining General Partner(s), or substitute General Partner(s), as liquidating trustees, and, except as otherwise provided herein, the proceeds remaining after the payment of or provision for the debts of the Partnership shall be distributed to the Partners in the same manner and proportion as if such proceeds constituted proceeds to which the provisions of Section 8.1 applied.  A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to minimize the losses normally attendant upon a liquidation.  The General Partners may retain such amount as they deem reasonably necessary as a reserve for any contingent liabilities or obligations of the Partnership, which amount shall be paid over to a bank or trust company in New York, New York, as

-20-

MID 00779

escrow agent, to be held by it for the discharge of liabilities of the Partnership and the distribution of the balance, if any, among the Partners in the same manner and proportion as hereinabove provided for in this Section. Each of the Partners shall be furnished with a statement, reviewed by the Partnership's independent accountants, which shall set forth the assets and liabilities of the Partnership as of the date of the Partnership's dissolution. Upon completion of the liquidation, the General Partners shall execute and cause to be filed a Certificate of Dissolution of the Partnership and any and all other documents necessary with respect to termination of the Partnership.

## ARTICLE XIII

### Books and Reports

SECTION 13.1. Books of Accounts. The General Partners shall maintain, at the principal office of the Partnership, complete books of account, in which there shall be entered, fully and accurately, every transaction of the Partnership. The fiscal year of the Partnership shall be the calendar year. The books of account of the Partnership shall be kept in accordance with sound accounting practice and principles applied in a consistent manner. All determinations by the General Partners with respect to the treatment of any item or its allocation for Federal, state, or local tax purposes shall be binding upon all of the Partners. Any Limited Partner shall have the right from time to time, at its own expense, to cause its accountants and representatives to examine and audit the books and records of the Partnership, and the General Partners, upon not less than ten days' written notice, shall make such books and records available for such examinations and audits at reasonable hours during the business day.

SECTION 13.2. Goodwill. No value shall be placed for any purpose upon the Partnership's name or the right to its use, or upon the goodwill of the Partnership or its business. Upon termination or dissolution of the Partnership, neither the Partnership's name, nor the right to its use, nor the goodwill of the Partnership, shall be considered as an asset of the Partnership.

SECTION 13.3. Statements. Within a reasonable time after the end of each fiscal year and in any event on or before March 1 of the next fiscal year, the General Partners shall cause to be delivered to each Partner (a) an annual statement of the Partnership's receipts and expenses for such year and the capital account of such Partner as at the end of such year, reviewed or audited by the Partnership's independent certified public accountants, and (b) a report or a tax return setting forth such Partner's share of the Partnership's profit or loss

MID 00780

for such year and such Partner's allocable share of all items of income, gain, loss, deduction and credit, for Federal income tax purposes.

SECTION 13.4.  **Election under Section 754 of the Code.**  In the event of any transaction described in Section 743(b) of the Code and permitted by the provisions of this Agreement, the Partnership shall, upon the timely written request of the person succeeding to a Partnership interest in such transaction, make the election provided for in Section 754 of the Code.

## ARTICLE XIV

### Further Documents

SECTION 14.1.  **Execution by Limited Partners.**  At any time, upon the request of the General Partners, any Limited Partner shall expeditiously execute, acknowledge and swear to any certificate required by the law of New York, any amendment to or cancellation thereof required by law, and any certificate or affidavit of fictitious firm name, trade name or the like (and any amendments or cancellations thereof) required by law; and the General Partners shall use their best efforts to cause to be filed of record all such Certificates and instruments as shall be required so to be filed.

## ARTICLE XV

### Amendment of Agreement

SECTION 15.1.  **Amendment by Majority Action.**  This Agreement may be amended by a written instrument subscribed by all of the General Partners and a majority in interest of the Limited Partners (all of the Limited Partners voting as one class), but only if each of the following conditions shall be met:

15.1.1  This Section may not be so amended.

15.1.2  The Partnership shall have given each of the Limited Partners at least 30 days' written notice, in reasonable detail, of the text and purpose of the proposed amendment.

15.1.3  Subject to Sections 4.2.1 and 5.1(m) of this Agreement, the amendment shall neither increase the liabilities or obligations nor decrease the participation in profits, losses, gains, distributions or other items of any Partner who is not a signatory thereto.

-22-

MID 00781

15.1.4   The Partnership shall have received the written opinion of its counsel that adoption of the amendment will neither cause the Partnership to fail to constitute a limited partnership under the Act nor cause any Limited Partner to be deemed, in such capacity, to be a general partner.

SECTION 15.2.   Delivery of Copies.   Within thirty days after any amendment made under the provision of Section 15.1, the Partnership shall deliver copies thereof to each Partner.

