UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X

Jericho group, ltd.

        Plaintiff,              No. 07-CV-1792 (RCC) (DCF)

    -AGAINST-

MIDTOWN DEVELOPMENT, L.P., EDWARD
IMPERATORE and MAURICE STONE.

        Defendants.

--------------------------------X

## DECLARATION OF ROBERT L. RIMBERG

    **1.**    Robert L. Rimberg, an attorney admitted to practice law in the State of New York declares the following under the penalties of perjury under the laws of the Unites States:

    **2.**    This declaration is being submitted in reply to the opposition submitted by the Defendants in this action to Plaintiff's motion pursuant to Title 28 U.S.C. §1447(c), 28 U.S.C. § 1927 and New York State Judiciary law §487.

    **3.**    In short, Defendants and their attorneys disclaim all culpability for their acts without justification and ignore the objective facts.

    **4.**    At the outset it MUST be pointed out that Defendants are being represented by two (2) law firms, Phillips Nizer LLP and Jones Day.

    **5.**    While the removal filings were authored by Mr. Geremia of Jones Day, Phillips Nizer LLP appears by the signature lines as co-counsel.

6.    The importance of this fact is that Edward Imperatore, a party defendant, is the partner at Phillips Nizer LLP responsible for its Hackensack, New Jersey office.  Phillips Nizer LLP's web site boasts that Mr. Imperatore's has over thirty (30) years of legal experience.

7.    Edward G. Imperatore is the key partner with decision making powers in Midtown Development L.P.[1][2].

8.    Virtually all documents of Midtown Development L.P. are signed by Mr. Edward G. Imperatore.

9.    Regardless of what Todd Geremia writes or says in his Declaration, Edward Imperatore at all times was aware of Midtown Development L.P.'s partners and the various filings by Midtown Development, L.P. with the New York County Clerk's office.

10.    Mr. Imperator's failure to insure that the notices of removal filed with this Court were accurate warrants that Plaintiff's motion be granted in its entirety.

11.    Defendants do not dispute the contents of the Affirmation of Charles A. Crum annexed as Exhibit "J" to Plaintiff's motion wherein this Court found it incomprehensible that Defendants counsel did not know the facts when the case was removed.

---

[1] See Exhibit "H" which is the deposition of Edward Ross taken on March 29, 2006 wherein he testifies on pages 15, 16, 17 that he and Ed Imperatore are the two principals of Midtown Development L.P. most actively involved in the Limited Partnership's activities would make the decisions for the Limited Partnership and were the general partners.  The other significant fact disclosed at the deposition was that a list of partners was testified to by Mr. Rossi (page 24) one of which is Tania Wexler.  Defending the deposition was Todd Geremia.  Any testimony by Mr. Geremia that he had no knowledge as to the complex make up of Midtown Limited Partnership is a lie as he sat through all the depositions detailing the Ownership of Midtown Development L.P.

[2] In Exhibit "C" Mr. Imperatore testifies that he is a partner in Midtown Development L.P.

**12.**   After review of the opposition and the various documents it is clear the word *incomprehensible,* as used by this Court, was clearly not strong enough.

**13.**   The Court was on target that something was not right; however, what the Court did not realize was that Defendant's concealment was broader and deeper than this Court and the Plaintiff knew.

**14.**   What is unclear is why Defendants' counsel persists in the game playing and claims absolute ignorance.   Putting aside that Mr. Imperatore had all the facts at his fingertips; Mr. Geremia was likewise just as knowledgeable and hid the facts from this Court.

**The Partnership Documents**
**are filed Documents**

**15.**   In paragraph 7 to the Deceleration of Todd R. Geremia ("Geremia Declaration") he testifies with regards to the various amendments of Midtown Development L.P.'s corporate documents:

> "I do not know when or where Jericho obtained this
>
> document, but it had not been produced by either Jericho or
>
> Midtown during the litigation."

The document referred to by Mr. Geremia is a copy of the Certificate of Limited Partnership of Midtown Development Limited partnership (Exhibit "A") and Second Amendment to the Midtown Partnership Agreement (Exhibit "B"). In spite of the fact that Mr. Geremia testifies that he does not know where Jericho secured these documents, he finishes paragraph 7 to his declaration that these documents bear the stamp of the New York County Clerk's office.

16.    These corporate documents located by Plaintiff were those of his clients and his co-counsel.

17.    The responsibility as to the knowledge of these corporate documents is that of Defendants' attorneys and Defendants. It should have not been that hard for Mr. Geremia to get details, all he had to do was to pick up the phone to Mr. Imperatore, his co-counsel.

18.    While Mr. Geremia shrugs off his responsibility to properly verify the facts surrounding the removal motions with his clients or even to check filed records that are intended to put the world on notice of partners in a Limited Partnership – there is no excuse for not remembering his client's (and co-counsel) testimony at a deposition he was personally defending.

19.    On November 8, 2005 the deposition of Edward G. Imperitore was conducted in an action pending in the Supreme Court of the State of New York, Jericho Group, Ltd. V. Midtown Development, L.P., (Sup. Ct. N.Y. Cty.)(Exhibit "C").

20.    Defending the deposition on behalf of the Defendant Midtown Development, L.P. was Frederick E. Sherman and Todd R. Geremia both of Jones Day.

21.    The questioning on page  25 led Mr. Edward Imperitore to answer that:

> "The general partner of [3]Gerart, the general partners of Gerart, which owns Midtown with Conrails, a small part being owned by Conrail, Edward W. Ross and

---

[3] In the deposition transcript it has "Gerart" misspelled and should read "Jerrart".

Arthur Imperitore Senior, they're the
general partners."

22.   Mr. Edward Imperitore further testifies that:

"Arthur E. Imperitore Senior is also the
general partner of Hadrian, which is an
owner of Gerart. And the partners in
Hadrian include, and I think are limited
to, members of his immediate family.

23.   Mr. Imperator's testimony even gets even more
specific:

"The Hadrian partnership owns 50 percent
of Gerart. And Gerart owns 47.5 percent
of Midtown."

24.   The testimony by Mr. Imperitore if it discloses
anything, it discloses that the membership of Defendants Midtown
Development L.P. is a lot more complicated then what Mr. Geremia
included in his Notice of Removal or for that matter what was included
in his Amended Notice of Removal.

25.   When Mr. Geremia, in his Declaration testifies

"I relied on the Agreement of Limited
Partnership of Mid-Town Development
Limited Partnership and the First
Amendment to Agreement of Limited
Partnership of Mid-Town Development
Limited Partnership to determine whose
Midtown's general and limited partners
are"

it is pathetic! Mr. Geremia should have relied on his co-counsel, his
co-counsels testimony and the filed documents!

26.   Mr. Geremia, an author of the exhaustive memorandum of
law submitted in opposition to Plaintiff's instant motion, is not

going to tell this Court that the removal filings were shoddy due to his careless and lackadaisical behavior. The only excuse that can be given was that the behavior of Defendants and their counsels was deliberate.

27.   Mr. Geremia does not discuss in his Declaration that any inquiry was made prior to the removal filings other that a review of the First Amendment to Midtown Development L.P. Partnership Agreement. Considering all the facts that Mr. Geremia had at his fingertips I find that hard to believe.

28.   To have Mr. Geremia to claim total ignorance is pure fiction.

29.   As part of Midtown Development L.P.'s production in the New York State action titled, Jericho Group, Ltd. v. Midtown Development, L.P., NY. Cty. Index Number 113274/2004 the Limited Partnership Agreement of Hadrian Properties Ltd. was produced as MID 810-856 (Exhibit "D")("Hadrian Partnership Agreement").

30.   Mr. Geremia knew that Hadrian Properties was a partner in Jerrart Venture Ltd.[4] from other agreements executed by Midtown Development L.P. (see Exhibit "F" Bates Stamped MID 92- MID 93).

31.   We find on the Hadrian partnership Agreement the signature of Edward G. Imperatore. It would seem that the attorney of record also knew that the document existed. The problem is that none of this information was included in the removal filings[5].

---

[4] A copy of the Joint Venture Agreement of Jerrart Venture is annexed hereto as Exhibit "E." This agreement was also produced by Defendants as part of discovery in the New York State action and is bates stamped as MID 790-MID 809.

[5] Annexed as Exhibit "I" is the WR West Side Associates Agreement and Certificate of Limited Partnership that was also produced by Defendants as part of their discovery and bates stamped MID 858-MID891.  This document was

32.    The relationship between Jerrart Venture, Hadrian Properties and Midtown Development L.P. can clearly be seen in the Mid-Town Jerrart - Amtrak Access and Construction Agreement Regarding Amtrak's West Side Rail Line dated April 23, 1990 that was produced by Midtown Development L.P. in the New York State action and bates stamped as MID 77- 98 (Exhibit "F").

33.    It is important for this Court to understand that Exhibit "F" has been attached to just about every single motion in this action and the State actions to date and has been refereed to repeatedly by the State Court Justices and the Appellate Court. It is incomprehensible that Defendants will deny knowledge of its existence. As such it is impossible for the Defendants and its counsels to deny who the partners were of Midtown Development L.P.

34.    I would like to direct this Court to the signature pages of Exhibit "F" where it has **Midtown Development Limited Partnership by: Jarrart Venture (its General partner) and BY: Hadrian Properties** among others. (Exhibit "F" bates stamped MID92-MID93). All these signature lines demonstrate that the partners in Midtown Development L.P. were no secret.

35.    This document smacks you in the face that the removal filings were complete fraud on this Court.

36.    Mr. Geremia testifies that he did not even look at the documents he produced? What Gaul. The exhibits annexed hereto are all bates stamped and were produced from Defendants files. All the

---

signed by Edward Imperatore as well. I can fill this Reply with many more exhibits as a basis to show this Court that Mr. Geremia has acted ad is acting in bad faith to this Court when it comes to his knowledge of what he knew and did now know.

attorneys had to do was read what they had and not even leave their offices.

37.    In paragraph 12 of the Geremia Declaration Mr. Geremia testifies:

> "I did not make any statement in the original notice of removal I knew was false"

38.    Based on the objective evidence it is hard to believe Mr. Geremia.

39.    Mr. Ross, whose declaration was annexed as Exhibit "G" to the Plaintiff's motion makes it crystal clear that since 1987 the only general partner of Midtown Development L.P. was Jerrart Venture.

40.    This is the same Mr. Ross that Mr. Geremia has as the general partner of Midtown in the Notice of Removal and the Amended Notice of Removal.

41.    Mr. Ross in his declaration shows no ambivalence in his declaration as to who the general partners of Midtown Development L.P. was!

42.    When Mr. Geremia prepared the removal documents did he talk with his clients?  Did he talk with Mr. Ross? Did he talk with his co-counsel? Did he look at the documents he produced?

43.    When I mentioned above that Mr. Geremia's testimony in his Declaration was pathetic, this is prime example.

44.    When the removal documents were filed with this Court where was Phillips Nizer to verify the accuracy of the facts that were being submitted before this Court.

**45.**    Phillips Nizer had a duty just as Mr. Geremia and considering that Mr. Imperatore is a partner and had full knowledge, it should have been easy enough to file a proper pleading.

**46.**    Where was Mr. Imperitore, a member of this bar, when documents were being filed?

**47.**    Both firms and their clients are seeking impunity from being assessed costs and sanctions for their behavior.

**48.**    The injustice would be if no award was made in favor of plaintiffs.  Regardless of what the status is of the State Court actions between the parties, both firms had a duty to this Court for papers that were filed in conjunction with the Notice of Removal.

**49.**    Annexed to this declaration is the affirmation of Herbert Rubin stating that contrary to Defendant's speculation this matter was handled by his firm on an hourly basis and not as a contingency matter (Exhibit "G").

**50.**    Defendants suggest to this Court on page 10 of their Memorandum of Law that "Due Process requires that Courts provide notice and opportunity to be heard before any kind of sanctions."

**51.**    If Defendants are requesting a full blown hearing, Plaintiff's welcomes such a proceeding.

**WHEREFORE**, Plaintiff respectfully requests that the instant motion be granted in its entirety.

Dated: April 28, 2008

Robert L. Rimberg

CERTIFICATE OF LIMITED PARTNERSHIP

OF

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP


The undersigned, desiring to form a limited partnership pursuant to the Uniform Limited Partnership Act of the State of New York, certify as follows:

1.  <u>Name</u>. The name of the Partnership is MID-TOWN DE-VELOPMENT LIMITED PARTNERSHIP.

2.  <u>Character of Business</u>. The character of the business of the Partnership is to acquire, own, improve, and manage the Property (which means (a) the real property (land) described in Exhibit A hereto, as the same may be improved from time to time, (b) buildings at any time situate thereon, (c) all personal property relating thereto, (d) all air-rights above the surface of the land, and (e) all mineral and other rights below the surface of the land, if any) and any property received in a like kind exchange, and to engage in any other activities relating to the Property. The Partnership shall not engage in any other business except with the consent of all of the partners.

3.  <u>Principal Place of Business</u>. The principal place of business of the Partnership is c/o Palantine Realty Corp., 630 Fifth Avenue, New York, New York 10020.

4.  <u>Members</u>. The name and residence of each General Partner is as follows:

| Name | Place of Residence |
|---|---|
| Arthur E. Imperatore | 10 Claremont Road<br>Fort Lee, New Jersey  07024 |
| Jerrold Wexler | 2800 Lake Shore Drive<br>Chicago, Illinois  60657 |
| Edward W. Ross | 1240 North Lake<br>Shore Drive<br>Chicago, Illinois  60610 |

The name and address of the Class B Limited Partner is as follows:

| Name | Address |
|---|---|
| CRC Properties, Inc. | 150 Allendale Road<br>King of Prussia,<br>Pennsylvania  19406 |

5. **Term.** The term for which the Partnership is to exist is until December 31, 2083. The Partnership shall be terminated prior to the date set forth above: (a) if the General Partners determine and the Class B Limited Partner consents in writing to such termination; (b) if the Partnership sells or otherwise disposes of its entire interest in all or substantially all of its assets, unless the Partnership receives as a part or all of the consideration for such sale or other disposition a mortgage note or other obligations; provided, however, that the General Partners may elect to dissolve the Partnership even if it receives a mortgage note or other obligations upon the sale of all or substantially all of the Partnership's assets if the Partnership receives the written opinion of tax counsel that such dissolution will not adversely impact the Limited Partner by accelerating or changing the nature of income recognition; (c) if the Partnership sells or receives full payment of the notes or obligations referred to

2

in clause (b); or (d) upon the retirement or withdrawal of any General Partner, or upon the death or adjudication of incompetency of any General Partner which is not a corporation, unless either (i) the remaining General Partner(s), if any, or (ii) a majority in interest of the Limited Partners, shall determine within thirty days after such event to continue the business of the Partnership and shall so notify all of the Partners, and, if there shall be no remaining General Partner, shall designate a substitute General Partner who has agreed in writing to serve in such capacity.

6. _Contributions_. The Class B Limited Partner has contributed Five and 00/100 ($5.00) Dollars in cash.

7. _Additional Contributions_. The Class B Limited Partner has not agreed to make any additional contributions to the Partnership.

8. _Return of Contribution_. No times are provided for the return of the Class B Limited Partner's contribution.

9. _Share of Profits_. The share of profits or compensation by way of income which the Class B Limited Partner is entitled to receive is five percent (5%), subject to the following provisions:

A. _Additional Funds_. Upon or prior to acquisition of the Property by the Partnership, the General Partners shall provide all sums required in order to fund the purchase of the Property; provided, however, that no such funding shall diminish the five percent (5%) interest of the Class B Limited Partner in cash distributions (Article 9B, below) and sale and refinancing proceeds (Article 9C, below),

unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata.

B.  Cash Distributions.  Distributions of cash shall be made by the Partnership (a) at the times and in the amounts required by the provisions of Article 9C, below, applicable upon the occurrence of the events therein described, and (b) otherwise at the time or times determined by the General Partners.  Within the first 120 days of each fiscal year, the General Partners shall cause the Partnership to distribute, under clause (b) of the preceding sentence, all cash (net cash flow) which the General Partners, in their sole discretion, determine not to be needed for the Partnership's business.  Subject to the provisions of Article 9A, above, and distributions shall be made 95% to the General Partners and 5% to the Class B Limited Partner.  If Class A or Class C Limited Partners are admitted to the Partnership, the interest of the General Partners shall be reduced accordingly.

C.  Sale and Mortgage Proceeds.  If the Partnership shall at any time realize net cash proceeds as a consequence of the refinancing of any mortgage on the Property or of the sale of the Property or any interest therein (including the exchange, condemnation or similar eminent domain taking, casualty, or other disposition of all or substantially all of the Partnership's assets, or from the sale of easements,

4

rights-of-way or similar interests in the Partnership's Property or any other similar items which in accordance with generally accepted accounting principles are attributable to capital; provided, however, that a sale shall not include a tax-free exchange under Section 1031 of the Internal Revenue Code), such net cash proceeds shall be distributed promptly after such refinancing or sale in the following order of priority:

1. First, to the payment, or as a reserve for payment, of any indebtedness of the Partnership;

2. Next, to the establishment of any reserve required by any mortgage or determined by the General Partners to be reasonably necessary to provide for any liabilities or obligations of the Partnership, including contingent or unforeseen liabilities; and

3. The balance, if any, as follows: (i) If a Certificate of Occupancy (as defined in Section 1.1.7 of the Agreement of Limited Partnership of the Partnership ["Agreement"]) has not been issued, then the balance shall be distributed 50% to the General Partners and 50% to the Class B Limited Partner, (ii) If a Certificate of Occupancy has been issued, then, subject to the provisions of Article 9A, the balance shall be distributed 95%

to the General Partners and 5% to the Class B
Limited Partner. If a Certificate of Occupancy
has been issued and if at that time there are
Class A and/or Class C Limited Partners, the 95%
interest of the General Partners shall be de-
creased accordingly.

If the General Partners shall determine that any reserve described
above is no longer needed for a new reserve, any reduction in such
reserve shall be treated as cash proceeds to which the above pro-
visions apply.

10. Right of First Refusal - Assignability.

(a) In the event that after the issuance of a Certificate of
Occupancy, the General Partners, on behalf of the Partnership, re-
ceive a written offer from a bona fide offeree to purchase all or any
substantial portion of the Property, then the General Partners shall
immediately deliver a true and complete copy of the offer to the Class
B Limited Partner and the Class B Limited Partner shall have an as-
signable right and option exercisable within forty-five (45) days after
its receipt of said copy of the offer to purchase the assets of the
Partnership referred to in the offer for the purchase price and upon
the same terms and conditions referred to in the offer. The option
shall be exercised by giving written notice to the Partnership within
the aforesaid forty-five (45) day time limit.

(b) The right of first refusal granted to the Class B Lim-
ited Partner pursuant to Article 10(a), above, shall be freely assign-
able by the Class B Limited Partner after its receipt of a copy of the

6

offer described in Article 10(a). In the event of the exercise of the Class B Limited Partner's right of first refusal within said forty-five (45) day period, closing shall be held at 10:00 A.M. at the principal office of the Partnership in New York, New York, and deed, bill of sale, checks, and the like, delivered, on the sixtieth (60th) day following the date of the exercise of the option, unless some other time, date, and place is agreed to in writing by the Partnership and the Class B Limited Partner or its assignee. Payment by check shall mean bank check, certified check or wire transfer (acceptable to the General Partners).

11.   Transfer by Limited Partners.

A.   A Limited Partner may assign all or part of its interest as a Limited Partner in the Partnership, provided that (a) the assignee shall not be a natural person younger than twenty-one (21) years of age or a natural person who shall have been adjudged incompetent; (b) the assignment shall be in writing in form reasonably satisfactory to the General Partners; (c) the assignee shall have agreed in a writing in form reasonably satisfactory to the General Partners to be bound by the terms of this Agreement and to give or confirm each consent and approval given herein by the original parties hereto; (d) a majority of interest in the General Partners shall have consented in writing to the assignment, which consent shall not be unreasonably withheld; and (e) if required by the General Partners, the assignment shall be effective as of the first day of a fiscal quarter. The assignee of an interest in the Partnership may be admitted

7

as a Limited Partner only with the consent of the General Partners, which consent shall not be unreasonably withheld.

B. The General Partners hereby consent to the assignment by the Class B Limited Partner of all or any part of its partnership interest to any corporation controlling, controlled by or under common control with the Class B Limited Partner, which consent shall be effective upon the General Partners' receipt of the documents referred to in Article 11A, above.

C. Any purported assignment not meeting the requirements set forth in Article 11A shall be void and shall not bind the Partnership.

D. For purposes of this Article 11, the term "assign" includes the making of any pledge, hypothecation, encumbrance, sale or other disposition.

12. Additional Partners.

(a) Class "A" Limited Partners

    (i) No Limited Partner may withdraw from the Partnership, except with the approval of the General Partners, which consent shall not be unreasonably withheld. Upon the death, bankruptcy, incompetency or dissolution of a Limited Partner, its successor in interest may be admitted as a Limited Partner and shall, upon such admission, have all of the rights and obligations of a Limited Partner under this Agreement, and the Partnership shall not be dissolved upon any such occurrence.

(ii)  No General Partner may retire, nor may any General Partner sell, assign or otherwise transfer his or its interest to any other Person, other than to an Approved General Partner Designee (as defined in Section 1.1.3 of the Agreement), nor may any other Person (other than an Approved General Partner Designee) be admitted to the Partnership as a general partner without the prior written consent of the Class B Limited Partner.  Each General Partner may assign a portion of his general partner's interest, without the consent of any other Partner, if the assignee is a person who is already a Partner or is a member of the Immediate Family (as defined in Section 1.1.13 of the Agreement) of the assignor or a trust for the primary benefit of such a person and if such assignee who holds such assigned interest is a Class C Limited Partner and not as a General Partner.

(iii)  Subject to compliance with Article 11, the General Partners may assign (without the consent of the Class B Limited Partner) a portion of their equity interest, either to new investors (Class A Limited Partners), or to the Partnership (which will then issue interests to Class A Limited Partners).  The proceeds of such assignment and sale shall be used solely for Partnership purposes and the rights and

interests of the Class B Limited Partner shall in no way be diminished or impaired, unless such funding is from a bank or other institutional lender which requires an "equity kicker," in which event the Partners' profit percentages shall be diluted pro rata. If the new Class A Limited Partner is not a bank or institutional lender, the Class B Limited Partner's interest shall not be diluted.

(iv) If the General Partners wish to assign a portion of their equity interest to new investors (Class A Limited Partners) and not apply the proceeds solely for Partnership purposes, then the proceeds of sale shall be distributed as follows:

(a) if a Certificate of Occupancy has not been issued, fifty percent (50%) of the proceeds of the sale not applied to Partnership purposes shall be distributed to the Class B Limited Partner;

(b) if a Certificate of Occupancy has been issued, the proceeds of the sale not applied to Partnership purposes shall be distributed ninety-five percent (95%) to the General Partners and five percent (5%) to the Class B Limited Partner.

(b)  Class "C" Limited Partners

Class "C" Limited Partner means the interest of a General Partner

(i)  If converted pursuant to Article 12(a) hereof.

(ii)  If the Partnership is continued pursuant to the provisions of Article 5(d) above, the Partnership interest of the General Partner who shall have died or been adjudicated an incompetent or been dissolved without such Partner's consent or acquiescence shall automatically be converted into a Class C Limited Partner's interest, which shall consist of the same interests in the profits, losses, distributions and other items of the Partnership to which such General Partner would have been entitled but for the event which terminated his status as a General Partner.

(iii)  If any General Partner shall (a) retire or withdraw in violation of the Agreement, (b) voluntarily dissolve or acquiesce in its dissolution, if such General Partner is a corporation, partnership or other entity which is not a natural person, (c) be adjudicated a bankrupt, (d) suffer or permit a receiver to be appointed to hold or administer any substantial portion of his assets and such appointment shall remain in effect for sixty (60) days, (e) make an assignment for the benefit of creditors, (f) admit by a pleading

11

the material allegations of any bankruptcy petition filed against him, then in any such event the interest if such General Partner shall automatically be converted into a Class C Limited Partner's interest and, notwithstanding any other provision of the Agreement, such former General Partner shall thereafter have no right to participate in any manner in the management of the Partnership's business or in any decision, consent or approval affecting any transaction or proposed transaction whatsoever.

13.    Interest of Class "A" and Class "C" Limited Partners. If Class "A" or Class "C" Limited Partners are admitted to the Partnership, the interest of the Partners shall be reduced, subject to, and in accordance with Article 12(a)(iii) of this Certificate.

14.    Priority. No right has been given to any Limited Partner for priority over any other Limited Partner as to contributions or as to compensation by way of income.

15.    Right to Continue Business. The remaining General Partners are given the right to continue the business of the Partnership to the extent provided in Article 5(d) hereof.

16.    Distribution of Property. No right has been given to any Limited Partner to demand or receive property other than cash in return for its contribution, except as set forth in Article 10 hereof regarding the right of first refusal granted to the Class B Limited Partner.

IN WITNESS WHEREOF, the undersigned have made, signed and acknowledged this Certificate of Limited Partnership this _11th_ day of _June_, 1985.

GENERAL PARTNERS

ARTHUR E. IMPERATORE

JERROLD WEXLER

EDWARD W. ROSS

ATTEST:

LIMITED PARTNER

CRC PROPERTIES, INC.

By: _____
LAWRENCE A. HUFF
President

J. D. McGEEHAN    Secretary

(SEAL)

STATE OF   New Jersey          )
                               ) ss.:
COUNTY OF   Hudson             )

On this 4th  day of June____ , 1985 before me personally came ARTHUR E. IMPERATORE, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledge to me that he resides at 10 Claremont Road, Fort Lee, New Jersey 07024 and that he executed the foregoing Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.

_____
Notary Public

LISA CACCAVALE-SOTO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 10, 1990

STATE OF _Illinois_            )
                               ) ss.:
COUNTY OF _Cook_               )

On this _31st_ day of _May___ , 1985 before me personally came JERROLD WEXLER, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledge to me that he resides at 2800 Lake Shore Drive, Chicago, Illinois 60657 and that he executed the foregoing Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.

_____
Notary Public
My Commission Expires:
August 21, 1985

14

STATE OF *Illinois*      )
                         ) ss.:
COUNTY OF *Cook*         )

On this 31st day of *May* , 1985 before me personally came EDWARD W. ROSS, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledge to me that he resides at 1240 North Lake Shore Drive, Chicago, Illinois 60610 and that he executed the foregoing Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.

*Christine Fairfeld*
Notary Public
*My Commission Expires*
*August 21, 1985*


STATE OF PA           )
                      ) ss.:
COUNTY OF *Philadelphia* )

On this 11 day of *June*, 1985, before me personally appeared LAWRENCE A. HUFF, to me known, who being by me duly sworn, did depose and say, that he resides at Oakwood Lane, Phoenixville, Pennsylvania 19460, that he is the President of CRC Properties, Inc. a Delaware corporation and the corporation described in and which executed the foregoing Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a Limited Partner; that he knows the seal of said Corporation; that the seal affixed to said Certificate is such corporate seal; that it was so affixed by order of the Board of Directors of said Corporation, and that he signed his name thereto by like order.

*Francis C. Flynn*
Notary Public

FRANCIS C. FLYNN
Notary Public, Philadelphia, Philadelphia Co.
My Commission Expires July 2, 1987

PARCEL 1 DESCRIPTION

BEGINNING at the corner formed by the intersection of the easterly line of Eleventh Avenue with the northerly line of West 36th Street;

1. Running thence northerly, along the easterly line of Eleventh Avenue, 98'-9";

2. thence easterly, parallel with the northerly line of West 36th Street, 175'-0";

3. thence northerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the southerly line of West 37th Street;

4. thence easterly, along the southerly line of West 37th Street, 275'-0";

5. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to the center line of block;

6. thence westerly, parallel with the northerly line of West 36th Street and along the center line of block, 75'-0";

7. thence southerly, parallel with the easterly line of Eleventh Avenue, 98'-9" to a point in the northerly line of West 36th Street;

8. thence westerly, along the northerly line of West 36th Street, 375'-0" to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM AN EASEMENT RETAINED BY THE GRANTOR THEREOF.



PARCEL 1   DESCRIPTION

BEGINNING at the corner formed by the intersection of the easterly line of
Eleventh Avenue with the northerly line of West 36th Street;

1. Running thence northerly, along the easterly line of Eleventh Avenue,
   98'-9";

2. thence easterly, parallel with the northerly line of West 36th Street,
   175'-0";

3. thence northerly, parallel with the easterly line of Eleventh Avenue,
   98'-9" to a point in the southerly line of West 37th Street;

4. thence easterly, along the southerly line of West 37th Street, 275'-0";

5. thence southerly, parallel with the easterly line of Eleventh Avenue,
   98'-9" to the center line of block;

6. thence westerly, parallel with the northerly line of West 36th Street
   and along the center line of block, 75'-0";

7. thence southerly, parallel with the easterly line of Eleventh Avenue,
   98'-9" to a point in the northerly line of West 36th Street;

8. thence westerly, along the northerly line of West 36th Street, 375'-0"
   to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any
streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM AN EASEMENT RETAINED BY THE GRANTOR THEREOF.

17

PARCEL 2  DESCRIPTION

BEGINNING at a point in the southerly line of West 38th Street distant 350'-0" west of the corner formed by the intersection of the westerly line of Tenth Avenue with the southerly line of West 38th Street;

1.  Running thence southerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the northerly line of West 37th Street;

2.  thence westerly, along the northerly line of West 37th Street, 150'-0";

3.  thence northerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the southerly line of West 38th Street;

4.  thence easterly, along the southerly line of West 38th Street, 150'-0" to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM AN EASEMENT RETAINED BY THE GRANTOR THEREOF.



PARCEL 2   DESCRIPTION

BEGINNING at a point in the southerly line of West 38th Street distant 350'-0" west of the corner formed by the intersection of the westerly line of Tenth Avenue with the southerly line of West 38th Street;

1.  Running thence southerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the northerly line of West 37th Street;

2.  thence westerly, along the northerly line of West 37th Street, 150'-0";

3.  thence northerly, parallel with the westerly line of Tenth Avenue, 197'-6" to a point in the southerly line of West 38th Street;

4.  thence easterly, along the southerly line of West 38th Street, 150'-0" to the point or place of BEGINNING.