## ARTICLE XVI

### Miscellaneous

SECTION 16.1.   Notices.   Any notice or other communication provided for or referred to in this Agreement shall be in writing and, if mailed at a United States Post Office in the State of New York, by registered or certified mail, return receipt requested, to the parties at the following addresses (or at such other address as a party may have previously specified by notice to the Partnership as the address to which notice shall be given to him), shall be deemed to be delivered on the second business day after such mailing:

16.1.1   If to the Partnership or the General Partners: c/o Palatine Realty Corp., 630 Fifth Avenue, New York, New York 10020.

16.1.2   If to the Class B Limited Partner:   CRC Properties, Inc., 150 Allendale Road, King of Prussia, Pennsylvania 19406, with a copy to Consolidated Rail Corporation, 1818 Walnut Street, Philadelphia, Pennsylvania 19103, Attn.:   Assistant Vice President-Real Estate.

16.1.3.   If to the Class A and/or Class C Limited Partners:   At such address as appears on the Certificate of Limited Partnership.

SECTION 16.2.   Complete Agreement.   This Agreement fully sets forth all of the agreements and understandings of the parties with respect to the Partnership, and cannot be changed or terminated orally or in any manner other than by a written instrument subscribed by the party to be charged.   There are no representations, agreements, arrangements or understandings, oral or written, among the parties relating to the subject matter of this Agreement which are not expressly set forth herein.

-23-

MID 00782

SECTION 16.3.  Severability.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, the applicable laws, ordinances, rules and regulations of the jurisdictions in which the Partnership engages in business.  If any provision of this Agreement, or the application thereof to any person or circumstance, shall, for any reason and to any extent, be held to be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected, but rather shall be enforced to the full extent permitted by law.

SECTION 16.4.  Ratification.  Each person who becomes a Partner in the Partnership after the execution and delivery of this Agreement shall, by becoming a Partner, be deemed thereby to ratify and agree to all prior actions taken by the Partnership and the General Partners.

SECTION 16.5.  Binding upon Successors.  This Agreement shall be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns, and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

SECTION 16.6.  Rights of Third Parties.  None of the provisions of this Agreement shall be construed as having been made for the benefit of any creditor of either the Partnership or any of the Partners, or shall be enforceable (except as otherwise required by law) by any person not a party hereto.

SECTION 16.7.  Governing Law.  Irrespective of the place of execution or performance, the validity and construction of this Agreement shall be governed by the internal law of New York.

SECTION 16.8.  Captions.  The captions, heading and titles contained in this Agreement are solely for convenience of reference and shall not affect the interpretation of this Agreement or of any provision hereof.

SECTION 16.9.  Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed as an original, but all of which shall together constitute one instrument.

SECTION 16.10.  Sense and Gender of Words.  All terms and words used in this Agreement, regardless of the sense or gender in which they are used, shall be deemed to include each other sense and gender unless the context requires otherwise.

SECTION 16.11.  Investment Representation.  Each Partner represents that his interest in the Partnership is being purchased for his own account for investment, and not for distribution or resale to

MID 00783

others. Each Partner agrees that he or it will not sell or otherwise transfer such interest unless the offering, sale or other transfer is registered under the Securities Act of 1933, as amended; provided, however, that this restriction shall not apply if an exemption from registration is then available. Each Partner agrees that he will not dispose of his or its interest in the Partnership or any portion thereof, except in accordance with this Agreement and applicable state securities ("Blue Sky") and Federal securities law.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

GENERAL PARTNERS:

_____
Arthur E. Imperatore

_____
Jerrold Wexler

_____
Edward W. Ross

CLASS B LIMITED PARTNER:

CRC PROPERTIES, INC.

By_____ President
     Lawrence A. Tisch

MID 00784

SCHEDULE "A"

All those certain five parcels of land, more fully described below, together with all of Seller's right title and interest in and to that area below the adjoining streets.

Parcel 1

BEGINNING at the corner formed by the intersection of the easterly line of Eleventh Avenue with the northerly line of West 36th Street;

1. Running thence northerly, along the easterly line of Eleventh Avenue, 98'-9";

2. thence easterly, parallel with the northerly line of West 36th Street, 175'-0";

3. thence northerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the southerly line of West 37th Street;

4. thence easterly, along the southerly line of West 37th Street, 275'-0";

5. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to the center line of block;

6. thence westerly, parallel with the northerly line of West 36th Street and along the center line of block, 75'-0";

7. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the northerly line of West 36th Street;

8. thence westerly, along the northerly line of West 36th Stret, 375'-0" to the point or place of BEGINNING.