TOGETHER with all right, title and interest, if any, of the grantor in and to any streets and roads abutting the above described premises to the center lines thereof.

EXCEPTING THEREFROM: AN EASEMENT RETAINED BY THE GRANTOR THEREOF.

M 628/85

**DATA ENTERED**

CERTIFIED COPY ISSUE
Fee Paid
Dated MAR 19 1987
County Clerk, N.Y. Co.
By

CERTIFIED COPY ISSUE
Fee Paid MAY 29 1987
Dated
County Clerk, N.Y. Co.
By

CERTIFIED COPY ISSUE
Fee Paid JUN 21 1985
Dated
County Clerk, N.Y. Co.
By



CERTIFICATE OF LIMITED PARTNERSHIP

OF

MID-TOWN DEVELOPMENT
LIMITED PARTNERSHIP

QUINN, COHEN, SHIELDS & BOCK
ATTORNEYS AT LAW
545 MADISON AVENUE
NEW YORK, N.Y. 10022
832-1806

'85 JUN 21 P3:18
FILED
COUNTY CLERK
N.Y COUNTY

46-2063

## COUNTY CLERK, NEW YORK COUNTY

### 60 CENTRE STREET, NEW YORK CITY

STATE OF NEW YORK,

COUNTY OF NEW YORK,

ss.:

Let a copy of the foregoing Limited Partnership Certificate or a notice containing the substance thereof be published once in each week for six successive weeks in the New York Law Journal and

two newspapers of the County of New York.

Dated, New York,

6/21/85

County Clerk, New York County.

### SECOND AMENDMENT TO CERTIFICATE OF LIMITED PARTNERSHIP OF MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

The undersigned, being all of the General and Limited Partners of Mid-Town Development Limited Partnership (the "Partnership") desiring to amend the Certificate of Limited Partnership of the Partnership (the "Certificate") heretofore filed as Document M628/85 on June 21, 1985 in the office of the County Clerk and Clerk of the Supreme Court, New York County, certify as follows:

1.   The Certificate is hereby amended by deleting Article 4 in its entirety and substituting the following therefor:

"4.   Members.   The name and address of the General Partner is as follows:

| Name | Address |
|------|---------|
| Jerrart Venture | 630 Fifth Avenue<br>New York, NY 10020 |

516-87 B

The name and address of the Class B Limited Partner is as follows:

| Name | Address |
|------|---------|
| CRC Properties, Inc. | 150 Allendale Road<br>King of Prussia<br>Pennsylvania 19406" |

IN WITNESS WHEREOF, the undersigned have made, signed and acknowledged, this Amended Certificate of Limited Partnership this 2nd day of May, 1987

WITHDRAWING GENERAL PARTNERS

_____
Arthur E. Imperatore

_____
Jerrold Wexler

_____
Edward W. Ross

LIMITED PARTNER

CRC PROPERTIES, INC.

BY: _____
     John Jaeger, President

JERRART VENTURE

BY: _____
     Arthur E. Imperatore

32464

STATE OF NEW JERSEY    )
                       ) SS.
COUNTY OF HUDSON       )


On this 23rd day of ~~May~~ JUNE, 1987, before me personally came ARTHUR E. IMPERATORE, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledged to me that he resides at Pershing Road, Weehawken, New Jersey 07087 and that he executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.


Notary Public

LISA CACCAVALE-SOTO
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES APRIL 10, 1990


STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )


On this 28th day of May, 1987, before me personally came JERROLD WEXLER, to me known, and know to me to be the individual described in and who executed the foregoing instrument and he duly acknowledged to me that he resides at 2800 Lake Shore Drive, Chicago, Illinois 60657 and that he executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.


Notary Public
my Commission expires
August 2, 1989

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )

On this 28th day of May, 1987 before me personally came EDWARD W. ROSS, to me known, and known to me to be the individual described in and who executed the foregoing instrument and he duly acknowledged to me that he resides at 1240 North Lake Shore Drive, Chicago, Illinois 60610 and that he executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a General Partner.

NOTARY PUBLIC

PENNSYLVANIA
STATE OF ~~NEW YORK~~    )
          PHILADELPHIA   ) SS.
COUNTY OF ~~NEW YORK~~   )

On this 13TH day of ~~May~~ July, 1987, before me personally appeared JOHN JAEGER, to me know, who being by me duly sworn, did depose and say, that he resides at 8 Merrion Road, Merrion Station, Pennsylvania, that he is the President of CRC Properties, Inc., a Delaware corporation, and the corporation described in and which executed the foregoing Second Amendment to the Certificate of Limited Partnership of Mid-Town Development Limited Partnership as a Limited Partner; and that he signed his name thereto by order of the Board of Directors of said Corporation.

NOTARY PUBLIC

JAMES W. HARTMAN, JR., NOTARY PUBLIC
PHILADELPHIA, PHILADELPHIA COUNTY
MY COMMISSION EXPIRES MAY 20, 1991
Member, Pennsylvania Association of Notaries.

32466

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SECOND AMENDMENT TO

CERTIFICATE OF LIMITED PARTNERSHIP

OF

MID-TOWN DEVELOPMENT LIMITED PARTNERSHIP

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

McCarter & English

Attn.:  Stephen M. Vajtay, Jr., Attorney

550 Broad Street

Newark, New Jersey  07102

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



'87 SEP -4 AM10:08

FILED
COUNTY CLERK
N.Y. COUNTY

THIS RECORD NOT TO
BE REMOVED FROM THE
COUNTY CLERK'S OFFICE

FILED BY

INDEXED BY

EDWARD IMPERATORE November 8 2005

7

8          DEPOSITION of EDWARD G. IMPERATORE,

9    held at the offices of JONES DAY, 222 East

10   41st Street, New York, New York 10017-6702,

11   before Michele Rossi, a Registered

12   Professional Reporter and Notary Public

13   within and for the State of New York.

14

15

16

17

18

19

20

21

22

23

24

25

1                                           3

2

3    ROBERT B. GOEBEL, ESQ.
      Attorney for Plaintiff
4          14 Walworth Avenue
           Scarsdale, New York 10583

5

6

7    LAW OFFICES OF LISA M. SOLOMON
      Attorney for Plaintiff
8          305 Madison Avenue, Suite 4700
           New York, New York 10165

9
     BY:   LISA M. SOLOMON, ESQ.

10

11

     JONES DAY
12    Attorneys for Defendant
           222 East 41st Street

EDWARD IMPERATORE November 8 2005

13    New York, New York 10017-6702

14    BY:    FREDRICK E. SHERMAN, ESQ.

15              - AND -

16        TODD R. GEREMIA, ESQ.

17

18

19

20

21

22

23

24

25

                                                    4

1

2        IT IS HEREBY STIPULATED AND AGREED by and

3    between the attorneys for the respective parties;

4        THAT all objections, except as to the form of

5    the question, shall be reserved to the time of

6    the trial; and

7        THAT failure to object to any question or to

8    move to strike any testimony at this examination

9    shall not be a bar or waiver of the right to make

10    such objection or motion at the time of the trial

11    of this action, and is hereby reserved; and

12        THAT this examination may be signed and sworn

13    to by the witness examined herein before a Notary

14    Public, but failure to do so or to return the

15    original of the examination to the attorney for

16    the party on whose behalf the examination is

17    taken shall not be deemed a waiver of the rights

18    provided by Rules 3116 and 3117 of the Civil

EDWARD IMPERATORE November 8 2005

19  Practice Law and Rules of Testimony, and shall be
20  controlled thereby; and
21      THAT certification and filing of the original
22  of this examination are waived; and
23      THAT counsel for the witness examined herein
24  shall be provided with a copy of this examination
25  at no charge.


                                                      5
1
2   E D W A R D    G.    I M P E R A T O R E,
3           stating his business address as 130 Main
4           Street, Hackensack, New Jersey 07601,
5           having been duly sworn by the Notary
6           Public (Michele Rossi, RPR), was
7           examined and testified as follows:
8   EXAMINATION BY MR. GOEBEL:
9           MR. GOEBEL:  Mark this as Plaintiff's
10      Exhibit 1.
11          (Plaintiff's Exhibit 1, Record on
12      Appeal, marked for identification, as of this
13      date.)
14      Q    So you know the way this works, I'm
15  going to ask you some questions and if they're
16  not clear, you'll tell me to try to clarify.  If
17  there's something you don't understand, we'll
18  stop and we'll try to address the issue with your
19  misunderstanding or my misstating a question.
20  Does that sound okay?
21      A    I'll do it.
22      Q    Please state your name for the record?
23      A    My name is Edward Gerard Imperatore,
24  I-M-P-E-R-A-T-O-R-E.

                        Page 4

EDWARD IMPERATORE November 8 2005

7    substantial. He'll tell you everyone who

8    knows anything if you just ask the question,

9    but the question with substantial is the

10   problem.

11       Q    Who are the principal owners, the

12   principal owners, the individuals, who are the

13   principal owners of Midtown directly or

14   indirectly?

15       A    Sir, I'm having trouble with directly or

16   indirectly.

17       Q    Well, what I mean by indirectly is, you

18   have an entity called Midtown Limited

19   Partnership. It's got constituent entities.

20   Gerart is one general partner. One or two other

21   general partners.

22            Inside those general partnerships there

23   may be other level of entities, but when you go

24   from top to bottom and you get to an individual

25   who owns something that owns something that owns

25

1

2    something, who are those individuals?

3        A    The general partner of Gerart, the

4    general partners of Gerart, which owns Midtown

5    with Conrails, a small part being owned by

6    Conrail, Edward W. Ross and Arthur Imperatore

7    Senior, they're the general partners.

8        Q    Please continue. I didn't ask you who

9    the general partners were. I asked you who the

10   individual beneficial owners were.

11       A    Arthur E. Imperatore Senior is also the

12   general partner of Hadrian, which is an owner of

Page 20

EDWARD IMPERATORE November 8 2005

13    Gerart. And the partners in Hadrian include, and
14    I think are limited to, members of his immediate
15    family.
16        Q    Who is his immediate family?
17        A    My uncle Arthur is immediate family.
18    And to a small degree, myself.
19        Q    You think or you know?
20        A    I know.
21        Q    You know?
22        A    But I don't know, as I sit here today,
23    whether one of those members participates in
24    individually or through her trust.
25        Q    If you were to calculate percentages,

1                                          26
2    Arthur, yourself, Arthur Imperatore, your uncle?
3        A    Senior.
4        Q    Senior?
5        A    Yourself and any other family,
6    Imperatores, family members, what percent of the
7    deal of Midtown do you own?
8        A    The Hadrian partnership owns 50 percent
9    of Gerart. And Gerart owns 47.5 percent of
10    Midtown.
11        Q    Who owns the other 53 percent of
12    Midtown?
13        A    Conrail owns 5 percent.
14        Q    Conrail being?
15        A    Well, the former Conrail, the
16    consolidated rail corporation, which has -- which
17    may not actually exist as a separate entity
18    anymore.

Page 21

19    Q    They own 5 percent of Midtown?

20    A    Yes.

21    Q    That plus the 47-1/2 percent you

22    mentioned, who owns the balance?

23    A    The balance is owned by W.R. West Side,

24    another partnership.

25    Q    Who are the partners?

                                    27

1

2    A    The general partner is Edward W. Ross.

3    Q    How much did does he own in that general

4    partnership?  Is it a general partnership or a

5    limited partnership?

6    A    I think it's a limited partnership.

7    Q    With general Ross as the partner?

8    A    I believe that's correct.

9    Q    What is his interest in that entity?

10    A    I think it's 1 percent.

11    Q    And the other 99 percent?

12    A    The other remainders are owned by

13    members of his family or their trust.

14    Q    Mr. Ross's family?

15    A    Yes.

16        MR. SHERMAN:  Excuse me, I asked what

17    was the question.

18        MR. GOEBEL:  I asked him as to whether

19    that question was members of Ross's family.

20        MR. SHERMAN:  I just didn't hear.

21    A    Or members of the late Jerry Wexler's

22    family or their trust.  And and a small equity

23    interest held by Irv Markin, Ira Kipmus and

24    myself.  And myself with some consistency, if I

EDWARD IMPERATORE November 8 2005

25    recall.


                                             28

1
2        Q    What are your interest in that limited
3    partnership, what percent of the west side, the
4    one that you just said you had an interest in?
5        A    It's 2 percent subject to some
6    contingencies.
7        Q    So would it be fair to say that you
8    owned 2 percent of Midtown?
9        A    No.
10       Q    Which of these individuals that you've
11   identified did do you speak with on some kind of
12   periodic or regular basis?
13       A    I speak to Edward W. Ross.  I speak with
14   my uncle Arthur E. Imperatore Senior and I speak
15   with his, my uncle Arthur's stepson, Armond Pohan
16   with some frequency.
17       Q    Since the time the litigation was
18   commenced, have you had any discussions with
19   Amtrak?  Amtrak the now known as railroad company
20   known as the Amtrak?
21       A    No.
22       Q    You haven't spoken with them?
23       A    No.
24       Q    Do they know about this litigation?
25       A    I don't know.


                                             29

1
2        Q    Have your counsel spoken with them at
3    all?

EDWARD IMPERATORE November 8 2005

4.   A   Not to my knowledge.

5   Q   The individuals, Ed Ross, Arthur

6  Imperatore Senior, and a couple of other, those

7  other people that have smaller interests, those

8  individuals you named, are they aware of this

9  litigation?

10   A   Well, sir, Mr. Kipmus and Mr. Markin,

11  are deceased, so their estates are, I guess you

12  could say, owners, have equity interest in W.R.

13  West Side.

14      With respect to the members of the Ross

15  and Wexler families or their trusts, I certainly

16  can't speak for the Ross family. Mr. Ross is

17  familiar with it. I believe as to the Wexler

18  family, they've received notice through their

19  trusts or through their entities or individually,

20  as the case may be. I believe they have been

21  informed.

22   Q   Who is an individual on behalf of

23  Midtown responsible for communications with the

24  various parties?

25   A   I would say most cases, I would inform

30

1

2  the principals of the two partnerships. And they

3  would give information as appropriate, as they

4  deemed necessary to their own partners. In

5  Hadrian on the one side and then W.R. West Side

6  on the other, generally.

7   Q   Did you meet or talk with any of these

8  individuals in preparation for this deposition?

9   A   No.

EDWARD IMPERATORE November 8 2005

10    Q    Are you saying Arthur Imperatore Senior

11  is your uncle?

12    A    Yes.

13    Q    By reason of?

14    A    My father, my late father was his oldest

15  brother and raised him. Seven sons in the

16  family, three sisters in the family. My uncle is

17  my last surviving uncle. So he is my natural

18  uncle and my only surviving uncle in that family.

19    Q    And your uncle is involved in real

20  estate transactions?

21    A    From time to time.

22    Q    When was Midtown formed?

23    A    I believe in 1987.

24    Q    And were the same individuals as you

25  referred to partners or principals from the

31

1

2  beginning?

3    A    Yes, sir. Unfortunately, we lost Jerry

4  Wexler tragically in 1992 or 1993. He was alive

5  then. So he was the general partner of W.R. West

6  Side and was involved with Midtown at that time.

7  Mr. Kipmus and Mr. Markin were then alive and I'm

8  not sure that on behalf of Mr. Ross or Mr. Wexler

9  that their families trusts or other entities were

10  participants at that time.

11        On the Hadrian side of, there really

12  hasn't been a change, although as I've testified

13  in one instance, I don't know if one member of my

14  uncle's family participates even now through a

15  trust or individually. Certainly at that time,

EDWARD IMPERATORE November 8 2005

16    she pointed through a trust and others in the

17    family may have payment understand in a trust at

18    that time.  That's quite a few years ago.

19        Q    But as far as you know, there were no

20    third party transfers?

21        A    There were none.

22        Q    Who had the individual to buy the

23    property?

24        A    Both my uncle and Jerry Wexler.

25        Q    Have you seen or reviewed any or all of


1                                                    32

2    the litigation documents in this case?

3            MR. SHERMAN:  Objection to the form.

4        Q    To your recollection, what documents

5    have you reviewed, what litigation documents have

6.   you reviewed?

7        A    I've seen the pleadings, the motion

8    papers.

9        Q    Motions papers being what, consists of

10   what?

11       A    Midtown's motion to dismiss, the

12   response to that.  I don't believe that I have

13   really reviewed all of the discovery demands on

14   both sides.  I have reviewed Jericho's demand for

15   documents.

16       Q    Did you provide an affirmation in this

17   litigation?

18       A    Yes.

19       Q    And that affirmation was for what

20   purpose?

21       A    To support Midtown's motion to dismiss

Page 26

Edward G  Impertore Deposition 2-Continued 6-15-06

1                                                    150

2          SUPREME COURT OF THE STATE OF NEW YORK

3                    COUNTY OF NEW YORK

4    _____

5    JERICHO GROUP, LTD.,

6                              Plaintiff,

7         - against -

8    MIDTOWN DEVELOPMENT, L.P.,

9                              Defendant.

10   _____

11

12

13

14      CONTINUED DEPOSITION OF EDWARD G. IMPERATORE

15                  New York, New York

16              Thursday, June 15, 2006

17

18

19   Reported by:
     MICHELE ROSSI, RPR
20

21

22

23

24

25

1                                                    151

2                      June 15, 2006

3                      10:10 a.m.

4

5

6

7           CONTINUED DEPOSITION of EDWARD G.

Page 1

Edward G  Impertore Deposition 2-Continued 6-15-06

8  IMPERATORE, held at the offices of JONES DAY,

9  222 East 41st Street, New York, New York

10  10017-6702, before Michele Rossi, a

11  Registered Professional Reporter and Notary

12  Public within and for the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                              152

2

3  ROBERT B. GOEBEL, ESQ.
4     Attorney for Plaintiff
        14 Walworth Avenue
        Scarsdale, New York 10583

5

6

7  JONES DAY
8     Attorneys for Defendant
        222 East 41st Street
        New York, New York 10017-6702

9

10  BY:  FREDRICK E. SHERMAN, ESQ.

11           - AND -

12       TODD R. GEREMIA, ESQ.

13

14

15                    Page 2

Edward G  Impertore Deposition 2-Continued 6-15-06

16
17
18
19
20
21
22
23
24
25

1                       Imperatore            153
2     E D W A R D      G.      I M P E R A T O R E,
3              having been previously sworn by the
4              Notary Public (Michele Rossi, RPR), was
5              further examined and further testified
6              as follows:
7     EXAMINATION BY MR. GOEBEL:
8        Q    Good morning.  We last took your
9     deposition on November 8, 2005.
10             Was your testimony, as far as your
11    recollection, true, correct and complete?
12       A    Yes.
13       Q    Have you signed your deposition
14    transcript to that effect?
15       A    No, I have not.
16       Q    What was the methodology in connection
17    with the production of documents by defendant?
18       A    I recall that we gathered boxes of
19    material that I had in my law offices.  I checked
20    to see what boxes of material there might have
21    been elsewhere, including the offices of
22    Mr. Ross.

Edward G  Impertore Deposition 2-Continued 6-15-06

11    expense of counsel to use Jones Day would be paid

12    by Midtown?

13        A    I think I offered that.

14        Q    Did they accept?

15        A    I don't recall.

16        Q    Did you communicate with or otherwise

17    discuss the litigation and your deposition in

18    discovery and production of discovery documents

19    with Mr. Ross prior to this deposition?

20        A    That would be privileged.  I am attorney

21    for Midtown.  Mr. Ross is one of the principals

22    of Midtown through W.R. West Side.  He's general

23    manager of W.R.; he is general partner of W.R.

24    West Side, which is one of the parties that

25    comprises Midtown.  He's my client.

1                      Imperatore              192

2        Q    He's your client as counsel?

3        A    Midtown is my client.  Mr. Ross is a

4    principal of Midtown so he is my client, sir.

5        Q    Did you speak to Mr. Maurice Stone in

6    connection with this litigation?

7        A    I believe I told him that the litigation

8    had commenced and I don't believe I discussed it

9    further with him.

10        Q    Did he tell you whether he had been

11    contacted by me on behalf of Jericho?

12        A    I don't recall.

13        Q    Did he know about the litigation before

14    you spoke to him?

15            MR. SHERMAN:  Objection to the form.

16        A    I think not.

17        Q    Who is Peter Clayman?

18        A    Peter Clayman is an architect with a

Page 33

LIMITED PARTNERSHIP AGREEMENT

OF

HADRIAN PROPERTIES LTD.

Dated:  MARCH *18*, 1987

McCarter & English
Counselors at Law
550 Broad Street
Newark, New Jersey 07102

MID 00810

TABLE OF CONTENTS

                                                                    Page

ARTICLE I      - FORMATION, NAME, OFFICE AND PURPOSES

          1.1  Formation                                             2
          1.2  Name                                                  2
          1.3  Offices                                               2
          1.4  Purposes                                              2

ARTICLE II     - CAPITAL AND LOANS

          2.1  Initial Capital                                       3
          2.2  Ownership by Partner of Partnership                   4
          2.3  Advances to Partnership                               4
          2.4  Percentage Interests in Capital                       5
          2.5  Capital Accounts                                      5
          2.6  Additional Capital                                    6

ARTICLE III    - DISTRIBUTIONS AND ALLOCATIONS OF
                 PROFITS AND LOSSES

          3.1  Profits and Losses                                    6
          3.2  Income Account                                        6
          3.3  Withdrawals                                           7

ARTICLE IV     - MANAGEMENT

          4.1  General Management                                    8
          4.2  Limitation of Powers and Affirmative Acts            10
          4.3  Bank Accounts                                        10
          4.4  Compensation and Outside Activities                 10
          4.5  Holding of Property                                  11
          4.6  Participation by Limited Partners                   13

ARTICLE V      - LIABILITY

          5.1  Liability of the Partnership                         13
          5.2  Limited Liability of Limited Partners                13
          5.3  Indemnification                                      14

ARTICLE VI     - ACCOUNTING

          6.1  Books and Records                                    14
          6.2  Fiscal Year                                          15
          6.3  Reports                                              15

ARTICLE VII    - TERM AND DISSOLUTION

    7.1  Term                                                    15
    7.2  Death or Incapacity of a Limited Partner              15
    7.3  Dissolution                                            16
    7.4  Death, etc. of General Partners                        17
    7.5  Distribution on Liquidation                            18

ARTICLE VIII    - ASSIGNMENTS

    8.1  Binding Effect and Benefit of this Agreement  22
    8.2  Investment Representations                     22
    8.3  Transfers                                       23

ARTICLE IX    - GENERAL PROVISIONS

    9.1  Certificates, etc.                              31
    9.2  Power of Attorney                               32
    9.3  Insurance Coverage                              32
    9.4  Partners' Relationship Inter Se                33
    9.5  Integration                                     33
    9.6  Notices                                         33
    9.7  Miscellaneous                                   34
    9.8  Amendment                                       34

LIMITED PARTNERSHIP AGREEMENT
OF
HADRIAN PROPERTIES LTD.

This LIMITED PARTNERSHIP AGREEMENT made on March _18_,
1987 (hereinafter the "Agreement") by and among FAFNER ENTERPRISES
INC., a New Jersey corporation, with offices at 2100 88th Street,
North Bergen, New Jersey 07047 ("Fafner") and ARTHUR E.
IMPERATORE, residing at 10 Claremont Road, Fort Lee, New Jersey
07024 ("Imperatore") as General Partners (hereinafter referred to
collectively as "General Partners" or individually as "General
Partner") and Imperatore, INDIA H. IMPERATORE, residing at One
Veteran's Way, Edgewater, New Jersey 07020 (hereinafter "India"),
EDWARD G. IMPERATORE, residing at 105 Serpentine Road, Tenafly,
New Jersey 07670 (hereinafter "Edward") and ARMAND POHAN, residing
at 373 Walnut Street, Englewood, New Jersey (hereinafter "Pohan"),
as Trustee under a Trust Agreement dated December 30, 1985 and
called the "ARTHUR E. IMPERATORE, JR. 1985 INCOME TRUST" as
Limited Partners (hereinafter sometimes referred to individually
as "Limited Partner" and collectively as "Limited Partners"). The
General Partners and the Limited Partners are hereinafter
sometimes referred to individually as "Partner", and collectively
as "Partners".

### W I T N E S S E T H:

WHEREAS, the parties hereto desire to form a New Jersey
limited partnership pursuant to and in accordance with the

10,124/39

provisions of the New Jersey Uniform Limited Partnership Law (1976), N.J.S.A. 42:2A-1, et seq.;

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

FORMATION, NAME, OFFICE AND PURPOSES

Section 1.1.    Formation.  The parties hereto have formed a limited partnership (hereinafter the "Partnership") under the New Jersey Uniform Limited Partnership Law (1976), N.J.S.A. 42:2A-1, et seq.

Section 1.2.    Name.  The name of the Partnership shall be "Hadrian Properties Ltd., a limited partnership."

Section 1.3.    Offices.  The principal office and place of business of the Partnership shall be c/o A-P-A Transport Corp., 2100 88th Street, North Bergen, New Jersey 07047.  The Partnership may have such additional offices or places of business as the General Partners shall deem advisable.

Section 1.4.    Purposes.  The general purposes of the Partnership are to purchase, hold, mortgage, build upon, improve, alter, repair, rent, lease and otherwise deal in real and personal property, including engaging in the business of owning, leasing, managing and otherwise dealing with residential and commercial

-2-

real estate, with improvements thereon, in New Jersey, New York and in such other states as deemed advisable by the General Partners. The Partnership may engage in such other business or businesses permitted by the New Jersey Uniform Limited Partnership Law (1976) or by the limited partnership laws of any and all other states in which the Partnership is qualified or may be qualified to do business as may from time to time be deemed advisable by the General Partners.

## ARTICLE II

### CAPITAL AND LOANS

Section 2.1.    Initial Capital.    The initial capital of the Partnership shall consist of the sum of $10,000.00 and shall be paid to the Partnership in cash simultaneously with the execution of this Agreement. The aggregate contribution to the initial capital of the Partnership by the General Partners shall be the sum of $4031.00. The initial capital contribution of each General Partner shall be equal to the dollar amount set forth opposite the name of each on Schedule A annexed hereto.

The aggregate contribution to the initial capital of the Partnership of the Limited Partners shall be the sum of $5969.00. The initial capital contribution of each Limited Partner shall be equal to the dollar amount set forth opposite his or her name on Schedule A annexed hereto.

-3-

Section 2.2.    <u>Ownership by Partner of Partnership</u>.
Each Partner shall have and own an undivided interest in the
Partnership in accordance with the terms hereof; provided,
however, that no Partner shall have any right of partition with
respect to any property or assets of the Partnership including,
without limitation, its land and buildings.

Section 2.3.    <u>Advances to Partnership</u>.  Any Partner may
from time to time, with the consent of the General Partners,
advance money to the Partnership by loan, upon such interest rate
and other terms as shall be agreed upon at that time by such
Partner and the General Partners.

The parties to this Agreement hereby expressly agree
that all such loans to the Partnership by any Partner shall be,
and shall be deemed to be for all purposes, on a non-recourse
basis; i.e, the liability of the Partnership as to principal,
interest or any other cost or charge which may become due and
payable under any such loan shall be limited wholly and solely to
the property and assets of the Partnership and the Partner
advancing such loan shall not be entitled to any deficiency claim,
nor shall such Partner be entitled to seek or obtain a judgment
against the General Partners hereunder, it being the intention
that the General Partners hereunder shall have no personal
liability under any such loans made to the Partnership by any
Partner.

-4-

Section 2.4.    <u>Percentage Interests in Capital</u>.    The interests of the Partners in the capital of the Partnership shall be equal to the total of the percentages set forth in accordance with Section 3.1 of this Agreement on Schedule B annexed hereto. The aforementioned percentages shall not be changed without the consent of the General Partners and the consent of Limited Partners holding at least ninety (90) percent of the total interests of all Limited Partners.

Section 2.5.    <u>Capital Accounts</u>.    Unless otherwise determined by the General Partners from time to time and at any time, no interest shall be paid by the Partnership with respect to the capital of the Partners. An individual "capital account" shall be maintained for each Partner. For purposes of this Agreement, the term "capital account" of any Partner as of any date shall mean the amount of cash or property contributed by such Partner to the capital of the Partnership, properly adjusted in accordance with generally accepted accounting principles to reflect any additions or withdrawals of such capital, including, but not limited to, a contribution to capital from the income accounts of the Partners pursuant to Section 3.2 hereof. Except as expressly hereinafter provided, (1) no Partner shall be entitled to withdraw any amount from his capital account in the Partnership; and (2) the General Partners shall make no distribution of the property of the Partnership to any Partner with respect to his capital interest in the Partnership.

-5-

MID 00817

Section 2.6.  Additional Capital.  The Partners may agree to contribute additional capital to the Partnership from time to time, including, but not limited to, a contribution to capital from the income accounts of the Partners pursuant to Section 3.2 hereof, and, in such an event, such additional capital shall be contributed by each Partner in accordance with his respective proportionate interest in profits and losses as set forth in Section 3.1 hereof.

## ARTICLE III

### DISTRIBUTIONS AND ALLOCATIONS OF PROFITS AND LOSSES

Section 3.1.  Profits and Losses.  Unless otherwise adjusted by mutual agreement of the Partners or by a transfer of partnership interests as among the Partners, the net profits or net losses of the Partnership shall be distributable or chargeable, as the case may be, at least annually, to each of the Partners in the proportions set forth in Schedule B annexed hereto.

Section 3.2.  Income Account.  An individual income account shall be maintained for each Partner for bookkeeping purposes.  Profits and losses shall be credited or charged to the individual income accounts as of the close of the fiscal year, as soon after the close of such year as such profits and losses can be determined.  Any credit balance in any individual income

-6-

account shall be deemed a debt owed to the Partner and any debit balance in any individual income account shall be deemed a debt owed to the Partnership; provided that the General Partners, with the concurrence of a majority in interest of all Limited Partners (i.e. the concurrence of Limited Partners holding as a group more than a 50% interest in profits and losses pursuant to Section 3.1 hereof), may transfer, on a proportionate basis as to all Partners, from time to time and at any time, such part or all of the credit balances in the income accounts to the capital accounts of the Partners, in which event the transferred amounts will no longer be-deemed a debt owed to the Partners. No interest shall be paid by the Partnership with respect to the income accounts of the Partners, except if so determined by the General Partners. Each individual income account shall be adjusted to reflect distributions of income to the Partner involved and any additions or reductions to the capital accounts that affect the income account as may be required by generally accepted accounting principles or as a result of a transfer of credit balances to the capital accounts.