Reserving unto Seller the following described parcel as an easement for railroad transportation purposes:

All that portion of the below described parcel lying below an upper inclined plane having an elevation of 27.86 at the northerly line of West 36th Street and an elevation of 26.14 at the southerly line of West 37th Street bounded and described as follows:

BEGINNING at a point in the northerly line of West 36th Street distant 212'-2"

MID 00785

easterly from the corner formed by the intersection of the easterly
Eleventh Avenue with the northerly line of West 36th Street;

1. Running thence northerly, along a line forming an angle o
123 -10'-44" on its westerly side with the preceding cour:
3/8" to a point of curvature;

2. thence still northerly, curving to the left on the arc of
having a radius of 600'-0" and a central angle of 11 -44'-46"
123'-0 1/8" to a point in the southerly line of West 37th Str

3. thence easterly, along the southerly line of West 37th St
59'-9 1/4";

4. thence southerly, curving to the right on the arc of a c
a radius of 656'-0" and a central angle of 13 -39'-15",
line forms an angle of 19 -31'-29" on its southerly side
southerly line of West 37th Street, 156'-4" to a point of ta

5. thence still southerly, along the line of tangency, 69'-
point in the northerly line of West 36th Street;

6. thence westerly, along the northerly line of West 36th :
66'-11" to the point or place of BEGINNING.

Elevations refer to datum used by the Topographical Bureau, Borough
which is 2.75 feet above the United States Coast and Geodetic Survey
sea level, Sandy Hook, New Jersey.


PARCEL II

BEGINNING at a point in the southerly line of West 38th Street di
west of the corner formed by the intersection of the westerly l
Avenue with the southerly line of West 38th Street;

1. Running thence southerly, parallel with the westerly l
Avenue, 197'-6" to a point in the northerly line of West :
Street;

2. thence westerly, along the northerly line of West 37tl
150'-0";

3. thence northerly, parallel with the westerly line of
197'-6" to a point in the southerly line of West 38th Str
to a point in the southerly line of West 38t

4. thence easterly, along the southerly line of West 38t
150'-0" to the point or place of BEGINNING.

Reserving unto seller the following described parcel as ar
railroad transportation purposes:

All that portion of the below described parcel lying below an upper inclined plane having an elevation of 25.66 at the northerly line of West 37th Street and an elevation of 23.99 at the southerly line of West 38th Street bounded and described as follows:

BEGINNING at a point in the southerly line of West 38th Street distant 357'-4 1/8" west of the corner formed by the intersection of the westerly line of Tenth Avenue with the southerly line of West 38th Street;

1. Running thence southerly, along a line forming an angle of 79 -17'-17" on its westerly side ith the southerly line of West 38th Street, 163'-0 3/8" to a point of curvature;

2. thence still southerly, curving to the right on the arc of a circle having a radius of 656'-0" and a central angle of 3 -20'13", 38'-2 1/2" to a point in the northerly line of West 37th Street;

3. thence westerly, along the northerly line of West 37th Street, 57'-10 3/4";

4. thence northerly, curving to the left on the arc of a circle having a radius of 600'-0" and a central angle of 4 -40'-45", whose radial line forms an angle of 15 -23'-28" on its southerly side with the northerly line of West 37th Street, 49'-0" to a point of tangency;

5. thence still northerly, along the line of tangency, 152'-4 1/4" to a point in the southerly line of West 38th Street;

6. thence easterly, along the southerly line of West 38th Street, 57'-0" to the point or place of BEGINNING.

Elevations refer to the datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey.

## PARCEL III

BEGINNING at a point in the northerly line of West 38th Street distant 340'-7" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 38th Street;

1. Running thence westerly, along the northerly line of West 38th Street, 109'-5";

2. thence northerly, parallel with the westerly line of Tenth Avenue, 98'-9" to the center line of block;

3. thence easterly, parallel with the northerly line of West 38th Street and along the center line of block, 50'-0";

Page 3

MID 00787

## FIRST AMENDMENT TO AGREEMENT OF
## LIMITED PARTNERSHIP OF MID-TOWN
## DEVELOPMENT LIMITED PARTNERSHIP

Agreement made as of March 18, 1987 by and among Arthur E. Imperatore, Jerrold Wexler, and Edward W. Ross, the general partners of Mid-Town Development Limited Partnership, a New York limited partnership ("Partnership"), and CRC Properties, Inc., a Delaware corporation, the limited partner of the Partnership.

Whereas, the parties hereto established the Partnership by that certain Agreement Of Limited Partnership Of Mid-Town Development Limited Partnership ("Agreement") and Certificate thereof dated June 11, 1985; and

Whereas, the parties hereto being all of the partners of the Partnership desire to amend the Agreement as hereinafter set forth.

Now, therefore, it is agreed:

1. Section 8.1.3 of the Agreement is deleted in its entirety and the following substituted therefor:

"8.1.3  Subject to the provisions of Sections 4.2.1 and 5.1(m), the balance, if any, shall be distributed 95% to the General Partners and 5% to the Class B Limited Partner.  If there are Class A and/or Class C Limited Partners, the 95% interest of the General Partners shall be decreased accordingly."