Section 3.3.    Withdrawals.  The General Partners may distribute from time to time and at any time such part or all of the net credit balance in each Partner's individual income account as the General Partners may determine in their absolute discretion; provided that the proportionate part distributed shall be uniform as to all Partners.

-7-

MID 00819

## ARTICLE IV

### MANAGEMENT

Section 4.1.  <u>General Management</u>.  Imperatore shall be
the initial Managing Partner of the Partnership.  The Managing
Partner shall have general supervision over the business and
administrative matters of the Partnership, and all decisions
affecting the Partnership shall be his ultimate obligation and
responsibility.  Should there be any disagreement as between the
General Partners as to any matter or decision, the Managing
Partner shall have all of the rights and powers of a general
partner as provided in the New Jersey Uniform Limited Partnership
Law (1976) and as otherwise provided by law, and any action taken
by the Managing Partner shall constitute the act of and serve to
bind the Partnership.  In dealing with the Managing Partner acting
on behalf of the Partnership, no person shall be required to
inquire into the authority of such Managing Partner to bind the
Partnership.  While it has been agreed among the Partners that the
powers of management are to be exclusively in the Managing
Partner, it is recognized that the act of any other General
Partner, including the execution in the Partnership's name of any
instrument, or apparently carrying on the business of the
Partnership in the usual way will bind the Partnership, unless the
person with whom such other General Partner is dealing has

-8-

MID 00820

knowledge of his lack of authority.  After the withdrawal, death, legal incompetency or bankruptcy of Imperatore, Fafner shall be the Managing Partner.

The powers of the Managing Partner shall include, without limitation, the following:

(a)  To engage personnel;

(b)  To engage independent attorneys, accountants, or other such persons as may be deemed necessary or advisable;

(c)  To open, maintain, and close bank accounts, and to draw checks and other orders for the payment of money;

(d)  To borrow money and to make, issue, accept, endorse, and execute promissory notes, drafts, bills of exchange and other instruments and evidences of indebtedness, all without limit as to amount, and to secure the payment thereof by mortgage, hypothecation, pledge, or other assignment of or arrangement of security interest in all or any part of the property then owned or thereafter acquired by the Partnership;

(e)  To take such actions and incur such expense on behalf of the Partnership as may be necessary or advisable in connection with the conduct of the affairs of the Partnership;

(f)  To enter into, make, perform and execute such contracts, agreements, and other undertakings as may be deemed necessary or advisable for the conduct of the affairs of the Partnership; and

-9-

MID 00821

(g)  To purchase, sell, mortgage, build upon, improve, alter, repair, rent, lease and otherwise deal in real and personal property on behalf of the Partnership.

Section 4.2.    <u>Limitation of Powers and Affirmative Acts</u>.  The General Partners shall not do any act which would make it impossible to carry on the ordinary business of the Partnership as set forth in Section 1.4 hereof, and shall not make any distribution or take any action in violation of this Agreement or the New Jersey Uniform Limited Partnership Law (1976).

Section 4.3.    <u>Bank Accounts</u>.  Checks shall be drawn on the Partnership bank account for Partnership purposes only and shall be signed by one of the General Partners or any employee of the Partnership authorized by the Managing Partner.

Section 4.4.    <u>Compensation and Outside Activities</u>.  The Managing Partner shall devote such time as is reasonably deemed necessary in his absolute discretion to manage the affairs and business of the Partnership and he shall be entitled to receive a management fee for his services to the Partnership.  Each of the Partners consents and agrees that any of the Partners may engage in and/or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, sale and development of real and personal property; and neither the Partnership nor the Partners, as such, shall have

-10-

MID 00822

any rights by virtue of this Agreement in and to said independent
ventures or to the income or profits derived therefrom. The fact
that a Partner, or a member of his or her family, is employed by
or is directly or indirectly interested in or connected with any
person, firm or corporation employed by the Partnership to render
or perform a service, or from whom the Partnership may buy
merchandise or other property, or to or from whom the Partnership
shall lease its property or any portion thereof, shall not
prohibit a General Partner from executing a lease with or
employing such person, firm or corporation or from otherwise
dealing with such person, firm or corporation, and neither the
Partnership nor any of the Partners, as such, shall have any
rights in or to any income or profits derived therefrom by such
person, firm or corporation.

Section 4.5. Holding of Property. Property owned by
the Partnership shall be held in the name of the Partnership.
Subject to provisions of this Agreement, the Managing Partner
shall have the right, power and authority without regard to the
term hereof, for and on behalf of the Partnership, to lease, sell,
mortgage, convey, assign, exchange, hypothecate, pledge, refin-
ance, grant easements on or dedicate any real or personal property
of the Partnership, to convey such property in fee simple by deed,
mortgage or otherwise, and to create straw corporations to act as
straw parties and nominees solely for and on behalf of the Part-

-11-

nership. In no event shall any party dealing with a General
Partner in his or her capacity as General Partner, with respect to
any property of the Partnership, or to whom any such property, or
any part thereof, shall be conveyed, contracted to be sold,
leased, mortgaged, or refinanced by the General Partner for and on
behalf of the Partnership, be obligated to see that the terms of
this Agreement have been complied with, or be obligated to inquire
into the necessity or expediency of any act or action of the
General Partner, or be obligated or privileged to inquire into any
of the terms of this Agreement. Every contract, agreement, deed,
mortgage, lease, or other instrument or document executed by a
General Partner in its capacity as General Partner, with respect
to any property or business activity of the Partnership, shall be
conclusive evidence in favor of any and every person relying
thereon or claiming thereunder that:

(a) At the time or times of the execution and
delivery thereof, the Partnership was in full force and effect,

(b) Such instrument or document was duly executed
in accordance with the terms and provisions of this Agreement and
is binding upon the Partnership and all of the Partners hereof,
and

(c) The General Partners or any of them, were duly
authorized and empowered to execute and deliver any and every such
instrument or document for and on behalf of the Partnership.

-12-

MID 00824

The manner of holding title to any property of the Partnership, or any part thereof, shall be solely for the convenience of the Partnership; accordingly, no spouse, heir, legal representative, successor or assign of any Partner shall have any right, title, or interest in and to any property of the Partnership by reason of the manner in which title shall be held; and all such property, including, without limitation, its land and buildings, shall be treated as property of the Partnership subject to the terms of this Agreement.

Section 4.6.    <u>Participation by Limited Partners</u>.    The Limited Partners, in their position as Limited Partners, shall take no part in the conduct or control of the Partnership and its business and shall have no right or authority to act for, or bind the Partnership.

ARTICLE V

<u>LIABILITY</u>

Section 5.1.    <u>Liability of the Partnership</u>.    Any liability of the Partnership shall be satisfied out of the assets of the Partnership (including the proceeds of any liability insurance which the Partnership may recover).

Section 5.2.    <u>Limited Liability of Limited Partners</u>. The liability of the Limited Partners in all respects shall be

-13-

limited to the capital contribution paid or agreed to be paid by such Limited Partner.

Section 5.3.    Indemnification.    The Partnership shall indemnify and hold harmless each General Partner and any agents of the General Partners (herein the "Indemnified Parties"), from and against any loss, expense, damage or injury suffered or sustained by them by reason of any act, omission or alleged act or omission arising out of the General Partners' activities on behalf of the Partnership or in furtherance of the interests of the Partnership, including, but not limited to, any judgment, award, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim; provided that the act, omission or alleged act or omission upon which such actual or threatened action, proceeding or claim is based was not performed or omitted fraudulently or in bad faith or as a result of wanton and willful misconduct or gross negligence by such Indemnified Party.

ARTICLE VI

ACCOUNTING

Section 6.1.    Books and Records.    At the principal office of the Partnership there shall be kept true, exact, and complete books of account in which shall be entered fully and accurately each and every transaction of the Partnership.

-14-

Section 6.2.   Fiscal Year.  The fiscal year and the taxable year of the Partnership shall be the calendar year.

Section 6.3.   Reports.  Within ninety (90) days after the end of each fiscal year, there shall be prepared and trans- mitted to each Partner a statement showing each Partner's share of the income, gain, losses, deductions and credits of the Partnership for such year for income tax purposes, which share shall be in proportion to their respective interest in profits and losses as provided for in Section 3.1 and set out on Schedule B annexed hereto.

## ARTICLE VII

### TERM AND DISSOLUTION

Section 7.1.   Term.  The term of this Partnership shall continue until April 30, 2079, or until prior dissolution as provided herein.  The Partnership may be continued beyond April 30, 2079, with the consent of all partners.

Section 7.2.   Death or Incapacity of a Limited Partner. The Partnership shall not terminate and dissolve upon the death or legal incapacity of a Limited Partner.  Rather, such Limited Part- ner's executor, administrator or legal representative shall have the rights of a Limited Partner for the purpose of settling or administering his or her estate, and his or her heir, legatee or legal representative shall have the right to become a substitute

-15-

MID 00827

Limited Partner by executing an amendment to this Agreement, and as provided by law, agreeing to be bound by all the terms and conditions hereof and to assume all the obligations of the deceased or incapacitated Limited Partner hereunder. The application of this Section 7.2 is specifically limited by the terms of Section 8.3(d) herein.

Section 7.3. <u>Dissolution</u>. The Partnership shall be dissolved upon the first to occur of the following:

(a)  The decision of the General Partners to dissolve the Partnership, which decision shall bind the Partnership;

(b)  The sale, abandonment or disposal by the Partnership of all or substantially all of its assets and the discontinuation of all business activity by the Partnership;

(c)  The entry of a final judgment, order or decree of a court of competent jurisdiction adjudicating the Partnership to be a bankrupt, and the expiration of the period, if any, allowed by applicable law in which to appeal therefrom;

(d)  The withdrawal, death, dissolution, legal incompetency or bankruptcy of any General Partner (except as otherwise provided in Section 7.4 hereof); and

(e)  The termination of the term of this Partnership unless otherwise extended.

In the event of dissolution of the Partnership, the rights of the Partners shall be in accordance with the provisions of Sections 7.4 and 7.5 hereof.

-16-

MID 00828

Section 7.4.    <u>Death, etc. of General Partners</u>.  Upon
the withdrawal, death, legal incompetency, dissolution, insolvency
or bankruptcy of any General Partner, he or his personal represen-
tative, heir, successor, guardian, receiver, assignee or trustee
shall become a Limited Partner hereunder, and shall have all
rights, responsibilities and limitations provided by law and under
the provisions of this Agreement for Limited Partners and shall in
all respects be treated as a Limited Partner; the remaining
General Partner shall continue the business of the Partnership.
However, in the event of the withdrawal, death, legal incompe-
tency, dissolution, insolvency or bankruptcy of the remaining
General Partner, or in the event of the withdrawal, death, legal
incompetency, dissolution, insolvency or bankruptcy of all of the
General Partners, the Partnership shall be dissolved and the
Partnership's assets shall be distributed in liquidation and the
rights of each distributee shall be governed in all respects by
the provisions of Section 7.5 hereof, unless sixty (60) percent of
all Limited Partners (i.e., Limited Partners holding as a group
60% or more of the total percentage interests of all Limited
Partners in profits and losses of the Partnership pursuant to
Section 3.1 hereof) elect one or more successor General Partners,
on such terms and conditions as agreed upon by such consenting
Limited Partners, including, but not limited to, the amount of
capital contributions to be required from any successor General

MID 00829

Partner, and each such General Partner elects to continue the business of the Partnership. If such election is made to continue the Partnership business, written notice of such election shall be given to all Limited Partners and to the withdrawing General Partner or to the personal representative, heir, successor, guardian, or trustee of the deceased, legally incompetent, dissolved, insolvent or bankrupt General Partner. In the event of such election the withdrawing General Partner, or the personal representative, heir, successor, guardian, receiver, assignee or trustee of the deceased, legally incompetent, dissolved, insolvent or bankrupt General Partner, shall become a Limited Partner hereunder, and shall have all rights, responsibilities, and limitations provided by law and under the provisions of this Agreement for Limited Partners and shall in all respects be treated as a Limited Partner. Upon each conversion hereunder of a General Partner's interest to that of a Limited Partner's interest, the Partnership shall have an Amended Certificate of Limited Partnership executed and filed in accordance with law.

Section 7.5. <u>Distribution on Liquidation</u>. Upon the dissolution of the Partnership by means of occurrences described in Section 7.3(a)-(c) and (e) hereof, and in the case of Section 7.3(d) hereof in the absence of an election to continue the business of the Partnership, the General Partners or the legal agents or representatives of the Partnership shall proceed to liquidate

-18-

MID 00830

its assets (including, but not limited to, a sale of all or part of the Partnership's assets to one or more corporations or other partnerships), wind up its affairs, and apply and distribute interests in Partnership property in a manner to take into account such priorities, to the extent consistent with the requirements of the New Jersey Uniform Limited Partnership Law (1976):

(a)  To the payment of the debts and liabilities of the Partnership and the expenses of liquidation in the order of priority as provided by law, and to the setting up of any reserves which the General Partners or such legal agents or representatives shall deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership.  Said reserves may be paid over by the General Partners or such legal agents or representatives to a bank or an attorney at law, to be held in escrow for the purpose of paying any such contingent or unforeseen liabilities or obligations and, at the expiration of such period as the General Partners or such legal agents or representatives shall deem advisable, of distributing the balance in the manner provided in the following subparagraphs of this Section 7.5 in like order of priority;

(b)  To the repayment of loans made to the Partnership pursuant to Section 2.3 hereof by any General or any Limited Partner on a proportionate basis;

-19-

(c) To the repayment to the Limited Partners of their capital contribution to the extent not previously repaid;

(d) To the repayment to the General Partners of their capital contribution to the extent not previously repaid;

(e) To the Limited Partners an amount equal to the balance of their capital and income accounts referred to in Sections 2.5 and 3.2 hereof, respectively;

(f) To the General Partners an amount equal to the balance of their capital and income accounts referred to in Sections 2.5 and 3.2 hereof, respectively; and

(g) Any balance to the Partners in proportion to their respective proportionate interest in profits. A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of its liabilities so as to en-able the General Partner or such legal agents or representatives to minimize the normal losses attendant upon such a liquidation. The provisions of Section 3.1 hereof relating to the allocation of income, gain, loss, deduction or credit of the Partnership shall be applicable during the period of liquidation and winding up.

In liquidating the assets of the Partnership, the General Partners or such legal agents or representatives may in their absolute discretion transfer and convey the legal ownership to all or part of the Partnership assets to one or more corpora-tions in exchange for stock of or securities of each such

-20-

corporation and thereafter, distribute such stock or securities to the Partners in liquidation of their interests hereunder. In addition, the General Partners or such legal agents or representatives may, with the consent of a majority of all Limited Partners (i.e., Limited Partners holding as a group more than 50% of the total percentage interests of all Limited Partners in profits and losses of the Partnership pursuant to Section 3.1 hereof), transfer and convey the legal ownership to all or part of the Partnership assets to one or more general or limited partnerships in exchange for general or limited partnership interests of each such partnership and thereafter, distribute such partnership interests to the Partners in liquidation of their interest hereunder.

The General Partners or such legal agents or representatives shall furnish each Partner with a statement audited by a responsible firm of public accountants showing the manner in which the proceeds of liquidation of the Partnership have been distributed.

No Partner shall be liable to the Partnership or to any other Partner for any negative balance in his capital account as said capital account is constituted immediately prior to the aforesaid distributions except to the extent that such negative balance is attributable to an erroneous overpayment to any Partner.

-21-

The Partnership shall terminate when all assets owned by the Partnership shall have been disposed of and the net proceeds, after satisfaction of liabilities to creditors, shall have been distributed among the Partners as aforesaid. The establishment of any reserves in accordance with the provisions of subparagraph (a) above shall not have the effect of extending the term of the Partnership.

ARTICLE VIII

ASSIGNMENTS

Section 8.1.    Binding Effect and Benefit of this Agreement. Subject to the provisions of Section 9.8 hereof, this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, executors, administrators, and assigns, as the case may be.

Section 8.2.    Investment Representations. Each Partner represents and warrants to the Partnership that he or she has acquired or is acquiring his or her interest in the Partnership for investment and not with a view to the transfer, resale or distribution thereof and that his or her interest shall not be sold, pledged, encumbered, offered, assigned, transferred or otherwise disposed of in violation of the Securities Act of 1933, as amended, the regulations promulgated by the Securities and Exchange Commission, or the New Jersey Securities Act or Real

-22-

MID 00834

Estate Syndication Offerings Law or any other applicable state
"blue sky" law. The General Partners may require a favorable
opinion of counsel as a condition precedent to approval of any
such transaction. Each Partner shall indemnify and hold the
Partnership harmless for all costs and expenses, including
reasonable attorneys' fees, incurred by the Partnership as a
result of a breach hereof by such Partner.

Section 8.3.    Transfers.

(a) Except as provided in Article VII hereof, the
General Partners shall have no right to transfer an interest in
the Partnership. Any Limited Partner shall have the right to
transfer all or any part of his interest in the Partnership, upon
securing the prior written consent of the General Partners and
upon complying with the provisions of subparagraph 8.3(b) below.

(b) In the event any Limited Partner (the
"optionor") receives a bona fide written offer to purchase all or
any part of his or her limited partnership interest, he or she
shall not accept such offer until he or she has first given the
option to each General and each of the other Limited Partners (the
"optionees") to purchase said interest at the same terms (except
for price, which shall be determined pursuant to subsection
8.3(c), below) and none of such options has been exercised.
Notice of such option shall be given to each of the optionees by
certified mail, return receipt requested, enclosing a copy of the

-23-

MID 00835

bona fide written offer and giving the optionees 45 days within
which to exercise the options so given, unless all optionees sign
a written waiver of said 45 day waiting period. Exercise of such
options shall be in writing by certified mail to the optionor at
his or her address on the books of the Partnership, return receipt
requested, and shall be effective upon receipt so long as mailed
within the 45-day period. In the event that two or more optionees
exercise the option, the limited partnership interest shall be
assigned to them in such proportions as their respective shares of
the Partnership profits then held bears to the total shares of
Partnership profits of all such optionees. In the event that no
Partner exercises the said option, the optionor shall not accept
such bona fide written offer until he or she has then given the
option to the Partnership to purchase said interest at the
purchase price provided in and calculated pursuant to subsection
8.3(c) below, and the Partnership has not exercised said option.
Notice of such option shall be given to the Partnership by
certified mail, return receipt requested, enclosing a copy of the
bona fide written offer and giving the Partnership 45 days within
which to exercise the option, or to waive the option in writing
prior to the expiration of said 45 day period. Exercise of such
option shall be in writing by certified mail to the optionor at
his or her address on the books of the Partnership, return receipt
requested, and shall be effective upon receipt so long as mailed

-24-

within the 45-day period. In the event that neither any Partner nor the Partnership exercises the said option, the optionor shall be free to accept the above-mentioned bona fide written offer and transfer his or her limited partnership interest or part thereof, but no such assignee shall become a substituted Limited Partner unless and until the General Partners have consented to the transfer as provided for in subparagraph 8.3(a) above and this Agreement and the Certificate of Limited Partnership filed with the Secretary of State shall have been amended in accordance with law. Any other Partner who exercises an option to purchase such a limited partnership interest shall, however, become a substituted Limited Partner to the extent of such purchase, and this Agreement and the Certificate of Limited Partnership shall be amended in accordance with the law to reflect the foregoing. No Limited Partner may accept an oral offer to buy his interest.

(c) The purchase price payable under subsection 8.3(b) by any Partner or by the Partnership shall be the Appraised Value of the limited partnership interest.

The term "Appraised Value" shall mean the highest price in terms of money that the partnership interest will bring to a seller if offered for sale in the open market and that allows a reasonable amount of time to find a buyer who has knowledge of the value of the partnership interest, neither buyer nor seller being under compulsion to buy or sell.

-25-

The Appraised Value of the partnership interest shall be determined as provided in this subparagraph 8.3(c):

The optionor shall give notice ("Initiating Notice") thereof to the optionee that desires to purchase the interest ("Responding Party") which notice shall include an appointment of a first appraiser (the "First Appraiser").

Within thirty (30) days after the service of the Initiating Notice, the Responding Party shall give written notice to the Initiating Party appointing the second appraiser (the "Second Appraiser"). If the Second Appraiser is not so appointed within the time above specified, then the appointment of the Second Appraiser shall be made as hereinafter provided for the appointment of a third appraiser in a case where the First Appraiser and Second Appraiser are unable to agree upon the third appraiser.

The First Appraiser and Second Appraiser so appointed shall meet promptly after the Second Appraiser is appointed and shall agree upon the appointment of a third appraiser (the "Third Appraiser"). In the event they are unable to agree upon such appointment of a Third Appraiser within thirty (30) days after the appointment of the Second Appraiser, then either party, on behalf of both parties, may request the appointment of the Third Appraiser by the American Arbitration Association, Newark, New Jersey.

-26-

MID 00838

In the event of the failure, refusal or inability of any appraiser to act, a new appraiser shall be appointed in his stead, which appointment shall be made in the same manner as hereinbefore provided for the appointment of such appraiser so failing, refusing or being unable to act.

Each party shall pay the fees and expenses of the original appraiser appointed by such party, or in whose stead, as above provided, such appraiser was appointed. The fees and expenses of the Third Appraiser, and all other expenses, if any, shall be borne equally by both parties (and each party will bear all of its own costs and expenses in connection with this appraisal proceeding).

Any appraiser designated to serve in accordance with the provisions of this letter shall: (i) take an oath of impartiality upon accepting the appointment; and (ii) be qualified to appraise partnership interests of the type covered by this Agreement.

The appraisers shall determine the fair market value of the partnership interest by a decision contained in a report as of the date ("Valuation Date"), which is the last day of the month in which the Initiating Notice is given.

A decision joined in by two of the three appraisers shall be the appraisal of the appraisers.

The fair market value of the partnership interest shall be determined within ninety (90) days from the date the Third Appraiser has been appointed.

-27-

After reaching a decision, the appraisers shall serve the written appraisal report upon the parties to the proceeding.

If, for any reason, the appraisers fail to issue a report concurred in by at least two appraisers within ninety (90) days after the appointment of the Third Appraiser, then the Third Appraiser shall make his appraisal, which shall be determinative, by selecting either the Appraised Value submitted by the First Appraiser or the Appraised Value submitted by the Second Appraiser.

(d)  Notwithstanding anything contained in this Agreement to the contrary, and notwithstanding the provisions contained in Section 7.2 specifically, any and all Limited Partner's interests in the Partnership owned or acquired by any person, corporation, partnership, trust, or any other entity, other than Imperatore, India, Arthur E. Imperatore, Jr. or any trust for Arthur E. Imperatore, Jr. (hereinafter called a "Nonqualified Partner"), shall be subject to a nonassignable, unqualified call option held by the Partnership to purchase at any time all of the Limited Partner's interests owned or held by such Nonqualified Partner at any time, whether or not the Partnership has previously exercised its call option with respect to that Nonqualified Partner.  The Partnership shall exercise its call option at the request of any General Partner and/or at the request

-28-

MID 00840

of Limited Partners representing at least fifty (50) percent of
the total interests of all Limited Partners.

The transfer of all the Limited Partner's interests
owned by any such Nonqualified Partner shall be completed and
accomplished in the books of the Partnership and by any and all
necessary filings with the Secretary of State of New Jersey and in
any other jurisdictions in which the Partnership is qualified to
do business within ten (10) days of receipt of written notice by
the Nonqualified Partner of such exercise by the Partnership.

The purchase price of the Limited Partner's interests
purchased by the Partnership pursuant to its call option herein
shall be the price computed under subsection 8.3(c) of this
Agreement.

.(e)    Notwithstanding anything contained in this
Agreement to the contrary, the General Partner's interest in the
Partnership held by Fafner shall be subject to the Partnership's
nonassignable, unqualified call option to purchase all of Fafner's
General Partner's interest in the Partnership immediately if (i)
there occurs a transfer of the stock of Fafner, whether by sale,
exchange, gift, bequest or any other transfer of interest, if,
following such transfer, any stock interest in Fafner is held by
any individual other than Pohan or by any business entity other
than one owned 100 percent by Pohan, or (ii) Pohan withdraws from

-29-

Fafner, abandons his stock in Fafner, dies or is declared legally incompetent.

Upon the occurrence of any of the events described above, the Partnership shall exercise its call option respecting Fafner's General Partner's interest in the Partnership at the request of any General Partner other than Fafner or at the request of Limited Partners representing at least fifty (50) percent of the total interest of all Limited Partners.

The transfer of all the General Partner's interest of Fafner pursuant to this subsection shall be completed and accomplished in the books of the Partnership and by any and all necessary filings with the Secretary of State of New Jersey and any other jurisdiction in which the Partnership is qualified to do business within ten (10) days of receipt of written notice by Fafner of such exercise by the Partnership.

The purchase price of Fafner's General Partner's interest purchased by the Partnership pursuant to its call option herein shall be the price computed under subsection 8.3(c) of this Agreement.

(f) Nothing contained in this Section 8:3, however, shall prevent the interest of a Limited Partner from being (i) transferred or disposed of by will or intestacy; or (ii) transferred or disposed of with the prior written consent of the General Partners by inter vivos gift to or for the benefit of the

-30-

MID 00842

Limited Partner's immediate family or immediate family interests. Any and all Limited Partner's interests transferred pursuant to this subsection shall remain subject to the Partnership's call option, as provided in subsection 8.3(d) herein.

For purposes of this subsection, "immediate family" shall mean the spouse, child, father, mother, sister or brother of the Limited Partner and issue of any such persons; and "immediate family interests" shall mean a trust created for the benefit of any member or members of the immediate family, a charitable foundation created by any member or members of the immediate family and a corporation or partnership the majority of the capital or stock interest of which is owned by any member or members of the immediate family.

.(g)  In the case of the transfer of a Partner's interest at any time other than the end of the fiscal year of the Partnership, the distributive shares of profits or losses of the Partnership shall be allocated between the transferor and trans- feree in the ratio of the number of days in such year before and after such transfer.

## ARTICLE IX

### GENERAL PROVISIONS

Section 9.1.   Certificates, etc..   The General Partners shall promptly have prepared and executed a Certificate of Limited

-31-

MID 00843

Partnership in substantially the same form set forth in Exhibit "A" hereto, as well as all legally required amendments to fictitious name or other applications, registrations, publications, certificates, and affidavits for filing with the proper governmental authorities and see to the proper advertisement, publication, and filing thereof for record.

Section 9.2.    Power of Attorney.    Each Limited Partner hereby makes, constitutes, and appoints the Managing Partner, with full power of substitution, his or her true and lawful attorney for him or her and in his or her name, place and stead and for his or her use and benefit, to sign, file, and record the Certificate of Limited Partnership in substantially the form set forth in Exhibit "A" hereto, or any further amendment thereof required under the New Jersey Uniform Limited Partnership Law (1976) or any other relevant state's law, and to sign, execute, certify, acknowledge, file, and record any other instrument referred to in Section 9.1 hereof or required of the Partnership or Partners by law in New Jersey, or any other jurisdiction.

Section 9.3.    Insurance Coverage.    The Partnership shall maintain employment, fire, casualty, liability, product liability and property damage insurance in amounts customary with the venture to be undertaken by the Partnership and consistent with sound commercial practice.

-32-

MID 00844

Section 9.4.   Partners' Relationship Inter Se.  Nothing herein contained shall be construed to constitute any Limited Partner the agent of any other Partner, except as expressly provided herein, or in any manner limit the Partners in the carrying on of their own respective business or activities.

Section 9.5.   Integration.  This Agreement and the Certificate of Limited Partnership represent the entire understanding of the parties with respect to the subject matter hereof.  No termination, revocation, waiver, modification, or amendment of this Agreement or the Certificate of Limited Partnership shall be binding unless in writing and signed by each of the Partners.

Section 9.6.   Notices.  All notices required under this Agreement shall be in writing, duly signed by the party giving such notice and transmitted by prepaid registered or certified mail as follows:

(a)   If given to the Partnership or to the General Partners, to the then principal place of business of the Partnership;

(b)   If given to the Limited Partners, to their respective addresses set forth in this Agreement, or to such other address as a Limited Partner may hereafter designate by written notice to the Partnership.

-33-

MID 00845

Section 9.7.  <u>Miscellaneous</u>.  Each of the individual parties hereto represents and warrants that he or she is over the age of eighteen (18) years.  Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties hereto, their personal representatives and assigns.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.  Paragraph titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision hereof.  This Agreement contains the whole understanding of the parties, and shall be construed in accordance with the laws of the State of New Jersey.

Section 9.8.  <u>Amendment</u>.  This Agreement and the Certificate of Limited Partnership may be amended or modified only by an instrument in writing signed (in counterparts or otherwise) by the Partners.

IN WITNESS WHEREOF, the undersigned have executed this

-34-                    MID 00846

Agreement on the day and year first above written.

Witness:

_[signature]_

_[signature]_

_[signature]_

_[signature]_

Witness:

_[signature]_

Attest:

_[signature]_
DOMINICK R. ALESSO, Secretary

LIMITED PARTNERS

_[signature]_ (L.S.)
ARTHUR E. IMPERATORE

_[signature]_ (L.S.)
INDIA H. IMPERATORE

_[signature]_ (L.S.)
ARMAND POHAN, Trustee of the
Arthur E. Imperatore, Jr.
1985 Income Trust

_[signature]_ (L.S.)
EDWARD G. IMPERATORE

_[signature]_
ARTHUR E. IMPERATORE,
General Partner

FAFNER ENTERPRISES INC.,
General Partner

_[signature]_
ARMAND POHAN, President

-35-

SCHEDULE A

| General Partner | Initial Capital Contribution | |
|---|---|---|
| FAFNER ENTERPRISES INC., a Jersey corporation | $2,500.00 | |
| Arthur E. Imperatore | $1,531.00 | $ 4,031.00 |
| **Limited Partners** | | |
| Arthur E. Imperatore | $  400.00 | |
| India H. Imperatore | $2,500.00 | |
| Arthur E. Imperatore, Jr. 1985 Income Trust | $2,500.00 | |
| Edward G. Imperatore | $  569.00 | $ 5,969.00 |
| | | $10,000.00 |

MID 00848

SCHEDULE B

| General Partner | Percentage Share |
|---|---|
| FAFNER ENTERPRISES INC., a New Jersey corporation | 25.00 |
| Arthur E. Imperatore | 15.31 |

| Limited Partners | |
|---|---|
| Arthur E. Imperatore | 4.00 |
| India H. Imperatore | 25.00 |
| Arthur E. Imperatore, Jr. 1985 Income Trust | 25.00 |
| Edward G. Imperatore | 5.69 |
| | 100% |

CERTIFICATE OF LIMITED PARTNERSHIP
HADRIAN PROPERTIES LTD.

STATE OF NEW JERSEY )
                    :ss.
COUNTY OF BERGEN    )

We, the undersigned, desiring to form a Limited
Partnership pursuant to the New Jersey Uniform Limited Partnership
Law (1976), N.J.S.A. 42:2A-1, et seq., certify as follows:

1.    The name of the partnership is "HADRIAN
PROPERTIES LTD., a limited·partnership" (the "Partnership").

2.    The general purposes of the Partnership are to
purchase, hold, mortgage, build upon, improve, alter, repair,
rent, lease and otherwise deal in real and personal property,
including engaging in the business of owning, leasing, managing
and otherwise dealing with real estate, with improvements thereon.
The Partnership may engage in such other business or businesses
permitted by the New Jersey Uniform Limited Partnership Law (1976)
as may from time to time be deemed advisable by the General
Partners.

3.    The principal place of business of the
Partnership is c/o A-P-A TRANSPORT CORP., 2100 88th Street, North
Bergen, New Jersey 07047.  The Partnership's registered agent at
such address is Arthur E. Imperatore.

10124/40                              MID 00850

4.    (a)    The name and place of residence of each
General Partner interested in the Limited Partnership is as
follows:

| Name | Place of Residence |
|------|--------------------|
| Arthur E. Imperatore | 10 Claremont Road<br>Fort Lee, New Jersey 07024 |
| Fafner Enterprises Inc. | 2100 88th Street<br>North Bergen, New Jersey 07047 |

(b)    The name and place of residence of the
Limited Partners interested in the Limited Partnership are:

Names and Addresses

Arthur E. Imperatore
10 Claremont Road
Fort Lee, New Jersey

India H. Imperatore
One Veteran's Way
Edgewater, New Jersey 07020

Edward G. Imperatore
105 Serpentine Road
Tenafly, New Jersey 07670

Armand Pohan
as Trustee under Trust
Agreement dated December 30,
1985 and called the "Arthur E.
Imperatore, Jr. 1985 Income
Trust"

5.    The term for which the Partnership is to exist
is March __, 1987 to April 30, 2079, unless terminated earlier or
otherwise extended.

6.    The amount of cash contributed by each Limited
Partner is set forth on Schedule A hereto; no other property has
been contributed.

7.    There is no additional contribution agreed to
be made by any of the Limited Partners, except that with the

MID 00851

concurrence of a majority in interest of all Partners, Partnership income may be transferred from the income account to the capital account of each Partner.

8.    At the time of liquidation of the Partnership, the initial contributions of Limited Partners are to be returned.

9.    The share of profits or other compensation by way of income, which each Limited Partner shall receive by reason of his contribution, is as set forth in Schedule A hereto.

10.    A Limited Partner's interest in the Partnership may be (i) transferred or disposed of by will or intestacy; or (ii) transferred or disposed of with the prior written consent of the General Partners by inter vivos gift to or for the benefit of the Limited Partner's immediate family or immediate family interests.  After receipt of a bona fide written offer to purchase, any Limited Partner has the right to transfer all or any part of his interest in the Partnership, but only after he has first offered in writing to sell such interest, or part thereof, first to the other Partners and then to the Partnership. Upon such offer, the other Partners and then the Partnership has the option, for a period of forty-five (45) days each, to purchase such interest, or part thereof at the purchase price set forth in the Limited Partnership Agreement.  In the event of a transfer, the transferee is to execute an addendum to the Certificate of Limited Partnership, agreeing to be bound by all the terms and

conditions thereof, and to assume all the obligations of the transferor Partner. Until and unless any such transferee shall execute such an addendum and unless and until the General Partners have consented to the transfer, the transferee shall be an assignee only and shall not have the rights of a substitute Limited Partner. A Limited Partner's interest may not be sold, transferred, assigned, pledged, encumbered or otherwise hypothecated in any other manner. The Partnership shall have and retain a non-assignable, unqualified call option to purchase at any time all of the interest of any Limited Partner other than Arthur E. Imperatore, India H. Imperatore, Arthur E. Imperatore, Jr. or any trust established for Arthur E. Imperatore, Jr. Additionally, the Partnership shall have and retain a non-assignable, unqualified call option to purchase the General Partner's interest held by Fafner Enterprises Inc. if Armand Pohan retains less than 100% of the stock interest in Fafner Enterprises Inc., if he withdraws from the corporation or abandons his stock in the corporation or if he dies.

       11. There is no right given to the partners to admit additional limited partners, except as provided herein.

       12. No Limited Partner has any priority over any other Limited Partner, as to contributions or as to compensation by way of income.

13.  Upon the withdrawal, death, legal incompe-
tency, dissolution or bankruptcy of a General Partner, the other
General Partner shall continue the business of the Partnership.
In the event of the withdrawal, death, legal incompetency,
dissolution or bankruptcy of all General Partners, the Partnership
shall be dissolved and liquidated, unless sixty (60) percent of
all Limited Partners elect one or more successor General
Partner(s) and such General Partner elects to continue the
business of the Partnership.

14.  A Limited Partner does not have the right to
demand and receive property other than cash in return for his
contribution.

IN WITNESS WHEREOF, the undersigned have duly signed,
sealed and acknowledged this Certificate of Limited Partnership as
of the 13th day of March __, 1987.

Witness:                              GENERAL PARTNERS:

_____              _____
                                     ARTHUR E. IMPERATORE

Attest:                              FAFNER ENTERPRISES, INC.

_____              _____
DOMINICK R. ALESSO,                  ARMAND POHAN, President
Secretary

-5-                    MID 00854

Witness:

_Dominik R. Alesso_

_Dominik R. Alesso_

_Dominik R. Alesso_

_Dominik R. Alesso_

LIMITED PARTNERS:

_Arthur E. Imperatore_
ARTHUR E. IMPERATORE

_India H. Imperatore_
INDIA H. IMPERATORE

_Armand Pohan_
ARMAND POHAN, Trustee of the
Arthur E. Imperatore, Jr. 1985
Income Trust

_Edward G. Imperatore_
EDWARD G. IMPERATORE

-6-          MID 00855

SCHEDULE A

| General Partners | Cash Contributed by General Partners | Share of Profits of General Partners |
|---|---|---|
| Arthur E. Imperatore | $1,531.00 | 15.31% |
| Fafner Enterprises Inc. | 2,500.00 | 25.00 |

| Limited Partners | Cash Contributed by Limited Partners | Share of Profits of Limited Partners |
|---|---|---|
| Arthur E. Imperatore | 400.00 | 4.00 |
| India H. Imperatore | 2,500.00 | 25.00 |
| Arthur E. Imperatore, Jr. 1985 Income Trust | 2,500.00 | 25.00 |
| Edward G. Imperatore | 569.00 | 5.69 |

## JOINT VENTURE AGREEMENT

### OF

### JERRART VENTURE

AGREEMENT made as of February 3, 1987 by and between
WR West Side Associates, an Illinois limited partnership ("WR")
and Hadrian Properties Ltd., a New Jersey limited partnership
("Hadrian"). Each of the foregoing is sometimes called Partner and
both of the foregoing are sometimes collectively referred to as
"Partners".

1. **Name and Business.** The parties do hereby form a joint
venture under the name of Jerrart Venture, an Illinois general
partnership, (hereinafter called "Partnership") to carry on the
business of investing in real property by directly or indirectly
acquiring and holding an interest in the property described in
Exhibit A attached hereto and made a part hereof ("Property") or
in a general or limited partnership owning or acquiring the Property
and/or other property, and improving, developing, holding for in-
vestment, maintaining, operating, mortgaging, managing, leasing,
exchanging, otherwise exploiting and ultimately disposing of the
Property and/or other property; to engage in any other lawful
activity; and to invest in other properties and investments and
to engage in any and all activities related and incidental thereto
as may be deemed appropriate by the Partners.

2. **Office.** The office of the partnership shall be located
at such location or locations as the Partners may from time to
time designate.

3. **Term.** The term of the Partnership shall begin on February
3, 1987 and shall continue until December 31, 2037 unless sooner

MID 00790

terminated as provided herein.

4. _Capital Contributions._ On not less than 15 days prior written call for capital contributions, the Partners shall contribute capital to or make loans to the Partnership in such total amount as the Partners shall determine from time to time is required in the interest of the Partnership and such capital or loans shall be contributed or made by the Partners in the respective percentages set forth in Paragraph 6. Loans to the Partnership made by the Partners pursuant to this Paragraph 4 shall be on such terms as the Partners shall determine from time to time.

5. _Profit and Loss._ The net profits of the Partnership shall be divided among the Partners and the net losses of the Partnership shall be borne by the Partners in the respective percentages set out in Paragraph 6.

6. _Partners' Percentages._ The respective percentages referred to in preceding Paragraphs 4 and 5 are as follows:

| | |
|---|---|
| WR | 50% |
| Hadrian | 50% |

7. _Management, Duties, and Restrictions._

(a) The Partners shall have full charge of the management, conduct, and operation of the partnership business in all respects and in all matters, including but not limited to full power to make all decisions with respect to acquisition, improvement, operation, maintenance, leasing, and use of the Property and other property, to become a general or limited partner in other partnerships in furtherance of the Partnership business, to borrow money, and to mortgage, sell, and convey the personal

MID 00791

-2-

and real property, or any part thereof, owned by the Partnership on such terms as they may determine.

(b)    The Partners are authorized and empowered to determine all questions relating to the conduct and management of the Partnership business, and the determination of the Partners on any such question (excepting, and not including, the determination of the interest or share of any Partner in the capital, net profits, or net losses of the Partnership, or the claims of any Partner against the Partnership, or its claims against such Partner) shall be binding on all Partners.  The Partners are authorized and empowered, on behalf of the Partnership, to establish and maintain reserves for working capital and against future expenses, replacements, and capital improvements, to borrow (from any Partner or third party) or lend money, make, deliver, or accept any commercial paper, execute any mortgage, bond, lease, deed, release, or agreement, purchase or contract to purchase, or sell or contract to sell any property, compromise or release any of its claims or debts, hire any person or discharge any person, and obligate the Partnership in an amount and withdraw any money of the Partnership.  Each of the  Partners agrees to execute or cause to be executed such personal guarantees as may from time to time be required by lenders in connection with loans made to the Partnership.  No Partner, except with the consent of all other Partners, shall withdraw its capital contribution, in whole or in part, or assign, create a security interest in, or sell its share in the Partnership or in its capital, assets, or property (except in accordance with the express provisions of this Agreement), or enter into any agreement

MID 00792

as a result of which any other person, firm, or corporation shall become interested with it in the Partnership, or do any act detrimental to the best interests of the Partnership, or which would make it impossible to carry on the ordinary business of the Partnership.

(c)   Each Partner may have other business interests and may engage in any other business or trade, profession, or employment whatsoever, on its own account, or in partnership with or as an employee of or as an officer, director, or shareholder of any other person, firm, or corporation, and it shall not be required to devote its entire time to the business of the Partnership. No Partner shall be obligated to devote more time and attention to the conduct of the business of the Partnership than shall be deemed by all of the Partners, including such Partner, to be required for the business of the Partnership. Without the consent of the other Partners, no Partner shall receive any salary or other special compensation for services to be rendered by it.

(d)   Except with respect to the provisions of Paragraphs 11 and 12, below, the affirmative vote of both WR and Hadrian is required for all acts and decisions of the Partnership and the signatures of both WR and Hadrian are necessary to bind the Partnership.

8.   <u>Banking</u>.  All funds of the Partnership shall be deposited and kept in its name in such Partnership bank account or accounts as shall be designated by the Partners.  All withdrawals therefrom shall be made upon checks signed by any one Partner or more than one Partner as shall be determined by the Partners.

MID 00793

9. <u>Books</u>. The Partnership shall maintain full and accurate books of account which shall be kept at the principal Partnership office. All transactions of or relating to the Partnership or its business shall be entered in such books. Each Partner shall have access to and the right to inspect and copy such books and all other Partnership records.

10. <u>Annual Accounting</u>. (a) As of the last day of December of each year during the continuance of the Partnership, commencing December 31, 1987, a full, true, and accurate account shall be made in writing of all of the assets and liabilities of the Partnership, and of all of its receipts and disbursements, and the assets, liabilities, and income, both gross and net, shall be ascertained, and the net profits or net losses shall be fixed and determined; and the account of each Partner shall thereupon be credited or debited, as the case may be, with its share (as specified in Paragraph 6) of such net profits or losses. In preparing such account, there shall be charged all expenses of the business, and also, all losses and other charges incident or necessary to the carrying on of the business.

(b) The funds of the Partnership shall be distributed to the Partners in proportion to the outstanding capital contributions at such time and in such amounts as the Partners may see fit. Net profits shall augment the individual capital accounts of each Partner and net losses shall diminish the capital accounts in accordance with the respective interests set forth in Paragraph 6.

11. <u>Failure to Contribute Capital</u>. In the event that any Partner's capital contribution or loan is not received by the ...... within fifteen (15) days after its due date (as stated

MID 00794

in the call therefor) then the remedies which shall be available to the Partnership or to the Partners in law or in equity shall be the following:

(a)  The percentage interest in the capital and the future profits and losses of the Partnership of the delinquent Partner shall be accordingly reduced and the aggregate interests of the non-delinquent Partners in the capital and future profits and losses of the Partnership shall be correspondingly increased on a basis pro-rated in accordance with their interests in the Partnership profits and losses prior to the call.  In making such adjustment, the delinquent Partner's failure to make a loan shall be treated as though it had failed to make a capital contribution in the amount of such loan.

(b)  The non-delinquent Partners may elect to have the Partnership purchase the entire Partnership interest of the delinquent Partner for a purchase price equal to the "net investment" theretofore made by the delinquent Partner less his pro-rata share of depreciation with respect to the Partnership's property theretofore recorded on the books of the Partnership as of the due date as stated in the call.  "Net investment" means the total cash or agreed value of other property theretofore contributed by such delinquent Partner to the capital of the Partnership.  Such election must be made within sixty (60) days after the date when such additional contribution is due in accordance with the terms of this Paragraph 11.  If such election is made, the purchase price of the delinquent Partner's interest shall be paid to him in cash not later than sixty (60) days after such election is made.  The

MID 00795

delinquent Partner shall thereupon cease to be a Partner and shall have no further Partnership obligations and the Partnership shall indemnify and hold harmless the delinquent Partner against any such further obligations including but not limited to any guarantee by such delinquent Partner of any Partnership loans.

(c)  The non-delinquent Partners may elect to admit additional Partners to the Partnership to supply the capital contribution of the delinquent Partner or to purchase the entire Partnership interest of the delinquent Partner on the terms set forth in Paragraph 11 (b), or both.

(d)  The non-delinquent Partners may enforce the delinquent Partner's obligation to make a capital contribution or loan, as the case may be, by a suit for specific performance, the Partners hereby acknowledging that it will be impossible to ascertain the damage to the Partnership caused by the delinquent Partner's failure to make such capital contribution or loan.

12.  _Transfers_.  Except as hereinafter provided, no Partner may make any _inter vivos_ transfer of its interest in the Partnership or any part thereof other than by _bona fide_ sale.  In the event of a contemplated _bona fide inter vivos_ sale by a Partner of all or any part of its interest in the Partnership, the Partnership and each of the other Partners shall have the prior right to purchase said interest or said part thereof in the manner hereinafter provided:

(a)  All offers to purchase must be in writing.  The selling Partner shall forthwith give the Partnership and all the other Partners written notice of the name and address of the offeror

MID 00796

and the price and all terms and conditions of the proposed sale together with a true and complete copy of the written offer.

(b)  The non-selling Partners on behalf of the Partnership shall within thirty (30) days after mailing of the selling Partner's notice serve their notice on the selling Partner and all the other Partners of the Partnership's election to purchase, or its election not to purchase, all of the interest which is the subject matter of the proposed sale at the price and upon the terms and conditions specified in the selling Partner's notice.

(c)  In the event that the Partnership shall elect not to purchase the full interest to be sold in the manner set forth in Paragraph 12 (b), each of the non-selling Partners may, within thirty (30) days after the mailing of the notice with respect to the Partnership's decision give notice to the selling Partner and to the remaining Partners, of its desire to exercise its option to purchase its pro-rata share (based on the ratio of such interest or part thereof which equals the ratio of its share in net profits and losses to the share in net profits and losses of all Partners other than the selling Partner) of the selling Partners' interest or part thereof as is within the contemplated sale upon the terms and conditions and at the price specified in the selling Partner's notice to it.  A second option, to be exercised within forty-five (45) days after the mailing of the said Partnership's decision is hereby granted to the Partners who exercised such first option to acquire (pro-rata as among themselves in accordance with their interests as of the date of the giving of the original notice)

the share as to which a Partner has not exercised its first option.

(d)   Unless the Partnership or the remaining Partners shall have exercised their options within said seventy-five (75) day period in such a manner as to purchase all of such interest of the selling Partner as is within the contemplated sale, the selling Partner shall be free to dispose of such interest for an additional period of sixty (60) days but only in the manner and on the terms stated by it in its original notice to the Partnership and the other Partners.  In the event that the selling Partner fails thus to dispose of said interest or part thereof during such period, the provisions hereof shall be applicable to any further contemplated disposition by said Partner of its interest or any part thereof.

(e)   No purported assignment of any Partner's interest shall be valid unless made in accordance with the terms and provisions of this Agreement and if such assignment is to one not theretofore a party to this Agreement unless such assignee shall prior to the making of such assignment execute and deliver to the other Partners an instrument in writing signifying its consent to be bound by the terms of this Agreement as then amended and assuming as a Partner all the terms and provisions of this Agreement as then amended.  It is mutually agreed that the continuing and surviving Partners shall accept as a Partner in this Partnership any assignee who has succeeded to an interest in accordance with this subparagraph.

13.  _Withdrawal of a Partner_.  (a)  In the event that any Partner withdraws from the Partnership prior to the expiration of

MID 00798

the term of this Partnership or the dissolution of the Partnership pursuant to the provisions of Paragraph 15, (the "Withdrawing Partner") each of the remaining Partners shall have the option, exercisable within sixty (60) days after receipt of written notice of such withdrawal, to purchase its pro-rata share (as defined in Paragraph 12 (c)) of the entire interest of the Withdrawing Partner in the Partnership and in the Partnership assets at a price equal to 80% of the Withdrawing Partner's net cash investment in the Partnership and in the assets as of the last day of the month in which such notice of withdrawal is given.  If one or more of the remaining Partners does not purchase its proportionate share of the Withdrawing Partner's interest, the remaining portion of the Withdrawing Partner's interest may be purchased proportionately by those of the remaining Partners who wish to purchase the balance of said interest.  The net cash investment of a Withdrawing Partner shall be the cash invested by said Partner minus withdrawals or distributions of any kind which have been paid or credited to said Partner.  The net cash investment of any Withdrawing Partner shall be determined by the certified public accounting firm then employed by the Partnership, and said determination by said accountants shall be final and conclusive on the Partners and their successors in interest.

    (b)  If the option set forth above in this Paragraph 13 (a) is not exercised with respect to a Withdrawing Partner's entire interest, then on the effective date of said withdrawal the remaining Partners (if there are more than one) shall be treated as having formed a new Partnership without the Withdrawing Partner

MID 00799

on terms and conditions identical hereto (including the provisions
of this Paragraph 13) and such new Partnership, or if no new
Partnership is formed, then the non-withdrawing Partner, on the
one hand, and the Withdrawing Partner, on the other, shall own
the Partnership assets (other than the Withdrawing Partner's
interest in the Partnership) as tenants in common until such time
as the same may be, and are sold with the consent of co-tenants
owning a 75.00 per cent or greater interest in the tenancy in
common.  In determining whether co-tenants owning a 75.00 per cent
or greater interest in the tenancy in common consent to the sale
or other disposal of the Partnership assets (other than the
Withdrawing Partner's interest in the Partnership), the non-
withdrawing Partners and the Withdrawing Partner shall be deemed
to own the same percentage interest in the tenancy in common that
they would have held in the Partnership itself if the Partnership
continued to hold the entire interest in the Partnership assets
at the time consent to said sale is sought.  Other decisions re-
lating to the management and operation of the property owned by
the Partnership immediately prior to the withdrawal of the With-
drawing Partner shall be made solely by the new Partnership or
the non-withdrawing Partner, as the case may be, in accordance
with the provisions of Paragraph 7 without regard to the consent
of the Withdrawing Partner thereto.  In the event the option set
forth in this Paragraph 13 (b) is not exercised with respect to
a Withdrawing Partner's entire interest, the Withdrawing Partner
hereby waives, for the benefit of its heirs, successors, assigns,
legal representatives, trustees, successor trustees and con-

MID 00800

servators, any rights which it may have pursuant to the Uniform Partnership Act as enacted in the State of Illinois.

14. <u>Bankruptcy of a Partner</u>. (a) Notwithstanding anything to the contrary contained in this Agreement, in the event that any Partner shall be adjudicated a bankrupt, each of the other Partners shall have the option, exercisable within ninety (90) days after such adjudication, to purchase its pro-rata share (as defined in Paragraph 12 (c)) of the bankrupt's entire interest in the Partnership and in the Partnership assets at a price equal to 80% of the net cash investment of the said bankrupt Partner in the Partnership and in the Partnership assets as of the last day of the month in which such adjudication occurs. If one or more of said other Partners does not purchase its proportionate share of the bankrupt Partner's interest, the remaining portion of the bankrupt Partner's interest may be purchased proportionately by those of the purchasing Partners who wish to purchase the balance of said interest. The net cash investment of any bankrupt Partner shall be the cash invested by the bankrupt Partner minus withdrawals or distributions of any kind which have been paid or credited to said bankrupt Partner. The net cash investment of any bankrupt Partner shall be determined by the certified public accounting firm then employed by the Partnership, and said determination by said accountants shall be final and conclusive on the Partners and their successors in interest.

(b) If the option set forth in Paragraph 14 (a) is not exercised as to the bankrupt Partner's entire interest, then as of

MID 00801

the last day of the month in which such adjudication of bankruptcy

occurs the non-bankrupt Partners shall be treated as having formed

a new Partnership without said bankrupt Partner on the terms and

conditions identical hereto (including the provisions of this

Paragraph 14) and such new Partnership, or if no new Partnership

is formed, then the non-withdrawing Partner, on the one hand, and

such bankrupt Partner or the successor or successors in interest

thereof, shall own the Partnership assets of this Partnership as

tenants in common until such time as the same may be, and are sold

with the consent of co-tenants owning a 75.00 per cent or greater

interest in the tenancy in common.  In determining whether co-tenants

owning a 75.00 per cent or greater interest in the tenancy in common

consent to the sale of the Partnership assets (other than the

bankrupt Partner's interest in the Partnership), the remaining

Partners and the bankrupt Partner shall be deemed to own the same

percentage interest in the tenancy in common that they would have

held in the Partnership itself if the Partnership continued to hold

the entire interest in the Partnership assets at the time consent

to said sale is sought.  Other decisions relating to the management

and operation of the property owned by the Partnership immediately

prior to the withdrawal of the Withdrawing Partner shall be made

solely by the new Partnership or the non-withdrawing Partner, as

the case may be, in accordance with the provisions of Paragraph 7

without regard to the consent of the bankrupt Partner thereto.

15.  Procedure on Liquidation.  At the termination of this

Partnership by the expiration of its term, or whenever the Partners

MID 00802

determine that the Partnership should be liquidated, the Partners shall proceed with reasonable promptness to liquidate the business of the Partnership. The profits and losses of the business during the period of liquidation shall be divided among or be borne by the Partners in the respective percentages in which they shared in such profits and losses prior to the event which resulted in such liquidation. After the payment of Partnership debts, expenses of liquidation, and any loans by Partners to the Partnership, the proceeds of liquidation, as realized, shall be distributed, first, in discharge of the undrawn profits of the Partners, and then proportionately in discharge of the respective capital accounts. Any excess shall be distributed among the Partners in the respective percentages in which they shared Partnership profits immediately prior to the event which resulted in such liquidation. In connection with such liquidation, the Partners shall have the sole discretion as to whether to sell any Partnership asset, including but not limited to real estate, and if so, whether at public or private sale and for what amount and on what terms, or whether (if sale thereof is not required to enable payment of debts, expenses of liquidation, loans by Partners, and undrawn profits of the Partners) to distribute and transfer the same to and among the Partners in kind by transferring interests therein in the respective percentages in which profits and losses were shared immediately prior to the event which resulted in such liquidation. In the event that the Partners determine to sell any real property, they shall not be required to sell the same promptly, but they shall have full right and discretion to determine the time when and manner in which such sale or sales shall be had, having due regard to the activity and

MID 00803

condition of the real estate market and general financial and economic conditions.

16.  Notices.  Wherever provision is made in this Agreement for the giving, service, or delivery of any notice, call, statement, or other instrument, it shall be deemed to have been duly given, served, and delivered, if served personally or if mailed by United States registered or certified mail, addressed to the party entitled to receive the same at the most recent address communicated in writing by such party to the other Partners.  Any notice, call, statement, or other instrument shall be deemed to have been given, served, and delivered three days after the date on which such notice was mailed as herein provided.

17.  Merger of Prior Agreements.  This Agreement contains the sole and entire Agreement and understanding of the parties with respect to the entire subject matter hereof.  Any and all prior discussions, negotiations, commitments, and understandings relating thereto are hereby merged herein.  This Agreement cannot be changed or terminated orally.

18.  Benefit.  The covenants and agreements herein contained shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

19.  Governing Law.  This Agreement shall be governed by the

law of the State of New York.

In witness whereof, the parties hereto have executed this Agreement as of the day and year first above written.

WR West Side Associates

By: _____
Jerrold Wexler

By: _____
Edward W. Ross
Its General Partners

Hadrian Properties Ltd.

By: Fafner Enterprises, Inc.

By: _____
President

By: _____
Arthur E. Imperatore
Its General Partners

## EXHIBIT A

### Parcel No. 1

BEGINNING at a point in the northerly line of West 38th Street, distant 340 feet 7 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 38th Street; (1) running thence westerly, along the northerly line of West 38th Street, 109 feet 5 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 98 feet 9 inches to the center line of block; (3) thence easterly, parallel with the northerly line of West 38th Street and along the center line of block, 50 feet 0 inches; (4) thence northerly, parallel with the westerly line of Tenth Avenue, 46 feet 4 inches; (5) thence easterly, parallel with the southerly line of West 39th Street, 7 feet 0 inches; (6) thence northerly, parallel with the westerly line of Tenth Avenue, 7 feet 0 inches; (7) thence westerly, parallel with the southerly line of West 39 Street, 7 feet 0 inches; (8) thence northerly, parallel with the westerly line of Tenth Avenue, 45 feet 5 inches to a point in the southerly line of West 39th Street; (9) thence easterly, along the southerly line of West 39th Street, 96 feet 8 inches; (10) thence southerly, along a line forming an angle of 79 degrees 19 minutes 10 seconds on its westerly side with the preceding course, 200 feet 11 3/4 inches to the point or place of BEGINNING.

CONTAINING 20,303.35 square feet, more or less, or 0.4661 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORTATION PURPOSES:

### Parcel No. 1

THIS easement right is across and through the aforesaid described Parcel No 1 and is situate below the upper inclined plane having an elevation of 23.61 at the northerly line of West 38th Street and an elevation of 21.86 at the southerly line of West 39th Street. The elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 23.61 feet at the northerly line of West 38th Street and an elevation of 21.86 feet at the southerly line of West 39th Street, bounded and described as follows:

BEGINNING at a point in the northerly line of West 38th Street, distant 380 feet 4 1/2 inches westerly of the corner formed by the intersection of the northerly line of West 38th Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 38th Street, 56 feet 11 7/8 inches; (2) thence northerly, along a line forming an angle of 79 degrees 17 minutes 17 seconds on its easterly side with the preceding course, 201 feet 0 inches to a point in the southerly line of West 39th Street; (3) thence easterly, along the southerly line of West 39th Street, 56 feet 11 7/8 secondss; (4) thence southerly, along a line forming an angle of 100 degrees 42 minutes 43 seconds on its easterly side with the southerly line of West 39th Street, 201 feet 0 inches to the point or place of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

Parcel No. 2

BEGINNING at a point in the northerly line of West 43rd Street distant 125 feet 0 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 43rd Street; (1) running thence westerly, along the northerly line of West 43rd Street, 100 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 44th Street; (3) thence easterly, along the southerly line of West 44th Street; 100 feet 0 inches; (4) thence southerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to the point or place of BEGINNING.

CONTAINING 20,083 square feet, more or less, or 0.461 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORATION PURPOSES:

Parcel No. 2

THIS easement right is across and through the aforesaid described Parcel No. 2 and is situate below the upper inclined plane having an elevation of 17.08 at the northerly line of West 43rd Street and an elevation of 19.18 at the southerly line of West 44th Street. The elevations refer to the datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, Mean sea level, Sandly Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 17.08 feet at the northerly line of West 43rd Street and an elevation of 19.18 feet at the southerly line of West 44th Street bounded and described as follows:

BEGINNING at a point in the northerly line of West 43rd Street, distant 145 feet 10 inches westerly of the corner formed by the intersection of the northerly line of West 43rd Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 43rd Street, 56 feet 0 inches; (2) thence northerly, along a line forming an angle of 89 degrees 54 minutes 40 seconds on its easterly side with the preceding course, 200 feet 10 inches; to a point in the southerly line of West 44th Street; (3) thence easterly, along the southerly line of West 44th Street, 56 feet 0 inches; (4) thence southerly, along a line forming an angle of 90 degrees 5 minutes 20 seconds on its easterly side with the southerly line of West 44th Street, 200 feet 10 inches to the point of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey), mean sea level, Sandy Hook, New Jersey.

## Parcel No. 3

BEGINNING at a point in the northerly line of West 47th Street distant 125 feet 0 inches westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 47th Street; (1) running thence westerly, along the northerly line of West 47th Street, 100 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 48th Street; (3) thence easterly, along the southerly line of West 48th Street, 100 feet 0 inches; (4) thence southerly, parallel with the westerly line of a Tenth Avenue, 200 feet 10 inches to the point or place of BEGINNING.

CONTAINING 20,083 square feet, more or less, or 0.461 acres, more or less.

SUBJECT TO THE FOLLOWING EASEMENT FOR TRANSPORTATION PURPOSES:

## Parcel No.3

THIS easement right is across and through the aforesaid described Parcel No.3 and is situate below the upper inclined plane having an elevation of 27.87 at the northerly line of West 47th Street and an elevation of 30.00 at the southerly line of West 48th Street. The elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey; and described as follows:

ALL THAT PORTION of the below described parcel lying below an upper inclined plane having an elevation of 27.87 feet at the northerly line of West 47th Street and an elevation of 30.00 feet at the southerly line of West 48th Street, bounded and described as follows:

BEGINNING at a point in the southerly line of West 47th Street, distant 145 feet 3 inches westerly of the corner formed by the intersection of the northerly line of West 47th Street with the westerly line of Tenth Avenue; (1) running thence westerly, along the northerly line of West 47th Street, 56 feet 0 inches; (2) thence northerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to a point in the southerly line of West 48th Street; (3) thence easterly, along the southerly line of West 48th Street, 56 feet 0 inches; (4) thence southerly, parallel with the westerly line of Tenth Avenue, 200 feet 10 inches to the point of BEGINNING.

ELEVATIONS noted above refer to datum used by the Topographical Bureau, Borough of Manhattan, which is 2.75 feet above the National Geodetic Survey Vertical Datum of 1929 (United States Coast and Geodetic Survey); mean sea level, Sandy Hook, New Jersey.

## PARTNERSHIP AFFIDAVIT

STATE OF NEW JERSEY )
                    ) SS.
COUNTY OF HUDSON )

EDWARD W. ROSS, being duly sworn upon his oath, deposes and says:

1. I am a General Partner of WR WEST SIDE ASSOCIATES, which in turn is a General Partner of JERRART VENTURE, an Illinois General Partnership (the "Partnership") duly formed in and governed by the laws of the State of Illinois.

2. The Partnership was formed pursuant to a Joint Venture Agreement dated February 3, 1987 (the "Partnership Agreement"), a true copy of which is attached to this Affidavit.

3. There has been no change in the Partnership Agreement between the date of formation of the Partnership and the date of this Affidavit, and the general partners of the Partnership are WR West Side Associates and Hadrian Properties, Ltd.

4. I, on behalf of WR West Side Associates., and Arthur E. Imperatore on behalf of Hadrian Properties, Ltd., are authorized by the Partnership Agreement to execute the Deed and all other closing documents relative to the sale of Lot 24, Block 1076, New York, New York (the "Property").

5. This Affidavit is made to induce Purchaser to accept conveyance of the Property, known full well that Purchaser will rely on the facts set forth in this Affidavit.

By: _____
                EDWARD W. ROSS

SWORN AND SUBSCRIBED to before me this 5th day of March, 2003.

_____

OFFICIAL SEAL
PATRICE A ALPERT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 07/25/05

MID 00809

MID-TOWN - JERRART - AMTRAK
ACCESS AND CONSTRUCTION AGREEMENT
REGARDING AMTRAK'S WEST SIDE RAIL LINE

Agreement made as of April 23, 1990, by and among Mid-Town Development Limited Partnership, a New York limited partnership ("Mid-Town"), Jerrart Venture, an Illinois general partnership ("Jerrart"), and National Railroad Passenger Corporation, a corporation of the District of Columbia ("Amtrak").

WHEREAS, by Deed dated January 10, 1986, recorded in the office of the City Register, New York County, in Reel 1080, Page 974 ("CRCP Deed"), Consolidated Rail Corporation, a Pennsylvania corporation ("Conrail"), conveyed to CRC Properties, Inc., a Delaware corporation ("CRCP") all of Conrail's right, title and interest in and to a line of railroad, easements for railroad operations across and through five parcels of land in the Borough of Manhattan, County of New York, State of New York, and certain additional rights (reserving to Conrail certain other rights), all as described in the CRCP Deed; and

WHEREAS, by Deed dated June 27, 1986, recorded in the Office of the City Register, New York County, in Reel 1059, Page 1108 ("Amtrak Deed"), CRCP conveyed to Amtrak the railroad line, easements, and rights conveyed to CRCP by Conrail in the CRCP Deed; and

WHEREAS, by Deed dated March 25, 1987, recorded in the Office of the City Register, New York County, in Reel 1226, Page 170 ("Mid-Town Deed"), Conrail conveyed to Mid-Town two parcels of land ("Parcels 1 and 2") in the Borough of Manhattan, County of New York, State of New York (being two of the five parcels of land referred to in the first WHEREAS clause of this Agreement which are the same two parcels that are referred to as Parcels 1 and 2, respectively, on Page 2 of the Amtrak Deed), and with respect to said Parcels 1 and 2 conveyed to Mid-Town all of the rights reserved by Conrail in the CRCP Deed (except as expressly reserved and excepted by Conrail in the Mid-Town Deed), and all the rights of Developer as set forth in the CRCP Deed and in Exhibit A thereof, all as described in the Mid-Town Deed; and

WHEREAS, by Deed dated March 25, 1987, recorded in the Office of the City Register, New York County, in Reel 1226, Page 185 ("Jerrart Deed"), Conrail conveyed to Jerrart three parcels of land ("Parcels 3, 4 and 5") in the Borough of Manhattan, County of New York, State of New York (being three of the five parcels of land referred to in the first WHEREAS clause of this Agreement, which are the same three parcels that are referred to as Parcels 3, 4, and 5, respectively, on Page 2 of the Amtrak Deed), and with respect to said Parcels 3, 4, and 5 conveyed to Jerrart all of the rights reserved by Conrail in the CRCP Deed (except as expressly reserved and excepted by Conrail in the Jerrart Deed), and all the

-2-

MID 00078

rights of Developer set forth in the CRCP Deed and in Exhibit A thereof, all as described in the Jerrart Deed; and

WHEREAS, Mid-Town, Jerrart and Amtrak desire to clarify the identity of the "Developer" and "Owner" as said terms are used in the Amtrak Deed, to relocate certain of the easements described in the Amtrak Deed, and to set forth certain agreements between Mid-Town and Amtrak with respect to the location and construction of a temporary and permanent vehicular access ramp in connection with Parcels 1 and 2; and

WHEREAS, except as modified by or in conflict with the terms of this Agreement, the parties hereto intend that the terms and conditions of the Amtrak Deed shall remain in full force and effect.

NOW, THEREFORE, it is agreed:

1. With respect to Parcels 1 and 2, the term "Developer" as is used in the Amtrak Deed and Exhibit A thereof shall mean Mid-Town, its successors and assigns, and the term "Owner" as used in the Amtrak Deed and Exhibit A thereof shall mean Amtrak, its successors and assigns.

2. With respect to Parcels 3, 4 and 5, the term "Developer" as it is used in the Amtrak Deed and Exhibit A thereof shall mean Jerrart, its successors and assigns, and

MID 00079

the term "Owner" as used in the Amtrak Deed and Exhibit A thereof shall mean Amtrak, its successors and assigns.

3. The easement across and through Parcel 3 granted and described in the Amtrak Deed and on Exhibit B thereof is hereby modified so that said easement will be located as shown on Exhibit A-1 attached hereto and made a part hereof.

4. The easement across and through Parcel 4 granted and described in the Amtrak Deed and on Exhibit B thereof is hereby modified so that said easement will be located as shown on Exhibit A-2 attached hereto and made a part hereof.

5. The easement across and through Parcel 5 granted and described in the Amtrak Deed and on Exhibit B thereof is hereby modified so that said easement will be located as shown on Exhibit A-3 attached hereto and made a part hereof.

6. Amtrak shall reimburse Mid-Town, in an amount not to exceed $1,000, for all costs and expenses incurred in connection with preparation of the exhibits to Paragraph 3, 4, and 5, above, and surveys for Parcels 3, 4 and 5 so as to relocate the easements pursuant to the provisions of Paragraphs 3, 4 and 5, above. Amtrak shall be responsible for moving or laying track, moving or installing signal, catenary and other equipment needed for the operation of a railroad, and for filling and restoring Jerrart's land beyond the

borders of Amtrak's easements to the same general condition as existed before commencement of such work. Amtrak shall keep Jerrart's land within the borders of Amtrak's easements in comparable condition, as compared to Jerrart's adjacent land; provided however, that this sentence is not intended, and shall not be interpreted, to restrict or interfere with Amtrak's rehabilitation of the railroad line or its maintenance and operation of a railroad thereon.

7.    Except as may be otherwise required by such law or laws as may be effective prior to the date that Developer commences the improvement of the parcels, the height clearance required and to be required by Amtrak in connection with the easements granted to it on Parcels 1, 2, 3, 4 and 5 in the Amtrak Deed and the provisions of Exhibit A thereof, as modified by Paragraphs 3, 4 and 5 of this Agreement, shall not exceed 18.5 feet above the top of the rail at any point, except that Amtrak may exceed this height at the following locations (including one foot on both the north and south sides of each such location), as indicated on Exhibit B-1 hereto:

| STATION | | TOP OF RAIL TO TOP OF AMTRAK STRUCTURE, AS INSTALLED |
|---------|-------|--------------------------------------------------|
| Parcel 1 | 32+00 | 21.52 feet |
| | 32+64 | 21.00 feet |
| | 33+30 | 21.53 feet |
| | 33+97 | 21.00 feet |
| Parcel 2 | 34+82 | 21.53 feet |
| | 35+64 | 20.86 feet |
| Parcel 3 | 36+61 | 20.33 feet |
| | 37+64 | 21.86 feet |
| Parcel 4 | 38+94 | 21.86 feet |
| | 50+95 | 21.66 feet |
| Parcel 5 | 52+35 | 21.66 feet |
| | 61+40 | 22.02 feet |
| | 62+26 | 21.66 feet |
| | 63+12 | 22.03 feet |

MID 00081

provided, that each such increase in height at such locations shall be limited to a maximum of 23 feet above top of rail. Due to the respective construction schedules of Amtrak and Developer, Amtrak will design and construct its signal and/or catenary systems based on the assumption that neither system will be attached to any building or other structure to be constructed by Developer. Amtrak agrees to consult with Developer as its design progresses in an effort to avoid any designs that would preclude such attachment(s) at a later date.

(a)    In the event that Developer's plans call for a change in any provision of this Paragraph 7 with respect to height clearance (or location of signal or catenary supports), Amtrak agrees, upon the request of Developer, to approve such change(s) in the locations indicated on Exhibit B-1 as requested and/or to attach its catenary and/or signal structures to buildings or other structures to be built by Developer subject, however, to the following terms and conditions:

(i)    the prior written approval of Amtrak's Deputy Chief Engineer must be obtained, which approval shall not be unreasonably withheld;

-6-

MID 00082

# 123

(ii)    all of Amtrak's costs in connection with effecting such change(s) and/or attachment(s) (including design, labor, materials, and overhead) shall be paid by Developer; and

(iii)    Amtrak shall be granted a permanent right to attach or relocate its catenary and/or signal system to the buildings or other structures to be built by Developer, provided the location and manner of any such relocation(s) or attachment(s) shall be subject to Amtrak's consultations with Developer and Developer's prior approval, such approval being not unreasonably withheld.

(b)    In the event that Amtrak's plans call for a change in any provision of this Paragraph 7 with respect to height clearance (or location of signal or catenary supports), Developer agrees, upon the request of Amtrak: (1) to approve such change(s) in the locations indicated on Exhibit B-1 as requested, and/or (2) to permit Amtrak to attach to catenary and/or signal structures to the buildings or other structures to be built by Developer subject, however, to the following terms and conditions:

(1)    the prior written approval of Developer must be obtained which approval shall not be unreasonably withheld;

(ii)  all of Developer's costs in connection with effecting such change(s) and/or permitting such attachment(s) (including design, labor, materials and overhead) shall be paid by Amtrak; and

(iii)  the location and manner of such attachments, if any, shall be subject to Amtrak's consultation with Developer and Developer's prior approval, such approval being not unreasonably withheld. Concurrent with such approval, Amtrak shall be granted a permanent right to attach or relocate its catenary and/or signal systems to the buildings or other structures.

8.  (a)  Amtrak at its sole cost and expense may construct a temporary vehicular access ramp ("Temporary Ramp"), with an approximate width of 13 feet, extending southward from West 38th Street to the easement across and through Parcel 2 granted and described in the Amtrak Deed and Exhibit B thereof. Such ramp shall be located across the western portion of said Parcel 2 and shall be located and constructed in accordance with the plans and specifications prepared by Amtrak and attached hereto as Exhibit C-1. Amtrak shall repair and maintain the Temporary Ramp at its sole cost and expense and in conformity to all applicable governmental laws and regulations, and may use the Temporary Ramp at no charge for such use, until such time as the Temporary Ramp is replaced by Mid-Town with the Permanent Ramp described below.

MID 00084

During such time as Mid-Town may be engaged in construction on Parcel 1 and/or 2, Amtrak acknowledges and agrees that access to and use of the Temporary Ramp by Amtrak may be interrupted by Mid-Town and its contractors, but Mid-Town agrees that, except in an emergency, any such interruption shall be subject to the following:

(i)  Any interruption extending longer than one (1) hour but less than two (2) hours will be preceded by not less than twenty-four (24) hours notice to Amtrak's West Side Line Project Manager, or of such other representative as may be indicted by Amtrak from time to time;

(ii)  With respect to any interruption of two (2) hours or longer, the prior approval of Amtrak's West Side Line Project Manager, or of such other representative as may be indicated by Amtrak from time to time, must be obtained, which approval shall not be unreasonably withheld or delayed; and

(iii)  In all events, Mid-Town agrees to use its best efforts to keep any periods of interruption to a minimum.

(b)    At such time as Mid-Town is ready to commence construction of a permanent ramp that would extend from West 38th Street to Amtrak's easement across and through Parcel 2 ("Permanent Ramp"), then on thirty (30) days prior written notice from Mid-Town to Amtrak, but not before May 1, 1990, Mid-Town at its sole cost and expense shall construct the Permanent Ramp with minimum unobstructed dimensions of eleven (11) feet in height and thirteen (13) feet in width and a maximum grade of ten percent (10%), using the Temporary Ramp to the extent reasonably feasible for that purpose. Mid-Town agrees to consult with Amtrak as its plans and specifications for the Permanent Ramp progress in an effort to assure that such ramp will meet Amtrak's needs and to minimize the disruption to Amtrak's access during construction. Amtrak agrees that its access to and use of the Temporary Ramp shall be halted to the extent necessary during construction of the Permanent Ramp.    Mid-Town agrees to complete construction of the Permanent Ramp with due diligence after commencement of its construction.    Upon completion of construction of the Permanent Ramp, Amtrak shall have the permanent right to use the Permanent Ramp at no cost for the purpose of pedestrian and vehicular access by Amtrak's employees, agents, contractors and suppliers to and from its easements, track and other properties.    At its sole cost and expense, Mid-Town shall keep, repair and maintain the Permanent Ramp in good working order (except with respect to damage caused by Amtrak's negligence) and in conformity to all

MID 00086

applicable governmental laws and regulations. The Permanent Ramp shall be artificially lighted in a manner similar to that set forth in Paragraph 11 of CRCP Deed. Mid-Town shall also allow police, fire, sewer and emergency vehicles to use the Permanent Ramp.

9.  Before beginning construction o the Temporary Ramp and continuing during the period when the Temporary Ramp is in existence and from and after completion of the Permanent Ramp, Amtrak shall procure and maintain policies of insurance insuring Mid-Town and Amtrak for injury or death to any person in an amount of not less than $5 million, for injury to or death of more than one person in any one occurrence in an amount of not less than $20 million, and for damage to property in an amount not less than $1 million made by or on behalf of any person or persons, firm or corporation arising from, related to or connected with Amtrak's construction, repair, maintenance or use of the Temporary Ramp and its use of the Permanent Ramp. The insurance policies shall comprehend coverage of the indemnity set forth in Paragraph 12(a) below. In lieu of procuring and maintaining the insurance policies described in this Paragraph 9, Amtrak shall have the right to self-insure.

10.    Mid-Town and its contractors, supplier, lessees, licensees and invitees shall have the the right to use both the Temporary Ramp and the Permanent Ramp and any service roadway or similar facility constructed by Amtrak on its easements located on Parcels 1 and 2, provided that such use shall not unreasonably interfere with the use of said ramps, roadway and facilities by Amtrak, its contractors and suppliers, and by police, fire, sewer and emergency vehicles.

Mid-Town and Amtrak hereby agree that each shall endeavor to ensure that said ramps, roadway and facilities are not used by persons and entities other than Amtrak, Mid-Town, and those persons and entities expressly permitted to use them under this Agreement, or as otherwise permitted by mutual agreement of Amtrak and Mid-Town.

11.    Amtrak hereby waives and releases any rights of and to a vehicular access ramp to Parcel 1 that it has or may have by reason of the provisions of the Amtrak Deed or otherwise. Mid-Town and Jerrart hereby confirm that Amtrak has permanent easements for rail operations (including the right to use, operate, maintain, repair, renew, replace and remove the existing track or tracks) across and through Parcels 1, 2, 3, 4 and 5.

# 129

12.    (a)    Amtrak will protect, indemnify and save harmless Mid-Town from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, reasonable attorneys' fees and expenses) imposed upon or incurred by or asserted against Mid-Town by reason of any accident, injury to or death of persons or loss for damage to property arising from Amtrak's construction, maintenance and repair of the Temporary Ramp or any part thereof, or its use by Amtrak, its contractors and suppliers, or arising from the use of the Permanent Ramp or any part thereof by Amtrak, its contractors and suppliers.

In case any action, suit or proceeding is brought against Mid-Town by reason of such occurrence, Amtrak will at Amtrak's expense resist and defend such action, suit, or proceeding or cause the same to be resisted and defended by counsel approved by Mid-Town, which approval shall not be unreasonably withheld.

(b)    Mid-Town will protect, indemnify and save harmless Amtrak from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including without limitation, reasonable attorneys' fees and expenses) imposed upon or incurred by or asserted against Amtrak by reason of any accident, injury to or death of persons or loss for damage to property arising from Mid-Town's

construction, maintenance and repair of the Permanent Ramp or any part thereof, or its use by Mid-Town, its contractors, suppliers, lessees, licensees and invitees, or arising from the use by Mid-Town, its contractors, suppliers, lessees, licensees and invitees of the Temporary Ramp, any part thereof, or of any facility or structure constructed by Amtrak on its easements located on Parcels 1 and 2. In case any action, suit or proceeding is brought against Amtrak by reason of such occurrence, Mid-Town will at Mid-Town's expense resist and defend such action, suit, or proceeding or cause the same to be resisted and defended by counsel approved by Amtrak, which approval shall not be unreasonably withheld.

(c)     Nothing herein is intended to limit in any way the parties' respective rights of indemnification under the appropriate Deeds.

13.     This Agreement shall be binding upon and inure to the benefit of Amtrak, its successors and assigns, provided that the provisions in this Agreement with respect to the construction and use of the Temporary Ramp and the use of the Permanent Ramp shall be personal to Amtrak and to any successor operator of intercity rail passenger service, and not inure to the benefit of any other of Amtrak's successors and assigns.     This Agreement shall be binding upon and inure to the benefit of Mid-Town, its successors and assigns, and Jerrart, its successors and assigns.

MID 00090

## 131

14.   Except as otherwise specified, any notice required or permitted to be given hereunder shall be in writing and shall be deemed to be delivered on the earlier of (i) the date received if by personal or commercial messenger delivery, (ii) the date of delivery, refusal, or non-delivery indicated on the return receipt if deposited in a United States Postal Service Depository, postage prepaid, sent registered or certified mail, return receipt requested, addressed in every case to the party to receive the same at the addresses set forth below:

TO:  National Railroad Passenger Corporation
     2000 Market Street
     Philadelphia, Pennsylvania 19103
     Attention:  Deputy Chief Engineer

TO:  Mid-Town Development Limited Partnership
     c/o Jerrart Venture
     ARCORP Properties
     Pershing Road
     Weehawken, New Jersey  07087

With a copy to:

     Jerrart Venture
     ARCORP Properties
     Pershing Road
     Weehawken, New Jersey  07087

With a copy to:

     Ira Kipnis
     Suite 1500
     919 North Michigan Avenue
     Chicago, Illinois  60611

TO:  Consolidated Rail Corporation
     c/o Conrail Real Estate
     Room 1500
     6 Penn Center Plaza
     Philadelphia, Pennsylvania  19103
     Attention:  Mr. John Jaeger

MID 00091

or at such other addresses as may be designate. by ____ ___ days' prior notice delivered or mailed as herein provided.

15.  This Agreement shall be governed by the laws of the District of Columbia.

16.  The parties intend that this Agreement be recorded with the  recorder of land records for the Borough of Manhattan, and each further agrees to execute such additional documents as may be necessary to effect such recording.  All cost of such recording shall be shared equally by the three parties herein.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed as of the day and year first written above.

National Railroad Passenger Corporation

By: _____

ATTEST:

_____
Asst.    Secretary

FORM APPROVED
Date 21 Au 94
Sig. _____
LAW
DEPART...

Mid-Town Development Limited Partnership
By:  Jerrart Venture (Its General Partner)
By:  Hadrian Properties, Ltd.

By:  Fafner Enterprises, Inc.

By: _____
President

By: _____
Arthur E. Imperatore
Its General Partner

-16-

MID 00092

By:   WR West Side Associates

By: _____
       Jerrold Wexler

By: _____
       Edward W. Ross
       Its General Partners

Jerrart Venture

By:   Hadrian Properties, Ltd.

By:   Fafner Enterprises, Inc.

By: _____
       President

By: _____
       Arthur E. Imperatore
       Its General Partner


By:   WR West Side Associates

By: _____
       Jerrold Wexler

By: _____
       Edward W. Ross
       Its General Partners

134

<u>CONSENT</u>

Consolidated Rail Corporation, a Pennsylvania corporation, hereby consents to the relocation of the easements as provided in Paragraphs 3, 4, and 5 of the foregoing Agreement by and among Mid-Town Development Limited Partnership, a New York limited partnership, Jerrart Venture, an Illinois general partnership, and National Railroad Passenger Corporation, a corporation of the District of Columbia, approves the provisions with respect to the Temporary Ramp as set forth in said Agreement, and hereby approves the height clearance provision of Paragraph 7 of said Agreement.

In witness whereof Consolidated Rail corporation has caused this Consent to be executed this____ day of _____, 1989.

Consolidated Rail Corporation

By:_____

_____President

ATTEST:


_____

_____Secretary

10

DISTRICT OF COLUMBIA

I, _Beverly J. Vinston_, a Notary Public in and for said District of Columbia, do hereby certify that _Tony DeAngelo_ personally known to me to be the _Vice President - Real Estate and Operations Development_ of National Railroad Corporation and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as _Vice President - Real Estate and Operations Development_ of said corporation, pursuant to authority given by the Board of Directors of said corporation, as his free and voluntary act and as the free and voluntary act and deed of said corporation for the uses and purposed therein set forth.

Given under my hand and notarial seal this _23rd_ day of _April_, 19~~88~~_90_.

Commission Expires: _June 30, 1992_



_Beverly J. Vinston_
Notary Public

STATE OF New Jersey )
                        ) ss.
COUNTY OF Hudson )

I, Benita Rodman, a Notary Public in and for said County in the State aforesaid, do hereby certify that Armond Pake, personally known to me to be the President of Fafner Enterprises, Inc. and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as President of said corporation, pursuant to authority given by the Board of Directors of said corporation, as his free and voluntary act and as the free and voluntary act and deed of said corporation, as a general partner of Hadrian Properties, Ltd., for the uses and purposes therein set forth.

Given under my hand and notarial seal this 22 day of Feb, 1989.

Commission Expires:

BENITA A. RODMAN
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES MAY 12, 1993

_____
Notary Public

MID 00096

STATE OF New Jersey )
                    ) ss.
COUNTY OF Hudson )

I, the undersigned, a Notary Public in and for said county, in the State aforesaid, do hereby certify that Arthur E. Imperatore, a General Partner of Hadrian Properties Ltd., personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he as a general partner as aforesaid signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and notarial seal this __22__ day of __Feb__, 1989.

Commission Expires:    BENITA A. RODMAN
                       NOTARY PUBLIC OF NEW JERSEY
                       MY COMMISSION EXPIRES MAY 12, 1993


                       _Benita A. Rodman_
                       Notary Public

STATE OF ~~ILLINOIS~~ ✓     )

                 ) SS.

COUNTY OF ~~COOK~~ Hudson    )


    I, Benita Rodman, a Notary Public in and for said County in the State aforesaid, do hereby certify that Jerrold Wexler and Edward W. Ross, General Partners of WR West Side Associates, are personally known to me to be the same persons whose names are subscribed to the foregoing instrument, and they did appear before me this day in person and acknowledged that they as General Partners as aforesaid, signed and delivered the said instrument as their own free and voluntary acts for the use and purposes therein set forth.


    Given under my hand and notarial seal this ___15___ day of February, ~~1989~~ 90.

Commission Expires: May 12 1993


                                 BENITA A. RODMAN
                          NOTARY PUBLIC OF NEW JERSEY
                     MY COMMISSION EXPIRES MAY 12, 1993

                              Benita A. Rodman
                               Notary Public


THIS INSTRUMENT PREPARED BY:

Ira A. Kipnis
Suite 1500
919 North Michigan Avenue
Chicago, Illinois  60611

MID 00098

# 139

## EXHIBIT C

### Permitted Exceptions as to the Property

Title to the Property is to be conveyed to and accepted subject only to the following:

1. Standard "printed form" exceptions in the Title Company's title policy, provided that the "gap", tenancy and mechanic's lien exceptions shall be omitted, the survey exception shall be modified to read in a current survey and the real estate taxes exception shall be modified to read "but not yet due and payable".

2. Party Wall Agreement recorded 9/29/30 in Liber 3771 Cp. 369 (Affects southeasterly line of Parcel 1).

3. Railroad Easements and Reservations made by New York State Realty and Terminal Company to The New York Central Railroad Company dated December 17, 1936 recorded January 14, 1937 in Liber 3947 page 163.  Affects Block 708 Lot 1.

4. Reservations, Restrictive Covenants and Charges contained in deed made by Consolidated Rail Corporation to Mid-Town Development Limited Partnership dated March 25, 1987 recorded May 5, 1987 in Reel 1226 page 170.

5. Terms, covenants and conditions contained in deed made by Robert W. Blanchette et al as trustees of the property of Penn Central Transportation Company to Consolidated Rail Corporation dated March 30, 1976 recorded December 15, 1978 in Reel 463 page 1563A.

6. Terms, covenants and conditions contained in Real Property Identification Document made by and between Despatch Shops, Inc. and Consolidated Rail Corporation undated recorded December 15, 1978 in Reel 463 page 1624A.

(a) Release of Easements made by Despatch Shops, Inc. to Consolidated Rail Corporation dated May 21, 1985 recorded May 5, 1986 in Reel 1226 page 210.

MID 00099

(b) Release of Easements made by Despatch Shops, Inc. to Consolidated Rail Corporation dated May 21, 1985

## EXHIBIT C

Permitted Exceptions as to the Property

7. Easement Agreement made by and between New York State Realty and Terminal Company and The New York Central Railroad Company dated June 8, 1932 recorded June 10, 1932 in Liber 3842 page 11. Affects both parcels.

    (a)    Correction Agreement made by and between New York State Realty and Terminal Company and The New York Central Railroad Company dated December 11, 1937 recorded January 4, 1938 in Liber 3968 cp 375. Affects block 709 lot 1.

### FOR INFORMATION ONLY

8. Easement made by Consolidated Rail Corporation to National Railroad Passenger Corporation dated January 10, 1986 recorded May 6, 1986 in Reel 1059 page 1108. Affects Eleventh Avenue.

9. Terms, Covenants, Conditions and Easements contained in deed made by Consolidated Rail Corporation to CBC Properties, Inc. dated January 10, 1986 recorded June 25, 1986 in Reel 1080 page 974.

10. Terms, Covenants, Conditions and Easements contained in deed made by CBC Properties, Inc. to National Railroad Passenger Corporation dated June 27, 1986 recorded March 16, 1987 in Reel 1203 page 1015.

# 141

## EXHIBIT C

Permitted Exceptions as to the Property

**Notices of Sidewalk Violations:**

Filed:        August 14, 1968.        No. 9260
Filed:        July 10, 1986          No. 39137
Affect Block 709 Lot 17.

Filed:        April 29, 1982          No. 24556
Filed:        July 10, 1986          No. 39120
Affect Block 708 Lot 1

(a)  Action:        Article 15; nuisance, breach of
                    contract, determination of claims to
                    real property
     Action:        25678-92
     Filed:         September 17, 1992
     Court:         Supreme Court, New York County
     Plaintiff:     Consolidated Rail Corporation
     Defendant:     Mid-Town Development Limited
                    Partnership et al

Note: Latest entries in clerks minutes are dated February
11, 1999 and February 16, 1999 and refer to a notice of
appeal.

(b)  Action:        Unsafe building
     Action:        40061-74
     Index No.:     1974
     Court:         Supreme Court, New York County
     Plaintiff:     The City of New York
     Defendant:     New York State Realty and Terminal

State of New York, County of New York

       HERBERT RUBIN, an attorney admitted to practice law in New York, under penalty of perjury affirms:

       1.    I am a senior member of Herzfeld & Rubin P.C. (H&R), and as attorney for Jericho Group Ltd., ("Jericho") in its litigation with Midtown Development, L.P. ("Midtown"), am fully familiar with the facts relevant to that litigation.

       2.    This affirmation is prepared at the request of Jericho in respect to its motion brought in the U.S. District Court, Southern District of New York, relating to the removal of its state court action to the Federal Court and subsequent remand to state court.

       3.    I hereby confirm that, in the foregoing litigation, H&R was retained on a conventional hourly basis for its services, and was not retained on a contingent basis.

       4.    I further confirm that H&R billed Jericho for its services rendered and received various payments for such services.

       5.    Further, I confirm that the annexed schedule of services in the amount of $48,703.50 performed for Jericho with respect to the removal of this action to the Federal Court between 1/1/2007 and 1/31/2000 which was previously provided to Jericho is an accurate abstract of services billed to Jericho and represents indebtedness incurred for services identified therein.

Dated: New York, NY
     April 25, 2008

                                         _____
                                          HERBERT RUBIN

Edward Ross 3-29-06 (2).txt

1                                          1

2           SUPREME COURT OF THE STATE OF NEW YORK

3                     COUNTY OF NEW YORK

4     ─────────────────────────────────

5     JERICHO GROUP, LTD.,

6                               Plaintiff,

7         - against -

8     MIDTOWN DEVELOPMENT, L.P.,

9                               Defendant.

10    ─────────────────────────────────

11

12

13

14

15                 DEPOSITION OF EDWARD ROSS

16                    New York, New York

17                 Wednesday, March 29, 2006

18

19

20    Reported by:
      MICHELE ROSSI, RPR

21

22

23

24

25


1                                          2

2

3                         March 29, 2006

4                         8:40 a.m. a.m.

5

                          Page 1

Edward Ross 3-29-06 (2).txt
```
10      BY:  FREDRICK E. SHERMAN, ESQ.

11                - AND -

12           TODD R. GEREMIA, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1           Ross - Noncertified Rough Draft      4

 2      E D W A R D      R O S S,

 3               stating his business address as 401

 4               North Michigan Avenue, Chicago,

 5               Illinois, having been duly sworn by the

 6               Notary Public (Michele Rossi, RPR), was

 7               examined and testified as follows:

 8               MR. GOEBEL:  I'd just like to state for

 9      the record that the deponent's counsel has

10      inform Ed me that the deponent has to leave

11      by a quarter to two today.

12               And I've objected on the basis that I

13      don't think it's humanly possible to finish

14      this deposition by a quarter to 2.
```
                              Page 3

Edward Ross 3-29-06 (2).txt

15          And if we are at the point where he
16      leaves and we're not finished, I have told
17      counsel to defendant that we need to have him
18      back to finish off the deposition.
19          THE WITNESS:  Let me point out, you
20      weren't here the last time.  You cancelled
21      out on me when I was here, just for the
22      record.
23          MR. GOEBEL:  I'd like to say that the
24      court has ordered the deposition of this
25      deponent in New York City.


1           Ross - Noncertified Rough Draft      5
2    EXAMINATION BY MR. GOEBEL:
3        Q    Please state your name for the record.
4        A    Edward Ross.
5        Q    Where do you reside?
6        A    Chicago, Illinois.
7        Q    Where do you work?
8        A    401 North Michigan Avenue in Chicago.
9        Q    What do you do?
10       A    Pardon me.
11       Q    What do you do?
12       A    What do I do?
13       Q    What do you do?
14       A    I do real estate, financing, banking,
15   other things.
16       Q    Do you maintain a New York City office?
17       A    I have no New York City office.
18       Q    But you maintain an office in Chicago?
                     Page 4

```
                          Edward Ross 3-29-06 (2).txt
19        A    401 North Michigan Avenue in Chicago.
20        Q    What age are you?
21        A    I can't hear you, sir.
22        Q    What age are you?  Highway old are you?
23        A    '85.
24        Q    Are you of sound mind?
25        A    I hope so.



 1             Ross - Noncertified Rough Draft      6
 2        Q    Do you have any reason to believe that
 3   you're not?
 4        A    I can't hear you, sir.
 5        Q    Do you have any reason to believe that
 6   you're not of sound mine?
 7        A    No, I have none.
 8        Q    Do you have a guardian?
 9        A    I still don't hear you.
10        Q    Do you have a guardian?
11        A    Do I have a guardian?
12        Q    Yes.
13        A    No.
14        Q    Do you have a caretaker?
15        A    No.
16        Q    Are you able to understand legal
17   documents?
18        A    I am not a lawyer, but I can read.
19        Q    But with respect to what you read, can
20   you understand it?
21        A    I think so.
22        Q    Are you familiar with real estate
23   contracts of sale, commercial properties?
                          Page 5
```

Edward Ross 3-29-06 (2).txt

24    A    I don't understand you.
25    Q    Are you familiar with real estate


1            Ross - Noncertified Rough Draft      7
2    contracts?
3    A    Am I --
4    Q    Am are you familiar with --
5    A    Yes.
6    Q    In the past, have you ever reviewed real
7    estate contracts for commercial properties?
8    A    Yes.
9    Q    Could you express whether that's 30
10    contracts, 50 contracts, any idea how many over
11    the years?
12    A    Maybe 1,000.
13    Q    1,000?
14    A    It could be.
15    Q    It could be more, it could be less?
16    A    It could be less, more.
17    Q    Maybe 1,000 is about --
18    A    It could be.
19    Q    Have you been a real estate professional
20    for most of you're working career?
21    A    I would consider so.
22    Q    What aspects of real estate do you get
23    involved in?
24    A    We get involved in everything from
25    development, acquisitions, dispositions,.


Page 6

```
                      Edward Ross 3-29-06 (2).txt
  1              Ross - Noncertified Rough Draft      8
  2       Q     With respect to what kinds of
  3    properties, commercial, residential?
  4       A     Commercial, multifamily, hotels,
  5    development.
  6       Q     How many years have you been in the real
  7    estate business, approximately, if you can say?
  8       A     I would say starting about 1960.
  9       Q     About 45 years, 46 years?
 10       A     I would say 45, thereabouts.
 11       Q     Do you hold any professional licenses,
 12    such as a brokerage license?
 13       A     I do not.
 14       Q     Attorneys -- you're not an attorney?
 15       A     I am not an attorney.
 16       Q     Do you have any other professional
 17    licenses?
 18       A     I had an engineer's license, but I
 19    don't -- professional engineer's license, but I
 20    let it lapse because I don't -- I don't practice
 21    engineering.
 22       Q     Did you ever practice engineering?
 23       A     I did.
 24       Q     For how many years, approximately?
 25       A     Oh, probably 10 years.
```

```
  1              Ross - Noncertified Rough Draft      9
  2       Q     Did do you anything to prepare for
  3    today's deposition?
  4       A     Reviewed documents.
  5       Q     Any documents that you can recall in
                          Page 7
```

Edward Ross 3-29-06 (2).txt

 6   particular?

 7       A    The Pfeiffer purchase agreement, I

 8   reviewed that.  And I reviewed some of the

 9   initial complaints and the rebuttal from the

10   court.

11       Q    Did you meet with anyone to prepare?

12       A    I met with our attorneys here yesterday.

13       Q    How many hours?

14       A    An hour perhaps.

15       Q    Was that your first meeting?

16       A    Pardon me.

17       Q    Was that your first meeting with the

18   attorneys?

19       A    No.  I never met with them prior.

20       Q    Had you ever met with them before this

21   litigation was commenced?

22       A    Never.

23       Q    So all your meetings with them came

24   after the commencement of the litigation?

25       A    That's correct.


 1           Ross - Noncertified Rough Draft    10

 2       Q    Do you have any other attorneys that are

 3   involved in this litigation?

 4       A    No.

 5       Q    Does Midtown have any other attorneys?

 6       A    Excuse me.

 7       Q    Does Midtown have any other attorneys

 8   involved in this litigation?

 9       A    Well, Midtown is represented by Harwood

                      Page 8

Edward Ross 3-29-06 (2).txt

10    Lloyd, I believe.

11        Q    Are they involved in this litigation?

12        A    Yes.

13        Q    Do you know the names of the attorneys

14    in particular?

15        A    The only one I deal with is Ed

16    Imperatore.

17        Q    Did you do anything else to prepare for

18    today's meeting, for today's deposition, did you

19    do anything else?

20        A    No.

21        Q    You said that you looked at the Pfeiffer

22    contract of sale?

23        A    I did.

24        Q    I want to introduce it as an exhibit, if

25    I may.


1              Ross - Noncertified Rough Draft    11

2              MR. SHERMAN:  You can mark an exhibit.

3              MR. GOEBEL:  Yes, mark the exhibit.

4        This is a June 18, 2002 --

5              THE WITNESS:  Excuse me just one minute.

6        I want to get my glasses.

7              MR. GOEBEL:  This is a June 18, 2002

8        document.  It's Bates stamped MID00001

9        through MID00049, which is a contract between

10       Midtown Development LP, as seller, and

11       Jericho Group, Ltd., as nominee, as

12       purchaser.

13             (Ross Exhibit 1, contract, marked for

14       identification, as of this date.)

Page 9

Edward Ross 3-29-06 (2).txt

15    Q    Does this contract look familiar?

16    A    It does.

17    Q    Is this the contract that you referred

18  to earlier?

19    A    It appears to be the same.

20    Q    I call your attention to an agreement

21  starting on page MID 00025?

22    A    00025?

23    Q    Right.

24    A    Okay.

25    Q    It's called access and construction


1          Ross - Noncertified Rough Draft    12

2  agreement regarding Amtrak's West Side rail line,

3  dated April 23, 1990 and it's between or by

4  among, Midtown, Jericho art venture,

5  J-E-R-R-A-R-T, venture, and National Railroad

6  Passenger Corporation, parentheses, quote,

7  Amtrak, close quote, close parentheses.

8          Does this look familiar to you, sir?

9    A    It does.

10    Q    Is this what people refer to as the

11  so-called Amtrak agreement?

12          MR. SHERMAN:  Objection to the form.

13    A    I believe so.

14          MR. SHERMAN:  You can answer when I

15    object to form.

16    A    Will you repeat the question, please?

17    Q    When Midtown or Jericho is, when

18  plaintiff or defendant refer to the Amtrak

Page 10

Edward Ross 3-29-06 (2).txt
```
19   agreement, do you believe this is what they're

20   referring to?

21          MR. SHERMAN:  Objection to the form.

22   A    I have no reason not to.

23   Q    Did you sign this agreement?

24   A    I'll let you know.  I did.

25   Q    In what capacity did you sign this



 1          Ross - Noncertified Rough Draft    13

 2   agreement?

 3   A    As a general partner.

 4   Q    Is this agreement an exhibit to the

 5   contract of sale?

 6   A    If it's attached, I assume it's an an

 7   agreement, part of the agreement.

 8   Q    I call your attention to MID00012, or

 9   page 8 of the rider to the contract.

10   A    Yes.

11   Q    Can you read paragraph 31.

12   A    I must have the wrong number.

13          MR. SHERMAN:  I'll turn these pages for

14   you.

15   A    I thought he said 08, I'm sorry.

16          MR. SHERMAN:  That's all right.  There's

17   two set of numbers.

18          MR. GOEBEL:  It should be page 8 of the

19   rider or otherwise MID00012.  Can you read

20   paragraph 31.

21   A    Yes.  The seller represents the annexed

22   hereto as Exhibit B is a true copy of this

23   agreement with Amtrak corp. permits development
```
Page 11

Edward Ross 3-29-06 (2).txt

24    of premises over Amtrak railroad track.

25        Q    And Exhibit B is the one we identified


1             Ross - Noncertified Rough Draft    14

2    earlier going back to page MID00025? Is that the

3    Exhibit B that the contract refers to, or may I

4    call your attention on 0024, MID00024?

5        A    To the best of my knowledge, it probably

6    does.

7        Q    Would it be all right with you, sir, if

8    going forward in this deposition, I refer to that

9    Exhibit B as the Amtrak agreement?

10       A    It's all right with me.

11       Q    Also when we refer to the contract of

12   sale, we can refer to that contract of sale we

13   introduced?

14            MR. SHERMAN:   What's the question?

15       Q    The question is, when I refer to the

16   contract of sale, do you understand I'm referring

17   to that contract that you have in your hand?

18       A    Yes.

19       Q    By the way, did you sign that contract

20   of sale?

21       A    I'll have to look again.

22       A    Yes.

23       Q    In what capacity did you sign it?

24       A    Pardon me?

25       Q    In what capacity did you sign it?


Page 12

```
                    Edward Ross 3-29-06 (2).txt
 1               Ross - Noncertified Rough Draft    15
 2      A    It says as limited partner, but I'd be
 3   the general partner.
 4      Q    Would you say that again.  I don't know
 5   what that means?
 6      A    It means I would be a general partner of
 7   a limited partnership.
 8      Q    Which limited partnership?
 9      A    West Side -- Midtown Development.
10      Q    So you were signing as a general partner
11   of Midtown?
12      A    I am there, I believe.
13      Q    Is Jones Day your regular counsel or
14   Midtown's regular counsel?
15      A    I don't know what you mean by regular
16   counsel, sir.
17      Q    Well, before this litigation was
18   commenced, did either you or Midtown use Jones
19   Day as counsel?
20      A    Not on a normal basis, regular basis.
21      Q    Can you say how you came to use Jones
22   day in this litigation?
23      A    They were selected by Imperatore.
24      Q    Which Imperatore?
25      A    Ed Imperatore, to the best of my


 1               Ross - Noncertified Rough Draft    16
 2   knowledge.
 3      Q    When we refer to Imperatore, we're
 4   referring to Ed?
 5      A    Yes.
                         Page 13
```

Edward Ross 3-29-06 (2).txt

6     Q   Who is bying your legal fees for Jones
7  Day, you personally?
8     A   Personally?
9     Q   Yes.
10    A   The partnership is paying for it.
11    Q   How do you know?
12    A   Pardon me?
13    Q   How do you know that?
14    A   Because I'm paying part of it myself.
15    Q   You're paying part of it yourself?
16    A   I'm paying part of it in my percentage
17  interest in our general partner.
18    Q   Do you know how Ed Imperatore came to
19  retain Jones Day?
20       MR. SHERMAN:  No.  That's an invasion of
21     attorney-client privilege, it's also entirely
22     irrelevant to the case.  I'm going to
23     instruct the witness not to answer, so ask
24     another question.
25       MR. GOEBEL:  Thank you, sir.


1       Ross - Noncertified Rough Draft   17
2    Q   How familiar are you with this
3  litigation?
4    A   I am not an attorney, but I think I have
5  a full grasp of what the issue is not.
6    Q   Does Ed Imperatore strike.
7    Q   Are there other partners or principals
8  in Midtown that you keep inform Ed?
9    A   I don't keep other -- outside of Ed

Page 14

Edward Ross 3-29-06 (2).txt

10    Imperatore, from time to time.  I will have a
11    conversation with Arthur Imperatore, that's an
12    uncle.  But beyond that, none other.
13        Q    How familiar are you with the subject
14    property?
15        A    I know it's there.  I've been there and
16    I visited it.
17        Q    How many parcels of real estate are
18    there?
19             MR. SHERMAN:  Objection to the form.
20        Under contract?  In the world?  Owned by
21        Midtown?  Owned by Mr. Ross?
22        Q    How many parcels of real estate are the
23    subject of this contract of sale?
24        A    To the best of my knowledge, two.
25        Q    Well, if you turn to the first page, if


1             Ross - Noncertified Rough Draft    18
2    it's all right with you, I'd like to refer to the
3    property as the property listed on the first
4    page.  It says, lot one, and block 708 and loss
5    17 and block 709.  So when I refer to the
6    property you understand it's those two lots?
7        A    Those two, yes.
8        Q    Would you consider that, you and Ed
9    Imperatore, are the two principals most actively
10    involved in the Midtown affairs?
11        A    I'd say that was correct.
12        Q    Do you review the litigation papers when
13    they're sent out by Jones Day?
14        A    I row view what is sent to me by Ed and
                    Page 15

Edward Ross 3-29-06 (2).txt

15    I have to assume what he sent to me is what he

16    referred from them.  But I reviewed, not at an

17    attorney, but I received as a businessman.

18        Q    Do you circulate those papers to any

19    principals or representatives of Midtown?

20        A    No.

21        Q    So they stay with you basically?

22        A    Basically they stay with me.

23        Q    How often do you think you speak to Ed

24    Imperatore?

25        A    It varies.  I can speak to him three or


1         Ross - Noncertified Rough Draft    19

2    four times in a week or I won't speak to him for

3    2 weeks.

4        Q    How are decisions made by Midtown?  How

5    are business decisions made by Midtown?

6        A    I don't know.

7        Q    How do you make a decision to take some

8    action or course of conduct?

9        A    You make decisions in the normal course

10    of events that require decisions.

11        Q    But who makes those?  Is there a voting

12    method or do you make decisions for Midtown?

13        A    Generally, for the administration of the

14    development, Ed Imperatore or myself generally

15    make the basic decisions.

16        Q    Who would make the unbasic decisions?

17    Who would make the decisions that were outside

18    the normal administrative decisions?

Page 16

Edward Ross 3-29-06 (2).txt

19    A    There wouldn't be any.

20    Q    who would make the decision to sell the

21    property?

22    A    Ed and I.

23    Q    Do you need anyone else as well?

24    A    we would keep our partners inform Ed.

25    Q    But do you need their vote?


1              Ross - Noncertified Rough Draft    20

2    A    No.

3    Q    Does either you or Imperatore have

4    authority to make a decision such as that

5    independently?

6              MR. SHERMAN:  Objection to the form.

7    Q    Let me break it down.  You and Ed

8    Imperatore make the business decisions, the

9    extraordinary decisions, the decision to sell,

10   correct?

11             MR. SHERMAN:  Objection to the form.

12   Q    Again, you testified that you and

13   Imperatore have the authority to make the

14   decision to sell?

15   A    Yes.

16   Q    Can one guy independently make that

17   decision?

18   A    I don't.

19   Q    Can you individually make that decision?

20   A    I would not, no.  It would take both of

21   us to do it.  It would take two the general

22   partners to do it.

23   Q    And who are the general partners?

Page 17

Edward Ross 3-29-06 (2).txt

24      A    He and I acting general partners, Ed and

25   I.


1           Ross - Noncertified Rough Draft    21

2       Q    Are there any other general partners in

3   Midtown?

4       A    In Midtown, to the best of my knowledge,

5   the general partners would be myself, Ed and

6   perhaps Arthur Imperatore or I'm not sure.

7       Q    As far as you know, does Imperatore send

8   you copies of everything he sends out regarding

9   the account?

10      A    I would think he sends me whatever he

11   feels that I could add input to, or I should be

12   involved with.

13      Q    Does Imperatore individually have

14   authority to make decisions in the ordinary

15   course of business?

16      A    It depends on the decision.

17      Q    What about the decision to retain a

18   professional?

19      A    He's got the authority.

20      Q    Who has authority to sign checks on

21   behalf of Midtown?

22      A    I don't know specifically who who is

23   authorized to sign on behalf of Midtown.

24      Q    Who usually signs the checks for

25   Midtown?

```
                    Edward Ross 3-29-06 (2).txt
1              Ross - Noncertified Rough Draft    22
2       A    I don't get any checks from Midtown.
3       Q    The chokes that go out for Midtown to
4   pay whatever expenses there are, such as real
5   estate taxes?
6       A    Midtown has an accounting -- an
7   accountant or controller that colates all the
8   bills and signs them, signs the checks, to the
9   best of my knowledge.
10      Q    who is that accountant?
11      A    I don't remember his name.
12      Q    where does the accountant work?
13      A    He works at the offices of, I believe,
14  Arthur Imperatore, although I'm not sure of that.
15      Q    Do you maintain a personal file of
16  Midtown documents?
17      A    Pardon me?
18      Q    Do you maintain a personal file at your
19  office of Midtown documents?
20      A    When you say personal, I have a file
21  that's available to anyone at my office that
22  wants to look at it.
23      Q    Did you produce those files?
24      A    Pardon me?
25      Q    Have you produced those files?


1              Ross - Noncertified Rough Draft    23
2       A    The files are nothing other than what we
3   got in here.  Anything that I produced them,
4   there's nothing to produce.  They're just copies
5   of whatever Ed sent to somebody else.
                        Page 19
```

Edward Ross 3-29-06 (2).txt

6      Q      Did you give those copies to your

7  counsel?

8      A      Pardon me?

9      Q      Did you give those copies to Jones Day?

10 Did you give those documents to Jones Day?

11     A      If they've asked me for them, I gave

12 them to them.  I don't recall anyone asking me

13 specifically for any.

14     Q      So you have no recollection that Jones

15 Day asked you for documents or copies of

16 documents?

17     A      There would be no reason to, they'd be

18 identical to Ed's.

19     Q      Well, the reason is that we asked you to

20 produce documents?

21           MR. SHERMAN:  You're either asking

22       questions or you're not doing anything.

23     Q      Have you produced any documents to your

24 counsel?

25     A      Anything my counsel asked me for, he


1           Ross - Noncertified Rough Draft    24

2  got.

3      Q      Did your counsel ask you for documents?

4           MR. SHERMAN:  I'm going to object.  Now

5       you're inquiring about communications between

6       counsel and the witness, counsel and the

7       client.  I'll instruct the witness not to

8       answer.  You made a document production --

9           MR. GOEBEL:  I heard your objection.

Page 20

Edward Ross 3-29-06 (2).txt

```
10              MR. SHERMAN:  Well, you're going to hear
11         more.  You made a request for documents to
12         Midtown that's been responded to.
13         Q    Do you know the name Maurice Stone,
14    Esquire?
15         A    He's an attorney, I know that, with the
16    esquire.
17         Q    Have you dealt him before?
18         A    I have not.
19         Q    Do you know where he works?
20         A    I believe he is either associated with
21    or works with Ed Imperatore.
22         Q    Was he involved in the drafting and the
23    negotiations of the contract of sale?
24         A    I have no idea.
25         Q    Do you know who Joseph Kennedy, Esquire
```

```
1              Ross - Noncertified Rough Draft    25
2    is?
3         A    No.
4         Q    Are you familiar with an affirmation
5    dated on or about January 6, 2005, made by
6    Imperatore in support of its motion to dismiss
7    the complaint?
8         A    I can't hear you.  Can you repeat that?
9         Q    Are you familiar with an affirmation
10    with Imperatore dated on or about January 6,
11    2005, in support of Midtown's motion to dismiss
12    this action?
13         A    I remember the discussion.  You're
14    talking about dismissing the action, I don't
```
Page 21

Edward Ross 3-29-06 (2).txt

15    remember seeing -- perhaps I saw the document.  I

16    don't know.

17        Q    You don't know whether you read or

18    reviewed the Imperatore affirmation?

19        A    If it came to me, I read it as a

20    business person, not at an attorney.

21        Q    Do you know whether you read it after it

22    was submitted?

23        A    If it was submitted to me, I read it.  I

24    would assume probably it was submitted to me.

25    And if it did, I read it.


1              Ross - Noncertified Rough Draft    26

2        Q    Would you be able to determine whether

3    it was submitted to you by reviewing your files?

4        A    I probably could.

5        Q    Either as a representative or as a

6    principal, what percentage of Midtown do you own

7    or control?

8              MR. SHERMAN:  Object to the form.

9        A    Personally, or partnership --

10        Q    Directly or indirectly; would you say

11    half?

12              MR. SHERMAN:  Objection to the form.

13        A    Essentially, it would be 50 percent less

14    a small percentage that was given to some

15    minority partners.  And I would have 50 percent

16    of the remainder and my late partner's estate,

17    his wife and daughter would have the other 50

18    percent of 50.

Page 22

Edward Ross 3-29-06 (2).txt

19    Q    So are there various constituents in
20    Midtown?  Are there various entities comprising
21    Midtown?
22    A    Midtown is made up of W.R. West Side,
23    which is what I represent.  And that is made up
24    essentially of my family partnership and my late
25    partner's family's partnership.  So we would have


1          Ross - Noncertified Rough Draft    27
2    50 percent theoretically of Midtown, half equity
3    participation in Midtown less a few percentage
4    that were given to some people that exerted an
5    amount of effort early in the development of the
6    property.
7    Q    So that would be 50 percent less a small
8    amount for your side and Wechsler's side?
9    A    50 percent of --
10    Q    Of midtown?
11    A    We own 50 percent of the total, less a
12    small percentage.
13    Q    When you say we, Ross?
14    A    The Ross Wexler, my late partner's
15    family.
16    Q    I'm not understanding.  Each family side
17    had 50, less a small percentage?
18    A    Exactly right.  50 percent of 50 percent
19    now.  We only owned 50 percent.
20    Q    50 percent of 50 percent?
21    A    We only owned 50 percent of Midtown.
22    Q    Who is we?
23    A    W.R. West Side.
                    Page 23

Edward Ross 3-29-06 (2).txt

24    Q    Who owns the other 50 percent?

25    A    It's owned by either Hadrian or whatever


1         Ross - Noncertified Rough Draft    28

2    the entity is for the Imperatore.

3    Q    Are this any limited partners in

4    Midtown?

5    A    They're all limited partners except, as

6    far as I know, Ed, myself and Arthur. We're the

7    general. The rest are limited.

8    Q    Can you name, as we sit here, can you

9    name those limited partners?

10   A    Not in -- I can't name them in Hadrian

11   or in the Imperatore side. I can name them on

12   our side.

13   Q    Okay.

14   A    On West Side.

15   Q    Okay. Who are they?

16   A    I'm the general partner and the other

17   par partners are limited partners are my family

18   partnership, called R-win. Tania Wexler, the

19   daughter of my late partner and his wife, Susan,

20   late wife, widow, Susan. She owns the balance.

21   They're all limited partners.

22   Q    But they're limited partners in your --

23   A    In West Side.

24   Q    Who are the limited part Ferraris in

25   Midtown?


Page 24

<pre>
                        Edward Ross 3-29-06 (2).txt
 1                 Ross - Noncertified Rough Draft     29
 2        A     I think I stated before, to the best of
 3     my knowledge, it's myself, Arthur.
 4        Q     You said limited partners side?
 5        A     I have no idea who the limited partners
 6     are on their side.
 7        Q     What percent of Midtown does West Side
 8     own?
 9        A     50 percent.
10        Q     50 percent less a little bit?
11        A     No.  We own 50 percent as West Side.
12        Q     And the Imperatore, what percent percent
13     do they own of Midtown?
14        A     Well, theoretically, they own 50
15     percent.
16        Q     Are there any individuals who are
17     limited partners of Midtown, not the
18     constituents, but of Midtown?
19        A     Yes.
20        Q     Who are they?
21        A     On our side, I gave them to you on West
22     Side.  I have no idea who they are on the
23     Imperatore side.  He's got family and I assume
24     that they divide it up somehow.
25        Q     Midtown is a limited partnership,


 1                 Ross - Noncertified Rough Draft     30
 2     correct?
 3        A     Yes.
 4        Q     And that's a limited partnership that
 5     consists of general partners and limited
                             Page 25
</pre>

Edward Ross 3-29-06 (2).txt

6    partners?

7        A    Traditionally, that's how it happens.

8        Q    I'm still not understanding who the

9    limited partners are of Midtown.

10       A    I think I explained that Midtown could

11   be divided into two pieces.  One is West Side,

12   which is represented by Ross Wexler.

13       Q    Stop right there, if you could.  West

14   Side is a limited partner of Midtown or a general

15   partner of Midtown?

16       A    As far as I know, they're a -- as far as

17   I know, they are a limited partner and I'm the

18   general partner.

19       Q    So that would make you the general

20   partner of Midtown, correct?

21       A    As far as I know, that's correct.

22       Q    And it was in that capacity that you

23   signed the contract of sale?

24       A    I signed it as a general partner, I

25   assume I signed it properly with the authority it


1            Ross - Noncertified Rough Draft    31

2    do it.

3        Q    And the same is true with for the Amtrak

4    agreement?

5        A    If I signed it, signed it in basically

6    because I had the authorization to do it.

7        Q    Are there any employee was Midtown?

8        A    Direct employees?

9        Q    Sure.

Page 26

Edward Ross 3-29-06 (2).txt

10      A    No.   I think from time to time, there

11   were consultants, engineers, so forth, but no

12   other direct employees.

13      Q    There are no employees today, direct

14   employees?

15      A    To my knowledge, no direct employees.

16      Q    Is Ed Imperatore an employee of Midtown?

17      A    No.

18      Q    Is he a principal of Midtown?

19      A    Yes.   He's a principal of Midtown.

20      Q    Is he an attorney for Midtown?

21      A    He is.

22      Q    Aside from Imperatore and aside from

23   Jones Day, and aside from the accountant, are

24   there any other agents that you can think of that

25   are active or have authority to act on behalf of


1              Ross - Noncertified Rough Draft     32

2    Midtown?

3              MR. SHERMAN:   Objection to the form.

4       Q    Are there any agents of Midtown besides

5    the Jones Day, Harwood Lloyd and the

6    accountant --

7              MR. SHERMAN:   Objection to the form.

8       A    Are you referring to agents that have

9    authority to.

10      Q    Not necessarily?

11      A    To speak for Midtown.

12      Q    Not necessarily.   Are had any agents who

13   are acting on behalf of Midtown?

14             MR. SHERMAN:   Objection to the form.
                         Page 27

Edward Ross 3-29-06 (2).txt

15      A    We have a traditional -- in the

16   traditional real estate transaction, we have a

17   broker, a real estate broker.

18          From time to time, we initially had an

19   architect, engineer and other people reviewing

20   the property, but none that represented us on a

21   full-time basis.  They have authority without our

22   approval to do anything.

23      Q    Is there a managing agent?

24      A    Pardon me?

25      Q    Was there a managing agent?


1           Ross - Noncertified Rough Draft    33

2       A    No.

3       A    Who managings the property.

4            MR. SHERMAN:  Objection to the form.

5       A    It's overseen by Ed Imperatore.

6       Q    Does he get paid for overseeing?

7       A    No.

8       Q    Does he have any other consideration for

9    overseeing?  Does he get any other consideration?

10      A    No.  If he does legal work, if his firm

11   does any legal work, he'll be reimbursed like any

12   other outside counsel.

13      Q    Are there any contracts of sale aside

14   from the one introduced earlier, are there any

15   contracts of sale with respect to the property

16   that are currently pending?

17           MR. SHERMAN:  Objection to the form.

18      Q    Are there any other contracts of sale

Page 28

Edward Ross 3-29-06 (2).txt
19    for Midtown with respect to the property?

20        A    Existing today?

21        Q    Existing today?

22        A    There are, there is.

23        Q    Are are there any outstanding written or

24    oral agreements with brokers with respect to the

25    property with respect to -- excuse me, you have


1              Ross - Noncertified Rough Draft    34

2    to repeat that.

3        Q    Are there any brokerage agreements with

4    respect to the outstanding contract you referred

5    to?

6        A    I have a verbal agreement with a broker.

7        Q    Verbal agreement with who?

8        A    Elaine Emmet.

9        Q    With her individually or with her firm?

10        A    With her individually.

11        Q    And does she have an oral -- let me back

12    up.  Is there another broker involved in the

13    transaction?

14        A    If there is, I'm not aware of it.

15        Q    What is the substance of that or will a

16    agreement with Elaine Emmet?

17        A    She's doing what a normal broker would

18    do to try to follow our instructions on what we

19    decide do the property from time to time.

20        Q    Has she followed your instructions to

21    date.

22        A    Generally, I'd say, yes.

23        Q    You said she's?
                          Page 29

Edward Ross 3-29-06 (2).txt

24      Q      Is he the broker responsible or entitled

25      to commission on the outstanding deal?


1              Ross - Noncertified Rough Draft      35

2       A      I would say, yes.

3       Q      And you have an oral understanding?

4       A      Correct.

5       Q      What are the terms of the oral

6       understanding?

7       A      You lost me.

8       Q      What are the terms of that brokerage

9       agreement?

10      A      Would that be privileged?

11             MR. SHERMAN:   No.

12      A      She would get 1-1/4 percent of the gross

13      sale amount and the existing contract in place.

14      Q      How many existing contracts are there?

15      A      Just one.

16      Q      What property does it cover?

17      A      It covers the two lots, the same two

18      lots we referred to before.

19      Q      Any others?

20      A      I think there's one other lot.  I get

21      lost on the streets.  It would be a block north

22      of 39, which would be 40.  There's another small

23      little 20,000 square foot piece, possibly three.

24      Q      So there are three properties, two we

25      referred to and this one, that you just

10/05/2005 11:49 FAX    JUPITER REALTY CORP    @002

8 7 1 5 0 1 0 6

87150106

# WR WEST SIDE ASSOCIATES
## AGREEMENT AND
### CERTIFICATE OF LIMITED PARTNERSHIP

87150106

This Document prepared by
Ira A. Kipnis
919 North Michigan Avenue
Chicago, Illinois  60611

MID 00857

5/05/2005 11:49 FAX                    JUPITER REALTY CORP                    ☏003

# 3 7 1 5 0 1 0 6

## WR WEST SIDE ASSOCIATES
### AGREEMENT AND
### CERTIFICATE OF LIMITED PARTNERSHIP

THIS AGREEMENT AND CERTIFICATE OF LIMITED PARTNERSHIP (the "Agreement") of WR WEST SIDE ASSOCIATES, an Illinois limited partnership (the "Partnership"), is entered into and executed as of the 2nd day of February, 1987 by and between Jerrold Wexler, and Edward W. Ross, as general partners ("General Partners") and those limited partners of the Partnership designated on Exhibit A attached hereto and made a part hereof. "Partners" without designation as to "General" or "Limited" include the General Partners and the Limited Partners.

### RECITALS:

WHEREAS, the parties desire to form a limited partnership pursuant to the Uniform Limited Partnership Act of the State of Illinois ("ULP") for the purposes and on the terms and conditions hereinafter set forth.

1. The Partners hereby form a limited partnership pursuant to the provisions of the ULPA under the name "WR WEST SIDE ASSOCIATES" or such other name as may hereafter be adopted. All transactions of the Partnership shall be carried on in such name. The General Partners and the Limited Partners shall be the parties designated aforesaid. The addresses of the Partners are set forth on the signature pages hereof. The Partners agree to execute such certificates or documents and do such filings and recordings in the appropriate offices in the States of Illinois and New York as may be required in order to comply with all applicable laws. A Limited Partner may change such address by written notice to the General Partners which notice shall be effective upon receipt.

2. <u>Purpose</u>. The purpose of the Partnership shall be to carry on the business of investing in real property by directly or indirectly acquiring and holding an interest in the Property or in a general or limited partnership owning or acquiring the Property and improving, developing, holding for investment, maintaining, operating, mortgaging, managing, leasing, exchanging, otherwise exploiting and ultimately disposing of the Property; to engage in any other lawful activity permitted under the Act; and to invest in other properties and investments and to engage in any and all activities related and incidental thereto as may be deemed appropriate by the General Partners.

3. <u>Place of Business and Principal Office</u>. The principal place of business of the Partnership is 15th Floor, 919 North Michigan Avenue, Chicago, Illinois 60611, or at such other place within the State of Illinois as the General Partners may designate by notice to the Limited Partners.

10/05/2005 11:50 FAX                JUPITER REALTY CORP                            ☑004

0 7 1 5 0 1 0 6

4. <u>Definitions and Glossary of Terms</u>. The following definitions shall be applicable to the terms set forth below as used in this Agreement:

(a)    ADDITIONAL CAPITAL means contributions to the capital of the Partnership made pursuant to Section 6(b).

(b)    ADDITIONAL LIMITED PARTNERS means any Limited Partners of the Partnership admitted subsequent to the date of this Agreement pursuant to the provisions of Section 8(f) hereof.

(c)    AFFILIATE means any Person directly or indirectly through one or more intermediaries, that controls, is controlled by or is under common control with another specified Person or entity, as the case may be.

(d)    CAPITAL ACCOUNT means the separate capital account maintained for each Partner maintained in accordance with Section 6(g) hereof.

(e)    CAPITAL CONTRIBUTION means the aggregate amount of investment in the Partnership, including both initial and Additional Capital contributions, by a Partner or all Partners, as the case may be.

(f)    CASH FLOW means the Partnership's cash funds provided from operations, without deduction for depreciation, but after deduction of cash funds used to pay all other expenses, debt principal and interest payments, capital improvements and replacements, and management and administration fees.

(g)    FINANCIAL STATEMENTS means the Partnership's balance sheets, statements of income, statements of partners' equity and statements of changes in financial position, prepared in accordance with generally accepted accounting principles.

(h)    INTEREST means each Partner's percentage interest in the Partnership as set forth in Exhibit A hereto.

(i)    NET CAPITAL PROCEEDS means all amounts received from a sale, mortgage or refinancing of a mortgage, foreclosure, abandonment, condemnation or other disposition or encumbrance of all or substantially all of the interest of the Partnership in the Property or any portion thereof, any insurance proceeds for reimbursement of a loss as a result of a fire, flood or other casualty to all or substantially all of the Property, less all expenses and tax liabilities attributable to such Net Capital Proceeds, any mortgage or other indebtedness or portion thereof satisfied out of such Net Capital Proceeds, the cost of any improvement, repair or replacement of such property, and any addition to the Reserves, and excluding dispositions of personal

2

10/05/2005 11:50 FAX          JUPITER REALTY CORP                    ☒005

0 7 1 5 0 1 0 6

property and equipment in the ordinary course of business. Any item included or deducted in determining Net Capital Proceeds shall not be included or deducted in determining Cash Flow.

(j)   NET WORTH means the excess of total assets over total liabilities as determined by generally accepted accounting principles, except that if any of such assets have been depreciated, then the amount of depreciation relative to any particular asset may be added to the depreciated cost of such asset to compute total assets, provided that the amount of depreciation may be added only to the extent that the amount resulting after adding such depreciation does not exceed the fair market value of such asset.

(k)   PARTICIPANT means the holder of an Interest in the Partnership.

(l)   PARTNERSHIP means WR West Side Associates, an Illinois limited partnership.

(m)   PERSON means any natural person, partnership, corporation, trust, association or other legal entity.

(n)   PROFITS or LOSSES means the net profits or losses of the Partnership for federal tax purposes.

(o)   PROPERTY means the real estate located in New York, New York, legally described in Exhibit B hereto, and all improvements now or hereafter constructed thereon.

(p)   PROPERTY MANAGEMENT FEE means the fee paid for day-to-day professional management services in connection with the Partnership's property or investments.

(q)   RESERVES means such amounts set aside at the reasonable discretion of the General Partners to pay for repairs, maintenance, improvements, or contingent or unforeseeable liabilities or obligations which the General Partners deem necessary or appropriate for the operation and protection of the Partnership.

(r)   STANDARD REAL ESTATE COMMISSION means that real estate or brokerage commission paid for the purchase or sale of property which is reasonable, customary and competitive in light of the size, type and location of property.

5.   Term.   The term of the Partnership shall commence February 2, 1987 and shall continue until December 31, 2037, or unless and until all of the assets of the Partnership are sooner converted to cash or its equivalent, or unless and until sooner terminated in accordance with the terms of this Agreement or as otherwise provided by law.

3

37 1 50 1 06

8.  **Capital Contributions and Capital Account.**

(a)    Each Partner has made an initial capital contribution in cash equal to the sum of $1,000.00 multiplied by that Partner's Interest as set forth in Exhibit A hereto.

(b) (1)    The General Partners have advised all of the Limited Partners that the Partnership in the future may need additional funds for the cost of operating and improving the Property and other Partnership purposes.  The Limited Partners acknowledge that Additional Capital Contributions may be required from them in accordance with their respective Interests not only for operating capital, but for any proposed Partnership purpose.  When the General Partners, in the exercise of their sole discretion, determine that Additional Capital Contributions are necessary for the purpose of operating capital, the operation of the business and affairs of the Partnership, financing any deficits, or for the making of any capital or other improvements to the Property, or for any other proper Partnership purpose, and if the General Partners shall determine that such funds can best be obtained by additional equity capital or by bank or other borrowings requiring the several, but not joint, guarantees of all Partners, then such additional funds or guarantees shall be made and/or furnished by the General Partners and the Limited Partners in proportion to their Interests and the General Partners shall proceed as set forth below.

(2)    The General Partners shall notify in writing each of the Limited Partners (each of the Partners who are required to make Additional Capital Contributions are referred to sometimes hereafter as "Contributing Partners") of the need for the Additional Capital Contributions, the amount of funds necessary, the intended use of the proceeds, the desired method of financing (whether by borrowing or additional equity capital), the amount of additional funds, or the amount of guaranty liability, required from each Contributing Partner, and such other information as the General Partners shall deem necessary.  The decision as to the method of borrowing or acquiring such Additional Capital Contributions shall be made by the General Partners in their sole and unconfined discretion and such decision, once made, shall be binding upon all of the Contributing Partners.

(3)    Within 15 days after delivery of the aforesaid notice by the General Partners, each Contributing Partner shall by notice in writing delivered to the Partnership (i) agree to contribute the required Additional Capital Contribution in cash, or agree to guarantee his proportionate share of the additional borrowings, as the case may be, in proportion to his Interest; or (ii) notify the Partnership of his refusal to contribute or guarantee (a "Declining Partner").  If any Contributing Partner

4

10/05/2005 11:50 FAX                    JUPITER REALTY CORP                    ☒007

8 7 | 5 0 | 0 6

shall fail to respond to the initial notice from the General Partners within said 15 day period, such failure shall be deemed to be a refusal to participate on the part of the Contributing Partner failing to respond.

(4) If any Contributing Partner shall fail to contribute to the Partnership the Additional Capital Contribution required to be contributed under this Section 6(b) or guarantee his proportionate share of the additional borrowings (the "Deficiency"), the General Partners may, in their discretion, exercise any one or more of the following remedies on behalf of the Partnership:

(i) Pursue any available remedy or remedies against the defaulting Contributing Partner in law or in equity; or, alternatively,

(ii) Advise the non-defaulting Partners that they may elect, in such proportion as they may determine, to make such additional contribution by giving notice to the General Partners of their intention to make such Additional Capital Contributions within ten (10) days after receipt of such advice. In the event two (2) or more Partners desire to make such contribution and are unable to agree as to the apportionment thereof, each such Partner shall be entitled to make such contribution in the ratio that his Interest bears to the total Profit Interest Percentages of the Partners desiring to make such contribution. In the event a Partner makes such contribution, or part thereof, the Partner making such contribution, to the extent thereof, shall become an assignee of the Declining Partner's Interest under the Uniform Limited Partnership Act on a pro rata basis.

(iii) Notwithstanding anything to the contrary herein, the General Partners shall not have the right to elect the remedy set forth in Section 6(b)(4)(i) above, against a Declining Partner after such Partner has made total Additional Capital Contributions equal to the sum of $2,000,000.00 multiplied by his Interest, but the General Partners shall continue to have the right to proceed against such Declining Partner under the remedy set forth in Section 6(b)(4)(ii).

(iv) No creditor of the Partnership shall have any rights as a third party beneficiary, or otherwise, by virtue of any provisions of this Agreement, nor any right to enforce payment of any Additional Capital Contributions by any Partner. Anything to the contrary herein expressed or implied notwithstanding, no Limited Partner shall be personally liable for any of the debts of the Partnership or any of the liabilities thereof

5

MID 00862

3 7 1 5 0 1 0 6

beyond the amount required to be contributed to the capital of the Partnership.

(c)  In the event that the maker of a loan or the issuer of a standby loan commitment to the Partnership secured or to be secured by a mortgage on the Property has a right to an equity interest in the Partnership whether in the form of a limited partnership interest or otherwise, the Interest of each Partner shall be reduced pro-rata to the extent necessary to satisfy such lender's right, such reduction to take place at the time said lender is to acquire its equity interest.

(d)  Each Partner's Interest shall be stated after his name in Exhibit A attached hereto.

(e)  if any Partner advances any funds to the Partnership in excess of his Capital Contribution, the amount of any such advance shall neither enlarge such Partner's Capital Account nor increase his Interest in Profits, Losses, Cash Flow or Net Capital Proceeds but shall be an obligation of the Partnership to such Partner, except that such advances shall be payable only from Partnership assets and the General Partners collectable shall not be obligated to repay any part thereof unless specifically agreed upon in writing.

(f)  Interest earned on Partnership funds shall inure to the benefit of the Partnership, and Limited Partners individually shall not receive interest on funds contributed by them.  No Limited Partner shall be entitled to withdraw any part of his Capital Contribution until dissolution of the Partnership.

(g)  A separate capital account shall be maintained for each Partner in accordance with the following provisions, which are intended to comply with the Treasury Regulations §1.704-1(b) and which shall be interpreted and applied in a manner consistent with such Regulations:

(i)  There shall be credited to the Capital Account of each Partner (1) all cash contributions of such Partner to the Partnership, (2) the fair market value of property contributed to the Partnership (net of liabilities assumed by the Partnership and liabilities to which such contributed property is subject), (3) such Partner's share of profits (including income exempt from tax and gain on sale or disposition of Partnership property), (4) the amount of any liabilities of the Partnership assumed by the Partner, and (5) the amount of any basis increase in Partnership property attributable to investment credit recapture allocated to such Partner (the aggregate of such credits is hereinafter sometimes referred to as the "Partner's Capital Credits").  There shall be debited to the Capital Account of each Partner (1) distributions to such Partner of Cash Flow and Net

6

MID 00863

10/05/2005 11:50 FAX JUPITER REALTY CORP ☒009

## 8 7 1 5 0 1 0 6

Capital Proceeds, (2) the fair market value of property distributed to such Partner (net of liabilities assumed by such Partner and liabilities to which such distributed property is subject, (3) such Partner's share of losses or items thereof (including expenditures which can neither be capitalized nor deducted for tax purposes, organization and syndication expenses not subject to amortization, and loss on sale or disposition of Partnership property, whether or not disallowed under the rules of Code Section 267 or 707), (4) the amount of any liabilities of such Partner assumed by the Partnership, and (5) the amount of any basis decrease in Partnership property attributable to investment credit allocated to such Partner (the aggregate of such charges is hereinafter sometimes referred to as the "Partner's Capital Charges"). To the extent that a Partner's Capital Credits exceed such Partner's Capital Charges, such excess is hereinafter referred to as a "positive balance". To the extent that a Partner's Capital Charges exceed such Partner's Capital Credits, such excess is hereinafter referred to as a "deficit balance".

(ii) Upon the sale or exchange of an interest in the Partnership, (1) if such sale or exchange causes a termination of the Partnership within the meaning of Section 708(b)(1)(B) of the Code, the income tax consequences of the deemed distribution of Partnership property and the deemed immediate contribution of Partnership property to a new partnership (which for all other purposes continues to be the Partnership) shall be governed by the relevant provisions of the Code and the regulations promulgated thereunder, and the Capital Accounts of the Partnership shall be redetermined in accordance with this Agreement; or (2) if such sale or exchange does not cause a termination of the Partnership within the meaning of Section 708(b)(1)(B) of the Code, the Capital Account of the selling or exchanging Partner will be carried over to the transferee Partner to the extent it relates to the transferred interest.

(iii) If, after capital is contributed pursuant to Sections 6(a), (b) above, and subject to the provisions of Section 6(b), money or property in other than a de minimus amount is contributed to the Partnership in exchange for an interest in the Partnership but the Partnership is not liquidated, the Capital Accounts of the Partners shall be adjusted based on the fair market value of partnership property at the time of such contribution or distribution (taking into account Code Section 7781(g)) and the unrealized income, gain, loss or deduction inherent in such Partnership property which has not previously been reflected in the Capital Accounts shall be allocated among the Partners as if there had been a taxable disposition of the Partnership property at its fair market value on such date. The fair

7

37150106

market value of contributed, distributed or revalued property shall be agreed to among the Partners or, if there is no such agreement, shall be determined by appraisal. If property of the Partnership has a fair market value different than its tax basis to the Partnership at the time of contribution, distribution or reevaluation so that the fair market value rather than tax basis of such property is used to determine the Capital Accounts of the Partnership, depletion, depreciation, amortization and gain or loss with respect to such property shall be computed on the basis of its fair market value using the same method and period as used for tax purposes and the Capital Accounts of the Partners shall be adjusted for their respective shares of such depletion, depreciation, amortization, and gain or loss on the basis of fair market value rather than tax basis. Depletion, depreciation, amortization, and gain or loss for tax purposes shall be allocated to each Partner for tax purposes, to the maximum extent possible, to eliminate any disparity between the Capital Accounts of the Partners as if they had been accounted for using tax basis and the Capital Accounts computed using the fair market value of such property. For this purpose, the Capital Account using the tax basis of a Partner who receives a distribution giving rise to a special basis adjustment to Partnership property under Code Section 734(b) shall be adjusted in an amount corresponding to such basis adjustment.

(iv)  Nothing herein shall be construed to impose upon any Partner an obligation to restore a deficit Capital Account upon liquidation or dissolution of the Partnership.

7.  Profits, Losses and Distributions.

(a)  The Profits and Losses of the Partnership, other than Profits and Losses from an event which could give rise to Net Capital Proceeds (whether or not any net capital proceeds are actually generated) shall be allocated for each fiscal year on the books of the Partnership and for federal income tax purposes to and among the Partners in accordance with their respective Interests as shown on Exhibit A hereto.

(b)  The Partnership shall make quarterly distributions (commencing with the calendar quarter subsequent to the one in which the Partnership was formed) of all the Cash Flow generated by the business operations of the Partnership, less such amount set aside for the restoration or creation of Reserves; Cash Flow shall be distributed to and among the Partners in accordance with their respective Interests as shown on Exhibit A hereto.

(c)  Profits from an event which could give rise to Net Capital Proceeds (whether or not net capital proceeds are actually generated) shall be allocated in an amount equal to the

8

3 7 1 5 0 1 0 6

Net Capital Proceeds generated from such event in accordance with the provisions of Section 7(e); provided that if the Net Capital Proceeds generated exceed the Profits from the event, the amount of Profits allocated to each Partner with a positive balance in his capital account (determined immediately prior to the event) shall be reduced in proportion to those positive balances until the Profit allocated pursuant to this sentence equals the total profit to be allocated.  Any remaining Profit shall first be allocated to the Partners with deficit balances in their Capital Accounts (determined prior to the allocation set forth in the immediately preceding sentence) in proportion to those deficit balances until those balances are equal to zero, and then shall be allocated among the Partners in accordance with their Interests as shown on Exhibit A hereto.

(d)  Losses from an event which would give rise to Net Capital Proceeds (whether or not any Net Capital Proceeds are actually generated) shall be allocated first, to and among those Partners having positive balances in their Capital Accounts (determined immediately prior to the event) in proportion to and to the extent of such positive balances; and second, to and among the Partners in accordance with their respective Interests in cash distributions as shown on Exhibit A hereto.

(e)  Net Capital Proceeds of the Partnership shall be distributed in the following order of priority:

(i)  If the event generating Net Capital Proceeds is not incident to or does not result in the liquidation of the Partnership, Net Capital Proceeds shall be allocated and distributed to and among the Partners in accordance with their Interests in cash distributions as shown on Exhibit A hereto.

(ii)  If the event generating Net Capital Proceeds is incident to results in the liquidation of the Partnership, Net Capital Proceeds therefrom shall be allocated in accordance with Section 10(c), anything herein to the contrary notwithstanding.

(f)  Tax credits shall be allocated to and among Partners in accordance with their Interests.  The amount of any recapture of tax credits (including but not limited to investment tax credits) shall be allocated to the Partners.

(g)  No Partner shall have priority over any other Partner either as to return of capital or as to Profits, Losses, or Capital Contributions.

8.  Management of Partnership Affairs.

9

10/05/2006 11:51 FAX         JUPITER REALTY CORP         ☑012

8 7 1 5 0 1 0 6

(a) The General Partners shall have full, exclusive and complete authority and discretion in the management and control of the business of the Partnership for the purposes herein stated and shall make all decisions affecting the business of the Partnership except as provided in Section 8(g). The decision of either of the General Partners shall bind the Partnership.

(b) By way of extension and clarification of the grant of authority in Section 8(a) hereof and not in limitation thereof, the General Partners are specifically authorized and empowered on behalf of the Partnership, except as expressly prohibited by Section 9(g), to:

(i) acquire interests in properties and investments of every kind and description including, but not limited to the Property;

(ii) expend the Partnership's capital and revenues in furtherance of the purposes of the Partnership;

(iii) manage, operate and develop any Partnership properties or investments, and enter into Partnership and operating agreements with others upon such terms, provisions and conditions as the General Partners shall approve; provided, however, that the expenses of operating Partnership properties and investments shall be billed directly to the Partnership and shall not include indirect expenses of the General Partners such as the salaries of its officers and employees and its overhead.

(iv) enter into and execute (1) agreements and any and all documents and instruments customarily employed in connection with the acquisition, sale, development, and operation of Partnership property, (2) agreements, commitments and any and all documents and instruments customarily employed in financing, (3) receipts, releases and discharges, and (4) all other instruments deemed by the General Partners to be necessary or appropriate to the proper operation or development of Partnership properties or to perform effectively and properly their duties or exercise their powers hereunder.

(v) sell, lease, exchange or otherwise dispose of all or any portion of the property or the Partnership's assets and investments upon such terms and conditions and for such consideration as the General Partners deem appropriate; provided, however, that no real estate commissions will be paid to Affiliates of any General Partner by the Partnership and provided further that the General Partners will advise the Partners of any proposed sale and give them an opportunity to comment thereon;

MID 00867

10/05/2005 11:51 FAX                    JUPITER REALTY CORP                        ☒013

3 7 1 5 0 1 0 6

(vi)    borrow money from banks, other lending institutions and other lenders for any Partnership purpose, and in connection therewith to issue notes, debentures and other debt securities and to pledge, mortgage or hypothecate the Property or assets of the Partnership to secure repayment of the borrowed sums; and to execute and deliver to the holder or holders of loans secure by mortgages on the Property or assets of the Partnership agreements for a deed or deeds in lieu of foreclosure, and do any other things and execute any other documents in connection therewith;

(vii)   employ or retain such individuals, firms or corporations, including a General Partner acting on his own behalf and his Affiliates, for the operation and management of the Property or assets, including, without limitation, of supervisors or managing agents, building caretakers, accountants, attorneys, appraisers, architects, engineers and other experts, on such terms and at such compensation as the General Partners shall determine; provided however, that any contract entered into with a General Partner or his Affiliates shall not be less favorable than, and any charges for property or services shall not be in excess of, such terms or charges customarily imposed by non-Affiliates in the same line of business and in the same geographic area; and provided further that such contracts with Affiliates shall have a provision permitting termination by the Partnership upon not more than 60 days notice without penalty;

(viii)  employ a Partnership secretary or a Partnership manager to operate under the direction of the General Partners, at the expense of the Partnership;

(ix)    commence, defend and settle actions at law or in equity at the expense of the Partnership;

(x)     hold title to the Property in the name of a land trust, General Partner or any other Person or entity as nominee or agent on behalf of the Partnership, but the name in which the Property is held shall in no way change the interest of the Partnership in the Property; and

(xi)    be reimbursed for all expenses incurred in conducting the Partnership business, all taxes paid by the General Partner in connection with the Partnership business, and all costs associated with the development, organization and operation of the Partnership.

(xii)   to become a general partner of a general or limited partnership which shall own and operate the Property and/or other property.

11

MID 00868

8 7 1 5 0 1 0 6

(c)  The General Partners, their agents and employees shall not be liable or responsible or accountable in damages or otherwise to the Partnership or any of the Partners or their successors or assigns for any acts performed or within the scope of the authority conferred on the General Partners and such agents and employees by this Agreement, including the execution and delivery of deeds in lieu of foreclosure, provided that the General Partners or such agents or employees shall act in good faith and shall not be guilty of willful misconduct or gross negligence.

(d)  Each of the Partners hereby constitutes and appoints Edward W. Ross as the "tax matters partner" of the Partnership for all purposes, pursuant to Sections 6221-6231 of the Internal Revenue Code.   The Partnership shall not be obligated to pay any fees or other compensation to the tax-matters partner in his capacity as such, provided that the Partnership shall reimburse the tax-matters partner for any and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and other professional fees) incurred by it in its capacity as a tax-matters partner.  The Partnership shall indemnify, defend, and hold the tax-matters partner harmless from and against any loss, liability, damage, cost or expense (including reasonable attorneys' fees) sustained or incurred as a result of any act or decision concerning Partnership tax matters and within the scope of such Partner's responsibilities as tax-matters partner.

(e)  In the event of a distribution of properties made in the manner provided in Section 734 of the Code or in the event of a transfer of any interest in the Partnership permitted by this Agreement made in the manner provided in Section 743 of the Code, the General Partners, on behalf of the Partnership, shall, at the request of any Partner, file an election under Section 754 of the Code in accordance with the procedures set forth in the applicable regulations promulgated thereunder.

(f)  In the event the General Partners determine that additional equity funds are necessary for the operation of the business and affairs of the Partnership and that such funds would most appropriately be obtained by additional equity capital from limited partners, the Partnership may sell additional limited partnership interests in the Partnership to investors ("Additional Limited Partners") on such terms and conditions as the General Partners shall determine, with such Additional Limited Partners having such rights and obligations as the General Partners shall determine.  In furtherance of the foregoing, each Partner hereby agrees and consents to the decrease in the Interests in Profits, Losses, Cash Flow and Net Capital Proceeds allocated to all of the Partners subject to the conditions herein set forth.  Such additional interests may be prior to or on a parity with the interests of the Limited

12

MID 00869

3 7 1 5 0 1 0 6

Partners; provided, however, that (i) any dilution of the Interests in Profits, Losses, and cash distributions of the Partners shall be made on a pro rata basis (before giving effect to clause (ii) hereof); and (ii) the General Partners shall first offer the Partners the right to subscribe for a proportionate share, pro rata to their respective Interests, in such additional interests for a 30-day period after the General Partners provide written notice to the Limited Partners of the availability of such additional Interests, and prior to offering said Interests to others.

(g) Neither the General Partners nor any Affiliates of the General Partners shall have the authority to:

(i) receive from the Partnership a rebate or give up or participate in any reciprocal business arrangements which would enable them or any Affiliate to do so;

(ii) do any act in contravention of this Partnership Agreement;

(iii) confess a judgment against the Partnership in connection with any threatened or pending legal action;

(iv) possess any Partnership property or assets or assign the rights of the Partnership in specific Partnership property for other than a Partnership purpose;

(v) without the consent of a majority of eighty per cent (80%) in Interests held by the Limited Partners as a group, cause the Partnership to purchase or lease any property or interests in which the General Partners or their Affiliates have an interest;

(vi) without the consent of a majority of eighty per cent (80%) in Interests held by the Limited Partners as a group, cause the Partnership to acquire property or interests from any other limited partnership in which the General Partners or any of them or their Affiliates have an interest;

(vii) cause the Partnership to pay any real estate commissions to the General Partners or Limited Partners or any of them or their Affiliates on resale of Partnership property;

(viii) cause the Partnership to sell or lease to a General Partner any of its properties;

(ix) cause the Partnership to make any loans to Participants or Affiliates;

13

3 7 1 5 0 1 0 6

(x) cause the Partnership to acquire any properties in exchange for interests in the Partnership; or

(xi) commingle the Partnership's funds with those of any other person or employ or permit another to employ such funds or assets in any manner except for the exclusive benefit of the Partnership.

(h) The General Partners shall use their best efforts, and devote such time as may be necessary to carry out the business of the Partnership and shall promptly take all action which they, in their sole discretion, may deem necessary or appropriate for the organization of the Partnership, investment of Partnership funds and protection of the Property. In particular, the General Partners shall use their best efforts to:

(i) perfect the Partnership by filing a certificate of limited partnership for record in the office of the register of deeds for the counties where the Partnership may be deemed to conduct business;

(ii) cause the Partnership to obtain and keep in force insurance of such types, including but not limited to fire and extended coverage and public liability insurance, in such amounts and with such carriers as will, in the judgment of the General Partners, adequately protect the Partnership and the Property, and to satisfy any judgment, decree, decision, settlement, damage or other loss, first, out of any insurance proceeds available therefor, and second, from Partnership assets and income;

(iii) cause the Partnership to remain in compliance with all statutes and regulations governing the Partnership and its business operations and to cause all Partnership reports, documents and income tax returns to be prepared and timely filed with the appropriate authorities;

(iv) open and maintain bank accounts in the name of the Partnership, deposit therein all funds of the Partnership, arrange for withdrawals only upon the signature of the General Partners and/or their designee or designees, and use such funds solely for the business of the Partnership; provided, however, that any funds not currently needed in the operation of the Partnership business shall be maintained in such interest-bearing accounts insured by an agency of the federal government or invested in such short term obligations (maturing within one year) as may be designed by the General Partners;

(v) not resign as a General Partner, subject to the provisions of Sections 9(e) and 10(b) hereof;

14

3 7 1 5 0 1 0 6

(vi) maintain at the expense of the Partnership complete and accurate records and books of account in which shall be entered fully all transactions and expenditures of the Partnership; furnish to the Limited Partners (1) annual reports including information necessary for the preparation of Partners' income tax returns (to be furnished within 75 days after the end of each calendar year), (2) a summary of Partnership activities, of compensation paid to the General Partners and their Affiliates, of distributions of Cash Flow and Net Capital Proceeds to Limited Partners, of proceeds from disposition of property and investments, and of lease payments, (3) a statement of reserves from the gross proceeds of the Partnership's offering, (4) audited Financial Statements prepared by an accountant to be furnished within 90 days after the year end, and (5) annual management statements respecting any property owned by the Partnership within 30 days following the end of each fiscal year of the Partnership.

(i) All the Partners hereby ratify, affirm, acknowledge and agree to be bound by all acts performed or to be performed and contracts entered into or to be entered into on behalf of the Partnership and in the negotiation for properties to be acquired by the Partnership. No party, including a bank or other lending institution, shall be required to inquire as to the purposes for which an act is performed, a contract is entered into or funds are used, it being conclusively presumed that such are to be and shall be used for purposes authorized under this Agreement.

(j) The General Partners, their employees, designees, nominees, officers and directors shall not be liable, and shall be entitled to indemnity (to the extent of the Partnership's assets), for any liability, costs and expenses including reasonable attorneys' fees incurred as a result of any act performed in good faith and within the scope of the authority conferred by this Agreement, or any omission or error in judgment, unless caused by misconduct or negligence.

9.   Rights of Limited Partners.

(a) No Limited Partner, as such, shall take part in the management, conduct or control of the business of the Partnership, or have any power to sign for or bind the Partnership.

(b) Subject to the provisions of Section (6)(b), no Limited Partner shall be subject to assessment or personal liability for any debts or losses of the Partnership in excess of the amount of his Capital Contribution plus his share of undistributed Cash Flow and Net Capital Proceeds.

15

10/05/2005 11:52 FAX          JUPITER REALTY CORP                    ☒013

# 3 7 1 5 0 1 0 6

(c)   Upon dissolution, each Limited Partner shall have the right to receive only cash (and not other property) of the Partnership in return for his Capital Contribution or as to Profits, Losses, or cash distributions, and if the Partnership property remaining after the payment or discharge of debts and liabilities of the Partnership is insufficient to return said Capital Contributions, the Limited Partners shall have no recourse against the General Partners or any other Limited Partner.

(d)   The Limited Partners or their representatives shall have the right to inspect and copy during normal business hours any Partnership books, records and such documents as the General Partners may execute, to have on demand true and full information of all things affecting the Partnership and a formal account of Partnership affairs whenever circumstances render it just and reasonable, and to obtain upon written request and for a proper purpose a list of names, addresses, Capital Contributions and Interests of each Limited Partner.

(e)   In the event that a General Partner shall become bankrupt, or refuse or be unable to act as a General Partner, the Partners, pursuant to the provisions of Section 10(b) below, may immediately elect a new and substitute General Partner, who shall succeed to all the rights of said General Partner pursuant to the terms of this Agreement.

(f)   Each Limited Partner agrees that he shall not, directly or indirectly, hypothecate, pledge, grant a security interest in, transfer or assign his Interest in the Partnership, except as provided in Section 9(h) and (i).

(g)   Transfers shall be recognized when consented to as effective on the last day of the calendar month following receipt by the General Partners of the above-mentioned documents and fee.   Except as otherwise provided in Section 6(g)(ii), the Profits, Losses and Cash Flow of the partnership for the year of transfer shall be allocated between the transferor and the transferee on a calendar month basis in proportion to the number of calendar days that each such holder was recognized as the owner of the Interest transferred during the year without regard to the date, amount or receipt or any distribution which may have been made with respect to the Interest transferred; provided that any Profits or Losses on an event which could give rise to Net Capital Proceeds shall be allocated to the Partners on the date such event occurs.

(h)   Upon the death or legal incompetency of an individual Limited Partner, or upon the bankruptcy, dissolution or cessation to exist as a legal entity of a Limited Partner not an individual, the legally authorized representative shall succeed to all of the rights granted by this Agreement to such Limited Partner.

16

10/05/2005 11:52 FAX                     JUPITER REALTY CORP                     ☒019

## 3 7 1 5 0 1 0 6

(i) Except as hereinafter provided, no Partner may make any transfer of his Interest in the Partnership or any part thereof other than by bona fide sale.   In the event of a contemplated bona fide, inter vivos sale by a Partner of all or any part of his Interest in the Partnership, each of the other Partners shall have the prior right to purchase said Interest or said part thereof in the manner hereinafter provided:

(I) the selling Partner shall forthwith give the Partnership and all the other Partners a true and complete copy of the offer to purchase and written notice of the name and address of the offerer and the price and all terms and conditions of the proposed sale;

(ii) each of the non-selling Partners may, within fifteen (15) days after the mailing of the selling Partner's notice, give notice to the selling Partner and to the remaining Partners, of his desire to exercise his option to purchase his pro rata share (based on the ratio of his Interest in Profits to the aggregate of all Partners, other than the selling Partner's Interest in Profits) of the selling Partner's Interest or portion thereof as is within the contemplated sale upon the terms and conditions and at the price specified in the selling Partner's notice, is hereby granted to the Partners who exercised such first option to acquire (pro rata as among themselves in accordance with their Interests in Profits as of the date of the giving of the original notice) the share to which a Partner has not exercised his first option;

(iii) unless the remaining Partners shall have exercised their options within said 45-day period in such a manner as to purchase all of such offered Interest of the selling Partner, the selling Partner shall be free to dispose of such Interest for an additional period of thirty (30) days but only in the manner stated by him in his original notice to the Partnership and the other Partners; in the event that the selling Partner fails to dispose of said Interest or portion thereof during such period, the provisions hereof shall be applicable to any further contemplated disposition by said Partner of his Interest or any portion thereof;

(iv) no purported assignment of any Partner's Interest shall be valid unless made in accordance with the terms and provisions of this Agreement and if such assignment is to a Person not theretofore a party to this Agreement, such assignee shall prior to making of such assignment execute and deliver to the General Partners an instrument in writing signifying his consent (1) to be bound by the terms of this Agreement as then amended and (2) to accept as a

17

10/05/2005 11:52 FAX                JUPITER REALTY CORP                    ☒020

## 8 7 1 5 0 1 0 6

Partner all the terms and provisions of this Agreement as then amended, and shall execute and deliver an amendment to the certificate of the Partnership reflecting the assignee's Interest as a Partner. The continuing and surviving Partners shall accept as a Limited Partner in this Partnership any assignee who has succeeded to an Interest in the Partnership in accordance with this subparagraph. The assignee of a General Partner's Interest pursuant to this subparagraph shall hold such Interest as a Limited Partner unless the other Partners consent to such assignee becoming a General Partner pursuant to Section 10(b).

(j) Section 9(i) shall not be applicable to any of the following:

(i) an _inter vivos_ gift by a Partner of a portion of or all of his Interest in the Partnership to his spouse, children, grandchildren, parents or brothers or sisters, or to a trust for their benefit, provided such donee executes and delivers prior to the making of such gift the consent and assumption and amendment which is referred to in Section 9(i)(iv) above and provided further that the donee of an Interest of a General Partner shall hold such Interest as a Limited Partner unless the other Partners consent to such donee becoming a General Partner pursuant to Section 10(b);

(ii) a transfer resulting from the death of a Partner, in which event his entire Interest shall pass under the provisions of his last will and testament, or if such Partner shall have died intestate, to his personal representatives, but subject, however, to all the terms and provisions of the Agreement as then amended. If such Partner's Interest is specifically bequeathed, the legatee shall become a Limited Partner upon the execution and delivery of the consent and assumption referred to in Section 9(i)(iv) above. In the event such Partner's Interest passes to his administrators or to his executors and/or trustee under his will, such persons collectively shall become a Limited Partner in the Partnership. In the event that any such administrator, executor and/or trustee shall desire to sell such Interest or portion thereof to any third person, then compliance must be had with the provisions of Section 9(i) hereof, provided that if any such administrator, executor and/or trustee distributes any Interest in kind to the heirs, legatees or beneficiaries as the case may be, then such administrator, executor, and/or trustee need not first offer such Interest to the other Partners as provided in Section 9(i) hereof and such heirs, legatees, or beneficiaries as the case may be, collectively shall succeed to all of the rights, benefits and obligations of such Interest upon their execution and delivery of the consent assumption referred to in Section 9(i)(iv) above. Any

18

MID 00875

8 7 1 5 0 1 0 6

transferee of an Interest of a General Partner pursuant to this subparagraph shall hold such Interest as a Limited Partner unless the other Partners consent to such transferee becoming a General Partner pursuant to Section 10(b);

(iii) a transfer resulting from the dissolution and liquidation or partial liquidation of a trust, corporation or partnership (limited or general) that is a Partner, pursuant to which the entire Interest of the Partner is distributed to its beneficiaries, shareholders or partners, as the case may be; in the event such Partner's Interest passes as aforesaid, the recipients of such Interest shall be and become substitute Limited Partners upon execution of a counterpart or Amendment to this Agreement. Any transferee of an Interest of a General Partner shall hold such Interest as a Limited Partner unless the other Partners consent to such transferee becoming a General Partner pursuant to Section 10(b);

(iv) a transfer to any other Partner. Any transferee of an Interest of a General Partner shall hold such Interest as a Limited Partner unless the other Partners consent to such transferee becoming a General Partner pursuant to Section 10(b);

(v) a transfer to members of any Partner's family or to any trust the beneficiaries of which are members of any Partner's family. Any transferee of an Interest of a General Partner shall hold such Interest as a Limited Partner unless the other Partners consent to such transferee becoming a General Partner pursuant to Section 10(b); or

(vi) a transfer to a corporation or partnership controlled or under the common control of, or private foundation created by, any of the persons referred to in (i), (iv) or (v) above. Any transferee of an Interest of a General Partner, shall hold such Interest as a Limited Partner unless the other Partners consent to such transferee becoming a General Partner pursuant to Section 10(b);

(k) The parties intend that the exercise of any rights granted to Limited Partners by this Agreement shall be deemed action affecting only the agreement among the partners and not an action affecting the management and control of the business or otherwise inconsistent with Illinois statutes and law. The exercise of any such right, at the option of the General Partners, shall be conditioned upon the prior receipt by the General Partners of an opinion of legal counsel for the Limited Partners (such counsel to be chosen by the Limited Partners holding a majority of the Interests) satisfactory in form and substance to the General Partners, to the effect that such exercise will neither affect the Limited Partners' limited

19

MTD-00076

10/05/2005 11:53 FAX                JUPITER REALTY CORP                                    ☑022

3 7 1 5 0 1 0 6

liability nor have an adverse tax or other legal impact upon the Limited Partnership.

10. **Term, Dissolution, Winding-Up and Liquidation.**

(a) The Partnership shall terminate upon (i) December 31, 2036; (ii) the disposition of all Partnership interests in the Property, real estate and other assets, or (iii) the written consent of the General Partners and of Limited Partners owning a majority of 80 per cent of the Interests held by the Limited Partners as a group to dissolve the Partnership or to compel the sale of all or substantially all of the Partnership's assets.

(b) The death, legal incompetency, bankruptcy, dissolution (except by way of merger, consolidation or corporate reorganization), assignment for benefit of creditors, withdrawal, retirement, expulsion or transfer of interest of any Partner, shall not cause the dissolution of the Partnership, but instead shall cause the successor in interest of said Partner to become subject to the terms of this Agreement; provided, however, that a successor to the Interest of a General Partner shall become a Limited Partner with respect to said Interest and a substitute General Partner may be elected by the written consent of Partners owning a majority of the Interests in Profits of the Partners as a group; provided further that the spouse of a General Partner shall not be eligible for election as a substitute General Partner.

(c) Upon the dissolution of the Partnership, the General Partners shall wind up the affairs and sell or otherwise dispose at fair value of all of the assets of the Partnership as promptly as is consistent with obtaining the fair value thereof. Following the payment of or provision for, all debts and liabilities of the Partnership and all expenses of liquidation, and subject to the right of the General Partners to set up such cost reserves as they deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership, the proceeds of the liquidation and any other funds of the Partnership shall be distributed to the Partners in the ratio of the Capital Account balances of each Partner after adjustment of such Capital Accounts for any Profit or Loss in the year of liquidation, any profit or loss realized or to be realized on any property sold or disposed of as part of the liquidation, and any profit or loss which would be realized if any property distributed in kind had been sold at its fair market value by the Partnership.

11. **Power of Attorney.** Each Limited Partner hereby irrevocably makes, constitutes and appoints the General Partners, with full power of substitution, as his true and lawful attorney-in-fact, for him and in his name, place and stead and for his use and benefit to make, execute, acknowledge, file and record the

MID 00877

8 7 1 5 0 1 0 6

Agreement, certificates of limited partnership, all amendments thereto, certificates of doing business under an assumed name, or any other certificate, consent, or other instrument that may be required to be filed by the Partnership or the Partners under the laws of any state or other jurisdiction, and any other instruments or documents which may be required by law or which the General Partners deem advisable to file, including, but not limited to, any documents which may be required to effect the continuation of the Partnership, the admission of a substitute Limited Partner, the admission of an Additional Limited Partner, or the dissolution and termination of the Partnership, provided such is in accordance with the terms of this Agreement. It is expressly intended by each of the Limited Partners that the Power of Attorney granted under this Section 11 is coupled with an interest, is irrevocable, shall not be affected by, and shall survive (i) the subsequent transfer or assignment by any Limited Partner of the whole or any portion of his Interest until such time as all actions necessary to effect the substitution of the transferee or assignee thereof shall have been performed, including, but not limited to the execution, acknowledgement and filing of any and all necessary instruments; (ii) the performance of all actions to effectuate the liquidation and winding up of the affairs of the Partnership and to clear title to Partnership property; and (iii) to the extent permitted by law, the subsequent death, legal incompetency, incapacity, disability, merger, bankruptcy, receivership or dissolution of a Limited Partner. In case of a conflict between the provisions of this Agreement (and any amendments hereto) and any document executed or filed by the General Partners pursuant to the Power of Attorney granted herein, this Agreement shall govern. The Power of Attorney is intended to provide a simplified method for execution of documents and not to deprive a Limited Partner of any of his rights.

12.   **Expenses and Fees of General Partners.**   The General Partners may charge the Partnership for any direct expenses incurred by them in connection with the Partnership's business and all allocable portions of expenses (other than overhead) incurred in connection with both Partnership and other activities, such allocation to be determined on any basis selected by the General Partners consistent with good accounting practices.

13.   **Amendments.**   Special meetings may be called and amendments to this Agreement may be proposed upon notice by the General Partners or by Limited Partners owning not less than ten percent (10%) of the Interests held by all Partners as a group. Within ten (10) days following such notice, the General Partners shall submit to all the Limited Partners a verbatim statement of any proposed amendment, an opinion of legal counsel as to the legality and effect of such amendment, and the General Partners' recommendations as to the proposed amendment. A vote shall be

21

10/05/2006 11:53 FAX          JUPITER REALTY CORP          ☎024

0 7 1 5 0 1 0 6

taken at such special meeting or ballots may be submitted by mail. Such amendment shall be approved and become part of this Agreement upon the affirmative vote of all of the General Partners and all of the Limited Partners.

(14)  **Miscellaneous.**

(a)  All article and section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any provision.

(b)  All pronouns and variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

(c)  This Agreement may be executed in two or more counterparts, and all so executed shall constitute one agreement, binding upon each party and his successors in Interest independently and immediately upon execution of this Agreement by a Partner.

(d)  This Agreement, and the application or interpretation thereof, shall be governed, exclusively by its terms and by the laws of the State of Illinois.

(e)  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

(f)  All notices, requests and demands herein required or permitted to be given or made shall be deemed to be effectively served and delivered when delivered personally or when deposited in the United States certified mail, postage prepaid, return receipt requested, and

if intended for the Partnership, addressed to the Partnership at the principal office of the Partnership, and

if intended for a Partner, addressed to the Partner at his address appearing below his name on the signature pages hereof.

or to any such other person and/or at such other address designated by written notice given to the Partnership and all Partners in accordance herewith.

22

MID 00879

10/08/2005 11:55 FAX          JUPITER REALTY CORP                    ☎025

8 7 1 5 0 1 0 6

IN WITNESS WHEREOF the parties have sworn to and caused this Agreement to be executed as of February 2, 1987.

GENERAL PARTNERS

_____
Jerrold Wexler
2800 North Lake Shore Drive
Chicago, Illinois   60657

_____
Edward W. Ross
1240 North Lake Shore Drive
Chicago, Illinois   60610

LIMITED PARTNERS

_____
Jerrold Wexler, as nominee
2800 North Lake Shore Drive
Chicago, Illinois 60657

_____
Edward W. Ross, as nominee
1240 North Lake Shore Drive
Chicago, Illinois   60610

_____
Edward G. Imperatore
Arcorp Properties
Pershing Road
Weehawken, New Jersey   07087

23

MID 00880

8 7 1 5 0 1 0 6

## EXHIBIT  A

| GENERAL  PARTNERS | INTEREST |
|---|---|
| Jerrold Wexler | 1.0% |
| Edward W. Ross | 1.0% |

| LIMITED  PARTNERS | |
|---|---|
| Edward W. Ross, as nominee | 48.0% |
| Jerrold Wexler, as nominee | 48.0% |
| Edward G. Imperatore | 2.0% |

10/06/2006 11:55 FAX                    JUPITER REALTY CORP                    ☒027

## EXHIBIT B

## PARCEL 17 | 5 0 | 0 6

BEGINNING at a point in the northerly line of West 38th Street distant 340'-7" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 38th Street;

    1. Running thence westerly, along the northerly line of West 38th Street, 109'-5";

    2. thence northerly, parallel with the westerly line of Tenth Avenue, 98'-9" to the center line of block;

    3. thence easterly, parallel with the northerly line of West 38th Street and along the center line of block, 50'-0";

    4. thence northerly, parallel with the westerly line of Tenth Avenue, 46'-4";

    5. thence easterly, parallel with the southerly line of West 39th Street, 7'-0";

    6. thence northerly, parallel with the westerly line of Tenth Avenue, 7'-0";

    7. thence westerly, parallel with the southerly line of West 39th Street, 7'-0";

    8. thence northerly, parallel with the westerly line of Tenth Avenue, 45'-5" to a point in the southerly line of West 39th Street;

    9. thence easterly, along the southerly line of West 39th Street, 96'-8";

    10. thence southerly, along a line forming an angle of 79 -19'-10" on its westerly side with the preceding course, 200'-11 3/4" to the point or place of BEGINNING.

Reserving unto Seller the following described parcel as an easement for railroad transportation purposes:

All that portion of the below described parcel lying below an upper inclined plane having an elevation of 23.61 at the northerly line of West 38th Street, and an elevation of 21.86 at the southerly line of West 39th street bounded and described as follows:

BEGINNING at a point in the northerly line of West 38th Street distant 346'-0" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 38th Street;

    1. Running thence westerly, along the northerly line of West 38th Street, 57'-0";

    2. thence northerly, along a line forming an angle of 79 -17'-17" on its easterly side with the preceding course, 201'-0" to a point in the southerly line of West 39th Street;

    3. thence easterly, along the southerly line of West 39th Street, 57'-0";

MID 00882

10/05/2005 11:53 FAX                    JUPITER REALTY CORP                          @028

8 7 | 5 0 | 0 6         87150106

STATE OF ~~ILLINOIS~~ ——) NEW JERSEY
                        ) SS
COUNTY OF ~~C O O K~~ ——) HUDSON

    I, the undersigned, a Notary Public in and for said County,
in the State aforesaid, do hereby certify that EDWARD G.
IMPERATORE, personally known to me to the same person whose name
is subscribed to the foregoing instrument, appeared before me
this day in person and acknowledged that he signed, sealed and
delivered the said instrument as his free and voluntary act as a
Limited Partner for the uses and purposes therein set forth.

    GIVEN under my hand and notarial seal this _18th_ day
of _March_ , 198_7_.

Commission Expires: _4/10/90_

                                Notary Public

                      LISA CACCAVALE-SOTO
             NOTARY PUBLIC OF NEW JERSEY
         MY COMMISSION EXPIRES APRIL 10, 1990

DEPT-01 RECORDING            $29.25
T#1111  TRAN 2936 05/29/87 11:37:09
#6903 # A *-87-150104
COOK COUNTY RECORDER

MAR 1:25    38·00

MID 00883                                    87150106

3 7 1 5 0 1 0 6

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF C O O K    )

    I, the undersigned, a Notary Public in and for said County, in the State aforesaid, do hereby certify that JERROLD WEXLER, personally known to me to the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, as both a General Partner and a Limited Partner, for the uses and purposes therein set forth.

    GIVEN under my hand and notarial seal this _____ day of _____, 1987.

Commission Expires: _____

_____
Notary Public

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF C O O K    )

    I, the undersigned, a Notary Public in and for said County, in the State aforesaid, do hereby certify that EDWARD W. ROSS, personally known to me to the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act, as both a General Partner and a Limited Partner, for the uses and purposes therein set forth.

    GIVEN under my hand and notarial seal this _____ day of _____, 1987.

Commission Expires: _____

_____
Notary Public

MID 00884

3 7 1 5 0 1 0 6

## PARCEL III

BEGINNING at a point in the northerly line of West 47th Street distant 125'-0" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 47th Street;

1. Running thence westerly, along the northerly line of West 47th Street, 100'-0";

2. thence northerly, parallel with the westerly line of Tenth Avenue, 200'-10" to a point in the southerly line of West 48th Street;

3. thence easterly, along the southerly line of West 48th Street, 100'-0";

4. thence southerly, parallel with the westery line of Tenth Avenue, 200'-10" to the point or place of BEGINNING.

Reserving unto Seller the following described parcel as an easement for railroad transportation purposes:

All that portion of the below described parcel lying below an upper inclined plane having an elevation of 27.87 at the northerly line of West 47th Street, and an elevation of 30.00 at the southerly line of West 48th street bounded and described as follows:

BEGINNING at a point in the northerly line of West 47rd Street distant 145'-3" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 47th Street;

1. Running thence westerly, along the northery line of West 47th Street, 56'0";

2. thence northerly, parallel with the westerly line of Tenth Avenue, 200'-10" to a point in the southerly line of West 48th Street;

3. thence easterly, along the southerly line of West 48th Street, 56'-0";

4. thence southerly, parallel with the westerly line of Tenth Avenue, 200'-10" to the point or place of BEGINNING.

Elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey.

4. thence southerly, along a line forming an angle of 89 -17'-17" on its westerly side with the preceding course, 201'-0" to the point or place of BEGINNING.

Elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey.

## PARCEL II

BEGINNING at a point in the northerly line of West 43rd Street distant 125'-0" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 43rd Street;

1. Running thence westerly, along the northerly line of West 43rd Street, 100'-0";

2. thence northerly, parallel with the westerly line of Tenth Avenue, 200'-10" to a point in the southerly line of West 44th Street;

3. thence easterly, along the southerly line of West 44th Street, 100'-0";

4. thence southerly, parallel with the westerly line of Tenth Avenue, 200'-10" to the point or place of BEGINNING.

Reserving unto Seller the following described parcel as an easement for railroad transportation purposes:

All that portion of the below described parcel lying below an upper inclined plane having an elevation of 17.08 at the northerly line of West 43rd Street, and an elevation of 19.18 at the southerly line of West 44th street bounded and described as follows:

BEGINNING at a point in the northerly line of West 43rd Street distant 145'-10" westerly from the corner formed by the intersection of the westerly line of Tenth Avenue with the northerly line of West 43rd Street;

1. Running thence westerly, along the northerly line of West 43rd Street, 56'-0";

2. thence northerly, along a line forming an angle of 89 -54'-40" on its easterly side with the preceding course, 200'-10" to a point in the southerly line of West 44th Street;

3. thence easterly, along the southerly line of West 44th Street, 56'-0";

4. thence southerly, along a line forming an angle of 89 -54'-40" on its westerly side with the preceding course, 200'-10" to the point or place of BEGINNING.

Elevations refer to datum used by the Topographical Bureau, Borough of Manhattan which is 2.75 feet above the United States Coast and Geodetic Survey Datum, mean sea level, Sandy Hook, New Jersey.

MID 00886

## FIRST AMENDMENT TO

## WR WEST SIDE ASSOCIATES LIMITED PARTNERSHIP AGREEMENT

This instrument constitutes the first amendment to the
Partnership Agreement of WR West Side Associates Limited
Partnership, an Illinois limited partnership, dated as of
February 2, 1987.

1.   Effective February 2, 1987, Jerrold Wexler transferred
and assigned all of his 48% limited partnership interest in the
Partnership, which he held as nominee, to the following-named
persons, who are admitted to the Partnership as substitute
limited partners pursuant to the terms of the Partnership
Agreement, effective as of February 2, 1987:

| | |
|---|---|
| To--Howard R. Koven and Philip Rootberg, not personally, but as Successor Trustees of Susan Wexler Trust No. 18 | 11.125% |
| Howard R. Koven and Philip Rootberg, not personally, but as Successor Trustees of Tanya Wexler Trust No. 18 | 11.125% |
| Howard R. Koven, not personally, but as Trustee of JW Family Trusts Number 1 through 20 | 22.25 % |
| Ira A. Kipnis | 1.75 % |
| Irving J. Markin | 1.75 % |
| Total | 48.000% |

2.   Effective February 2, 1987, Edward W. Ross transferred
and assigned all of his 48% limited partnership interest in the
Partnership, which he held as nominee, to the following-named
persons, who are admitted to the Partnership as substitute

MID 00887

limited partners pursuant to the terms of the Partnership
Agreement, effective as of February 2, 1987:

| | |
|---|---|
| To--R-WIN Venture | 44.5 % |
| Ira A. Kipnis | 1.75 % |
| Irving J. Markin | 1.75 % |
| Total | 48.000% |

3.   Effective as of January 1, 1991, Jerrold Wexler
withdrew as a general partner and transferred and assigned to
Jerrold Wexler or his successor(s), not personally, but as
Trustee or as Successor Trustee(s) of the Jerrold Wexler
Declaration of Trust dated October 15, 1990, a 1.0% general
partnership interest in the Partnership.

4.   Jerrold Wexler or his successor(s), not personally, but
as Trustee or as Successor Trustee(s) of the Jerrold Wexler
Declaration of Trust dated October 15, 1990, is admitted to the
Partnership as a substitute general partner pursuant to the terms
of the Partnership Agreement, effective as of January 1, 1991.

5.   Effective December 23, 1992, Howard R. Koven, not
personally, but as Trustee of JW Family Trusts 1-20, transferred
and assigned to Philip Rootberg, not individually, but as
Successor Trustee of the Third Restatement of the Jerrold Wexler
Revocable Trust dated January 29, 1991 (the "JW Revocable
Trust"), all of said trust's 22.25% limited partnership interest
in the Partnership.

6.   Effective December 23, 1992, Philip Rootberg, not
individually, but as Successor Trustee of the JW Revocable Trust,

2

10/05/2005 11:04 FAX                    JUPITER REALTY CORP                    ☒034

is admitted to the Partnership as a substitute limited partner pursuant to the terms of the Partnership.

7.    Exhibit A of the Agreement is deleted and Exhibit A attached hereto is substituted therefor.

8.    As amended hereby, the Agreement shall remain in full force and effect.


Dated:    December 28, 1992

_____
Philip Rootberg, not
personally, but as Trustee of
the Jerrold Wexler Declaration
of Trust dated October 15,
1990

_____
Edward W. Ross

_____
Edward G. Imperatore

_____
Howard R. Koven

_____
Philip Rootberg, not
personally, but as successor
trustees of Susan Wexler Trust
No. 18

R-WIN VENTURE

By: _____
       Edward W. Ross
       General Partner

_____
Ira A. Kipnis

_____
Irving J. Markin

_____
Howard R. Koven

and
_____
Philip Rootberg, not
personally, but as successor
trustees of Tanya Wexler Trust
No. 18


[Signatures continued on following page]

3

MID 00889

Philip Hootberg, not
personally but as successor
trustee of the Third
Restatement of the Jerrold
Wexler Revocable Trust dated
January 29, 1991

[Signatures continued from preceding page]

4

MID 00890

## EXHIBIT A

| GENERAL PARTNER | INTEREST |
|---|---|
| Philip Rootberg, not personally, but as Successor Trustee of the Jerrold Wexler Declaration of Trust dated October 15, 1990 | 1 % |
| Edward W. Ross | 1 % |

**LIMITED PARTNERS**

| | |
|---|---|
| R-WIN Venture | 44.5 % |
| Philip Rootberg, not personally, but as Successor Trustee of the Third Restatement of the Jerrold Wexler Revocable Trust dated January 29, 1992 | 22.25 % |
| Howard R. Koven and Philip Rootberg, not personally, but as Successor Trustees of Susan Wexler Trust No. 18 | 11.125% |
| Howard R. Koven and Philip Rootberg, not personally, but as Successor Trustees of Tanya Wexler Trust No. 18 | 11.125% |
| Ira A. Kipnis | 3.5 % |
| Irving J. Markin | 3.5 % |
| Edward G. Imperatore | 2 % |
| Total | 100% |