2. Section 10.4.2 of the Agreement is deleted in its entirety and the following substituted therefor:

"10.4.2  If the General Partners wish to assign a portion of their equity interest to new investors (Class A Limited Partners) and not apply the proceeds solely for Partnership purposes, then that portion of the proceeds of the sale not applied to Partnership purposes shall be distributed ninety-five per cent (95%) to the General Partners and five per cent (5%) to the Class B Limited Partner."

3.   Except as expressly amended herein, the Agreement is in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

GENERAL PARTNERS:

_____

Arthur E. Imperatore

_____

Jerrold Wexler

_____

Edward W. Rose

CLASS B LIMITED PARTNER:

CRC PROPERTIES, INC.

By:_____
        President

# EXHIBIT C

## SECOND AMENDMENT TO CERTIFICATE OF LIMITED PARTNERSHIP OF MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

The undersigned, being all of the General and Limited Partners of Mid-Town Development Limited Partnership (the "Partnership") desiring to amend the Certificate of Limited Partnership of the Partnership (the "Certificate") heretofore filed as Document M628/85 on June 21, 1985 in the office of the County Clerk and Clerk of the Supreme Court, New York County, certify as follows:

1. The Certificate is hereby amended by deleting Article 4 in its entirety and substituting the following therefor:

"4. Members. The name and address of the General Partner is as follows:

| Name | Address |
|------|---------|
| Jerrart Venture | 630 Fifth Avenue New York, NY 10020 |

$5/6 - 87 B$

The name and address of the Class B Limited Partner is as follows:

| Name | Address |
|------|---------|
| CRC Properties, Inc. | 150 Allendale Road King of Prussia Pennsylvania 19406" |

IN WITNESS WHEREOF, the undersigned have made, signed and acknowledged this Amended Certificate of Limited Partnership this 28th day of May, 1987

WITHDRAWING GENERAL PARTNERS

Arthur E. Imperatore

Jerrold Wexler

Edward W. Ross

LIMITED PARTNER

CRC PROPERTIES, INC.

BY: _____
John Jaeger, President

JERRART VENTURE

BY: _____
Arthur E. Imperatore

32464

STATE OF NEW JERSEY        )
                           ) SS.
COUNTY OF HUDSON           )

On this _23rd_ day of ~~May~~ JUNE, 1987, before me personally
came ARTHUR E. IMPERATORE, to me known, and known to me to
be the individual described in and who executed the foregoing
instrument and he duly acknowledged to me that he resides
at Pershing Road, Weehawken, New Jersey 07087 and that he
executed the foregoing Second Amendment to the Certificate
of Limited Partnership of Mid-Town Development Limited Part-
nership as a General Partner.

_____
Notary Public

LISA CACCAVALE-SOTO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 10, 1990

STATE OF ILLINOIS         )
                          ) SS.
COUNTY OF COOK            )

On this _28th_ day of May, 1987, before me personally
came JERROLD WEXLER, to me known, and know to me to be the
individual described in and who executed the foregoing
instrument and he duly acknowledged to me that he resides
at 2800 Lake Shore Drive, Chicago, Illinois 60657 and that
he executed the foregoing Second Amendment to the Certificate
of Limited Partnership of Mid-Town Development Limited
Partnership as a General Partner.

_____
Notary Public
My Commission Expires:
August 21, 1989

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )

On this ⟨28th⟩ day of May, 1987 before me personally came EDWARD W. ROSS, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledged to me that he resides at 1240 North Lake Shore Drive, Chicago, Illinois 60610 and that he executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.

NOTARY PUBLIC

**PENNSYLVANIA**
STATE OF ~~NEW YORK~~     )
                **PHILADELPHIA** SS.
COUNTY OF ~~NEW YORK~~    )

On this ⟨13TH⟩ day of ~~May~~ July, 1987, before me personally appeared JOHN JAEGER, to me know, who being by me duly sworn, did depose and say, that he resides at 8 Merrion Road, Merrion Station, Pennsylvania, that he is the President of CRC Properties, Inc., a Delaware corporation, and the corporation described in and which executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a Limited Partner; and that he signed his name thereto by order of the Board of Directors of said Corporation.

NOTARY PUBLIC

JAMES W. HARTMAN, JR., NOTARY PUBLIC
PHILADELPHIA, PHILADELPHIA COUNTY
MY COMMISSION EXPIRES MAY 20, 1991
Member, Pennsylvania Association of Notaries

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SECOND AMENDMENT TO

CERTIFICATE OF LIMITED PARTNERSHIP

OF

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


McCarter & English

Attn.:  Stephen M. Vajtay, Jr., Attorney

550 Broad Street

Newark, New Jersey  07102


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *



